# RECORD NO. 21-1536

In The

# United States Court Of Appeals
### For The Fourth Circuit

## In re: INFINITY BUSINESS GROUP, INC.,

*Debtor,*

------------------------

## ROBERT F. ANDERSON,
### as Chapter 7 Trustee for Infinity Business Group, Inc.,

*Trustee - Appellant,*

v.

## MORGAN KEEGAN & COMPANY, INC.,
## KEITH E. MEYERS,

*Defendants – Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### AT COLUMBIA

---

### JOINT APPENDIX – VOLUME I OF X
### PROCEEDINGS
### (Pages 1 - 451)

---

Mitchell Willoughby
Elizabeth Zeck
WILLOUGHBY &
  HOEFER, P.A.
930 Richland Street
Columbia, SC  29201
(803) 252-3300

R. Walker Humphrey, II
WILLOUGHBY &
  HOEFER, P.A.
133 River Landing Drive,
Suite 200
Charleston, SC  29492
(843) 619-4426

Gerald Malloy
MALLOY LAW FIRM
108 Cargill Way
Hartsville, SC  29550
(843) 339-3000

Robert C. Byrd
Alyson S. Podris
PARKER, POE, ADAMS &
  BERNSTEIN, LLP
200 Meeting Street
Suite 301
Charleston, SC  29401
843-727-2650

Olga Greenberg
Steven L. Polk
EVERSHEDS SUTHERLAND (US) LLP
Suite 2300
999 Peachtree Street, NE
Atlanta, GA  30309
404-853-8000

*Counsel for Appellant*                    *Counsel for Appellant*                    *Counsel for Appellees*

## **TABLE OF CONTENTS**
### Joint Appendix Volume I of X

Page:

**District Court Docket Sheet [3:19-cv-03096-JMC]** ...............................................1

**Notice of Appeal from the Bankruptcy Court,**
**with Attachment,**
    **filed October 31, 2019 [DE1]**...............................................................**8**

**Attachment:**

1. **Bankruptcy Transmittal Sheet [DE1-1]** ......................................**12**

    **Bankruptcy Record, [Case No. 12-80208-jw]:**

        **Robert F. Anderson, as Chapter 7 Trustee for**
        **Infinity Business Group, Inc.'s Complaint**
          **filed August 31, 2012 [BCDE1]**..............................................**15**

        **Judgment an Order**
        **Granting in Part and Denying in Part the Motion to Dismiss**
          **entered July 15, 2013 [BCDE71]** ..........................................**188**

        **Order**
        **Granting Default Judgment against Defendants**
          **entered January 9, 2014 [BCDE98]**....................................**191**

        **Notice of Settlement with Defendants John F. Blevins,**
        **The Law Office of John F. Blevins, LLC and**
        **Golden Ghost, Inc.**
          **filed April 6, 2016 [DCDE355]**.............................................**194**

        **Joint Stipulation of Undisputed Facts**
          **filed March 15, 2018 [BCDE788]**.........................................**198**

        **Order Denying Amended Motion**
        **Re: Hargett**
          **entered May 21, 2018 [BCDE963]** .......................................**208**

**i**

<u>**Bankruptcy Record, [Case No. 12-80208-jw], Continued:**</u>

**Order**
**On Trustee's Motion for Directed Verdict**
    **filed May 29, 2018 [BCDE974]** ...............................209

**Bankruptcy Court Judgment**
    **entered October 15, 2019 [BCDE1057]**...............................213

**Order Granting Judgment in Favor of**
**Meyers and Morgan Keegan**
    **entered October 15, 2019 [BCDE1058]**...............................215

**Notice of Filing –**
**Email Correspondence and Proposed Order**
    **dated December 03, 2019 [BCDE1066-1]** ...........................349

**Excerpts of Appellant's Opening Brief**
    **filed May 20, 2020 [DE17]**...............................355

**Excerpts of Appellant's Reply Brief**
    **filed September 30, 2020 [DE52]**...............................372

**Opinion and Order**
    **entered March 31, 2021 [DE61]**...............................379

**Judgment in a Civil Case**
    **entered March 31, 2021 [DE62]**...............................449

**Robert F. Anderson, as Chapter 7 Trustee for**
**Infinity Business Group, Inc., ("Trustee")**
**Notice of Appeal**
    **filed April 30, 2021 [DE64]** ...............................450

## <u>TABLE OF CONTENTS</u>
**Joint Appendix - Transcripts & Exhibits**
**Volume II of X**

Page:

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on April 23, 2018** ........................................................**452**

      **Preliminary Matters** ..............................................**453**

      **Testimony of <u>William Van Hoeven</u>:**

      **Direct Examination by Mr. Willoughby**................**454**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on April 24, 2018** ........................................................**492**

      **Testimony of <u>William Van Hoeven</u>:**

      **Cross Examination by Mr. Polk**...........................**493**

      **Testimony of <u>John P. Holmes, III</u>:**

      **Direct Examination by Ms. Gartley**.......................**518**

      **Testimony of <u>William Van Hoeven</u> *(Resumed)*:**

      **Redirect Examination by Mr. Willoughby**.............**531**

      **Testimony of <u>Jeffrey Lyle</u>:**

      **Direct Examination by Mr. Humphrey**..................**533**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on April 25, 2018** ................................................................**545**

    **Testimony of <u>Scott Matula</u>:**

    **Direct Examination by Mr. Willoughby**................................**546**

    **Testimony of <u>William Danielson</u>:**

    **Direct Examination by Mr. Humphrey** .................................**575**
    **Cross Examination by Mr. Polk**...........................................**593**

    **Testimony of <u>Keith Meyers</u>:**

    **Direct Examination by Mr. Willoughby**................................**596**

    **Testimony of <u>Evelyn Berry</u>:**

    **Direct Examination by Ms. Zeck** .........................................**597**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on April 26, 2018** ................................................................**609**

    **Testimony of <u>Alvin Berry</u>:**

    **Direct Examination by Ms. Zeck** .........................................**610**
    **Cross Examination by Ms. Podris**........................................**619**
    **Redirect Examination by Ms. Zeck** ....................................**624**

    **Testimony of <u>Luther Marshall</u>:**

    **Direct Examination by Mr. Willoughby**................................**626**

    **Testimony of <u>Paul Newberry</u>:**

    **Direct Examination by Mr. Humphrey** .................................**630**
    **Cross Examination by Mr. Polk**...........................................**633**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on April 26, 2018, Continued:**

    **Testimony of <u>George A. Fowler</u>:**

        **Direct Examination by Mr. Willoughby**................................**634**

    **Testimony of <u>Robert Caughman</u>:**

        **Direct Examination by Ms. Gartley**................................**643**
        **Cross Examination by Ms. Greenberg**................................**652**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on April 27, 2018**................................**654**

    **Testimony of <u>Robert Caughman</u> *(Resumed)*:**

        **Cross Examination by Ms. Greenberg**................................**655**
        **Redirect Examination by Ms. Gartley**................................**659**

    **Testimony of <u>John F. Blevins</u>:**

        **Direct Examination by Mr. Willoughby**................................**660**
        **Cross Examination by Mr. Byrd**................................**683**

    **Testimony of <u>Thomas V. Handy</u>:**

        **Direct Examination by Mr. Humphrey**................................**685**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on April 30, 2018**................................**689**

    **Testimony of <u>John P. Freeman</u>:**

        **Direct Examination by Mr. Willoughby**................................**690**
        **Cross Examination by Mr. Polk**................................**717**

**Transcript Excerpts of Trial Proceedings Before
The Honorable John E. Waites**
    **on May 1, 2018**..................................................................**733**

    **Testimony of <u>George Durant</u>:**

        **Direct Examination by Mr. Humphrey** .................................**734**
        **Resume Direct Examination by Mr. Humphrey** ....................**735**
        **Cross Examination by Mr. Polk** .........................................**786**
        **Redirect Examination by Mr. Humphrey** .............................**791**

**Transcript Excerpts of Trial Proceedings Before
The Honorable John E. Waites**
    **on May 2, 2018**..................................................................**793**

    **Testimony of <u>Howard Zandman</u>:**

        **Direct Examination by Mr. Polk** .........................................**794**
        **Cross Examination by Mr. Humphrey** .................................**802**
        **Redirect Examination by Mr. Polk** .....................................**810**

    **Testimony of <u>Wade Cordell</u>:**

        **Direct Examination by Ms. Greenberg** .................................**811**

**Transcript Excerpts of Trial Proceedings Before
The Honorable John E. Waites**
    **on May 3, 2018**..................................................................**814**

    **Testimony of <u>Wade B. Cordell</u>:**

        **Cross Examination by Mr. Willoughby**.................................**815**

    **Testimony of <u>Calvin Clark</u>:**

        **Direct Examination by Ms. Williams-Wass** ..........................**840**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
  **on May 4, 2018**....................................................................**862**

  **Testimony of <u>Calvin Clark</u> *(Resumed)*:**

    **Direct Examination by Ms. Williams-Wass** ...............**863**
    **Cross Examination by Mr. Humphrey** ........................**873**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
  **on May 7, 2018**....................................................................**882**

  **Testimony of <u>Calvin Clark</u> *(Resumed)*:**

    **Cross Examination by Mr. Humphrey** ........................**883**

  **Testimony of <u>Keith Meyers</u>:**

    **Direct Examination by Ms. Greenberg** .......................**884**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
  **on May 8, 2018**....................................................................**921**

  **Testimony of <u>Keith Meyers</u> *(Resumed)*:**

    **Direct Examination Ms. Greenberg**............................**922**
    **Cross Examination by Mr. Willoughby**........................**968**

## **TABLE OF CONTENTS**
### **Joint Appendix - Transcripts & Exhibits**
### **Volume III of X**

**Page:**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on May 9, 2018**......................................................................**982**

    **Testimony of <u>Keith Meyers</u> *(Resumed)*:**

    **Cross Examination by Mr. Willoughby**.................................**983**

**Transcript of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on May 10, 2018** ...................................................................**987**

    **Testimony of <u>Keith Meyers</u> *(Resumed)*:**

    **Cross Examination by Mr. Willoughby**.................................**988**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on May 11, 2018** ...................................................................**990**

    **Testimony of <u>Scott Ilario</u>:**

    **Direct Examination by Mr. Polk**.........................................**993**
    **Cross Examination by Mr. Humphrey**.................................**996**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on May 14, 2018** ...................................................................**1002**

    **Testimony of <u>Keith Meyers</u> *(Resumed)*:**

    **Direct Examination by Ms. Greenberg** ...............................**1003**
    **Cross Examination by Mr. Willoughby**...............................**1016**

**Transcript Excerpts of Trial Proceedings Before**
**The Honorable John E. Waites**
    **on May 21, 2018** ...............................................................**1017**

    **Testimony of <u>John Blevins</u> *(Resumed)*:**

    **Cross Examination by Mr. Polk**............................................**1018**

**<u>Trustee's Trial Exhibits</u>:**

    23    **Email from Sturgill to Meyers**
         **Re: Information Request,**
            **dated April 13, 2005**........................................**1025**

    24    **Email from Meyers to Grayson**
         **Re: Bryon Sturgill**
            **dated April 13, 2005**........................................**1028**

    28    **Letter from Wade Cordell to IBG Staff**
         **Re: Going Public**
            **dated September 12, 2005**................................**1033**

    29    **Email from Meyers to Sturgill**
         **Re: Greetings**
            **dated September 18, 2005**................................**1036**

    32    **Email from Grayson to Meyers,**
         **Re: Bryon Sturgill**
            **dated November 11, 2005**...............................**1038**

    37    **Morgan Keegan Presentation**
            **dated January 2006**........................................**1043**

    41    **Email from Meyers to IBG**
            **dated January 24, 2006**...................................**1076**

    44    **Email from W. Cordell to Blevins**
            **dated February 6, 006**....................................**1078**

**Trustee's Trial Exhibits, Continued:**

55    Organizational Meeting
         dated February 22, 2006......................................................1080

56    Email from Meyers to Grayson
       Re: Infinity Business Group
         dated February 22, 2006......................................................1102

72    Email from Meyers to Infinity Business
       Re: Infinity Draft Memorandum
         dated March 5, 2006 .........................................................1104

75    Email from W. Cordell to Meyers
       Re: Emailing: InfinityCollectionsReport
         dated March 10, 2006 .......................................................1230

78    Email from Clark to Meyers
       Re: IBG Memorandum
         dated March 10, 2006 .......................................................1233

80    Email from Meyers to Clark
       Re: IBG Audited Financials
         dated March 13, 2006 .......................................................1235

89    Email from Meyers to Blevins -
       Private Placement Engagement Letter FINAL
         dated March 16, 2006 .......................................................1244

90    Morgan Keegan IBG Private Placement
       Engagement Letter
         dated March 16, 2006 .......................................................1245

98    Email from Meyers to W. Cordell
       Re: 2006 Projected Financial Data (Draft)
         dated March 22, 2006 .......................................................1253

99    Email from Sturgill to Meyers & Clark
       Re: 2006 Projected Financial
         dated March 22, 2006 .......................................................1258

x

**Trustee's Trial Exhibits, Continued:**

100    Email from Meyers to W. Cordell
       Re: Website
              dated March 22, 2006 ..................................................1260

101    Email from W. Cordell to Catoe
       Re: IBG Website
              dated March 22, 2006 ..................................................1263

105    Email from Sturgill to Clark
       Re: 2006 Projections
              dated March 27, 2006 ..................................................1265

106    Email from Sturgill to Clark
       Re: 2005 Financial Data
              dated March 27, 2006 ..................................................1272

107    Email from Clark to Sturgill
       Re: IBG Memorandum
              dated March 29, 2006 ..................................................1280

112    2006 Closed Transactions
              dated April 7, 2006 ....................................................1354

115    Email from Meyers to W. Cordell
       Re: FW: Pipeline, with attachments
              dated April 13, 2006 ..................................................1360

117    Email Clark to Roche
       Re: IBG Pipeline, with attachments
              dated April 14, 2006 ..................................................1363

121    Email from Meyers
       Infinity Business Group - Additional Information
              dated April 25, 2006 ..................................................1368

125    Email from Meyers to Sturgill
       2005 AR Balance
              dated April 25, 2006 ..................................................1406

**Trustee's Trial Exhibits, Continued:**

127   **Email from Meyers to Sturgill**
     **Re: 2005 financials w CF**
         **dated April 26, 2006**............................................**1411**

150   **Email from Meyers to Sturgill**
     **Re: TeleCheck Accounting from 10-K**
         **dated May 15, 2006**............................................**1417**

151   **Email from Jones to Sturgill**
     **Re: TeleCheck Accounting from 10-K**
         **dated May 16, 2006**............................................**1420**

155   **Email from B. Cordell to Mackie**
     **Re: Line of Credit for IBG**
         **dated May 22, 2006**............................................**1423**

156   **Email from Meyers to W. Cordell**
     **Re: Regions Banker**
         **dated May 23, 2006**............................................**1428**

165   **Email from Reid to Meyers**
     **Re: Infinity**
         **dated May 30, 2006**............................................**1429**

169   **Email from Van Hoeven to Meyers**
     **Re: IBG Memorandum**
         **dated June 1, 2006**............................................**1430**

170   **Email from Meyers to Clark**
     **Re: Financials for Regions**
         **dated June 2, 2006**............................................**1493**

193   **Email from Bissette to Meyers**
     **Re: CFO Candidate**
         **dated June 16, 2006**............................................**1495**

206   **Email from Caballero to Bissette & Meyers,**
     **Re: Call with IBG**
         **dated June 23, 2006**............................................**1497**

# TABLE OF CONTENTS
## Joint Appendix - Transcripts & Exhibits
## Volume IV of X

Page:

**Trustee's Trial Exhibits, Continued:**

214 **Email from Bissette to Meyers**
**Re: Audit, Financial Due Diligence Items**
    dated July 8, 2006..................................................1502

223 **Email from Clark to Caballero**
**Re: Audit**
    dated July 18, 2006................................................1503

228 **Email from Clark to Meyers**
**Re: Note F, #5**
    dated July 24, 2006................................................1506

229 **Email from Clark to Meyers**
**Re: Note F, #5**
    dated July 24, 2006................................................1507

230 **Email from Clark, Calvin to Van Hoeven**
**Re: Daily Fees June 2006 Template**
    dated July 24, 2006................................................1508

235 **Email from Clark, Calvin to Van Hoeven**
**Re: 1stquarter Financial**
    dated July 26, 2006................................................1509

240 **Email from Meyers to Sturgill**
**Re: Few Questions**
    dated July 27, 2006................................................1511

243 **Email from W. Cordell to Blevins**
**Re: FW; Transfirst Visit**
    dated July 27, 2006................................................1513

<u>**Trustee's Trial Exhibits**</u>**, Continued:**

256  **Email from Meyers to W. Cordell, Sturgill & Van Hoeven**
     **Re: Bank Collection Rate**
          **dated August 3, 2006**.......................................................**1517**

266  **Email from Clark to Sturgill**
     **Re: Call with DLA**
          **dated August 7, 2006**.......................................................**1526**

268  **Email from Meyers to Clark**
     **Re: Call with DLA**
          **dated August 7, 2006**.......................................................**1527**

282  **Email from Clark to Bissette & Caballero**
     **Re: 2005 Monthly Financials Posted**
          **dated August 9, 2006**.......................................................**1530**

290  **Email from Clark to Meyers**
     **Re: IBG Update**
          **dated August 11, 20006**..................................................**1532**

292  **Email from Clark to Caballero;**
     **RE: 2005 Monthly Financials Posted**
          **dated August 14, 2006**.....................................................**1535**

301  **Email from W. Cordell to Meyers; Van Hoeven**
     **Re: Customer Accounts**
          **dated August 17, 2006**.....................................................**1539**

303  **Email from Cordell to Meyers**
     **RE: Customer Accounts**
          **dated August 17, 2006**.....................................................**1541**

307  **Email from Meyers to Grayson**
     **Re: Memphis - Sept 19-21**
          **dated August 18, 2006**.....................................................**1543**

**xiv**

**<u>Trustee's Trial Exhibits</u>, Continued:**

310    **Email from Clark to Isaacson**
       **Re: IBG Reg D Offering**
              **dated August 18, 2006**..................................................**1546**

321    **Email from Hardy to Meyers**
       **Re: Revised Draft of IBG PPM**
              **dated August 28, 2006**..................................................**1587**

330    **Email from Isaacson Whitlock Receiving Meyer's**
       **Re: IBG Private Placement Engagement Letter**
              **dated August 30, 2006** .............................................**1671**

334    **Email from Meyers to Sturgill & Clark**
       **Re: Financial Pages –**
       **(Grafton Audit as of Dec. 31, 2005)**
              **dated August 30, 2006**..................................................**1759**

336    **Certegy Inc. As of 12/31/05:**
       **Consolidated Balance Sheets,**
       **Statements of Income, Statement of Case Flow,**
       **Changes in Shareholders Equity, and**
       **Notes re: Financial Statements**
              **dated August 30, 2006**..................................................**1782**

350    **Email from Sturgill to Grafton**
       **Re: FW: Certegy 10-K**
              **dated September 01, 2006**.............................................**1792**

361    **Email from Sturgill to Grafton**
       **Re:2004 Financials-Restate.xls**
              **dated September 6, 2006**...............................................**1794**

362    **Email from Sturgill to Clark**
       **Re: Infinity Business Group Notes 2004-Restated**
              **dated September 6, 2006**...............................................**1799**

## Trustee's Trial Exhibits, Continued:

363    **Email from Sturgill to Grafton**
       **Re: 2005 Financials - Restated**
              **dated September 6, 2006**......................................**1803**

364    **Email from Clark to Sturgill**
       **Re: 2005 Financials-Restated**
              **dated September 6, 2006**......................................**1809**

366    **Email from Sturgill to Clark**
       **Re:2005 Financials- Restated**
              **dated September 6, 2006**......................................**1810**

367    **Email from Sturgill to Grafton**
       **Re:2005 financials- restated.xls**
              **dated September 6, 2006**......................................**1816**

368    **Email from Sturgill to Clark**
       **Re: 2004 financials-Restate**
              **dated September 6, 2009**......................................**1822**

371    **Email from Sturgill to Clark**
       **Re: Infinity Business Group Notes 2005a (2)**
              **dated September 8, 2006**......................................**1827**

375    **Email from W. Cordell to Meyers**
       **Re: Morgan Keegan**
              **dated September 11, 2006**......................................**1834**

377    **Email from Grayson to Meyers**
       **Re: IBG Website**
              **dated September 11, 2006**......................................**1836**

382    **Email from Clark to Sturgill**
       **Re: Infinity Business Group Notes 2005-Restated**
              **dated September 14, 2006**......................................**1838**

<u>**Trustee's Trial Exhibits**</u>**, Continued:**

389   **Email from Blevins to Hargrett**
**FW: Financial Section**
     **dated September 21, 2020.......................................1844**

395   **Email from Meyers to Eastsidepartners**
**Re: IBG Call with Eastside**
     **dated September 22, 2006.......................................1860**

397   **Email from Clark to Hargrett**
**Re: Copy of IBG Reg D Offering**
     **dated September 25, 2020.......................................1890**

399   **Email from Sturgill to Eastsidepartners**
     **dated September 25, 2020 .......................................1893**

400   **Email from Clark to W. Cordell**
**Re: IBG Management Presentation**
     **dated September 25, 2006.......................................1913**

401   **Email from Clark Hargrett**
**Re: 2005 Sample Check Analysis**
     **dated September 26. 2006.......................................1943**

402   **Email from Clark to Hargrett**
**Re: Hard Collections - Sample Size Inferences**
     **dated September 26, 2006.......................................1953**

409   **Email from W. Cordell to Blevins**
**Re: FW: Conference Call, IBG Presentation**
     **dated September 26, 2006.......................................1958**

431   **Email from Hardy**
**Re: IBG Private Placement Memorandum**
     **dated September 29, 2006.......................................1985**

434   **Email from Blevins to Nemphos**
**Re: IBG Private Placement Memorandum**
**Attorney/Client Privilege - Do Not Forward**
     **dated October 3, 2003 .......................................2079**

# TABLE OF CONTENTS
## Joint Appendix - Transcripts & Exhibits
## Volume V of X

Page:

**Trustee's Trial Exhibits**, Continued:

437  **Email from Hargrett to Clark**
     **Re: 2003, 2005 & 2004 Final Audit Reports**
          **dated October 4, 2006**......................................................**2087**

443  **Email from Clark to Hargrett**
     **Re: Financial Insert**
          **dated October 4, 2006**......................................................**2113**

453  **Email from Hargrett to Clark,**
     **Re: Financial Insert**
          **dated October 4, 2006**......................................................**2128**

454  **Email from Clark to Isaacson**
     **Re: Financial Insert**
          **dated October 5, 2006**......................................................**2131**

457  **Email from Meyers to Hargrett**
     **Re: IBG Management Presentation 2006 Shareholder**
          **dated October 5, 2006**......................................................**2164**

464  **Email from Franz to Nemphos & Blevins**
     **Re: IBG Offering Memo**
          **dated October 6, 2006**......................................................**2202**

465  **Email from Clark to Hargrett**
     **Re: New Financial Slide.ppt**
          **dated October 6, 2006**......................................................**2414**

472  **Management Presentation,**
     **Shareholder Meeting**
          **dated October 9, 2006**......................................................**2417**

xviii

**<u>Trustee's Trial Exhibits</u>, Continued:**

486    **Email from Clark to Hargett**
      **Re: Financial Moder and Unite Revenue/Cost Model**
         **Dated October 13, 2006** ......................................................**2457**

491    **Email from Clark to Hargrett**
      **Re: IBG Financial Model 10-14-06-CC**
         **dated October 14, 2006** ......................................................**2461**

493    **Email from Hargrett to Clark**
      **Re: Unit Cost**
         **dated October 16, 2006** ......................................................**2479**

500    **Email from Hargrett to Meyers**
      **Re: Eastside Meeting Shareholders**
         **dated October 17, 2006** ......................................................**2484**

525    **Email from Hardy Eastsidepartners**
      **Re: Infinity Business Group PPM**
         **dated October 25, 2006** ......................................................**2488**

# TABLE OF CONTENTS
## Joint Appendix - Transcripts & Exhibits
## Volume VI of X

Page:

**Trustee's Trial Exhibits, Continued:**

532    **Email from Meyers to Sturgill**
       **Re: Background Report**
               **dated October 27, 2006** ......................................................**2591**

534    **Email from Meyers to Eastsidepartners**
       **Re: Cordell Background Report**
               **dated October 28, 2006** ......................................................**2618**

545    **November 2006 Private Placement Memorandum of**
       **IBG Class a Common Stock at $1.25 per share**
               **dated November 3, 2006** ......................................................**2620**

554    **Email from W. Cordell to Meyers**
       **Re: Regions Bank & Capital Raise**
               **dated November 14, 2006** ......................................................**2712**

555    **Email from Meyers to Douglas**
       **Re: Meyers Outside Activity**
               **dated November 15, 2006** ......................................................**2713**

558    **Email from W. Cordell to Mutula**
       **Re: Investment Questions Per PPM**
               **dated November 19, 2006** ......................................................**2720**

569    **Email from Grayson to Meyers**
       **Re: Jones Day Bill for Infinity Business Group**
               **dated December 6, 2006** ......................................................**2724**

571    **Email from Meyers to W. Cordell & Sturgill**
       **Re: Electronic Clearinghouse Acquired**
               **dated December 18, 2006** ......................................................**2727**

**Trustee's Trial Exhibits**, Continued:

576   **IBG Letter of Transmittal to Tender Shares of**
      **Class A Common Stock pursuant to Offer to Purchase**
            dated December 22, 2006....................................................2729

580   **By-Laws, IBG, Inc.**
            dated January 2007........................................................2812

584   **Presentation for January 2007 Potential Investors**
            dated January 4, 2007...................................................2822

585   **Agenda, Board of Directors Meeting,**
            dated January 8, 2007 ..................................................2844

588   **Minutes of the Infinity Business Group**
      **Board of Directors Meeting**
            dated January 8, 2007...................................................2848

591   **Email from W. Cordell to Sturgill**
      **Re: Company Agreements**
            dated January 11, 2007.................................................2853

592   **Email from Meyers to W. Cordell & Sturgill**
      **Re: Update**
            dated January 25 2007.................................................2856

627   **Materials Presented at Board of Directors Meeting:**
      **PPM Offering Booklet Distribution**
            dated May 8, 2007 .....................................................2858

650   **Letter from Grafton & Co.**
      **Re: Engagement of Grafton & Co to Do Audit of**
      **IBG Financial Statements for y/e 2006 (unsigned)**
            dated August 8, 2007.................................................2864

677   **Email from W. Cordell to Berry**
      **Re: FW: Pay2Learn/Velocity Payments**
            dated October 26, 2007...............................................2866

**Trustee's Trial Exhibits**, Continued:

710    **Email from Meyers to Garfinkel**
**Re: IBG PPM**
      **dated December 14, 2007**......................................................**2869**

711    **Email from Meyers to Garfinkel**
**Re: Infinity Business Group (IBG)**
**Private Placement**
      **dated December 14, 2007**......................................................**3021**

713    **Email from Meyers to Karchmer**
**Re: Infinity Business Group (IBG)**
**Private Placement**
      **dated December 18, 2007**......................................................**3074**

724    **Email from W. Cordell to Sturgill**
**Re: Capital Raise**
      **dated January 2, 2008**......................................................**3077**

725    **Email from Meyers to Grayson**
**Re: Infinity Business Group Offering**
      **dated January 2, 2008**......................................................**3081**

## TABLE OF CONTENTS
### Joint Appendix - Transcripts & Exhibits
### Volume VII of X

Page:

<u>Trustee's Trial Exhibits</u>, Continued:

726    **Email from Woodman to Meyers**
      **Re: Infinity Business Group Offering**
        **dated January 2, 2008**....................................................**3091**

728    **Email from Meyers to Grayson**
      **Re: Discussion of Compensation**
        **dated January 4, 2008**....................................................**3102**

729    **Email from Meyers to Grayson**
      **Re: Infinity Business Group Offering**
        **dated January 8, 2008**....................................................**3104**

752    **IBG Spotlight Newsletter**
      **No dates available**........................................................**3120**

766    **Letter from Keith Meyers to Wade Cordell**
      **Re: Confirmation of IB's Engagement with MK**
      **to Act as Exclusive Financial Advisor**
        **dated April 24, 2008**......................................................**3130**

769    **Email from Snider to W. Cordell & Hargrett**
      **Re: Executive Summary**
        **dated April 25, 2008**......................................................**3135**

771    **Letter from Keith Meyers & Irena Snider to**
      **Michael Becker, Plexus Capital LLC**
      **Re: Thank You for Interest**
        **dated April 29, 2008**......................................................**3139**

777    **Email from Hargrett to Meyers**
      **Re: Q&A**
        **dated April 30, 2008**......................................................**3221**

**xxiii**

**Trustee's Trial Exhibits**, Continued:

783  **Email from Hargrett to Meyers**
     **Re: Overview of Receivables**
          dated April 20, 2008.............................................3224

809  **Email from Nutter to Meyers**
     **Re: IBG Term Sheet**
          dated May 14, 2008.............................................3234

816  **Email from Snider to Hargrett**
     **Re: Information In Banking Investments**
          dated May 22, 2008.............................................3238

821  **Letter from E. Sims to Wade Cordell**
     **Re: Mezzanine Financing**
          dated May 27, 2008.............................................3242

822  **Email from Sims to W. Cordell**
     **Re: Nancy Creek Capital Mezzanine Investment**
          dated May 28, 2008.............................................3245

843  **Email from Hargrett to Nutter**
     **Re: IBG Financial Forecast**
          dated June 5, 2008.............................................3246

898  **Email from Nutter to Hargrett**
     **Re: Confidential Info**
          dated July 1, 2008.............................................3266

899  **Email from Hargrett to Sturgill**
     **Re: FW: Confidential Info**
          dated July 1, 2008.............................................3365

904  **Email from Meyers to W. Cordell**
     **Re: Memo- 2008 Cash Flow**
          dated July 2, 2008.............................................3417

**Trustee's Trial Exhibits**, Continued:

905   Email from W. Cordell to Meyers
      Re: Memo-2008 Cash Flow
            dated July 2, 2008................................................................3420

906   Email from Meyers to W. Cordell
      Re: Memo- 2008 Cash Flow
            dated July 2, 2008................................................................3423

907   Email from Hargrett to Nutter
      Re: 2008 Cash Flow
            dated July 2, 2008................................................................3433

909   Email from Meyers to Hargrett
      Re: Financial Due Diligence Report Review (2)
            dated July 2, 2008................................................................3442

915   Email from Hargrett to Meyers
      Re: Financial Due Diligence Report Review
            dated July 2, 2008................................................................3446

917   Email from Meyers to W. Cordell
      Financial Due Diligence Report Review
            dated July 2, 2008................................................................3452

921   Email from Hargrett to Nutter
      Re: Review of Financial Due Diligence Review
            dated July 2, 2008................................................................3456

1020  Email from Grayson to Meyers
      Re: Deals Update
            dated September 6, 2008........................................................3463

1044  Email from Meyers to Blevins
      Re: Pay-O-Matic Check Cashing
            dated September 18, 2008......................................................3465

## Trustee's Trial Exhibits, Continued:

1046  Email from Caughman to B. Cordell
      Re: IBG
            dated September 23, 2008.................................................3470

1097  Email from Meyers to W. Cordell
      Re: FW: 401K
            dated December 2, 2008.................................................3475

1125  Email from W. Cordell to Meyers
      Re: New Bank Contract
            Dated February 4, 2009.................................................3479

1142  State of the Company Address by
      Wade B. Cordell, President
            dated February 24, 2009.................................................3484

1182  Email from Lyle to W. Cordell
      Re: Regions
            dated April 30, 2009.................................................3499

1229  Email from Caughman to Sturgill
      Re: shareholder written consent tally
            dated August 27, 2009.................................................3503

1273  Email from Hargrett to Reed
      Re: Final Settlement Documents
            dated October 7, 2009.................................................3505

1317  Email from Meyers to Sturgill
      Re: FW: Infinity
            dated November 16, 2009 .................................................3584

# TABLE OF CONTENTS
### Joint Appendix - Transcripts & Exhibits
### Volume VIII of X

Page:

**Trustee's Trial Exhibits, Continued:**

1409  Letter from Margaret Roberts to Thomas Windsor,
 Investigator for the Office of S.C. Attorney General
 Re: Infinity Business Group, Inc. File No. 09089
   dated March 15, 2010 ......................................................3589

1446  Financial Statements 2006-2009 Restated
   dated July 14, 2010........................................................3628

1455  Email from Caughman to Pitch
 Re: Draft Bankruptcy Schedules
   dated August 13, 2010....................................................3634

1508  Letter from John Grayson, Jr. to Tommy Windsor, Jr.
 Re: Morgan Keegan & Co., Inc. No. 09089, &
 "Keith Meyers Compensation 2005 - 2010"
   dated April 20, 2011 ......................................................3720

1572  Danielson Aff. Ex. 1: Financials – Composite Ex. List –
 IBG Financials from 2003 – 2008
   dated May 5, 2016 .........................................................3722

1605  Marshall Aff. Ex. 15:
 Shipment Confirmation Receipt 3-17-11
   dated May 6, 2016 .........................................................3802

1614  Caughman Aff. Ex. 4:
 Stockholder List
   dated May 11, 2016 .......................................................3848

1615  Caughman Aff. Ex. 5:
 IBG - Issues Review
   dated May 11, 2016 .......................................................3864

**Trustee's Trial Exhibits**, Continued:

1627  Durant Damages with
      Prejudgment Interest at 8.75%
            dated May 1, 2018 ...............................................3872

1635  Deposition Excerpts of Michael Potter
            taken November 14, 2015 ...............................3873

1636  Deposition Excerpts of O. Bradshaw Cordell
            taken January 28, 2016 ....................................3881

1638  Meyers with KBW on Capital Club Radio
            dated January 23, 2018...................................3885

1639  Email from Meyers to W. Cordell
      Re: Capital Raise
            dated March 2, 2016 .......................................3887

**Defendants' Trial Exhibits:**

1     Revised Financial Composite 2003-2008 Financials,
      Management Rep Letters, Engagement Letters
            dated April 23, 2008....................................3889

4     MK Agreement Signed by Bryon Sturgill
            dated March 16, 2006 ...................................3962

14    Email from Nemphos to Jones
      Re: IBG Memorandum
            dated May 13, 2006 ......................................3970

16    Redacted - Letter from E&Y
            dated May 23, 2006 ......................................3974

18    Email from Blevins to W. Cordell
      Re: FW: Fw: IBG
            dated June 3, 2006.......................................3975

**Defendants' Trial Exhibits, Continued:**

19    **Email from Caballero to Meyers & Bissette**
      **Re: Hard Collections Data 2006**
          **dated June 16, 2006**......................................................**3977**

23    **Email from Van Hoeven to McKay**
      **Re: IBG/FARS Company information**
          **dated July 24, 2006**......................................................**3979**

49    **Email from Franz to Isaacson & Meyers**
      **Re: Diligence Materials Needed for the IBG PPM**
          **dated October 4, 2006**......................................................**4042**

69    **Email from Meyers to Hargrett**
      **Re: 2006 Audit**
          **dated November 10, 2006**......................................................**4045**

78    **Email from W. Cordell to Sturgill**
      **Re: Raising Capital**
          **dated March 11, 2007**......................................................**4046**

79    **Email from W. Cordell to Blevins**
      **Re: Management Presentation**
          **dated March 20, 2007**......................................................**4047**

98    **Email from W. Cordell to Meyers**
      **Re: IBG Financial Model 2008 #1**
          **dated December 10, 2007**......................................................**4048**

99    **Email from Hargrett to Blevins,**
      **W. Cordell, B. Cordell & Sturgill**
      **Re: IBG Information**
          **dated December 11, 2007**......................................................**4051**

100    **Email from W. Cordell to Blevins**
      **Re: Bills**
          **dated January 10, 2008**......................................................**4058**

<u>**Defendants' Trial Exhibits**</u>, **Continued:**

111   **Email from Nutter to Meyers**
      **Re: IBG Term Sheet**
            **dated May 14, 2008** .............................................................**4061**

129   **Email from W. Cordell to Sturgill**
      **Re: auditors and GAAP**
            **dated July 21, 2008**.............................................................**4065**

130   **Email from Hargrett to Sturgill & W. Cordell**
            **dated July 21, 2008:** .............................................................**4067**

131   **Email from Wade Cordell to Brad Cordell**
      **Re: Haines's Remarks**
            **dated July 21, 2008**.............................................................**4069**

141   **Email from Blevins to Lewis**
      **No Subject - Investment Offer**
            **dated October 24, 2008** .......................................................**4073**

# **TABLE OF CONTENTS**
### **Joint Appendix - Transcripts & Exhibits**
### **Volume IX  of X**

**Page:**

**Defendants' Trial Exhibits**, Continued:

244    **IBG Meeting Minutes Binder**
       **dated May 18, 2003** ...............................................4121

## **TABLE OF CONTENTS**
### **Joint Appendix Volume X of X**

Page:

**Defendants' Trial Exhibits, Continued:**

281   **Email from Blevins to W. Cordell & Sturgill**
    **Re: FW: IBG Call**
        **dated October 28, 2006** .......................................................**4751**

291   **Email from Myers to Clark**
    **Re: FW IBG Audited Financials**
        **dated March 13, 2006** ........................................................**4754**

292   **Email from Clark to Meyers**
    **Re: Call with DLA**
        **dated August 7, 2006**.........................................................**4767**

293   **Email from Clark to Isaacson**
    **Re Financial Insert 10/5/2006 HH**
        **dated October 5, 2006** ......................................................**4770**

300   **Email from Clark to Caballero & Bissette**
    **Re: Questions About IBG Financials**
        **dated August 14, 2006**......................................................**4803**

303   **Email from Hardy to Franz**
    **Re: IBG Private Placement Memo**
        **dated September 29, 2006**..................................................**4805**

308   **Deposition Excerpts of Haines Hargrett**
        **taken on November 1, 2010** ................................................**4899**

309   **Deposition of Haines Hargrett 2015**
        **taken November 19, 2015** ..................................................**4905**

311   **Deposition Excerpts of Brent Grafton**
        **taken on December 1, 2015** ................................................**4924**

**<u>Defendants' Trial Exhibits</u>, Continued:**

314    **Email (redacted) from Blevins to**
**Nemphos, Isaacson & W. Cordell**
**Re: Conference Call Request**
       **dated October 31, 2006** ......................................**4931**

315    **Email (redacted) from W. Cordell to Nemphos**
**Re: Meyers Conference Call Request**
       **dated October 31, 2006**......................................**4933**

327    **Email from Blevins to W Cordell, Sturgill & Smith**
       **dated November 4, 2006** ...................................**4935**

328    **Redline PPM**
       **dated November 3 2006** ...................................**5014**

329    **Email from Blevins to Isaacson,**
**Nemphos, W. Cordell & Sturgill**
**Re: PPM corrections**
       **dated November 6, 2006** ...................................**5103**

331    **FW Email from Wade Cordell to Brad Cordell of DLA**
**email to Blevins, Cordell, and Sturgill**
**Re: PPM $6M offering**
       **dated November 7, 2006** ...................................**5104**

332    **Email from Blevins to W Cordell & Sturgill**
**Re: Don't Think We Can Trust Keith Meyers**
       **dated November 13, 2006** .................................**5190**

334    **Email from Blevins to**
**W. Cordell, B. Cordell & Hargrett**
**Re: issues with M, organ Keegan deal**
       **dated August 8, 2008**......................................**5192**

<u>**Joint Stipulated Trial Exhibits Admitted into Evidence:**</u>

42    **Employment Agreement of Haines Hargrett**
        **dated September 19, 2006**................................................**5194**

48    **Employment Agreement O. Bradshaw Cordell**
    **MK-58-0049313 through MK-58-0049326**
        **dated March 20, 2007** ............................................**5205**

49    **Employment Agreement Wade B. Cordell**
    **MK-58-0049295 through MK-58-0049303**
        **dated March 20, 2007** ............................................**5219**

50    **IBG Employment Agreement Biron K. Sturgill (executed)**
        **dated March 20, 2007** ............................................**5228**

51    **Employment Agreement John F. Blevins**
    **MK-58-0049286 through MK-58-0049294**
        **dated March 20, 2007** ............................................**5236**

53    **Email from Hargrett to W. Cordell & Sturgill**
    **Re: January Financials,**
        **dated March 26, 2007** ............................................**5245**

54    **Email from Hargrett to Sturgill**
    **Re: 2006 Proposed Audit Adjustments**
        **dated March 27, 2007** ............................................**5255**

66    **Email from Hargrett to W. Cordell, Sturgill & Blevins**
    **Re: 2007 Audit Revised**
        **dated April 15, 2008**............................................**5260**

78    **Email from Hargrett to Sturgill**
    **Re: Accounts Receivable Processing**
    **dated June 19, 2008** ............................................**5270**

94    **Email from Hargrett to Sturgill,**
    **Re: FW: Missed your call – Update**
        **dated April 23, 2009**............................................**5274**

**<u>Joint Stipulated Trial Exhibits Admitted into Evidence</u>, Continued:**

111     *U.S. v. Hargrett*, Cr. No: 2:14-857,
        Information [ECF No. 1]
                filed December 15, 2014 .....................................................5276

112     *U.S. v. Grafton*, Cr. No: 2:14-855,
        Information [ECF No. 1]
                filed December 15, 2014.....................................................5281

113     *U.S. v. Grafton*, Crim. No. 2:14-cr-855,
        Plea [22]
                filed March 24, 2015 .........................................................5282

114     *U.S. v. Hargrett*, Cr. No: 2:14-857,
        Plea [ECF No. 19]
                filed April 15, 2015............................................................5283

APPEAL,CLOSED

# U.S. District Court
## District of South Carolina (Columbia)
## CIVIL DOCKET FOR CASE #: 3:19-cv-03096-JMC

In Re: Infinity Business Group Inc
Assigned to: Honorable J Michelle Childs
Case in other court:  US Bankruptcy Court, 10-06335
                    USCA, 21-01536
Cause: 28:0158 Bankruptcy Appeal from Judgment/Order

Date Filed: 10/31/2019
Date Terminated: 03/31/2021
Jury Demand: None
Nature of Suit: 422 Bankruptcy Appeal (801)
Jurisdiction: Federal Question

**Appellant**

**Robert F Anderson**
*as Chapter 7 Trustee for Infinity Business
Group Inc*

represented by **Elizabeth Zeck**
Willoughby and Hoefer PA
PO Box 8416
930 Richland Street
Columbia, SC 29202-8416
803-252-3300
Fax: 803-256-8062
Email: ezeck@willoughbyhoefer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mitchell Myron Willoughby**
Willoughby and Hoefer PA
PO Box 8416
930 Richland Street
Columbia, SC 29202-8416
803-252-3300
Fax: 803-256-8062
Email:
mwilloughby@willoughbyhoefer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Walker Humphrey , II**
Willoughby and Hoefer
151 Meeting Street
Suite 325
Charleston, SC 29401
843-619-4426
Email: whumphrey@willoughbyhoefer.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Appellee**

-1-

| | | |
|---|---|---|
| **Morgan Keegan & Company Inc** | represented by | **Olga Greenberg** |

Eversheds Sutherland US LLP
999 Peachtree Street NE
Suite 2300
Atlanta, GA 30309-3996
404-853-8000
Email: olgagreenberg@eversheds-sutherland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert C Byrd**
Parker Poe Adams and Bernstein LLP
200 Meeting Street
Suite 301
Charleston, SC 29401
843-727-2665
Fax: 843-727-2680
Email: bobbybyrd@parkerpoe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**S Lawrence Polk**
Eversheds Sutherland US LLP
999 Peachtree Street NE
Suite 2300
Atlanta, GA 30309-3996
404-853-8000
Email: larrypolk@eversheds-sutherland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alyson Smith Podris**
Parker Poe Adams and Bernstein LLP
200 Meeting Street
Suite 301
Charleston, SC 29401
843-727-6312
Email: smithpodris@parkerpoe.com
*ATTORNEY TO BE NOTICED*

**Appellee**

| | | |
|---|---|---|
| **Keith E Meyers** | represented by | **Olga Greenberg** |

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert C Byrd**
(See above for address)
*LEAD ATTORNEY*

CM/ECF - scd

*ATTORNEY TO BE NOTICED*

**S Lawrence Polk**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alyson Smith Podris**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Trustee**

**Robert F Anderson**
Robert F Anderson Law Office
PO Box 76
Columbia, SC 29202
803-252-8600

| Date Filed | # | Docket Text |
|---|---|---|
| 10/31/2019 | 1 | NOTICE of APPEAL FROM BANKRUPTCY COURT. Bankruptcy Court case number 10-6335-jw., filed by Robert F Anderson. (Attachments: # 1 Bankruptcy Transmittal Sheet)(mflo, ) See 7 and 8 for additional attachments. (Entered: 11/01/2019) |
| 11/05/2019 | 3 | MOTION for Extension of Time by Robert F Anderson. Response to Motion due by 11/19/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Willoughby, Mitchell) (Entered: 11/05/2019) |
| 11/08/2019 | 4 | Amended MOTION for Extension of Time by Robert F Anderson. Response to Motion due by 11/22/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Willoughby, Mitchell) (Entered: 11/08/2019) |
| 11/08/2019 | 5 | **TEXT ORDER granting 4 Motion for Extension of Time until 12/3/19 for Trustee's to file and serve Statement of Issues and Designation of Matter on Appeal and MK Defendant's have until 1/7/2020 to file and serve designation of additional items to be included in the record; finding as moot 3 Motion for Extension of Time; Directed by Honorable Joseph F Anderson, Jr on 11/8/19.(mflo, ) (Entered: 11/08/2019)** |
| 12/03/2019 | 7 | Additional Attachments to Main Document 1 Bankruptcy Appeal. First attachment description: Appellant's Statement of Issues and Designation of Matter . (Willoughby, Mitchell) (Entered: 12/03/2019) |
| 01/06/2020 | 8 | Additional Attachments to Main Document 1 Bankruptcy Appeal. First attachment description: MK Defendants' Designation of Record on Appeal . (Byrd, Robert) (Entered: 01/06/2020) |
| 01/15/2020 | 9 | NOTICE: The District Court will reference the electronic Bankruptcy record for the purpose of this appeal unless otherwise noted. re 1 Bankruptcy Appeal, 7 Appellant's Statement of Issues and Designation of Record on Appeal, 8 Appellees' Designation of Record on Appeal. (Bankruptcy Case No. 10-6335-jw) (mflo, ) (Entered: 01/15/2020) |
| 03/03/2020 | 10 | DESIGNATED RECORD(BANKRUPTCY) by Bankruptcy Court re 1 Bankruptcy Appeal (kdouglass-USBK, ) (Entered: 03/03/2020) |

| 03/04/2020 | 11 | **TEXT ORDER Appellant's Brief shall be filed within 45 days from the date of this order, the Appellee's Brief shall be filed 45 days from the filing of Appellant's Brief and Appellant's Reply Brief shall be filed 20 days after the filing of the Appellant's Brief. re 10 Designated Record(Bankruptcy) filed by Bankruptcy Court, ( Appellant Brief due by 4/20/2020, Appellant Reply Brief due by 6/25/2020, Appellee Brief due by 6/5/2020) Directed by Honorable Joseph F Anderson, Jr on 3/4/20. (mflo, )** (Entered: 03/04/2020) |
|---|---|---|
| 03/17/2020 | 12 | MOTION for Extension of Time by Robert F Anderson. Response to Motion due by 3/31/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Willoughby, Mitchell) (Entered: 03/17/2020) |
| 03/26/2020 | 13 | RESPONSE in Opposition re 12 MOTION for Extension of Time Response filed by Keith E Meyers, Morgan Keegan & Company Inc.Reply to Response to Motion due by 4/2/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Byrd, Robert) (Entered: 03/26/2020) |
| 03/27/2020 | 14 | REPLY to Response to Motion re 12 MOTION for Extension of Time Response filed by Robert F Anderson. (Willoughby, Mitchell) (Entered: 03/27/2020) |
| 03/30/2020 | 15 | **TEXT ORDER Appellant's Motion to Enlarge Page Limitations and For Extension of Time (ECF No. 12) granted in part and denied in part. The request for extension of time is granted in full. Trustee's deadline to file and serve his initial brief is now May 20, 2020. The Defendants' deadline to file and serve their response brief is now August 4, 2020. Trustee's deadline to file and serve his reply brief is 30 days after the receipt of Defendants' brief. This extension is in lieu of and not in addition to the twenty-one day extension in the District Court's March 16, 2020 standing order. The motion to enlarge page limitations is granted in part and denied in part. Each parties' initial briefs shall be no more than 100 pages in 12-point font. The reply brief shall be no more than 50 pages in 12-point font. granting in part and denying in part 12 MOTION for Extension of Time filed by Robert F Anderson, 1 Bankruptcy Appeal filed by Robert F Anderson, ( Appellant Brief due by 5/20/2020. Appellant Appellee Brief due by 8/4/2020. Reply Brief due by 9/4/2020.) Directed by Honorable Joseph F Anderson, Jr on 3/30/20. (mflo, )** (Entered: 03/30/2020) |
| 04/03/2020 | 16 | NOTICE of Appearance by Alyson Smith Podris on behalf of Keith E Meyers, Morgan Keegan & Company Inc (Podris, Alyson) (Entered: 04/03/2020) |
| 05/20/2020 | 17 | Appellant's BRIEF by Robert F Anderson. Appellee Brief due by 6/19/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Willoughby, Mitchell) See the following for additional attachments: 18 19 20 21 22 23 24 25 26 27 28 29 30 31 32 33 34 35 36 37 38 39 40 41 (Entered: 05/20/2020) |
| 05/20/2020 | 18 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 1 . (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 19 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 2 . (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 20 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 3 . (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 21 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 4 . (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 22 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 5 . (Willoughby, Mitchell) (Entered: 05/20/2020) |

| 05/20/2020 | 23 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 6. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 24 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 7. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 25 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 8. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 26 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 9. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 27 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 10. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 28 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 11. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 29 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 12. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 30 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 13. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 31 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 14. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 32 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 15. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 33 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 16. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 34 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 17. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 35 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 18. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 36 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 19. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 37 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 20. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 38 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 21. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 39 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 22. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 40 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 23. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 05/20/2020 | 41 | Additional Attachments to Main Document 17 Appellant's Brief. First attachment description: Appellant's Appendix - Part 24. (Willoughby, Mitchell) (Entered: 05/20/2020) |
| 08/04/2020 | 42 | Appellee's BRIEF by Keith E Meyers, Morgan Keegan & Company Inc. Appellant Reply Brief due by 8/18/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Byrd, Robert) See Additional Attachments 43 , 44 , 45 , 46 , 47 and 48 . (Entered: 08/04/2020) |

| 08/04/2020 | 43 | Additional Attachments to Main Document 42 Appellee's Brief. First attachment description: Appendix - Part 1 . (Byrd, Robert) (Entered: 08/04/2020) |
| 08/04/2020 | 44 | Additional Attachments to Main Document 42 Appellee's Brief. First attachment description: Appendix - Part 2 . (Byrd, Robert) (Entered: 08/04/2020) |
| 08/04/2020 | 45 | Additional Attachments to Main Document 42 Appellee's Brief. First attachment description: Appendix - Part 3 . (Byrd, Robert) (Entered: 08/04/2020) |
| 08/04/2020 | 46 | Additional Attachments to Main Document 42 Appellee's Brief. First attachment description: Appendix - Part 4 . (Byrd, Robert) (Entered: 08/04/2020) |
| 08/04/2020 | 47 | Additional Attachments to Main Document 42 Appellee's Brief. First attachment description: Appendix - Part 5 . (Byrd, Robert) (Entered: 08/04/2020) |
| 08/04/2020 | 48 | Additional Attachments to Main Document 42 Appellee's Brief. First attachment description: Appendix - Part 6 . (Byrd, Robert) (Entered: 08/04/2020) |
| 08/19/2020 | 49 | Case Reassigned to Judge Honorable J Michelle Childs. Judge Honorable Joseph F Anderson, Jr no longer assigned to the case. (glev, ) (Entered: 08/19/2020) |
| 09/03/2020 | 52 | Appellant's REPLY BRIEF by Robert F Anderson. (Attachments: # 1 Appendix Supplemental Appendix)(Willoughby, Mitchell) (Entered: 09/03/2020) |
| 10/08/2020 | 56 | MOTION for Hearing by Robert F Anderson. Response to Motion due by 10/22/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Willoughby, Mitchell) (Entered: 10/08/2020) |
| 10/22/2020 | 57 | RESPONSE in Opposition re 56 MOTION for Hearing Response filed by Keith E Meyers, Morgan Keegan & Company Inc.Reply to Response to Motion due by 10/29/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Byrd, Robert) (Entered: 10/22/2020) |
| 10/26/2020 | 58 | **TEXT ORDER: This matter is before the court on Appellant Robert Anderson's Motion for Oral Argument (ECF No. 56) pursuant to Bankruptcy Rule 8019 in his capacity as Chapter 7 Trustee for Infinity Business Group, Inc. The court DENIES the Motion (ECF No. 56 ) WITHOUT PREJUDICE. The court will first review the extensive briefing by the parties and determine whether such a hearing is necessary. If the court determines that a hearing is necessary, the court will narrow the issues for a hearing and reasonably accommodate the parties. Signed by Honorable J Michelle Childs on 10/26/2020.(asni, )** (Entered: 10/26/2020) |
| 03/31/2021 | 61 | **ORDER AND OPINION The court AFFIRMS the order and judgment issued by the Bankruptcy Court on October 15, 2019 and DISMISSES the Trustee's appeal. Signed by Honorable J Michelle Childs on 3/31/2021. (asni, )** (Main Document 61 replaced on 3/31/2021) (asni, ). Modified to replace PDF document to correct case caption on 3/31/2021 (asni, ). (Entered: 03/31/2021) |
| 03/31/2021 | 62 | JUDGMENT affirming the decision of the US Bankruptcy Court and dismissing the appeal. (asni, ) (Entered: 03/31/2021) |
| 04/01/2021 | 63 | ***DOCUMENT E-MAILED 61 Order to US Bankruptcy Court (asni, ) (Entered: 04/01/2021) |
| 04/30/2021 | 64 | NOTICE OF APPEAL as to 61 Order, 62 Judgment by Robert F Anderson. - Filing fee $ 505, receipt number 0420-9813833. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Willoughby, Mitchell) additional attachment entry 67 added on 5/17/2021 (asni, ). (Entered: 04/30/2021) |

| 04/30/2021 | 65 | Transmittal Sheet for Notice of Appeal to USCA re 64 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (asni, ) (Entered: 05/03/2021) |
| 05/14/2021 | 67 | Additional Attachments to Main Document 64 Notice of Appeal,. First attachment description: Appellant's Statement of Issues and Designation of Record on Appeal . (Willoughby, Mitchell) (Entered: 05/14/2021) |
| 05/24/2021 | 68 | DESIGNATION of Record on Appeal by Keith E Meyers, Morgan Keegan & Company Inc re 64 Notice of Appeal, (Byrd, Robert) (Entered: 05/24/2021) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 10/07/2021 09:20:46 | | | |
| **PACER Login:** | tmstuckey:2830027:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-03096-JMC |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE:<br>Infinity Business Group, Inc.,<br><br>　　　　　　　　　　　　　Debtor. | Bankruptcy Case No. 10-06335-jw |
| Robert F. Anderson, as Chapter 7<br>Trustee for Infinity Business Group, Inc.,<br><br>　　　　　　　　　　　　　Plaintiff,<br>vs.<br><br>Wade Cordell, O. Bradshaw Cordell,<br>Cordell, L.L.C., The Cordell Group, L. L. C.,<br>Gibson Commons, L.L.C., Bryon K. Sturgill,<br>Sturgill & Associates Inc., John F. Blevins,<br>Law Offices of John F. Blevins, L.L.C.,<br>Golden Ghost, Inc., Haines H. Hargrett,<br>Donald Brent Grafton, D. Larry Grafton,<br>Grafton and Company, P.L.L.C., Morgan<br>Keegan & Company, Inc., Keith E. Meyers,<br><br>　　　　　　　　　　　　　Defendants. | Adv. Proc. No. 12-80208-jw |

**NOTICE OF APPEAL**

　　　Plaintiff Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc., hereby

appeals to the United States District Court from the Judgment and Order of the United States

Bankruptcy Court filed October 15, 2019 in the above-captioned matter.

1

-8-

The parties to the Judgment and Order from which this appeal is taken are as follows:

| PARTIES | ATTORNEYS |
|---|---|
| 1.  Morgan Keegan & Company, Inc. | S. Lawrence Polk, Esquire<br>Olga Greenberg, Esquire<br>EVERSHEDS SUTHERLAND (US) LLP<br>999 Peachtree Street NE, Suite 2300<br>Atlanta, GA 30309-3996<br>(404) 853-8000<br>larrypolk@eversheds-sutherland.com<br>olgagreenberg@eversheds-sutherland.com<br><br>Robert C. Byrd, Esquire<br>PARKER POE ADAMS & BERNSTEIN LLP<br>200 Meeting Street, Suite 301<br>Charleston, SC 29401<br>(843) 727-2650<br>bobbybyrd@parkerpoe.com |
| 2.  Keith E. Meyers | S. Lawrence Polk, Esquire<br>Olga Greenberg, Esquire<br>EVERSHEDS SUTHERLAND (US) LLP<br>999 Peachtree Street NE, Suite 2300<br>Atlanta, GA 30309-3996<br>(404) 853-8000<br>larrypolk@eversheds-sutherland.com<br>olgagreenberg@eversheds-sutherland.com<br><br>Robert C. Byrd, Esquire<br>PARKER POE ADAMS & BERNSTEIN LLP<br>200 Meeting Street, Suite 301<br>Charleston, SC 29401<br>(843) 727-2650<br>bobbybyrd@parkerpoe.com |

[*signature page follows*]

Respectfully submitted,


s/ Mitchell Willoughby
Mitchell Willoughby, Fed. Bar No. 4702
Elizabeth Zeck, Fed. Bar No. 6627
R. Walker Humphrey, II, Fed. Bar No 12524
WILLOUGHBY & HOEFER, P.A.
Post Office Box 8416
Columbia, South Carolina 29202
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
whumphrey@willoughbyhoefer.com


*Counsel for Robert F. Anderson, as Chapter
7 Trustee for Infinity Business Group, Inc.*


October 29, 2019
Columbia, South Carolina

3

**-10-**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE:<br>Infinity Business Group, Inc.,<br><br>Debtor. | Bankruptcy Case No. 10-06335-jw |
| Robert F. Anderson, as Chapter 7<br>Trustee for Infinity Business Group, Inc.,<br><br>Plaintiff,<br>vs.<br><br>Wade Cordell, O. Bradshaw Cordell,<br>Cordell, L.L.C., The Cordell Group, L. L. C.,<br>Gibson Commons, L.L.C., Bryon K. Sturgill,<br>Sturgill & Associates Inc., John F. Blevins,<br>Law Offices of John F. Blevins, L.L.C.,<br>Golden Ghost, Inc., Haines H. Hargrett,<br>Donald Brent Grafton, D. Larry Grafton,<br>Grafton and Company, P.L.L.C., Morgan<br>Keegan & Company, Inc., Keith E. Meyers,<br><br>Defendants. | Adv. Proc. No. 12-80208-jw |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of October, 2019, a true and correct copy of the foregoing **NOTICE OF APPEAL** was filed electronically and notice of its filing will be served on all parties at their email address on file with the Court's electronic filing system.

s/ Mitchell Willoughby
Mitchell Willoughby, Fed. Bar No. 4702

4

**-11-**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA

IN RE:

Infinity Business Group, Inc.
                    Debtor(s)

Robert F Anderson, as Chapter 7 Trustee
                    Plaintiff(s)

          v.

O. Bradshaw Cordell, Wade Cordell, Sturgill
& Associates Inc., Haines H. Hargrett,
Law Offices of John F. Blevins, LLC, Cordell
L.L.C, The Cordell Group L.L.C, Gibson
Commons L.L.C, Bryon K Sturgill, John F
Blevins, Golden Ghost, Inc., Donald Brent
Grafton, D. Larry Grafton, Grafton and
Company, P.L.L.C, Morgan Keegan &
Company, Inc., Keith E. Meyers,
Morgan Keegan & Associates, LLC.
                    Defendant(s).

CASE NUMBER 10-06335-JW

ADVERSARY PROCEEDING NO: 12-80208-JW

TRANSMITTAL OF NOTICE OF APPEAL

**FILED**

OCT 3 1 2019

United States Bankruptcy Court
Columbia, South Carolina

To:    The Honorable Robin L. Blume, Clerk of the United States District Court, District of South
Carolina

       Pursuant to Bankruptcy Rule 8003, I hereby transmit the Notice of Appeal filed by Robert F.
Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc. on October 29, 2019.

Laura A. Austin, Clerk of Court
United States Bankruptcy Court

BY: _____
       M. Stalvey, Appeals Clerk

Columbia, South Carolina

October 31, 2019

**-12-**

Parties to appeal are:

For Appellant:

| | |
|---|---|
| Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc. | Mitchell M Willoughby, Fed. Bar No. 4702<br>Elizabeth Zeck, Fed. Bar No. 6627<br>R. Walker Humphrey, II, Fed. Bar No 12524<br>Willoughby & Hoefer, PA<br>PO Box 8416<br>Columbia, SC 29202<br>(803) 252-3300<br>mwilloughby@willoughbyhoefer.com<br>ezeck@willoughbyhoefer.com<br>whumphrey@willoughbyhoefer.com |

For Appellee:

| | |
|---|---|
| Morgan Keegan & Company, Inc. | S. Lawrence Polk, Esquire<br>Olga Greenberg, Esquire<br>EVERSHEDS SUTHERLAND (US) LLP<br>999 Peachtree Street NE, Suite 2300<br>Atlanta, GA 30309-3996<br>(404) 853-8000<br>larrypolk@eversheds-sutherland.com<br>olgagreenberg@eversheds-sutherland.com<br><br>Robert C. Byrd, Esquire<br>PARKER POE ADAMS & BERNSTEIN LLP<br>200 Meeting Street, Suite 301<br>Charleston, SC 29401<br>(843) 727-2650<br>bobbybyrd@parkerpoe.com |
| Keith E. Meyers | S. Lawrence Polk, Esquire<br>Olga Greenberg, Esquire<br>EVERSHEDS SUTHERLAND (US) LLP<br>999 Peachtree Street NE, Suite 2300<br>Atlanta, GA 30309-3996<br>(404) 853-8000<br>larrypolk@eversheds-sutherland.com<br>olgagreenberg@eversheds-sutherland.com |

**-13-**

Robert C. Byrd, Esquire
PARKER POE ADAMS & BERNSTEIN
LLP
200 Meeting Street, Suite 301
Charleston, SC 29401
(843) 727-2650
bobbybyrd@parkerpoe.com

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document      Page 1 of 173

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc. | **DEFENDANTS**<br>Wade Cordell, O. Bradshaw Cordell, Cordell, L.L.C., The Cordell Group, L.L.C., et al. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Anderson & Associates, P.A., 208 Candi Lane, Suite B, Columbia, SC 29210 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐Debtor  ☐U.S. Trustee/Bankruptcy Admin<br>☐Creditor  ☐Other<br>☑Trustee | **PARTY** (Check One Box Only)<br>☐Debtor  ☐U.S. Trustee/Bankruptcy Admin<br>☐Creditor  ☑Other<br>☐Trustee |

| **CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED) |
|---|
| |

| **NATURE OF SUIT** |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☑ 12-Recovery of money/property - §547 preference
☑ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑Check if this case involves a substantive issue of state law | ☐Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐Check if a jury trial is demanded in complaint | Demand  $ |
| Other Relief Sought | |

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document    Page 2 of 173

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR Infinity Business Group, Inc. | BANKRUPTCY CASE NO. 10-06335-jw | |
| DISTRICT IN WHICH CASE IS PENDING<br>South Carolina | DIVISION OFFICE<br>Columbia | NAME OF JUDGE<br>Waites |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ Marilyn E. Gartley | | |
| DATE<br>August 31, 2012 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Marilyn E. Gartley | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**-16-**

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:<br><br>Infinity Business Group, Inc.,<br><br>                                        Debtor. | Case No. 10-06335-jw<br><br>Chapter 7 |
| Robert F. Anderson, as Chapter 7<br>Trustee for Infinity Business Group, Inc.,<br><br>                                        Plaintiff,<br><br>vs.<br><br>Wade Cordell, O. Bradshaw Cordell,<br>Cordell, L.L.C., The Cordell Group, L. L. C.,<br>Gibson Commons, L.L.C., Bryon K. Sturgill,<br>Sturgill & Associates Inc., John F. Blevins,<br>Law Offices of John F. Blevins, L.L.C.,<br>Golden Ghost, Inc., Haines H. Hargrett,<br>Donald Brent Grafton, D. Larry Grafton,<br>Grafton and Company, P.L.L.C., Morgan<br>Keegan & Company, Inc., Keith E. Meyers,<br><br>                                        Defendants. | C/A No. _____<br><br><br><br>**COMPLAINT** |

1.      Plaintiff is the duly-appointed Chapter 7 Trustee for the Infinity Business Group, Inc. ("Debtor").

2.      Debtor is a Nevada Corporation, which filed for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of South Carolina on September 1, 2010 (the "Petition Date").

3.      Defendant Wade B. Cordell ("Wade Cordell") is a citizen and resident of the State of South Carolina, and may be served at 100 Birkdale Court, Lexington, South Carolina, and who and served as an officer and director of the Debtor.

4.      Defendant O. Bradshaw Cordell ("Brad Cordell") is a citizen and resident of the State of South Carolina, and may be served at 1339 Hendrix Landing Road, Lexington, South Carolina, and who and served as an officer and director of the Debtor.

1

**-17-**

5.      Defendant Cordell, L.L.C., ("CLLC") is an entity organized and existing under the laws of the State of South Carolina, created on or about May 22, 2002.

6.      Defendant The Cordell Group, L.L.C., ("CGLLC") is an entity organized and existing under the laws of the State of South Carolina, created on or about February 2, 2007.

7.      Defendant Gibson Commons, L.L.C., ("Gibson") is an entity organized and existing under the laws of the State of South Carolina, created on or about January 7, 2005.

8.      Defendant Bryon K. Sturgill ("Sturgill") is a citizen and resident of the State of Kentucky and served as an officer and director of the Debtor.

9.      Defendant Sturgill & Associates, Inc., ("S&A") is or was a corporation organized and existing pursuant to the laws of the State of Kentucky.

10.      Defendant John F. Blevins ("Blevins") is an attorney licensed to practice in the State of Maryland, is, upon information and belief, a citizen and resident of the State of Maryland; lives, upon information and belief, part-time in the State of South Carolina; and served as an officer and director of the Debtor.

11.      Defendant Law Offices of John F. Blevins, L.L.C., ("Blevins Law") does or has done business as Blevins Law Group; is or was an entity previously or presently organized and existing under the laws of the State of Maryland; and provided legal services to the Debtor at relevant times as set forth herein.

12.      Defendant Golden Ghost, Inc. ("Golden") is a corporation organized and existing under the laws of the State of Nevada.

13.      Defendant Haines H. Hargrett ("Hargrett") is a Certified Public Accountant, licensed as such in a State of the United States; became the Chief Financial Officer of the Debtor in 2006, and served in such office until July of 2010.

14.      Defendant Donald Brent Grafton ("Brent Grafton") is a citizen and resident of the State of Mississippi, and provided accounting services for the Debtor at the direction of corporate insiders of the Debtor.

15.      Defendant D. Larry Grafton ("Larry Grafton") is a citizen and resident of the State of Mississippi, and provided accounting services for the Debtor at the direction of corporate insiders of the Debtor.

**-18-**

16.        Defendant Grafton and Company, PLLC ("Grafton") is or was an entity organized and existing under the laws of the State of Mississippi, and provided accounting services for the Debtor at the direction of corporate insiders of the Debtor.

17.        Defendant Morgan Keegan & Company, Inc. ("MK") is a corporation organized and existing under the laws of Tennessee; registered with the SEC as a broker-dealer and investment advisor; doing business within the State of South Carolina; and was engaged to provide securities, marketing and consulting advice to the Debtor.

18.        Defendant Keith E. Meyers ("Meyers"), is, upon information and belief, a citizen and resident of the State of Georgia and is an employee of MK.

**JURISDICTION**

19.        This is an action by the Chapter 7 Trustee in his capacity as representative of the Bankruptcy Estate, asserting the rights of the Debtor under 11 U.S.C. § 541; and acting in his strong-arm capacity under 11 U.S.C. §§ 544, 547, 548, and 550.

20.        This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 as well as pursuant to 28 U.S.C. §§ 1331 and 1367. Certain claims are core proceedings under 28 U.S.C. § 157.

21.        Venue of this matter is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**FACTUAL ALLEGATIONS**

**1. FORMATION OF DEBTOR AND RELATED ENTITIES**

22.        The Debtor was incorporated under the laws of the State of Nevada on May 8, 2003.

23.        At Debtor's organizational meeting, on May 18, 2003, Sturgill, Michael Potter, and David Shaffer were named the initial board of directors of the Debtor.

24.        On October 9, 2003, FARS Marketing, Inc. ("FARS Marketing") was incorporated under the laws of the State of South Carolina, for the purpose of marketing check collection services, Wade Cordell and Brad Cordell were its initial incorporators.

25.        On December 22, 2003, Federal Automated Recovery Systems, Inc. ("FARS") was incorporated under the laws of the States of Nevada; Sturgill served on the initial board of directors of FARS and was its first treasurer; William Van Hoeven served as its President.

26.        On December 22, 2003, FARS entered into an agreement with the Debtor for the processing and collection of dishonored checks through the electronic recovery systems,

3

**-19-**

primarily utilizing computerized collection through direct removal of funds from the bank accounts of the makers of dishonored checks.

27.    Debtor's Articles of Incorporation ("Articles"), filed on May 8, 2003, with the Nevada Secretary of State, provided that the "purpose for which the corporation is organized shall be: To engage in any lawful activity." Section Eight of the Articles ("Section Eight") provides that "No director or officer . . . of the corporation shall be personally liable to the corporation or any of its stockholders for damages for a breach of fiduciary duties or for any act or omission unless the breach involves: (1) acts or omissions which involve intentional misconduct, fraud, or a knowing violation of law; or (2) the payment of dividends as identified in violation of Section 78.300 of the Nevada Revised Statutes." Debtor's Amended and Restated Articles of Incorporation, filed with the Nevada Secretary of State on January 3, 2007, also include Section Eight.

28.    Debtor's By-Laws provide in Article IV, section 7, that the directors serving on its board of directors ("Board of Directors") were not entitled to compensation for such service. However, this section continues that service on the Board of Directors does not preclude a serving director from also serving or being compensated by the Debtor for his or her service to the Debtor in a different capacity.

a.    Article IV, Section 1 provides that "[t]he business and affairs of this corporation shall be managed by its Board of Directors, six (6) in number . . . [that] shall be elected by the stockholders at the annual meeting of stockholders of the corporation, and each director shall be elected for the time of one year, and until his successor shall be elected and shall qualify or until his earlier resignation or removal."

b.    Article IV, Section 8 provides that "[a]ny director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except that when cumulative voting is permitted, if less than the entire Board is to be removed, no director may be removed without cause if the votes cast against his removal would be sufficient to elect him if then cumulatively voted at an election of the entire Board of Directors, or, if there be classes of directors, at an election of the class of directors of which he is a part."

4

**-20-**

    c.  Article V, Section 1 provides that "[t]he executive officers of the corporation shall be chosen by the directors and shall be a Chairman of the Board, President, Secretary/Treasurer, Chief Operating Officer, Corporate Counsel, Chief Executive Officer, and Processing Center Director," as well as the ability for the Board of Directors to choose one or more Vice Presidents and other officers it shall deem necessary.

    d.  Article V, Section 2 provides that the salaries of all officers and agents of the corporation shall be fixed by the Board of Directors.

    e.  Article V, Section 3 provides that officers of the corporation hold office for one year and until their successors are chosen and have qualified. Further that any officer or agent appointed by the Board of Directors may be removed by the Board of Directors whenever the Board of Directors finds in its judgment that the best interest of the corporation will be served thereby.

    f.  Article V, Section 4 provides that the Chairman of the Board "shall preside at all meetings of the stockholders and directors; he shall see that all orders and resolutions of the Board are carried into effect, subject, however, to the right of the directors to delegate any specific powers, except such as may be by statute exclusively conferred on the Chairman, to any other officer or officers of the corporation. He shall execute bonds, mortgages and other contracts requiring a seal, under the seal of the corporation. He shall be EX-OFFICIO a member of all committees."

    g.  Article V, Section 5 provides that the President/CEO "shall attend all sessions of the Board. The CEO/President shall be the chief executive officer of the corporation; he shall have general and active management of the business of the corporation, subject, however, to the right of the directors to delegate any specific powers, except such as may be by statute exclusively conferred on the President, to any other officer or officers of the corporation. He shall have the general power and duties of supervision and management usually vested in the office of President of a corporation."

    h.  Article V, Section 6 provides that the Secretary shall "attend all sessions of the Board and all meetings at the stockholders and act as clerk thereof, and record all

the votes of the corporation and the minutes of all its transactions in a book to be kept for that purpose and shall perform like duties for all committees of the Board of Directors when required. He shall give, or cause to be given, notice of all meetings of the stockholders and of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or President, and under whose supervision he shall be. He shall keep in safe custody the corporate seal of the corporation, and when authorized by the Board affix the same to any instrument requiring it."

    i.    Article V, Section 7 provides that the Treasurer shall "have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall keep the moneys of the corporation in separate accounts to the credit of the corporation. He shall disburse the funds of the corporation as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the President and other directors, at the regular meetings of the Board, or whenever they may require it, an account of all his transactions as Treasurer and of the financial condition of the corporation."

    j.    Article XII provides that "[t]he Corporation shall indemnify and save harmless any Director or Officer for any legal actions brought against them while acting in a Corporate capacity. Such indemnification shall include the payment of attorney's fees on behalf of the Officer or Director."

29.      Prior to the Merger of FARS and Fars Marketing with the Debtor, on May 18, 2003, Sturgill was elected as President of the Debtor. On December 22, 2003, Sturgill ceased serving in his role as President and became the Treasurer of the Debtor. On October 2, 2004, Sturgill ceased serving his role as Debtor's Treasurer and became Debtor's Chief Executive Officer. Sturgill served as Debtor's Chief Executive Officer until May 4, 2010, when he requested a leave of absence. On July 19, 2010, Sturgill was removed as Debtor's Chief Executive Officer by resolution of the Board of Directors. In addition, Debtor served as a member of Debtor's Board of Directors from May 18, 2003, until the Debtor's cessation of business.

30.      Wade Cordell was elected as President and Chairman of the Board of Directors on October 2, 2004. On October 9, 2006, Wade Cordell was re-elected as President and Chairman

of the Board of Directors and served in this capacity until August 15, 2009, when he was terminated by the Board of Directors for "cause." On March 20, 2007, Wade Cordell signed an employment contract with the Debtor as President for a term ending on March 31, 2010. Wade Cordell was elected to the Board of Directors on September 22, 2004, and served until August 15, 2009, when he was removed from this position by his fellow board members.

31.       Brad Cordell was elected to the Board of Directors on September 22, 2004, and served on the board until August 15, 2009, when he was removed by his fellow board members for cause. On October 2, 2004, Brad Cordell was elected as Debtor's Vice President of Operations. On October 4, 2004, Brad Cordell was elected as Debtor's Chief Operating Officer and served in this position until August 15, 2009, when he was terminated by members of the Board of Directors. On March 20, 2007, Brad Cordell executed an employment contract with Debtor to serve as Debtor's Chief Operating Officer for a term ending March 31, 2010.

32.       Blevins was elected as a director on September 22, 2004, and served on the board until August 15, 2009, when he was removed by his fellow board members. On October 2, 2004, Blevins was elected as Debtor's Vice President/Corporate Counsel. On October 4, 2004, Blevins' position became that of Corporate Counsel, and he served as Debtor's Corporate Counsel until his termination on August 15, 2009 by the Board of Directors for cause. On March 20, 2007, Blevins executed an employment contract with Debtor to serve as Debtor's Corporate Counsel for a term ending on March 31, 2010. On February 24, 2009, Blevins was elected to also serve as Debtor's Vice President of Risk Management and Compliance, and his tenure in this position ceased on or before August 15, 2009.

33.       Hargrett entered into an employment contract with the Debtor on September 19, 2006, to serve the Debtor as its Chief Financial Officer, and he served in this position until he was suspended by a July 15, 2010 Resolution of the Board of Directors pending further investigation into his conduct in that capacity.

### 2. BUSINESS MODEL OF THE DEBTOR

34.       The Debtor, from its inception, was in the business of collecting dishonored checks for entities that had received those checks ("Payees") as payment from third party Payors ("Check Writers") through electronic check recovery ("ECR").

35.       For example:

        a.   A Payee would forward dishonored checks directly to the Debtor.

    b.  Utilizing job-specific software, the Debtor would electronically present the dishonored checks to the Check Writer's bank for collection.

    c.  If there were sufficient funds in the Check Writer's account upon the electronic presentation, then the check amount would be paid to the Debtor's account.

    d.  For this service the Debtor was entitled to collect a statutory fee (which varies in amount from state to state) from the bank account of the Check Writer.

    e.  Moneys so collected were divided into two funds, designated as: (a) the "Face Amount" (the face amount of the check, which is the legal property of the Payee); and (b) the "Collection Fee" (the statutorily-allowed amount of collection fee permitted by the state in which the Check Writer and its bank account are located, and is the property of the Debtor).

    f.  Upon its collection, the Face Amount was property of the Payee that had received the dishonored check and was required to be kept in a separate account for the Payee ("Face Account") until statutory or contract statutes of limitations had run for challenging the electronic check recovery by the Check Writer.

    g.  The Debtor was to transfer to the Payee the Face Amount.

36.    The Debtor also provided electronic check conversion ("ECC") services where, at the point of sale, a check is scanned through a machine that automatically captures the information from a paper check and introduces that information into the payment systems in an electronic format, using automatic entries resulting in deposits of funds from the transaction directly into a customer's bank account. The Debtor provided its customers with the ability to accept checks electronically via the point of sale, by phone, or via the internet.

37.    The Debtor offered customers utilizing its ECC services two additional services:

    a.  account verification ("Account Verification Program") which disclosed whether the check writer is a known writer of bad checks; and

    b.  a guarantee service ("Guarantee Program") where the Debtor guaranteed payment on any check that is approved through the Account Verification Program.

38.    Debtor's ECC services provided the Debtor with income in the form of processing fees.

39.    Debtor's Account Verification Program provided the Debtor with income, as every time a customer accesses the database, the customer is charged a fee for this access.

40.      Debtor's Guarantee Program charged the customer a percentage of the face amount of the check. If the check is returned for insufficient funds and the check is not collected through electronic re-presentment of the check, then the Debtor pays the Payee the Face Amount of the check. However, if the Debtor collects the check then it returns the Face Amount of the check to the Payee less the percentage of the Face Amount of the check payable to the Debtor while retaining the Collection Fee.

41.      Debtor also provided Hard Collections services to its customers; therefore, in the event that the Debtor cannot collect a check electronically, the check is transferred to hard collections where Check Writers are contacted directly by the Debtor's employees. For this service, Debtor collected a contingent portion of the Face Amount of the check as a collection fee (typically 25%); the Collection Fee; and an administration fee to be recovered from the Check Writer.

42.      The Debtor, after 2006, marketed its products to banks as a service that banks could give to its customers; the banks would receive a percentage of the Collection Fee for each check collected.

43.      At the Merger Date and thereafter, the Debtor had great potential as a money-making business.

### 3. DEVELOPMENT OF BUSINESS RELATIONS AND MERGER

44.      In 2003, Wade Cordell, Brad Cordell, and Blevins approached Sturgill to offer FARS Marketing's services to the Debtor.

45.      FARS Marketing was successful in obtaining accounts for which the Debtor could provide services and receive Collection Fees in return.

46.      FARS Marketing utilized a multi-level marketing strategy or plan, selling what it called "Territories" to individuals for varying amounts, with a guarantee to the purchasers of a territory that any Payee within an owned Territory that used the Debtor's check collection services would receive a certain amount for any and all checks collected by the Debtor, typically between $1.00 and $10.00 per check.

47.      On June 10, 2004, Sturgill, Michael Potter, and David Schaffer, as the majority of shareholders of the Debtor, voted for the Debtor to acquire all of the capital stock of FARS and FARS Marketing.

9

48.　　On August 1, 2004, the directors of FARS, the directors of FARS Marketing, and the directors of the Debtor, adopted identical resolutions, agreeing to merge FARS and FARS Marketing into the Debtor.

49.　　On September 15, 2004, a Share Purchase Agreement was executed by the Debtor; FARS and FARS Marketing agreed for the Debtor to purchase all of the outstanding shares of FARS Marketing and FARS.

  a.　All of the outstanding shares of FARS Marketing were owned by TGT Group, Inc., whose shareholders were Wade Cordell, Brad Cordell, Blevins, Paul Newberry, Jeff Lyle, Bob Caughman, and David Price (collectively, "TGT Shareholders").

  b.　On September 1, 2004, FARS Marketing had 100,000 shares of outstanding capital stock and FARS had 100,000 shares of outstanding capital stock, and both FARS Marketing and FARS received equal allotments of the Debtor's stock in exchange for tendering their stock to the Debtor.

50.　　On September 22, 2004, at a special meeting of the Board of Directors of the Debtor, Wade Cordell, Brad Cordell, Blevins, Sturgill, Potter, and Van Hoeven were elected as directors of the Debtor.

51.　　On October 1, 2004 (the "Merger Date"), FARS Marketing and FARS merged into the Debtor as the successor corporation after the Merger.

52.　　On the Merger Date, the Debtor acquired the assets and liabilities of FARS and FARS Marketing.

53.　　On the Merger Date, FARS was approximately $200,000.00 out-of-trust in its Face Account, which was assumed by the Debtor.

54.　　On the Merger Date, the Debtor assumed liability for all the Territories.

55.　　On October 4, 2004, the Debtor held the annual meeting of the Debtor's stockholders ("2004 Annual Stockholders Meeting"), and the stockholders from the stock transfer ledger ("Formation Shareholders") were identified as follows with their respective shares of Class A Preferred stock held (collectively, "Formation Shares"); this was the Debtor's first stock issuance:

  a.　Sturgill – 20,000 shares; Wade Cordell – 20,000 shares; Brad Cordell – 20,000 shares; Sturgill & Associates – 20,000 shares; Mike Potter – 20,000 shares; John

10

**-26-**

Blevins – 20,000 shares; Van Hoeven – 20,000 shares; John Powell – 20,000 shares; Bob Caughman – 20,000 shares; Jeff Lyle – 20,000 shares; Paul Newberry – 20,000 shares; David Price – 10,000 shares; Mike Till – 5,000 shares; Steve Roland – 5,000 shares.

56.    On October 4, 2004, the Formation Shares were circumscribed by the Formation Shareholders' execution of a Redemption Buy/Sell Agreement which provided for restrictions on the sale or transfer of the Formation Shares, evidenced by a restrictive legend.

57.    Subsequently, on October 4, 2004, at the first regularly-scheduled meeting of the Board of Directors of the Debtor ("First Meeting"), Wade Cordell was elected as vice-president and chairman of the board of the Debtor; Blevins was elected corporate counsel of the Debtor; Brad Cordell was elected as chief operating officer of the Debtor; Sturgill was elected chief executive officer of the Debtor, Michael Potter was elected president of the Debtor; Robert Caughman was elected secretary and treasurer of the Debtor; and William Van Hoeven was elected as Processing Center Director of the Debtor.

58.    At the First Meeting of its Board of Directors, the Debtor issued the following shares of Class A Preferred stock with a $100 per share par value to the following individuals ("First Share Owners"): Wade Cordell, 40,000 shares; Sturgill, 40,000 shares; Sturgill & Associates, 30,000 shares; Blevins, 10,000 shares; Brad Cordell, 40,000 shares; Michael Potter, 40,000 shares; William Van Hoeven, 10,000 shares; John Powell, 10,000 shares (collectively, "First Shares").

59.    On October 4, 2004, the Debtor assumed the outstanding financial obligations of FARS Marketing, Wade Cordell, Brad Cordell, and Robert Caughman, totaling $340,938.00—not including the $200,000.00 attributable to FARS' Face Account deficiency—as follows:

    a.  Branch Banking & Trust Company of South Carolina, two loans of $68,435.00 and $46,000;

    b.  MBNA America – BC, $12,650.00;

    c.  GMAC Mortgage, $50,473.00;

    d.  Branch Banking & Trust Company, $22,400;

       Crossland Mortgage, $26,000.00;

       Roscoe Caughman, two loans of $60,795.00, and $18,565.00, respectively; and

    e.  MBNA America – FA, $35,620.00.

60.	On December 6, 2004, the First Shares and Formation Shares were cancelled. In exchange, each share cancelled was replaced with common stock reflecting the restrictive legend and subject to conditions encapsulated in the restrictive legend of the Formation Shares carrying over to the converted common stock as follows: Wade Cordell – 4.5 million shares, Sturgill – 4.5 million shares, Sturgill & Associates – 3.75 million shares, Blevins – 2.25 million shares, Brad Cordell – 4.5 million shares, Van Hoeven– 2.25 million shares, John Powell  – 2.25 million shares, Robert Caughman – 1.5 million shares, Jeffrey Lyle – 1.5 million shares, Paul Newberry – 1.5 million shares, David Price – 750,000 shares, Michael Till – 375,000 shares, and Steve Roland – 375,000 shares.

61.	Also, upon information and belief, in December of 2004, Wade Cordell and Brad Cordell caused the Debtor to issue 3,750,000 shares of Debtor's Common Stock to CLLC ("2004 Misappropriated CLLC Shares") for no consideration to the Debtor while also issuing an additional 412,500 shares to Brad Cordell and 412,500 shares to Wade Cordell for no consideration to the Debtor.

62.	In 2006 and 2007, Wade Cordell, Brad Cordell, and Sturgill sold approximately 820,000 shares of Debtor's stock wrongfully issued to Cordell, LLC to individuals for profit without remitting any consideration to the Debtor ("06&07 Cordell LLC Stock Sales").

63.	In 2008, Wade Cordell, Brad Cordell, and Sturgill sold approximately 641,000 shares of Debtor's stock wrongfully issued to Cordell, LLC to individuals for profit without remitting any consideration to the Debtor ("2008 Cordell LLC Stock Sales").

64.	Intermittently, during 2004 and 2005, Wade Cordell, Brad Cordell, Blevins, and Sturgill sold Territory Agreements for no consideration to the Debtor but for the purpose of misappropriation.

65.	The Debtor was the sole member of two limited liability corporations: BLG Collection Services, LLC and Infinity Business Assurance, LLC and its organizational structure is displayed below:

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document      Page 15 of 173

| Infinity Business Group, Inc. |
|---|

| Fars Marketing, Inc. [owns 100% stock] | Fars, Inc. [owns 100% stock] | BLG Collection Services, LLC [sole member] | Infinity Business Assurance, LLC [sole member] |
|---|---|---|---|

66.     On November 9, 2005, a Certificate of Designation ("2005 Certificate of Designation") was filed with the Nevada Secretary of State providing that "[b]y resolution of the board of directors pursuant to a provision in the articles of incorporation, this certificate establishes the following regarding the voting powers, designations, preferences, limitations, restrictions and relative rights of the following class or series of class of stock."

    a.  Common Stock Authorized: 50,000,000 shares, consisting of 47,000,000 of Class A Voting Common Stock (1 vote per share) and 3,000,000 of Class B Non-Voting Common Stock.

    b.  1,000,000 shares of voting preferred stock (100 votes per share).

### 4. WADE CORDELL'S PRIOR BANKRUPTCY

67.     Prior to the Merger Date, Wade Cordell, Brad Cordell, Blevins, and Blevins Law Group had operated various multi-level marketing operations from, in and outside of Lexington, South Carolina, in addition to operating FARS Marketing, which were not successful and resulted in a judgment against Wade Cordell by a bankruptcy trustee and others arising out of securities violations.

68.     Subsequently, Wade Cordell filed for Chapter 7 relief and was denied a discharge.

### 5. BUSINESS LOCATIONS OF DEBTOR
#### A. PRIOR TO MERGER DATE

69.     Prior to the Merger Date, the Debtor operated out of facilities in Pikeville, Kentucky.

70.     Prior to the Merger Date, FARS operated out of facilities in Jacksonville, Florida.

71.     Prior to the Merger Date, FARS Marketing operated out of facilities in Lexington, South Carolina.

#### B. AFTER MERGER DATE

13

**-29-**

**i. South Carolina Operations**

72.     After the Merger Date, the Debtor continued to operate in Lexington, South Carolina, and Jacksonville, Florida.

73.     The South Carolina operations housed the offices of Wade Cordell, Brad Cordell, and Blevins, and the sales and marketing staffs of the Debtor (which were designed to be a small part of Debtor's profit strategy of creating revenue) together with the other employees necessary to run the management of the Debtor, including Hargrett (after mid-2006) and others.

74.     After the Merger Date, until early 2006, the Debtor maintained a physical office in leased premises at 111 Tarrar Springs Road in Lexington, South Carolina.

75.     At an October 2006 Board Meeting of IBG, Wade Cordell as Chairman of the Board, made a motion, which was unanimously adopted, to have the Secretary of the Debtor physically present at the Corporate Offices in Lexington on a day-to-day basis.

76.     In 2006, the Debtor moved its South Carolina offices to 140 Gibson Road in Lexington, South Carolina ("140 Gibson Road"), out of which it operated until approximately November 2009.

77.     140 Gibson Road was and is owned by Gibson.

78.     The Employment Agreements between Debtor and its officers also provided that the executive offices of Debtor would be located at 140 Gibson Road.

79.     From its 140 Gibson Road executive offices, the Debtor's officers supervised, coordinated, and directed Debtor's actions while also controlling its finances.

80.     After November 2009, until its date of bankruptcy, the Debtor was in rented facilities at 407 West Main Street in Lexington, South Carolina.

**ii. Florida Operations**

81.     Debtor had a facility in Jacksonville, Florida, until September 2006, where William Van Hoeven ("Van Hoeven") managed a small subset of the Debtor's business concerning manual collections of bad checks.

82.     After September of 2006, when Debtor opened a facility in Barbourville, Kentucky, Van Hoeven commuted to Kentucky, where he remained responsible for the operations of the Debtor's IT product development and maintenance for the banking sector and overseeing the training of employees.

### iii. Kentucky Operations

83.     After the Merger Date, Sturgill maintained offices in Pikeville, Kentucky.

After the Merger Date, Sturgill utilized his political connections to induce the Kentucky Communities Opportunity Council Community Action Partnership to build a modern state-of-the-art facility in Barbourville, Kentucky, to be leased by the Debtor.

84.     In September of 2006, the Debtor began collection services out of the Barbourville facility, which continued in Barbourville until the date of bankruptcy.

### 6. DEFENDANT DIRECTORS' SCHEME
### TO PERPETRATE FRAUD AGAINST THE CORPORATION

#### A. SALES OF SERVICES

85.     Debtor employed sales personnel ("Sales Personnel") and independent contractors ("Sales Contractors") (collectively, "Sales Agents") out of its Lexington, South Carolina office, who performed sales and marketing functions for the Debtor, which included  soliciting new merchant contracts for the Debtor's services, and customizing Debtor's programs for easy implementation of customers in the Debtor's systems.

86.     Sales Agents were compensated through salaries, commissions, bonuses, or some combination thereof based on performance bonuses, which diverted profits from the Debtor's gross revenues.

#### B. TERRITORIES

87.     In the marketing of the Debtor's services, Wade Cordell, Brad Cordell, Blevins, and others sold licenses called Territory Agreements to various third parties ("Territory Holders") for vacillating prices, awarding them the right to receive income for each check (a) presented for recovery and (b) collected within a specific geographical area of varying sizes  ("Territory" or "Territories").

88.     During 2004 and 2005, Wade Cordell, Brad Cordell, and Blevins sold at least $1,600,000.00 worth of Territories outside the scope of their employment and/or scope of their authority.

89.     Wade Cordell, Brad Cordell, and Blevins sold these Territory Agreements prior to the Merger Date through 2009.

90.     In some instances, Wade Cordell, Brad Cordell, and Blevins "gifted" (transferred for no consideration) stock of the Debtor to the Territory Holders. These transfers of "gifted stock" were outside the scope of their authority and/or scope of their employment.

91.     Territory Holders were given the right to market the Debtor's services in the Territory to increase the value of their investment; however, no Territory Holder was required to take these or any other actions to receive the pecuniary benefits defined in the Territory Agreements ("Territory Commission"), which was stated as a dollar amount per check (e.g., two dollars per check) collected in the Territory.

92.     On November 22, 2004, the Board of Directors resolved ("Territory Compensation Resolution") that a limited and select portion of the Territory Agreements would include a "bonus compensation" provision, which provided that, in the event of a future sale of the Debtor, those Territory Holders would receive a portion of forty percent (40%) of the net sale of the Debtor based on the "IBG Production Formula" ("40% Bonus Compensation Term"). At a minimum, this provision provided that the investor would be refunded the purchase price of the Territory.

93.     Although the Territories were exclusive, pursuant to the terms of the Territory Agreement, some Territories were sold to more than one investor by Wade Cordell, Brad Cordell, and/or Blevins acting outside the scope of their authority and/or scope of their employment.

94.     The Territory Agreements were and are securities that were not exempt from registration and were not registered under applicable Federal or State securities laws.

### C. FINANCIAL EFFECT OF BUSINESS MODEL

95.     Upon the collection of a check, the Debtor was entitled to collect an average of $30.00 per check for its Collection Fee, by statutory law of the state governing the transaction.

### 7. FINANCIAL REPORTS OF DEBTOR

96.     From the Debtor's inception, through the efforts of Sturgill, Brent Grafton, Larry Grafton and Grafton were employed as outside Certified Public Accountants, and independent auditors of the Debtor, to prepare annual audited financial reports for the Debtor (collectively, "Grafton Audited Financials").

97.      Brent Grafton was a principal of Grafton, who forfeited his certification as a Certified Public Accountant in the State of Mississippi in January of 2008 and held no other license as a Certified Public Accountant ("CPA") from any other state.

98.      As a result of Brent Grafton losing his certification as a CPA in January of 2008, Brent Grafton, Larry Grafton, and Grafton could no longer legally issue certified audited financial statements for any entity.

99.      However, Brent Grafton, Larry Grafton, and Grafton prepared, and published for compensation from Debtor, what were represented to be audited financial reports for the Debtor for the years 2004, 2005, 2006, 2007, and 2008.

100.     With the Grafton Audited Financials, Brent Grafton, Larry Grafton and Grafton included an Independent Auditors' Report attesting that the auditing methods comported with GAAP.

101.     Brent Grafton, Larry Grafton, and Grafton knew that the audited financial reports they prepared for the Debtor would be utilized by the Board of Directors in determining the fiscal salubrity of the Debtor as well as in determining the propriety of actions taken in reliance on this false portrait of financial health.

a. In fact, the Grafton Audited Financials for the years 2005 through 2008 included an Independent Auditors' Report from Grafton addressed to the Board of Directors providing that the audits "the financial statements . . . present fairly, in all material respects, the financial position of [the Debtor] . . . and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles."

102.     The Grafton Audited Financials were deficient, false, and misleading. Those deficiencies included, without limitation, the following: stated revenue including sums not yet earned by the Debtor; significant overestimates of the accounts receivable owed to the Debtor; and significant underestimates of the amounts payable.

a. The Grafton Audited Financials materially overstated revenue, net income, and accounts receivable. Specifically, the financials included as income, the Collection Fee portion or any portion of a check potentially collectible by the Debtor when a check was submitted to the Debtor for its recovery services instead of properly recognizing this contingent income when the Debtor actually received

17

**-33-**

the collection of such income from the Check Writer. Furthermore, if income was received, Grafton did not net the cash collection against the accounts receivable. In addition, Grafton further inflated the accounts receivable by accruing historic figures on account of potentially collectible checks when in fact a large portion of these checks were no longer even potentially collectible in order to assist the Scheme.

103. As a result of these deficiencies, the Grafton Audited Financials made it appear that the Debtor had a positive net income, when in fact it was operating at a loss throughout most of its life due to the excessive salaries, unwarranted compensation, and looting by Blevins, Wade Cordell, Brad Cordell, Hargrett, and Sturgill.

104. A competent audit would have revealed these flaws in the Debtor's audited financial statements. Instead, MK and its employees, with the assistance of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett in coordination with Brent Grafton, Larry Grafton, and Grafton manufactured the "audited" financials to further perpetrate a fraud against the Debtor.

105. Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett knew the Grafton Audited Financials prepared by Brent Grafton, Larry Grafton, and Grafton were flawed and participated in their fraudulent formulation with the assistance of MK through its employees including Meyers.

106. The flawed and fraudulent Grafton Audited Financials were utilized in advising the Debtor in the propriety of its issuance of securities by Debtor's outside securities counsel.

107. The flawed and fraudulent Grafton Audited Financials were also utilized by MK in advising the Debtor, despite MK's knowledge or conscious disregard for the falsity thereof.

108. The flawed and fraudulent Grafton Audited Financials were published by Wade Cordell, Brad Cordell, Blevins, Sturgill, Hargrett, and MK to Debtor's outside securities counsel and presented to the Board of Directors.

    a. Michael Potter, Van Hoeven, Thomas Handy—members of Debtor's Board of Directors (collectively, "Innocent Members of the Board of Directors")—relied on the Grafton Audited Financials in determining whether to issue debt instruments and/or various securities; in all actions associated with the Debtor's business; and these board members also relied on MK's skill and expertise and continuing participation in Debtor's financing activities, which necessarily

> included the use of the Grafton Audited Financials. They had a reasonable
> expectation that if the Grafton Audited Financials included, *inter alia*, artificially
> inflated assets—that those types of deficiencies would be communicated to the
> **entire** Board of Directors.

109.    The figures in the Grafton Audited Financials were utilized by Wade Cordell, Brad
Cordell, Blevins, and Sturgill to obtain various institutional borrowings for the Debtor, as well as
to procure additional accounts for check collection, such as accounts with US Bank and
Wachovia.

110.    Sturgill, Brent Grafton, Larry Grafton, and Grafton concealed from the Board of
Directors the fact that Brent Grafton had forfeited his Certification as a CPA.

### 8. STOCK AND NOTE OFFERINGS
#### A. FRIENDS AND FAMILY

111.    After the Merger Date, and beginning in early 2005, Sales Agents under the
supervision of corporate insiders, including Wade Cordell, Brad Cordell, Blevins, and Sturgill,
began offering the Debtor's stock to various potential shareholders in what was called the
"Friends and Family Offering," purportedly in order to increase the capital for the operations of
the Debtor.

112.    During 2004 and 2005, at least four million (4,000,000) shares of stock were issued,
and sold.

113.    In addition to the shares that were sold, a material number of shares were gifted to
third parties, upon information and belief, in part to satisfy personal debts of Wade Cordell and
Brad Cordell and/or to establish a conduit by which Wade Cordell and Brad Cordell could
siphon money from the Debtor. Moreover, numerous shares were gifted by Wade Cordell, Brad
Cordell, Blevins, and Sturgill to facilitate their looting.

114.    Although the shares issued under the Friends and Family Offering purported to be
exempt from registration pursuant to Regulation D, Rule 506 of the 1933 Securities Act, in the
language of the Subscription Agreements, which were the written instruments that facilitated the
sales, these shares sold by Wade Cordell, Brad Cordell, Blevins, and Sturgill did not comply
with the exemption's requirements, causing the claimed exemption to fail.

115.    The shares issued under the Friends and Family Offering were not registered under the
federal securities laws or under the state securities laws.

### B. CAPITALIZATION EFFORTS OF DEBTOR
### ROLE OF MORGAN KEEGAN
### I. 2006 ROLE OF MORGAN KEEGAN COMPANY

116.    In 2005, Wade Cordell, Brad Cordell, Blevins and Sturgill consulted securities counsel in South Carolina and were advised that the Friends and Family Offering violated state and federal securities laws.

117.    Rather than taking remedial action, Wade Cordell, Brad Cordell, Blevins, and Sturgill consulted MK and its employee, Meyers, upon information and belief, to have MK and its employee, Meyers, facilitate sales of Debtor's securities to raise money. This plan to raise capital was presented to the Board of Directors as ostensibly for the operation of the Debtor, but in reality, it was intended for the purpose of procuring liquid assets to be diverted from the Debtor and was integral to conceal Wade Cordell, Brad Cordell, Blevins, and Sturgill's past and future systemic scheme of looting the Debtor.

118.    Meyers received his M.B.A. from the Fuqua School of Business at Duke University; was a licensed Certified Public Accountant at various times appurtenant hereto; provided securities, marketing and consulting advice to the Debtor; and was upon information and belief a registered representative of MK.

119.    Beginning in September of 2005, Meyers and Sturgill corresponded regarding MK's potential role as an underwriter in the offering of Debtor's securities, culminating in a meeting between Sturgill, Meyers, and two other MK employees from MK's equity originations division to discuss MK's role as an underwriter.

120.    In January of 2006, MK presented a brochure ("Brochure"), upon information and belief, to Debtor's Board of Directors to market its investment services to the Debtor claiming that MK had "[i]n-depth knowledge and proven history of advising transaction processing clients," and "strong brand equity and credibility as underwriter and/or advisor" with a "[l]ong history and impressive track record of working with middle market companies."

121.    In February of 2006, Blevins consulted a South Carolina law firm to ascertain whether the Territory Agreements constituted securities for purposes of the federal securities laws ("Inquiry").

122.    On March 8, 2006, the South Carolina law firm addressed the Inquiry and informed Blevins that the Territory Agreements, indeed, constituted securities under the seminal opinion

of S.E.C. v. W.J. Howey Co., 328 U.S. 293 (1946) and its progeny. Furthermore, the South Carolina law firm provided Blevins with an analogous factual parallel in relevant case law to the Territory Agreements where such agreements were deemed securities. Even when considering the three versions of Territory Agreements submitted to the South Carolina law firm by Blevins, the South Carolina law firm concluded that the variations of the agreements would not be dispositive on the determination of whether the Territory Agreements constituted securities, but instead, the courts would look to the totality of the circumstances. Furthermore, the South Carolina law firm replied that even if the licensees depreciate their licenses for federal income tax purposes, this would neither be a persuasive argument nor prevent a determination that the Territory Agreements were securities.

      a. Blevins did not communicate the South Carolina law firm's conclusions to the Innocent Members of the Board of Directors.

123.    In March of 2006, MK and the Debtor entered into an engagement contract ("2006 MK Engagement Contract"), governed by the laws of Delaware, whereby MK agreed to act as the exclusive placement agent for Debtor's stock issuance and use its "best efforts" in connection with the engagement in consideration of a contingent equity placement fee, consisting of six percent (6%) of the gross proceeds raised on behalf of the Debtor in its security sales pursuant to a private placement of securities. MK would further assist in the Private Placement Memorandum's ("PPM") formulation in the following capacities:

      a. By entering into the 2006 MK Engagement Contract, MK acted as a broker in soliciting investments in Debtor as the Debtor "authorizes [MK] to provide the Private Placement Memorandum and such other communications to prospective purchasers of the Securities" and by requiring the Debtor to use "its best efforts to promptly notify Morgan Keegan of any potential purchasers known to the Company to be interested in purchasing Securities."

      b. Also, by entering into the 2006 MK Engagement Contract, MK acted as an underwriter by participating in the underwriting of Debtor by receiving the equity placement fee and channeling the interest of investors to the Debtor, thereby acting as both the locus and hub of the distribution.

      c. The 2006 MK Engagement Contract pledged that MK "shall be solely responsible for its own actions with regard to the transactions described herein, which actions

shall be in compliance with all applicable laws and regulations, including but not limited to investment advisor, broker-dealer and similar rules and regulations."

d. The initial impetus for the 2006 MK Engagement Contract was for MK to find an institutional investor to invest in the Debtor.

124.    Pursuant to the 2006 MK Engagement Contract and independent of the 2006 MK Engagement Contract, Debtor relied on MK's expertise in the area of securities, and the Innocent Members of the Board of Directors expected MK to promptly and effectively inform it of any and all issues as they arose.

a. The Debtor was induced to and did repose confidence in MK's knowledge and expertise to give the Debtor and the Innocent Members of the Board of Directors advice as to the propriety of issuing securities and to engage in honest dealings with Debtor's best interests in mind.

b. Debtor and the Innocent Members of the Board of Directors hired MK to give it advice for the benefit of the Debtor, and MK thereby had a fiduciary obligation to disclose any and all material fact(s) to the <u>entire</u> Board of Directors.

c. It was foreseeable by MK and its employees that the Innocent Members of Debtor's Board of Directors would rely on MK and its employees to disclose any and all material fact(s) to them.

125.    On March 10, 2006, in order to assist MK in performing its duties, Sturgill sent MK, through Meyers, the Debtor's Balance Sheet, Income Statement, Statement of Retained Earnings, and Statement of Cash Flow as of December 31, 2003 ("March 10, 2006 2003 Financials Version"), and as of December 31, 2004 ("March 10, 2006 2004 Financials Version"), which was audited by Grafton, and included Grafton's letter, dated February 20, 2005, certifying that the audit was in "conformity with generally accepted accounting principles."

a. The net income reflected on said Debtor's Income Statement for 2004 was $(102,745.92).

126.    On March 19, 2006, Calvin Clark ("Clark"), an employee of MK, who works with Meyers, emailed Sturgill inquiring into when he would send Debtor's 2005 Financials and the projections for 2006.

22

**-38-**

127.     On March 20, 2006, Sturgill sent Clark and Myers Debtor's 2005 Statement of Income ("March 20, 2006 2005 Version of Statement of Income"), which reflected total revenues of $35,418,929.00 and net income of $3,730,423.00.

128.     On March 21, 2006, Clark emailed Wade Cordell, with a copy to Meyers, suggesting a method to create a higher computation of the Debtor's monthly potential revenue using the number of students in Lexington School District as a base for re-computation resulting in higher annual revenue potential. Wade Cordell responded utilizing Clark's suggested method of computation resulting in an annual potential revenue figure of $518,400,000, which was approximately $378 million above MK's proffered projection. Said increased annual potential revenue was then applied by MK in the April 2006 Confidential Investor's Memorandum and said memorandum, published by MK, demonstrated a figure for the potential revenue from "schools as nearly $520 million," despite MK's willful disregard for the facts that Wade Cordell's computations were based on a vast overestimate of potential check collections in light of MK's opposing data.

129.     On March 22, 2006 at 10:53 a.m., Sturgill emailed Meyers and Clark the Debtor's 2006 projected financial data, and stated, "[l]ook these projections over, [sic] waiting on auditors to give me a call back" ("March 22, 2006 2006 Projected Financial Data").

    a.     Total revenue was projected at $70,000,000.00.

    b.     Cost of Goods Sold was projected at $36,400,000.00.

    c.     Gross profit was projected at $33,600,000.00, which was a gross profit margin of 48%.

130.     On March 22, 2006, Meyers emailed Wade Cordell and Sturgill with a copy to Clark, MK's comments on Sturgill's submission to Meyers of the Debtor's March 22, 2006 Projected Financial Data. MK's comments indicated that certain projected expenses should increase substantially.

131.     Later on March 23, 2006, Meyers sent Sturgill, Wade Cordell, and Blevins while copying Calvin Clark, the additional items requested by, upon information and belief, Advance America in preparation for the ensuing talks concerning Advance America's investment in the Debtor:

23

**-39-**

    a.  First, Advance America requested the total face value of the checks guaranteed for January and February of 2006 and second, the biographies of the Advisory Board Members.

132.    On March 27, 2006, Sturgill submitted revised 2006 Projected Financial Data ("Revised 2006 Projections Submissions") to Meyers, incorporating MK's suggestions regarding increases to Debtor's expenses. Sturgill also increased Debtor's gross revenue by $7,468,750.00 resulting in a projected profit margin of Debtor for 2006 of 52.3%, which re-alerted MK to issues concerning the improper malleability of Sturgill's reporting methods.

133.    On March 27, 2006, Sturgill sent MK, through Clark, the Debtor's 2005 Balance Sheet, 2005 Statement of Retained Earnings, and 2005 Statement of Income ("March 27, 2006 2005 Version of Statement of Income"), which all included the twelve months ending December 31, 2005; the March 27, 2006 2005 Version of Statement of Income significantly deviated from the March 20, 2006 2005 Statement of Income with no justifiable explanation for such changes nor was any request for any such justifications made:

| Item | March 20, 2006 2005 Version of Statement of Income | March 27, 2006 2005 Version of Statement of Income | Difference |
|---|---|---|---|
| Total Revenues | $35,418,929.00 | $38,518.929.00 | $3.1 million increase |
| Gross Profit | $8,127,662.00 | $11,227,662.00 | $3.1 million increase |
| Depreciation | $405,025.00 | $113,640.00 | $291,385.00 decrease |
| Total Expenses | $4,397,239.00 | $4,105,854.00 | $291,385.00 decrease |
| Net Income | $3,730,423.00 | $7,121,808.00 | $3,391,385.00 increase |

134.    On March 27, 2006, Clark emailed Sturgill, requesting the breakout of revenue and the cost of goods for the 2005 financials and then clarified that for the revenue breakdown he needed

an estimate of what percentage of revenue the following components of Debtor's services constituted: electronic check conversion, check verification, check guarantee, electronic collections, and hard collections. Clark explained that if Sturgill sent him the estimated percentages for those items, then "that should get us there on the revenue."

135.    On April 5, 2006, Clark emailed Sturgill, Wade Cordell, Blevins, Van Hoeven, and Meyers regarding the three upcoming conference calls with Advance America, a prospective institutional investor, whose interest in the Debtor was garnered by MK, along with MK's analysis on Advance America and possible answers to these board members' hypothetical questions formulated by Clark that could arise based on reading MK's Advance America report.

136.    On April 25, 2006, at 3:11 p.m., Meyers emailed Sturgill a caption for the Debtor's 2005 Accounts Receivable Balance Sheet ("April 25, 2006 2005 AR Caption") and requested for Sturgill to review it for accuracy.

| # checks | Face | Fee – SM [State Mandated Fee] | Fee – Admin. [Fees that are allowed to be added to the collections (state specific)] | Fee – Cont. [Contingency Fees (25% of the face charged for hard collections to clients)] | Total Fees | Collectible Fees @ 75% |
|---|---|---|---|---|---|---|
| 270,485 | $12,283,845.00 | $3,997,261.00 | $4,928,245.00 | $4,323,032.54 | $13,248,538.54 | $9,936,403.90 – accounts receivable |

a.    It also included the notation "[t]his document details the total fees that make up the 12/31/05 accounts receivable balance. The Company's historical collection rate is 80-85% of all checks. For conservatism, the Company books 75% of the fees due as a receivable. At year end, there were 270,485 checks in the process of being collected with a total face value of $12.3 million and additional fees of $12.3 million. The Company booked $9.9 million or 75% of the $12.3 in fees receivable at year end."

137.    On April 25, 2006, at 5:46 p.m., Sturgill emailed Meyers "[t]ry this."

138.    On April 25, 2006, Sturgill forwarded Meyers Debtor's 2005 Statement of Cash Flow, 2005 Statement of Retained Earnings; 2005 Balance Sheet; and 2005 Statement of Income ("April 25, 2006 Version of 2005 Statement of Income") from Brent Grafton (collectively, "April 25, 2006 Version of 2005 Financials").

   a. These financials were different from those displayed in the final version of Debtor's audited 2005 Financial Statements by Grafton.

**Comparison of Cash Flow Statements for 2005**

|  | April 25, 2006 Version of 2005 Financials | Audited 2005 Financials |
|---|---|---|
| *Cashflow from operating activities – 2005* |  |  |
| Net Income | $7,091,338.89 | $4,979,821 |
| Depreciation Expense | 144,110.00 | 451,644 |
| Amortization Expense | 300,015.00 | 314,422 |
| (Increase) Decrease in Accounts Receivable | (6,804,061.00) | (6,803,957) |
| Increase (Decrease) in Accounts Payable | (80,575.00) | (80,575) |
|  |  | 30,601 *New category – Increase (Decrease) in Guarantees Payable |
|  |  | 2,565,362 *New category – Increase (Decrease) in Accrued Income Tax Payable |
| Cashflow (used) provided by Operations | 650,827.89 | 1,457,318 |

**Balance Sheet – 2005**

|  | April 25, 2006 Version of 2005 Financials | Audited 2005 Financials |
|---|---|---|
| **Assets** |  |  |
| Current Assets |  |  |
| Cash | $655,249.00 | $655,249.00 |
| Accounts Receivable | 9,936,403.00 | 9,936,403.00 |
| *Total Current Assets* | 10,591,652.00 | 10,591,652.00 |
|  |  |  |

**-42-**

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document    Page 29 of 173

| Property, Plant, and Equipment | | |
|---|---|---|
| Property, Plant and Equipment | 754,150.00 | 1,160,482.00 |
| Less: Accumulated Depreciation | (264,169.89) | (571,704) |
| *Total Property, Plant and Equipment* | 489,980.11 | 588,778 |
| | | |
| Intangible Assets | | |
| | | 4,500,000 *New Category - Goodwill |
| | | 2,200,961 *New Category – Other intangible assets, net |
| Goodwill, less Amortization | 3,724,965.00 | |
| | | 6,700,961 *New Category – Total Intangible Assets |
| | | |
| **Total Assets:** | **$14,806,597.11** | **$17,881,339** |

139.    On April 26, 2006 at 1:36 p.m., Meyers emailed Sturgill a version of Debtor's 2005 Statement of Cash Flow; 2005 Statement of Retained Earnings; 2005 Balance Sheet; and 2005 Statement of Income ("April 26, 2006 Version of 2005 Financials"), which had only one difference when compared to the April 25, 2006 Version of 2005 Financials:

a.    The April 26, 2006 Version of 2005 Financials included footnote one next to the category for Purchase of Accounts Receivable of (2,983,882.00) indicated under the category "Cash flow from Investing Activities" on Debtor's Statement of Cash Flow, which provided as follows:

i.    "During 2005 the Company consolidate [sic] its collection subsidiary into Infinity Business Group, Inc. in anticipation of this Transaction. The outstanding receivables on the books of the collection company at that point of $2.98 million was accounted for in the cash flow statement as a purchase of receivables."

1.    However, these receivables were worthless, which MK knew since MK knew that these accounts receivable were no longer collectible.

27

**-43-**

140.    On April 26, 2006, Sturgill sent Meyers a monthly breakdown of Debtor's purported Statement of Income for the period of October of 2005 through March of 2006 (respectively, "April 26, 2006 Version of Statement of Income for October of 2005 through December of 2005" and "April 26, 2006 Version of Statement of Income for January of 2006 through March of 2006").

141.    However, despite these numerous red flags and deviations from industry standards apparent to MK and its employees including Meyers, these fraudulent figures were utilized by MK in the April 2006 Confidential Investor's Memorandum ("06 CIM").

142.    Debtor's securities counsel suggested changes to the 06 CIM to MK; however, many of the suggested changes were not incorporated into the final version of the 06 CIM by MK.

143.    The 06 CIM, authored by MK, contained many misleading statements and material omissions and was directed by MK toward acquiring institutional, strategic investors for the Debtor as well as demonstrating to the Innocent Members of the Board of Directors that procuring such investments was in Debtor's best interest.

    a. The 06 CIM provided that the Debtor was seeking an infusion of $20 million of capital to maximize its growth and first-mover advantage in its new markets.

        i. "The Company's system automation and relatively low variable cost structure allow for substantial and accelerated earnings growth."

        ii. "The gross margins on the Company's services individually are exceptional. This recovery increases the total gross margin on the check to over 91% [recovery], with a material $25-$40 increase in revenue from the state mandated NSF fee collected by the company."

        iii. As to the stock issued pursuant to the Friends and Family offering, the 06 CIM provided that a portion of the funds raised in the offering would be utilized by the Debtor to repurchase the Debtor's issued and outstanding shares of common stock, and provided that "[t]hese external shareholders obtained their shares in various private offerings that complied in varying degrees with state and Federal securities requirements."

        iv. Furthermore, the 06 CIM provided that a portion of the funds raised by the offering would be utilized to reacquire rights embedded in the Territory Agreements.

    v. The 06 CIM included the following description of the Debtor's Check Guarantee Program:

       1. "For Check Guarantee, IBG charges 1.6% of the face amount of a check, with the average face amount at $38. As a result of the quality of IBG's customer base, the return rate on checks is 0.5% or less (versus an industry average in excess of 1.5%). NSF fees vary between $25 and $40 depending on state law. The Company usually collects 80%-85% of NSF checks on average through electronic collections alone."

          a. "On 200 checks, for example, IBG will receive $121.60 in guarantee fees ($7,600 face amount at 1.6%). Of these 200 checks, only one will be returned on average (0.5% return rate)."

          b. "If the check is not collected, IBG will pay the face amount to the client, which is $38 on average, leaving IBG with $83.60 in gross margin."

          c. "However, if the check is collected, there is no net payment to the customer and IBG receives a $25 NSF fee from the check writer. This fee results in a gross margin of $146.60."

          d. "Since at least 80% of NSF checks are usually collected by IBG, the weighted average gross margin on Check Guarantee solutions for 200 checks is $134.00."

             i. That, *inter alia*, the 1.6% fee should not be recorded as income until the actual check was collected was a violation of GAAP accounting principles that was readily apparent to anyone entity in the industry of MK and its employees.

29

**-45-**

vi.  In explaining the Margin Growth, the 06 CIM described that "[b]etween 2004 and 2005, the company's gross margin increased from $1.8 million (8.2%) to $11.2 million (29.1%). In 2006, the Company projects revenues of $77.5 million dollars with total cost of goods sold at only $36.9 million. These projections put gross margin at $40.5 million – or 52.3%."

1.  These figures were derived from the Revised 2006 Projections Submissions.

vii.  On page 50 of the 06 CIM, Debtors' Income Statement was provided reflecting Debtor's net profit of $(102,745.92) in 2004; Debtor's Statement of Retained Earnings for 2004 was also provided, reflecting $(92,792,89) for Debtor's 2004 retained earnings.

1.  These numbers were identical to those provided to Meyers in the March 10, 2006 2004 Financials Version.

viii.  MK contracted to act and participated in the role of an intermediary between investors and Debtor, fulfilling the terms of the 2006 MK Engagement Contract. For instance, in its role as, *inter alia*, underwriter, in the 06 CIM, investors with any inquiry relating to the 06 CIM were directed to contact MK, who also apprised investors of the attractiveness of an investment in Debtor's securities.

144.  On May 1, 2006, pursuant to the terms of the 2006 MK Engagement Contract, MK arranged for the Debtor to discuss terms for institutional investors' investments in Debtor with Goldman Sachs, Bison Capital ("Bison"), and Summit Partners.

145.  On May 1, 2006, pursuant to the terms of the 2006 MK Engagement Contract, MK arranged for the Debtor to discuss terms for two possible sources of equity financing in the Debtor.

a.  On May 1, 2006, Bison Capital informed the Debtor that it was interested in making a $25 million investment and proposed terms of such investment to the Debtor

i.  As a closing condition, the Debtor was required to provide Bison with a clean audit opinion for fiscal year 2005 as well as completion of

satisfactory business, legal and financial due diligence, which was estimated to be completed within sixty days.

b. However, as an overall condition precedent to investment, on May 12, 2006, Bison explained that it would have to conduct its due diligence "to gain deeper understanding of the Company, its operations, past performance, and position within the industry, as well as comfort on the dynamics of the industry as a whole . . . to build a financial model that will serve as a broad guideline of what might be reasonably expected future financial performance."

   i. For example, as a part of Bison's reasonable due diligence investigation, confirmatory due diligence was required to be  conducted by third parties, which  consisted of the following primary components:

      1. "Background checks – Bison Capital hires an outside agency that conducts background checks (legal, etc.) on certain key managers of the companies it invests in."

      2. "Accounting Diligence – Bison Capital hires an outside accounting firm to perform third party validation of financial matters as directed by Bison Capital."

      3. "Insurance Diligence – Bison Capital utilizes an outside firm to evaluate the insurance position of Companies it invests in."

      4. "Legal Diligence/Documentation – Bison Capital will hire an outside legal firm to perform legal due-diligence on the Company and to work in conjunction with the Company's legal counsel to author the necessary legal documents associated with the Investment."

         a. Bison's due diligence requests of the Debtor entailed seven pages of time intensive and detailed materials that Bison sought in contrast to the dearth of due diligence materials requested by MK and its employees, despite their obligation to do so.

c. On May 1, 2006, the Debtor also received a Letter of Intent ("Summit LOI") from Summit Partners who proposed to provide the Debtor with "$32.0 million in

exchange for 42.67% ownership interest in the Debtor." The Summit LOI further provided that "[f]inancing for this transaction will be exclusively in the form of equity from our $3 billion equity fund. As per the guidance of Morgan Keegan and IBG, Summit will not employ the use of senior or subordinated debt to finance this transaction."

146.    On May 4, 2006, Meyers emailed Wade Cordell, Strugill, and Blevins regarding the revised term sheet received from Bison, to inform Wade Corell and Sturgill that the following concessions were made to Bison and remitted a revised term sheet from Bison:

    a.    "[i]ncreased valuation on 20056 [sic] EBITDA to 5.5X from 5.0X;"

    b.    "[r]educed excess cash sweep from 75% to 50% to allow a greater build-up of cash on the balance sheet;"

    c.    "[p]ut right changed to 8.0X from 9.0x upon a change of control transaction;"

    d.    "[s]ix board [seats] instead of five (2 bison, 3 mgt, 1 outside);" and

    e.    "[e]xpenses – Cap of $100,000 prior to legal documentation; $225,000 post-legal documentation if Bison terminates; $350,000 max expenses"

    f.    Meyers continued that, in contrast, the Summit LOI would require all shares repurchased are owned by Summit.

    g.    Furthermore, Meyers informed Wade Cordell, Strugill, and Blevins that four other equity investment firms were still in the mix with expected proposed terms to follow shortly.

    h.    Moreover, Meyers expressed that "I would like [Debtor's securities counsel] to work with us to ensure that the letter of intent is detailed enough to allow for an easy transition into a Definitive Agreement for which they will be the primary point persons."

147.    On May 3, 2006, Sturgill sent Meyers points of discussion for their impending conference call with Bison concerning the breakdown of the put rights; the last sentence of the covenants; and the expenses.

148.    On May 15, 2006, Meyers emailed Sturgill and requested for him to send Meyers the Auditor's Letter.

149.    On May 17, 2006, Meyers travelled to the Debtor's Lexington facility to assist the Debtor in preparing for Bison's visit to the Lexington facility and to assist the Debtor in

preparing for Bison's visit on May 23-25, 2006, the result of which was MK's assistance to corroborate the manipulated financial statements included in the Grafton Audited Financials in order to assist the Scheme.

150.    On May 22, 2006, Meyers forwarded the itinerary of Bison's employees' visit to the Debtor's facilities in Lexington, South Carolina, which had been sent to Meyers by Louis Bissette ("Bissette"), an employee of Bison.

    a.    Bison's employees were to visit Debtor's Lexington, South Carolina facility from May 23 – May 25, 2006.

    b.    For each day, Bison had a proposed agenda to explore components of the Debtor's operations in performing its due diligence, which included a review of the Debtor's existing customers, analyzing the monthly volume and face amounts with the monthly revenue, and Debtor's business model's general market risks .

151.    On May 25, 2006, Meyers forwarded additional due diligence items previously requested by Bison from Brad Cordell to Wade Cordell and Sturgill in order to precipitate a response.

152.    On June 5, 2006, Meyers emailed Van Hoeven requesting for him to sign an authorization form to allow Bison to complete his background check. Meyers also told Van Hoeven to put it at the bottom of the list since it was more important for Van Hoeven to focus his time on the items discussed earlier in the day.

153.    On June 6, 2006, Wade Cordell emailed Meyers, copying Sturgill and Brad Cordell, that the Debtor had hired the nationally esteemed firm of Robert Half Finance and Accounting to assist the Debtor in its search for a Chief Financial Operator.

154.    On June 6, 2006, Sturgill received a term sheet from Regions Bank ("Regions") outlining Regions' requirements for its proposed six month line of credit to be extended to the Debtor in the amount of $1,000,000.00 ("Credit Line").

    a.    A commitment fee of $10,000.00 was due at closing.

    b.    The term of the Credit Line was for six months with initial interest at a rate of 7.395 percent (7.395%).

    c.    The Credit Line was secured by the Debtor's accounts receivable and its furniture, fixtures and equipment.

    d.  The Credit Line also required reporting requirements including the submission of monthly financial information by the Debtor's CFO; Regions' review and approval of the 2005 audit report of the Debtor; and Debtor's covenant that its maximum total liabilities to net worth would be not greater than .25 to 1.0 at any time.

    e.  Moreover, Wade Cordell and Sturgill personally guaranteed the repayment of the Credit Line.

155.    On June 7, 2006, Sturgill sent Meyers a version of Debtor's 2006 monthly Statement of Income for January through April of 2006, which only contained new information to Meyers concerning April of 2006.

156.    On June 7, 2006, attorneys employed by Debtor's security counsel communicated in an internal email that the Territory Agreements between Infinity Lease Group and the Debtor were related-party transactions since Mike Potter, a director of IBG, and Sturgill, CEO, were on both sides of the deal, which resulted in the appearance of impropriety, if not actual conflict of interest.

    a.  "I told him [John Blevins] that we need to be sure that we can clearly demonstrate that the transaction was fair to the company." Blevins relayed to Debtor's securities counsel that he understood his concerns, although, the problems were alleviated as ILG [Blevin's related business entity] had not yet chosen any territories but had just "put money in." However, Debtor's securities counsel concluded that this would not resolve any problems with apparent self-dealing as "this works against the fairness argument because it is different terms than other licensees could purchase on (i.e., no other licensee could come in and wait to pick their territories)."

    b.  Furthermore, Debtor's securities counsel informed Blevins of the 40% provision in the ILG [Blevin's related business entity] agreement. To this information, Blevins responded that "he thought that this would help him in terms of setting forth what the terms of Article 1 mean because a CEO and Director involved in the resolutions also were on the other side of the contract as well and gave themselves the same term."

34

**-50-**

     c.   Debtor's securities counsel disagreed with Blevins' interpretation: "I don't at all agree with this and think that someone should probably explain to John the concept of persons acting in different capacities. In any event, I don't think that this helps define terms in the agreement and we should clarify some of these points with John **and the rest of the company.**" (emphasis added).

157.    On June 8, 2006, Sturgill sent Meyers, Wade Cordell, and Bison employees – Lou Caballero ("Caballero") and Bissette, a requested breakdown of collection data for the first week of January; for the fourth week of April; the third week of November; the third week of March; and for the second week of October, upon information and belief, of 2005, as well as random data samples for the first week of September 2005 and the fourth week of December of 2005.

158.    Later on June 8, 2006, a Bison employee emailed Sturgill and Meyers to request additional information concerning the breakdown of check collection data to, upon information and belief, better enable Bison to discern problems with the accounting methods it had ascertained were being incorrectly utilized by Defendants and to seemingly ascertain unexplained gaps in Debtor's income stream.

159.    On June 10, 2006, Sturgill sent Meyers, Wade Cordell, Bissette and Caballero, Debtor's purported monthly Statement of Income from January of 2005 through March of 2006 ("June 10, 2006 Version of 2005 Statement of Income" and "June 10, 2006 Version of 2006 Statement of Income"), which differed substantially from the statement previously concocted by Meyers and Sturgill in an effort to conceal the poor financial condition of the Debtor resulting from the Scheme.

|  | *April 26, 2006 Version of Statement of Income for October of 2005 through December of 2005* | June 10, 2006 Version of 2005 Statement of Income | *April 26, 2006 Version of Statement of Income for October of 2005 through December of 2005* | June 10, 2006 Version of 2005 Statement of Income | *April 26, 2006 Version of Statement of Income for October of 2005 through December of 2005* | June 10, 2006 Version of 2005 Statement of Income |
|---|---|---|---|---|---|---|
|  | **October of 2005** | **October of 2005** | **November of 2005** | **November of 2005** | **December of 2005** | **December of 2005** |
| **Revenues** |  |  |  |  |  |  |

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document    Page 38 of 173

| Sales | *$3,766,669* | $4,153,333 | *$2,417,681* | $3,035,210 | *$2,203,833* | $2,782,023 |
|---|---|---|---|---|---|---|
| Total Revenues | *$3,766,669* | $4,153,333 | *$2,417,681* | $3,050,695 | *$2,203,833* | $2,793,044 |
| **Cost of Goods Sold** | | | | | | |
| COGS | *$3,149,390* | $2,961,643 | *$1,405,664* | $1,763,650 | *$1,348,837* | $1,676,427 |
| **Gross Profit** | *$617,309* | $1,191,690 | *$1,012,017* | $1,287,045 | *$854,996* | $1,116,617 |
| Total Expenses | *$237,259.25* | $430,128 | *$216,403.25* | $491,969 | *$229,474.25* | $337,095 |
| **Net Income** | *$380,049.75* | $761,562 | *$795,613.75* | $795,076 | *$625,521.75* | $779,522 |

a. In addition, the year-end figures included in the 2005 Statement of Income included in the June 10, 2006 Version of 2005 Statement of Income did not correspond to the following versions of Debtor's 2005 Statements of Income submitted to Meyers as displayed below:

| Item | March 20, 2006 Version of Statement of Income for 2005 | March 27, 2006 Version of Statement of Income for 2005 | April 25, 2006 Version of 2005 Statement of Income | June 10, 2006 Version of 2005 Statement of Income | 2005 Audited Financials by Grafton |
|---|---|---|---|---|---|
| Total Revenues | $35,418,929.00 | $38,518.929.00 | $38,518,929.89 | $38,502,774 | $38,651,370 |
| Cost of Goods Sold | $27,291,267.00 | $27,291,267.00 | $27,291,267.00 | $27,458,819 | $27,331,917 |
| Gross Profit | $8,127,662.00 | $11,227,662.00 | $11,227,662.89 | $11,070,461 | $11,319,453 |
| Depreciation | $405,025.00 | $113,640.00 | $144,110.00 | $113,640.00 | $443,254 |
| Total Expenses | $4,397,239.00 | $4,105,854.00 | $4,136,324.00 | $4,181,060.00 | $4,831,180 |

36

**-52-**

| Net Income | $3,730,423.00 *includes an expense itemization for taxes of $44,671.00 | $7,121,808.00 *includes an expense itemization for taxes of $44,671.00 | $7,091,338.89 *includes an expense itemization for taxes of $44,671.00 | $6,889,401.00 *includes an expense itemization for taxes of $77,294.00 | $7,545,183 *Net income before income taxes |
|---|---|---|---|---|---|

160.     Later that day on June 10, 2006, Meyers responded to Sturgill regarding Sturgill's submission of the June 10, 2006 Version of 2005 Statement of Income and the June 10, 2006 Version of 2006 Statement of Income to Bison stating, "[k]eep working hard! I need to pay for my vacation."

161.     On June 11, 2006, Bissette emailed Meyers noting that he and Meyers needed to talk after receiving the June 10, 2006 Version of 2005 Statement of Income and the June 10, 2006 Version of 2006 Statement of Income from Sturgill.

162.     Later on June 11, 2006, Meyers emailed Sturgill responding to this inquiry from Bissette and stated "Bryon please call me on my cell. The EBITDA from 2005 per this spreadsheet is only $7.3 mm."

> a.  EBITDA is essentially net income with interest, taxes, depreciation, and amortization added back to it, and can be used to analyze and compare profitability between companies and industries because it eliminates the effects of financing and accounting decisions.
>
> b.  EBITDA can be useful in determining the ability of a company to pay off its debt and its future profitability. Since interest payments are not included in an EBITDA calculation, it projects the company's future profitability, as once the company repays its debt, it will no longer have future payments on account of servicing its debt.

163.     On June 14, 2006, Meyers sent Sturgill the Debtor's purported monthly Balance Sheet, Statement of Income, and Cash Flow Statement for 2005 ("June 14, 2006 Version of 2005 Financials"). The 2005 Cash Flow Statement was not completed, and neither the Balance Sheet nor the Statement of Income mirrored the figures utilized in the final version of the 2005 Financials audited by Grafton, and Meyers told Sturgill, "we need to discuss. I build the cash flow statement on a monthly basis."

164.    On June 15, 2006, Meyers sent Wade Cordell and Sturgill an email, copying Bissette and Caballero, that Hargrett, the current CFO of Prenova, who Meyers knew from a recent capital raise MK completed for Prenova, was interested in speaking to the Debtor about its current opening for a CFO.

165.    On June 15, 2006, Meyers sent figures mirroring the June 14, 2006 Version of 2005 Financials to Wade Cordell ("June 15, 2006 Version of 2005 Financials"), which did not match the 2005 Financials audited by Grafton, and by way of example, the following chart demonstrates selected discrepancies:

|  | June 15, 2006 Version of 2005 Financials | 2005 Financials Audited by Grafton |
|---|---|---|
| Statement of Income – Net Income before Income Taxes | $6,889,401.00 | $7,545,183.00 |

166.    On June 22, 2006, Hargrett followed up with Meyers to gather more information on the conference call Meyers was hosting with Hargrett, Sturgill, Wade Cordell and possibly Bissette, and Caballero concerning Hargrett becoming Debtor's Chief Financial Officer.

167.    On July 7, 2006, Meyers hosted a conference call between Sturgill and Meyers concerning the Bison deal, upon information and belief, to further their efforts to conceal the true financial condition of the Debtor and the Scheme.

168.    On July 7, 2006, a draft Memorandum ("06 Securities Counsel Due Diligence Memo") concerning the results of the due diligence performed on the Debtor by Debtor's securities counsel for Bison was written to Debtor's securities counsel's file. The 06 Securities Counsel Due Diligence Memo was divided into ten sections, each with various subsections identifying problems found in the due diligence investigation and was distributed to Meyers.

    a.    In section IX, titled Financial Statements & Tax Matters, the 06 Securities Counsel Due Diligence Memo relayed the following: "The Company has provided its 2003-2004 financial statements and an auditors' letter dated February 20, 2005. No due diligence analysis has been undertaken with respect to the financial statements provided. It should be noted, however, that we have not received any interim financial statements or appraisals, nor has the Company provided any materials responsive to our due diligence request regarding tax

matters. We should renew our request for the financial statements and related materials and for the Company's tax returns."

b. Moreover, the 06 Securities Counsel Due Diligence Memo provided as follows: "Furthermore, while the Company did identify certain personal relationships among the Board members, officers, and employees, no response identified related party transactions as indicated in our due diligence request. Nonetheless, our initial (review) has uncovered (a number of) instances in which the company has engaged in related-party transactions with its officers and directors or affiliates thereof (e.g., a loan by the Company to one of its officers and a license agreement with a company called Infinity Lease Group which is controlled by two directors of the Company)."

c. Thus, it was apparent to MK and Meyers that Debtor's securities counsel and thus, the Innocent Members of the Board of Directors were relying on MK in its role, *inter alia*, as an underwriter pursuant to the 2006 MK Engagement Contract to review the Grafton Audited Financials as well as the existence of questionable related-party transactions by Wade Cordell, Brad Cordell, Strugill, and/or Blevins.

169.    On July 20, 2006, Meyers sent Wade Cordell and Sturgill an email detailing that he had spoken with an employee of Bison to try to extend the trigger date to, upon information and belief, February 28, 2007. Meyers further advised that it would be helpful to "our cause if all the info the [sic] requested is on the ftp site before the end of the weekend and an e-mail sent [by Sturgill or Cordell] to Bison telling them that it is there."

170.    In July of 2006, Clark published a presentation for Bison on the ftp site that did not accurately reflect the costs associated with the Guarantee Program.

171.    On July 25, 2006, Meyers sent Sturgill, while copying Clark, a request for the following additional items needed for various functions MK was providing to Debtor pursuant to the 2006 MK Engagement Contract as follows:

a. Bison required the 2005 and 2006 monthly financials; an overview of the E&Y (Ernst and Young) interaction; and the supporting documents for the audit, particularly the Cost of Goods calculation.

     b.  Will Reid from Regions Bank, in connection with a six-month line of credit issued to the Debtor in the amount of $1,000,000.00, required a bound and signed 2005 audit.

          i.  Meyers noted that this was needed "ASAP in order to get Regions to give IBG the line of credit on the leased equipment."

172.     Later on July 25, 2006, Clark sent Bissette and Caballero information pertaining to two new files Clark had posted on the ftp site.

     a.  The first was called "all checks screened collection rate," which was a large list of checks with three collection rates during the periods of June of 2005 to May of 2006, June of 2005 to December of 2005, and January 2006 to May of 2006.

          i.  Clark noted he had "eliminated checks older than 60 days to remove the 'box-of-old-checks' effect, that skews the collection rates of new NSF checks from existing clients" to give a more "accurate picture of the overall collection rate;" however, checks older than sixty (60) days were still deemed collectible and were included in the Debtor's computation of its accounts receivable on its books, further misrepresenting the financial condition of the Debtor, despite notice of this fact to MK and its employees and the attendant gap in the Debtor's income that these facts evidenced due to Wade Cordell, Brad Cordell, Blevins, and Sturgill's systematic looting and embezzlement from the Debtor.

173.     On July 27, 2006, Meyers sent Sturgill a revised caption for Debtor's 2005 Accounts Receivable Balance, which differed from the April 25, 2006 AR Caption in that the additional fees were noted as totaling $13.2 million instead of $12.3 million.

174.     On July 29, 2006, Clark emailed Meyers discussing the problems with Debtor's Statement of Operating Income:

     a.  "The [r]evenue numbers are obviously not being caught quite right, but if you look at the beginning of 2005, you can get a good feel for the electronic side, because manual collections had not started yet."

   b. "I'm pretty sure the hard collections numbers are right, [be]cause this comes straight from the daily reports from Bill [Van Hoeven], so we can tie all the numbers to the check and the collector."

   c. "The trick comes when we are looking at the combined number. It still isn't quite right. I also think they are double counting payroll taxes in their wage figures, and they are missing some of those numbers altogether in 2006."

   d. "It might make sense to put the process on hold for a while until more check volume starts coming in on the electronic side and Haines has a chance to put some more financial controls in place."

   e. "I think the business model is sound, but we just don't have the financial controls or the check volume to prove it yet."

175.    MK is a subsidiary of Regions.

176.    On July 31, 2006, Will Reid from Regions inquired as to when Meyers expected for Regions to receive the Debtor's audited financial statement, and noted "[t]he email of the audit numbers you sent has an error in the PP& E [property, plant and equipment] section of the footnotes. The categories of Equipment don't add up to the total shown," which triggered a duty for MK to conduct an independent investigation that MK failed to fulfill while also again portraying patent inaccuracies in the Grafton Audited Financials to MK and its employees.

177.    Rather than following up on this warning himself, Meyers simply referred the matter to Sturgill by forwarding the July 31, 2006 email on July 31, 2006 with a notation to "[s]ee below from Regions."

178.    On July 31, 2006, Sturgill emailed Clark a monthly breakdown of the Debtor's accounts receivable for 2005 relating to the Debtor's electronic check collection and hard collections programs ("July 31, 2006 Submission") indicating total revenues for the Debtor's hard collections of $6,073,537.34.   The Total Accounts Receivables for 2005 totaled $9,937,155.34, which included a itemization on account of the Debtor's 2004 Accounts Receivable increase of $2,983,882.00.

   a. This 2004 Accounts Receivable increase of the July 31, 2006 Submission did not remotely correspond with the 2004 Accounts Receivable decrease of $3,338.00 reflected in the March 10, 2006 2004 Financials Version or the September 1, 2006 Version of 2004 Financials.

41

**-57-**

b. The 2004 Accounts Receivable increase of the July 31, 2006 Submission did not correspond with the 2004 Accounts Receivable increase reflected in the September 6, 2006 Morning Version of 2004 Financial Statements, which was $2,980,544.00.

c. The 2004 Accounts Receivable increase of the July 31, 2006 Submission did not correspond with the 2004 Accounts Receivable increase of $2,980,648 reflected in the September 6, 2006 Afternoon Version of 2004 Financials.

d. The 2004 Accounts Receivable increase of the July 31, 2006 Submission did not exactly correspond with the 2004 Accounts Receivable increase reflected in the 2004 financial statements audited by Grafton of $2,980,648.00.

e. These efforts were directed to fraudulently increase Debtor's stated income and profitability.

179.    On August 3, 2006 at 10:40 a.m., Wade Cordell emailed Meyers, with a copy to Sturgill, and Clark, a Bank Detail Report reporting the collection rates for the first three banks utilizing Debtor's services with explanations concerning the various problems that were unexpectedly encountered and/or were to be fixed.

180.    Later on August 3, 2006, at 10:46 a.m., Clark emailed Wade Cordell and Meyers, with a copy to Sturgill, to request the data included in the Bank Detail Report in an excel file.

181.    On August 3, 2006 at 8:59 p.m., Meyers emailed Wade Cordell, Sturgill and Van Hoeven concerning the check collection rates for July of 2006 of one bank and requested for them to review his comments that indicated as follows in *italics*  ("Meyers's August 3, 2006 Check Collection Concerns"):

a. Total Checks Collected: 143

b. Total Checks Entered: 298

i. *Collection Rate 48.0%*

c. Checks Entered after 7/14: 148

d. Checks entered before 7/14: 150

e. Checks collected before 7/14: 98

i. *Collection Rate: 65%*

f. *Questions:*

i. *why does it take on average 14 days to collect?*

42

**-58-**

ii. *are these all electronic?*

182.    On August 3, 2006, Meyers emailed Brad Cordell, Wade Cordell, and Van Hoeven explaining how he had increased the average checks collected per collector per day for future collections to twelve from seven in light of increases in efficiency from the auto dialer.

183.    On August 3, 2006, Wade Cordell responded to Meyers that after discussing the matter with Van Hoeven that the average collection per day could be two (2) checks per hour due to the new auto dialer and its effective and prompt communication with the Check Writers' respective banks.

184.    On August 3, 2006, at 10:06 p.m. Sturgill sent Meyers a version of Debtor's purported monthly 2005 Income Statement, which was different from all other prior submissions, and indicated a net income before taxes for 2005 of $8,158,749.00.

185.    On August 8, 2006 at 10:09 a.m., Sturgill sent Clark a monthly breakdown of Debtor's accounts receivable for 2005 for Debtor's electronic check collection and hard collections programs indicating total revenues for Debtor's hard collections of $4,734,790.00 without a decrease in the manual checks collected, resulting in a significant decrease of $1,338,747.34 from the July 31, 2006 Submission's indications of total revenues for Debtor's hard collections totaling $6,073,537.34.

> a.  However, the Total Accounts Receivable for 2005 was reflected as $9,936,403.00, despite the decrease in revenue from Debtor's hard collections indicated in the July 31, 2006 Submission, since Sturgill included an itemization in the 2005 Accounts Receivable calculation, among others, for an amount of $1,349,607  indicated as "[f]orward from 2004."

> b.  Furthermore, the 2004 Accounts Receivable balance was $2,983,882.00 encountering the same problems as the July 31, 2006 Submission in failing to correspond with the 2004 Financials audited by Grafton, whose Independent Auditor's Report was dated February 20, 2005.

186.    On August 8, 2006 at 3:23 p.m., Sturgill sent Clark a version of Debtor's 2005 Balance Sheet and Statement of Income ("August 8, 2006 2005 Balance Sheet and Statement of Income Version") delineating figures for each month as well as year end totals.

> a.  The August 8, 2006 2005 Balance Sheet and Statement of Income Version reflected monthly totals for Debtor's Accounts Receivables.

43

**-59-**

187.     On August 9, 2006 at 11:01 a.m., Clark emailed Sturgill relaying problems concerning the 2005 monthly financial statements and stated, "[t]he Monthly financials didn't come through. Maybe we can get on the phone and you can walk me through what you did, and I can key in the numbers as we go on the version I have and see if we can make it happen."

188.     On August 9, 2006 at 3:16 p.m., Sturgill emailed Clark with the "complete[d]" 2005 Balance Sheet, Cash Flow Statement, and Statement of Income for Debtor ("August 9, 2006 2005 Statement of Income and Balance Sheet Version") delineating figures for each month as well as year-end totals that split up the 2004 accounts receivable carry forward over the year 2005 in order to minimize the actual limited possibility of actually collecting checks that were stale and to further inflate Debtor's income. These figures were significantly different from the August 8, 2006 2005 Balance Sheet and Statement of Income Version as reflected below (and did not correspond with the Cash Flow statement included in the 2005 Audited Financials by Grafton):

| Month of 2005 – Statement of Income | August 8, 2006 2005 Balance Sheet and Statement of Income Version  (Accounts Receivable) | August 9, 2006 2005 Statement of Income and Balance Sheet Version Version (Accounts Receivable) |
| --- | --- | --- |
| January | $4,805,839 | $1,084,256 |
| February | $5,212,742 | $2,352,566 |
| March | $5,925,519 | $3,176,325 |
| April | $6,258,336 | $4,156,064 |
| May | $6,611,194 | $4,844,009 |
| June | $6,998,257 | $5,590,078 |
| July | $7,355,929 | $6,300,603 |
| August | $7,792,850 | $7,527,881 |
| September | $8,156,804 | $8,190,866 |
| October | $8,469,201 | $8,703,263 |
| November | $8,751,692 | $9,492,728 |
| December | $9,936,403 | $9,936,403 |

189.     On August 16, 2006, Meyers emailed Wade Cordell and Sturgill requesting for information to allow Meyers to expand the bank section of the PPM.

190.    On August 21, 2006, Sturgill emailed Meyers, Clark, Brad Cordell, and Wade Cordell the Debtor's purported Interim 2006 Statement of Income, Balance Sheet, and Cash Flow Statement for the period ending March 31, 2006 ("August 21, 2006 2006 Financial Statements").

      a.    The Net Income from Operations on the Statement of Income was indicated as $1,821,353 and the Net Income, deducting an expense for income taxes, was $1,202,093.00.

      b.    The Net Income on the Cash Flow Statement was $544,447.00.

191.    On August 22, 2006, Meyers recognized that in the August 21, 2006 2006 Financial Statements the "net income on the P&L does not equal the net income on the cash flow statement;" yet he only communicated his concern to Sturgill, and Sturgill quickly replied in an email to Meyers, "[s]orry guys cash was for march only, here [sic] is the three month cashflow for 1st qtr" and attached the Debtor's purported Interim 2006 Statement of Income, Balance Sheet, and Cash Flow Statement for the period ending March 31, 2006, which indicated the Net Income on the Cash Flow Statement as $1,202,093.00.

192.    On August 29, 2006, Sturgill sent Meyers, Clark, and Wade Cordell a list of Debtor's shareholders indicating that there were 44,270,607 outstanding shares of the Debtor. Later Meyers and Sturgill further improvised the number of outstanding shares to continue falsely projecting the portrait of the Debtor's financial success for potential investors in order to perpetuate the Scheme without any tangible benefit to the Debtor.

193.    On August 29, 2006, MK entered into a Referral Agreement ("06 MK Referral Agreement") with MK, which provided for MK to endorse and recommend the Debtor to financial institutions, credit card processing companies, and merchant customers as a potential provider of transaction processing services ("Services"); to promote and actively seek to cause financial institutions, credit card processing companies, and merchant customers to enter into Services' agreements with the Debtor by, among other things, referring the Services and the endorsement of the Services through marketing letters or phone calls; refer to the Debtor on an exclusive basis all current and future financial institutions, credit card processing companies and merchant customers seeking services similar to those offered by the Debtor (collectively, "MK Referred Customer"). In exchange, the Debtor agreed that it would offer the MK Referred Customer custom pricing; deliver to MK monthly status reports listing all MK Referred Customers and describing whether the Debtor has entered into a business relationship with the

MK Referred Customers; promote and actively seek to cause the MK referrals of MK Referred Customers to enter into agreements for Services; and market the Services to MK's financial customers, credit card processing companies, and merchant customers and pay MK a commission for each check collected on account of Referred Customers.

    a.  The term of the 06 MK Referral Agreement was for three years from the date of its execution and was renewable for successive three (3) year periods by mutual agreement of the Debtor and MK.

    b.  For a period of two (2) years following the termination of the 06 MK Referral Agreement, MK agreed not to directly or indirectly solicit, upon behalf of itself or any third party, any financial institution, credit card processing company or merchant customer that it referred to the Debtor for the purpose of providing or receiving services similar to the Debtor's services.

    c.  In exchange for MK's referrals, the Debtor agreed to the following commission compensation structure:

        i.  If a MK Referred Customer did not receive a commission for each collected check then Schedule Two applied. Otherwise, Schedule One was applicable.

           1.  Schedule One provided that the Debtor would pay MK a $1.00 management override commission per collected check earned by the Debtor from a Referred Customer. Schedule One further required the Debtor to submit to MK a monthly summary report detailing each Referred Customer's activity for the preceding month. Each commission was required to be remitted to MK within thirty days of day in which such revenues are earned and booked by the Debtor.

           2.  Schedule Two provided that Debtor would pay MK a $2.00 commission for each check recovered by the Debtor on behalf of a MK Referred Customer (collectively, "MK Check Referral Commission").

194.      On August 30, 2006, Meyers emailed Sturgill with a copy to Clark a model for Sturgill to use an example to assist in fabricating the Debtor's financial such that the financials were in a

standard format and advised Sturgill "[t]here [are] a lot of disclosures that are not applicable to [the Debtor], so your footnotes will not be quite as long." Meyers went on to explain that the "financials and notes start on page 41."

195.     On September 1, 2006, Sturgill sent Meyers Debtor's purported 2003 Balance Sheet, Income Statement, Statement of Retained Earnings, and Statement of Cash Flow ("September 1, 2006 2003 Financials Version"), which were demonstrably different from the March 10, 2006 2003 Financials Version sent by Sturgill to Meyers and was a further step to misrepresent the financial condition of the Debtor to the Innocent Members of the Board of Directors, resulting in the subsequent years of the Grafton Audited Financials appearing more credible.

|  | March 10, 2006 2003 Financials Version | September 1, 2006 2003 Financials Version |
|---|---|---|
| **Balance Sheet** |  |  |
| Assets | $4,539,953.03 | $214,958.00 |
| **Income Statement** |  |  |
| Net Income | $9,953.03 | $129,575.00 |

196.     The Debtor's actual 2004 Financial Statements, audited by Grafton including the Independent Auditors' Report, dated February 20, 2005, reflected Debtor's 2004 net income of $130,198.00.

197.     On August 31, 2006, Sturgill emailed Clark the "2004 financials," which included Debtor's purported 2004 Balance Sheet, Statement of Income, Statement of Retained Earnings, and Statement of Cash Flow, and on September 1, 2006, Sturgill emailed Meyers these same versions ("September 1, 2006 Version of 2004 Financials").

198.     On September 6, 2006 at 9:56 a.m., Sturgill sent Clark the "2004 financials – Restate[d]," which included Debtor's purported 2004 Balance Sheet, Statement of Income, Statement of Retained Earnings, and Statement of Cash Flow ("September 6, 2006 Morning Version of 2004 Financials").

199.     On September 6, 2006 at 3:52 p.m., Sturgill sent Clark the "2005 financials – restated," which included Debtor's 2005 Balance Sheet, Statement of Income, Statement of Retained Earnings, and Statement of Cash Flow ("September 6, 2006 Version of 2005 Financial Statements").

200.     On September 6, 2006, at 3:58 p.m., Clark responded to Sturgill "[t]he restated 2005 financials came through. Could you send over the 2004 numbers and the notes?"

Case 12-80208-jw   Doc 1   Filed 08/31/12   Entered 08/31/12 23:38:00   Desc Main
Document    Page 50 of 173

201.    Also, on September 6, 2006, at 3: 52 p.m., Sturgill sent Clark Debtor's purported 2005 Statement of Cash Flow, Statement of Retained Earnings, Balance Sheet, and Statement of Income – "restated."

202.    On September 6, 2006 at 4:02 p.m., Sturgill sent Clark an edited version of the "2004 financials – Restate[d]," which included Debtor's purported 2004 Balance Sheet, Statement of Income, Statement of Retained Earnings, and Statement of Cash Flow ("September 6, 2006 Afternoon Version of 2004 Financials").

203.    On September 9, 2006, Sturgill forwarded an email from Brent Grafton to Meyers while copying Clark attaching Debtor's purportedly audited 2004 Financial Statements, which included Debtor's purported 2004 Balance Sheet, Statement of Income, Statement of Retained Earnings, and Statement of Cash Flow ("September 9, 2006 Grafton Version of 2004 Financials").

204.    MK, upon information and belief, was assisting Sturgill in crafting the 2004 Audited financials by Grafton, which audit was purportedly completed by Grafton on February 20, 2005; however, in reality, MK, and its employees, assisted Sturgill in constructing believable figures to result in the final figures used in the 2004 Grafton audited financials and such financials were then backdated to reflect an audit date of February 20, 2005, despite the culmination of these figures in September of 2006 by MK, MK's employees, Sturgill, and Grafton with the knowledge of Wade Cordell, Brad Cordell, and Blevins. The September 2006 versions of the 2005 financials demonstrate MK and its employees' knowledge of the falsity of the Grafton Audited Financials as well as their assistance in the creation thereof especially when considering MK's publication of the 06 CIM, which used the March 10, 2006 of 2004 Financials and stated "[f]inancial statements for years 2003 and 2004 have been audited by Grafton & Company, PLLC." The information in paragraphs 199 to 205 is summarized below:

**Balance Sheet - 2004**

| Item: 2004 Balance Sheet | March 10, 2006 Version of 2004 Financials *Also used in 06 CIM* | Sept. 1, 2006 Version of 2004 Financials | Sept. 6, 2006 Morning Version of 2004 Financials | Sept. 6, 2006 Afternoon Version of 2004 Financials | Sept. 9, 2006 Grafton Version of 2004 Financials | 2004 Audited Financials by Grafton |
|---|---|---|---|---|---|---|
| Assets | | | | | | |

48

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document    Page 51 of 173

| | | | | | |
|---|---|---|---|---|---|
| Current Assets | | | | | |
| Accounts Receivable | *$148,460* | *$148,460* | *$3,132,342* | *$3,132,446* | *$3,132,446* | *$3,132,446* |
| **Total Assets:** | *$10,226,530.11* | *$6,246,550* | *$9,230,432* | *$9,230,536* | *$9,230,536* | *$9,230,536* |
| | | | | | |
| **Liabilities and Capital** | | | | | |
| **Total Liabilities** | $97,000 | *$157,184* | *$219,454* | *$219,454* | *$219,454* | *$219,454* |

**2004 – Income Statement**

| Item: | March 10, 2006 Version of 2004 Financials | Sept. 1, 2006 Version of 2004 Financials | Sept. 6, 2006 Morning Version of 2004 Financials | Sept. 6, 2006 Afternoon Version of 2004 Financials | Sept. 9, 2006 Grafton Version of 2004 Financials | 2004 Audited Financials by Grafton |
|---|---|---|---|---|---|---|
| Total Expenses | $1,926,686.92 | $1,626,672 | $1,626,672 | $1,626,672 | $1,626,672 | $1,626,672 |
| Net Income before Income Tax | $(102,745.92) | $197,269 | $197,269 | $197,269 | $197,269 | $197,269 |

205.    At the insistence of Meyers, Hargrett, who had a previous relationship with MK through a successful capital raise, became the Debtor's Chief Financial Officer. Thus, despite the Board of Director's employment of a nationally esteemed employment agency to assist in Debtor's search for a Chief Financial Officer, Hargrett was chosen at the behest and upon the recommendation of MK and its employees.

206.    On September 15, 2006, Debtor's securities counsel sent Meyers the "relevant due diligence items you requested," including a forty percent license sample (upon information and belief, a Territory Agreement containing a 40% Bonus Compensation Term), resolutions with formula (upon information and belief,  the Territory Compensation Resolution), the Debtor's

Charter, and the Debtor's Certificate of Designation (upon information and belief, 2005 Certificate of Designation), stating, "Keith – attached are the relevant due diligence items you requested and below is a description of the strategy that IBG has determined to follow to [sic] in connection with the private placement and associated tender offers" while also explaining the Debtor's strategy to follow "in connection with the private placement and associated tender offers." Thus, Meyers and MK also had knowledge of the 06 Securities Counsel Due Diligence Memo.

207.    On September 19, 2006, Hargrett executed an employment contract to become Debtor's CFO; his bonus structure was based on the Debtor's EBITDA measured from each fiscal year beginning in December of the previous year.

> a.    For instance, if the EBIDTA equals or exceeds the EBITDA projections of December in the year prior then Hargrett would receive a bonus of fifty percent (50%) of his annual salary.

208.    Meyers also actively assisted the Debtor's securities counsel with the preparation of the PPM. For instance, by drafting the risk factors, Meyers misrepresented the facts known to Meyers, and failed to communicate the accurate information to the Innocent Members of the Board of Directors.

209.    Meyers requested information based on the 06 Securities Counsel Due Diligence Memo, which identified many problems arising from the due diligence investigation conducted by the securities counsel, and MK knew such identified inconsistencies were indeed *continuing* problems but failed to disclose this knowledge to the Innocent Members of the Board of Directors.

210.    On October 11, 2006, Hargrett emailed Sturgill, Wade Cordell, Meyers, and Clark, subsequent to receiving instructions from Meyers, and assigned Hargrett and Clark the task to prepare the financial model through 2007 so as to pass the "sanity test," which was designed to corroborate the fraudulent figures used in the Grafton Audited Financials at the Debtor's expense.

211.    On or about October 27, 2006, Meyers and Clark agreed to use the valuation of the Debtor prepared by Sturgill, despite their knowledge (supplied in a due diligence background check) that Sturgill was not a Certified Valuation Analyst.

212.    In November of 2006, a Private Placement Memorandum ("November 06 PPM") was published by the Debtor with the active assistance of MK and its employees and as a consequence of the nondisclosures of MK to the Innocent Members of the Board of Directors of any of the issues associated with the Grafton Audited Financials or associated with the Scheme, which offered the sale of the Debtor's stock, pursuant to Regulation D, Rule 506, of the Securities Act of 1933 and included the figures from the 2004 Grafton Audited Financials as well as a complete copy of the 2005 Grafton Audited Financials including the Independent Auditor's Report.

213.    Meyers and MK actively solicited investors to invest in the Debtor, despite their knowledge of the problems with the Debtor's accounting, fraudulent financials, and looting by Wade Cordell, Brad Cordell, Sturgill, and Blevins, while simultaneously failing to disclose the Debtor's true financial condition to the Debtor's Innocent Members of the Board of Directors thereby precluding the Innocent Members of the Board of Directors immediate and decisive action based on such disclosures that MK was expected and obligated to give to the Innocent Members of the Board of Directors.

    a.    Thus, MK and Meyers stood mute in the face of their duty to disclose.

214.    Given that the Debtor was an unseasoned issuer, its stock thinly traded, and the substantial size of the proposed offer in the November 06 PPM, MK should have conducted a thorough investigation of all members of the Board of Directors; of significant related transactions between the Debtor and Wade Cordell, Brad Cordell, Blevins and Sturgill; and of the relatively large compensation received by Wade Cordell, Brad Cordell, Blevins, and Sturgill to Debtor's detriment. MK's reputable skill, as a result of its regular activities in the course of its business for which it was employed by Debtor, utilized by MK, detected the wrongdoings of Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins, including but not limited to looting, inaccurate and misleading accounting, detrimental insider transactions, incomplete shareholder ledgers, and improper use of the Face Accounts but failed to disclose these wrongs to the Innocent Members of the Board of Directors.

215.    In dealing almost exclusively with Wade Cordell, Brad Cordell, Blevins, and Sturgill, MK ignored the conspicuous and self-serving nature of the statements made by these directors, which demonstrated these Defendants self-serving motivations in contradiction to the interests of

MK's true client, the Debtor. Moreover, MK, in its role as underwriter, was aware of its adverse position in relation to the issuing company (the Debtor) and its counsel.

216.    On December 13, 2007, the Board of Directors convened a regularly scheduled meeting where it was resolved to terminate the offering of shares after it was reported that 4,434,884 of the 4,800,000 shares had been issued and sold pursuant to the November 06 PPM resulting in approximately $5,543,605.00 in cash proceeds which should have been remitted to the Debtor, and resulted in no net benefit to the Debtor due to the Scheme and its attendant looting and embezzlement components.

   a.  In November and December of 2006, of the total shares sold pursuant to the November 06 PPM, 528,000 shares were sold, resulting in $470,000.00 in cash proceeds that should have been received by the Debtor.

   b.  Thus, from January of 2007 to December of 2007, the Debtor was entitled receive $5,073,605.00 in cash proceeds from sales of the Debtor's shares sold pursuant to the November 06 PPM.

217.    As a registered broker-dealer under 15 U.S.C.A. § 78(c)(a)(26), MK and its employees are also subject to the industry standards established by Financial Industry Regulatory Authority (FINRA) and the NASD and specifically, over private placements of Regulation D securities.

   a.  Brokers are required to establish minimum standard procedures to prevent and detect violations of the federal securities laws and to ensure that the firm meets its continuing responsibility to know both its customers and the securities being sold.

   b.  A broker, in accordance with NASD Rule 27, must establish, maintain and enforce written procedures to enable it to properly supervise the activities of each registered representative and associated person to assure compliance with applicable securities laws, rules, regulations, and statements of policy promulgated thereunder and with the rules of the NASD.

   c.  Brokers, in accordance with Rule 3010, must have supervisory procedures designed to ensure that the firm's personnel including its registered representatives:

      i.  engage in an inquiry that is sufficiently rigorous to comply with their legal and regulatory requirements;

      ii.  perform the analysis required by NASD Rule 2310;

    iii.  qualify their customers as eligible for the purchase of securities exempt from registration pursuant to Regulation D; and

    iv.  to comply with the antifraud provisions of the federal securities laws and FINRA rules in connection with their preparation or distribution of offering documents or sales literature.

d.  NASD Rule 2310 states a broker-dealer must have reasonable grounds to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer and should at a minimum, conduct a reasonable investigation concerning:

    i.  the issuer and its management, which would include the following:

        1.  examining the issuer's governing documents, including any charter, bylaws, and partnership agreement noting particularly the amount of its authorized stock and any restriction on the entity's activities.

        2.  examining historical financial statements of the issuer and its affiliates, with particular focus, if available, on financial statements that have been audited by an independent certified CPA as well as the issuer's auditor's letters to management;

        3.  looking for any trends indicated by the financial statements;

        4.  inquiring about the business of affiliates of the issuer.

    ii.  the business prospects of the issuer;

    iii.  the assets held by or to be acquired by the issuer;

    iv.  the claims being made, and

    v.  the intended use of proceeds of the offering.

e.  If a broker-dealer encounters "red flags" which indicate that the financial statements were not accurate, the broker must conduct a further, independent investigation of the financial condition of the issuer under the circumstances.

f.  MK failed to perform these functions.

218.    As an underwriter, MK and its employees are also subject to a more rigorous standard of due diligence, and the Debtor and the Innocent Members of the Board of Directors reasonably

relied on MK to comply with those standards in performing the terms of the 2006 MK Engagement Contract.

    a.  An underwriter holds itself out to the public as a professional capable of evaluating the financial condition of the issuer; the Debtor relied on MK's expertise that MK's involvement in an offering was synonymous with its representation and warranty of its reasonable investigation into that offering. The Innocent Members of the Board of Directors relied upon MK's reputation as the underwriter in deciding whether to sell securities pursuant to the 2006 MK Engagement Contract and more specifically, pursuant to the November 06 PPM.

    b.  As an underwriter and/or as a securities professional working for an underwriter, MK and its employees had a duty to investigate the nature and circumstances of the offering.

    c.  MK accepted its position of trust and its position of trust included its obligation, thereby undertaking to render expert advice to the Debtor while also assuming primary responsibility in providing such expert advice to the Debtor and the Innocent Members of the Board of Directors and providing services to the Debtor related to Debtor's issuance of securities and other financing devices employed.

219.    In performance of its duties as underwriter, MK was charged to conduct itself by a standard of reasonable prudence: as a prudent man in the management of his own property by making an effective investigation of the issuer including a reasonable attempt to independently verify the data submitted to it. Thus, MK was required not to rely solely on the company's officers or on the company's counsel in order to formulate a reasonable belief that the statements provided to its client, the Debtor, and thus, investors, were truthful and complete.

    a.  An underwriter's reliance on audited financial statements may not be blind, but rather where "red flags" regarding the reliability of an audited financial statement emerge, mere reliance on an audit will not constitute reasonable care exercised by an underwriter.

    b.  Whether MK relied on its own due diligence or that of its counsel or another, in any circumstance where MK delegates its due diligence functions, it must bear the consequence of an inadequate examination.

    c.  MK failed to perform these duties.

220.    Through its registration under the Investment Adviser's Act of 1940, §15 U.S.C.A. 80b-1, et seq., and the terms of the 2006 MK Engagement Contract, MK also undertook the role of an investment adviser. In its role as an investment adviser, MK was required to exercise "the affirmative duty of utmost good faith, and full and fair disclosure of all material facts and to use reasonable care to avoid misleading its client," the Debtor.

    a.  MK failed to perform these duties.

221.    Upon information and belief, MK did not conduct independent investigation to ensure that the directors, Wade Cordell, Brad Cordell, and Blevins did not or were not continuing to sell stock to unaccredited investors, thereby destroying the safe harbor exempting the securities issued under the November 06 PPM from registration under the Securities Act of 1933.

222.    When confronted with numerous red flags concerning the accuracy of the Debtor's financial statements, MK and its agent, Meyers did not abide by the standards of due diligence, governing the conduct of brokers, underwriters, or investment advisers, but instead, relied exclusively on statements made by Defendants Wade Cordell, Brad Cordell, Sturgill, Hargrett and furthermore, knew of the apparent falsity of these Defendants' statements and assisted in molding these statements into statements that were facially credible without disclosing the fraud they knew suffused Debtor's financial statements to the Innocent Members of the Board of Directors.

223.    MK and its employees were not entitled to rely on the expertised section of the financial statements provided by Grafton.

    a.  When confronted with the Grafton audits' GAAP and GAAS violations, which were apparent to Meyers, as a certified public accountant at the time, Meyers neither independently verified Grafton's certification nor the amount of time the auditor spent at the Debtor's headquarters reviewing the financial records. In addition, MK did not reveal these significant and material issues to *all* the members of the Board of Directors, thereby withholding crucial information from its true client, the Debtor, who was entitled to have effective communications from MK concerning these material issues.

    b.  By turning a willful and knowing blind eye to significant accounting red flags and by participating in their creation as well as failing to make their concerns, if any in light of their knowledge of the same, known to the entire Board of Directors,

Meyers and MK abandoned their profession's duty of due diligence as an underwriter, investment adviser, and broker and breached its duty to disclose all material facts to its client, the Debtor.

c. Furthermore, MK, through its employees, even assisted the Defendants—Sturgill, Hargrett, Brad Cordell, Wade Cordell, Hargrett, and Blevins—in defrauding the Innocent Members of the Board of Directors and others relying on the Grafton Audited Financials by working with the Defendants Sturgill, Hargrett, Brad Cordell, Wade Cordell, Hargrett, and Blevins to refine and sculpt versions of the Grafton Audited Financials to results inuring to MK, MK's employees and these Defendant directors and officers to the exclusion of its client, the Debtor.

224.    The Debtor suffered massive damages at the direction of Blevins, Sturgill, Hargrett, Brad Cordell and Wade Cordell as a result of transactions by which these Defendants—Sturgill, Hargrett, Brad Cordell, Wade Cordell, Hargrett, and Blevins—misappropriated the Debtor's funds for the personal benefit of themselves and others. The fraudulent Grafton Audited Financials concealed the Debtor's losses and portrayed a false image of Debtor's financial heath by materially overstating the income and assets of the Debtor while materially understating its losses and liabilities. As a result of this image, these Defendants—Sturgill, Hargrett, Brad Cordell, Wade Cordell, Hargrett, and Blevins—were able to obtain for the Debtor funds from creditors, debenture holders, stockholders and other sources, which were then immediately looted or embezzled by these Defendant Directors and officers.

225.    Wade Cordell, Brad Cordell, Blevins, Hargrett, and Sturgill utilized the sale of securities as a continuing fraud with the objective of looting the Debtor of such funds received on account of the security sales.

226.    The scheme designed to enable further the systemic looting of the Debtor by Defendants—Sturgill, Hargrett, Brad Cordell, Wade Cordell, Hargrett, and Blevins—was reasonably foreseeable to MK and its employees, who not only had a duty to be apprised of such apparent scheme but also assisted in its perpetration and fulfillment in order to benefit on its own account through the Equity Placement Fee as well as through motivating its employees to also participate in such schemes through a bonus compensation scheme dependent on the formation and execution of such engagement contracts and through compensation from the 06 MK Referral Agreement.

227.    MK and its employees owed the Debtor to exercise independent judgment and the level of care and prudence expected of professionals and to report any respect in which the Grafton Audited Financials were not fairly presented and any matter which threatened the Debtor's continued operations and to properly evaluate the Debtor's institutional controls and to determine whether the controls were reliable.

228.    MK and its employees also assisted Wade Cordell, Brad Cordell, Blevins, Hargrett, and Sturgill in its concealment from the Innocent Members of the Debtor's Board of Directors of the Debtor's financial condition, which if accurately portrayed would have reflected that these Defendant-directors were merely propping up the perishing Debtor and the attendant information, known to MK and its employees, that the Debtor's grave condition was precipitated by these Defendants' looting and embezzlement.

229.    MK and its employees acquiesced and failed to communicate disapproval of the accounting methods employed by Grafton. Therefore, the Board of Directors reasonably relied on the representations in the Grafton Audited Financials and reasonably concluded that in light of MK's use of the Grafton Audited Financials after MK's required due diligence investigation and MK's participation in the due diligence investigations conducted by institutional investors, pursuant to the 2006 MK Engagement Contract, that such financials and projections were accurate.

230.    For instance, the 2006 Grafton Audited Financials compared to internal records of the Debtor, which were created subsequent to the Innocent Members of the Board of Director's realization of the accounting problems incorporated into the Grafton financials ("2006 – Post Management Change Financials") in conjunction with an additional version created by the Trustee ("2006 – Additional Trustee Adjustments") demonstrates the glaring problems with the financials MK used in advising the Innocent Members of the Board of Directors through non-disclosure and the justifiable reliance of the Innocent Members of the Board of Directors that such disclosures would be made and thereby assisted in creating:

| Item: | 2006 – Grafton Audited Financials | 2006- Post Management Change Financials | 2006 – Additional Trustee Adjustments to filed tax returns |
|---|---|---|---|
| Total Assets: | $23,187,292 | $8,527,893 | $3,727,893 |

57

**-73-**

| Total Liabilities: | $6,761,378 | $3,751,772 | $3,751,815 |
| Total Capital: | $16,425,914 | $4,776,121 | (23,922.00) |
| Net Income: | $608,365 | $(4,101,231) | --not configured to date-- |

231.    On January 16, 2007, Chip Grayson, an employee of MK, emailed Meyers a summary of the Transactions closed in 2006, and indicated as under the heading of "Engaged Transactions" is a notation for Infinity Business Group of South Carolina where the transaction taking place was an equity private placement with a deal size of $25 million with a total fee for MK of $1.5 million scheduled to close in the second quarter of 2007 with Meyers and Calvin Clark acting as the team for the deal.

232.    In 2006, Meyers base salary, upon information and belief, was $80,000.00. Meyers received a bonus in August of 2006 for $72,000.00 and in February of 2007 for $375,000.00.

233.    In 2007, Meyers base salary, upon information and belief, was $80,000.00. Meyers received a bonus in August of 2007 for $72,000.00 and in February of 2008 for $385,000.00.

## II. 2008 ROLE OF MK

234.    In November 2006 and January 2008, Meyers bought stock in the Debtor, paying $50,000.00 for 40,000 shares of stock.

235.    On December 7, 2007, Wade Cordell emailed Meyers that "IBG now has close to 2 million shares from Mike Potter that we can sell. Are you in a position to help sell this to any 'individuals'? Before I send you anything about our 2008-2012 projections I first need to know if you wish to help. Secondly, before you were not able to sell even one person except yourself. Just let me know as soon as you can."

236.    Later on December 7, 2007, Meyers emailed Wade Cordell that he was not sure what he could sell but he would definitely send the information to some parties that may have an interest. Meyers continued, "[t]he Company has definitely mitigated all of the concerns that we had in the past," and that he could not ask for any compensation related to his sale of the two million shares but that "[b]onus time (and there for cash) is near for us bankers so now is the time to get the info out to the folks that I know . . . ."

237.    On December 10, 2007, Meyers emailed Wade Cordell the following: "Wade, I've got $50k accounted for with my first call. Please send me the info and the new projections."

238.    On December 10, 2007, Wade Cordell sent Meyers the 2008 to 2012 revenue projections of the Debtor, which incorporated Debtor's 2007 year-end results ("December 10, 2007 Projections"); a PPM; a Subscription Agreement; the 2004-2006 Audited Financials; and a management presentation.

    a.  The 2007 Balance Sheet submitted by Wade Cordell to Meyers indicated $19 million dollars in net receivables.

239.    On December 10, 2007, after reviewing the Debtor's projected revenues expected for 2008 to 2012, and in particular after examination of the 2007 figures indicated on the Balance Sheet, Meyers emailed Wade Cordell as follows:

    a.  "Wade, I thought you wrote off the receivables? What are the 19mm in receivables related to?"

    b.  The December 10, 2007 Projections included accounts receivable in the amount of $19 million. However, Debtor's actual accounts receivable totaled approximately $300,000.00.

240.    On that same day Wade Cordell admitted the accounts receivable were overvalued by responding, "[w]e wrote off the receivable[s] in 2007."

241.    On January 11, 2008, Roger Woodman, an employee of MK and a partner of Woodman Investment Partners wrote the Debtor a check for $50,000.00 in consideration for the purchase of 40,000 shares of the Debtor's common stock

242.    On January 15, 2008, Woodman executed a stock subscription agreement as signatory for Woodman Investment Partners and was issued a stock certificate by the Debtor for 40,000 shares.

243.    In 2008, again because of the Debtor's obfuscated perilous financial condition, Wade Cordell and Sturgill approached Meyers and MK regarding MK's services for the Debtor. MK, and its employees, again, failed to inform the Innocent Members of the Board of Directors of such perilous state.

244.    The Board of Directors convened a special board meeting on April 23, 2008. In attendance telephonically were Wade Cordell, Brad Cordell, Blevins, Van Hoeven and Sturgill. At the meeting, the Board of Directors discussed that it was in the best interests of the Debtor to issue certain debt instruments to accredited investors in light of the Debtor's projected

profitability and MK's explicit support thereof and resolved to do so in order to provide bridge financing to allow time for MK to find an institutional investor for the Debtor.

    a. Pursuant to this resolution, Promissory Notes were issued to accredited investors ("2008 Promissory Notes") providing for interest at a rate of twelve percent (12%) per year on the balance of the outstanding principal.

    b. In addition to the interest payable, the 2008 Promissory Notes included a clause where for each dollar of principal loaned to the Debtor, the obligee was entitled to one share of stock.

245.    On April 24 2008, the Debtor and MK entered into an engagement contract ("2008 MK Engagement Contract"), governed by the laws of Georgia, reflecting the signatures of Meyers, as Senior Vice President of MK's Business and Financial Services Group and Wade Cordell, as Chairman and President of the Debtor.

    a. MK was retained specifically to "(i) provide financial advisory services, including general business and financial analysis of the Company, and (ii) provide advisory services concerning the raising of necessary mezzanine debt (a 'Transaction')."

    b. MK accepted the engagement described above and, in that connection, agreed to:

        i. "[i]dentify and approach selected investors on behalf of the Company, advise the Company on debt parameters, and assist the Company on the timing and strategy of exploring potential Transactions (as defined herein);"

        ii. "[c]onduct financial due diligence of the Company, including but not limited to an examination of financial results and management projections;"

        iii. "[c]onduct financial due diligence of potential investors in order to screen potential transaction partners, evaluate offers, advise in negotiating a definitive agreement (if requested by the Company), and assist in completing any Transaction;" and

        iv. "[a]ssist the Company in the preparation of any descriptive information and appropriate confidentiality agreement for marketing to potential investors[;]"

        v. "[i]dentify and select the appropriate financial partners to fund the Transaction." (collectively, "Services").

    c. The term of MK's appointment and authorization under the 2008 MK Engagement Contract extended from April 28, 2008 through October 24, 2008, although MK was

entitled to its fee if a Transaction was consummated at any time prior to the expiration of twelve months after April 28, 2008.

d. Furthermore, Debtor agreed in the 2008 MK Engagement Contract that during the period of engagement, neither the Debtor nor any representative of the Debtor (other than MK) would initiate discussions regarding a Transaction except through MK, and if the Debtor received an inquiry regarding a Transaction, the Debtor or its representatives would promptly advise MK of such inquiry in order for MK to evaluate the person and or/entity making such inquiry and assist the Debtor in any resulting negotiations.

e. As compensation for MK's Services, the Debtor agreed to pay MK a contingent placement fee in cash at closing equal to 3% of the gross proceeds raised on behalf of the Debtor, and in addition, whether a Transaction was completed or not, Debtor agreed to "reimburse MK's upon demand for its reasonable out-of-pocket expenses (including fees and expenses of counsel) incurred in connection with its engagement . . . ."

f. The Debtor also agreed to provide MK with all financial and other information requested by MK for the purpose of the engagement while MK agreed to keep such information confidential and not disclose or permit its employees to disclose such information received by the Debtor, except as contemplated by the 2008 Engagement Agreement or as required by law.

g. MK also explained in the 2008 MK Engagement Contract, that MK is a "full services securities firm and as such may from time to time affect transactions, for its own account or the account of customers, and hold positions in securities or options on securities of [the Debtor] and other Companies which may be the subject of the engagement contemplated. . . ."

h. Moreover, the 2008 MK Engagement Contract provided that "[a]ll opinions and advice provided to the [Debtor] are intended solely for the benefit and use of the [Debtor] in connection with the matters described. . . ."

246.    On April 25, 2008, Irena Snider ("Snider"), an MK employee, who worked with Meyers, emailed Hargrett with a copy to Meyers reminding Hargrett "to send us [MK] at your convenience the management presentation, audited financials, and projections in a soft copy."

247.     To execute its role in the 2008 MK Engagement Contract, MK, upon information and belief, presented a Management Presentation ("Management Presentation") to potential investors and the Innocent Members of the Board of Directors, which provided, *inter alia*, as follows:

    i.    Under the heading, 2008 Sales Goals, Management Presentation provided:

        1.  New National Banks by End of 2008

          a.  "3 National Banks x 50,000 New Merchants = 150,000

          b.  150,000 New merchants x 2.5 checks per month = 375,000

          c.  375,000 checks per month x $30.00 Fee = $11,250,000.00"

        2.  The 2008 Sales Goals stated that by the end of 2008, the Debtor's National Bank initiative should produce:

          a.  "$11,250,000 in Revenues Monthly!

          b.  EVEN AT A 25% SIGN UP RATE IBG CAN EXPECT - $2,812,500.00 in Monthly Potential revenue."

    ii.    Under the hearing, IBG Exit Strategy for Shareholders:

        1.  "Begin meeting with Potential 20% Buyers @ August/September 2008:

          a.  Wachovia & Other  Large Banks

          b.  Top 10 Credit Card Companies

          c.  Equity Groups

          d.  Other Public Companies within the Financial Sector

             i.  *Once check counts reach 250,000 + monthly, IBG seeks buy-out of all shares"

    iii.    The Independent Auditor's Report to the Balance Sheet, Income Statement, Statement of Retained Earnings, and Statement of Cash Flow of the Grafton Audited Financials noted that these financial statements were "in conformity with generally accepted accounting principles."

        a.  The 2007 Balance Sheet indicated $19,723,322 million dollars in net receivables.

    iv.    The Management Presentation used by Sturgill, Blevins, Hargett, Brad Cordell, and Wade Cordell and MK and its employees including Meyers incorporated the Grafton Audited Financials, which inflated the Debtor's

financial health, while also including greatly exaggerated financial
projections for the years 2008 to 2012.

248.    In its plan to effectuate its obligations pursuant to the 2008 MK Engagement Contract,
MK solicited potential investors through a form letter ("Form Letter"), which included a copy of
the 2008 Management Presentation. The Form Letter provided, *inter alia*, as follows:

    a.  "Due to the success IBG has had in developing community bank sector products, the
        Company is now expanding its marketing to larger regional and national financial
        institutions… To date the Company has managed its business to almost cash flow
        break-even, with significant investment in infrastructure and personnel in preparation
        for future growth. Post implementation of one of these two contracts, [from major
        U.S. Banks] the Company becomes significantly cash flow positive and expects to be
        at a run rate of more than $2 million EBITDA per month by year end."

    b.  To assist in the potential investors' evaluation of the Transaction, MK enclosed a
        copy of the Confidential Company Presentation and audited financial statements.

    c.  Furthermore, MK directed that "[a]ll inquiries and correspondence in this process
        should be directed to Morgan Keegan, and under no circumstances, should the
        Company, its management or employees be contacted directly."

        v.  The Form Letter was signed by Keith Meyers, acting as Senior Vice
            President of MK and Irena Snider, as Associate of MK.

249.    Shortly thereafter, MK received interest from investors such as Nancy Creek Capital,
Patriot Capital, and Laurus Capital and MK coordinated discussion of these entities with the
Debtor.

    a.  For instance:

        i.  On May 2, 2008, Meyers sent the Form Letter and Management Presentation
          to Beth Roireau of Vencore Capital to solicit Vencore Capital as a possible
          source of debt financing for the Debtor. Again, the Form Letter was signed by
          both Meyers and Snider.

        ii.  On May 2, 2008, Snider contacted Wade Cordell and Hargrett to set up a
          conference call with Patriot Capital.

250.    On April 30, 2008, Meyers emailed Hargrett copying Snider to request copies of
Debtor's audited financials for the years 2003 through 2005.

251.    Later on April 30, 2008, Hargrett responded to Meyers by remitting Debtor's Audited Financials for 2004 and 2005 while also noting that the Debtor did not have an audit for 2003.

252.    Also on April 30, 2008, MK created a document entitled "Overview of Accounts Receivable and Revenue Recognition" ("Overview of AR and RR") evidencing MK's continued recognition that the Debtor's accounts receivables records were improperly inflated and how the receivables would be properly recorded going forward by the Debtor:

    a.  The Overview of AR and RR provided that the Debtor's "historical business focused on both manual and electronic collection of bad checks," and Debtor's "program was marketed directly to individual merchants, . . . using independent sales organizations and internal sales personnel" who would often times receive boxes of uncollected check from merchants for collection and thus, the Debtor would have to enter the check data in their system and begin spending money on manual collection efforts.

        i.  "Per the contract with these merchants, [the Debtor] is entitled to the fees arising from the collection efforts of those checks and per accounting requirements of matching revenue and expenses, was required to accrue the estimated revenue that will be received upon collection of these checks. Again note that the accounts receivable balance only includes fees due to [the Debtor] upon collection of the checks and does not include the face amount of the checks."

    b.  The Overview of AR and RR further explained that "[d]ue to the change in its business model moving aggressively into electronic collection, the portion of revenue arising from the older type of transaction will be decreasing dramatically."

        i.  "The Company is currently in the process of evaluating the accounting for the checks supporting the recorded accounts receivable and may write-off some portion of the receivables. It is anticipated that this would be recorded as a change in accounting principle and would be a one-time charge to expense and recorded as an extraordinary item."

    c.  The Overview of AR and RR went on to explain that the Debtor's current business model primarily involves contracting with banks resulting in collection rates significantly higher than under the Debtor's previous business model and the

checks are remitted to the Debtor immediately when the Check Writers' accounts
are more likely to be open and active.

    i.  "As the checks are not owned by [the Debtor] and the contract with the banks and the banks' merchants are a 'fee for service,' revenue is recognized at the time a check is collected which essentially equals cash received. The accounting policies for this business model are in line with other payment processing companies and enable easier comparison of the financial results. Under this accounting methodology there are no receivables generated and revenue and cash flow are in sync."

        1.  "As an example, if [the Debtor] collects a $40 check and a $25 NSF fee related to that check, [the Debtor] would record revenue of $25 for its fee when it clears [the Debtor's] bank account and record an expense for direct variable costs. The $40 face amount of the check is remitted to the merchant and is not reflected in [the Debtor's] income statement."

        2.  Historically, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett had caused the Debtor to record the Face Amount of any check remitted to the Debtor for collection, for instance from a merchant, as well as the Collection Fee, despite the possibility that neither revenue source could be actually realized by the Debtor.

253.    On May 10, 2008, Meyers emailed Wade Cordell and Hargrett copying Snider that MKSF has "[s]aid they were very impressed and expect to put in a term sheet. Good work team!"

254.    From May 12 through May 16, 2008, Snider made repeated requests to Hargrett to send April's financial results to her, which where met with mysterious delays; if financial controls had been in place by Hargrett, as intended by the Innocent Members of the Board of Directors in employing Hargrett at the suggestion of MK, monthly financial results would have been readily available for production to Snider without any unexplained delay.

255.    On May 18, 2008, an email was sent from Snider to Wade Cordell, Sturgill, Hargrett, Blevins, and Brad Cordell outlining the financing alternatives available to the Debtor ("MK Financing Alternatives Analysis"), including the following:

    a.  Scenario 1 – Raise new equity at $1.25 per share

b. Scenario 2 – Raise new equity at $1.00 per share

c. Scenario 3 – Morgan Keegan Strategic Fund proposal

d. Scenario 4 – 50% of the terms in the Morgan Keegan Strategic Fund proposal (i.e., $3,000,000 investment)

e. Scenario 5 – Nancy Creek anticipated proposal

    i. In advising the Board of Directors through a comparative analysis of Scenarios 1 through 5, MK considered the Scenarios even with the EBITDA projections being fifty percent (50%) of what MK projected; however, even when projected at fifty percent (50%), the EBITDA was wildly inflated.

    ii. For instance, MK projected the Debtor's 2009 EBITDA to be $40,177,990.00, when in fact, MK and its employees knew the Debtor's EBITDA for 2007 was (4,519,161.00).

    iii. Debtor's actual 2008 EBITDA was (5,012,567) and Debtor's actual 2009 EBITDA was (4,494,818.00).

    iv. MK advised the Board of Directors that Scenario 4 or Scenario 5 would be in Debtor's best interest.

        1. Not once in the five scenarios presented was any warning given to the Innocent Members of the Board of Directors concerning the problems with its financial statements or the obvious and known mismanagement of the Debtor by Wade Cordell, Brad Cordell, Blevins, Strugill, and Hargrett, including the systemic looting occurring by Defendants Wade Cordell, Brad Cordell, Hargrett, Sturgill, and Blevins, instead MK and its employees stood mute.

        2. Since the Debtor had exceeded its debt capacity and in light of MK's knowledge thereof, MK's advice for Debtor to incur additional debt, when this debt would be subject to onerous debt servicing requirements, was a breach of the 2008 MK Engagement Contract.

256.    On May 19, 2008, Wade Cordell emailed Snider with a copy to Hargrett the Debtor's community bank pipeline report ("Pipeline Report") excluding figures relating to Regions, which he was to provide to Snider shortly.

a. The Pipeline Report portrayed fifteen banks that had contracted with Debtor resulting in thousands of new merchants to market Debtor's services remitting their checks to Debtor beginning in April of 2008.

b. Moreover, five of the banks' programs were opt-in programs where the banks' merchants were automatically enrolled in Debtor's ECR services.

257.    On May 21, 2008, Meyers emailed Hargrett, Wade Cordell, Sturgill, Blevins and Brad Cordell Morgan Keegan Strategic Fund, L.P.'s ("MKSF") Response to Meyers attempted negotiations over the terms evidenced in  MKSF's proposed term sheet as follows:

a. The $3 million dollars investment was fine

b. MSKF "[a]greed not to have a board seat, but need[ed] observation rights and be given the same information that is given to board members."

c. MKSF would need "a deposit for fees. If [MKSF] walk[s] due to something in due diligence or you walk because you found a better deal, then out-of-pocket expenses paid for and will give back any unspent deposit."

d. "Warrants –  Recognized that we cut back from a pro-rata of 3.6% to 3%."

    i. Meyers then suggested a counter: "Would agree to 3% with a ratchet that if the [Debtor] does not hit $5mm in EBITDA for 2007 (which is less than ½ of the projection) then their warrants go to 4%."

        1. Meyers also "negotiated that a write-off of the A/R even to zero would be carved out of EBITDA."

            a. Thus, again Meyers and MK recognized the problems with the accounting procedures' recordation of the accounts receivable of the Debtor in the manner used in the Grafton Audited Financials could no longer be concealed and failed to inform the entire Board of Directors, instead continuing its employ to receive, *inter alia*, its contingent placement fee and to further the Scheme.

e. "Security interest – would take a second position to the Regions debt, but would need a pledge of the stock from the management team."

f. Also, Meyers noted that MKSF "will use a 3rd party accounting firm to review the numbers with an expected cost of $40-50k" and that MKSF "[w]ill likely

conduct background checks on Wade [Cordell], Bryon [Sturgill], and Haines [Hargrett] (~$1,500 each)."

258.    On May 22, 2008, Snider emailed Hargrett copying Meyers informed Hargrett that "Barry Etra is not giving up on this deal. He has asked only for the amount of good receivables on the books, he does not need to see support yet (though I would suspect he would eventually). I told him you are looking to potentially write-off all of the receivables this year and clean-up the balance sheet, so if you tell me they are $0, that's what I'll tell him."

259.    Later on May 22, 2008, Hargrett responded to Snider that "[i]t will probably not be all the way to zero, but will surely go to less than $1M. So [l]et's tell him that for all practical purposes it will be all written off."

260.    Pursuant to the terms of the 2008 MK Engagement Contract, MK attempted to arrange debt financing for the Debtor with MKSF, as evidenced by MK's successful efforts resulting in the May 29, 2008 agreement between MKSF and Debtor ("May 2008 MKSF Contract"), signed by Wade Cordell, acting as President/Chairman of the Debtor.

    a.    The Summary of Proposed Terms and Conditions of the May 2008 MKSF Contract provided the Debtor with an opportunity for MKSF to loan the Debtor up to $4.5 million dollars. The initial amount of the loan offered was for $3 million dollars ("Investment Amount") with annual interest calculated on a 360-day-cycle at a rate of twelve percent interest (12%), payable per month by automatic bank draft. In consideration of the anticipated Investment Amount, MKSF was to receive a detachable warrant, which would be adjusted on a pro-rata basis to reflect funding greater than $3 million, to purchase three percent (3%) of the Debtor's fully diluted outstanding common stock at $.01 per share.

        a.    The warrant would "be increased by an amount representing 1.0% of the then outstanding common shares of the Company, in any year that the Investment Amount remains outstanding, if the Company's audited EBITDA is less than $5.0 million. (For purposes of this section, EBITDA will exclude the impact of one-time A/R adjustments made prior to the closing of the proposed transaction.)."

68

**-84-**

    b.   As a transaction fee, the Debtor was required to pay MKSF two percent (2%) of the Investment Amount ("Transaction Fee"), $40,000.00 of which was due upon acceptance of the proposed term sheet with the balance payable at closing.

    c.   If MKSF elected not to close the transaction, the Transaction Fee less its direct expenses would be returned to the Debtor.

    d.   Conditions precedent of MKSF's fulfillment of initial funding would be, *inter alia*, as follows:

        i.   "Completion of financial, accounting, management, customer, product, supplier, legal, industry and other business due diligence by Investor, including completion of a third party accounting review of the Issuer. Due diligence will be satisfactory to Investor in form and substance;

        ii.   Senior debt financing acceptable to the Investor;

        iii.   Overall capital and legal structure of Issuer, acceptable to Investor;"

        iv.   "No material adverse change in the financial condition or outlook for the Company."

        v.   "Other closing conditions as are customary for a transaction of this nature."

261.    On May 30, 2008, Sturgill emailed Greg Couch ("Couch"), upon information and belief, an employee of MK, details concerning a team sponsored by the Debtor in an upcoming golf tournament and informed Couch as follows:

    a.   "We have signed a deal with Morgan Keegan and have set aside u[p] to 1.5 million shares for you[r] group. You can call Keith Meyers and talk to him if you wish. FYI we also added over 100,000 new business[es] this month. Let me know how much stock your group is going to take."

262.    On June 5, 2008, Hargrett emailed Bob Caughman, Debtor's Secretary, to request the following items for MKSF's due diligence investigation: updated stockholders' list; updated warrant list; standard bank contract; standard school contract; standard direct merchant contract; standard territory license; standard area marketing agreement; and standard ISO.

263.    On June 6, 2008, William Nutter ("Nutter"), a partner with MKSF, emailed Hargrett copying Meyers the contact information for MKSF's lawyer involved with the May 2008 MKSF Contract and its due diligence requirements: John E. Murdock, III ("Murdock") of Boult,

Cummings, Conners & Berry, PLC ("Boult and Cummings"), a firm located in Nashville, Tennessee.

264.    On June 9, 2008, Debtor's software engineer added Wade Cordell, Brad Cordell, and John Blevins to the only other user, Hargrett, on the ftp site storing the MKSF due diligence information provided by the Debtor.

   a.  Each user, other than Hargrett, could read and download, but could not add, change, or delete the materials posted on the ftp site.

   b.  No other member of the Board of Directors had access to the site.

265.    On June 11, 2008, a partner with Nancy Creek Capital (a potential institutional investor in the Debtor engaged by MK pursuant to the 2008 MK Engagement Contract), copied Meyers on an email to Wade Cordell referring Wade Cordell to a potential client for the Debtor's bank-based ECR program, upon information and belief, as part of the 06 MK Referral Agreement.

266.    On June 11, 2008, the Debtor paid MKSF $40,000.00 pursuant to the May 2008 MKSF Contract in anticipation of the $4,500,000 line of credit from MKSF to the Debtor.

267.    On June 23, 2008 at 11:29 a.m., Bryan deBettencourt ("Bettencourt"), an employee of Transaction Services, LLC, who was hired by MKSF to perform financial due diligence, emailed Hargrett to inquire into why the average rebate per check owed by the Debtor to the merchants was indicated as $2.00 per check in the forecast model Hargrett submitted versus Debtor's historical figure of $5.00 per check.

   a.  Bettencourt concluded that unless Hargrett could think of a better approach, he was going to move the rebate rate to $5.00 per check.

   b.  Using $5.00 as the model for merchants rebates would result in the merchants' rebates significantly increasing and decreasing revenues to the Debtor.

268.    Later on June 23, 2008, Bettencourt emailed Hargrett questions concerning the Debtor's check recovery processing costs.

   a.  Bettencourt detailed that when he attempted to run the forecast model and recalculated the Debtor's historical figures he ended up short and he questioned whether the amount that Debtor collected per check should increase since using the expense per check received in the model provided by Debtor unless there was

70

a "layer of fixed cost" he could not understand why his calculations were running short.

    i. Thus, Bettencourt discovered, despite the fraudulent Grafton Audited Financials, that Debtor was operating at a loss due to the "fixed cost" of Wade Cordell, Brad Cordell, Blevins, Hargett, and Sturgill's looting and self-dealing, of which MK and its employees were already aware.

b. Bettencourt later questioned Hargrett concerning Hargrett's percentages provided on Debtor's check processing flow surmising that Hargrett must have made an error since at the very least, payments of the Face Amount to the merchants should mirror the Debtor's total collection rate of the total checks collected.

    i. Thus, Bettencourt discovered that Debtor's recordation of the accounts receivable was improper and payment to the merchants from the Face Account did not track the Debtor's collections of the Face Amounts of collected checks since Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett were diverting funds from the Face Account for their personal aggrandizement, which MK and its employees in performing their attendant duties also knew.

269.    On June 24, 2008, a special meeting of the Board of Directors was convened in which Debtor's Corporate CFO, Haines Hagrett led a discussion of the 2008 to 2012 financial projections using the Management Presentation to advise the Debtor, and thus the Innocent Members of the Board of Directors, to pursue alternatives in furtherance of the Scheme at the expense of the Debtor's best interests.

a. Hagrett discussed that despite the US Bank project being approximately two months behind its initial target implementation date, Hagrett anticipated Debtor reaching its EBITDA's goals due to overall conservative projections.

b. At this meeting, the Board of Directors also discussed the MK Financing Alternatives Analysis comparing proposals for capital fundraising analyzed by MK, and potential strategies for paying off existing corporate debts.

c. The Board of Directors also discussed offering investors a twenty to twenty-five percent (20%-25%) return on $1 million dollars with a ninety (90) day option to

71

convert any principal and interest owed thereon to stock for bridge financing until completion of the 2008 MKSF Contract.

d.  Furthermore, the Board of Directors considered information pertaining to a twenty percent (20%) buy-back of outstanding corporate stock; however, the Board of Directors resolved to develop a formal resolution to consider that option.

e.  The Board of Directors also resolved to make available an opportunity for select investors (generally, "Short Term Mezzanine Debt Financing") to:

  i.  1) Loan to the company a minimum of $100,000.00 for ninety (90) days, with a twenty percent (20%) rate of return, or

  ii.  2) purchase 100,000 shares of common stock and receive 100,000 additional warrants priced at $1.25 per share.

  1.  Blevins was designated to develop an appropriate subscription agreement, confidentiality notice, and applicable loan documents ("Proposed Mezzanine Debt Instruments")

  2.  Sturgill, Van Hoeven, Blevins, Wade Cordell, and Brad Cordell attended the meeting, and Thomas V. Handy ("Handy") was also in attendance.

  3.  Handy was unanimously elected to the Board of Directors, effective immediately for a term to run until the next annual shareholders meeting.

    a.  Based upon the representations and projections of the financial health of the Debtor by MK in its role as investment adviser, pursuant to the May 2008 MKSF Contract, Van Hoeven and Handy when considering the propriety of issuing the Proposed Mezzanine Debt Instruments, even when projecting the issuance of $1.695 million in face value of Proposed Mezzanine Debt Instruments and $3.94 million in the face value of 2008 Promissory Notes, the net income profit of the Debtor for 2008 would be projected at approximately $7.6 million dollars, and therefore, the issuance of the Proposed Mezzanine Debt Instruments and 2008 Promissory Notes was

a sound business decision to provide short term gap financing
until the effectuation of the terms of the 2008 MKSF
Engagement Contract or a contemplated sale of the Debtor.

b.  Accordingly, Van Hoeven and Handy were deprived of crucial
information about the Debtor's financial condition and the
looting and embezzlement of Wade Cordell, Brad Cordell,
Sturgill, Blevins, and Hargrett and had Van Hoeven and Handy
been provided accurate information, they could and would
have taken corrective action and had the authority to do so.

c.  Van Hoevan and Handy in approving these transactions acted
in a good faith belief that their conduct was in the Debtor's best
interests; they exercised due care in ascertaining the relevant
facts and law before acting; and did not act in self-interest.

d.  Van Hoeven and Handy had the right to rely on MK and its
employees acting in its best interests and that MK and its
employees would disclose any and all material facts to the
entire Board of Directors, namely the Innocent Members of the
Board of Directors.

270.    On June 26 2008, Transaction Services, LLC ("Transactions") completed its financial
due dilligence of the Debtor and formalized a written report of its findings for MKSF
("Transaction Report") addressed to Nutter.

a.  It encountered serious problems with the Company's audited financial statements
and concluded "the Company's audited financial statements are materially
misstated, and should not be relied upon . . . ."

b.  The Transaction Report advised that "MKSF should require that all audited
financial statements in the future be performed by an another qualified accounting
firm."

c.  Moreover, the Transaction Report noted "[w]e were provided an introductory
letter from Morgan Keegan & Company, Inc. to MKSF indicating that 'the
Company has managed its business to almost cash flow break-even.' Our analysis

73
**-89-**

obviously refutes this statement. More importantly, our adjustment creates at [sic] significantly larger 'gap' to breakeven cash flow, and hence future profitability."

   d.   The Transaction Report also indicated that it was unable to procure the information or explanations it needed to complete its analysis from management of the Debtor.

   e.   The Transaction Report also identified that the beginning in November of 2007, "the Company began to 'accrue' revenue for the guaranteed check program through accounts receivable. In prior periods, the Company simply recorded the 'face' of the guaranteed check when collected from the debtor (expense), while recording the 'guaranteed' reimbursement to customer <u>when paid</u>." Therefore, in arriving at its projections, Transactions "eliminated the remaining 'guaranteed check' accounts receivable balance at APR08 to account for potentially uncollectable 'guaranteed' NSF checks" since recording contingent fees as income was not in accordance with GAAP.

271.    When comparing the quality of due diligence undertaken by MK in its role, *inter alia*, as the Debtor's investment advisor, which was required to even advise the Debtor whether the pursuit of mezzanine debt financing was in its best interest, it is clear that MK's participation in Grafton's improper accounting practices was undertaken despite its contractual role to spot such irregularities and despite that MK was indeed retained to prudently protect and safeguard the Debtor's interest in fulfilling its duties under the 2008 MK Engagement Contract.

272.    On June 28, 2008, the Board of Directors finalized the terms of the 2008 Mezzanine Debt Instruments ("2008 Mezzanine Debt Instruments"):

   a.   Interest of twenty percent (20%) of the entire outstanding balance would be due to the obligee on the date of the of the note's maturity.

       i.   Upon the maturity date of the Mezzanine Debt Instrument, the obligee had two options, in lieu of being paid principal and interest:

          1.   First, the obligee could receive one share of Debtor's class A common stock for each $1.00 of principal and interest owed and any remaining balance of principal and interest, if any, after receiving the common stock, in cash.

74

**-90-**

      2.  Second, the obligee could receive one share of Debtor's class A common stock for each $1.00 of principal and one common stock warrant at $1.25 for each $1.00 of principal owed plus receive all accrued interest in cash.

          a.  However, to elect option two, the obligee must accept repayment of all principal in stock and warrants.

273.     Upon information and belief, pursuant to the 2008 Promissory Notes, the following loans, *inter alia*, were made to the Debtor, based on Van Hoeven and Handy's mistaken belief concerning the fiscal salubrity of the Debtor:

    a.  Eason Leake - $500,000.00 – note date of October 7, 2008

    b.  Luther S. Ott - $250,000.00 – note dated October 9, 2008

    c.  Janet S. Ott - $250,000.00 – note dated October 9, 2008

    d.  Michael T. McRee - $500,000.00 – note dated October 10, 2008

    e.  Yerger Properties, L.P. - $500,000.00 – note dated October 13, 2008

    f.  Rivers, L.P. - $100,000.00 – note dated November 3, 2008

274.     On June 30, 2008, Bettencourt emailed Nutter letters authorizing for Meyers and Hargrett's access to the Transactions Report ("Access Letters").

275.     Later on June 30, 2008, Nutter forwarded the Access Letters to Meyers and Hargrett and informed them that their execution and remittance of the Access Letters to Bettencourt was a condition precedent to their review of the Transactions Report. Moreover, Nutter instructed for any questions concerning the Transactions Report to be directed to him instead of Bettencourt.

276.     On the evening of June 30, 2008, Hargrett emailed Bettencourt and Nutter copying Wade Cordell and Meyers his modified and executed Access Letter to view the Transactions Report.

    a.  The Access Letter originally stated "IBG further represents that it has performed or will perform its own due diligence inquires and procedures for the purpose of satisfying itself regarding the financial condition and control environment of [it operating subsidiaries] and for all other purposes."

      i.  Hargrett struck through this portion of the Access Letter initialing by his revision.

277.    After June 30, 2008, MK by its employee, Meyers, and Hagrett had access to the Transaction Report, which was shared with Wade Cordell.

278.    Also on July 2, 2008, Hargrett responded to the Transaction Report in a memo to Nutter, with a copy to Meyers and Wade Cordell, detailing and justifying many of the differences in assumptions undertaken by Hargrett in his financial models sent to Transactions such as that the Transaction Report failed to increase Debtor's collection revenues for community banks the despite community banks required participation in Debtor's opt-out program from 2007 forward.

279.    On July 2, 2008 at 4:45 p.m., Harrett forwarded an email to Meyers from Wade Cordell identifying banks that were implementing Debtor's ECR program.

280.    On July 2, 2008 at 5:35 p.m. Hargrett emailed Meyers and Snider copying Wade Cordell Debtor's Banks in the Pipeline spreadsheet ("Banks in the Pipeline Spreadsheet") and stated "I am starting to review you[r] draft memo now."

281.    Later on July 2, 2008 at 5:52 p.m., Hargrett emailed Meyers and Snider copying Wade Cordell a revised Banks in the Pipeline spreadsheet separating the newly signed banks from the unsigned but firm projections of new banks incorporating Debtor's services and when each projected bank was expected to implement Debtor's services. This listing included Regions Bank as a unsigned bank that Debtor was currently engaging in contract negotiations.

282.    On July 2, 2008 at 7:12 p.m., Hargrett emailed Nutter copying Wade Cordell, Snider and Meyers two items:

      a.  First, the Banks in the Pipeline Spreadsheet without the inclusion of Debtor's contract negotiations with Regions Bank.

      b.  Second, to address the problems of Debtor's projected earnings identified in the Transaction Report, Hargrett attached a memorandum purportedly authored by Wade Cordell, but upon information and belief, authored by Meyers, to Nutter, copying Hargrett and Meyers entitled "2008 Cash Flow" that contained more projections from bank rollouts, in which he argued against "what we consider very conservative estimates by Transaction Services," and that these rollouts "will generate a significant amount of cash flow that is not included in the Transaction Services forecast."

      c.  Further demonstrating MK and its employees' role in furthering the Scheme.

283.    On July 3, 2008, Boult-Cummings sent Hargrett, Nutter, and Blevins copying Murdock the MKSF Closing Agenda status, which itemized each document required from the Debtor and whether the Debtor, Boult and Cummings, or MKSF was charged with its remittance to Boult and Cummings.

284.    On July 4, 2008, Blevins emailed Caughman Debtor's by-laws in a word document and requested for him to use them as a "template" to "prepare Bylaws for Infinity Collections, Inc. and Sturgill Enterprises, Inc." after first calling Sturgill to see if already possessed bylaws for Sturgill Enterprises, Inc. Blevins further directed that both entities, in contrast to the provisions included in Debtor's bylaws, would only require three directors instead of six.

285.    On July 5, 2008, Nutter emailed Hargrett and requested for a brief summary of the capitalization history of the Debtor. He stated, "[a]ll I'm looking for is a simple table of equity raises that includes $ amount raised, # shares sold, date of offering and valuation."

286.    On July 7, 2008, Hargrett emailed Nutter copying Wade Cordell, Meyers, Snider, and Blevins that the only "'formal' capital raise [the Debtor] had was the PPM dated 11/3/06 (closed out 12/31/07) of which you have a copy. Under the PPM we sold 4,434,884 shares @ $1.25 per share raising $5,543,605. All of the remaining Class A (Voting) shares over the years ha[ve] been from friends and family at a price of either $1.25 or $1.00."

> a.    Hargrett further explained, "[y]ou will also notice a Class B (Non-Voting) shares. These shares were issued (it appears generally during 2005) to those long-time holders of License Agreements as a 'thank you for your support' and as an incentive to go out and develop their assigned areas."

> b.    However, indeed the problem was the recording of the accounts receivable.

287.    On July 16, 2008, Murdock participated in a telephone conference with Debtor's securities counsel and Blevins concerning various equity questions and his concerns pertaining to the potential liability due to the material misstatements in the November 06 PPM based upon how the accounts receivable for the Debtor were accounted.

> a.    In response to Murdock's concerns based on the computation of the accounts receivable, Hargrett explained that the accounts receivable were properly recorded and the issue was more aptly characterized as a question of collectability and that going forward Debtor would have a policy concerning this issue pertaining to revenue recognition.

288.    Also, on July 16, 2008, Murdock emailed Blevins, Hargrett, Wade Cordell, Nutter, Debtor's securities counsel, and Meyers but not to Van Hoeven and Handy the following:

> a.  "[w]e also need to see the rescission tender documents. Please forward those or post them on the diligence site in the legal folder. Per our recent call, we will just stand by to hear more from you on the securities front. Also, as we discussed, we will need to see the conversion document to tie the old preferred to the present common."

289.    The Transaction Report revealed the Debtor's true "debt parameters;" rather than MK communicating its concerns to the entire Board of Directors, Meyers and MK actively continued to locate potential lenders, precipitating Debtor's ever-increasing liabilities which they knew, or should have known, the Debtor could not repay, while also decreasing the Debtor's fair asset value and furthering the Debtor's loss of profit . The Debtor was not only insolvent at this point, but the influx of capital could not cover its operating expenses and despite this influx, the Debtor would still operate at a loss because the payments on account of new checks collected increased the Debtor's insolvency and liabilities. MK evidenced, at the very least, a willful indifference to the burgeoning wave of crushing debt that the Debtor was incurring and more aptly described as knowledge thereof based on MK's favorable forecasts of the Debtor's current and future profitability to the Innocent Members of the Board of Directors, despite MK and its employees' awareness of the falsity of these projections and the continuing attendant looting and embezzlement resulting from this enablement of the Scheme by MK and its employees. Meyers and MK communicated exclusively with Hargrett, Sturgill, Blevins, and Wade Cordell.  In spite of warnings of the adversity of these figures to the Debtor, MK's client, MK did not communicate directly with the Board of Directors to inform it of such glaring facts but remained silent despite its duty to disclose this material information to the **entire** Board of Directors, especially in light of MK and its employees' knowledge of the bad acts of Strugill, Brad Cordell, Wade Cordell, Blevins, and Hargrett.

> a.  For instance, on September 26, 2008, Blevins emailed Meyers, with a copy to Wade Cordell, reminding him about his contact with Founders Equity and Pay-O-Matic. Blevins also stated, "[t]hanks for your help and attendance at our sales meeting this week."

    b.  On October 3, 2008, Morgan Keegan Equity Research sent the Debtor financial projections of a comparable company.

    c.  On November 19, 2008, Meyers, upon information and belief, set up a conference call with Greg Rable from Factor Trust, who was yet another potential institutional investor.

    d.  On December 2, 2008, Meyers received an email from Wade Cordell seeking assistance in advising a potential investor in Debtor how to withdraw $500,000.00 from the investor's annuities to purchase stock in Debtor directly while also avoiding paying income tax on the withdrawal. Later that day, Meyers requested assistance within MK for information in order to assist Wade Cordell and forwarded Wade Cordell's inquiry to another MK employee, who advised Meyers on how to effectuate the potential investor's intent, and Meyers forwarded this response to Wade Cordell.

    e.  On October 3, 2009, Meyers was still coordinating possible Transactions (loans) between business investors and the Debtor.

290.    On July 22, 2008, upon information and belief, a conference call was held between Meyers, Blevins, Snider, Nutter; Hargrett; Murdock; Wade Cordell; and Sturgill to discuss the Transaction Report in conjunction with the 2008 MK Engagement Contract and May 2008 MKSF Contract.

291.    On July 23, 2008, Sturgill received a letter ("KCEOC Letter") via fascmile informing the Debtor that Kentucky Communities Economic Opportunity Council Community Action Partnership ("KCEOC Partnership") and the Kentucky Highlands Investment Corporation, as originator, were to finalize a federally guaranteed loan with the U.S. Department of Agriculture's Rural Development Administration of $2 million dollars to KCEOC. Of this $2 million dollars, $1.5 million would be utilized by KCEOC Partnership to purchase all of the equipment at Debtor's Barbourville, Kentucky facility while the remaining $500,000.00 would be utilized to provide additional work space for the employees of the Debtor due to the planned expansion of the Debtor's workforce ("KCEOC Grant").

292.    Also, on July 23, 2008, Wade Cordell sent Nutter the KCEOC Letter.

293.    Finally, on July 23, 2008, Wade Cordell sent Meyers the KCEOC Letter with the comment that "[t]his should be enough to satisfy Bill Nutter."

294.    On August 5, 2008, Wade Cordell emailed Nutter comments on the Stock Purchase component to the proposed MKSF Loan Agreement and expressed that Wade Cordell had evaluated the MKSF Loan Agreement and accompanying warrant without discussing its terms with the Debtor's outside securities counsel; however, he continued that "I feel that if we can come to an agreement on these documents between us, then we can bring the legal folks in after we have hashed out any concerns."

295.    On August 14, 2008, Nutter sent Hagrett and Meyers Transaction Services' revised version of Debtor's financial model for 2008 testing its covenants.

296.    Later on August 14, 2008, Wade Cordell emailed Nutter copying Meyers a slide show providing a quick view of the progression of Debtor's bank program's development since 2006 indicating Debtor had ninety-two (92) agreements in hand from banks contracting for Debtor's ECR services.

297.    On August 19, 2008, Greg Couch, upon information and belief, an employee of MK emailed Sturgill to inquire into the Union College investment account opportunity.

298.    On September 2, 2008, the Debtor executed a Confidentiality Agreement with MK, signed by Wade Cordell, as President of the Debtor, and Meyers, as Senior Vice President of MK, which detailed that MK would become privy to confidential information in the course of its business relationship with the Debtor and MK agreed not to disclose any confidential information acquired during this course of dealing for a period of two years from September 2, 2008.

299.    On September 9, 2008, Wade Cordell emailed Nutter detailing the projections for Debtor's check collections from Synovus's representative, which indicated Synovus's monthly receipt of 39,000 returned items and of the returned items, 20,000 were NSF checks currently re-deposited for the merchant to be transferred to the Debtor for collection upon finalization of the deal. Moreover, Wade Cordell indicated that Synovus currently had an additional 500 third party checks and 250 returns resubmitted to BB&T, which would be halted upon the launch of Debtor's services resulting in more checks and thus, revenue for Debtor.

300.    On September 10, 2008, Nutter emailed Hargrett, Wade Cordell, Meyers and Carolina Ducas ("Ducas"), an employee of MK, the Amended MKSF Summary of Proposed Terms and Conditions ("Amended MKSF Term Sheet").

80

**-96-**

a. The Amended MKSF Term Sheet amended the 2008 MKSF Contract in that MKSF received a detachable warrant to purchase 5.5 percent (5.5%) of the Debtor's fully diluted outstanding common stock at $0.01 per share.

b. However, unlike the terms of the 2008 MKSF Contract, the warrant was subject to performance-based adjustments determined by the Debtor's EBITDA levels. For instance, if the Debtor's 2009 EBITDA is less than $6.0 million, the warrant would be increased by one percent (1 %) of the then outstanding, fully-diluted stock.

c. The Debtor was also subject to revised covenants "to include Minimum EBITDA, Funded Debt to Cash Flow, Fixed Charge Coverage and minimum Liquidity Requirement," which was defined by an attachment to the Amended MKSF Term Sheet. For instance, Debtor's minimum EBITDA Requirement was to measured monthly beginning in November of 2008 and ending after January of 2009 and as an example, required Debtor's minimum EBITDA for October of 2008 to be $350,000.00.

d. The Amended MKSF Term Sheet was set to expire on September 19, 2008 if not accepted by the Debtor.

301.     On October 24, 2008, Hargrett emailed Nutter with a copy to Wade Cordell and Blevins that with the receipt of the detailed version of the legal bill from Boult and Cummings and the background checks performed by MKSF, that Debtor would send MKSF a check early next week.

302.     On November 6, 2008, Meyers emailed Wade Cordell regarding Meyers' discussions of the Debtor's bank-initiative ECR program with a MK employee, who covered community banks, and he relayed to his fellow MK employee that he "believ[ed] Morgan Keegan will receive the sales commission for referring banks to IBG." Meyers then requested for Wade Cordell to send over some marketing materials that Meyers's fellow employee could use to start preliminary discussions. Meyers stated "I told him that his job is just to open the door and IBG will close the deal!"

303.     On November 8, 2008, the Debtor paid MKSF $48,443.59, pursuant to the 2008 MKSF Contract, to reimburse MKSF for its direct due diligence expenses.

  a. Thus, in 2008, the Debtor paid MKSF over $88,000 pursuant to the 2008 MKSF Contract.

304. On November 10, 2008, an employee of the Debtor responded to an email from Meyers and thanked Meyers for "putting the bank master list together. This will be a big help for our direct marketing campaign."

  a. Thus, MK continued to refer the Debtor potential customers who might utilize its Services pursuant to the 06 MK Referral Agreement so as to receive the MK Referral Commissions.

305. On November 12, 2008, Meyers emailed Wade Cordell requesting Wade Cordell to prepare information regarding Debtor's services in anticipation of Meyers's meeting with a CEO of a company specializing in alternative credit data and risk management for the under-banked consumer market who was a possible potential candidate for the Debtor's services.

  a. Again, MK and its employees facilitated the ability for Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett to perpetuate the Scheme knowing of the Scheme and its attendant embezzlement and looting in order to receive the MK Referral Commissions.

306. From April of 2008 through December of 2008, the Debtor was entitled to receive $5,635,000.00 from issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments.

  a. In 2008, Debtor satisfied $125,000.00 of the 2008 Promissory Notes.

  b. In 2008, Debtor was required to pay these note holders $398,225.00 in interest on account of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments.

  c. In 2008, on account of these obligations and its general accounts payable, Debtor paid approximately $724,445.00 on account of interest obligations.

307. On February 4, 2009, Daniel Till, an employee of the Debtor, emailed Grayson Smith, an employee of MK, the Debtor's power point presentation for presentment to Referral Customers by MK pursuant to the 06 MK Referral Agreement.

308. On February 24, 2009, at the annual meeting of stockholders of Debtor ("2009 Annual Meeting"), in discussing the exit strategy, meaning how the Debtor was to be sold, Wade Cordell discussed and utilized the Management Presentation and described it as follows:

    a. "And by the way, these next three slides that were provided, or the information on this slide were provided by Morgan Keegan Investment Bankers, and the other two slides were the actual slides that they provided for us to talk to you about what's happening around us."

    b. Each member of the Board of Directors attended the 2009 Annual Meeting either in person at the corporate offices of the Debtor, 140 Gibson Road, Lexington, South Carolina, or by internet webcast.

        i. Therefore, again, since MK and its employees failed to notify the Innocent Members of the Board of Directors of the problems identified in the Transaction Report, the Board of Directors continued to operate under the impression that the Debtor was in good health with greatly improving financial prospects.

309.    On May 5, 2009, a special meeting of the Board of Directors was held, where it was resolved that Van Hoeven and Sturgill would come every-other-week to work in Lexington, South Carolina.

310.    From June of 2008 to 2009, the Debtor incurred, upon information and belief, $8.1 million dollars of debt from the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes to its detriment.

311.    Despite these attempts at capitalizing the Debtor, Debtor continued to lose money; and its Face Account continued to be out-of-trust because of funds being diverted by the corporate insiders, Wade Cordell, Brad Cordell, Hargrett, Blevins and Sturgill.

312.    In addition to the fee the Debtor was obligated to pay MK pursuant to the terms of the 2008 MK Engagement Contract, MK, upon information and belief, received the sales commissions for referring banks to the Debtor and the MK Check Referral Commission.

313.    In 2008, Meyers base salary, upon information and belief, was $80,000.00. Meyers received a bonus in August of 2008 for $72,000.00 and in February of 2009 for $175,000.00 for the year 2008.

314.    In 2009, Meyers' base salary, upon information and belief, was $80,000.00. Meyers received a bonus in August of 2009 for $85,000.00 and in February of 2010 for $320,000.00 for the year 2009.

315.    In 2010, Meyers' base salary, upon information and belief, was $80,000.00. Meyers received a bonus in August of 2010 for $85,000.00 and in February of 2011 for $200,000.00 for the year 2010.

316.    For instance, the 2007 and 2008 Grafton Audited Financials compared to internal records of the Debtor, which were created subsequent to the Innocent Members of the Board of Director's realization of the accounting problems incorporated into the Grafton Audited Financials ("2006 – Post Management Change Financials") in conjunction with an additional version created by the Trustee ("2006 – Additional Trustee Adjustments") demonstrates the glaring problems with the financials MK used and assisted in creating:

| Item: | 2007 – Grafton Audited Financials | 2007- Post Management Change Financials | 2007 – Additional Trustee Adjustments to filed tax returns |
|---|---|---|---|
| Total Assets: | $26,950,876 | $7,527,554 | $2,727,464 |
| Total Liabilities: | $6,641,580 | $3,991,474 | $6,023,280 |
| Total Capital: | $20,309,296 | $3,536,080 | (3,295,816) |
| Net Income: | (697,823) | (5,821,246) | --not configured to date-- |

| Item: | 2008 – Grafton Audited Financials | 2008 - Post Management Change Financials | 2008 – Additional Trustee Adjustments to filed tax returns |
|---|---|---|---|
| Total Assets: | $32,452,224 | $7,875,331 | $3,607,978 |
| Total Liabilities: | $9,619,118 | $8,030,012 | $8,487,000 |
| Total Capital: | $22,833,106 | $(154,681) | (4,879,022) |
| Net Income: | $(2,157,364) | $(7,160,015) | --not configured to date-- |

### III. THE SCHEME

317.    Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins with the assistance of MK and its employees, falsely inflated Debtor's accounts receivable by creating fictitious accounts receivable on the Debtor's books and records as well as improperly reporting the aging of receivables and presenting the same to the Innocent Members of the Board of Directors without disclosing the falsity thereof.

318.    In selling securities pursuant to the November 06 PPM and issuing the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett were acting outside the course of their employment and scope of their agency and apparent agency since the intent behind these sales and issuances was to precipitate embezzlement and looting of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett as Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett had totally abandoned the interests of the Debtor when they entered into these transactions, which were designed by MK and its employees to assist Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett in concealing the Scheme with its attendant embezzlement and looting that Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett  used to enrich themselves and their friends and relatives and to enhance their standing within the community at the Debtor's expense by misappropriating and fraudulently diverting Debtor's funds to third parties, including friends and relatives, and associates of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett as well as business entities affiliated with or related to Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett.

319.    As a result of these transactions, the Debtor's funds and credit were utilized by Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett and diverted to their confederates without any concomitant benefit to the Debtor.

320.    As the Debtor suffered mounting losses from the looting of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett with the assistance of MK and Meyers, sought to hide the financial hemorrhaging with misleading manipulations and false transactions.

321.    The Scheme and its attendant embezzlement was aimed in part to benefit Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett but also to benefit Meyers in his role in Electronic Transaction Partners, LLC and the solicitation of the Debtor's former customers and business opportunities.

322.    The dissipation of Debtor's assets resulting from the Scheme did not result from the normal operation of the Debtor's business operations but instead resulted from the bleeding of the Debtor by Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, which was part of the underlying Scheme.

323.    Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, with the assistance of MK and Meyers, were stealing from, not for, the Debtor as the Scheme was intended to loot the

85

Debtor and dissipate the Debtor's assets; the Scheme was intended to line the pockets of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett in violation of every fiduciary duty they owed to the Debtor.

324.    The Scheme was perpetuated solely for the benefit of Wade Cordell, Brad Cordell, Sturgill, Blevins, Hargrett, and Meyers with the assistance of MK, and the perpetration and continuation of the Scheme was directly antagonistic to the Debtor and its shareholders.

325.    Through MK and its employees' assistance, Wade Cordell, Brad Cordell, Blevins, Hargrett, and Sturgill were able to structure and execute a series of transactions, namely the sale of securities pursuant to the November 06 PPM and the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes, by way of the fraudulent Grafton Audited Financials to raise financing for Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett's massive looting of the Debtor, and the eventual result of these actions was the Debtor's bankruptcy.

326.    The only benefit of these transactions was to Wade Cordell, Brad Cordell, Sturgill, and Blevins, who could use the transactions to feign the Debtor's creditworthiness. This enabled them to keep the Debtor afloat, while they continued to divert assets from the Debtor. As a result of MK's knowing assistance, Wade Cordell, Brad Cordell, Sturgill, and Blevins were able to continue their embezzlement scheme while concealing Debtor's deepening insolvency and diminishing Debtor's assets, without any corresponding benefit to the Debtor which directly resulted from the Scheme.

327.    In looting the Debtor, Wade Cordell, Brad Cordell, Sturgill, and Hargrett were acting outside the scope of their employment and/or their authority or apparent authority and the sole purpose in entering into the transactions was to benefit themselves.

328.    The Debtor was the target of the Scheme and therefore was the intended and foreseeable victim of the Scheme.

329.    Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett acted solely for their own benefit in carrying out the Scheme and all the attendant requirements to fulfill and execute the Scheme.

330.    MK and its employees' material omissions lulled the Innocent Members of the Board of Directors into a false sense of security in the health of the Debtor. Without being told the true state of affairs, the Innocent Members of the Board of Directors relied on the mirage created by MK and its employees in conjunction with Wade Cordell, Brad Cordell, Sturgill, Blevins, and

Hargrett and the Innocent Members of the Board of Directors were prevented from investigating further; had the Innocent Members of the Board of Directors been told the truth, they would have halted the fraud and the theft.

331.     MK and its employees, including Meyers, operated and controlled the Scheme by advising the Debtor regarding as well as structuring the offerings of the Debtor's securities pursuant to the November 06 PPM and advising the Innocent Members of the Board of Directors regarding the propriety of the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes; working with Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett; and exerting their influence by omission and non-disclosure over the Innocent Members of the Board of Directors, which was part of the Scheme.

332.     Debtor's harm was a direct result and/or reasonably possible consequence of the MK and its employees' omissions.

333.     MK had an affirmative obligation to prevent use of its prestige to defraud the Innocent Members of the Board of Directors, and MK failed to meet this obligation.

334.     Despite the peppercorn of income to the Debtor, if any,  resulting from the miniscule portion of the proceeds from the sales of the securities that actually remained with the Debtor subsequent to the 06 PPM and the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes used by Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett to help inflate sales and facilitate public offerings consistent with the embezzlement, looting, and dissipation of Debtor's assets perpetuated by the Scheme , the issuances and sales were overwhelmingly adverse to the Debtor; furthermore, but for the assistance of MK and its employees, these transactions would not have occurred.

335.     In perpetuating the Scheme, Wade Cordell, Brad Cordell, Blevins, and Meyers also misappropriated "Confidential Information," *inter alia¸* customer information, from the Debtor resulting in further harm to the Debtor in violation of the Employment Contracts and the 2008 MK Engagement Contract, 2006 MK Engagement Contract, and the Confidentiality Agreement entered into between MK and the Debtor on September 2, 2008.

336.     It was reasonably foreseeable that Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett intended to operate Debtor's business past the point of insolvency for the improper purpose of continuing the Scheme and that the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments and sale of securities pursuant to the November 06 PPM would

result in proceeds that Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett would misappropriate.

## IV. THE INNOCENT MEMBERS OF THE BOARD OF DIRECTORS

337.    At no time during the relevant transactions did Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett legitimately own a majority of the outstanding shares of the Debtor or otherwise own a sufficient number of the outstanding shares to control the Debtor.

338.    The Innocent Members of the Board of Directors prudently considered the reports made at each Board of Directors' meeting by, *inter alia*, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, and the Innocent Members of the Board of Directors reviewed the acts of these officers as well as their recommendations based in part upon the recommendations of MK and its employees and ratified and/or approved them in good faith.

339.    The Innocent Members of the Board of Directors relied on the Grafton Audited Financials in determining whether to sell securities pursuant to the November 06 PPM and to issue the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments relied on the Grafton Audited Financials in taking any actions required by the Board of Directors for the Debtor's best interests, and saw and reviewed the Grafton Audited Financials contemporaneously with making such decisions.

340.    The Innocent Members of the Board of Directors were lulled into a false sense of security based on the Grafton Audited Financials in failing to detect Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett's respective related third-party transactions as well as in failing to detect the Scheme and its attendant components.

341.    The Innocent Members of the Board of Directors did not have access to the truth regarding the falsity and concoction of the Grafton Audited Financials and were prevented from having such access through the actions of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett who provided false documentation to corroborate the Grafton Audited Financials.

342.    Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett were able to conceal their illicit acts from the Innocent Members of the Board of Directors despite the thorough reviews of their activities by the Innocent Members of the Board of Directors and despite the fact that a thorough audit upon removal of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett revealed the fraudulent activities of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett and the nondisclosures of MK and its employees; however, such activities were not readily

decipherable by the Innocent Members of the Board of Directors in the exercise of their ordinary due diligence.

343.    The Innocent Members of the Board of Directors acted in the good faith belief that their conduct was in the Debtor's best interests; exercised due care in ascertaining relevant facts before acting; and did not act in their self-interests in approving actions proposed by the Board of Directors for the Debtor to take and/or pursue.

344.    Upon notice of the possibility of the bad acts of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, the Innocent Members of the Board of Directors diligently took actions to discover any and all details concerning the bad acts of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett committed with the knowing assistance of MK and its employees.

345.    The Innocent Members of the Board of Directors exercised the real possibility of corporate control under the Debtor's By-Laws through the ability to remove Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett as well as though the ability to terminate their respective employment contracts for cause based on their actions, and would have taken such actions upon being apprised of the Scheme, while also acting to take immediate cost-cutting measures and other measures designed to preserve the Debtor's assets and enterprise value and if those measures failed, put the Debtor into bankruptcy.

346.    If the Innocent Members of the Board of Directors had been informed of the fraudulent nature of the Grafton Audited Financials and the nature of the Scheme, the Innocent Members of the Board of Directors would have immediately voted in a new regime to manage the Debtor.

347.    The Innocent Members of the Board of Directors also had the ability to resort to state law to oust Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett.

348.    When confronted with actual suspicions of suspect activity of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, the Innocent Members of the Board of Directors took immediate decisive actions to stop the Scheme.

349.    The Innocent Members of the Board of Directors placed their trust and confidence in MK to use its superior expertise in complex financial transactions and securities transactions to execute the sale of securities pursuant to the November 06 PPM and issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes in a manner that would benefit the Debtor and that by accepting the obligation to provide expert advice to the Debtor on how to

structure such transactions and whether such transactions were in Debtor's best interests by entering into the 2006 MK Engagement Contract and 2008 MK Engagement Contract, MK entered into a fiduciary relationship that required it to provide that advice and to perform their duties properly.

350.    MK exercised full penetration into the Debtor's finances and the Innocent Members of the Board of Directors reposed extraordinary trust and confidence in MK and its employees.

351.    The Innocent Members of the Board of Directors relied on MK and its employees' advice and obligation to disclose any and all material facts associated or discovered during its engagements and its obligation and fulfillment of any and all due diligence requirements in connection with the securities sales and note issuances.

352.    MK and its employees possessed superior knowledge of the facts surrounding the Scheme and superior facts surrounding the Grafton Audited Financials and superior facts surrounding the propriety of selling securities pursuant to the November 06 PPM and the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments as well as any and all due diligence and financial statistics and status of the Debtor when compared to the Innocent Members of the Board of Directors.

353.    The Innocent Members of the Board of Directors inquired into the fiscal health of the Debtor and the status of its debt-to-equity ratio and were provided with false financial information corroborating that information reflected in the Grafton Audited Financials and furthermore did not have access to the true financial figures nor information that would reveal the Scheme.

354.    MK's nondisclosures occurred prior to when the Innocent Members of the Board of Directors chose to enter into the challenged transactions.

355.    MK and its employees knew that the projections of Debtor's profits as well as the Grafton Audited Financials were not only unreasonable but fraudulent and the role of MK and its employees in concocting the Grafton Audited Financials was integral to the Scheme, crucial to the fabrication of the Grafton Audited Financials.

356.    The acceptance by the Innocent Members of the Board of Directors of the Grafton Audited Financials with MK's imprimatur was reasonable since the Grafton Audited Financials did not reflect an apparent discrepancy.

357.    Debtor's business operations' model possessed internal controls to monitor its Face Account that were manipulated by Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett without the knowledge of or notice to the Innocent Members of the Board of Directors of such manipulation and despite the knowledge of MK and its employees of such manipulation.

**V. HARM TO THE DEBTOR CAUSED BY AND RESULTING FROM THE SCHEME AND MK AND ITS ROLE THEREIN**

358.    MK and its employees' nondisclosures as well as MK and its employees' assistance and substantial participation in concocting and crafting the Grafton Audited Financials were a substantial factor in causing Debtor's harm because the preconceived purpose of the Scheme, which such actions were an integral component of, was to benefit MK and its employees and Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett at the expense of the Debtor.

359.    The effect of MK and its employees' nondisclosures had the effect of concealing the circumstances that bore on the Debtor's ultimate losses.

360.    MK and its employees knew that the Grafton Audited Financials with MK's imprimatur would be provided to the Innocent Members of the Board of Directors who authorized the sales of the Debtor's securities pursuant to the November 06 PPM and who authorized the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments as well as in taking all other actions.

361.    The specific intended consequence of the Scheme was to cause injury to the Debtor.

362.    The Debtor was the direct target of the Scheme.

363.    Damages to the Debtor were a direct and inevitable result of MK and its employees' conduct as well as the conduct of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett; however, these losses were not simply a consequence of the Scheme's exposure.

364.    The embezzlement was a concurrent cause of the Debtor's bankruptcy along with the Debtor taking on unsustainable debt, losing its enterprise value, and loss of corporate assets and goodwill.

365.    The business model of the Debtor was sound and the business of the Debtor, but for the Scheme, occurred in an economic climate that precipitated positive market conditions for a lucrative income stream for the Debtor in light of Debtor's market share and market advantage and advanced and front-running techniques in the industry. Therefore, but for the actions and

nondisclosures of MK and its employees in conjunction with the actions of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, Debtor's business model would have been profitable.

366.    Debtor's losses did not occur during any market-wide phenomenon that caused comparable losses to business offering the same services as the Debtor.

367.    The false information included in the Grafton Audited Financials harmed the Debtor's reputation.

368.    Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett had the opportunity to perpetuate and continue the Scheme only because their conduct was not disclosed by MK and its employees to the Innocent Members of the Board of Directors who were in a position to stop it.

369.    MK and its employees concealed information through nondisclosure and manipulated the Innocent Members of the Board of Directors and thus, the Debtor, with intent to defraud, in order to self-deal in breach of its duty of loyalty to the Debtor.

370.    But for the Scheme and MK and its employees' participation therein, the Debtor would have earned profits based on its business model had it not been plagued with the referenced misconduct; furthermore, the market and the Innocent Members of the Board of Directors and their attendant skilled management acumen would have resulted in Debtor profiting from its business model.

371.    Any and all of MK's fees and any compensation paid to Meyers as well as the MK Check Referral Commissions constituted harm to the Debtor.

372.    But for MK's dereliction of duty, the Innocent Members of the Board of Directors, and thus, the Debtor would not have incurred liability to its business reputation and its creditworthiness as otherwise the Innocent Members of the Board of Directors would have ousted Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett resulting in Debtor's business model succeeding.

373.    As a result of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett's actions and MK and its employees' inaction and nondisclosures, the Debtor lost assets through Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett's embezzlement and looting resulting in the gap between Debtor's assets and liabilties widening and thereby impairing the Debtor's ability to service its outstanding debt.

374.    As a result of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett's actions and MK and its employees' inaction and nondisclosures, the Debtor's corporate life was

artificially prolonged resulting in continued dissipation, diversion, and depletion of the Debtor's assets without a corresponding benefit to the Debtor.

375.    As a result of the fraud and malpractice of Grafton, Larry Grafton, and Brent Grafton and the fraud, securities violations, breach of fiduciary duty, and the aiding and abetting thereof by MK, Meyers, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett, the Debtor was harmed suffering damages that include losses resulting from diversion of cash, diversion of funds through improper lease transactions, and fraudulent transfers and circular transactions, as well as, upon information and belief, losses from diverted funds pertaining to the credit card arm of the Debtor's business in addition to the Debtor's loss of corporate assets, the Debtor's inability to service its outstanding debt to the widening gap between liabilities and assets, as well as the diminution in value of the Debtor as an enterprise.

376.    If MK and Meyers had properly performed their duties under the 2006 MK Engagement Contract and 2008 MK Engagement Contract, the Debtor through the Innocent Members of the Board of Directors could have and would have stopped the improper activities of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett as well as the improper activities of MK and Meyers and could and would have reduced the amounts looted by Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett and the losses sustained as a result thereof.

377.    The Scheme caused the Debtor to borrow far more than it otherwise would have and rendered the Debtor unable to pay its creditors.

378.    Furthermore, the Scheme hid the fact that the Debtor was insolvent and that the Debtor's insolvency was becoming more severe as the magnitude of the losses resulting from the Scheme escalated over time, until it was too late to save the Debtor or minimize the Debtor's losses by, among other things, preventing the continuing looting and embezzlement and dissipation of corporate assets and loss of the Debtor's enterprise value and if necessary, filing for bankruptcy at an earlier juncture.

379.    Ultimately the Scheme caused the demise of the Debtor which, but for each of the defendants' respective malpractice, securities violations, fraud, breaches of contract, breach of fiduciary duties and aiding and abetting thereof could have been avoided or, at the very least, the losses incurred could have been significantly reduced.

380.    MK and its employees were thoroughly familiar with the Debtor's finances and as such were in a position to know that the Debtor's funds had been misappropriated since at least

2004 and to foresee that Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett would embezzle funds obtained after the Grafton Audited Financials were published.

381.    The Debtor's chances of falling into bankruptcy increased due to the actions of Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett with the assistance of MK and its employees as well as Grafton, Larry Grafton, and Brent Grafton and these defendants' conduct prevented the Debtor from performing in a profitable manner and that these defendants' actions forced the Debtor to dissipate corporate assets that would have otherwise been retained while also resulting in a loss of Debtor's value as an enterprise.

382.    Debtor was also damaged by continuing in light of these defendants' (Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett with the assistance of MK and its employees as well as Grafton, Larry Grafton, and Brent Grafton) conduct as the Debtor incurred liability beyond the amounts it earned through its check collection business as a result of the Scheme since the Collection Fees  obligated to be paid to the merchants were not properly returned and the Face Amounts were also not properly returned to the merchants.

383.    Meyers and its employees and Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett and Grafton, Larry Grafton, and Brent Grafton acted in concert resulting in embezzlement from the Debtor and worked together to perpetuate the existence of the Debtor in the context of the ongoing Scheme through fraudulent means with the intent of further enabling the looting of the Debtor, including taking on obligations the Debtor had no hope of performing in light of the Scheme's existence and continuance.

## VI. MEMBER OF THE BOARD OF DIRECTORS WITHOUT NOTICE OF DEFENDANTS' WRONGDOING

384.    From at least January 1, 2005 through September 1, 2009, the Board of Directors consisted of, at various times and in various combinations, Wade Cordell, Brad Cordell, Blevins, Sturgill, Van Hoeven, Thomas Handy, and Michael Potter.

### i. WILLIAM VAN HOEVEN

385.    William Van Hoeven ("Van Hoeven"), who had been in the check presentment business originally, was a director on the Board of Directors from September 22, 2004 until the Debtor's demise in 2010.

386.    Van Hoeven served as the Secretary for the Debtor from May 26, 2004 until October 1, 2006, when he was replaced by Robert Caughman.

387.    Van Hoeven was also employed by the Debtor as an officer, VP of Electronic Processing, from October of 2006, and on March 21, 2007, he signed an employment contract with the Debtor to continue in his position as VP of Electronic Processing.

388.    Van Hoeven was retired from the US Navy.

389.    Though he was aware that the Face Account had a deficit of approximately $70,000 in 2006, his role changed when he became primarily responsible and controlled the operations component of the Debtor's business, maintained control over IT product development for the banking sector, and supervised and managed the training of employees.

390.    From 2006 to the 2009 intra-management lawsuits, Wade Cordell, through various intermediaries like Janice Barton, prevented Van Hoeven from gaining access to the true financial picture of the Debtor.

391.    As he was neither a CPA nor a financial expert, Van Hoeven relied on the expertise of MK and its employees to disclose to the Board of Directors if any problems in their analyses were discovered and to only act in the best interests of the Debtor.

392.    Van Hoeven relied on the representations of Hargrett, who was known by Van Hoeven to be a CPA and who upon recommendation of MK became the Debtor's Chief Financial Officer. Hargrett repeatedly represented that there was no deficit in the Face Account. He told the Board of Directors the "merchants are caught up…we're catching them up…no emergency situation…everything was taken care of."

393.    After MK arrived at the Debtor's operational sites and reviewed the financials, the failure of MK and its employees to disclose any issues or problems discovered in its due diligence investigation lead Van Hoeven to believe and justifiably rely that MK and its employees' silence operated as confirmation of the Debtor's vibrant state of financial health and future prospects in light of MK's expertise and the Board of Director's trust placed on MK's representations of its expertise and skill.

394.    The nondisclosures of MK further justified Van Hoeven's responses.

395.    As securities experts, MK and its employees were hired to represent the Debtor and in that MK's role in executing the 2006 MK Engagement Contract and 2008 MK Engagement Contract and Van Hoeven had no reason to question the propriety of the sales of securities pursuant to the November 06 PPM and the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes based upon his reasonable belief that MK and its employees were

acting in the best interests of the Debtor while also relying on MK's duty to disclose any and all material information to him as a member of the Board of Directors.

396.     Before August 2009, Van Hoeven operated under the illusion manufactured by Brad Cordell, Wade Cordell, Sturgill, Blevins, Hargrett, MK, and Meyers that the Debtor would be sold; thus, he focused on the operations of the Debtor's business to make the goal of Debtor being bought out a reality.

397.      In January 2009, Van Hoeven inquired into the status of the merchants account and was provided information that it was indeed "caught up".

398.     It was not until August of 2009, when Wade Cordell and Sturgill began arguing over $60,000.00 required for the Debtor's continued business operations that Van Hoeven became concerned about the finances despite repeated rosy projections that the Debtor was profitable.

399.     Upon investigating the merchants account, Van Hoeven discovered that in the period between January and August the merchants account became deficient in the amount of approximately $2,000,000.00.

400.     Van Hoeven joined with other members of the Board of Directors to oust Wade Cordell, Brad Cordell, and Blevins.

401.     By 2010, Van Hoeven was actively attempting to revive the Debtor's business because he still believed in the viability of its business model.

**ii. TOM HANDY**

402.     Tom Handy was elected to the Board of Directors on June 24, 2008. He had served as director until his resignation on March 31, 2010 and was also an investor, buying stock directly in the Debtor and converting stock pursuant to a convertible promissory note.

403.     Handy received no compensation during his tenure as a board member as compensation for being a director of the Board of Directors and served on the Board of Directors at the request of a group of investors of the Debtor located in London and Knox County, Kentucky.

404.     Handy believed in the Debtor's business model and had raised money for the Debtor through advocating the sale of the 2008 Promissory Notes.

405.     Wade Cordell, through various intermediaries like Janice Barton, prevented Handy from gaining access to the true financial picture of the Debtor.

406.    It was not until August of 2009 that Handy was informed that corporate theft was being committed by Wade Cordell, Brad Cordell, and Blevins that had caused the deficit in the Face Account to grow exponentially.

407.    In response to the information, Handy joined other shareholders and members of the Board of Directors to oust Wade Cordell, Brad Cordell, and Blevins.

408.    Handy vehemently opposed the settlement of the intra-management lawsuits, as its terms would force the Debtor to pay for the legal fees incurred by both sides in the law suit; however, as Handy was fearful of the Debtor losing credibility before the major banks, he along with the other board members approved the Settlement, believing in counsel's opinion that the settlement was in the best interests of the Debtor.

### iii. MICHAEL POTTER

409.    Michael Potter ("Potter") was the first president of the Debtor when the goal of the company was to operate debt free. He owned stock in the Debtor, served as director from his election on May 18, 2003 until November 13, 2007, and from September 11, 2009, until his resignation on August 2, 2010.

410.    Potter was elected to become President of the Debtor on May 18, 2003, and served as President, upon information and belief, until the election of Wade Cordell as President in May of 2005.

411.    Potter also raised money for the Debtor and was told repeatedly by Wade Cordell and Brad Cordell that the Debtor's finances were in a healthy state, and Potter was not given any access to the Debtor's internal records other than that presented at meetings of the Board of Directors.

### iv. GENERALLY

412.    Potter, Handy, and Van Hoeven were deprived of crucial information about the Debtor's financial condition; had these members of the Board of Directors been informed before 2009 of the Debtor's financial condition, they would have taken immediate corrective action. Thus, when they did learn of the wrongdoing, they endeavored to stop it and did so.

### a. INFORMATION TO HANDY

413.    On December 12, 2007, prior to Handy's election to the Board of Directors, Wade Cordell remitted a memorandum detailing the Territory Agreements available for purchase that would have the best rate of return and emphasized that "all *Areas* come with a 'guaranteed

return' and that I am in no way making the decision for your group" but was making the same recommendations he would "to any friend or family member" that he would bring into the company. Moreover, Wade Cordell offered Handy and his group an opportunity to purchase warrants enabling them to purchase the Debtor's shares at $1.25 per share, which was a prudent prospect in light of Wade Cordell's representations to the Board of Directors and future members thereof of Debtor's impending sale.

414.    On April 15, 2008, Handy submitted his resume to Wade Cordell to serve on the Board of Directors, responding to Wade Cordell that he "appreciate[d] the invitation and opportunity to serve on the board of [the Debtor], and [he would] do [his] best to make a contribution, while listening and learning a business that I know little."

415.    On June 11, 2008, Wade Cordell emailed Handy, with a copy to Sturgill, Brad Cordell, Van Hoeven, Hargrett, and Blevins, detailing that the upcoming Board of Directors meeting was scheduled for June 24, 2008, and that "because of the fact that [the Debtor] has been accepted as the company to provide payment solutions to so many large accounts over the next several months, it will be necessary for [the Debtor] to conduct a quick money raise of additional stock sales." Noting that due to this growth, it had been decided that the "Debtor would sell 1.5 million more shares to fund this incredible growth," taking the number of the Debtor's outstanding shares to 51 million," which is "not a great concern to any of us due to the "buy-back" of 20% of the shares that will take place later this year and decrease our share counts down to the mid 40 million area. [The Debtor] has already begun this process and our talks with Morgan Keegan have concluded with their complete buy-in on this project and the 20% buy-back later in the year." Wade Cordell further relayed that "as you know, next week [the Debtor] is implementing 101,000+ new merchants from US Bank," and that process would be continual for the next six months. Wade Cordell further directed to Handy that "Tom, with the funding heading our way from these new merchants, [the Debtor] will be an extremely profitable company very, very soon. As of today however, we need a little more capital to get there."

416.    On June 24, 2008, Wade Cordell emailed an agenda for the upcoming Board of Directors' meeting and welcomed the newest board member, Handy. Wade Cordell continued that "because of the fact that IBG has been accepted as the company to provide the payment solutions to so many large accounts over the next several months, it will be necessary for IBG to conduct a quick raise of additional stock sales. We have decided to sell 1.5 million more shares

98

**-114-**

to fund this incredible growth. This number will take our outstanding stock shares to a little over 51 million. That is not a great concern to any of us due to the "buy-back" of @ 20% of the shares that will take place later this year and decrease our share counts down to the mid 40 million area. IBG has already begun this process and our talks with Morgan Keegan have concluded with their complete buy-in on this project and the 20% buy-back later in the year."

    a. Wade Cordell continued, "It is very important that IBG stays cash healthy during the implementation of these large accounts. As all of you know, next week IBG is implementing 101,000+ new merchants from US Bank. . . . Tom, with the funding heading our way from these new merchants, IBG will be an extremely profitable company very, very soon. As of today however, we need a little more capital to get there."

    b. "With the additional capital and the additional capital that we will get from Morgan Keegan, we will really be free from the burden of being able to take on all of the new business heading our way."

417.    On July 11, 2008 and July 14, 2008, Handy emailed Wade Cordell, Blevins, Brad Cordell, and Hargett a listing of prospective investors as well as their proposed respective investment amounts believing that these investments would provide a great return.

418.    On October 4, 2008, Blevins corresponded with Handy explaining the recent offer Wade Cordell had made to the group of Kentucky investors associated with Handy allowing for the conversion of the principal and interest, due and owing from the Debtor on account of loans made by these investors to the Debtor, to the Debtor's common shares of stock, and on November 11, 2008, Hargett followed up on this correspondence requesting for the group of investors in London and Knox County, Kentucky associated with Handy to select whether they would exercise this conversion option.

419.    On May 29, 2009, Blevins sent an email to Wade Cordell and Brad Cordell and copied among others, Sturgill, Van Hoeven, Hargett, Jeff Lyle, Mike Till, and Handy to inform them that Wade Cordell and Blevins had sent the "Talking points and Valuation Report" to Debtor's securities counsel for their comments, and that as soon as everything is approved by Debtor's securities counsel, Blevins would schedule a conference call to discuss the Valuation Report and its use in fund raising efforts.

420.     On July 28, 2009, Handy emailed Brad Cordell, Sturgill, Van Hoeven, Hargrett, and Blevins to address problems and concerns being raised by shareholders of the Debtor. Handy explained that in Spring of 2008, during which time he was a member of the Board of Directors, the Board of Directors recognized the need for more capital and made significant purchases of stock to assist in implementing Wachovia and other business and later, in 2008, a large number of investors loaned money and subsequently converted to stock, by taking advantage of an attractive offer and warrants. Thereafter, there was a withdrawal of the offer to purchase twenty percent (20%) of the stock held by the Debtor's shareholders, and this was never explained to him. Moreover, Handy identified that there were many missing explanations to both the Board of Directors and the stockholders concerning where the Debtor was in the third quarter of 2009, and what the time table was for a purchaser of the Debtor.

**b. INFORMATION TO VAN HOEVEN**

421.     On March 10, 2006, Wade Cordell emailed Meyers with a copy to Clark, Sturgill, Blevins, and Van Hoeven that the Debtor had acquired ninety-three additional school districts, who were voting on implementing Debtor's programs within the next sixty to ninety days, which if approved, would result in annual net revenue of $25,000,000.00.

422.     On April 5, 2006, Meyers emailed Van Hoeven, Sturgill, Wade Cordell, and Blevins a pass code for their scheduled conference call with Advance America, a potential institutional investor engaged by MK pursuant to the terms of the 2006 MK Engagement Contract.

423.     On May 14, 2006, Wade Cordell emailed Meyers copying Sturgill, Van Hoeven, and Brad Cordell coordinating Meyers to visit the Lexington facility on May 17, 2006, when Debtor's securities counsel would also be present at the facility in preparation for Bison's visit and explained that most of the items requested by Bison for its due diligence were "readily available."

424.     On June 16, 2006, Wade Cordell emailed Meyers with a copy to Sturgill, Van Hoeven, Blevins, and Brad Cordell to update them concerning the successful meetings between two of Debtor's employees and a bank holding company, who owned fifteen banks, where the Debtor would become the Originating Depository Financial Institution for the holding company's customer base of over 440,000 retail merchants. Wade Cordell explained although he was not certain of the number of merchant customers, it would "entail tens of thousands!" Wade Cordell

further relayed that the Debtor had completed seventy-five percent (75%) of the holding company's due diligence.

425.     On July 6, 2006, Meyers emailed Sturgill and Van Hoeven, with a copy to Wade Cordell, forwarding the June 21, 2006 questions posed by Bison employees noting that he had received a phone call from the Bison employees requesting for the questions to be answered and Meyers requested for either Sturgill or Van Hoeven to do so.

426.     On August 8, 2006, Wade Cordell emailed Stugill, copying among others Van Hoeven, that new bank business had been acquired; an additional six to seven banks would be signed this week; beginning in August of 2006, the Debtor would have about forty additional school districts submitting checks to the Debtor; and that a Sheriff's Department had been signed.

427.     On August 9, 2006, Wade Cordell emailed Meyers with a copy to Van Hoeven providing news that the Debtor was "full steam ahead" in its scheduled opening of the Barbourville processing plant.

428.     On November 18, 2006, Sturgill and Wade Cordell decided to give among others, Van Hoeven, Hargrett, Mike Till, and Jeff Lyle what they termed a "state of the union" type update on the Debtor.

      a.   "Over the last six to nine months we have been talking with Morgan Keegan and their investor base about the correct financial road that IBG needs to travel. Over the last year we have spoken to various financial organizations that wanted to give IBG funding to carry out our goals. Finding just the right fit has been a monumental task. As of this week, I feel we have come to our final decision on which investment team IBG should choose as our partner. As you are aware, Morgan Keegan and [Debtor's securities counsel] have been there along the way advising IBG on which steps need to be followed in order to reach our final goals."

      b.   "[L]et me tell everyone where we are today. Because of your superb leadership in the areas of our banking initiative, school districts and governmental accounts, IBG is on the verge of an explosion. Mike Till and Jeff Lyle have met with countless organizations and marketing groups over the last six months that are beginning to fill our 'pipleline of banks' at an unbelievable rate."

101

c. "Many months back IBG set Barbourville on our radar screen . . . . But it would not have come together without Bill Van Hoeven's help and loyalty to IBG. Bill has spent months in Barbourville away from his family. He has given his life to IBG and he will certainly be rewarded for this in the end. Bill left Babourville yesterday to head back to Jacksonville in order to begin helping IBG build a 'world class' collection agency in Jacksonville for 'open end debt collections.' Thanks Bill!"

d. "We project to be extremely cas[h] flow positive by the end of December. This is an amazing event for IBG. Think about the millions we have spent on infrastructure and to become cash flow positive at this juncture is really a statement."

e. "On Friday I met with Bison Capital in Charlotte, North Carolina. They have been waiting for IBG to hit the target numbers before they moved forward with us, through Morgan Keegan. They want to move forward with their $25 million investment in IBG. Here's the really good part. IBG can now dictate the terms of how we move forward. This is all because of each of you did your jobs over the last year. IBG is now negotiating from a position of 'strength' instead of weakness. This is huge news folks!"

f. "Let me explain to you how fast we are moving forward. First, commission checks are soaring . . . . It is very important to note that our banking initiative has just begun and that we have two banks that have said 'yes' but we have not officially received their checks yet. The most amazing thing about this is that these two banks alone would pay 100% of the IBG budget monthly with six figures monthly to spare! That's a powerful statement."

g. In closing, I can tell you that the 'State of Infinity Business Group' is at the point of an exponential growth explosion!"

h. "Haines is implementing the very needed financial reports and accountability records."

429.    On November 21, 2006, Wade Cordell emailed Blevins, Sturgill, Hargrett, Van Hoeven, and other employees of the Debtor regarding the Debtor's upcoming 2007 Planning and Strategy Meeting to be held November 29, 2006. Wade Cordell requested for each recipient to

outline their plans to contribute to a successful 2007 for the Debtor and stated "[t]hanks to all of you 2006 was a year of greatness. However, 2007 will be our 'break-out' year in terms of company growth and achievement. I am so excited about where we have come over the past three years. But, the excitement of 2007 overshadows those feelings."

430.    On November 24, 2006, Van Hoeven emailed Hargrett his 2007 Plan for BLG Collections, which was Debtor's hard collection component that he was charged with operating.

431.    On December 8, 2006, Wade Cordell responded to a dispute between the Jacksonville facility and the Barbourville facility, criticizing Van Hoeven for his attempts to stream line the processes handling systematic bad check writers. Van Hoeven had suggested that a systematic bad check writer's checks should be handled in whatever facility was already working to collect bad checks from that writer, and had indeed found the individual.

432.    On September 20, 2007, Wade Cordell emailed Sturgill with a copy to Blevins, Brad Cordell, Van Hoeven, and Hargrett concerning fund raising, explaining that it was imperative for the Debtor to raise funds. Wade Cordell explained "[a]t this point in time things look really good for [the Debtor] in terms of future business. We are ONLY two and a half weeks away from the Wachovia checks being sent to Barbourville and we are beginning to finally receive our school checks once more as the month of September progresses. The lack of school checks really impacted [the Debtor] this entire summer. It would be a real shame if [the Debtor] runs out of money before we get all of this going." Thus, Wade Cordell explained that the Debtor's business was close to taking off and that the Debtor's success was imminent; however, the Debtor was faced with a temporary cash flow shortage.

433.    On May 27, 2008, Wade Cordell emailed Sturgill with a copy to Brad Cordell, Van Hoeven, Blevins, and Hargrett with an itemization of the Debtor's total bills due, relaying that "[w]e have to raise a minimum of $500,000 very soon. This will pay these bills and cover payroll until the Morgan Keegan funding takes place."

434.    On June 5, 2008, Brad Cordell emailed Van Hoeven the MKSF due diligence requests that he had not been copied on, which delineated specific tasks to individuals with expertise in that area.

435.    On June 9, 2008, Wade Cordell emailed the Board of Directors that he was loaning the Debtor $50,000.00 but simultaneously he was "quite confident that the company is going to work

through this" and that due to the Debtor's inevitable success, he expected a ten percent (10%) return on his investment within two weeks.

436.     On June 23, 2008 and July 2, 2008, Blevins emailed an employee of Colonial Bank of Montgomery Alabama and copied Brad Corell, Till, Van Hoeven, and Bob Catoe, an employee of the Debtor, a copy of the signed contract by the bank as well as a declaration that "[b]ased on how you described how the Bank is going to roll out Phase I, I gained much more confidence in the amount of new business this will generate for IBG in the first place." The roll out included identified that the new services provided by Debtor would be offered to new and existing customers with the Business Check Select Checking Account and thereafter, the Debtor's services would be open to all business clients.

437.     On June 25, 2008, Brad Cordell forwarded an email from Meyers to the Board of Directors and Jeff Lyle, and Hargrett responding to an inquiry from Wade Cordell as to the possibility of MK dealing with Security Credit Service, a competitor of the Debtor, to which Meyers responded, "[w]e discussed selling the business for them, but due to my relationship with Infinity Business Services we decided to pass. I believe we have backed the right horse in this race!"

438.     On August 26, 2008, Wade Cordell sent an email to Sturgill while copying Brad Cordell, Blevins, Van Hoeven, and Hagrett, that he was glad that the Board of Directors had turned down the MKSF funding but that the Debtor was in a pinch due to a cash flow shortage problem but that the shortage was temporary and that the only funding required was a bridge to get through the remaining portion of 2008.

439.     On September 8, 2008, Wade Cordell emailed Brad Cordell with a copy to Sturgill, Van Hoeven, Blevins, and Hargrett informing them that his last email was intended to get Handy's attention, but assuring them that he was scheduled to talk with MK that day noting that "[t]here are some irons in the fire, but we will just have to see."

440.     On September 30, 2008, Wade Cordell explained in an email to Sturgill, copying Brad Cordell, Van Hoeven, Hargrett and Blevins that the cash flow shortage was trying but that the Debtor would prevail as it always did and that the Debtor was getting through this cash flow shortage but that the bills due, including a $27,000 advance to Regions Bank had been paid; however, the following week $75,000 was due to Regions, along with the pressing need to pay $50,0000.00 in bills, $10,000.00 to pay Collections Express, and $65,000.00 to Wachovia.

441.    On November 10, 2008, Wade Cordell emailed Brad Cordell and copied Strugill, Van Hoeven, Blevins, and Hargrett, explaining that the recent cash flow shortage was due to the production costs of implementing Wachovia and US Bank and that "IBG is turning the corner when it comes to our finances. Last week we paid $48k to Morgan Keegan. So all of our past costs . . . have been paid. Our goals are being met."

442.    On October 23, 2008, Wade Cordell emailed Sturgill with a copy to Brad Cordell, Van Hoeven, Blevins, and Hargrett that we was terminating employees who were no longer performing to cut down on the Debtor's overhead indicating to Van Hoeven that the problems with Debtor's cash flow short fall would soon be remedied.

443.    On November 12, 2008, Wade Cordell emailed Brad Cordell while copying Sturgill, Hargrett, Blevins, and Van Hoeven emphasizing the importance of raising funds until "all of the 51 banks and US Bank is fully implemented."

444.    On January 27, 2009, Wade Cordell emailed Sturgill while copying Van Hoeven, Blevins, and Hargrett that over the last several months, the Debtor had enjoyed a financial cushion in its bank accounts that was gone and to alert Wade Cordell to any unexpected costs that the Debtor would need to pay.

445.    Later that day, on January 27, 2009, Sturgill had a conversation with Blevins, Wade Cordell, and Brad Cordell while copying Van Hoeven and Hargrett concerning the creation and constitution of an advisory board to the Debtor and in particular, the consideration of Steve Kane for such role, who was introduced to the Debtor, upon information and belief, by Meyers in 2008.

446.    On February 3, 2009, Wade Cordell emailed Sturgill while copying Brad Cordell, Van Hoeven, Blevins, and Hargrett that the cushion of $300,000.00 in the Debtor's operating account, although increased to $400,000.00, was depleted due to unexpected expenses including reimbursements for failing to timely pay interest on agent commissions and Promissory Notes, and that only the elimination of all programs and people that unnecessarily cost the Debtor money would provide a solution to this persistent problem while awaiting the inevitable gold rush to the Debtor.

447.    On February 5, 2009, Brad Cordell emailed Van Hoeven and Catoe that as of that day, the Debtor would cease expenditures related to any operational, sales and or IT until the Debtor became very fluid and cash flow positive which should happen as early as June of this year.

Brad further relayed that "[w]e have spent a considerable amount of capital to get IBG to this point and given the state of the economy we have to be very fruitful with the funds that we have available as it stands today. We have raised enough capital to get IBG to the cash flow positive timeline & we will scrutinize any & all expenditures from today forward."

448.    On February 20, 2009, Wade Cordell emailed Brad Cordell, with a copy to Sturgill, Van Hoeven, Blevins, and Hargrett, that despite the cash flow shortage of $250,000.00 it "looks as though Synovus will make up this short-fall. [The Debtor] will not begin seeing the benefits of Synovus until late May, so we can add it back for June. I feel we need to raise enough capital to get IBG through the 3rd quarter."

449.    On March 16, 2009, Wade Cordell emailed Sturgill, copying Brad Cordell, Hargrett, Blevins, and Van Hoeven, detailing that "we have 100% of everything paid except the repurchase of the Mike Miller Territory and the taxes."

450.    On June 8, 2009, Wade Cordell sent an email to Brad Cordell, Strugill, Van Hoeven Caughman, Blevins, Lyle, Hargrett, Jim Miles, an employee of Debtor, Mike Till, and others, clarifying that "our securities attorneys out of Baltimore, has reviewed all documents as well as filed all necessary paperwork with each state ag[e]ncy and we are now ready to make available this new capital raise."

451.    On June 30, 2009, another push for fundraising to bridge over a short term capital shortage was necessitated and requested by Wade Cordell to Strugill, Brad Cordell, Hargrett, Blevins, and Van Hoeven.

452.    On June 30, 2009, Van Hoeven emailed Wade Cordell informing him that Nancy Mills had two prospective purchasers of the Debtor's shares in amounts of $50,0000.00 each.

453.    On July 9, 2009, Wade Cordell emailed Brad Cordell, Van Hoeven, Sturgill, Blevins, and Hargrett confirming their review of the great emails about the possibility of the Debtor collecting on all ACH returns for all the large Synovous accounts; Bank of America and Food Lion in addition to the Debtor's current receipt of 400 to 5,500 checks per day from Synovous. However, Wade Cordell also informed these recipients that next week US Bank was owed $35,000.00 in commissions and IBG could not take the money from the ODFI accounts since the ODFI accounts were $350,000.00 in the red.

454.    All components of the issuance of the 2008 Promissory Notes and the 2008 Mezzanine Debt Instruments as well as issuance of securities pursuant to the November 06 PPM are completed.

455.    No serious moral turpitude on behalf of the Debtor and/or the Innocent Members of the Board of Directors is involved here.

456.    MK is guilty of the greatest moral fault because MK violated professional rules, its contractual obligations, and professional standards utilized in its industry.

457.    MK is guilty of greater moral fault when compared to the Debtor because it engendered a hardship against the Innocent Members of the Board of Directors, thereby providing an unconscionable advantage to itself and Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett.

### C. RECISSION OF STOCK SOLD UNDER FRIENDS AND FAMILY

458.    In connection with the stock offering under the November 06 PPM, and upon advice of Debtor's securities counsel, the Debtor made a rescission offer ("Rescission Offer") for shareholders of common stock of the Debtor purchased by investors pursuant to the 2005 Friends and Family Offering to tender up to 4,384,800 ("Tender Limit") shares of Class A Common Stock for a purchase price of $1.20 per share.

  a. The Rescission Offer was detailed as a mechanism to allow the Debtor's stockholders the ability to get their money back plus interest of 20%.

  b. The tender of shares was to be made to Blevins at Debtor's Lexington, South Carolina location.

  c. The Rescission Offer was a limited offer and if more than the Tender Limit accepted the Rescission Offer than the shares tendered by "odd lots"—the tendered shares would first be purchased on a priority basis and then the remaining tendered shares would be repurchased on a first-come first-serve basis.

  d. Pursuant to the Rescission Offer, no member of the Board of Directors was eligible to participate in the Rescission Offer.

  e. The Rescission Offer provided that "[t]he Offer is intended to eliminate to the extent possible and at least limit the Company's liability to existing shareholders who purchased their shares in securities offerings made by the Company that did not fully comply with Federal and state securities laws. Because we have

designed the Offer to materially comply with the rescission requirement of the states in which we previously sold securities we believe that our future liability to those shareholders for and failure to fully comply with Federal and state securities laws will be eliminated."

    f.   The Rescission Offer further provided, "[w]e are also currently conducting a private tender offer for the Territory Licenses with Additional Commission for an amount equal to the purchase price for such licenses plus 20% (which is the same formula we used to determine the Purchase Price in the Offer and which is mandated by state rescission requirements)."

459.    On May 8, 2007, the Board of Directors held a regularly scheduled meeting where the Rescission Offer was discussed by Hargrett and it was reported that the Debtor had purchased $353,100.00 of the shares tendered pursuant to the Rescission Offer.

### D. 40% BONUS COMPENSATION TERRITORY LICENSE RESTRUCTURING AGREEMENTS

460.    During 2004 and 2005, Debtor sold twenty-six (26) Territory Agreements including the 40% Bonus Compensation Terms.

461.    Upon information and belief, each holder of a 40% Territory Agreement entered into a Termination and Release Agreement ("Release Agreement") with the Debtor, which released the Debtor from any liability from the 40% Territory Agreement and returned any gifted stock to the Debtor, and in exchange, received the full purchase price of the 40% Territory Agreement with interest at a rate of twenty percent (20%).

462.    The repurchase of the twenty-six (26) 40% Territory Agreements, upon information and belief, was completed in June and July of 2006, with Debtor remitting $1,343,554.83 for the termination price and in addition remitting $191,794.83 in interest to the holders of the 40% Territory Agreements.

463.    After the completion of the Rescission Offer and Release Agreement, the Debtor was, upon information and belief, no longer subject to the weighty fines it could have incurred for its possible security violations associated with the 40% Territory Agreements and the Friends and Family Offering.

## 9. ACTIONS OF INDIVIDUAL DEFENDANTS

### A. STOCK FOR PAYMENT OF PERSONAL DEBT

464.     On or about November 5, 2005, Wade Cordell and Brad Cordell caused 50,000 shares of stock to be transferred from the Debtor's treasury stock to Stuart M. Comer ("Comer").

465.     The stock so transferred ("Transfer A") was a gift to Comer, made in consideration for work done by him for Brad Cordell individually.

466.     No payment was made by Comer or by anyone else to the Debtor for Transfer A.

467.     No Internal Revenue Service Form 1099 was issued by the Debtor to Brad Cordell recognizing the satisfaction of his personal debts through Transfer A as income.

468.     The Board of Directors did not authorize Transfer A.

469.     On February 14, 2007, Comer tendered 40,000 of the 50,000 shares of the Debtor's stock back to the Debtor for a payment of $48,000.00, which constituted the largest single stock redemption during the Rescission Offer.

470.     Upon information and belief, immediately after this transaction, on February 14, 2007, Wade Cordell and Brad Cordell each received $24,000.00 from Comer.

471.     Upon information and belief, such payments were made by this individual to Wade Cordell and Brad Cordell upon their direct instructions.

### B. CONVERSION OF DEBTOR'S STOCK BY DEFENDANTS

472.     On March 29, 2005, Wade Cordell gifted 2,000 shares of Debtor's stock to Jeff Kersey evidenced by stock certificate number 88 for no consideration to the Debtor.

473.     On April 4, 2005, Wade Cordell gifted 100,000 shares of Debtor's stock to Roscoe S. Caughman to satisfy an outstanding debt of $55,524.00 owed by CORDATA Administrations, Inc. to Roscoe Caughman. No consideration was paid to Debtor for this transfer.

474.     On April 4, 2005, Wade Cordell also gifted 50,000 shares of Debtor's stock to Steve Roland to satisfy an outstanding debt of $49,391.00 owed by CORDATA Administrations, Inc. to Steve Roland. No consideration was paid to Debtor for this transfer.

475.     On April 26, 2005, Wade Cordell, Brad Cordell, Sturgill, and/or Blevins gifted 35,000 shares of Debtor's Class A common stock to Robert N. Fuller for no consideration to the Debtor evidenced by stock certificate number 179.

476.     Also, on April 26, 2005, Wade Cordell caused the Debtor to issue shares of Debtor's Class A common stock to twenty-two unnamed individuals for no consideration to the Debtor.

477.    On October 13, 2005, Wade Cordell gifted 7,500 shares of Debtor's class A common stock to Carl Wilson evidenced by stock certificate number 212 for no consideration to the Debtor. On February 15, 2007, Carl Wilson tendered these shares to the Debtor pursuant to the Rescission Offer and received consideration of $9,000.00 in return from the Debtor.

478.    Also, on October 13, 2005, Wade Cordell, Brad Cordell, Sturgill, and/or Blevins, upon information and belief, gifted 35,000 shares of Debtor's Class A common stock to Kay Tinsley for no consideration to the Debtor evidenced by stock certificate number 179.

479.    On October 20, 2005, Wade Cordell, Brad Cordell, Sturgill, and/or Blevins, upon information and belief, gifted 10,000 shares of Debtor's Class A common stock to Gary M. White for no consideration to the Debtor evidenced by stock certificate number 422.

480.    Also, on October 20, 2005, Wade Cordell gifted 25,000 shares of Debtor's Class A common stock to Bellus, Inc. owned by Keith Hare and Wade Cordell for no consideration to the Debtor, evidenced by stock certificate number 417.

481.    On December 29, 2005, Wade Cordell, Brad Cordell, Sturgill, and/or Blevins, upon information and belief, gifted 1,000 shares of Debtor's Class A common stock to Jason Travis Blevins, upon information and belief, Blevin's relative, for no consideration to the Debtor evidenced by stock certificate number 394.

482.    Also, on December 29, 2005, Wade Cordell, Brad Cordell, Sturgill, and/or Blevins, upon information and belief, gifted 1,000 shares of Debtor's Class A common stock to Ashley Brooks Blevins, upon information and belief, Blevin's relative, for no consideration to the Debtor evidenced by stock certificate number 395.

483.    Also, on December 29, 2005, Wade Cordell, Brad Cordell, Sturgill, and/or Blevins, upon information and belief, gifted 1,000 shares of Debtor's Class A common stock to Kathryn Lynn Dear, upon information and belief, Blevin's relative, for no consideration to the Debtor evidenced by stock certificate number 396.

484.    On November 4, 2006, Scott Matula purchased 32,000 shares of Debtor's Class A common stock; however, the $40,000 in proceeds from the sale was deposited directly into the account of CLLC at the direction, upon information and belief, of Wade Cordell, Brad Cordell, and Blevins.

485.    Also, on November 4, 2006, the Debtor issued 48,000 shares of Debtor's Class A common stock to Deer Water Investment Group, LLC, and the $60,000.00 as consideration for

110

these shares of was deposited into the account of Cordell, LLC instead of being properly remitted to Debtor at the direction, upon information and belief, of Wade Cordell, Brad Cordell, and Blevins.

486.    On October 31, 2007, Blevins gifted 4,000 shares of Debtor's Class A common stock to Henry B. and Susan C. Dingle for no consideration to the Debtor evidenced by stock certificate number 621.

487.    On July 14, 2009, Wade Cordell gifted 100,000 shares of Debtor's Class A common stock to Ark Bank Services, LLC for no consideration to the Debtor evidenced by stock certificate number 897.

488.    In addition, from 2005 to 2009, Wade Cordell, Brad Cordell, Sturgill, and/or Blevins, upon information and belief, gifted an additional 181,700 shares of Debtor's Class A common stock to individuals for no consideration to the Debtor, but instead, for personal benefit.

## C. SALES OF PERSONAL STOCK BY VARIOUS DEFENDANTS

489.    From 2005 through 2008, Wade Cordell and Brad Cordell utilized CLLC to hold numerous shares of Debtor's stock.

490.    CLLC received and held shares of stock of the Debtor issued from the treasury of the Debtor—the 2004 CLLC Misappropriated Shares, without authorization from the Board of Directors for this improper distribution, upon the instructions of Wade Cordell and Brad Cordell.

491.    No consideration was paid to the Debtor for this stock transfer.

492.    In 2006 and 2007, Wade Cordell, Brad Cordell, and Sturgill sold approximately 820,000 shares of Debtor's stock wrongfully issued to CLLC to individuals for profit without remitting any consideration to the Debtor ("06&07 Cordell LLC Stock Sales").

493.    In 2008, Wade Cordell, Brad Cordell and Sturgill sold approximately 641,000 shares of Debtor's stock wrongfully issued to CLLC to individuals for profit without remitting any consideration to the Debtor ("2008 Cordell LLC Stock Sales").

494.    During the 06&07 Cordell LLC Stock Sales and the 2008 Cordell LLC Stock Sales approximately one million four hundred and sixty two thousand (1,462,000) shares of the Debtor's stock was sold and/or transferred by CLLC between August of 2007 and November of 2008 for no consideration to the Debtor.

495.    In addition, intermittently, portions of the proceeds from the sales of the Debtor's stock offered during the Friends and Family offering, were deposited into the account of CLLC, and utilized for the benefit of Wade Cordell, Blevins, and Brad Cordell.

496.    Such sales of the Debtor's stock were made without authorization from the Board of Directors.

497.    The consideration for the sales of this stock was used for the benefit of Wade Cordell, Blevins, and Brad Cordell.

498.    Approximately two hundred fifty-seven thousand (257,000) shares of the Debtor's stock were sold or transferred by Sturgill through S&A between August 2007 and November 2008.

499.    This stock was owned either by Sturgill or S&A.

500.    The moneys received from the sales of this stock were used for the benefit of Sturgill.

### D. EXPENSES OF DEFENDANTS PAID FOR BY DEBTOR

501.    Between 2004 and 2009, numerous personal expenses of the Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins were paid for by the Debtor. These payments included (without limitation):

   a.    Payments for almost weekly trips to strip clubs in Columbia, South Carolina, Charlotte, North Carolina, and Atlanta, Georgia (During one visit, Defendants spent over $3,400.00 of Debtor's income);

   b.    Payments for car repairs for Wade Cordell's vehicle;

   c.    Numerous payments for expenses associated with attendance at Clemson University football games by Wade Cordell and Brad Cordell;

   d.    Payments for improvements to, repairs for, and operations of Brad Cordell's yacht;

   e.    Payments to liquor stores – including one charge of over $900 in May of 2008 by Brad Cordell;

   f.    Payment of country club dues for Wade Cordell, Brad Cordell, Blevins, Hargrett, and others;

   g.    Payments for hotels in Lexington, South Carolina, by Wade Cordell, Brad Cordell and Blevins (despite all of them having residences in Lexington);

    h.   Gasoline charges by Wade Cordell, Brad Cordell and Blevins, despite each having automobile allowances paid by the Debtor;

    i.   Payments of a mortgage on a Lexington, South Carolina, condominium owned by Deborah Dear (wife of Blevins); and

    j.   Payments for landscaping services for the personal residences of Wade Cordell, Joyce Cordell and Brad Cordell.

### E. GIBSON COMMONS

502.    The Debtor maintained its Lexington, South Carolina offices, from 2006 through 2009, at 140 Gibson Road. This realty is owned by Gibson, which is owned by Brad Cordell.

503.    In 2004 or 2005, upon information and belief, Brad Cordell borrowed approximately $550,000.00 to purchase 140 Gibson Road secured by a mortgage thereon ("140 Gibson Road Mortgage"). The payments on account of the 140 Gibson Mortgage were paid, upon information and belief, by Debtor without authorization from the Board of Directors.

504.    Later, upon information and belief, in late 2005 or early 2006, Brad Cordell caused the Debtor to pay off the 140 Gibson Road Mortgage.

505.    As an officer and director of the Debtor, Brad Cordell was under a duty to inform the Debtor and thus the entire Board of Directors of the full circumstances surrounding the Debtor's transactions involving 140 Gibson Road.

    a.   Brad Cordell only informed the Board of Directors of the transaction without disclosure of the circumstances surrounding the Debtor's transactions with Gibson and 140 Gibson Road.

506.    On May 10, 2005, a special meeting of the Board of Directors was held where it was resolved that the Debtor would loan Brad Cordell $60,000.00, evidenced by a Demand Promissory Note incorporating the personal guarantee of payment by Brad Cordell, to enable the construction of the space which, upon completion, Debtor would occupy and lease at 140 Gibson Road.

507.    On December 9, 2005, Brad Cordell through Gibson, executed a Demand Promissory Note ("Gibson Note") to memorialize that indebtedness. The Gibson Note provided that Gibson would repay the Debtor principal in the amount of $60,000, together with interest at the rate of six percent (6%) on the unpaid principal balance. The Gibson Note further provided that the note was to bear interest at a rate of twelve percent (12%) on all past-due principal and late

charges of an additional five percent (5%) of any payment not made within ten (10) days of its due date. The Gibson Note further provided that, upon default, and if placed in the hands of an attorney, the holder of the Gibson Note was entitled to any and all legal fees due for collection thereof.

508.    On March 1, 2006, Debtor entered into a lease agreement to lease 140 Gibson Road, consisting of six thousand square feet, for a monthly payment of $7,000.00: $6,500.00 for the Lease amount and $500.00 for maintenance. The maintenance portion of the lease payment was required to be adjusted annually based on actual maintenance costs incurred. The lease's term was for three years and expired on March 1, 2009.

509.    On July 24, 2006, Debtor entered into a lease agreement to lease 130 Gibson Road, consisting of two thousand square feet, for a monthly payment totaling $2,750.00: $2,500.00 for the Lease amount and $250.00 for maintenance. The maintenance portion of the lease payment was required to be adjusted annually based on actual maintenance costs incurred. The lease's term was for three years, and began on August 1, 2006, and expired on August 1, 2009.

510.    As of August 21, 2007, more than $42,000 of the principal amount borrowed by Gibson evidenced by the Gibson Note had not been repaid by Brad Cordell or Gibson to the Debtor.

511.    On August 21, 2007, Brad Cordell requested for the Debtor to forgive the remaining balance on the Gibson Note.

512.    On June 1, 2008, Debtor entered into a lease agreement to lease 140 Gibson Road, Suites A and B, consisting of 9,000 square feet, from Gibson for consideration of a monthly payment of $12,052.00. The term of the lease was for three years and began on June 1, 2008 and expired on June 1, 2011.

513.    As of June 1, 2011, there is now due and owing the sum of $67,043.00 on the Gibson Note.

514.    Brad Cordell, the single member of Gibson, and a director and officer of the Debtor, was required to provide the Board of Directors with complete and adequate disclosure concerning the terms of these lease agreements and the Gibson Note and he failed to do so. Instead, Brad Cordell misrepresented facts pertaining to the lease agreements and Gibson Note resulting in an unfair transaction that did not benefit the Debtor. Instead, Brad Cordell was motivated exclusively to procure personal gain.

515.    In addition, Brad Cordell leased a portion of the same space rented to the Debtor to BLG Collection Services, LLC for a monthly payment totaling $2,500.00: $2,000 for the lease amount and $500.00 for maintenance expenses. Therefore, BLG Collection Services, LLC, a single-member LLC constituted by its single member, Debtor, also paid Gibson an additional $2,500 per month to share the same space rented by the Debtor at 140 Gibson Road, which was unwarranted and excessive and did not constitute a fair transaction.

516.    Furthermore, such rent, despite representation to the contrary by Brad Cordell to the Board of Directors, was in excess of the going commercial rate for similar property in the Greater Columbia area at the time and the terms of the lease agreements secured a private advantage to Gibson and Brad Cordell at the expense of the Debtor.

517.    In addition, the Debtor paid more than $35,000.00 in landscaping for Gibson without authorization from the Board of Directors, for which it was not reimbursed and for which was in excess of its contractual obligations pursuant to the lease agreements.

### F. GOLDEN GHOST

518.    Blevins was an officer, was an officer, director, and the chief legal officer for the Debtor.

519.    Blevins is, upon information and belief, the sole shareholder and director of Golden Ghost, Inc., a holding company that performed no legitimate services for the Debtor.

520.    Blevins caused, utilizing his position as an officer, director and chief legal officer of the Debtor, the Debtor to pay Golden Ghost more than Two Hundred Sixty Three Thousand dollars ($263,000.00) to which it was not entitled.

### G. ADDITIONAL LOOTING AND EFFECTS THEREOF

521.    In 2006 to 2009, Wade Cordell, Brad Cordell, Hargrett, Sturgill, and Blevins misappropriated the following monies from the Debtor as reflected below.

| Type of Payments and Recipient's name | Income from Debtor 2007 | Income from Debtor 2008 | 2009 Income Received from Debtor 1/1/2009-9/1/2009 | Received from Debtor After 9/1/2009 |
|---|---|---|---|---|
| **Brad Cordell** | | | | |
| Credit Card Payment | $ 29,657.03 | $ 45,999.66 | $ 12,586.00 | |
| B Cordell | $ 323,160.00 | $ 171,250.00 | $ 34,000.00 | |
| Borral Bricks | $ 33,959.54 | | | |
| Merrifield Garden Center | $ 12,226.33 | $ 24,535.52 | | |
| Amy Evenhouse (Space Coordinator/Gibson Commons) | $ 4,950.00 | $ 2,118.36 | | |
| William Leaphart (Office maintenance for Gibson) | $ 1,200.00 | $ 26,500.00 | $ 21,836.00 | |
| Chad Warren (Landscaping) | | $ 16,476.00 | $ 3,106.00 | |
| Lexington County Treas. (Prop Tax) | | $ 17,999.17 | $ 16,085.11 | |
| Gibson , LLC | $ 332,787.00 | $ 498,310.00 | $ 288,250.00 | $ 150,658.00 |
| Gibson, LLC 2005 Loan Forgiveness | | | $ 42,000.00 | |
| **Total Payment to B Cordell** | **$ 737,939.90** | **$ 803,188.71** | **$ 417,863.11** | **$ 150,658.00** |

| Type of Payments and Recipient's name | Income from Debtor 2007 | Income from Debtor 2008 | 2009 Income Received from Debtor 1/1/2009-9/1/2009 | Received from Debtor After 9/1/2009 |
|---|---|---|---|---|
| **Wade Cordell** | | | | |
| W Cordell Credit Card | $ 47,698.45 | $ 64,111.29 | $ 17,582.91 | |
| W Cordell | $ 118,909.34 | $ 284,023.08 | $ 50,746.08 | |
| Stuart Comer | $ 48,000.00 | | | |
| Deerwater Investments Group | | $ 5,852.00 | $ 12,032.00 | |
| Scott Matula | | $ 14,296.00 | $ 7,444.00 | |
| Roscoe Caughman | | $ 20,000.00 | $ 11,300.00 | $ 2,000.00 |
| Expenses Reported | $ 46,686.49 | $ 23,524.38 | | |
| Cordell LLC | $ 236,500.00 | $ 308,660.00 | $ 198,220.00 | $ 188,093.88 |
| **Wade Cordell Total** | **$ 497,794.28** | **$ 720,466.75** | **$ 297,324.99** | **$ 190,093.88** |
| J. Cordell (W. Cordell's wife) | $ 22,471.22 | $ 186,212.68 | $ 24,700.00 | |
| Ginger Taylor | | $ 56,400.00 | $ 62,040.00 | |
| Ann Price (Sister) | $ 55,966.19 | $ 77,936.88 | $ 76,074.43 | $ 31,838.37 |
| David Price (Brother-in-law) | $ 79,542.59 | $ 79,600.00 | $ 73,575.00 | |

116

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document    Page 119 of 173

| Total Cordell Family | $ 1,371,242.96 | $ 1,923,805.02 | $ 951,577.53 | $ 31,838.37 |
|---|---|---|---|---|
| | | | | |
| **Blevins** | | | | |
| Credit Card Payment | $ 16,183.66 | $ 25,087.68 | $ 7,405.68 | |
| BLG | $ 67,400.00 | $ 12,100.00 | | |
| John Blevins | $ 180,299.38 | $ 21,873.77 | $ 7,504.64 | |
| Law Offices of Blevins | $ 172,841.54 | $482,955.77 | $ 162,180.00 | $ 30,138.82 |
| Golden Ghost | $ 20,700.00 | $ 25,350.00 | $ 95,650.00 | $ 121,529.18 |
| Thornhill Apartments | | $ 8,569.00 | $ 4,039.59 | |
| Debra Dear (Blevins' wife) | | $ 8,276.00 | $ 7,446.00 | |
| Analicia Blevins | | $ 2,742.75 | | |
| **Total Blevins** | $ 457,424.58 | $ 586,954.97 | $ 276,820.23 | $ 151,668.00 |

| Type and Recipient's name | Income from Debtor 2007 | Income from Debtor 2008 | 2009 Income Received from Debtor | Received from Debtor 2010 |
|---|---|---|---|---|
| **Sturgill** | | | | |
| Credit Card Payment | $ 13,968.53 | $ 18,753.21 | $ 5,084.58 | $ 28,900.00 |
| Bryon Sturgill | $ 5,485.28 | $ 147,000.00 | $ 2,000.00 | $ 139,501.84 |
| Sturgill Group | $ 356,612.00 | $ 308,660.00 | $ 279,257.00 | |
| **Total Sturgill** | $ 376,065.81 | $ 474,413.21 | $ 286,341.58 | $ 168,401.84 |
| **Hargrett** | | | | |
| **Total Hargrett** | $ 157,412.43 | $ 288,158.25 | $ 151,034.48 | $ 65,973.59 |

522.    In June of 2008, Wade Cordell informed Brad Cordell, Sturgill, Blevins, Hargrett and others, that Wade Cordell and Joyce Cordell were increasing their loans to the Debtor to $100,000.00, and that Wade Cordell and Joyce Cordell expected to be repaid $110,000.00 by the Debtor within two weeks of the funds being advanced.

523.    On July 28, 2008, Joyce Cordell, Wade Cordell's wife, received a check for $110,000.00 from Debtor for repayment of the $100,000.00 that had been advanced.

524.    Such interest (annualized equal to a 120% return) was excessive and far over market rates at the time and was a related-party transaction that was not fair in price and was not made with fair dealing to the Debtor.

525.    On August 4, 2009, Wade Cordell, Brad Cordell and/or Blevins caused the Debtor to borrow $250,000.00 from William Danielson with annual interest at a rate of 48 percent (48%) payable over a term of ninety (90) days. In conjunction with said loan, Wade Cordell, Brad

117

**-133-**

Cordell, and Blevins caused the Debtor to issue 400,000 shares of Debtor's stock as an equity sweetener to Danielson.

526.    On August 11, 2009, Wade Cordell, Brad Cordell and/or Blevins caused the Debtor to borrow $50,000.00 from Kurt L. Zanelotti with annual interest at a rate of 48 percent (48%) payable over a term of ninety (90) days. In conjunction with said loan, Wade Cordell, Brad Cordell, and Blevins caused the Debtor to issue 10,000 shares of Debtor's stock as an equity sweetener to Zanelotti.

527.    The 2004 balance sheet of the Grafton Audited Financials indicated that the Debtor's total liabilities were $219,454.

528.    According to the 2004 Balance Sheet of the Grafton Audited Financials, the Debtor's assets exceeded its liabilities by $9,011,082.

529.    At the time the Debtor filed bankruptcy, on September 1, 2010, it was grossly insolvent. The Debtor had assets totaling only 606,557.23.

530.    At the time the Debtor filed bankruptcy, it had liabilities of $12,393,958.51.

531.    At the time the Debtor filed bankruptcy, its liabilities exceeded its assets by $11,787,401.28.

### H. BLEVINS LAW

532.    Blevins was a vice president and chief counsel for the Debtor, and wholly-owns Blevins Law.

533.    In 2007, the Debtor paid Blevins Law $172,841.54; in 2008, the Debtor paid Blevins Law approximately $482,955.77; and in 2009, the Debtor paid Blevins Law $162,180.00.

534.    The amounts paid by the Debtor to Blevins Law were in addition to the amounts paid by the Debtor to Blevins individually.

535.    Upon information and belief, Blevins Law provided no services for the Debtor.

### I. CLLC

536.    In 2007, the Debtor paid CLLC $236,500.00; in 2008, the Debtor paid to CLLC $308,660.00; in 2009 and 2010, the Debtor paid CLLC $386,313.88. Thus, from 2007 to 2010, the Debtor paid CLLC approximately $931,473.88.

537.    The amounts paid by the Debtor to CLLC were in addition to the amounts paid by the Debtor to Wade Cordell and Brad Cordell.

538.    Upon information and belief, CLLC provided no services to the Debtor.

### J. S&A

539.    Between January 1, 2007 and December 31, 2009, the Debtor paid to S&A: $356,612.00 in 2007; $308,660.00 in 2008; and $279,257.00 in 2009.

540.    The amounts paid by the Debtor to S&A were in addition to the amounts paid by the Debtor to Sturgill.

541.    Upon information and belief, S&A prepared and filed tax returns for the Debtor for the years 2003-2009.

542.    The amounts paid to S&A by the Debtor are far in excess of the amounts reasonably to be charged for preparation of tax returns for a business such as the Debtor.

### K. EMPLOYMENT CONTRACTS

543.    On March 20, 2007, Wade Cordell, Brad Cordell, Sturgill, and Blevins each entered into employment contracts with the Debtor and on September 19, 2006, Hargrett entered into an employment contract with Debtor (collectively, "Employment Contracts").

    a.    The Employment Contracts required for the signatories to serve in their employment with full faith and loyalty to the Debtor, and without self-aggrandizement.

    b.    The Employment Contracts further provided that the officers would receive a base salary and in addition, the officers would receive a base salary increase of five percent (5%) for each forthcoming fiscal year unless determined otherwise by the Board of Directors; however, the Employment Contracts also provided that in no event would the base salary be increased if the Debtor's EBITDA had not increased over the EBITDA over the previous fiscal year absent a unanimous vote of the Board of Directors to the contrary.

    c.    The Employment Contracts also provided that the Debtor would indemnify the officers from and against any claim, loss or cause of action arising out of the officer's performance as an officer or employee of the Debtor, or in any other capacity including serving as a fiduciary, except for acts or omissions not in good faith or which involve gross negligence, intentional misconduct, or a knowing violation of the law, for any breach of the officer's duty of loyalty or any other fiduciary duty to the Debtor or for any other transaction from which the officer derived an impersonal benefit.

d.  The Employment Contracts also provided for termination of the officers for "cause" defined in relevant part as (i) embezzlement or willful or knowing misappropriation of funds or other assets of the Debtor; (iii) gross negligence, recklessness or willful misconduct which is materially injurious to the Debtor or its affiliates, provided, that no act of the officer would be deemed "willful" unless done, or omitted to be done, by him not in good faith and without reasonable belief that his action or omission was in the best interests of the Debtor; or for a material breach of the officer's obligation to refrain from disclosing the Debtor's Confidential Information or from refraining to solicit the Debtor's customers.

e.  The Employment Contracts provided that they were governed by the laws of South Carolina.

f.  The Employment Contracts also provided as follows: <u>Non-Disclosure; Non-Solicitation</u>. In consideration of the Company entering into this Agreement and providing the salary and other benefits hereunder, the Executive agrees as follows (the term "Company" for all purposes of this Section 4.4 shall include any successor thereof or any other person acquiring all or substantially all of the assets and/or the operations of the Company:

   i.  (a) <u>Confidentiality</u>. The Executive acknowledges that in his capacity as an officer and/or director, as applicable, of the Company, he occupies a position of trust and confidence with respect to the Company. The Executive agrees that, during the Covenant Term (as defined below) (or until such information shall have become public other than by any unauthorized disclosure, directly or indirectly, by the Executive), he shall not disclose to others or use, directly or indirectly, any Confidential Information of or regarding the Company, except (i) to carry out his duties hereunder, (ii) to the extent the Executive or his counsel may reasonably determine such information is relevant to, and should be disclosed in, any judicial, arbitration, mediation or similar such proceeding (and in filings made with respect thereto) undertaken by the Executive to enforce his rights hereunder (with the Executive agreeing on behalf of himself and his counsel that, notwithstanding any such disclosure of information, such

120

information shall continue to be treated as "Confidential Information" hereunder) or (iii) as required by applicable law. "Confidential Information" shall mean information about or created by the Company or any Affiliate thereof, or any of their respective clients, customers, suppliers and vendors, and that was learned by the Executive in the course of his employment by or ownership of the Company and is not otherwise publicly available, provided that the "pubic availability" exception shall not apply if the Executive Board of Directors' consent, including (without limitation) any proprietary knowledge, trade secrets, data, formulae, information and client and customer lists and all papers and other records (including computer records) of the documents containing such Confidential Information.   The Executive acknowledges that such Confidential Information is specialized, unique in nature and of great value to the Company and that such information gives the Company a competitive advantage. The Executive agrees to deliver or return to the Company at the Board of Directors' request or upon the termination or expiration of his employment with the Company or as soon thereafter as possible all documents, work papers, lists, memoranda, records, computer data and other data (including all copies) constituting or pertaining in any way to any Confidential Information.   The Company agrees that the Company shall not disclose to others or use, directly or indirectly, any information regarding the Executive, whether personal or professional, including, but not limited to this Agreement and the terms thereof.  The "Covenant Term" means the period commencing on the date hereof and ending three (3) years after the date of termination;

ii.  (b) <u>Non-Solicitation of Customers</u>. The Executive hereby covenants and agrees with the Company that, during the Covenant Term, the Executive shall not solicit any customers, clients, or other Persons, including contractors and independent contractors, from whom the Company derives any revenue or persuade or attempt to persuade any customer, client, vendor, service provider, supplier, contractor or any other Person having

business dealings with the Company to cease doing business or otherwise transacting with the Company or to reduce the amount of business or such other transactions he, she or it conducts or will conduct with the Company; nor shall the Executive engage in any business as an owner, principal stockholder, consultant, employee, independent contractor, partner, or member that is in competition with the Company in any location that is within 325 miles of any of the Company's offices.

iii. (c) <u>Non-Solicitation of Employees</u>. The Executive hereby covenants and agrees with the Company that, during the Covenant Term, the Executive shall not solicit or induce any employee or independent contractor of the Company to terminate his or her relationship with the Company or, directly or indirectly, offer employment to or compensate or cause or permit any other Person to compensate any such employee or independent contractor.

iv. (d) <u>Severability</u>. If any court determines that any of the covenants or other provisions contained in <u>Section 4.4</u>, or any part thereof, is invalid or unenforceable, the remainder of such covenants and this Agreement shall not thereby be affected and shall be given full effect without regard to the invalid portions. If any court determines that any of the covenants contained in <u>Section 4.4</u>, or any part there, are unenforceable because of the duration of such provision or the area covered thereby or for any other reason, such court shall have the power and the parties intend and desire that such court, and in connection with the Company's providing the salary and other benefits hereunder, the Company is relying on such court to, exercise such power, to reduce the duration or cover of such provision shall then be enforceable and shall be enforced.

v. (e) Injunctive Relief with Respect to Covenant. The Executive acknowledges and agrees that the covenants and obligations of this <u>Section 4.4</u> relate to special, unique and extraordinary matters and that a violation or attempted or threatened violation of any of the terms of such covenants and obligations will cause the Company and its Affiliates

122

irreparable injury for which adequate remedies are not available at law. Therefore, the Executive agrees that the Company shall be entitled to an injunction, restraining order, or such other equitable relief as a court of competent jurisdiction may deem necessary or appropriate to restrain the Executive from committing, attempting or threatening any violation of the covenants and obligations contained in this <u>Section 4.4</u>. These injunctive remedies are cumulative and are in addition to any other rights and remedies the Company may have at law or in equity.

vi. (f) Survival of Provisions. The obligations contained in this Section 4.4 shall survive the termination or expiration of the Executive's employment with the Company and shall be fully enforceable thereafter.

544.    Wade Cordell's Employment Contract provided that he would serve as the Debtor's President for a base salary of $286,000.00.

545.    Brad Cordell's Employment Contract provided that he would serve as the Debtor's Chief Operating Officer for a base salary of $286,000.00.

546.    Hargrett's Employment Contract provided that he would serve as the Debtor's Chief Financial Officer for a base salary of $156,000.00.

547.    Sturgill's Employment Contract provided that he would serve as the Debtor's Chief Executive Officer for a base salary of $286,000.00.

548.    Blevins's Employment Contract provided that he would serve as the Debtor's General Counsel for a base salary of $234,000.00.

## 10. INTRA-MANAGEMENT LAWSUITS -- TERMINATION OF WADE CORDELL, BRAD CORDELL, BLEVINS, HARGRETT AND STRUGILL

549.    Upon information and belief, in August of 2009, Sturgill informed the Board of Directors that in his review of the Debtor's financial records he had become aware that there were numerous irregularities in Wade Cordell, Brad Cordell, and Blevins' roles in the Debtor, including financial transactions made without approval of the Board of Directors; questionable financial transactions to unknown entities; and the conferral of benefits and/or payments on behalf of persons employed by Wade Cordell, Brad Cordell, and Blevins or their related companied who were not employees of the Debtor.

123

550.     On August 15, 2009, members of the Board of Directors, including Van Hoeven and Potter, resolved to remove Wade Cordell as President of the Debtor and Brad Cordell as the Debtor's Chief Operations Officer. These members of the Board of Directors also resolved to terminate the employment of Blevins, Wade Cordell, and Brad Cordell for mismanagement of the Debtor's day-to-day operations. Contemporaneously, these members of the Board of Directors resolved to temporarily appoint Van Hoeven as Chief Operations officer and Sturgill as President and Chairman until the next Board of Directors' meeting.

551.     In August of 2009, shareholder proxies were solicited for the removal of Wade Cordell, Brad Cordell, and Blevins as members of the Board of Directors.

552.     On August 18, 2009, Wade Cordell, Brad Cordell, Blevins ("Cordell Group"), with the Debtor's name appearing in the caption, filed a complaint against Sturgill, Paul Newberry, James Beasley, Haines Hagrett, Michael Lambert, and Jeffrey Lyle ("Sturgill Group") in the Court of Common Pleas in the County of Lexington, South Carolina ("Lexington County Action") while also moving for a Temporary Restraining Order against Sturgill Group.

     i. The Cordell Group claimed that the Sturgill Group had improperly terminated their employment contracts without providing them notice of the meeting at which such termination was approved.

    ii. The Cordell Group also claimed that the Sturgill Group had, *inter alia*, unlawfully and wrongfully:

        1. removed a large number of files from the Debtor's headquarters, including the corporate records;

        2. told various employees not to come to work;

        3. attempted to change the bank accounts of the Debtor;

        4. locked the Cordell Group out of all of the Debtor's data and computers;

        5. instructed the receptionist to change all locks and alarm codes; and

        6. made disparaging remarks regarding the Cordell Group.

553.     On August 20, 2009, the Sturgill Group on behalf of the Debtor moved in the Commonwealth of Kentucky Circuit Court for a judgment against the Cordell Group claiming that prior to the lawful termination of employment and removal from the Board of Directors, the Cordell Group had caused numerous irregularities in the management of the Debtor's corporate

business and finances and/or misapplication of corporate funds and claimed damages ("Kentucky Suit") against the Cordell Group for this negligence, recklessness, breach of fiduciary and duty of loyalty for the disregard of the best interest of the corporation and its stockholders. The Sturgill Group on behalf of the Debtor also moved for an *Ex-Parte* Restraining Order ("Kentucky TRO Motion") against the Cordell Group, their agents, servants and employees . . . from any of the following acts:

> i. Obtaining possession of, hiding, transferring or otherwise disposing of any assets of the Debtor, including but not limited to financial accounts and deposits;
>
> ii. Taking any action on behalf of the Debtor, including, but not limited to executing any document on behalf of the corporation;
>
> iii. From contacting, and/or threatening any employee of IBG;
>
> iv. From coming about the Debtor's Kentucky facility;
>
> v. From contacting, directly or indirectly, orally or in writing or by any form of electronic transmission any customer, financial institution, vendors, or any other business associate of the Debtor in an attempt to obtain information related to the Debtor's business and/or damage the Debtor's business operations;
>
> vi. From accessing any business records or other assets or records of assets of the Debtor.

554.    On August 20, 2009, the Kentucky TRO Motion was granted *ex parte*.

555.    On September 1, 2009, the Sturgill Group filed a motion to dismiss in response to the Lexington County Action moving to dismiss Infinity Business Group, Inc. from the Lexington County Action for lack of standing since half of the Debtor's Board of Directors at that time – Handy, Van Hoeven, and Sturgill – had attested that no vote had been called, no meeting had taken place, and no resolution passed to give the Cordell Group the authority for the Debtor to be a Plaintiff in the Lexington County Action but that instead, Debtor's involvement in the suit was a unilateral attempt to align the corporation to the side of the Cordell Group. In addition, counterclaims were asserted against the Cordell Group. The Sturgill Group was represented by Nexsen Pruet.

556.    Prior to September 2, 2009, two-thirds of the Debtor's voting class shareholders expressed their support for the removal of the Cordell Group as members of the Board of Directors.

557.    On September 2, 2009, the Sturgill Group entered into a "Compromise and Settlement Agreement" ("2009 Settlement Agreement") with the Cordell Group and others to resolve the Lexington County Action and Kentucky Suit.

558.    The Debtor was not represented by legal counsel in the 2009 Settlement Agreement; however, Paul Newberry, James Beasley, and Jeffrey Lyle in their role of members of the Board of Directors believed that their counsel was recommending the 2009 Settlement Agreement to further the best interests of the Debtor.

    a.    Counsel for Newberry, Beasley and Lyle never informed them to the contrary and informed Newberry, Beasly and Lyle that their actions in agreeing to the 2009 Settlement Agreement were not only in the best interests of the corporation but were also in compliance with the Debtor's by-laws as well as the Nevada Business Corporations Act and required the indemnification of their legal fees and expenses for the results achieved therein.

559.    On September 11, 2009, a Special Meeting of the Board of Directors was held and Sturgill discussed the recent action of the Board of Directors for removal of Brad Cordell, Wade Cordell, and Blevins for violation of their fiduciary duty, violation of their duty of loyalty, and mismanagement of their role in the Debtor's day-to-day operations.

    a.    Present were the members of the Board of Directors, Van Hoeven, Handy, and Sturgill, as well as the newly elected board members James Beasley, Potter, Jeffrey Lyle, William Reed, and Paul Newberry.

    b.    It was also resolved that the By-Laws would be amended to allow for management of the Debtor by a nine-member Board of Directors.

    c.    At the meeting, Hargrett gave the Board of Directors a financial report of the Debtor, including a review of original and restated financial statements and projections.

    d.    The Board of Directors also resolved that the previous problematic accounting procedures utilized by Wade Cordell, Brad Cordell, and Blevins and its advisers would be rectified by utilization of the proper computation of income by the

Debtor through implementation of the following proper accounting methods suggested by the Debtor's new outside auditor:

    i.  Eliminate the pass through revenue and cost of guaranteeing checks process by the Debtor's merchants that are not returned to the Debtor for collection;

    ii.  discontinue the reporting of revenue associated with the estimated future collection of checks presented for collection;

    iii.  discontinue the Gross-Up of credit card revenue and cost for the portioning of credit card fees retained by the processor; and

    iv.  review the balance of the Accounts Receivable currently carried on the Balance Sheet with the auditor and write down any amounts that are determined to be in excess of a very conservative collection rate.

560.    On September 21, 2009, upon information and belief, the Board of Directors addressed questions concerning the 2009 Settlement Agreement with Nexsen Pruet and expressed concern regarding the scope of release being granted to Wade Cordell, Brad Cordell, and Blevins therein.

    a.  Handy specifically questioned the propriety of settling with Wade Cordell, Brad Cordell, and Blevins until an audit of the Debtor was performed in order to ascertain how much they each owed the Debtor for improperly diverted funds.

561.    On October 2, 2009, the Board of Directors resolved to authorize Sturgill to execute the documents required to execute the 2009 Settlement Agreement.

562.    On October 5, 2009, the Annual Meeting of the Stockholders was held where James Beasley, Handy, Eason Leake, Jeffrey Lyle, Paul Newberry, Potter, William Reed, Sturgill and Van Hoeven were elected to serve as directors of the Debtor until the 2010 annual meeting.

    a.  Van Hoeven announced that transparency and communication are the two key goals for taking the Debtor to the level that everyone aspires to reach.

563.    On October 6, 2009, the 2009 Settlement Agreement was presented to the Court of Common Pleas in the County of Lexington, South Carolina and was incorporated into an order approving the 2009 Settlement Agreement, entered on October 30, 2009.

    a.  At the hearing, held September 2, 2009, where the 2009 Settlement Agreement was considered, the Court of Common Pleas did not make any type of determination that the values on each side of the transaction between the Debtor,

> the Sturgill Group, and the Cordell Group were equal nor of the financial
> condition of the Debtor. Indeed, the Court of Common Pleas did not make a
> determination as to value of the 2009 Settlement Agreement as between the
> Debtor and the Cordell Group.

564.    The Debtor did not receive adequate consideration for the 2009 Settlement Agreement.

565.    In the 2009 Settlement Agreement, the Debtor agreed to the following (collectively referred to as "Debtor's Consideration" or "Fraudulent Transfer"):

> a. Debtor gave the Cordell Group full and complete releases from any and all
> claims, demands, debts, liabilities, obligations, contracts, agreements, causes of
> action, suits and costs, of whatever nature, character or description, whether
> known or unknown, suspected or unsuspected, anticipated or unanticipated, which
> the Debtor may have had, may have, or may hereafter claim to have against the
> Cordell Group through September 2, 2009 ("2009 Settlement Agreement
> Release").

> a. Debtor agreed to pay the salaries of the Cordell Group weekly until March of
> 2010 totaling $471,428.50; agreed to repay a purported loan owed to Wade
> Cordell by the Debtor in the amount of $36,500.00; and agreed to repay a
> purported loan owed to John Blevins by the Debtor in the amount of $26,200.00.
> Therefore, the Debtor in fact paid the Cordell Group $534,128.50.

> b. Debtor agreed to pay the health insurance expenses of the Cordell Group weekly
> until March of 2010 totaling $7,812.00, and the Debtor in fact paid the Cordell
> Group these health insurance expenses.

> c. Debtor agreed to pay the legal expenses incurred by the Cordell Group on account
> of the Lexington County Action and the Kentucky Suit in the amount of
> $100,000.00, and the Debtor did so.

> d. Debtor agreed to dismiss its claims against the Cordell Group pending in the
> Kentucky Action with prejudice.

> e. The Debtor was bound to indemnify Wade Cordell for any loss that may be
> occasioned by the default of the Debtor on the Regions Bank Note.

  f. Debtor also agreed to a Waiver and Termination of the Buy/Sell Agreement between the Debtor, the Formation Shareholders and First Share Owners thereby waiving any noncompliance with the terms thereof to the detriment of the Debtor.

    i. This termination allowed the Cordell Group to sell their individually held First Shares and Formation Shares for profit without prior approval of the Board of Directors.

  g. Debtor also received a Release executed by the TGT Shareholders releasing any claims against the Debtor for the Cordell Group's improper allocation of the First Shares and Formation Shares.

  h. Debtor further agreed to honor any and all contracts with Deborah Dear, the wife of Blevins.

  i. Debtor also agreed to indemnify the Cordell Group to the extent allowed under Debtor's Articles of Incorporation, By-laws, and under the terms of the Employment Agreements executed by the Cordell Group.

566. In total, the Debtor paid cash in the amount of $647,740.50 to the Cordell Group to effectuate the 2009 Settlement Agreement.

567. In exchange for Debtor's Consideration, pursuant to the 2009 Settlement Agreement, the Debtor received the following consideration from the Cordell Group (collectively, "Cordell Group Consideration"):

  a. The Cordell Group released the Debtor from any and all claims, demands, debts, liabilities, obligations, contracts, agreements, causes of action, suits and costs, of whatever nature, character or description, whether known or unknown, suspected or unsuspected, anticipated or unanticipated, which the Cordell Group may have had, may have, or may hereafter claim to have against the Cordell Group through September 2, 2009.

  b. The Cordell Group agreed to waive payment of their car allowances.

    i. The Employment Contracts provided that the Cordell Group members were entitled to $1,000.00 per month as an automobile expense reimbursement. Therefore, as the Employment Contracts expired on

March 31, 2010, the Cordell Group relinquished their claim to $21,000.00, which in light of their termination for "cause" was a tenuous claim.

c.  The Cordell Group agreed to cause the Lexington County Action to be dismissed with prejudice.

d.  The Cordell Group agreed to resign as Directors, Officers, and Employees of the Debtor, effective September 2, 2009.

    ii.  The Cordell Group's Employment Contracts already provided for termination for cause, which the Cordell Group's behavior constituted. "Cause" under the terms of the Cordell Group's Employment Contracts was constituted by "embezzlement or willful misappropriation of [the Debtor's] funds or other assets of [the Debtor]" and/or "gross negligence, recklessness or willful misconduct which is materially injurious to [the Debtor] or [the Debtor's] affiliates." The Cordell Group's actions as officers and directors of the Debtor satisfied this standard; thus, the Cordell Group was terminated in compliance with the Employment Contracts, and the Debtor was not required to pay any form of compensation to the Cordell Group.

e.  The Cordell Group also agreed to not solicit employees or customers of the Debtor until December 31, 2011. The Cordell Group's Employment Contracts were superseded and replaced by this provision.

    iii.  The Cordell Group's Employment Contracts already provided that the Cordell Group would not solicit employees or customers for a period of three years following their termination date.

f.  The Cordell Group agreed to return 2,914,000 shares of Debtor's stock to the following members TGT Shareholders of the Sturgill Group: Paul Newberry, Jeffrey Lyle, Robert Caughman, and David Price, which were to be held in escrow by Nexsen Pruet to be released to these individuals when all payments owed by the Debtor and the Sturgill Group were paid in full to the Cordell Group.

    iv.  These shares returned by the Cordell Group were originally misappropriated by the Cordell Group in the issuance of the First Shares.

Furthermore, these returned shares were not issued in the name of the Debtor, and thus, Debtor received no consideration for their return.

    g.   The Cordell Group agreed to be available to discuss in good faith and to the best of their ability all written and oral agreements they made on behalf of the Debtor.

    h.   The Cordell Group also agreed to remove all of their personal effects by the close of business on September 3, 2009.

568.    In addition, pursuant to the terms of the 2009 Settlement Agreement, Gibson reduced its rent for Debtor's lease of 140 Gibson Road to $8,000.00 per month.

569.    At the time of the 2009 Settlement Agreement, the net saleable values of the assets of the Debtor were not sufficient to pay its debts in full. The Debtor was insolvent pursuant to 11 U.S.C. § 548(a)(1)(B)(ii) and 11 U.S.C. § 101(32).

570.    At the time of the Fraudulent Transfer, the Face Account of the Debtor was out-of-trust by more than two Million ($2,000,000) Dollars.

571.    The Fraudulent Transfer was actually fraudulent.

572.    At the time of the Fraudulent Transfer, the Cordell Group were fully aware of the financial problems faced by the Debtor and were also aware of the numerous claims against them that they actively concealed from the Innocent Members of the Board of Directors.

573.    At the time of the Fraudulent Transfer, each share of the Debtor's stock was without value.

574.    At the time of Fraudulent Transfer, Wade Cordell, Brad Cordell, and Blevins were insiders of the Debtor.

575.    On January 28, 2010, a regular meeting of the Board of Directors was held and Hargrett discussed the impact the changes of the "Before vs. After Management Change" had on the monthly financials.

576.    On May 4, 2010, a regular meeting of the Board of Directors was held where Sturgill's leave of absence as CEO was accepted.

577.    On May 24, 2010, a regular meeting of the Board of Directors was held and the Board of Directors resolved to hire an independent third party investment firm to value the Debtor while also reviewing advice provided by Debtor's outside securities counsel as to how to address the previous problems associated the South Carolina Attorney General's Office's investigations, which were not focused on any malfeasance of the Debtor itself.

578.     On June 8, 2010, a special meeting of the Board of Directors was held and the Board
of Directors resolved to require a formal review process to be established for approval of any and
all future contracts and for a standard approval process to be developed.

   a.  In addition, the Board of Directors undertook to issue letters to advise
       shareholders who held questionably issued capital stock.

579.     On July 19, 2010, a Special Meeting of the Board of Directors was held where
McCarthy law firm was hired as counsel to advise the Debtor regarding its financial and
reorganization alternatives.

   a.  In addition, the Board of Directors resolved  that since the value of the assets
       previously reported on the financial statements of the company were written down
       in the fall of 2009 at the recommendation of Hargrett, and on July 6, 2010,
       Hargrett advised the Board of Directors that the amounts originally reported had
       been correctly reported – notwithstanding the large write-down; and since a
       majority of the Board of Directors continues to have substantial concern as to
       whether the financial statements were correctly prepared in conjunction with other
       questions regarding the Debtor's compliance with financial and related
       requirements that Hargrett was suspended from his position as CFO and also
       required to provide the Board of Directors a statement detailing the accounting
       method that was previously used in the preparation of the financial statements for
       the items that were substantially written down during the year 2009.

   b.  Also, the Board of Directors resolved that in light of Sturgill's request to resume
       his position as CEO, the Board determined that granting such request was not in
       the best interests of the Debtor and that Sturgill was removed from any and all
       positions he may hold as an officer of the Company without compensation and
       was required to submit a statement including the following:

       i.  detailing the accounting method that was previously used in the
           preparation of the financial statements for the items that were substantially
           written down during the year 2009 and providing the nature and source of
           any professional or other advice that supported that treatment, the reasons
           for the reduction in the amount of assets taken by the company during the
           prior year, and the role of any and all professional accountants, lawyers, or

132

**-148-**

other persons with respect to ascertaining the propriety and impropriety of the accounting treatment of the company.

580.     Despite efforts to raise capital for the Debtor's operations, on August 13, 2010, the Board of Directors resolved to authorize McCarthy to initiate the process for the Debtor filing for Chapter 11 Relief.

## 11. CAUSES OF ACTION

### First Cause of Action

### Preference – 11 U.S.C. § 547- 2009 Settlement Agreement Release

581.     The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

582.     Defendants Wade Cordell, Brad Cordell, and Blevins were insiders of the Debtor at the time of the 2009 Settlement Agreement.

583.     Within one year of the Petition Date, the Debtor made transfers to Defendants Wade Cordell, Brad Cordell, and Blevins, including the transfer of Debtor's rights in the 2009 Settlement Agreement Release.

584.     The transfers were made while the Debtor was insolvent.

585.     The transfers enabled Defendants Wade Cordell, Brad Cordell, and Blevins to receive more than they would have if the Debtor's case were a case under Chapter 7 of the Bankruptcy Code, if the transfers had not been made, and/or if they received payment on the debt to the extent provided by the Bankruptcy Code.

586.     Accordingly, the Trustee is entitled to void such transfers and for judgment against Wade Cordell, Brad Cordell, and Blevins in an amount to be determined at trial, plus interest.

### Second Cause of Action

### Avoidance of Voluntary and Involuntary Transfer – 11 U.S.C. §§ 548 and 550 – 2009 Settlement Agreement Release

587.     The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

588.     At the time of the transfer of the 2009 Settlement Agreement Release and at the time of the negotiation of the 2009 Settlement Agreement, Wade Cordell, Brad Cordell, and Blevins were "insiders" of the Debtor.

589.     The 2009 Settlement Agreement Release was a transfer as contemplated by 11 U.S.C. § 548.

590.     In exchange for the 2009 Settlement Agreement Release, the Debtor received less than reasonably equivalent value.

591.     As described above, at the time of the transfer, namely the 2009 Settlement Agreement Release, the Debtor was insolvent under 11 U.S.C. § 548(a)(1)(B)(ii)(I) and/or at the time of the transfer of the 2009 Settlement Agreement Release, the Debtor was engaged in businesses or transactions for which any property remaining with the Debtor was unreasonably small in relation to the business of the Debtor and/or made such transfer for the benefit of an insider and/or incurred such obligation for the benefit of an insider outside of the ordinary course of business.

592.     At the time of the transfer of the Debtor's rights embodied in the 2009 Settlement Agreement Release, Wade Cordell, Blevins, and Brad Cordell were aware of numerous potential claims against them but failed to disclose the existence of the same to the Board of Directors and in executing the 2009 Settlement Agreement had totally abandoned the Debtor's interests and were acting completely to benefit themselves and only themselves.

593.     The Debtor received no tangible or concrete value in exchange for the 2009 Settlement Agreement Release from the Cordell Group Consideration.

594.     Pursuant to 11 U.S.C. § 550 the transfer of the Debtor's rights embodied in the 2009 Settlement Agreement Release are voidable by the Debtor.

595.     Accordingly, the Trustee is entitled to void the transfer of Debtor's rights embodied in the 2009 Settlement Agreement Release.

**Third Cause of Action**

**Avoidance of Fraudulent Transfers and Conveyances – 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10 – 2009 Settlement Agreement Release**

596.     The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

597.     The 2009 Settlement Release was a voluntary transfer.

598.     There was a creditor of the Debtor then in existence with an unsecured indebtedness owed it before such transfer was made and that creditor's debt remained unsatisfied on the date

134

of bankruptcy of the Debtor; and that creditor has filed a proof of claim against the Debtor's estate.

599.　　　Pursuant to 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10, the transfer of the Debtor's rights in the 2009 Settlement Agreement Release is voidable.

600.　　　Accordingly, the Trustee is entitled to void the transfer of the Debtor's rights in the 2009 Settlement Agreement Release.

Fourth Cause of Action

§ 548(a)(1)(A) Avoidance of Voluntary Transfer Re: 2009 Settlement and 2009 Settlement Agreement Release

601.　　　The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

602.　　　Through engagement in the Scheme, Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins' execution of the 2009 Settlement Agreement Release constituted an intentional fraudulent transfer under 11 U.S.C § 548(a)(1)(A).

603.　　　Through engagement in the Scheme, Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins' execution of the 2009 Settlement Agreement Release constituted an intentional fraudulent transfer under 11 U.S.C § 548(a)(1)(A).

604.　　　Accordingly, the Trustee is entitled to void such transfers and for judgments against Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins in an amount to be determined at trial, plus interest.

Fifth Cause of Action

Avoidance of Voluntary and Involuntary Transfer – 11 U.S.C. §§ 548 and 550 – 2009 Settlement Agreement

605.　　　The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

606.　　　At the time of the transfer of the 2009 Settlement Agreement and at the time of the negotiation of the 2009 Settlement Agreement, Wade Cordell, Brad Cordell, and Blevins were "insiders" of the Debtor.

607.　　　The 2009 Settlement Agreement was a transfer as contemplated by 11 U.S.C. § 548.

608.　　　In exchange for the 2009 Settlement Agreement, the Debtor received less than reasonably equivalent value.

135

-151-

609.    As described above, at the time of the transfer, namely the 2009 Settlement Agreement, the Debtor was insolvent under 11 U.S.C. § 548(a)(1)(B)(ii)(I) and/or at the time of the transfer of the 2009 Settlement Agreement Release, the Debtor was engaged in businesses or transactions for which any property remaining with the Debtor was unreasonably small in relation to the business of the Debtor and/or made such transfer for the benefit of an insider and/or incurred such obligation for the benefit of an insider outside of the ordinary course of business.

610.    At the time of the transfer of the Debtor's Consideration pursuant to the the 2009 Settlement Agreement, Wade Cordell, Blevins, and Brad Cordell were aware of numerous potential claims against them but failed to disclose the existence of the same to the Board of Directors and in executing the 2009 Settlement Agreement had totally abandoned the Debtor's interests and were acting completely to benefit themselves and only themselves.

611.    The Debtor received no tangible or concrete value in exchange for the 2009 Settlement Agreement Release from the Cordell Group Consideration.

612.    Pursuant to 11 U.S.C. § 550 the transfer of the Debtor's Consideration embodied in the 2009 Settlement Agreement Release are voidable by the Debtor.

613.    Accordingly, the Trustee is entitled to void the transfer of Debtor's Consideration pursuant to the 2009 Settlement Agreement.

### Sixth Cause of Action

### Avoidance of Fraudulent Transfers and Conveyances – 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10 – 2009 Settlement Agreement

614.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

615.    The transfer of the Debtor's Consideration pursuant to the 2009 Settlement Agreement was a voluntary transfer.

616.    There was a creditor of the Debtor then in existence with an unsecured indebtedness owed it before such transfer was made and that creditor's debt remained unsatisfied on the date of bankruptcy of the Debtor; and that creditor has filed a proof of claim against the Debtor's estate.

617.    Pursuant to 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10, the transfer of the Debtor's Consideration pursuant to the 2009 Settlement Agreement Release is voidable.

136

618.    Accordingly, the Trustee is entitled to void the transfer of the Debtor's Consideration pursuant to the 2009 Settlement Agreement Release.

**Seventh Cause of Action**

**Preference – 11 U.S.C. § 547- 2009 Settlement Agreement**

619.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

620.    Defendants Wade Cordell, Brad Cordell, and Blevins were insiders of the Debtor at the time of the 2009 Settlement Agreement.

621.    Within one year of the Petition Date, the Debtor made transfers to Defendants Wade Cordell, Brad Cordell, and Blevins, including the transfer of Debtor's Consideration pursuant to the 2009 Settlement Agreement.

622.    The transfers were made while the Debtor was insolvent.

623.    The transfers enabled Defendants Wade Cordell, Brad Cordell, and Blevins to receive more than they would have if the Debtor's case were a case under Chapter 7 of the Bankruptcy Code, if the transfers had not been made, and/or if they received payment on the debt to the extent provided by the Bankruptcy Code.

624.    Accordingly, the Trustee is entitled to void such transfers and for judgment against Wade Cordell, Brad Cordell, and Blevins in an amount to be determined at trial, plus interest.

**Eighth Cause of Action**

**§ 548(a)(1)(A) Avoidance of Voluntary Transfer Re: 2009 Settlement and 2009 Settlement Agreement**

625.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

626.    Through engagement in the Scheme, Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins' execution of the 2009 Settlement Agreement constituted an intentional fraudulent transfer under 11 U.S.C § 548(a)(1)(A).

627.    Through engagement in the Scheme, Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins' execution of the 2009 Settlement Agreement constituted an intentional fraudulent transfer under 11 U.S.C § 548(a)(1)(A).

137

628.    Accordingly, the Trustee is entitled to void such transfers and for judgments against Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins in an amount to be determined at trial, plus interest.

### Ninth Cause of Action – 11 U.S.C. § 548 – Gibson

629.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

630.    On May 5, 2009, and within two years of the date of bankruptcy of the Debtor, the Debtor through its board of directors with Brad Cordell failing to abstain from the vote and without full information concerning the nature of the transactions between Gibson and the Debtor and based on the misrepresentations of Wade Cordell and Brad Cordell forgave the indebtedness owed it by Gibson in the principal amount of $42,000.00.

631.    There was no consideration for this forgiveness.

632.    Despite representations to the Board of Directors otherwise, Gibson had not made any interest payments on the note for which this money owed since August 2007.

633.    Brad Cordell, as the manager and person in charge of Gibson, had a duty to ensure that its debts were paid in a timely manner.

634.    Gibson incurred the indebtedness to the Debtor in December of 2005.

635.    The indebtedness that was forgiven was made at a time when the Debtor was insolvent.

636.    The note provides for interest on the indebtedness owed by Gibson in the amount of 1% per month, cumulative, after default thereof.

637.    Plaintiff is informed and believes that the forgiveness of the note is a voidable transfer under the Bankruptcy Code, and should be declared null and void.

638.    Plaintiff is informed and believes that he should have judgment against **Gibson** in the amount of $67,043.00, together with interest thereon from June 1, 2011, and reasonable attorney's fees and costs.

### Tenth Cause of Action

### Avoidance of Fraudulent Transfers and Conveyances – 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10 – Gibson

639.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

640.    Gibson received unpaid loans, in the form of excess rent, from the Debtor as well as landscaping bills for the benefit of Gibson that were not the Debtor's obligation.

641.    Such loans would not have been paid had not Brad Cordell been an officer and director of the Debtor; and an officer, and owner of, Gibson.

642.    Such payments were voluntary transfers by the Debtor.

643.    There were creditors in existence at the time such excessive rental payments and landscaping payments were made by the Debtor, who remain in existence on the identical debts

644.    Plaintiff is informed and believes that such excessive rental payments were voluntary transactions by the Debtor.

645.    Plaintiff is informed and believes that the Court should look into the matters herein stated: declare such payments of such to be excessive rent; and declare such payments to be fraudulent.

### Eleventh Cause of Action

### Avoidance of Fraudulent Transfers and Conveyances – 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10 – Golden Ghost

646.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

647.    The Debtor paid Golden Ghost, on January 28, 2009, $10,000.00.

648.    Such payment was a voluntary transfer by the Debtor.

649.    Such payments would not have been paid had not Blevins been an officer and director of the Debtor; and an officer, and owner of, Golden Ghost.

650.    There were creditors in existence at the time such payment was made by the Debtor to Golden Ghost, who remain in existence on the identical debts.

651.    Plaintiff is informed and believes that the Court should look into the matters herein stated: declare such payments voluntary; and declare such payments to be fraudulent.

## Twelfth Cause of Action

### Avoidance of Fraudulent Transfers and Conveyances – 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10 – Blevins Law

652.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

653.    Blevins Law is a legal practice organized and existing under the laws of the State of Maryland.

654.    Blevins Law is not licensed to practice law within the State of South Carolina.

655.    No member or employee of Blevins Law was licensed, at any time herein, to practice law within the State of South Carolina.

656.    Blevins Law has, during all times herein indicated, one party licensed to practice laws by a State of the United States, and that person was the Blevins.

657.    The Debtor paid Blevins Law in the year 2007 the sum of $172,841.54.

658.    The Debtor paid Blevins Law in the year 2008 the sum of $306,040.00.

659.    The Debtor paid Blevins Law in the year 2009 the sum of $192,318.32.

660.    Such payments were voluntary transfers by the Debtor.

661.    Blevins Law provided no services for the Debtor.

662.    There were creditors in existence at the time such payment was made by the Debtor to Blevins Law, who remain in existence on the identical debts.

663.    Plaintiff is informed and believes that the Court should look into the matters herein stated: declare such payments voluntary; and declare such payments to be fraudulent.

### Thirteenth Cause of Action – 11 U.S.C. § 548 – Blevins Law

664.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

665.    The Debtor paid Blevins Law, in the two years prior to the date of bankruptcy of the Debtor, $295,678.32.

666.    At the time of such payment, the Debtor was insolvent.

667.    The Debtor did not receive an equivalent value from Blevins Law for such payment.

668.    The Trustee is informed and believes that the Court should look into the matters herein stated; declare such payment to be fraudulent within the meaning of 11 U.S.C. §548; and declare such payment to be null and void.

### Fourteenth Cause of Action

### Avoidance of Fraudulent Transfers and Conveyances – 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10 – CGLLC

669.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

670.    CGLLC is wholly-owned by Wade Cordell.

671.    CGLLC provided no services to the Debtor.

672.    The Debtor paid CGLLC in the year 2007 the sum of $236,500.00.

673.    The Debtor paid CGLLC in the year 2008 the sum of $308,660.00.

674.    The Debtor paid CGLLC in the year 2009 the sum of $310,018.18.

675.    The Debtor paid CGLLC in the year 2010 the sum of $75,295.20.

676.    The payments to CGLLC by the Debtor were voluntary transfers.

677.    There were creditors in existence at the time such payment was made by the Debtor to CGLLC, who remain in existence on the identical debts.

678.    The Trustee is informed and believes that the Court should look into the matters herein stated: declare such payments voluntary; and declare such payments to be fraudulent.

### Fifteenth Cause of Action – 11 U.S.C. § 548 – CGLLC

679.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

680.    The Debtor paid CGLLC, in the two years prior to the date of bankruptcy of the Debtor, $491,253.38.

681.    At the time of such payment, the Debtor was insolvent.

682.    The Debtor did not receive an equivalent value from CGLLC for such payment.

683.    The Trustee is informed and believes that the Court should look into the matters herein stated; declare such payment to be fraudulent within the meaning of 11 U.S.C. §548; and declare such payment to be fraudulent.

### Sixteenth Cause of Action

### Avoidance of Fraudulent Transfers and Conveyances – 11 U.S.C. §§ 544(b) and 550 and S.C. Code Ann. § 27-23-10 – S&A

684.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

141

**-157-**

685.    S&A is wholly-owned by Sturgill.

686.    S&A provided no services to the Debtor.

687.    The Debtor paid S&A in the year 2007 the sum of $356,612.00.

688.    The Debtor paid S&A in the year 2008 the sum of $308,660.00.

689.    The Debtor paid S&A in the year 2009 the sum of $279,257.18.

690.    The payments to S&A by the Debtor were voluntary transfers.

691.    There were creditors in existence at the time such payment was made by the Debtor to S&A, who remain in existence on the identical debts.

692.    The Trustee is informed and believes that the Court should look into the matters herein stated: declare such payments voluntary; and declare such payments to be fraudulent.

### Seventeenth Cause of Action – 11 U.S.C. § 548 – S&A

693.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

694.    The Debtor paid **S&A**, in the two years prior to the date of bankruptcy of the Debtor, $384,197.00.

695.    At the time of such payment, the Debtor was insolvent.

696.    The Debtor did not receive an equivalent value from S&A for such payment.

697.    Plaintiff is informed and believes that the Court should look into the matters herein stated; declare such payment to be fraudulent within the meaning of 11 U.S.C. §548; and declare such payment to be fraudulent.

### Eighteenth Cause of Action

### § 548(a)(1)(B) Constructive Fraud Re: MK, Blevins Law Fees

698.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

699.    The legal services rendered by Defendant Blevins from 2007 through 2009 did not benefit the Debtor but instead caused Defendant Blevins to receive a preferred claim over other unsecured creditors at a time when the Debtor's bankruptcy and liquidation were inevitable. Accordingly, the fee provided by Debtor for Defendant Blevins' services was for less than a reasonably equivalent value.

700.    The services rendered by Defendant MK in connection with 06 MK Referral Agreement, 2006 MK Engagement Agreement and 2008 MK Engagement Agreement did not

benefit the Debtor but instead caused Defendant MK to receive a preferred claim over other unsecured creditors at a time when the Debtor's bankruptcy and liquidation were inevitable.

701.    Accordingly, the fees provided by Debtor for Defendants Blevins and MK's services was for less than a reasonably equivalent value, and the Trustee is entitled to judgment against each of the Defendants Blevins and MK in an amount to be determined at trial.

### Nineteenth Cause of Action – Morgan Keegan and Meyers Violation of § 10(b), 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5

702.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

703.    As corporate officers and directors of the Debtor, Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett each owed the Debtor a duty of care and a duty of loyalty and were required to maintain in good faith, the Debtor and its shareholder's interests over anyone else's.

704.    Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett each breached these fiduciary duties by their systemic looting of the Debtor; by engaging in self-interested transactions; by not maintaining an undivided and unselfish loyalty to the Debtor through their perpetration of a scheme to defraud the Debtor by failing to disclose the creation, with the knowing and active assistance of MK and its employees, of the fraudulent Grafton Audited Financials in order to misappropriate proceeds from securities sales pursuant to the November 06 PPM and proceeds from the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes.

705.    The 06 Referral Agreement created an agency relationship between the Debtor and MK.

706.    Pursuant to the 2006 MK Engagement Contract and 2008 MK Engagement Contract and independent of the 2006 MK Engagement Contract and 2008 MK Engagement Contract, Debtor relied on MK's expertise in the area of securities, and the Innocent Members of the Board of Directors expected and were entitled to rely on MK and its employees to promptly and effectively inform it of any and all issues as they arose.

707.    The 2006 MK Engagement Contract and 2008 MK Engagement Contract did not limit MK and its employees' responsibilities there under.

708.    The Debtor and the Innocent Members of the Board of Directors considered MK to possess refined skills and expertise and to be entirely familiar with advising Debtor in its role,

*inter alia*, as a broker, underwriter, and investment adviser, due to the direct representations made by MK and its employees to the Innocent Members of the Board of Directors and by MK and its employees to issuing corporations in general.

709.    The Debtor and thus the Innocent Members of the Board of Directors were induced to and did repose confidence in MK's knowledge and expertise to give the Debtor and the Innocent Members of the Board of Directors advice as to the propriety of issuing securities in addition to the propriety of issuing the 2008 Mezzanine Debt Instruments and the 2008 Promissory Notes and to furthermore engage in honest dealings with Debtor's best interests in mind based on a foundation for these beliefs possessed by the Debtor and Innocent Members of Debtor's Board of Directors inculcated by MK and its employees.

710.    MK and its employees accepted the position of trust and the confidence that the Innocent Members of the Board of Directors placed in them pursuant to MK and its employees' inducement thereof.

711.    MK and its employee, Meyers, knew that Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett stood to gain immensely from the sales of securities and the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments and in such circumstances were required to identify any problems known and discovered to the entire Board of Directors.

712.    The 2006 MK Engagement Contract, 06 Referral Agreement, and 2008 MK Engagement Contract were contracts that from their essential nature called for perfect good faith and full disclosure from MK and its employees to the Innocent Members of the Board of Directors, and thus, the Debtor.

713.    The Debtor and the Innocent Members of the Board of Directors hired MK to give them advice for the benefit of the Debtor, and MK and its employees thereby had fiduciary obligations and contractual obligations to disclose any material fact to the entire Board of Directors.

714.    The Innocent Members of its Board of Directors were entitled to rely that MK and accordingly, its employees would fulfill its duty to disclose and in considering the Brochure and representations of MK and its employees, deemed MK to be entirely familiar with the areas in which MK and its employees were retained to advise the Debtor.

715.    The Innocent Members of the Board of Directors had an expectation that MK would provide them with any and all material information related to its relationship with Debtor during its engagement in the 2006 MK Engagement Contract, 06 MK Referral Agreement, and 2008

144

MK Engagement Contract, and the Innocent Members of the Board of Directors would not have approved the issuance of securities pursuant to the November 06 PPM and/or issuance of the 2008 Promissory Notes and/or issuance of the 2008 Mezzanine Debt Instruments without relying on MK and its employees' silence in failing to disclose that such sales and issuances were not in the Debtor's best interests since the Debtor did not stand to benefit from these sales and issuances in light of the Scheme. The Innocent Members of the Board of Directors were deceived into believing that MK and its employees were going to observe their fiduciary duties.

716.    It was foreseeable by MK and its employees that the Innocent Members of Debtor's Board of Directors would rely on MK and its employees to disclose any and all material facts to them.

717.    MK and its employees omitted material facts that its preexisting duty required for it to disclose to the Innocent Members of Debtor's Board of Directors and the Innocent Members of the Board of Directors relied on the information and the impression that they had received all pertinent, mandated, and material disclosures from MK and its employees.

718.    MK and its employees did not exercise reasonable care to bring such material information to the entire Board of Directors, namely, the Innocent Members of Debtor's Board of Directors, in light of MK and its employees' knowledge of the fraudulent activities that Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett committed against the Debtor, and MK stood mute and failed to disclose pertinent and material information to the Innocent Members of the Board of Directors and did more than just fail to tell the Innocent Members of the Board of Directors the truth.

719.    Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett were perpetrating a fraud against the Debtor in order to not only loot the influx of capital from the securities sales and proceeds from the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments from the Debtor's accounts, but also, by issuing securities and these financing instruments with the necessary imprimatur of MK, and its employee, Meyers, utilized the proceeds from these issuances and sales to sell their personal shares of Debtor's stock as well as to sell gifted stock back to the Debtor in the Debtor's Rescission Offer and such sales and issuances were required to perpetuate the Scheme.

720.    The Innocent Members of Debtor's Board of Directors had no reason to consider that the Grafton Audited Financials were fraudulent in light of the reports and representations of Wade

145

Cordell, Brad Cordell, Strugill, Blevins, and Hargrett on the Debtor's vibrant and profitable existence and in light of MK and its employee's duty of disclosure and its duty of rendering expert advice to the Debtor and these innocent board members.

721.    The Innocent Members of Debtor's Board of Directors had no inkling that the Debtor was not projected to be financially viable and that the Grafton Audited Financials were inflated and fraudulent.

722.    The Innocent Members of Debtor's Board of Directors exercised due diligence in reviewing the otherwise available information pertaining to the financial health of the Debtor.

723.    MK and its employees failed to disclose any information whatsoever to the Innocent Members of the Board of Directors pertaining to the fraudulent nature of the Grafton Audited Financials and the Scheme of which MK and its employees were aware.

724.    MK and its employees actively encouraged potential consumer and institutional investors to invest in the Debtor through the purchase of securities and/or the 2008 Promissory Notes and/or 2008 Mezzanine Debt Instruments.

725.    Disclosure by MK and/or its employees of the fraudulent nature of the Grafton Audited Financials and disclosure of the negative ramifications of the Debtor's issuance of securities pursuant to the November 06 PPM and the issuance of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes would have resulted in the Innocent Members of the Board of Directors taking timely corrective action to stop the improper activities and conduct of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett and the Debtor's losses could have been avoided or at the very least significantly reduced as well as the Innocent Members of the Board of Directors would have preserved the enterprise value of the Debtor.

726.    The Debtor suffered massive damages at the direction of Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett as a result of transactions by which Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett misappropriated the Debtor's funds for the personal benefit of themselves, their family members, and their affiliated business entities.

727.    As the Scheme continued, larger amounts of money were required in order to cover up the past fraudulent activities and management malfeasance of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett and to give the Debtor the false and misleading appearance of legitimacy and success to continue the Scheme.

728.    The Grafton Audited Financials were necessary to the continued ability of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett to obtain funds to misappropriate from the Debtor and the Grafton Audited Financials were included in offers to sell Debtor's securities and the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments, and the Grafton Audited Financials were an integral part of the Scheme since they generated the money that was necessary to perpetrate and maintain the Scheme.

729.    MK and its employees, in conjunction with Hargrett, Sturgill, Brad Cordell, Sturgill, Wade Cordell and Blevins, employed the Scheme in breaching their duty of candid disclosure by utilizing the Grafton Audited Financials and MK and its employees' assistance in formulating such in addition to MK and its employees stamp of imprimatur on the Grafton Audited Financials, which was a contrivance in carrying out the Scheme, which was a deceptive device.

730.    MK and its employees, and Hargrett, Sturgill, Brad Cordell, Wade Cordell and Blevins caused the Debtor to sell securities and to issue the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments by which Hargrett, Sturgill, Brad Cordell, Wade Cordell and Blevins then caused those proceeds to be misappropriated.

731.    Each step of MK, its employees, and Meyers, was in furtherance of Debtor's sales of securities and issuances of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments, and MK and its employees correspondingly failed to disclose to Debtor and to the Innocent Members of the Board of Directors material facts that if disclosed would have altered the total mix of information available to the Innocent Members of the Board of Directors and would have been significant in the Innocent Members of the Board of Directors' decision to sell securities.

732.    The Scheme was not complete until the misappropriation of the proceeds by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett subsequent to the consummation of the sales pursuant to the November 06 PPM and the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments and each sale and issuance was made to further the Scheme and was deceptive because despite the duty of disclose of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett and MK and its employees' duties to disclose, the nature of the Scheme was not disclosed and the Innocent Members of the Board of Directors had a right to rely that such disclosure would have occurred and been timely in light of their relationship to MK and its employees and to the Defendant directors. Both the sales of securities and issuance of financing instruments and the misappropriations were integral components of the coherent Scheme.

733.    Therefore, in the aggregate, the sale of securities and issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments and the Scheme coincided and MK and its employees' role in breaching their fiduciary duties operated as a course of business that operated as a fraud or deceit on the Innocent Members of its Board of Directors and thus, the Debtor.

734.    The fraud of the Scheme occurred in the offer and sale of the securities and issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments in conjunction with the nondisclosures to the Innocent Members of the Board of Directors.

735.    MK and its employees' nondisclosure of material facts operated to deprive the Board of Directors of critical information necessary to inform it of how to act for the best interests of the Debtor and this non-disclosure continued throughout the period of the 2006 MK Engagement Contract while also extending to the 2008 MK Engagement Contract, when still no disclosure was made to the Innocent Members of the Board of Directors of events first discovered in March of 2006.

736.    Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett were able to carry out the Scheme without making an affirmative representation to the Innocent Members of the Board of Directors concerning the nature of the Grafton Audited Financials because the Innocent Members of the Board of Directors had trusted MK and its employees to advise them to take actions only in the Debtor's best interests and no disclosure by MK and its employees was made.

737.    MK and its employees and the Scheme made it necessary or inevitable in light of these dual fiduciary relationships and reasonable rights of reliance by the Innocent Members of Debtor's Board of Directors that the Innocent Members of the Board of Directors would act in approving the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments and securities pursuant to the November 06 PPM.

738.    MK and its employee, Meyers, were both knowingly complicit in the Scheme and were so reckless in their duties as to be oblivious to the malfeasance that was readily apparent to them and were not deceived by the lies of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett.

739.    MK and its employees were active participants in the creation of the fraudulent Grafton Audited Financials; were intimately involved in the decision making processes of the Debtor; and directly participated in creating a mirage of the Debtor's robust health to the Innocent Members of the Board of Directors while deliberately not disclosing the falsity of this mirage, which made the Scheme itself possible.

740.    The Scheme and the corresponding falsity of the Grafton Audited Financials was material to the Innocent Members of the Board of Directors in that it would have altered the total mix of factors considered in determining the propriety of issuing securities pursuant to the November 06 PPM and issuing the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes.

741.    MK and its employees' nondisclosures were the means of accomplishing the sales of securities pursuant to the November 06 PPM and issuance of the 2008 Promissory Notes and the 2008 Mezzanine Debt Instruments, and these sales and issuances were the means to produce the funds eventually misappropriated by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett as the Innocent Members of the Board of Directors relied on MK and its employees' roles in determining whether to approve these actions.

742.    MK and its employee, Meyers, played more than a ministerial role in the Scheme, but were pivotal in the Innocent Members of the Board of Director's approval of the Debtor's issuance of securities through the November 06 PPM and the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments, and MK and its employees actively encouraged the nondisclosures concerning the Debtor's current and future financial prospects.

743.    The sales of the securities pursuant to the November 06 PPM and issuance of the 2008 Promissory Notes and the 2008 Mezzanine Debt Instruments were not independent events but coincided with the Scheme and were all integrally related as without one component the other component could not be consummated as each component of the Scheme was necessary for completion of the other and the sales and issuances coincided with the Scheme.

744.    The Scheme's component, consisting of the misappropriation by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett, was not only the reasonably foreseeable result of the Grafton Audited Financials and their corresponding effect on the Innocent Members of the Board of Directors' decisions concerning the sales of securities pursuant to the November 06 PPM and issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments, but was the very objective of the Scheme.

745.    The Scheme was repeated through cycles, each time driving the Debtor further into deficit and toward its ultimate financial ruin, and a result of the Scheme, the Debtor's financial situation was caused to further deteriorate and the corporate life of the Debtor was not only artificially prolonged, but its enterprise value diminished as Debtor was suffering from pernicious anemia and thus, the Scheme served only to benefit the beneficiaries of the Scheme,

namely MK and its employees, as well as Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett.

746.    The only benefit of the Scheme was to Hargrett, Sturgill, Brad Cordell, Wade Cordell and Blevins who could use the Grafton Audited Financials and the imprimatur of MK in conjunction with MK's failure to disclose the true condition of the Debtor to the Innocent Members of the Board of Directors to make it appear that the Debtor was creditworthy and profitable when it was not, as a result of the Scheme. This enabled Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett to keep the Debtor afloat, while they continued to loot it. As a result of MK and its employees' knowing assistance in the Scheme, these Defendant directors were able to continue their Scheme while concealing the Scheme's dissipation, diversion, and depletion of the Debtor's assets and enterprise value without a corresponding benefit to the Debtor.

747.    But for the inaccurate financial statements, the Grafton Audited Financials, the Debtor would not have been able to sell securities and/or issue the 2008 Promissory Notes and the 2008 Mezzanine Debt Instruments and but for the sale of the Debtor's securities and issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments, Debtor would not have been in possession of any proceeds from such sales or from these loans; and that but for the existence of such monies, Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett would not have been able to utilize these funds for the personal benefit of themselves and others.

748.    But for the nondisclosures of MK and its employees, the Innocent Members of the Board of Directors would not have permitted these transactions to be consummated, and thus, Debtor's mounting losses would not have continued to compound and would have been avoided, or at the very least, the losses incurred could have been significantly reduced.

749.    It was a direct and reasonably foreseeable result of the Grafton Audited Financials and MK's failure to disclose the fraudulent nature thereof and/or their participation in the creation thereof that Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett would embezzle these surplus funds for their own personal use.

750.    MK and its employees' nondisclosures lulled the Innocent Members of the Board of Directors into a false sense of security in the health of the Debtor and without being told the true state of affairs, the Innocent Members of the Board of Directors relied on this mirage and did not investigate further; had the innocent insiders been told the truth, they would have halted the fraud and the theft and the Scheme would have been extinguished.

751.     It was foreseeable to MK and its employees that failing to disclose the Debtor's financial condition, which resulted from the Scheme, and thus, hiding from the Innocent Members of the Board of Directors that the Debtor was being driven into the ground by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett, would cause the Debtor harm.

752.     Had MK and its employees acted properly, the Debtor's true financial condition would have been revealed and the Innocent Members of the Debtor's Board of Directors would not have allowed the Debtor to issue securities pursuant to the November 06 PPM or to issue the 2008 Promissory Notes and/or 2008 Mezzanine Debt Instruments.

753.     MK and its employees' omissions were a substantial factor in the chain of causation that lead to the Debtor's losses, and the Debtor's harm and losses were a direct result and a reasonably probable consequence of MK and its employees' nondisclosures.

754.     The actions of MK and its employees caused the Debtor damages in that the funds from the securities sales and proceeds from the issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments were misappropriated by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett and this influx of capital perpetuated a false appearance of fiscal salubrity to which the Debtor was not entitled as a result of the Scheme resulting in the additional incurrence of liabilities by the Debtor and dissipation of the Debtor's assets and loss of the Debtor's enterprise value and actions by the Board of Directors that were contrary to the best interests of the Debtor.

755.     Accordingly, the Trustee is entitled to judgment against MK and Meyers in an amount to be determined at trial plus interest.

**Twentieth Cause of Action – Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett**
**Violation of § 10(b), 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5**

756.     As detailed above, Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett, as corporate officers and directors of the Debtor, Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett each owed the Debtor a duty of care and a duty of loyalty and were required to maintain in good faith, the Debtor and its shareholder's interests over anyone else's.

757.     Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett each breached these fiduciary duties by formulating and participating in the Scheme, which was a scheme and artifice to defraud.

758.     Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett's roles were central to the continuance of the Scheme and Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett were the Scheme's architects.

759.     The fraudulent intent of Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett deprived the Debtor of the proceeds from the Debtor's sales of securities pursuant to the November 06 PPM and from the issuance of the 2008 Mezzanine Debt Instruments and the 2008 Promissory Notes.

760.     Each step of Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett were in furtherance of Debtor's sales of securities and issuances of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments, and Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett correspondingly failed to disclose to the Debtor and to the Innocent Members of the Board of Directors material facts that if disclosed would have altered the total mix of information available to the Innocent Members of the Board of Directors and would have been significant in the Innocent Members of the Board of Directors' decision to sell securities.

761.     The Innocent Members of the Board of Directors relied on Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett to respect and comply with their fiduciary duties to the Debtor, including the duty to disclose as well as to act in the Debtor's best interests, and based on this reliance and their corresponding expectation for the actions of Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett based on this reliance, the Innocent Members of the Board of Directors, and thus, the Debtor were induced to sell securities pursuant to the November 06 PPM and to issue the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes.

762.     Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett's omissions were a substantial factor in the chain of causation that lead to the Debtor's losses, and the Debtor's harm and losses were a direct result and a reasonably probable consequence of Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett's nondisclosures.

763.     Accordingly, the Trustee is entitled to judgment against Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett in an amount to be determined at trial plus interest.

## Twenty-First Cause of Action
### Equitable Subordination

764.     The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

152

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document      Page 155 of 173

765.    The following Defendants and affiliates filed a valid claim in the above captioned bankruptcy proceeding:

a.    Proof of Claim Number 352 was filed on October 22, 2010 by Haines and Pat Hargrett to evidence their unsecured claim on account of a promissory note in the principal amount of $100,000.00;

b.    Proof of Claim Number 460 was filed on November 29, 2010 by Christina L. Sturgill to evidence her equity ownership in Debtor on account of her purchase of $900,000.00 shares of Debtor;

c.    Proof of Claim Number 208 was filed on September 30, 2010 by Haines and Pat Hargrett to evidence their unsecured claim on account of a promissory note in the principal amount of $100,000;

d.    Proof of Claim Number 209 was filed on September 20, 2010 by Haines Hargrett to evidence his priority claim on account of wages, salaries, or commissions in the amount of $4,546.59 and to evidence his unsecured claim on account of wages, salaries, or commissions in the amount of $6,290.32;

e.    Proof of Claim Number 478 was filed on December 6, 2010 by Wade B. Cordell and Bradshaw O. Cordell to evidence their unsecured claim on account of indemnity and defense in the amount of $1,500,000.00;

f.    Proof of Claim Number 461 was filed on November 29, 2010 by Debra K. Dear to evidence her unsecured claim on account of breach of sales and marketing agreement and breach of agency policies and procedures in the amount of $53,000.00.

g.    Proof of Claim Number 425 was filed on November 18, 2010 by Matthew A. Blevins to evidence his equity ownership in Debtor on account of his purchase of $10,000.00 shares of Debtor.

h.    Proof of Claim Number 426 was filed on November 18, 2010 by John S. Blevins to evidence his equity ownership in Debtor on account of his purchase of $5,000.00 shares of Debtor.

i.    Proof of Claim Number 479 was filed on December 6, 2010 by Wade B. Cordell and Bradshaw O. Cordell to evidence their unsecured claim on account of indemnity and defense in the amount of $1,500,000.00.

153

766.     As set forth above, the conduct of all Defendants has resulted in injury to the creditors of the Debtor and/or conferred an unfair advantage on each of the Defendants.

767.     Consistent with 11 U.S.C. § 510(c), any claim filed by any of the Defendants should be equitably subordinated to other claims against Debtor.

**Twenty-Second Cause of Action**

**Breach of Employment Contracts – Wages**

768.     The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

769.     The salaries paid to Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett were excessive and these officers failed to perform the services for which they were compensated.

770.     In constructing and perpetuating the Scheme and its attendant components, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett were faithless servants to the Debtor.

771.     While employed with the Debtor, Wade Cordell, Brad Cordell, and Blevins solicited the Debtor's customers and formulated plans aimed at competing with Debtor in its business model.

772.     Furthermore, while employed with the Debtor, Wade Cordell, Brad Cordell, and Blevins began competing with the Debtor through constructing and operating a competing business, which went far beyond pre-termination planning.

773.     Throughout their employ with the Debtor, there was no period in which Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett were employed by the Debtor and were not simultaneously and concurrently breaching their respective duties of loyalty to the Debtor.

774.     Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett were employed to provide extensive services to the Debtor; however, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett each failed to perform these duties by failing to properly render such services in perpetuating the Scheme and overall failing to act in Debtor's best interest in every facet of their respective employs.

775.     Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett's egregious and reprehensible conduct pervaded and corrupted their respective master-servant and/or agent-principal relationship with the Debtor.

776.     As a result thereof, the Debtor is entitled to recover all wages paid to Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett during the entire period of their respective employ.

### Twenty-Third Cause of Action

### Breach of Employment Contracts

777.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

778.    Pursuant to the Employment Contracts, Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett were required to perform their duties in good faith and in a manner that he reasonably believes to be in the best interests of the Company and its Shareholders.

779.    As detailed above, Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett committed material breaches of *inter alia*, this duty, excusing the Debtor from performance.

780.    Furthermore, the material breaches of Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

781.    Accordingly, the Trustee is entitled to judgment against Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett in an amount to be determined at trial plus interest.

### Twenty-Fourth Cause of Action

### Malpractice – Grafton, Brent Grafton, Larry Grafton

782.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

783.    Grafton failed to have a second partner work on Debtor's audit.

784.    Grafton failed to complete a related party checklist or investigate whether transactions between Wade Cordell, Brad Cordell, Sturgill, and Blevins and their respective business entities were completed at arm's length.

785.    Grafton's representations in the Grafton Audited Financials that their examinations of Debtor's financial statements presented fairly, in all material respects, the financial position, results of operations, and cash flows of the Debtor in accordance with GAAP, were materially false and misleading.

786.    Because Grafton, Larry Grafton, and Brent Grafton failed to conduct appropriate audits under GAAS, to conduct themselves in accordance with professional standards, and to perform their obligations to Debtor, the Innocent Members of the Board of Directors, shareholders and attorneys were not advised of the questionable and improper activities and conduct of Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins.

787.    If the Innocent Members of the Board of Directors had been advised of Debtor's improper activities and conduct, they could have and would have, stopped the improper activities of Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins and Meyers and its employees.

788.    Debtor has suffered damages as a result of Grafton, Brent Grafton, and Larry Grafton's knowing indifference or reckless indifference as to whether or not the Grafton Audited Financials were free from material misstatements.

789.    Grafton, Brent Grafton, and Larry Grafton committed malpractice in failing to detect the fraud and Scheme of Wade Cordell, Brad Cordell, Sturgill, Hargrett, and Blevins during the time periods for which Grafton, Brent Grafton, and Larry Grafton audited the Grafton Audited Financials.

790.    Grafton, Larry Grafton, and Brent Grafton failed to render their services with the degree of skill, care, knowledge, and judgment usually possessed and exercised by members of that profession in the particular locality, in accordance with accepted professional standards and in good faith without fraud or collusion.

791.    Brent Grafton, Larry Grafton, and Grafton violated the following general standard requirements and the following requirements applicable to the completion of field work in failing to complete the following standards espoused in GAAS AU § 150:

792.    The second general standard that the auditors should maintain an independence in mental attitude in all matters relating to the assignment;

793.    The third general standard that due professional care is to be exercised in the performance of the audit and preparation of report (see AU 230 (Due Professional Care in Performance of Work));

794.    The first standard of field work that the audit is to be adequately planned and that assistants should be properly supervised;

795.    The second standard of field work that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

796.    The third standard of field work that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

797.     Brent Grafton, Larry Grafton, and  Grafton failed adequately to verify the Debtor's accounts receivable in accordance with AU § 330 by failing to complete confirmation procedures and by failing to plan and perform a reliable test of reported accounts receivable.

798.     If Brent Grafton, Larry Grafton, and Grafton had performed proper related-party audit procedures under AU § 334 and verified subsequent cash receipt transactions, it would have detected the Debtor's accounts receivable fraud but instead Brent Grafton, Larry Grafton, and Grafton only obtained verifications, if any, from Wade Cordell, Brad Cordell, Sturgill, Hargett, and/or Blevins.

799.     If Brent Grafton, Larry Grafton, and Grafton had exercised professional skepticism in providing due care required by AU §§ 230 and 316, they would have detected the Debtor's fraudulent financial statements and communicated the fraud to the appropriate management, namely the Innocent Members of the Board of Directors. Instead, Grafton, Brent Grafton, and Larry Grafton assisted and participated in fabricating and constructing the Grafton Audited Financials with the assistance of MK and its employees, and Wade Cordell, Brad Cordell, Sturgill, Hargett, and Blevins.

800.     Based on industry standards, AU § 317, Grafton, Brent Grafton, and Larry Grafton should have concluded that Wade Cordell, Brad Cordell, Sturgill, Hargett, and Blevins' illegal acts had a material effect on the Debtor's financial statements, which were undisclosed to the Innocent Members of the Board of Directors, and Grafton, Brent Grafton, and Larry Grafton should have then expressed an adverse opinion on the Debtor's financial statements, taken as a whole, based on the materiality of the effect of these illegal acts on the financial statements.

801.     The malpractice of Grafton, Brent Grafton, and Larry Grafton directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

802.     Accordingly, the Trustee is entitled to judgment against Grafton, Brent Grafton, and Larry Grafton in an amount to be determined at trial plus interest.

### Twenty-Fifth Cause of Action

### Malpractice – MK and Meyers

803.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

804.    By engaging in the conduct described-above, including but not limited to that MK never arranged for a second partner review other than Meyers

805.    By engaging in the conduct described-above, including but not limited to that MK inadequately monitored the Debtor's creditworthiness and Debtor's risk exposure in contrast to other financial institutions in the same field as MK and MK's internal controls were unreasonable when viewed in light of prevailing industry practice.

806.    By engaging in the conduct described-above, including but not limited to MK failed to perform its duties to the Debtor in accordance with industry standards in its roles as an investment adviser, as an underwriter, and as a broker-dealer.

807.    By engaging in the conduct described-above, including but not limited to MK committed malpractice and breached its duty to exercise that degree of skill, care, knowledge and judgment usually exercised by members of its profession, including a duty to report to the entire Board of Directors, namely the Innocent Members of the Board of Directors, of the material discrepancies, suspicious circumstances and defects in the Debtor's internal controls and financial statements resulting from the malfeasance of Wade Cordell, Brad Cordell, Sturgill, Hargett, and Blevins that not only raised red flags to MK and its employees but which MK and its employees had knowledge of based on its communications, due diligence, and involvement in the Scheme.

808.    Had these nondisclosures not occurred, the funds obtained through the sales of securities pursuant to the November 06 PPM and issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments would not have occurred in the context of the Scheme and the Innocent Members of the Board of Directors would have taken decisive action to oust Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett and cut expenses as well as to prevent further dissipation of the Debtor's assets and loss of enterprise value resulting from the defalcations of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett. Thus, MK and its employees' malpractice prolonged the Debtor's existence causing it to expend corporate assets

that would not have been spent if the Debtor had been dissolved in a timely manner rather than being kept afloat with spurious debt.

809.    MK and its employees knew that its advice would encourage Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett to continue to harm the Debtor through the Scheme as well as MK and its employees' nondisclosure to the Innocent Members of the Board of Directors.

810.    MK and its employees' malpractice was also the cause of the Debtor's lost profits.

811.    MK and its employees' malpractice directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

812.    Accordingly, the Trustee is entitled to judgment against MK and Meyers in an amount to be determined at trial plus interest.

**Twenty-Sixth Cause of Action**

**Fraud – Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett**

813.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

814.    By engaging in the conduct described-above, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett falsely misrepresented and omitted facts known to themselves that they had a duty to disclose to the Debtor and the Innocent Members of the Board of Directors.

815.    By engaging in the conduct described-above, it is clear that Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett knew that these representations described-above were false.

816.    By engaging in the conduct described-above, Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett intended in making the representations described-above to induce the Innocent Members of the Board of Directors and thus the Debtor to refrain from taking actions that were in the Debtor's best interests.

817.    As described-above, the Innocent Members of the Board of Directors acted in justifiable reliance on the representations of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett.

818.    As described-above, the Debtor was injured by its reliance.

819.    The fraud of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

820.    Accordingly, the Trustee is entitled to judgment against Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett in an amount to be determined at trial plus interest

### Twenty-Seventh Cause of Action

### Fraud – MK and Meyers

821.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

822.    By engaging in the conduct described-above, MK and its employees omitted facts known to them that they had a duty to disclose to the Debtor and the Innocent Members of the Board of Directors.

823.    By engaging in the conduct described-above, it is clear that MK and its employees knew that these omissions described-above constituting a representation were false and/or made the representation with a reckless disregard for the truth.

824.    By engaging in the conduct described-above, it is clear that MK and its employees intended in making the representation to induce the Innocent Members of the Board of Directors and thus the Debtor to refrain from taking actions that were in the Debtor's best interests and to further the Scheme.

825.    As described-above, the Innocent Members of the Board of Directors acted in justifiable reliance on the representation.

826.    As described-above, the Debtor was injured by its reliance.

827.    MK and its employees' fraud directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

828.    Accordingly, the Trustee is entitled to judgment against MK and Meyers in an amount to be determined at trial plus interest.

### Twenty-Eighth Cause of Action

### Aiding and Abetting Fraud – MK and Meyers

829.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

830.    As described above, the Scheme constituted a fraud.

831.    As detailed above, MK and Meyers had knowledge of the Scheme.

832.    As described above, MK and Meyers provided substantial assistance to advance the Scheme's commission and this substantial assistance proximately caused the Debtor's harm.

833.    Accordingly, the Trustee is entitled to judgment against MK and Meyers in an amount to be determined at trial plus interest.

**Twenty-Ninth Cause of Action**

**Fraud – Grafton, Brent Grafton, Larry Grafton**

834.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

835.    By engaging in the conduct described-above, Grafton, Brent Grafton, and Larry Grafton never performed the audit required in order to produce GAAS audited financial statements and never performed their required field work and if they did perform any field work, they disregarded the clear evidence of fraud staring them in the face.

836.    As described-above, Grafton, Brent Grafton, and Larry Grafton knew that the representations they made in the Grafton Audited Financials were false;

837.    As described-above, Grafton, Brent Grafton, and Larry Grafton intended to induce the Innocent Members of the Board of Directors and thus, the Debtor to refrain from acting in the Debtor's best interest in collusion with MK and its employees and Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett in furthering the Scheme and its attendant components.

838.    As described-above, the Innocent Members of the Board of Directors acted in justifiable reliance on Grafton, Larry Grafton, and Brent Grafton's representations in the Grafton Audited Financials.

839.    As described-above, the Debtor was injured by its reliance on the representations made by Grafton, Brent Grafton, and Larry Grafton.

840.    The fraud of Grafton, Brent Grafton, and Larry Grafton directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

841.    Accordingly, the Trustee is entitled to judgment against Grafton, Brent Grafton, and Larry Grafton in an amount to be determined at trial plus interest.

### Thirtieth Cause of Action

### Breach of Contract – MK

842.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

843.    By entering into the 2006 MK Engagement Contract and 2008 MK Engagement Contract, MK bargained for fees in consideration for services provided to the Debtor.

844.    As detailed above, MK and its employees failed to fulfill its obligations under the 2006 MK Engagement Contract and 2008 MK Engagement Contract and such failure constituted a material breach of the 2006 MK Engagement Contract and 2008 MK Engagement Contract.

845.    MK and its employees' breaches of its obligations under the 2006 MK Engagement Contract and 2008 MK Engagement Contract directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

846.    Accordingly, the Trustee is entitled to judgment against MK and Meyers in an amount to be determined at trial plus interest.

### Thirty-First Cause of Action

### Breach of Fiduciary Duty – MK and Meyers

847.    The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

848.    By entering into the 2006 MK Engagement Contract, the 2008 MK Engagement Contract, the 06 MK Referral Agreement, through acting in its role as a broker-dealer, investment adviser, and underwriter, and based on its superior knowledge and the confidence and trust reposed in MK and accepted by MK, MK owed a fiduciary duty to the Debtor.

849.    MK in providing knowing assistance to the Scheme and the attendant defalcations of Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett breached these duties.

850.    MK and its employees' breaches of these fiduciary duties directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

851.    Accordingly, the Trustee is entitled to judgment against MK and its employees in an amount to be determined at trial plus interest.

**Thirty-Second Cause of Action**

**Breach of Fiduciary Duty – Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett**

852.     The Trustee repeats and alleges the allegations contained in each preceding paragraph of the Complaint as set forth fully herein.

853.     At all relevant times, in their capacities as Officers and/or Directors of the Debtor, Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett each owed the strictest fiduciary duties to the Debtor, including duties of care, good faith, loyalty, honesty, candor, and full disclosure as well as the utmost confidence and trust. Each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett was required to act in the Debtor's best interests, and not for his own personal benefit. Because the Debtor was insolvent or in the zone of insolvency at all material times hereto, the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett also owed fiduciary duties to the Debtor's creditors.

854.     As described above, the terms of the 2008 Mezzanine Debt Instruments and 2008 Promissory Notes were unfair to the Debtor and in approving the issuance thereof, Wade Cordell, Brad Cordell, Sturgill, and Blevins profited therefrom without disclosing the same to the entire Board of Directors.

855.     By engaging in the conduct described above, including, but not limited to, falsifying financial information and manipulating data included in the Debtor's financial statements; making false reports to the Innocent Members of the Board of Directors; manipulating the accounts receivable records of the Debtor and improper reporting of accounts receivable aging; causing and permitting the Debtor to pay excessive salaries and other inappropriate disbursements; and/or failing to halt the misuse of corporate funds to pay for personal expenses; incurring non-business non-compensable charges on the Debtor's corporate credit cards for various personal expenses; unjustifiable payments to affiliated entities in which insiders had ownership interests; and embezzling the Debtor's assets each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett breached his fiduciary duties to the Debtor.

856.     Furthermore, as described-above, by engaging in self-interested transactions, namely by receiving personal benefits, including personal financial benefits, not received by the Debtor's other shareholders, while also appearing on both sides of transactions involving the Debtor without following the procedures required by Nev. Rev. Stat. § 78.140 and other applicable state law and concealing the interested nature and lack of good faith in such transactions, Defendants

Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett each breached his fiduciary duties to the Debtor.

857.      Moreover, as described above, in perpetrating fraud against the Debtor, Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett each breached his fiduciary duties to the Debtor.

858.      In addition, because the Debtor was insolvent or in the "zone of insolvency" at the time of the conduct described above, each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett breached his fiduciary duties to the Debtor's creditors.

859.      The actions of Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett, described above, involved intentional misconduct, fraud, and/or a knowing violation of the law.

860.      Each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett's breaches of fiduciary duties directly and proximately caused substantial harm to the Debtor and to the Debtor's creditors in an amount to be determined at trial.

861.      Pursuant to Nevada Rev. Stat. § 78.138 and other applicable state law, Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett are jointly and severally liable in an amount to be determined at trial for breaching their fiduciary duties to the Debtor and to the Debtor's creditors.

862.      Accordingly, the Trustee is entitled to judgment against each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett in an amount to be determined at trial, plus interest.

### Thirty-Third Cause of Action

### Aiding and Abetting Breach of Fiduciary Duty – MK and Meyers

863.      The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

864.      As corporate officers and directors of the Debtor, Wade Cordell, Brad Cordell, Blevins, Strugill and Hargrett each owed the Debtor a duty of care and a duty of loyalty and were required to maintain in good faith, the Debtor and its shareholder's interests over anyone else's.

865.      From March 2006 to the cessation of Debtor's business, MK and its employees knew that the Scheme was occurring; MK and its employees also knew that the Grafton Audited

Financials were fraudulent; and that fraudulent nature of the Grafton Audited Financials were not disclosed to the Innocent Members of the Board of Directors.

866.    From March of 2006 to the cessation of Debtor's business, MK and its employees were apprised of both who sat on Debtor's Board of Directors and that Strugill, Brad Cordell, Wade Cordell, and Blevins were not its only members and that the Debtor had outstanding shares.

867.    MK and its employees owed the Debtor a duty to investigate, monitor, and verify the veracity of information submitted to them Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett in performing its role as Debtor's underwriter, investment adviser, broker, fiduciary, agent, and in rendering expert advice.

868.    MK and its employees knew that Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett utilized the Grafton Audited Financials in the November 06 PPM and the Management Presentation to induce investors to invest in the Debtor by way of purchasing securities pursuant to the November 06 PPM or through loaning Debtor money by way of the 2008 Promissory Notes and the 2008 Mezzanine Debt Instruments.

869.    MK and its employees knew that the Scheme constituted a breach of fiduciary duty to the Debtor.

870.    The Grafton Audited Financials, when considered in the context of MK and its employees' knowledge of the problems associated at the very least with Debtor's accounts receivable, could by no means be construed as facially accurate.

871.    MK's entry into the 06 Referral Agreement was highly unusual.

872.    Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett took Meyers into their confidence, and Meyers had knowledge of the wrongful purpose of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett.

873.    MK, in exercising control over Meyers, knew of Meyers' participation in the Scheme and allowed Meyers to use MK's facilities, premises, and personnel to further the Scheme.

874.    MK and its employees were intentionally complicit in the breach of fiduciary duties by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett to the Debtor because of MK and its employees' assistance in concocting the Grafton Audited Financials and MK and its employees' knowledge of both its own and the non-disclosures by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett of the fraudulent nature of the Grafton Audited Financials operated as a

substantial factor in causing the Debtor harm. Therefore, MK and its employees essentially threw their lot in with Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett and were one in spirit with them.

875.    MK and its employees possessed a general awareness that Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett were conducting a Scheme to artificially inflate the Debtor's income in order to raise capital and understood its role in the Scheme in assisting to create the Grafton Audited Financials and knew that the victim of the Scheme was the Debtor during the time that the Scheme took place during which time MK rendered assistance to further the Scheme.

876.    MK and its employees knew and likewise suspected and realized the probability of the Scheme because of MK and its employees' knowledge of the fraudulent nature of the Grafton Audited Financials but refrained from confirming the reasonably foreseeable looting of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett resulting from the Scheme so as to be able to later have the ability to deny such knowledge.

877.    MK and its employees rubber stamped the Grafton Audited Financials knowing that they were fraudulent because MK and its employees were colluding with Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett. At the very least MK and its employees consciously disregarded the fraudulent nature of the Grafton Audited Financials and the Scheme in order to later have the ability to deny such knowledge.

878.    MK and its employees, acting as Debtor's underwriter, investment adviser, broker, fiduciary, agent, and in rendering expert advice had the opportunity to commit fraudulent acts.

879.    Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett as directors and officers of the Debtor had the opportunity to commit fraudulent acts.

880.    Through their participation in the Scheme, MK and its employees received concrete and personal benefits from the consummation of the Scheme.

881.    MK and its employees had access to documentation that provided details concerning the nature of the Scheme and thus, MK had the means of knowledge to discover the looting as well as the other harms to the Debtor resulting from the Scheme.

882.    The Debtor was in the class of likely victims of any scheme to artificially inflate a corporation's revenues and the Scheme itself was aimed at harming the Debtor, and MK and its

166

employees' assistance in concocting the Grafton Audited Financials resulted in harm to the Debtor.

883.    MK and its employees' role in the Scheme, *inter alia*, nondisclosure of material information to the Innocent Members of the Board of Directors; unjustifiably giving its stamp imprimatur on the Debtor's issuance of securities and the Debtor's issuance of the 2008 Promissory Notes and 2008 Mezzanine Debt Instruments; and creation of the Grafton Audited Financials, was central to the Scheme.

884.    MK and its employees knew of the misrepresentations and omissions included in the November 06 PPM and the Management Presentation and executed a role in negotiating and otherwise facilitating the consummation of these transactions by failing to disclose any information pertaining to the fraudulent nature of the Grafton Audited Financials, thereby facilitating the Scheme itself.

885.    MK and its employees' participated in the core of the Scheme through their role as an underwriter, investment adviser, broker, in rendering expert advice, fiduciary, and agent in conjunction with MK and its employees' formulation of the Grafton Audited Financials. MK and its employees received emails that demonstrate their knowledge of the Scheme or in so many words informed MK and its employees of the Scheme's existence.

886.    MK and its employees' conduct was an extreme departure from the standards of ordinary care for an underwriter, investment adviser, broker, in rendering expert advice, fiduciary, and agent.

887.    MK and its employees' assistance in, *inter alia*, crafting and concocting the Grafton Audited Financials was integral and necessary for the perpetuation and perpetration of the Scheme.

888.    MK and its employees assistance in crafting and concocting the Grafton Audited Financials in conjunction with MK and its employees failure to disclose the true financial picture of the Debtor and failure to disclose the fraudulent nature of the Grafton Audited Financials occurred concurrently with the Scheme and this assistance was pivotal to the ability of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett to carry out the Scheme.

889.    MK and its employees' nondisclosures to the Innocent Members of the Board of Directors and its role in the fabrication of the fraudulent Grafton Audited Financials was in and of itself a breach of MK's fiduciary and contractual duties to the Debtor.

890.    MK and its employees' nondisclosures to the Innocent Members of the Board of Directors and its role in the fabrication of the fraudulent Grafton Audited Financials was a substantial factor in causing the Debtor's harm as these actions were essential to the perpetration and perpetuation of the Scheme and furthered the Scheme itself and such assistance did not merely go to aid Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett.

891.    MK and its employees' role in the Scheme was a role that was such a role that the Scheme itself was highly interdependent in that MK and its employees actively assisted and facilitated the Scheme because the Scheme's continuation was beneficial to MK.

892.    MK and its employees' nondisclosures and participation in fabricating the Grafton Audited Financials were the very acts that enabled the Scheme to occur resulting in Debtor's harm.

893.    MK and its employees' nondisclosures and participation in fabricating the Grafton Audited Financials were actions taken to affirmatively hide the misdeeds of Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett.

894.    MK and its employees' nondisclosures and participation in fabricating the Grafton Audited Financials were a substantial factor in causing the breaches of fiduciary duties by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett.

895.    The Grafton Audited Financials and MK's nondisclosures were the foundation for the Scheme and MK's role in advising the Debtor as its underwriter, broker, investment adviser, and in rendering expert advice to the Debtor was vital in establishing the Innocent Members of the Board of Directors sense that the Debtor was in robust financial health, which was integral to concealing the Scheme.

896.    MK and its employees' nondisclosures and participation in fabricating the Grafton Audited Financials was indispensable and was a substantial cause of the ability of the Scheme's success and was a substantial factor in causing the breaches of fiduciary duties by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett.

897.    Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett were heavily dependent on MK and its employees' assistance in carrying out the Scheme, and MK and its employees sought to enable the Scheme succeed.

898.    MK and its employees' nondisclosures and participation in fabricating the Grafton Audited Financials enabled the Scheme to proceed and were active and knowing participants in the continuation of the Scheme.

899.    MK and its employees' silence furthered the commencement and perpetuation of the Scheme.

900.    MK and its employees' assistance in the Scheme was not only a meaningful contribution to the Scheme itself but also resulted in the direct and reasonably foreseeable harm to Debtor of the Scheme—the misappropriations by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett; the artificial extension of the Debtor's corporate life contrary to its best interests in conjunction with the dissipation of the Debtor's assets; incurrence of debt the Debtor would not have occurred otherwise and was thereafter not able to service; and loss of enterprise value—MK and its employees' nondisclosures served only to facilitate the continuance of the Scheme and allow for Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett to embezzle additional funds that would otherwise not be available to them.

901.    The Debtor's harm from the misappropriations by Wade Cordell, Brad Cordell, Strugill, Blevins, and Hargrett; from the Debtor's continued operations past the point of viability; from the Debtor's dissipation of corporate assets; from the Debtor's loss of enterprise value; and from the Debtor's loss of creditworthiness were directly attributable to MK and its employees' breaches of duties and these breaches of duties made the Scheme possible. MK and its employees intended to further the Scheme through their actions.

902.    But for MK and its employees willingness and participation in the creation and concoction of the Grafton Audited Financials in conjunction with their role in performing under the 2006 MK Engagement Contract, 2008 MK Engagement Contract, and 06 MK Referral Agreement and its nondisclosures to the Innocent Members of the Board of Directors the Scheme simply could not have occurred.

903.    MK and its employees' nondisclosures and participation in fabricating the Grafton Audited Financials made a substantial contribution to the Scheme's commencement and success as they were a substantial contribution in the sequence of responsible causation for the Debtor's harm.

### Thirty-Fourth Cause of Action

### Corporate Waste – Wade Cordell, Brad Cordell, Sturgill, Blevins, and Hargrett

904.     The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

905.     By engaging in the conduct described-above, including but not limited to, causing or permitting the Debtor to pay excessive salaries and other inappropriate disbursements; and/or failing to halt the misuse of corporate funds to pay for personal expenses; incurring non-business non-compensable charges on the Debtor's corporate credit cards for various personal expenses; making unjustifiable payments to affiliated entities in which insiders had ownership interests; by engaging in self-interested transactions, including but not limited to self-interested transactions with affiliated entities, each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett caused the Debtor to divert the Debtor's assets for improper and unnecessary purposes for which no person of ordinary sound business judgment could conclude represented a fair exchange.

906.     Each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett is obligated to restore to the Debtor's estate the amount wasted through the foregoing wasteful and self-serving transactions.

907.     Accordingly, the Trustee is entitled to judgment against each of the Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett in an amount to be determined at trial, plus interest.

### Thirty-Fifth Cause of Action

### Unjust Enrichment – Wade Cordell, Brad Cordell, Sturgill, Blevins, Hargrett, Meyers, and MK

908.     The Trustee repeats and re-alleges the allegations contained in each preceding paragraph of the Complaint as through set forth fully herein.

909.     As described in detail above, Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, Hargrett, MK, and Meyers benefitted by receiving property from the Debtor to which they were not entitled.

910.     As described in detail above, Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, Hargrett, MK, and Meyers benefitted unjustly at the Debtor's expense.

Case 12-80208-jw    Doc 1    Filed 08/31/12    Entered 08/31/12 23:38:00    Desc Main
Document        Page 173 of 173

911.    It is inequitable and unjust for Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, Hargrett, MK, and Meyers to have received, been enriched by, and retained without payment of value, such benefits from the Debtor.

912.    Equity and good conscience require that Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, Hargrett, MK, and Meyers disgorge monies and other assets obtained improperly from the Debtor.

913.    Accordingly, the Trustee is entitled to judgment against Defendants Wade Cordell, Brad Cordell, Blevins, Sturgill, Hargrett, MK, and Meyers in an amount to be determined at trial, plus interest.


ANDERSON & ASSOCIATES, P.A.


By:    /s/Marilyn E. Gartley
       Marilyn E. Gartley, Attorney
       for Trustee
       District Court ID #10616
August 31, 2012            P.O. Box 76
       Columbia, SC  29202-0076
       (803) 252-8600 phone
       (803) 256-0950 fax
       marilyn@andersonlawfirm.net


By:    /s/Robert F. Anderson
       Robert F. Anderson, Trustee
       District Court ID #1091
       Post Office Box 76
       Columbia, SC  29202-0076
       (803) 252-8600 phone
       (803) 256-0950 fax
       bob@andersonlawfirm.net

171

**-187-**

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, | C/A No. 10-06335-JW |
| Infinity Business Group, Inc., | Adv. Pro. No. 12-80208-JW |
| Debtor(s). | Chapter 7 |
| Robert F. Anderson, as Chapter 7 Trustee, for Infinity Business Group, Inc., | **JUDGMENT AND ORDER GRANTING IN PART AND DENYING IN PART THE MOTION TO DISMISS FILED BY MORGAN KEEGAN & COMPANY, INC. AND KEITH E. MEYERS AND REQUIRING ADDITIONAL BRIEFING OF CERTAIN ISSUES** |
| Plaintiff(s), | |
| v. | **(PARTIAL RULING)** |
| Wade Cordell; O. Bradshaw Cordell; Cordell L.L.C.; The Cordell Group L.L.C.; Gibson Commons L.L.C.; Bryon K. Sturgill; Sturgill & Associates Inc., John F Blevins; Law Offices of John F. Blevins, LLC; Golden Ghost, Inc.; Haines H. Hargrett; Donald Brent Grafton; D. Larry Grafton; Grafton and Company, P.L.L.C.; Morgan Keegan & Company, Inc.; and Keith E. Meyers; | |
| Defendant(s). | |

Based upon the findings of fact and conclusions of law set forth on the record at the

hearing to announce oral ruling on the Motion to Dismiss filed by Defendants Morgan Keegan &

Company, Inc. and Keith E. Meyers ("MK Defendants"), the Motion Dismiss is granted in part

and denied in part, as follows:

-188-

1) The Motion to Dismiss all causes of action against the MK Defendants on the grounds that the applicable statutes of limitation had run prior to the commencement of this action is denied on the grounds that, accepting the facts alleged by the Trustee as true and in a light most favorable to the Trustee, the Innocent Members of the Board of Directors discovered the harm to the Debtor at some point no earlier than July 2009 and, therefore, the Trustee commenced the action prior to the running of the applicable statutes of limitation, which would have been tolled upon the filing of the Debtor's bankruptcy petition.

2) The Motion to Dismiss the eighteenth cause of action, Constructive Fraud, is granted on the grounds that the Trustee failed to allege the essential element of an affirmative representation;

3) The Motion to Dismiss the twenty-fifth cause of action, Malpractice, is granted because South Carolina does not recognize a malpractice claim against any profession alleged to have been conducted by the MK Defendants;

4) The Motion to Dismiss the twenty-eighth cause of action, Aiding and Abetting Fraud, is granted because South Carolina does not appear to recognize a cause of action for aiding and abetting fraud;

5) The Motion to Dismiss the thirtieth cause of action, Breach of Contract, is denied because the Court finds that the Trustee has sufficiently alleged a cause of action for breach of contract and the grounds set forth in MK Defendants' Motion raise issues of fact which prevent the Court's conclusion as a matter of law that this cause of action should be dismissed;

6) The Motion to Dismiss the thirty-first cause of action, Breach of Fiduciary Duty, is denied, as the Court finds that the Trustee has sufficiently alleged facts which allow the Court to reasonably infer that a fiduciary relationship existed between the Debtor and the MK Defendants;

7) The Motion to Dismiss the thirty-second cause of action, Aiding and Abetting Breach of Fiduciary Duty, on the grounds that South Carolina does not recognize this cause of action is denied on the grounds that the cause of action is governed by Nevada law and it appears that the cause of action is recognized under Nevada law;

8) With regard to the nineteenth cause of action, Violation of § 10(b), 15 U.S.C. § 78j, 17 C.F.R. § 240.10b-5 ("Securities Fraud"), the Motion to Dismiss this cause of action on the grounds that the MK Defendants were not the makers of the allegedly false statements in the Grafton Audited Financials is denied since the Trustee's cause of action is brought under 10b-5(a) and (c), not 10b-5(b), thus the Trustee is not required to show the MK Defendants were the makers of an untrue statement. With respect to the Motion to Dismiss this cause of action on the grounds that the Complaint does not plead securities fraud with specificity, the Court requires additional, more concise briefing focused on the elements of "a connection with the

Case 12-80208-jw    Doc 71    Filed 07/15/13    Entered 07/15/13 15:47:57    Desc Main
Document        Page 3 of 3

purchase or sale of a security" and "loss causation" only.  The Court finds that the
remaining elements of the Securities Fraud claim were sufficiently pled.

9)  With regard to the twenty-seventh cause of action, Fraud, the Court will require
    additional, more concise briefing regarding the issue of causation.

10) With regard to the thirty-fifth cause of action, Unjust Enrichment, the Court will
    require additional, more concise briefing regarding the issues of whether the
    Complaint alleges that a benefit was conferred by the Debtor and realized by the MK
    Defendants.

Therefore, it is hereby ordered that the Trustee shall submit his brief on the outstanding

issues listed above on or before July 29, 2013.  The MK Defendants shall submit any responsive

brief within 14 days after the filing of the Trustee's brief.  Each brief shall not exceed 15 pages

in length.  A further order will be issued after receipt of the additional briefs on the outstanding

issues.  Accordingly, the time period within which the MK Defendants are required to file their

answer to the Complaint pursuant to Fed. R. Bankr. P. 7012(a)(4)(A) shall not commence until

the entry of the further order addressing the outstanding grounds in the Motion.

**AND IT IS SO ORDERED**.

**FILED BY THE COURT**
**07/15/2013**



_John E Waites_

US Bankruptcy Judge
District of South Carolina

Entered: 07/15/2013

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

Case Number:  10-06335-jw
Adversary Proceeding Number: 12-80208-jw

### ORDER GRANTING DEFAULT JUDGMENT AGAINST DEFENDANTS

The relief set forth on the following pages, for a total of 3 pages including this page, is hereby
ORDERED

---

**FILED BY THE COURT**
**01/09/2014**



Entered: 01/10/2014

JohnEWaites

US Bankruptcy Judge
District of South Carolina

**-191-**

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF SOUTH CAROLINA

|  |  |
|---|---|
| IN RE:<br><br>Infinity Business Group, Inc.,<br><br>     Debtor. | Bankruptcy Case No. 10-06335-jw<br><br>Adv. Proc. No. 12-80208-jw |
| Robert F. Anderson, as Chapter 7<br>TRUSTEE FOR INFINITY BUSINESS<br>GROUP, INC.,<br><br>     Plaintiff,<br><br>vs.<br><br>WADE CORDELL, O. BRADSHAW<br>CORDELL, CORDELL, LLC, THE<br>CORDELL GROUP, LLC, GIBSON<br>COMMONS, LLC, BRYON K. STURGILL,<br>STURGILL & ASSOCIATES, INC., JOHN<br>F. BLEVINS, LAW OFFICES OF JOHN F.<br>BLEVINS, LLC, GOLDEN GHOST, INC.,<br>HAINES H. HARGRETT, DONALD<br>BRENT GRAFTON, D. LARRY<br>GRAFTON, GRAFTON & COMPANY,<br>PLLC, MORGAN KEEGAN & COMPANY,<br>INC., and KEITH E. MEYERS,<br><br>     Defendants. | Chapter 7 |

### ORDER GRANTING DEFAULT JUDGMENT AGAINST DEFENDANTS

It appearing that Sturgill & Associates, Inc.; Bryon K. Sturgill; Donald Brent Grafton; D.

Larry Grafton; and Grafton and Company, P.L.L.C. (collectively, "Defendants") were properly

served and have failed to file a timely response to the Complaint filed on August 31, 2012 within

the time prescribed by Fed. R. Bankr. P. 7012(a), as evidenced by the Affidavit of Default filed

by Robert F. Anderson, Chapter 7 Trustee ("Trustee") of the estate ("Estate") of Infinity

2

Business Group, Inc. ("Debtor"), C/A No. 10-6335-jw on November 15, 2012, and the Second

Amended Affidavit of Default, filed December 30, 2013, it is hereby:

      **ORDERED, ADJUDGED AND DECREED** that, pursuant to Fed. R. Civ. P. 55(b),

made applicable to the Adversary Proceeding by Fed. R. Bankr. P. 7055, judgment shall be and

is hereby entered in favor of the Trustee and against the Defendants in respective amounts of

damages that shall be determined at a hearing to be set by further order of the Court.

      **AND IT IS SO ORDERED.**

3

**-193-**

Case 12-80208-jw    Doc 355    Filed 04/06/16    Entered 04/06/16 08:39:55    Desc Main
Document      Page 1 of 4

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:                                       ) | |
|                                              ) | **Bankruptcy Case No. 10-06335-jw** |
| INFINITY BUSINESS GROUP, INC.,               ) | |
|                                              ) | |
| Debtor.                                      ) | |
|                                              ) | |
| ─────────────────────────────               ) | |
|                                              ) | |
| ROBERT F. ANDERSON, as Chapter 7             ) | **Adv. Proc. No. 12-80208-jw** |
| Trustee for Infinity Business Group, Inc.,   ) | |
|                                              ) | |
| Plaintiff,                                   ) | **NOTICE OF SETTLEMENT WITH** |
|                                              ) | **DEFENDANTS JOHN F. BLEVINS, THE** |
| v.                                           ) | **LAW OFFICE OF JOHN F. BLEVINS, LLC,** |
|                                              ) | **AND GOLDEN GHOST, INC.** |
| WADE CORDELL, O. BRADSHAW                     ) | |
| CORDELL, CORDELL, LLC, THE                    ) | |
| CORDELL GROUP, LLC, GIBSON                    ) | |
| COMMONS, LLC, BRYON K.                        ) | |
| STURGILL, STURGILL &                          ) | |
| ASSOCIATES INC., JOHN F. BLEVINS,             ) | |
| LAW OFFICES OF JOHN F. BLEVINS,               ) | |
| LLC, GOLDEN GHOST, INC., HAINES               ) | |
| H. HARGRETT, DONALD BRENT                     ) | |
| GRAFTON, D. LARRY GRAFTON,                    ) | |
| GRAFTON & COMPANY, PLLC,                      ) | |
| MORGAN KEEGAN & COMPANY,                      ) | |
| INC., and KEITH E. MEYERS,                    ) | |
|                                              ) | |
| Defendants                                   | |

TO:  ALL CREDITORS AND PARTIES IN INTEREST:

     **YOU ARE HEREBY NOTIFIED** that the Chapter 7 Trustee for Infinity Business Group, Inc., intends to submit the following compromise or settlement to the Court for approval.

     **YOU ARE FURTHER NOTIFIED** that any response, return and/or objection to this application, should be filed with the United States Bankruptcy Court for the District of South Carolina ("Court") no later than twenty-one (21) days from April 7, 2016, the date of service of the motion/application and a copy simultaneously served on all parties in interest.

     **YOU ARE FURTHER NOTIFIED** that no hearing will be held on this application, except at the direction of the judge, unless a response, return and/or objection is timely filed and served, in which case, the Court will conduct a hearing on **May 17, 2016, at 9:30 a.m.** at the Court located at

-194-

the J. Bratton Davis U.S. Bankruptcy Courthouse, 1100 Laurel Street, Columbia, South Carolina 29201. No further notice of this hearing will be given.

**NATURE OF DISPUTE:**  The Trustee, on behalf of the Estate, filed the instant action against, among others, the defendants John F. Blevins ("John Blevins"), *Pro Se*; the Law Office of John F. Blevins, L.L.C.  ("Law Offices"), a Limited Liability Company organized under the laws of Maryland; and Golden Ghost, Inc. ("Golden Ghost"), A Nevada Corporation (collectively, the "Blevins Group Defendants")  for many alleged violations of duties the Trustee alleges were owed by them, and for recovery of moneys from them, as is set forth in Causes of Action 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 13, 18, 20, 21, 22, 23, 26, 32, 34, and 35 of the Complaint (which is on file with the United States Bankruptcy Court for the District of South Carolina, and to which the Trustee refers any and all parties concerning the dispute.

**AMOUNT DISPUTED:**  In excess of $5,000,000.00, actual, incidental and consequential damages, interest and attorney's fees, and subordination of any claims the Blevins Group Defendants may have against the Estate.

**PROPOSED SETTLEMENT OR COMPROMISE:  Subject to final, non-appealable Court approval, the Settlement includes the following terms and conditions:**

**SPECIFIC DETAILS OF SETTLEMENT:**

1.  The Blevins Group Defendants shall jointly execute a Confession of Judgment ("Confession") in favor of the Estate for $1,321,998.88, and an immediate cash payment of $500.00 (to be paid by the Blevins Group to the Estate of the Debtor upon any Order approving this Settlement becoming a Final Order).

2.  The Confession shall contain an explicit recital that its execution does not constitute an admission of guilt or liability, but instead is entered into by the Blevins Group Defendants to effectuate expedited finality of the Adversary Proceeding as to the Blevins Group Defendants and by the Trustee to ensure performance by the Blevins Group Defendants of the terms of the Settlement.

3.  The Blevins Group Judgments shall not be recorded for any public record unless and until the Blevins Group Defendants have been adjudged to have breached the Covenants Not to Execute Agreement by a court of competent jurisdiction, except that an unexecuted copy of the Confession of Judgment of the Blevins Group Defendants may be filed with the Court if deemed necessary by the Trustee to obtain approval of the Settlement pursuant to Fed. R. Bankr. P. 9019.

4.  The Trustee shall execute a Covenant not to Execute the Blevins Group Judgment.

5.  The Trustee shall not contest the Proofs of Claim of the Blevins Group against the Estate.

6.  Other than the Proof of Claim, which is specifically provided for herein, the Blevins Group shall release, waive, and discharge any and all other claims, obligations, suits, judgments, damages, demands, rights, causes of action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that each has or

may have against the Estate. Notwithstanding the foregoing, the Blevins Group do not release or waive the right to enforce any provision of this Agreement.

7.  Entry into this Settlement and requesting approval of the Court or Court approval of the same is not a waiver of any claims, counterclaims, defenses, or causes of action that the Estate, the Debtor, or the Trustee may have against anyone other than Entry into this Settlement and requesting approval of the Court or Court approval of the same is not a waiver of any claims, counterclaims, defenses, or causes of action that the Estate, the Debtor, or the Trustee may have against anyone other than Entry into this Settlement and requesting approval of the Court or Court approval of the same is not a waiver of any claims, counterclaims, defenses, or causes of action that the Estate, the Debtor, or the Trustee may have against anyone other than Dunes, Ivey, and Williams or that the Defendants may have against anyone other than the Estate, the Debtor, or the Trustee, including but not limited to any party, any financial institution, and/or Entity, as defined in 11 U.S.C. § 101(15). Nothing shall be construed in the Settlement as a waiver or limitation on the Trustee's ability to pursue any claim, defense, counterclaim, or cause of action related to or connected with the Chapter 7 Case, the Debtor, and/or the Estate, (including but not limited to any claim, counterclaim, or cause of action brought pursuant to § 541 and/or any claim brought under the avoidance powers as set forth in §§ 544, 547, 548, 549, and 550, including any obligation arising from anyone's guarantee and any damages arising to the Estate from or relating to the Causes of Action) against anyone, other than The Blevins Group, who may be or is, whether known or unknown, subject to liability on account of the Causes of Action or any obligation or damages arising from or relating to the Causes of Action. The Trustee specifically, but without such specific reference constituting any limitation on the foregoing paragraph, does not withdraw, release, discharge, waive, or forgive anyone other than The Blevins Group, from any liability, obligation, claims, defenses, actions, causes of action, counterclaims, and/or any other obligation of any kind or nature that are alleged in, including as alleged in the Causes of Action, or as may be alleged in or that may arise from or be related to, whether known or unknown, the Adversary Proceeding 12-80208-jw, Trustee v. Wade Cordell, et. al., filed in the Court. Subject to the foregoing, the Trustee shall release, waive, and discharge any and all claims, obligations, suits, judgments, damages, demands, rights, causes of action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that he, the Debtor, or the Estate has or may have against the Blevins Group, including but not limited to, the Causes of Action and any claim and cause of action against the Blevins Group arising from 11 U.S.C. § 550 as a consequence of the fifteenth Cause of Action set forth in the Amended Complaint. Notwithstanding the foregoing, the Trustee does not release or waive the right to enforce any provision of this Agreement.

8.  Notwithstanding the foregoing, the Trustee does not release or waive the right to enforce any provision of this Agreement.

9.  The Defendants shall, subject to the applicable Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure, (i) provide access to the Trustee to records relating to the Sellers and information relating to the Adversary Proceeding in the Defendants' possession, custody, or control and (ii) be available as fact witnesses in connection with the Adversary Proceeding.

Case 12-80208-jw    Doc 355    Filed 04/06/16    Entered 04/06/16 08:39:55    Desc Main
Document    Page 4 of 4

**10.** The parties shall keep the terms of settlement and negotiations confidential other than as required to obtain Court approval or as otherwise ordered by a court of competent jurisdiction.

**FEES:**  Hourly fees for the Trustee's counsel; the amount to be requested for this specific settlement is impossible to calculate, as it is impossible to determine the objections to any settlement at this time which could be made by the other Defendants in this adversary proceeding; or any creditors or parties in interest.

**BENEFIT TO THE ESTATE:**  The Estate benefits by entry into the Settlement by resolving all claims against the Defendants; receiving the cooperation of the Defendants in the Trustee's investigation as set forth above, including having the reasonable opportunity to use the Defendants as fact witnesses in the Adversary Proceeding; will also reduce the uncertainty of recovery, and reduce the further costs and expenses of the estate; will result in the case being closed much more expeditiously by reducing the further litigation of the Causes of Action against the Blevins Group, and the Defendants' anticipated defenses thereto..

**MOVING PARTIES:**

Robert F. Anderson, Chapter 7 Trustee         John F. Blevins. Esquire, *individually and on behalf*
for Infinity Business Group, Inc.             *of* the Law Office of John F. Blevins, L.L.C. and
                                              Golden Ghost, Inc.

**The parties hereby certify that the terms set out above are complete and have been agreed upon by the moving parties named herein.**

                         ANDERSON & ASSOCIATES, P.A.


            By:    /s/Robert F. Anderson_____
                   Robert F. Anderson, Attorney for Plaintiff
                   District Court ID #1091
                   P.O. Box 76, Columbia, SC  29202-0076
                   (803) 252-8600

Address of Court:                        Address of U.S. Trustee:
United States Bankruptcy Court           United States Trustee
1100 Laurel Street                       1835 Assembly St., Suite 953
Columbia, SC  29202                      Columbia, SC  29201

Address of Chapter 7 Trustee:
Robert F. Anderson
P.O. Box 76
Columbia, SC 29202

USCA4 Appeal: 21-1536    Doc: 29-1    Filed: 11/08/2021    Pg: 234 of 487  Total Pages:(234 of 487)

## UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | Bankruptcy Case No. 10-06335-jw |
| Infinity Business Group, Inc., | |
| Debtor. | |
| Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc., | |
| Plaintiff, | Adv. Proc. No. 12-80208-jw |
| vs. | |
| Wade Cordell, O. Bradshaw Cordell, Cordell, L.L.C., The Cordell Group, L. L. C., Gibson Commons, L.L.C., Bryon K. Sturgill, Sturgill & Associates Inc., John F. Blevins, Law Offices of John F. Blevins, L.L.C., Golden Ghost, Inc., Haines H. Hargrett, Donald Brent Grafton, D. Larry Grafton, Grafton and Company, P.L.L.C., Morgan Keegan & Company, Inc., Keith E. Meyers, | |
| Defendants. | |

### Joint Stipulation of Undisputed Facts

1. IBG was incorporated under the laws of Nevada by filing its Articles of Incorporation on May 8, 2003.

2. Federated Automated Recovery System, Inc. and Fars Marketing Inc. were wholly-owned subsidiaries of IBG along with Infinity Collections, Inc. and Infinity Business Assurance, LLC.

3. IBG was a payment processing company that offered a complete outsourced payment, risk management, and fraud detection solution that included the following types of services,

1

1    among others:

2       a.  The business of conducting electronic transactions conducted through the internet;

3         the telephone; accounts receivable conversion; back office capture; point of sale

4         terminals by way of electronic check conversion through the national check network,

5         Affirmative Technologies, Inc., or Image Transfer Management System; ETFs and

6         Credits; and EFT debits and credits;

7       b.  Initial transactions services provided to customers of IBG's processing services

8         through NSF Processor or ACH Processor (or for a limited amount of customers,

9         through the NCN System, e.g., QuickCheck);

10         i.  For processing initial transactions, IBG received a processing fee per

11          transaction.

12      c.  Fee and Billing services that included verification only services from which IBG

13        earned fees based on the number of transactions processed and/or guarantee services

14        from which customers paid IBG fees based on a percentage of the face value of the

15        transaction;

16      d.  Guarantee and/or verification services including IBG's guarantee of point of purchase

17        and point of sale transactions along with web, telephone, ETF debits and credits;

18        verification only services for which IBG charged merchants a fee per transaction (and

19        a smaller fee for the limited customers using QuickCheck); guarantee and verification

20        services for which IBG charged a percentage of the face value of the transaction;

21         i.  During the guarantee process, a merchant scanned the check or other form of

22          payment and then the system would verify if the transaction was approved. If

23          the transaction was approved, IBG guaranteed the payment of the transaction.

1     e.  Point of Sale and Point of Purchase transaction services for which IBG captured

2         images of checks and also used verification and electronic conversion;

3     f.  Consolidated Return services that were processed through back office capture;

4     g.  School Guarantee Program for which IBG did not verify checks in the program but

5         guaranteed the checks; IBG would collect the NSF checks in the School Guarantee

6         Program through its NSF Processor system;

7     h.  Non-Sufficient Funds Services  were provided for deposits arising from physical

8         checks, electronic return files, remote scanner programs, and re-presented check entry

9         programs;

10     i.  NSF Processing services providing NSF Tracking which provided for first and second

11         re-presentments from the federal automated efts; for authorized one-time ACH debits

12         to check writers accounts; pre-authorized multiple ACH Debits; and money grams

13         along with transfers;

14     j.  Infinity Card Services provided customers with point of sale equipment for processing

15         of credit card transactions along with chargeback and retrieval department services

16         available to customers to assist in resolving chargeback issues merchants could

17         encounter; and

18     k.  IBG also provided hard collection services or manual collections; through this service,

19         IBG contacted check writers directly and charged fees for its services including fees

20         for a contingency collection fee, the state-regulated NSF fee, and if applicable, the

21         state-regulated administration fee.

22     l.  IBG also offered Third Party Accounts Collection services to its clients, which were

23         offered as a compliment to IBG's suite of check and credit card processing products.

4.    The Guaranteed Program and Non-Guaranteed Program were also among the programs offered by IBG and were the programs through which IBG offered its clients services for collecting non-sufficient fund ("NSF") checks and transactions.

    a.    The Guaranteed Program was a fee-based program. The Guaranteed Program assured the customer that it would be reimbursed for any check that was returned NSF. For certain guarantee customers, this required that IBG buy the check for the face amount when the check was returned NSF. IBG was then responsible for collecting the face amount of the check plus the state mandated fee.

    b.    For certain client-contracts and services provided pursuant thereto, the Non-Guaranteed Program was not a fee-based program and was offered at no cost to the customer.  IBG was entitled to receive the state mandated fee as compensation for its services pursuant to the terms of certain contracts falling under the Non-Guaranteed Program.

5.    IBG's check recovery and payment processing services during 2008 were concentrated within three major customer services lines: the banking division, which included the Community Banks division and also included contracts with large national banks (including Synovus, US Bank, and Wachovia, among others), provided services through which customer-participants could offer check recovery and processing services to their respective customer bases; through the School Division, IBG provided electronic verification and check guarantee services to school districts throughout the United States; through the Direct Merchant Division, IBG maintained certain direct accounts with merchants which were signed up under IBG's acquisition model of calling on individual merchants for check recovery and payment processing services.

6.   Many of IBG's large clients required IBG to submit an audited set of financial statements at certain intervals pursuant to the terms of the specific contract.

7.   IBG entered into contracts with merchants, banks, school districts, government agencies, and other clients, which in the context of certain services IBG offered, authorized IBG to re- present the clients' checks. Under certain contracts, if the client had a check that was returned for nonsufficient funds, it would send the check to IBG for collection, and for certain contracts, IBG would then attempt to collect the debt for the client and upon successful collection, would receive the statutory fine as payment for collection.

8.   IBG's Articles of Incorporation, filed May 8, 2003, provided that IBG's total outstanding shares could not exceed 50 million shares of common stock with a $.01 value and one million shares of Preferred stock with a $.01 value.

9.   As of September 16, 2004, IBG's corporate information published by the Nevada Secretary of State reflected that Michael Potter served as IBG's president.

10.   On November 9, 2005, IBG's Certificate of Designation was amended so that of IBG's 50 Million shares of authorized common stock. 47 Million were classified as Class A voting common shares having one vote per share while 3,000,000 shares were classified as Class B non-voting common stock ("2005 Certificate of Designation").

11.   Further, the 2005 Certificate of Designation classified each share of IBG's One Million shares of voting preferred stock as holding 100 votes per share.

12.   On June 10, 2004, IBG's board of directors resolved for IBG to initiate IBG's purchase of all of the capital stock of Fars Marketing, Inc. and Fars, Inc.

13.   On September 15, 2004, IBG, Fars, Inc., and Fars Marketing, Inc. entered into a Share Purchase Agreement, whereby IBG purchased all of the issued shares of Fars Marketing,

1        Inc. and Fars, Inc.: the 100,000 outstanding shares of Fars, Inc. and the 100,000

2        outstanding shares of Fars Marketing, Inc.

3    14.    The terms of the Share Purchase Agreement provided that in consideration for Fars

4        Marketing, Inc. and Fars, Inc.'s sale of all of their respective outstanding shares to IBG,

5        the respective stockholders of Fars Marketing, Inc. and Fars, Inc. would receive all of the

6        issued and outstanding shares of IBG's common and preferred stock.

7    15.    Pursuant to the Articles of Sale and Transfer, which was referenced in Article 4, Section

8        4.1(g) of the Share Purchase Agreement, Fars, Inc. and Fars Marketing, Inc. transferred

9        all of their outstanding and issued shares of capital stock to IBG.

10    16.    The Articles of Sale and Transfer in § 10(d) provided that in exchange for their surrender

11        of these shares, any holder of surrendered shares of Fars Marketing, Inc. or Fars, Inc. would

12        receive a certificate representing a number of shares of IBG common stock commensurate

13        with the ownership interests represented by the shares the holder surrendered.

14    17.    Article IV of IBG's By-Laws provided that IBG's business and affairs would be managed

15        by a six-member board of directors, who would be elected annually by IBG's stockholders

16        for a term of one year and until his or her successor qualified or until the earlier of his

17        resignation or removal. Article IV, section 8 of IBG's By-Laws provided that IBG's

18        directors could be removed without cause by the holders of a majority of IBG's shares

19        then entitled to vote at an election of IBG's directors.

20    18.    On August 17, 2009, Wade Cordell, Brad Cordell, and John Blevins were informed by

21        letter that IBG's board of directors had voted to remove them from their management

22        positions and that their employment was terminated "for cause."

23    19.    Wade B. Cordell served in various capacities at IBG from 2004 until August 15, 2009,

1      including serving as President and Chairman of the Board.

2    20.   O. Bradshaw "Brad" Cordell served in various capacities at IBG from 2004 until August

3        15, 2009, including serving as the Chief Operating Officer ("COO") of IBG and as a

4        member of the Board.

5    21.   John F. Blevins served in various capacities at IBG from 2004 until August 15, 2009,

6        including serving as general counsel for IBG and as a member of the Board. Mr. Blevins

7        periodically gave legal advice to IBG's Board, President, and CEO.

8    22.   Bryon K. Sturgill served in various capacities at IBG from 2003 until July 19, 2010. During

9        that time, he served as the Chief Executive Officer for certain periods and continually

10      served as a member of the Board.  He was also involved in soliciting capital from outside

11      investors.

12    23.   Haines H. Hargrett served as CFO of IBG from September of 2006 to July 2010.   Mr.

13      Hargrett was a certified public accountant.

14    24.   Michael Potter served on the Board from 2003 until 2007 and again from 2009 until his

15      resignation in 2010.

16    25.   Mr. Potter attended some, but not all, Board meetings. Mr. Potter attended sales

17      presentations and implementation meetings along with Bryon Sturgill.

18    26.   Thomas Handy served as a member of the Board from June 24, 2008 through March 31,

19      2010.

20    27.   William Van Hoeven served in various capacities at IBG from 2004 until 2010. During

21      that time, he served as a member of the Board of Directors of IBG. Mr. Van Hoeven held

22      the following titles at IBG: Processing Center Director, Vice President of Electronic

1      Processing, and Vice President of Product and Technology Development.

2   28.  IBG employed Defendant Brent Grafton and his firm, Grafton & Company, PLLC

3      ("Grafton & Company") (collectively, "Grafton Defendants"), an outside auditor, to audit

4      IBG's financial statements and issue an audit opinion for the fiscal years 2003 through at

5      least 2008 ("Grafton Audited Financials").

6   29.  IBG engaged the Grafton Defendants to perform an audit on IBG in accordance with

7      generally accepted audited standards ("GAAS") and to audit the financial statements of IBG

8      and to present the financial statements of IBG in accordance with generally accepted

9      accounting principles ("GAAP").

10  30.  Morgan Keegan was a registered broker dealer and investment adviser properly licensed to

11     conduct business in South Carolina, and other relevant jurisdictions by all appropriate state

12     and federal regulatory bodies as well as all appropriate self-regulatory organizations.

13  31.  In late 2007, IBG approached MK Defendants about a capital raise.

14  32.  On or about April 24, 2008, IBG and Morgan Keegan executed an engagement letter

15     agreement.

16  33.  In 2008, an institutional investor, Morgan Keegan Strategic Fund, L.P., retained an

17     independent due diligence firm, Transaction Services, LLC, to perform due diligence on

18     IBG and examine the financial health of the Company.

19  34.  IBG first engaged the McNair Law Firm, P.A to provide legal services to the Debtor in the

20     first quarter of 2006 and during periods in 2005.

21  35.  On or about March 21, 2006, IBG retained the law firm, DLA Piper, LLP, to provide legal

22     services and advice to IBG pertaining to a private placement of IBG's securities and

1  pertaining to, as described in the client engagement letter, "general corporate clean-up, as

2  well as other corporate, tax and other matters" for which IBG would consult DLA Piper

3  for legal advice. DLA Piper represented the Debtor from on or about March 10, 2006 to

4  on or about January 8, 2007.

5  36.  On or about January 9, 2007, IBG authorized the transfer of IBG's files from DLA Piper

6  to engaged Duane Morris, LLP to represent IBG, as a company. Duane Morris, LLP was

7  not retained to represent any parent, subsidiary, or affiliated entities of IBG and was not

8  retained to represent any officers, directors, members, partners, shareholders, or employees

9  of IBG.

10  37.  Duane Morris performed legal services for IBG from on or about January 9, 2007 until

11  late 2009 or 2010. Duane Morris provided IBG with legal services concerning corporate

12  and securities matters during this time period.

[SIGNATURE PAGE FOLLOWS]

By:  s/Marilyn E. Gartley
     Marilyn E. Gartley, Fed. Bar No. 10616
     ANDERSON & ASSOCIATES, P.A.
     Post Office Box 76
     Columbia, South Carolina 29202
     Telephone Number: 803-252-8600
     marilyn@andersonlawfirm.net


     s/Mitchell Willoughby
     Mitchell Willoughby, Fed. Bar No. 4702
     Elizabeth Zeck, Fed. Bar No. 6627
     R. Walker Humphrey, II, Fed. Bar No. 12524
     WILLOUGHBY & HOEFER, P.A.
     Post Office Box 8416
     Columbia, South Carolina 29202
     Telephone Number: 803-252-3300
     mwilloughby@willoughbyhoefer.com
     ezeck@willoughbyhoefer.com
     whumphrey@willoughbyhoefer.com

     *Counsel for Robert F. Anderson, as Chapter 7
     Trustee for Infinity Business Group, Inc.*

s/Robert C. Byrd
Robert C. Byrd (Fed. Id. #1643)
bobbybyrd@parkerpoe.com
Parker Poe Adams & Bernstein LLP
200 Meeting Street, Suite 301
Charleston, SC 29401
Phone: (843) 727-2650
Fax: (843) 727-2680

S. Lawrence Polk (admitted pro hac vice)
larrypolk@eversheds-sutherland.com
Sutherland Asbill & Brennan LLP
999 Peachtree Street NE
Atlanta, GA 30309
Phone: (404) 853-8000
Fax: (404) 853-8806

Yvonne Williams-Wass (admitted pro
hac vice)
yvonnewass@eversheds-sutherland.com
Sutherland Asbill & Brennan LLP
999 Peachtree Street NE
Atlanta, GA 30309
Phone: (404) 853-8000
Fax: (404) 853-8806

*Attorneys for Morgan Keegan & Company,
Inc. and Keith E. Meyers*

Case 12-80208-jw    Doc 963    Filed 05/21/18    Entered 05/21/18 16:33:55    Desc
Generic Text Order    Page 1 of 1

950BNC

**United States Bankruptcy Court**
**District of South Carolina**

Case Number:  10–06335–jw

Adversary/Complaint Number: 12–80208–jw

Name of Debtor(s):  Infinity Business Group, Inc.

**Robert F Anderson, as Chapter 7 Trustee**

Plaintiffs(s)

v.

**O. Bradshaw Cordell, et al.**

Defendants(s)

| Entered By The Court 5/21/18 | ORDER | Filed By The Court 5/21/18 Laura A. Austin Clerk of Court US Bankruptcy Court |
|---|---|---|

This Order formalizes the oral rulings indicated by the Court at the hearing on the Amended Motion to Continue Trial held on April 23, 2018. At that hearing, counsel for the Trustee indicated that the Trustee has reached a settlement with Haines Hargrett, and therefore made Mr. Hargrett's request for a bifurcated or continued trial no longer necessary. Counsel for Mr. Hargrett did not appear at the hearing, but indicated by email to Chambers the fact that the Amended Motion was no longer necessary. Therefore, for these reasons, the Court denies Mr. Hargrett's Amended Motion to Continue Trial. AND IT IS SO ORDERED. Signed by: Judge John E. Waites, US Bankruptcy Court – District of South Carolina (related document(s)822).

*John E Waites*

United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Infinity Business Group, Inc.,<br><br>Debtor(s). | C/A No. 10-06335-JW<br><br>Adv. Pro. No. 12-80208-JW<br><br>Chapter 7<br><br>**ORDER ON TRUSTEE'S MOTION FOR DIRECTED VERDICT** |
| Robert F Anderson, as Chapter 7 Trustee,<br><br>Plaintiff(s),<br><br>v.<br><br>Keith E. Meyers; Cordell L.L.C.; The Cordell Group L.L.C.; Gibson Commons L.L.C.; Bryon K Sturgill; John F Blevins; Golden Ghost, Inc.; Haines H. Hargrett; Donald Brent Grafton; D. Larry Grafton; Grafton and Company, P.L.L.C.; Morgan Keegan & Company, Inc.; Law Offices of John F. Blevins, LLC; O. Bradshaw Cordell; Wade Cordell; Sturgill & Associates Inc.; Morgan Keegan & Associates, LLC,<br><br>Defendant(s). | |

This matter comes before the Court upon the motion for directed verdict ("Motion") requested by Robert F. Anderson, as Chapter 7 Trustee ("Trustee"), at the conclusion of the trial in this adversary proceeding on May 22, 2018. The Motion seeks the Court to order a directed verdict in favor of the Trustee as to Morgan Keegan & Company, Inc. and Keith E. Meyers' ("MK Defendants") counterclaims and many of MK Defendants' affirmative defenses pursuant to Fed. R. Civ. P. 50.[1] MK Defendants assert that a directed verdict is not appropriate as Fed. R. Civ. P. 50 is not applicable to the adversary proceeding and that Fed. R. Civ. P. 52 is the appropriate rule

---

[1] The Trustee alleges that MK Defendants asserted 15 affirmative defenses. The Trustee is seeking a directed verdict as to all of the MK Defendants' affirmative defenses with the exception of MK Defendants' *in pari delicto* defense.

for any judgment on partial findings. MK Defendants assert that as Fed. R. Civ. P. 52(c) requires

the Court to make separate findings of fact and conclusions of law for any partial entry of

judgement, any judgment entered at this stage of the litigation would be subsumed by the Court's

entry of a final order as to all matters in this adversary proceeding. After hearing arguments by the

parties, the Court took the matter under consideration.

## **CONCLUSIONS OF LAW**

Fed. R. Civ. P. 50(a)(1) provides:

> If a party has been fully heard on an issue during a *jury trial* and the court finds that
> a reasonable jury would not have a legally sufficient evidentiary basis to find for
> the party on that issue, the court may:
>     (A) resolve the issue against the party; and
>     (B) grant a motion for judgment as a matter of law against the party on a claim
>         or defense that, under the controlling law, can be maintained or defeated
>         only with a favorable finding on that issue.

(emphasis added). As this adversary proceeding involved a non-jury trial, Fed. R. Civ. P. 50 is not

applicable to this matter. See Green v. Kirkland, C/A No. 1:14-2225-MGL-SVH, slip op., 2015

WL 1268320 at *3 (D.S.C. Mar. 19, 2015) (holding that because "[the] case has not proceeded to

a jury trial . . . Plaintiff's motion for a judgment as a matter of law [pursuant to Fed. R. Civ. P.

50(a)] must be denied at this time."); 9B C. Wright & A. Miller, Federal Practice and Procedure §

2523 (3d ed. April 2018 update) ("The motions described in Federal Rule 50 are available only in

cases tried to a jury that has the power to return a binding verdict. Thus it does not apply to cases

tried without a jury or to those tried to the court with an advisory jury."). Therefore, the Court

interprets the Trustee's Motion as a motion for judgment on partial findings under Fed. R. Civ. P.

52(c).

Fed. R. Civ. P. 52(c) provides that "[i]f a party has been fully heard on an issue during a

nonjury trial and the court finds against the party on that issue, the court may enter judgment

Case 12-80208-jw    Doc 974    Filed 05/29/18    Entered 05/29/18 15:30:10    Desc Main
Document    Page 3 of 4

against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." In determining a motion under Fed. R. Civ. P. 52(c), "the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself in which party's favor the preponderance of the evidence lies." 9C C. Wright & A. Miller, Federal Practice and Procedure § 2573.1 (3d ed. April 2018 update). Further, in granting a judgment on partial findings, the Court is required to issue separate findings of fact and conclusions of law under Fed. R. Civ. P. 52(a) in the same manner as the Court would for a final order on all of the causes of action and defenses presented at trial.

The Court notes that the Trustee's Motion was made at the conclusion of the trial. At this stage of the litigation, the Court's next step is to make final findings of facts and conclusions of law as to all of the causes of action and defenses asserted in this adversary proceeding. Further, the record in this matter is lengthy as the parties have presented nearly four-weeks' worth of testimony, lengthy depositions and hundreds of exhibits. In the interest of judicial economy and considering the scope of the record, it appears that the best use of the Court's resources at this time is to consider all of the causes of action and defenses in a single final determination, rather than addressing them in a piecemeal manner. Therefore, the Court is not inclined to grant a judgement on partial findings under Fed. R. Civ. P. 52(c) at this time.

The Court understands that this Motion may have been requested due to concerns regarding the length of the parties' proposed orders. In lieu of post-trial briefs, the Court ordered the parties to submit within 60 days of the conclusion of the trial proposed orders with separate findings of facts and conclusions of law. The Court indicated that the parties shall provide analysis as to each element of the causes of action and defenses raised by the parties. The Court further indicated that these proposed orders should be limited to 100 pages in length. To the extent that the parties find

as they draft these proposed orders that the limitation in length inhibits counsel from adequately addressing all matters before the Court, counsel for the parties may seek a reconsideration of the 100-page limit by submitting a correspondence to the Court, with a copy to opposing counsel.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
May 29, 2018

**FILED BY THE COURT**
**05/29/2018**



US Bankruptcy Judge
District of South Carolina

Entered: 05/29/2018

4

## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **10-06335-jw**
Adversary Proceeding Number:  **12-80208-jw**

### JUDGMENT

The relief set forth on the following pages, for a total of 2 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**10/15/2019**



_John E Waites_

US Bankruptcy Judge
District of South Carolina

Entered: 10/15/2019

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, | C/A No. 10-06335-JW |
| Infinity Business Group, Inc., | Adv. Pro. No. 12-80208-JW |
| Debtor(s). | Chapter 7 |
| Robert F. Anderson, as Chapter 7 Trustee, | |
| Plaintiff, | **JUDGMENT** |
| v. | |
| Keith E. Meyers; Cordell L.L.C.; The Cordell Group L.L.C.; Gibson Commons L.L.C.; Bryon K Sturgill; John F. Blevins; Golden Ghost, Inc.; Haines H. Hargrett; Donald Brent Grafton; D. Larry Grafton; Grafton and Company, P.L.L.C.; Morgan Keegan & Company, Inc.; Law Offices of John F. Blevins, LLC; O. Bradshaw Cordell; Wade Cordell; Sturgill & Associates Inc.; Morgan Keegan & Associates, LLC, | |
| Defendants. | |

Based on the Findings of Fact and Conclusions of Law set forth in the attached Order, the Court grants judgment in favor of Keith E. Meyers ("Meyers") and Morgan Keegan & Associates, LLC, ("Morgan Keegan") on the grounds that the Chapter 7 Trustee's remaining causes of action are barred because the Debtor, Infinity Business Group, Inc., was *in pari delicto* with Meyers and Morgan Keegan. Further, the Court finds that, regardless of the application of *in pari delicto*, the Trustee has not met his burden of proof to satisfy the elements of his remaining causes of action. The Trustee's post-trial oral motion to amend his complaint is denied.

**-214-**

## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **10-06335-jw**
Adversary Proceeding Number:  **12-80208-jw**

### ORDER

The relief set forth on the following pages, for a total of 134 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**10/15/2019**



_John E Waites_

US Bankruptcy Judge
District of South Carolina

Entered: 10/15/2019

**-215-**

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Infinity Business Group, Inc.,<br><br>Debtor(s).<br><br>---<br><br>Robert F Anderson, as Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>Keith E. Meyers; Cordell L.L.C.; The Cordell Group L.L.C.; Gibson Commons L.L.C.; Bryon K Sturgill; John F. Blevins; Golden Ghost, Inc.; Haines H. Hargrett; Donald Brent Grafton; D. Larry Grafton; Grafton and Company, P.L.L.C.; Morgan Keegan & Company, Inc.; Law Offices of John F. Blevins, LLC; O. Bradshaw Cordell; Wade Cordell; Sturgill & Associates Inc.; Morgan Keegan & Associates, LLC,<br><br>Defendants. | C/A No. 10-06335-JW<br><br>Adv. Pro. No. 12-80208-JW<br><br>Chapter 7<br><br>**ORDER** |

This matter comes before the Court upon the Complaint filed by Robert F. Anderson, as Chapter 7 Trustee ("Trustee") in the above captioned adversary proceeding. After lengthy discovery and numerous motions and contested matters, the Court held a four-week trial to address the Trustee's remaining causes of action against Keith E. Meyers ("Meyers") and Morgan Keegan & Company, Inc. ("Morgan Keegan").

The adversary proceeding centers on the rise and eventual fall of Infinity Business Group, Inc. ("Debtor"), the business of which focused on the collection of non-sufficient funds checks ("NSF Checks") for third parties, using both electronic and manual collection methods. From its

1

inception, Debtor's business and customer base grew rapidly and attracted numerous individual investors, most of whom were family and friends of Debtor's founders and key members. These investors purchased stock, territory licenses, or promissory notes as a means of investment. Throughout its existence and due to its rapid growth, Debtor's primary goal and that of its shareholders was to attract a purchaser of the company or pursue a merger or initial public offering, and therefore, multiply the value for investors. However, Debtor's rapid business growth and expansion also caused a constant need for cash, forcing Debtor into a perpetual cycle of fundraising.

As one of the consequences of its need for cash, Debtor often delayed the turnover of the portion of checks collected on behalf of and owed to its customers and frequently used those funds to support its expansion and on boarding of more customers. In addition, during most of its operations, Debtor used an accounting practice which incorrectly stated the composition and collectability of its accounts receivable, which at any single point in time created the appearance that Debtor was in a better financial position than it was.

In 2009, as a result of the discovery of a $2 million deficit in customers' funds (also known as merchant accounts), Debtor began to lose customers, and the discovery led certain shareholders to attempt to oust some of Debtor's founding managers and key long-term members of its Board of Directors. The attempt to oust management resulted in costly litigation that ultimately settled with certain managers and directors agreeing to leave their positions in exchange for releases and cash payments from Debtor. New directors were selected, and despite new leadership, Debtor continued to lose business and was in constant need of additional funding.

Within one year of the initial ouster of three key managers, the Board of Directors removed two other officers, one being Debtor's founder and CEO Bryon Sturgill, that the new Board

2

deemed responsible for the improper accounting practice. Ultimately, due to its financial struggles, Debtor filed for relief under chapter 7 of the Bankruptcy Code.

Two years later, the Trustee commenced the present adversary proceeding on behalf of Debtor against certain key managers (former officers and Board members) of Debtor and several third-party Defendants who provided services to Debtor for their alleged involvement with the improper accounting practice. As the primary focus of this proceeding, the Trustee alleges that the Defendant managers and Defendants Meyers and Morgan Keegan colluded to create the accounting practice to conceal Debtor's true financial state, which ultimately led to the company's demise. Prior to trial, many of the individual Defendants defaulted, confessed judgment or entered into settlements with the Trustee. The trial addressed the liability of Morgan Keegan, a brokerage and investment banking firm, which had contracted with Debtor on two occasions to provide services relating to capital raises for Debtor, and its employee, Keith Meyers. After receiving an extensive presentation of evidence, including testimony from an 18-day trial and the admission of several hundred exhibits and several deposition transcripts for consideration,[1] the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, which is made applicable to this proceeding by Fed. R. Bankr. P. 7052.[2]

---

[1]     At the trial, the Court took several matters under advisement, including the submission of certain exhibits and the challenges to the admissibility of expert testimony.

    Previously, when considering pretrial motions to exclude the challenged experts' testimony, the Court noted that it "is in the best position to weight the probative value of each expert's testimony, and there are no concerns that jury will be inappropriately swayed by the experts' testimony." With this understanding, the Court finds that the two challenged expert witnesses, John Freeman and Scott Illario are properly qualified as experts "by knowledge, skill, experience, training, or education" pursuant to Fed. R. Evid. 702. The Court finds that the challenges to their qualifications go to the weight of the opinions rendered by these experts, rather than to the admissibility of their testimony. Therefore, the Court denies the motions to strike or exclude the testimony of these expert witnesses.

    Further, the Court took the admission of several of the parties exhibits under advisement. After review, the Court admits these exhibits into the record. For all other matters taken under advisement during the trial, those matters are resolved through this Order.

[2]     To the extent the following findings of fact are conclusions of law, they are adopted as such, and to the extent the following conclusions of law are findings of fact, they are so adopted.

3

## FINDINGS OF FACT[3]

### The Formation of Debtor

1.      In the early 2000s, Bryon Sturgill ("Sturgill") was the primary owner of FARS, Inc.

("FARS"), which specialized in the electronic collection of NSF Checks for third party merchants.

2.      In 2003, after receiving a postcard from Sturgill seeking marketing assistance,

Wade Cordell and others formed FARS Marketing, Inc. ("FARS Marketing") for the purpose of

marketing the services of FARS to potential customers.

3.      On May 8, 2003, Debtor, led by Sturgill, was incorporated under the laws of

Nevada.

4.      To consolidate the operations of FARS and FARS Marketing with Debtor, on June

10, 2004, Debtor's Board of Directors resolved for Debtor to initiate the purchase of all capital

stock of FARS and FARS Marketing, and on September 15, 2004, Debtor, FARS, and FARS

Marketing entered into a Share Purchase Agreement, whereby Debtor completed the purchase of

---

[3]      The Court notes that the factual testimony presented by both parties' witnesses was inherently self-serving. The Trustee's factual witnesses consisted of former investors of Debtor who hold allowed unsecured claims in Debtor's main bankruptcy case and who may ultimately benefit from the Trustee's recovery in this adversary proceeding, and John Blevins, a former insider of Debtor who had reached an agreement with the Trustee to not enforce a confession of judgment in this proceeding in exchange for his cooperation. Conversely, Meyers, the central witness for the defense, is both personally a defendant in this proceeding and a former employee of the other defendant, Morgan Keegan. Further, while Calvin Clark, another witness for the defense and former employee of Morgan Keegan, does not appear to have a personal stake in this litigation, he may have professional implications as the proceeding relates to the propriety of his previous employment with Morgan Keegan.  In addition, much of the factual testimony regards specific conversations and remarks made over a decade ago and may be undependable due to faded recollections.

Further, the Trustee placed emphasis on certain metadata contained in electronic documents submitted as exhibits. The metadata presented by the Trustee showed the person who originated the document and the time it was originated, as well as the person who last made a change to the document and the time of that last change. The metadata did not provide the extent of the last change made to the document, nor did it provide who made changes to the documents and the extent of those changes between the origination of the document and the last change made. As a result, the metadata was of very limited probative value as it does not describe how a document was changed or who drafted the particular information within the document.

4

FARS and FARS Marketing, and issued stock to the former shareholders of FARS and FARS Marketing ("2004 Merger").[4]

5.      Debtor was an established payment processing company offering payment, risk management, and fraud detection services related to checks received by various clients, including banks, schools, and direct merchants.

6.      One of the focuses of Debtor's business was the collection of checks that had insufficient funds when first presented for collection ("NSF Checks"), with Debtor obtaining its revenues from check recovery service charges permitted under state laws for the collection of NSF Checks and under its agreements with its customers ("Service Charge").[5] Debtor offered its clients two separate programs for collecting NSF Checks: the Guaranteed Program and the Non-Guaranteed Program. Under the Guaranteed Program, Debtor would become the owner of the NSF Check by paying to the customer the amount that the NSF Check was written for, also known as face value. Upon any collection, Debtor would receive both the face value and the applicable Service Charge. Under the Non-Guaranteed Program, the ownership of the NSF Check remained with the customer with Debtor having a contractual right to the Service Charge upon collection. Therefore, under the Non-Guaranteed Program, upon the collection of an NSF Check, Debtor retained the Service Charge and delivered the remaining portion of the face value of the NSF Check to its customer.

---

[4]      As part of the merger, the owners of FARS and FARS Marketing were given preferred shares of Debtor in September 2004. Shortly thereafter, in December 2004, these preferred shares were converted to common shares of Debtor's stock. While not a party to these agreements, it appears Debtor's stockledgers reflected that Cordell LLC received shares of Debtor's stock as part of these transactions. During these proceedings, the Trustee raised concerns regarding the shares issued to Cordell LLC as part of the merger of the companies.

[5]      For example, under South Carolina law, a payee of a check is permitted to recover a $30 service charge from the check writer for each NSF Check that is collected. *See* S.C. Code Ann. § 34-11-70 (2019).

5

7.    In addition, it appears Debtor had two wholly-owned subsidiaries, Infinity

Collections, Inc., which focused on the manual collection of NSF Checks,[6] and Infinity Business

Assurances, Inc., which focused on collections related to the insurance industry.

**Debtor's Management and Professionals**

8.    Throughout its operations, Debtor was managed by a Board of Directors and several

key officers, including the following individuals who are relevant to this matter:

- Sturgill: Sturgill was Debtor's Chief Executive Officer and a member of Debtor's Board of Directors from its founding in 2003 until July 19, 2010, the day he was terminated by the Board of Directors ("Second Ouster"). As part of Sturgill's duties from 2003 to September 2006, he reviewed and prepared the company's financial statements and was effectively Debtor's chief financial officer during that period. During that period, he was also responsible for providing the Board with all financial information and for the hiring of Debtor's outside accounting firm, Grafton & Company, PLLC. On the company's website, Sturgill represented that he was a certified public accountant ("CPA"), when he in fact never passed the CPA exam. Further, Sturgill became a certified valuation analyst by falsifying his status as a CPA. It appears that Wade B. Cordell and John Blevins were aware that Sturgill was not a CPA from at least November 6, 2006. John Blevins testified that he disclosed to Debtor's Board on multiple occasions that Sturgill was not a CPA.

- Wade B. Cordell ("Wade Cordell"): Wade Cordell was Debtor's President and Chairman of the Board from 2004 until August 15, 2009, the date of his alleged termination pursuant to a vote of Debtor's shareholders ("Initial Ouster"). His removal and the removals of certain other officers at that time occurred as the result of a settlement of litigation between himself and the members of Debtor's Board based on the central allegation that Cordell allowed Debtor to improperly use customer trust funds. Among other things, Wade Cordell oversaw Debtor's operations and sales, met with prospective customers, and raised capital from individual investors.

- O. Brad Cordell ("Brad Cordell"): Brad Cordell was Debtor's Chief Operating Officer and a Board member from 2004 until August 15, 2009, the Initial

---

[6]    Based on the record, it appears manual collection of NSF Checks involved Debtor attempting to collect dishonored checks through traditional means of collection, such as contacting the drawer of the check or bringing legal action against the drawer. Manual collection would typically occur after Debtor was unable to collect the check through is electronic means of collections, using the Automated Clearing House, a bank clearing house of over 25,000 banks. With electronic collections, Debtor developed software to search the Automated Clearing House for the drawer of the NSF Check's bank and bank account and then present the check for payment multiple times, which if payment was available, the Automated Clearing House would debit the drawer's bank account for the amount of the check and Service Charge, and thereafter, electronically transfer the funds to Debtor.

Ouster. Brad Cordell was responsible for managing the daily operations of Debtor and for achieving Debtor's financial targets. In addition, he assisted with Debtor's capital raises from individual investors.

- Haines H. Hargrett ("Hargrett"): Hargrett, a Certified Public Accountant ("CPA"), served as Debtor's Chief Financial Officer from September 2006 until July 2010 when his services were terminated by Board (the Second Ouster). Hargrett was not a member of the Board, but he reported to the Board and frequently attended Board meetings. In 2015, Hargrett pled guilty to one felony count relating to his role in preparing Debtor's financial statements.

- John F. Blevins ("Blevins"): Blevins served as Debtor's general counsel and as a member of the Board from 2004 until August 15, 2009, the Initial Ouster. Blevins was in charge of compliance for Debtor, and he had all authority and responsibility for legal issues affecting Debtor, including contract review and negotiation as well as providing advice and counsel to Debtor's Board, President, and CEO. Blevins also retained and interacted with outside counsel. Prior to his involvement with Debtor, Blevins was suspended from the practice of law in the State of Maryland for a period of six months. It appears Blevins never disclosed his suspension to Meyers, Morgan Keegan or Debtor's shareholders.

- Thomas Handy ("Handy"): Handy served as a member of Debtor's Board from June 24, 2008 until March 31, 2010.

- Michael Potter ("Potter"): Potter served as a member of Debtor's Board from May 2003 until the Annual Meeting in November 2007 and rejoined the Board in August 2009 until his resignation in August 2010. After 2004, Potter rarely attended Board meetings and testified that he stopped actively participating as a director in 2006. Potter had no involvement in the day-to-day operations of Debtor and typically followed Sturgill's instructions on matters relating to Debtor.[7] Potter, in his deposition testimony, also stated that decisions were regularly made without his input or knowledge while he served on the Board.

- Van Hoeven ("Van Hoeven") served on the Board from 2004 until August 31, 2010 when Debtor filed its bankruptcy petition. Until September of 2006, Van Hoeven managed Debtor's Processing Center located in Jacksonville, Florida. In addition, Debtor employed Van Hoeven in various capacities, including the Director of Information and Technology. In addition, he assisted with Debtor's capital raises from individual investors.

- Robert Caughman ("Caughman") served as Debtor's Vice President of Administrative Support from June 15, 2004 until Debtor's bankruptcy filing. Caughman also served as Debtor's Secretary from October 1, 2006 until

---

[7]        During the trial, evidence was presented that Potter was very close to Sturgill and typically voted similarly to Sturgill during Board votes. It appears Potter resigned from the Board due to the removal of Sturgill as part of the Second Ouster.

Debtor's bankruptcy filing. In addition, he assisted with Debtor's capital raises from individual investors.

- William Danielson ("Danielson") was an investor in Debtor and chaired Debtor's Advisory Board from April 2009 until Debtor's bankruptcy filing. In addition, he assisted with Debtor's capital raises from individual investors.

- Jeffrey Lyle ("Lyle") was the Senior Vice President of Sales and worked in sales for Debtor. In addition, he assisted with Debtor's capital raises from individual investors.

- Evelyn Berry was an officer of Debtor serving as Debtor's Executive Director for Schools Initiatives from January of 2006 until Debtor filed its petition for bankruptcy relief on September 1, 2010. In addition, she assisted with Debtor's capital raises from individual investors.

9.      For the purposes of this Order, Blevins, Hargrett, Sturgill, Brad Cordell and Wade Cordell will, at times, be referred to as "Management Defendants" as they are defendants in this adversary proceeding.[8] From Debtor's inception until the Initial Ouster, the Management Defendants controlled both the day-to-day and long-term aspects of Debtor's business, including holding four of the six director positions on the company's Board,[9] and held the significant leadership positions in the company, including Chief Executive Officer, Chief Financial Officer, In-House Counsel, President, and Chairman of the Board. The Management Defendants also held a sizeable portion of Debtor's stock. It appears that the remaining non-defendant directors did not have involvement in the day-to-day operations of Debtor.

10.     The authority of Debtor's management was set by Debtor's corporate bylaws ("Bylaws"), which provided that the business and affairs of Debtor were to be managed by

---

[8]      The Trustee also brought claims against various entities associated with the Management Defendants including Cordell, L.L.C., The Cordell Group L.L.C. and Gibson Commons L.L.C. (associated with the Cordells); Golden Ghost, Inc., and the Law Offices of John F. Blevins, LLC (associated with Blevins); and Sturgill & Associates Inc. (associated with Sturgill). In addition, the Trustee brought claims against Donald Brent Grafton, Larry Grafton and Grafton and Company, P.L.L.C. for their role as the auditor of Debtor.

[9]      The Court notes that the evidence also suggests that at least some of the other directors during this period may have strongly supported the positions of the Management Defendants. For example, Michael Potter, who served on Debtor's Board for more than five years, indicated that he placed his full trust and confidence in Sturgill when it came to matters regarding Debtor.

8

Debtor's Board of Directors. The Bylaws provide that the chief executive officer "shall have general and active management of the business of the [company], subject, however, to the right of the directors to delegate any specific powers . . . to any other officer or officers of the [company]." As to the authority to establish accounting practices for Debtor, neither the Bylaws nor the management's employee contracts specifically addressed which individuals had the authority to set such practices.

11.     Each of the directors on Debtor's Board had a fiduciary duty to make full disclosure to the Board and keep the Board informed as to improper actions affecting Debtor, including any red flags associated with the sale of securities by the corporation.

12.     In addition to its Management, Debtor also retained several professionals, which are relevant to this proceeding, to advise and assist it, including:

- **McNair Law Firm**: McNair Law Firm served as Debtor's securities counsel until February 2006 when Debtor retained DLA Piper.

- **DLA Piper**: DLA Piper were attorneys for Debtor hired to assist with securities and business matters of the company from February 2006 until 2010. The individual attorneys who assisted Debtor eventually joined Duane Morris LLP in December 2006 and continued to serve as counsel for Debtor. For the purposes of this Order, the Court will refer to Duane Morris LLP and DLA Piper as "Outside Securities Counsel."

- **Grafton & Company, PLLC**: Grafton & Company, PLLC, a named defendant, served as Debtor's auditors from 2003 until 2009, issuing audited financials for each of those years. Grafton & Company, PLLC was led by Donald Brent Grafton, who was a certified public accountant, and assisted by his father, D. Larry Grafton. Donald Grafton pled guilty to one felony count relating to his involvement with Debtor's financial statements.  For the purposes of this Order, the Court will collectively refer to Grafton & Company, PLLC, Donald Brent Grafton and D. Larry Grafton as "Grafton."

**Early Capitalization of Debtor and IPO Plans**

13.     Before Morgan Keegan's involvement with Debtor, in 2004 and 2005, through the efforts of its officers and directors, Debtor raised approximately $4 million through a "friends and

9

family" offering and $1.6 million through a sale of territory licenses.[10] It subsequently appeared that these early offerings conducted by Debtor were in violation of securities laws as they constituted offerings to unaccredited investors without proper registration with the Securities and Exchange Commission. In addition, it appears Debtor paid commissions to unregistered individuals for the sale of Debtor's stock and licenses in violation of state and federal securities laws. Ultimately, these investment offerings would require Debtor to make a rescission offer in 2006 to repurchase the shares from these investors.

14.    As early as 2004 and before the involvement of Meyers and Morgan Keegan, the management of Debtor focused on "taking the company public" and filed paperwork with the NASDAQ stock exchange to acquire a stock symbol in March 2005.

15.    After obtaining the stock symbol, on September 12, 2005, Wade Cordell sent a letter to Debtor's employees announcing Debtor's plan "to go public" and referred to a potential agreement with Morgan Stanley. In the letter, Wade Cordell stated that:

> [A]round July [2005, Debtor was] approached by the largest firm on Wall Street, Morgan-Stanley, to take a look at [the] company as a possible client. Morgan-Stanley is certainly the "big league" when it comes to taking a company public. Today, [Debtor] received a call that will change all of our lives. Morgan-Stanley informed Bryon Sturgill this morning that they intend to take [Debtor] public. Their time frame is between 120-180 days. Just within the last six weeks Morgan-Stanley took a similar company as [Debtor] public. This company opened trading at $22.00 per share and in just six short weeks are trading at $26.00 per share. This company did not have the revenues [Debtor] currently ha[s]. . . . **The goal of [Debtor's] public offering is to raise between $35 million and $100 million. This money will be used for expansion and other projects in order to drive the stock to $50.00 per share.**

(emphasis added).[11]

---

[10]    In addition to selling traditional shares of its stock, Debtor sold territory licenses in which investors bought the rights to a certain percentage of the revenue generated from each and every check collected within the investor's geographical area.

[11]    Debtor's management was constantly selling the potential success of Debtor in order to raise capital, and the record contains several examples of misstatements by Debtor's management seeking to promote and leverage its business relationships with outside firms in order to sell that potential success to its employees, and its current and

16.    In October 2005, Debtor retained the McNair Law Firm to assist Debtor with the preparation of a private placement memorandum intended for use in raising monies from outside investors.  Debtor advertised that the firm would "perform all the securities legal work necessary to guide the Company in its efforts to become a public company [] sometime in 2006."

17.    Testimony was received from Van Hoeven and Handy, who served as Directors for Debtor, that Debtor's Board of Directors never officially approved any specific capital raise. Later in April 2008, the Board, including Van Hoeven, the Cordells, Blevins, and Sturgill, resolved that Wade Cordell as President of Debtor had the authority to issue certain securities in his discretion and under the terms that he set.

### Debtor's Introduction to Morgan Keegan

18.    On September 28, 2005, after learning that Debtor had completed the preliminary filing requirements for an initial public offering, Meyers, an employee of Morgan Keegan, sent an email to CEO Sturgill:

> Mr. Sturgill, It has been a couple months since we last spoke. Please let me know if you would like to continue our conversations regarding Infinity Business Group. I see per your website that you have filed preliminarily to go public. I believe that Morgan Keegan & Company would be a strong underwriter for your company and would like to discuss our participation.

19.    Meyers joined Morgan Keegan in early 2005. Meyers holds B.S./B.A. degrees in accounting and finance from Washington University in St. Louis. After Meyers passed the CPA exam in 1997, he received his New York CPA license, and for a period of time, he was an accountant with the Deloitte & Touche audit department, focusing on the audits of manufacturing

---

potential investors, sometimes hyperbolizing the extent of the relationship and/or promoting the relationship without the outside firm's knowledge, including Meyers and Morgan Keegan. Wade Cordell indicated that these type of business relationships provided Debtor with "great credibility." As a result, it creates a considerable question as to the veracity of any statements made about Morgan Keegan by Debtor's management when it was promoting Debtor, as well as raises doubts that such statements were made with the knowledge and approval of Morgan Keegan.

businesses, before attending the Duke University Fuqua School of Business. Upon obtaining an

MBA, Meyers began to work in investment banking, allowing his CPA license to become inactive

in 2001. Meyers did not practice as an accountant after 1998. Meyers holds multiple securities

licenses, including Series 7 (general broker's license), 63 (state licenses), and 24 (supervisory

designation). Meyers specifically focused his work on raising institutional capital for non-bank

lending and financial services companies. Meyers is not licensed as an investment adviser, and he

testified that he does not provide any investment advice.

20.     On November 11, 2005, Meyers emailed his supervisor at Morgan Keegan, Chip

Grayson, about Sturgill, Debtor's CEO, asking, "Remember this guy? He is coming to Atlanta in

two weeks to discuss his upcoming $100mm IPO [(Initial Public Offering)] (Infinity Business

Group). He has spoken with Morgan Stanley and we were his next call. I will keep you posted."

Grayson responded, "I vaguely remember him. Sounds like a potential good piece of business."

21.     On January 24, 2006, Meyers met with members of Debtor's management to

discuss whether Debtor should retain Morgan Keegan's services. During the meeting, Meyers

provided Debtor's management with a general overview that described the range of services that

Morgan Keegan could provide Debtor, including but not limited to assistance with obtaining

private equity capital and mezzanine funds, assistance with mergers and acquisitions, as well as

serving as an underwriter or advisor to the company.

22.     On February 22, 2006, Meyers and Calvin Clark ("Clark"), an associate of Morgan

Keegan, visited Debtor's Lexington, South Carolina facility to further discuss the possibility of

Debtor retaining Morgan Keegan's services. During this meeting, it was discussed whether it was

best for Debtor to proceed with an initial public offering or to first pursue a private equity investor.

Meyers testified that he had explained to Debtor's management that, in his view, Debtor was not

in a position at that time to make a public offering because of the size of the company. Meyers, on behalf of Morgan Keegan, provided a brochure which included a proposed timetable for Morgan Keegan to assist Debtor in the raising of private equity and a list of preliminary information Morgan Keegan would need to assist Debtor, including Debtor's historical and projected financial information.  As a means of providing an example of Morgan Keegan's services, Meyers and Clark also requested information, including Debtor's financial information (i.e. financial statements), that Morgan Keegan could fashion into a draft Confidential Information Memorandum, which would describe Debtor to potential investors.

23.    Without contradiction, Meyers indicated that the February 22, 2006 meeting was to conduct Morgan Keegan's due diligence of Debtor. During the meeting, Morgan Keegan did not undertake to do a comprehensive review nor opine on Debtor's financial information. As part of its due diligence efforts, Morgan Keegan reviewed information provided by Debtor in order to have sufficient details and understanding to explain that information to potential institutional investors, but it did not audit the information or hire outside auditors to review, audit or opine on the accuracy of the information. Further, as part of the initial information gathering, Meyers requested that Debtor's management disclose any issues in their backgrounds that may be revealed in a background report. Meyers testified that neither Sturgill nor Blevins disclosed any possible issues to him.

24.    Handwritten notes of Blevins from the February 22, 2006 meeting also suggest that there was some discussion about whether Debtor should immediately pursue a public offering or whether it should delay a public offering. These handwritten notes also state "6% for private placement, 7% for IPO [(Initial Public Offering).]"

13

25.    On the afternoon on February 22, 2006, Meyers emailed the following message to his supervisor to report on the outcome of the meeting: "Great meeting today. We are moving forward with a 15-20mm private placement at 6%. Better news, there is no broker involved." Meyer's supervisor responded, "Great job. Do we have a signed letter?" to which Meyers replied, "I am preparing one tomorrow. This meeting was due [diligence] for us and now that we both want to move forward, we have a handshake agreement on our fees."

26.    Throughout both of the engagements between Morgan Keegan and Debtor in 2006 and 2008, Meyers understood that he directly reported to the management team of Debtor and not the Board. Further, during both engagements, the Management Defendants constituted a majority of Debtor's Board.

### 2006 Contract

27.    On March 16, 2006, Morgan Keegan and Debtor entered into an engagement agreement ("2006 Contract"), which provided that Morgan Keegan would serve for a period of one year as Debtor's exclusive placement agent,[12] seeking to assist Debtor and raise capital in exchange for a 6% commission on all gross proceeds raised on behalf of Debtor resulting from a private equity[13] placement. Based on the evidence of the parties' course of conduct, under the 2006

---

[12]    The 2006 Contract does not define "placement agent." Secondary sources state that it is not uncommon for a company seeking to issue stock "to engage a finder or placement agent to assist in locating investors and bringing the financing to a successful conclusion. The placement agent will assist the company in locating potential investors and in attempting to close the financing transaction. For its efforts, the placement agent will generally receive a fee based on a percentage of the funds raised from investors identified by the placement agent and contingent equity compensation in the form of options or warrants." Alan S. Gutterman, *Business Transactions Solutions* § 349:49 (June 2019 Update).

[13]    Private equity refers to the investment class that consists of capital not listed on a public exchange and exempt from public securities laws. *See* James C. Spindler, *How Private is Private Equity, and at What Cost?*, 76 U. Chi. L. Rev. 311, 311–12 (2009).

Contract, Morgan Keegan was to assist Debtor with obtaining capital from institutional investors.

The 2006 Contract[14] included several relevant provisions, including the following:

- 4. (b) [Debtor] will furnish Morgan Keegan with such information[,] including financial statements, with respect to the business, operations, assets and liabilities of the [Debtor] as Morgan Keegan may reasonably request in order to permit Morgan Keegan to assist [Debtor] in preparing a private placement memorandum . . . for use in connection with the offering of Securities. *Morgan Keegan may rely upon the accuracy and completeness of the Information without independent verification. [Debtor] will be solely responsible for the contents of the Private Placement Memorandum and any and all other written or oral communications provided to an actual or prospective purchaser of the Securities by [Debtor]. [Debtor] represents and warrants [to Morgan Keegan] that the Private Placement Memorandum and such other communications will not, as of the date of the offer or sale of the Securities, to [Debtor's] knowledge, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.*

- 4. (c) Notwithstanding anything to the contrary set forth herein, Morgan Keegan shall be solely responsible for its own actions with regard to the transactions described herein, which actions shall be in compliance with all applicable laws and regulations, including but not limited to investment advisor, broker-dealer and similar rules and regulations.

- 6. Morgan Keegan will not have any obligations in connection with the private placement of the Securities contemplated by this Agreement except as expressly provided in this Agreement. Morgan Keegan will use its reasonable "best efforts" in connection with this engagement hereunder . . . .

- 7. The term of Morgan Keegan's appointment and authorization hereunder shall extend from the date hereof through March 6, 2007 or such other date as may be mutually agreed by [Debtor] and Morgan Keegan.

- 8. If during Morgan Keegan's engagement or within six (6) months thereafter, the Company (i) purchases all or a substantial portion of the stock or assets of or enters into a merger . . . or (ii) engages in any public offering or private placement of debt or equity of the Company[,] the Company shall give Morgan Keegan the right of first refusal to act as its financial advisor in connection with such transaction or as lead managing underwriter or exclusive placement agent in connection with such Financing, on terms and conditions customary for similar transactions.

- 11. *All opinions and advice provided by Morgan Keegan to [Debtor] in connection with this engagement are intended solely for the benefit and use of [Debtor] in connection with the matters described in this Agreement, and accordingly such advice shall not be relied upon by any person or entity other than [Debtor] and its advisers. [Debtor] will not make any other use of any such opinions or advice. In addition, none*

---

[14]     The Court previously granted summary judgment as to the Trustee's Cause of Action for Breach of Contract as it relates to the 2006 Contract. (ECF No. 549.) There are no remaining causes of action by the Trustee relating to any alleged breach of the 2006 Contract or any other contract relating to the 2006 Contract.

> *of (i) the name of Morgan Keegan, (ii) any advice rendered by Morgan Keegan to [Debtor], or (iii) any communication from Morgan Keegan pursuant to this Agreement will be quoted or referred to in any report, document, release, or other communication prepared, issued or transmitted by [Debtor] or any person controlled by [Debtor], without Morgan Keegan's prior written consent, which consent will not be unreasonably withheld.*

- 15. This Agreement may not be amended or modified except in writing signed by each of the parties hereto . . . .This Agreement incorporates the entire understanding of the parties with respect to the subject matter hereof and supersedes all previous agreements should they exist with respect thereto and shall be binding upon and inure to the benefit of [Debtor], Morgan Keegan, and other Indemnified Persons and their respective successors, assigns, heirs and personal representatives.

(emphasis added). The 2006 Contract also included express provisions for Debtor to indemnify Morgan Keegan for any lawsuit that Morgan Keegan or its employees and agents are involved in and for any losses resulting from "an untrue statement of material fact contained in the Private Placement Memorandum or any other written or oral communication provided by [Debtor] to any prospective purchaser . . . or arising out of or based upon the omission or alleged omission to state therein a material fact required to be stated . . . in order to make the statements . . . not misleading."

**Drafting of a Confidential Information Memorandum**

28.      Prior to entering into the 2006 Contract, on March 5, 2006, Meyers sent to Wade Cordell, Blevins and others a rough draft of a confidential information memorandum which might be distributed to potential institutional private equity investors. The first draft of the confidential information memorandum contained no substantive information on the financials of Debtor.

29.      On March 10, 2006, Sturgill, as CEO, sent to Meyers the 2003 and 2004 Consolidated Audited Financial Statements which were provided by and certified as GAAP compliant by Grafton, Debtor's auditor, for inclusion in a draft confidential information memorandum.

30.      On March 19, 2006, Clark sent an email to Sturgill following up on the status of the 2005 financials since they would also need to be included in any confidential information

memorandum to be provided thereafter to potential institutional investors. On March 20, 2006,

Sturgill provided Debtor's Statement of Income for 2005. At that time, Debtor's management had

not produced any other financial statements for Debtor, including Debtor's balance sheet or cash

flow statements.

31.    On March 22, 2006, Sturgill, Debtor's CEO, provided Morgan Keegan with

forward-looking financial projections for 2006.[15]

### 2005 Financial Statements

32.    On March 27, 2006, Sturgill, as CEO and the individual preparing Debtor's

financial statements at that time, provided to Clark additional financial data of Debtor for the year

2005, including a balance sheet. These 2005 financials included an accounts receivable balance of

$9,936,403, which indicated a significant increase from the prior years' balance of $151,798 for

2003 and $148,460 for 2004.

33.    Shortly after reviewing the 2005 balance sheet provided by Sturgill on March 27,

2006, Meyers questioned Sturgill about the significant increase in the accounts receivable balance

for 2005. Meyers testified that Sturgill explained that Debtor's historic financial statements did

not reflect the company's collections entity, but that Sturgill was now merging that information

into the company's financial statements. Sturgill advised him that in 2005, Debtor's business

significantly increased in the area of manual or hard collection of NSF checks and that the

collections entity utilizes a practice of treating the Service Charge from NSF checks as an account

receivable ("Accounting Practice").

---

[15]    Clark testified at trial that Sturgill provided multiple versions of the unaudited 2005 financials in connection
with Morgan Keegan's preparation of a confidential information memorandum as Grafton had not completed its audit.
Considering that status, Clark did not consider it a red flag that there were multiple versions of the 2005 unaudited
financials, and the Court finds his testimony credible.

34.     According to Sturgill, Debtor had adopted the Accounting Practice for the collections entity because its contracts with its clients provided that Debtor would be entitled to the Service Charge even if the client requested the check be returned. Sturgill stated to Meyers that "the fees are still contractually obligated to [Debtor]. So as such, [Debtor was] required, per GAAP, to record an asset for those receivable." Additionally, Meyers indicated that in response to his question, CEO Sturgill was adamant "that this is how he's been told that he should record it. It's GAAP. The auditors[, Grafton,] have signed off on it." The Court notes that the Trustee did not present the testimony of Sturgill or any other party to contradict Meyers' recollection of Sturgill's explanation of Debtor's use of this approach of recognizing accounts receivable.

35.     During his testimony, Meyers indicated that at that time, he was aware of a similar accounting practice utilized by debt collection companies, known as the effective yield method of accounting. According to Meyers, as he understood it, the effective yield method is a type of GAAP compliant accounting method that certain debt collection companies utilize that provides for both fees and principal to be treated as a receivable when a company buys a pool of accounts for collection. Under the effective yield method, companies will record their revenues based on expected collection rates of those accounts.

36.     Based on Sturgill's explanations, Meyers drafted explanatory notes, subject to Sturgill's approval that were provided to potential institutional investors for their review.[16]

37.     The weight of the evidence indicates that the Accounting Practice originated with Sturgill and not Meyers or Morgan Keegan. In addition, the evidence presented does not establish

---

[16]     Two examples of these explanatory notes sent to potential institutional investors based on Sturgill's representations includes an explanation of how Debtor calculated its accounts receivable balance in 2005 and a footnote to Debtor's 2005 cashflow statement that explained that the purchase of accounts receivable on the financials was not actually a purchase of receivables but a consolidation of the collection subsidiary into Debtor in anticipation of an investment by an institutional investor.

that Meyers or Morgan Keegan altered in any way the underlying numerical data that constituted Debtor's financial statements. Further, none of the institutional investors that Morgan Keegan introduced to Debtor made loans or otherwise relied upon the Accounting Practice.

### Debtor's Accounting Discussions with Ernst and Young

38.     On May 10, 2006, Sturgill emailed to George Nemphos, an attorney at Debtor's Outside Securities Counsel, a letter from Grafton, Debtor's auditor, explaining Debtor's accounts receivable revenue recognition policy, including the Accounting Practice.

39.     At some point thereafter, Meyers identified from public filings, the revenue recognition practice of another company in the debt collections industry, Telecheck.

40.     Unbeknownst to Meyers, Sturgill sent TeleCheck's Form 10-K information to David Jones, a partner of the accounting firm Ernst and Young. It appears Ernst and Young was being considered as a possible accountant for Debtor at that time. On that same day, David Jones responded to Sturgill regarding the details of TeleCheck's accounting process, indicating that the use of TeleCheck's process would be appropriate if Debtor is guaranteeing payment to the client prior to the checks being presented for collection, but that if Debtor is merely accepting "bounced checks from merchants," it would need to "follow similar accounting" that was discussed between Mr. Jones and Sturgill on the morning of May 16, 2006. While Outside Securities Counsel was apparently copied on Mr. Jones's email response, Meyers was not a recipient of the email.

41.     On May 23, 2006, Blevins asked Sturgill to forward a copy of the letter from Ernst and Young to him and Wade Cordell as "[i]t addresses the accounting issues and how to resolve them according to George [Nemphos of Outside Securities Counsel]. . . ."

42.     On June 2, 2006, David Jones of Ernst and Young emailed Sturgill with a copy to George Nemphos of Outside Securities Counsel regarding Debtor establishing an audit

19

relationship with Ernst and Young and indicated that David Jones had discussed with David Greene (also of Ernst and Young) about Sturgill and David Jones' "consultations regarding revenue over the past few weeks . . . ." On June 3, 2006, Nemphos forwarded David Jones' email to Blevins.

43.     Based on this correspondence, it appears that at some point in May of 2006, Debtor's management was discussing Debtor's accounts receivable revenue recognition practices with Ernst & Young, of which Outside Securities Counsel was aware. Outside Securities Counsel's responses to Ernst & Young's and Sturgill's communications were redacted from the relevant exhibits based on the Trustee assertion of the attorney-client privilege as to that communication.[17] While the Court has not considered the content of the letter due to the Trustee's privilege claim, it is apparent that Debtor's management was directly consulting with Outside Securities Counsel and an accounting firm on Debtor's accounts receivable revenue recognition of NSF checks, all without Meyers or Morgan Keegan's involvement.

44.     Meyers testified that "at no time . . . was it disclosed to me that . . . the company had been in conversation with [Ernst & Young]" and that "[Debtor] didn't discuss that they had been in discussion with any other accounting firm other than Grafton."

### Finalization of April 2006 Confidential Information Memorandum

45.     On March 29, 2006, Clark sent to Sturgill for approval of the final version of the confidential information memorandum ("April 2006 CIM") to be distributed by Morgan Keegan

---

[17]     It appears much of the discussion from these emails has been redacted due to a claim of attorney-client privilege by the Trustee. The Court overruled the challenges to the Trustee's assertions of privilege during the trial. Further, certain testimony of Wade Cordell was kept under seal due to concerns of attorney-client privilege and was not considered by the Court.

to potential institutional investors pursuant to the 2006 Contract.[18] The April 2006 CIM included

the financial information from the 2003 and 2004 Consolidated Audited Financial Statements by

Grafton, as well as financial information for 2005 provided by Sturgill on March 27, 2006. In

addition, the April 2006 CIM included a detailed disclosure to the potential institutional investors,

which included the following relevant provisions:

a. The information contained in the April 2006 CIM is based on "information furnished to [Morgan Keegan] by [Debtor;]"
b. Morgan Keegan "makes no representations . . . as to the accuracy or completeness of the information contained in this Memorandum[;]"
c. "[A]ny prospective purchaser acknowledges its responsibility to perform a thorough due diligence review prior to consummating a transaction involving [Debtor;]"
d. With respect to statements regarding Debtor's "anticipated future performance," "Morgan Keegan has not attempted to independently verify any such statements[;]" and
e. "This Memorandum does not constitute an offer to sell or a solicitation of offers to buy securities of the Company."

46.    Shortly after being approved by Debtor's management, Morgan Keegan provided

the April 2006 CIM to several institutional investors for consideration of an investment in Debtor.

One such institutional investor was Bison Capital ("Bison"), which expressed an interest in

investing by sending a preliminary non-binding term sheet to Debtor on May 3, 2006. On May 12,

2006, Bison and Debtor ultimately negotiated a revised term sheet, which provided for an

investment in the form of a $25 million convertible note.

47.    It appears the parties did not intend for, nor did the 2006 Contract anticipate that

the April 2006 CIM would be distributed to individual investors. Meyers testified that he never

distributed the document to individual investors and he never authorized Debtor or its management

to distribute it to individual investors.

---

[18]    The record reflects that a Confidential Information Memorandum is a document providing information about the company seeking investment, including its history, its organization, and its financials, that is provided to potential investors considering an investment in the company.

21

### Bison's Due Diligence Review

48.    As is the practice of most institutional investors in such circumstances, Bison conducted extensive due diligence of Debtor, including Debtor's financials, in determining whether to invest in Debtor. On May 12, 2006, Bison sent its due diligence requests to Morgan Keegan via Meyers, which contained significant information requests from Debtor, including descriptions of "all assumptions and estimates made . . . in recognizing revenue for each category" and "historical collection data and other relevant data (% of bad checks, collect-ability of those checks and corresponding NSF fees, etc.) for each revenue category that supports the current revenue recognition assumptions and polices." One of Bison's goals was to create a financial model of Debtor "that can be used as a guide of expectations for future financial performance." Bison also conducted background checks of Debtor's management as part of its due diligence.

49.    In July of 2006, Bison contacted Debtor regarding its concern with the speed that Debtor was responding to its due diligence requests. As result of this communication, Clark was assigned to Debtor's Kentucky offices to assist Debtor with gathering the information needed to respond to Bison's due diligence requests. Clark testified that he was at Debtor's officers for one to two weeks total to assist with Bison's due diligence requests.

50.    As part of his assistance with Bison's due diligence requests and based on financial information provided by Debtor and its CEO Sturgill, Clark prepared a draft of a projected financial model for use in predicting Debtor's future revenues to assist in marketing to potential institutional investors. Clark provided the proposed model to Hargrett, a CPA who became Debtor's CFO on October 6, 2006, for review and approval.

51.    As part of his assistance, Clark collected a sample of 400 checks in Debtor's inventory to estimate Debtor's rate of collection to provide to Bison. Based on the sample, on July

24, 2006, Clark reported to Van Hoeven with a copy to Sturgill, Wade Cordell and Meyers, that

the collection rate was 82.6%. In describing his methodology, Clark stated that he "took out any

checks that were older than 60 days and only looked at checks that were settled/resolved or

settled/unresolved." In the email, Clark reported:

> Since the overall collection rates come out so close for both the sample, and the actual rate, I think we can assume that Electronic and Hard Collections rates in the sample are close to what the actual rates overall should be. The actual rates might even be a bit higher.

> I think these collection rates are more realistic now that we've controlled for older checks, checks that are still in the process of being collected, and for time period where [Debtor's] collections was [sic] not yet up and running.

> Tomorrow, I'd like to show you what I've done and get everyone's feedback, and then I can clean up the file a bit and turn it over to Bison when we're ready.

Thereafter, it does not appear any party expressed concerns with his methodology. In addition,

Clark provided a similar description of his methodology to Bison's representative. The evidence

is clear that, throughout this effort,  Morgan Keegan, Meyers, and Clark knew Bison was a

sophisticated investor and likely to employ the accounting firm of Grant Thornton to assist in its

due diligence review by "perform[ing] third party validation of financial matters . . . ."[19] The Court

finds no intent to deceive or defraud on the part of Meyers and Morgan Keegan.

52.    On July 27, 2006, Louis Bissette, a partner with Bison, questioned the collection

rate: "Tell me again what the hard collection revenue recognition policy is? I was thinking that it

---

[19]    At trial, Van Hoeven testified that in his opinion, using only checks that were less than 60 days old provided a higher collection rate than Debtor's actual collection rate for all outstanding checks and that the individual collection rate between each industry from which the checks originated could vary significantly depending on the sampling of checks selected. Van Hoeven testified that he orally advised Clark of these issues when Clark was determining the collection rate in July of 2006; however, there was no email or writing presented into evidence to substantiate Van Hoeven's communications to Clark.

was 75% of expected [Debtor] fees with a 25% reserve. But now that we think the hard collection

rate is 50%, we need to reconcile." Bissette's email was forwarded to Sturgill for review and

direction.

53.    On September 26, 2006, Clark provided to CFO Hargrett Bison's findings on

Debtor's collection rate for hard collections, which showed a significantly lower rate of collection

than the 75% used by Debtor's management.

54.    On September 27, 2006, a background report on Sturgill was completed as part of

Bison's due diligence review. The background report indicated that Sturgill was not a certified

public accountant as he had previously represented.

55.    Thereafter, Bison chose not to invest in Debtor, without providing a specific reason

for its decision. However, Meyers testified that he was later advised that Bison declined to invest

in Debtor as a result of Sturgill's misrepresentation of his background.

**Restatement of the 2003 and 2004 Audited Financial Statements**

52.    In June 2006, Debtor began seeking a loan from Regions Bank, which owned

Morgan Keegan at the time.  Due to that relationship, it appears that Meyers and Clark relayed

information between Regions Bank and Debtor's management regarding the loan application. On

June 2, 2006, Clark emailed Sturgill, with a copy to Wade Cordell and Meyers, stating that "Will

Reid at Regions [Bank] needs the consolidated, Audited Financials for '04. These would need to

include the figures from the collections company, so there is no jump in the receivables number

when comparing to '05." It appears, in response, that Meyers advised Debtor to provide Regions

Bank with both the copies of the original 2004 audited financials and provide a *pro forma* of the

2004 financials (which includes "the figures from the collections company"), in order to clearly

reflect the reason for any changes. The Court is not convinced, as the Trustee alleges, that this is a

24

directive by Meyers or Morgan Keegan to Debtor's management to conduct a restatement of its historical financials, and further, having reviewed the events associated with these communications, finds it is unlikely that Meyers or Clark would knowingly participate in a deception involving the Accounting Practice conveyed to the parent company of their employer.

53.     Thereafter, on July 21, 2006, Grafton issued Debtor's 2005 audited financial statements and certified them as GAAP compliant. These financial statements used the Accounting Practice and included the accounts receivable figure of $9,936,403 that was first provided by CEO Sturgill on March 27, 2006. The 2005 audited financial statements included a new note regarding Debtor's policy on its accounts receivable recognition, which indicated that Debtor recognized state mandated fees in its accounts receivable balance:

> Accounts Receivable Recognition
>
> [Debtor] offers two programs for collection assistance of NSF Checks, a Guaranteed Program, which is fee based and a Non Guaranteed Program, which is not fee based and is offered at no cost to the customer.  The company uses a proven proprietary risk assessment in order to decide which program to offer a particular merchant.  The Accounts Receivable that arises from each program is recognized as follows.  The guaranteed program assures the customer that it will be reimbursed for any check that is returned NSF.  This requires that [Debtor] buy the check for the face amount of the check when returned NSF.  [Debtor] is then responsible for collecting the face amount of the check plus the state mandated fee.  Once [sic] [Debtor] has purchased these checks, the face amount of the check plus the state mandated bad check fee are recorded as accounts receivable since [Debtor] is now entitled to and actively collecting that amount.  The Non Guaranteed program, since it is not guaranteed, only entitles [Debtor] to the state mandated fee since the customer will be paid for the face once the check is collected.  For the Non Guaranteed Program, [Debtor] only records an Accounts Receivable for the amount of the State Mandated fee.  Under the Non Guaranteed Program, unlike the Guaranteed Program where [Debtor] owns the check, the customer still has rights to the check and can request the check back after so many days.  However, [Debtor] by contract is still entitled to state mandated fee.

The record does not reflect who drafted this revised note regarding Debtor's accounts receivable recognition policy; however, the note and information therein would ultimately fall within the

-240-

responsibility of Sturgill as the CEO and the officer charged at the time with the responsibility of Debtor's financial statements. Furthermore, it is noteworthy that the audited financials were certified by Grafton as continuing to be GAAP compliant. In his deposition, Grafton testified that he was not aware of anyone from Morgan Keegan, including Meyers or Clark, playing any role with respect to the preparation of any of Debtor's audited financial statements. Further, Van Hoeven testified that he was not aware that Morgan Keegan, including Meyers and Clark, ever prepared or provided the notes to Debtor's financial statements.[20]

54. It appears in connection with Grafton's audits of Debtor's financial statements that Sturgill, as CEO, and Wade Cordell, in his capacity as President, signed representation letters, which included representations to Grafton that Debtor prepared the financial statements to be audited, that the data included in those financial statements were true and correct, and that there were no irregularities at the company.

55. On September 6, 2006 and September 8, 2006, CEO Sturgill sent Debtor's restated financials and financial notes for 2004 and 2005 to Grafton, Clark, and Meyers. Among other changes, the income statement in the 2004 restated financials showed an increase in the amount of accounts receivable from $148,460 to $3,132,446 and a decrease in the amount of Property, Plant and Equipment by $4,455,000, and included similar financial notes as the 2005 audited financial statements. The 2005 restated financials also included significant changes to the Debtor's statement of cash flow. It appears the 2004 restated financials used the Accounting Practice for its revenue recognition policy.

---

[20]    It appears Meyers and Clark did provide some stylistic and grammatical suggestions to Sturgill for the notes to the financial statements, but the evidence does not demonstrate that Meyers or Clark created the content of these notes.

56.    According to Meyers,[21] "Sturgill indicated that Grafton was going to . . . re-audit, re-review the financial statements, and make sure that he felt it was accurately stated." [22] CFO Hargrett provided Meyers and Morgan Keegan with what he described as "'Final and Restated' audited financial statements," and indicated that Debtor's auditor had opined on these statements, accepting them as GAAP compliant. Further, the evidence does not indicate that Morgan Keegan, Meyers, or Clark had any connection or communication with Grafton.

57.    On October 4, 2006, CFO Hargrett provided to Clark, as approved, the "Final & Restated" audited financial statements for 2003, 2004 and 2005 from Grafton. The cover letter Grafton provided with the restated audited financial statements for 2004 is dated "February 20, 2005" and is nearly identical to the cover letter Grafton provided on the original consolidated financial statements for 2003 and 2004 that were issued on February 20, 2005. This letter indicated that Grafton "conducted [the] audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. . . . In [Grafton's] opinion, the financial statements . . . present fairly, in all material respects, the financial position of [Debtor] as of December 31, 2004, and the results of its operations and its cash flows for the year then ended in conformity with generally accepted accounting principles."

---

[21]    According to Meyers' understanding, based on representations from Sturgill, the change in the audited financial statements provided by Grafton was to address a mapping error that resulted from the consolidation of Debtor's related businesses FARS and FARS Marketing into Debtor. While the Trustee asserts that there was no evidence of a mapping error or need to consolidate companies, the evidence presented was insufficient to confirm or deny that Sturgill made these representations to Meyers regarding the purpose of the restated financials.

[22]    Grafton, in his deposition testimony, had a very limited recollection of the restatement of Debtor's financials and could not elaborate on why Debtor restated the financials. Grafton's testimony on the topic was essentially, "I cannot remember a restatement. I just can't. It's been so long ago. If there was anything of that nature, I can't remember it."

27

**Opening of the Barbourville Processing Center/Cash Needs**

58.      Indicative of its constantly growing business and client base, in September 2006, Debtor expanded and moved its processing center from its Jacksonville location to its newly constructed Barbourville, Kentucky facility. As of May 8, 2007, twenty-seven employees were employed at the Barbourville facility; this number increased to at least sixty in the year prior to Debtor's bankruptcy filing.

59.      In 2006 and 2007, Debtor incurred over $2 million in expenses relating to the startup of the Barbourville facility, $500,000 in legal fees for fundraising efforts, including direct stock and note offerings,[23] and $350,000 in start-up costs associated with two of its largest new customers, Wachovia Bank and U.S. Bank.

60.      In his deposition, Hargrett testified that when he started his employment as CFO in 2006, "funding was always a concern" and cash flow was a problem. He believed that the major reason for the cash shortfall was the "startup of the operation in Barbourville . . . hiring a lot of people in anticipation of future revenue . . . the fixed outlay of starting the facility . . .and the ramping up the sales effort to generate the revenues to cover those costs."

**November Offering**

61.      In 2006, Debtor was advised by its Outside Securities Counsel that shares and territory licenses previously issued in 2004 and 2005 appeared to have been sold in violation of securities laws because the shares and related territory licenses were sold to unaccredited investors, among other reasons. Outside Securities Counsel advised Debtor's management that to correct the

---

[23]      For the purposes of this Order, the Court intends "direct" securities sales to mean the sale of securities without the involvement or assistance of a professional to serve as an intermediary in the sale of stock. In other words, securities sold directly by Debtor's management to individual investors.

violations, Debtor would need to make a rescission offer to repurchase the shares previously sold to unaccredited investors.

62.     Due to this offering, Morgan Keegan's efforts to move forward with seeking new investment from institutional firms was delayed. In the meantime, Outside Securities Counsel asked Morgan Keegan to forward information from the April 2006 CIM for use in the offering document in order to speed up its work on the recession offering.

63.     On August 18, 2006, Clark sent to Keli Isaacson ("Isaacson"), an attorney with Outside Securities Counsel, an email which contained an "initial draft for the Reg D offering." Clark testified that he created this draft based on a template provided to him by Outside Securities Counsel. He reported to Isaacson that "[m]ost of it is complete, with the exception of the financial section, which we will need to update with information that [Debtor] is preparing. The information that is currently in the financial section is there as a place-holder. . . . [W]e wanted to get this draft into your hands so we can keep the process moving. Most of the document was taken from our original memorandum . . . ."

64.     On August 30, 2006, Meyers emailed Isaacson, providing her with a markup of the private placement memorandum for the offer. Meyers indicated that he does "not have Jones Day's [Morgan Keegan's counsel] comments in [the markup]. We are working on the MD&A [Management Discussion and Analysis,] and [Sturgill] spoke with the auditors who will revise the footnote disclosure to be in-line with a public document."

65.     Even though Clark and Meyers provided assistance as requested, it is apparent to the Court that Outside Securities Counsel was the responsible professional for this offering with Debtor and controlled the contents of the document.

66.    On September 20, 2006, after final review and approval by CFO Hargrett and CEO Sturgill, Clark forwarded the financial section for the offering to Outside Securities Counsel.

67.    Throughout the drafting process, several drafts of a private placement memorandum for the offering were exchanged between Outside Securities Counsel and Debtor's management, with copies to Meyers or Clark.

68.    Meyers and Clark testified that their understanding was that their work was being used exclusively for a rescission offer to past investors of Debtor and not to be used as document seeking new investment for Debtor from individual accredited investors. Meyers testified that Morgan Keegan consulted with the law firm Jones Day to ensure that the offering to rescind shares was conducted properly so as to avoid any issues in the future with institutional investors. An attorney at Jones Day reviewed the offering document and Debtor's 2005 financial statements, and Meyers passed those comments to Isaacson, an attorney with Outside Securities Counsel. There is documentary evidence that supports the view that Meyers thought the rescission offer would be part of the offering document that was being drafted. For example, on October 27, 2006, Meyers requested from Isaacson a copy of the 1-2 page cover letter that would include the "actual rescission terms" of the offering to pass along to an interested institutional investor in connection with its potential investment. Isaacson replied that "the rescission language will be incorporated into the document rather than in a cover letter." She also indicates that "[Outside Securities Counsel] is not in a position to weave the required language through the [offering document] because [they] don't have a final [offering document] as of yet." As late as October 31, 2006, Meyers referred to the offering as the "rescission document."

69.    Meyers testified that on October 31, 2006, he was no longer involved in any further discussions with Debtor and Outside Securities Counsel about the offering document, and it

30

appears there is no documentary evidence showing that Meyers or anyone else from Morgan Keegan communicated with Outside Securities Counsel or Debtor from that date until after the offering was finalized.

### Eastside's Interest in Debtor

70.     Eastside Partners ("Eastside") was another private equity firm that considered an investment in Debtor in October 2006 as a result of Morgan Keegan's services under the 2006 Contract.

71.     On October 20, 2006, Meyers relayed a request from Eastside to see "the rescission document," to Wade Cordell, Sturgill and Hargrett. On October 25, 2006, Debtor's Outside Securities Counsel provided a draft document as well as an analysis of the rescission elements under state law to Eastside.

72.     As a result of discussions and the information provided, Eastside submitted a term sheet for a potential private equity transaction on October 24, 2006.

73.     To expedite its due diligence work, Eastside requested copies of the background checks performed by Bison on Debtor's management, which upon the consent of Sturgill, Wade Cordell and Blevins, Bison released the reports to Eastside and Meyers. The background reports from Bison's due diligence indicated that the "report is confidential and is intended solely for the information and use of the client to whom it is addressed. This report is not to be disseminated to any third party without our express written consent. If the report is related to a third party without our express written consent, the client agrees to indemnify us for all costs and judgments as a result of litigation." Copies of each background report were also provided to the subject individual of each report and Meyers.

74.     On October 31, 2006, Eastside withdrew its proposal and terminated its interest in investing due to Sturgill's background report. Meyers testified that he did not believe he could disclose the contents of Sturgill's background report to other members of Debtor's management due to the confidentiality and liability provisions of the background report.

**Termination of 2006 Contract**

75.     According to its terms, the 2006 Contract was to terminate on March 6, 2007 unless otherwise agreed to by the parties. At the trial, Meyers testified, that once Eastside withdrew its proposal, the parties terminated the 2006 Contract on October 31, 2006. Based on the communication of the parties and their course of conduct after October 31, 2006, it appears that, for all effective purposes, the parties ceased performing under the 2006 Contract as Morgan Keegan discontinued its efforts to find interested institutional investors on Debtor's behalf.

76.     Because Morgan Keegan's fees under the 2006 Contract were contingent on the closing of an investment transaction under the contract, and because none occurred, Morgan Keegan received no compensation pursuant to the 2006 Contract. There was no other evidence indicating compensation or fees were ever paid by Debtor to Morgan Keegan, Meyers, or Clark.

77.     Upon the termination of the 2006 Contract, Meyers conducted an exit interview with Debtor's management in which he offered recommendations, including: (1) sharing their background reports with each other; (2) hiring a more recognized auditing firm; and (3) changing the Accounting Practice to a more conservative method of recognizing revenues and writing down the accounts receivable balance, if any. Meyers' testimony is not contradicted and appears to be corroborated by the evidence presented at trial because soon thereafter, Debtor's Board of Directors discussed changing the Accounting Practice and changing auditors at its January 2007 Board meeting. Furthermore, testimony was presented that at some point thereafter, Debtor's

32

management attempted to exchange background reports, with Sturgill refusing to participate.

78.    In November 2006, Meyers followed up with Hargrett about the status of Debtor considering a new auditor. Hargrett advised Meyers that Debtor was in the process of selecting a new auditor. While Hargrett requested a suggestion for a new accountant from Outside Securities Counsel, the evidence does not indicate that Debtor hired a new auditor.

79.    The record reflects that Debtor's management continued to occasionally correspond with Meyers after the termination of the 2006 Contract. On November 13, 2006, Wade Cordell sent an email to Sturgill and Blevins that stated that:

> I just spoke with Keith Meyers and he said that he was "just now reviewing" the [November 2006] PPM's [sic] that I sent to him. I find it really interesting that he is just now taking a look at them even though he has been in the office all day. I really will be surprised if he actually has anyone to purchase one dollar of stock. . . . I spoke with Keith about [Regions Bank becoming an Originating Depository Financial Institution for Debtor] but all he wanted to talk about was [Debtor] finding a "new" auditor, like [Ernst & Young]. He didn't seem to want to even talk to me at all.
>
> Guys I feel Keith is exactly what [Outside Securities Counsel] is saying, "A lot of wind". But we will see.

In reply to Wade Cordell's email, Blevins responded: "You know that I don't feel that Keith [Meyers] can be trusted based on his past lack of performance and his failing to advise us about Bison's bylaws and Morgan Keegan having investments in Eastside."

**November 2006 PPM and Rescission Offer**

80.    On November 3, 2006, Debtor's Outside Securities Counsel provided Blevins, Debtor's in-house counsel, a further draft of the private placement memorandum for the offering ("November 2006 PPM"). The November 2006 PPM did not list Morgan Keegan or Meyers as a placement agent, nor referenced Morgan Keegan in any way. During the course of the drafting of the November 2006 PPM, Outside Securities Counsel directly raised to Blevins, Debtor's in-house

counsel and a Board member, several concerns about the calculation of Debtor's capitalization table (i.e., the listing of shares owned by Debtor's insiders) provided by Debtor for the November 2006 PPM, including concerns that it could be later determined to be fraudulent. However, it does not appear that these concerns were ever raised by Blevins to other members of Debtor's management.  It appears a final draft of the November 2006 PPM was produced by Outside Securities Counsel on November 7, 2006; but was dated as effective as of November 3, 2006.[24] This final draft of the November 2006 PPM contained multiple differences from the drafts of the offering document that Meyers had previously seen. Before the November 2006 PPM was finalized for use, between November 1, 2006 and November 7, 2006, Debtor's management had already directly and individually sold nearly 150,000 shares of Debtor's stock using the PPM.

81.    In his efforts to individually sell stock, on November 14, 2006, Wade Cordell contacted Meyers regarding his personal ability to find investors and provided Meyers six copies of the November 2006 PPM.

82.    On November 20, 2006, Meyers personally invested $25,000 in Debtor through the purchase of stock based on the November 2006 PPM.

83.    On December 22, 2006, Debtor issued a separate rescission offering to its non-accredited investors to repurchase those investors' shares.

84.    In March of 2007, Wade Cordell sent an email to Debtor's management, with a copy to Meyers addressing Meyers' concerns that certain members of Debtor's management continued to refer to and use Morgan Keegan's name in its direct stock sales and in reference to the November 2006 PPM. Wade Cordell stated:

---

[24]    The Final November 2006 PPM is dated as of November 3, 2006; however, there is correspondence indicating that the version of the November 2006 PPM sent on November 3, 2006 remained a draft due to issues with the capitalization table contained in the document.

 I assured [Meyers] that this is inaccurate. [Meyers] has a copy of the PPM and there is NO PLACE WITHIN THE PPM THAT TALKS ABOUT MORGAN KEEGAN. I can only deduce that some of you may be using the "old["] management presentation that does not talk about Morgan Keegan but it does have their logo at the bottom left corner. Please STOP using this presentation if you are doing so and Brad [Cordell] has an updated management presentation you can use.

. . . [A]s of this offering, Morgan Keegan has absolutely nothing to do with this offering. I can certainly see where they would be concerned.

### Debtor's January 8, 2007 Board of Directors Meeting

85.      On January 8, 2007, Debtor held a Board of Directors meeting. There is no evidence that Morgan Keegan, Meyers or Clark attended or participated in the meeting. The minutes from this meeting indicates that the Board discussed Debtor's Accounting Practice and its policy of recognizing accounts receivable. Specifically, the minutes provide that CFO Hargrett "addressed the [B]oard concerning the 2006 financial statements and discussed [sic] ensued regarding changing the way the revenues of the company are booked, i.e. checks in the system waiting for collection.  It was decided unanimously that it is in the Company's best interests to maintain the status quo and not to change the reporting method.  The Board decided unanimously to continue with Grafton & Company as the Company auditors for 2006."  On behalf of the Trustee, Van Hoeven testified that to his best recollection the discussions were limited to the fact that there are two different ways to recognize accounts receivable and that both were proper but one method provided for less booked accounts receivable. He indicated that he was under the impression from the discussions at the meeting that the Accounting Practice was GAAP compliant and that the Board decided to continue with the method it had always utilized. It appears from this Board meeting that this was a clear instance of issues related to the Accounting Practice being raised to the Board, thus placing all Board members on notice of the Accounting Practice, and that the Board approved the continued use of the Accounting Practice.

35

86.     Further, it is clear that Board members, including non-Defendant Board members such as Van Hoeven and Handy, had the opportunity to ask questions regarding Debtor's financial policies, including the Accounting Practice.

87.     It appears that Hargrett, as CFO, presented the issues associated with the Accounting Practice to the Board. The evidence also demonstrates that shortly after Hargrett joined Debtor in September 2006, he recommended to other Management Defendants and to the Board that Debtor change its Accounting Practice to recognize revenue based on when it was actually collected; in other words, move from an accrual to cash basis method of accounting. Although, Hargrett thought both methods were compliant with GAAP, he advocated for this change, which would have resulted in the deferral of "a great deal of revenue and removal of the accounts receivable from the balance sheet and align the income statement with the cash flow statement," which he "thought was a good thing."

88.     The Agenda from the January 8, 2007 Board meeting also demonstrated the ongoing rapid expansion of Debtor's customer base, indicating that Debtor had signed several new bank customers recently: "Renasant Bank has signed their contract (12,000 merchants). Alabama Banc Corp. is also ready (16,000 merchants)! Just received the contract for Arkansas Bank & Trust (6,000 merchants)." The Agenda also indicates several other relevant matters including: "Discuss the $6 million capital raise! This is absolutely a must!!!"; "Discuss where we see Morgan-Keegan and/or Steve Kane and others, fitting into our plans for 2007";[25] and "Discuss our 'Exit Strategy' for 2008."

---

[25]     Steve Kane was a businessman associated with TransFirst, who served on Debtor's Advisory Board. Per Danielson, the Advisory Board did not provide active advice to Debtor's management but served as a group of prominent names to represent Debtor publicly.

36

### Debtor's January 15, 2007 Special Board of Directors Meeting

89.     On January 15, 2007, Debtor held a further special Board meeting, to which certain of Debtor's shareholders, including Meyers, who had purchased shares in November 2006, were invited. Testimony was received at trial from shareholders Alvin and Evelyn Berry that at the January 15, 2007 Board meeting, Meyers presented a slide show presentation that included graphs showing Debtor's prospects for significant growth. The Berrys also testified that Meyers stated at the meeting that he hoped that Debtor would be sold in a few years and that in the past, he had worked with similar companies that ultimately sold for $8 to $12 a share. The Berrys also testified that Wade Cordell handed out a pamphlet discussing Debtor's growth and future that contained Morgan Keegan's logo. However, a copy of this alleged pamphlet or other corroborating testimony was not submitted into evidence. At the conclusion of the special Board meeting, Wade Cordell announced a sale of Debtor's stock at half-price. Meyers testimony contradicts that of the Berrys as he stated that as a practice, he does not speak to the specifics of a particular company but only as to the industry, in general, when providing presentations for clients.

### 2007 Business Activities of Debtor

90.     Substantiating Meyers' testimony that the 2006 Contract terminated on October 31, 2006, it appears that Morgan Keegan and Meyers had little involvement with Debtor in 2007 beyond occasional phone calls and emails checking in on Debtor.

91.     On March 6, 2007, the Securities Division of the South Carolina Office of the Attorney General ("Securities Division") began investigating Debtor's direct capital raises from individual and issued a subpoena to Debtor requesting, among other items, a copy of the prospectus or other documents outlining the specifics of any and all current offerings of securities or other means being employed by Debtor to raise funds for the continued operation of the company.

37

Debtor did not disclose the existence of the Securities Division's subpoena to Morgan Keegan or Debtor's investors, including Meyers. On April 9, 2007, Debtor's Outside Securities Counsel provided a response on behalf of Debtor and included with that response a copy of the November 2006 PPM as the document outlining the specifics of Debtor's securities offerings. It appears that the November 2006 PPM provided to the Securities Division did not include audited or unaudited financial statements of Debtor.

92.    Debtor's Board of Directors held a meeting on May 8, 2007 to provide several updates on Debtor's business and many significant financial improvements for the company. The minutes of this meeting indicated that:

- Debtor had 43 bank agreements in hand and projected 66 closings of new bank agreements for the second quarter of 2007.
- Per CFO Hargrett, the total cost of the rescission offering for shareholders wishing to rescind was $353,100. He reported that this amount was paid and the offering had ended.
- CFO Hargrett announced that 1,963,544 shares of Class A common stock had been sold to date in the November 2006 PPM, leaving 2,836,456 shares left remaining to be sold through May 4, 2007. He also reported that if Debtor chose to sell an additional 20% under the PPM, it would have 3.6 million shares left to sell.
- COO Brad Cordell reported that 27 employees were employed at Debtor's Barbourville facility.
- The Board unanimously decided to renew the Regions Bank credit line. President Wade Cordell and CEO Sturgill agreed to continue to personally guarantee the line. The Board agreed unanimously to indemnify and hold harmless President Wade Cordell and CEO Sturgill against any debt established by the credit line, including legal fees and expenses. It was also decided that President Wade Cordell and CFO Hargrett would continue to work on establishing a new line of credit through McColl Partners to replace the Regions Bank line of credit.
- The Board unanimously agreed to use the Regions equipment line of credit to pay for the Dell line of credit for its computer equipment as far as the available line would allow.
- Twelve new client presentations were scheduled within one week in Dallas, Chicago, and Atlanta.
- **The Board unanimously agreed that bank merchants would be paid on a daily basis beginning immediately.**

38

- Debtor was processing bad checks for over 2,900 schools.

93.    Without Morgan Keegan's assistance or Meyers' involvement, Debtor's management individually and directly pursued capital raises from outside investors in 2007. In an email on May 21, 2007 from Wade Cordell to other members of management, including Sturgill, Blevins, Hargrett and Van Hoeven, he stated that he was "going to aggressively pursue the relationships [Debtor has] been attempting to establish between McColl Partners and Spring Capital with Debtor." Wade Cordell goes on to explain how each entity could assist with Debtor: "[McColl Partners] have agreed to finance any bank contracts (i.e. Wachovia), all we would need to provide is an invoice. They will also finance any lease or loan agreement such as Regions Bank." For Spring Capital, Wade Cordell states "[t]hey have agreed to purchase the 'insider stock' in the amount up to 15% provided [Debtor] has first sold all of the PPM."

94.    Throughout 2007, Debtor continued to add new clients. Specifically, Debtor had signed agreements with major banks, including Wachovia Bank, Synovus, and U.S. Bank. It was expensive to prepare for new clients, and Debtor was rapidly using all of its capital raised to cover the additional labor costs, insurance costs, and marketing expenses that came with adding the new clients. Debtor also required significant capital to improve its administrative office to be able to service these new accounts.

**Debtor's Discussions with Outsiders Regarding the Accounting Practice**

95.    On November 14, 2007, a representative for Regions Bank, the lender for one of Debtor's lines of credit, emailed CFO Hargrett after reviewing Debtor's financials to inquire about what Debtor's "receivables were made up of[?]" Hargrett replied on November 20, 2007, stating "Sorry for taking so long to response [sic], but [Debtor's management] w[as] reviewing our options with regard to how we handle the reporting of revenue for our uncollected checks (Accounts

Receivable) with our auditor. After evaluating various alternative methods, we have finally

decided that the best [way] was to continue the same manner in which we had been reporting." In

describing Debtor's accounts receivable recognition practice, Hargrett replied to Regions Bank

with the following:

> These represent checks that we have in the collection process. We have begun the
> collection effort and expensed the cost related to them. They are heavily discounted
> based on expected collection rate and additional collection costs.
>
> Some are guaranteed checks in which case the recorded amount is a portion of the
> face and fee expected to be recovered. For guaranteed checks, we have already paid
> the merchant and everything we collect, we keep. Some are non-guaranteed, in
> which case the booked amount is only the portion of the fees that we expect to
> collect. When we collect the face of the non-guaranteed check, we return it to the
> merchant.
>
> Our current systems do not give us a very reliable method to determine exactly what
> is in the system. We do know that there is approximately $23,000,000 in funds
> available to us if we collect all of them. All of these items are less than three years
> old, with most of that being concentrated in the more recent periods.

There is no evidence which indicates that Meyers or Morgan Keegan were involved in any way

with these communications between Regions and CFO Hargrett.

**Meyers' Personal Communications with Morgan Keegan Coworkers about Debtor**

96.    In December 2007, as part of Debtor's management's direct effort to raise capital

by selling stock, Wade Cordell contacted Meyers personally to determine if he knew of any other

parties interested in investing in Debtor.

97.    On December 10, 2007, Wade Cordell emailed to Meyers Debtor's 2008 through

2012 financial models. The financial models indicated that as of December 2007, Debtor's

accounts receivable balance was approximately $19,000,000. In response to Wade Cordell's email,

Meyers inquired: "Wade, I thought you wrote off the receivables? What are the $19mm in

receivables related to?" In an apparent misrepresentation, Wade Cordell responded to Meyers by email: "We wrote off the receivable [sic] in 2007."

98.    At Wade Cordell's request, Meyers personally reached out to coworkers at Morgan Keegan by email on December 14, 2007, stating "[Debtor] is finishing up their private round from last year and have asked if I knew of any potential investors. I have committed $50k to this company. I have attached their most recent investor presentation and will follow up with another e-mail with the PPM (due to file size). Please pass this along to other accredited investors that may have an interest in investing." Later that same day, Meyers passed the November 2006 PPM to these four coworkers at Morgan Keegan. It appears that in December 2007, Meyers reached out in total to approximately six coworkers at Morgan Keegan about investment in Debtor, with one coworker, Roger Woodman, investing $50,000 in Debtor on January 14, 2008. Meyers also made an additional investment in Debtor of $25,000 on January 8, 2008.

### Debtor's Continued Expansion in 2008

99.    According to its Form D filed with the SEC on December 12, 2007, Debtor reported raising $2,614,180 in investments from the offering under the November 2006 PPM.

100.    According to the Trustee, by the first quarter of 2008, Debtor's business was booming.[26]

101.    On January 10, 2008, Wade Cordell reported to the Board that:

Today [Debtor] began receiving the London Kentucky Stock monies that will eventually add up to the $2.25 million. I received two checks totaling $160,000.00. The original amount of money we owed out was @ $442,000. The following is what is left to be paid with a balance in our check book as of today (including a $25,000 check that will be deposited tomorrow from a sale I made last week with a check dated for 01/11/2008) would be @ $22,000.00, after paying [Outside Securities Counsel] the monthly installment of $25,000.00 (BTW, [Debtor] only owes 3 more installments to [Outside Securities Counsel] and we are paid in full):

---

[26]    P. 31 of the Trustee's Proposed Order

41

| 1. Loan to be Paid Back to Joyce Cordell | $50,000.00 |
| 2. Back Auto Allowances for everyone | $35,000.00 |
| 3. 2006-2007 IRS | $180,602.35 |
| TOTAL DUE | $265,602.35 |

All other past due payroll, Kentucky State and SC State taxes are now paid up to date. [Debtor] will be receiving all of the $2.25 million by next Tuesday. I will keep everyone informed on the final payments of the "above" next week. [Debtor] should also be receiving @ $210,000.00 from the investors in Florida and an additional $100,000.00 from my investor in Columbia by next Tuesday.

Also, Bryon and Tom Smith will be meeting with the Gas-Well investors today and they should be moving forward with an additional $800,000 to $1,500,000. Then Bryon and Tom have a group with Bob Mitchell that should be adding close to $1,000,000 more. John Blevins still has his group talking in regards to adding more money (up to $10 million) and Eric Dell's guy spoke with me yesterday and is serious about purchasing @ $1,000,000. Also, Keith Meyers will be sending @ $100,000 by Tuesday.

Things are indeed looking very bright. I want to thank you all for the last two days of hard work!!!

This communication clearly shows that Debtor's managers, officers, employees and Board members continued to sell securities to investors directly.

102.     CFO Hargrett testified in his deposition that at some point in 2008, [Debtor] was processing 30,000 checks per month.

103.     The school division of [Debtor's] business increased from the thousand-school range in October of 2006 to five thousand schools in December of 2008.[27]

104.     On August 25, 2008, Debtor issued a Monthly Update of Sales ("Sales Update") to certain investors, which further demonstrated Debtor's continued growth in the second half of 2008. The Sales Update indicated that:

---

[27]     Debtor specifically marketed its services to school districts as schools used Debtor to collect on NSF Checks written by parents for lunches and other student activities.

42

- Debtor expected to begin earning revenues of $50,400 per day from US Bank, "given our proven collection rate of 70%-75% (minimum)," and that revenue would exceed monthly expenses by $350,000.

- The Sales Update indicated that there were 665 new school accounts to be added to the check counts beginning in September and a Bank Initiative with various banks that had contracted or were close to contracting with Debtor for check roll-outs that were scheduled to take place between October 2008 and January 2009.

### Debtor's Increasing Capital Concerns in 2008

105.    As a result of the significant growth in business accounts in 2007 and 2008, Debtor continued to have significant expenses in "on boarding" new customers and in general business expenses. This caused an additional and ongoing need for new capital.

106.    In late May 2008, Wade Cordell indicated that $500,000 would have to be raised by Debtor soon to meet its bills and payroll expenses until mezzanine financing from institutional investors would take place and stated that Debtor's current total bills at the time were $258,150.88. By early June, Debtor had $124,000 of expenses, and Wade Cordell indicated to Debtor's management that he and his wife loaned Debtor $50,000 but that they did not "want to do" it again and threatened that "if [Debtor] cannot come up with the funds then the following people will not receive checks this weeks [sic]: Wade Cordell, Brad Cordell, Bryon Sturgill, Haines Hargrett, John Powell, John Blevins and Bill Van Hoeven."

### Debtor's 2008 Contract with Morgan Keegan

107.    On April 24, 2008, Debtor and Morgan Keegan entered into a second contract ("2008 Contract"), in which Morgan Keegan agreed to be Debtor's exclusive financial advisor with respect to a possible mezzanine debt financing,[28] in exchange for contingent placement fee

---

[28]    Mezzanine debt financing is an investment mechanism that falls between senior debt (such as a secured loan) and common equity (such as stock) in a company's capital structure. Benjamin W. Baldwin, *A Primer on Mezzanine Finance*, 18 No. 4 Westlaw J. Bank & Lender Liability, at *1 (July 2, 2012). The benefit of mezzanine debt financing is that while it is more expensive, it is easier to obtain and usually produces more financing than senior debt. *Id.* Additionally, mezzanine debt financing is generally easier and less expensive to obtain as compared to issuing common equity. *Id.* Mezzanine debt financing typically includes covenants and stock options or warrants, which

equal to 3% of the gross proceeds Morgan Keegan raises on behalf of Debtor. Like the 2006 Contract, Morgan Keegan's fees under the 2008 Contract were contingent on a transaction being closed pursuant to the contract. As part of the duties under the 2008 Contract, Morgan Keegan agreed to "[i]dentify and approach select investors on behalf of [Debtor;] . . . [c]onduct financial due diligence of the Company [Debtor], including but not limited to an examination of financial results and management projections; [c]onduct financial due diligence of potential investors[;] . . . [a]ssist the company in the preparation of any descriptive information and appropriate confidentiality agreement for marketing to potential investors[;] and] [i]dentify and select the appropriate financial partners to fund the [mezzanine debt] [t]ransaction." By its terms, the 2008 Contract was to terminate on October 24, 2008 and included a merger clause that stated that the contract "may not be amended or modified except in writing signed by each of the parties."

108. Unlike the 2006 Contract, the 2008 Contract does not include a provision that provided Morgan Keegan with a right to first refusal to serve as Debtor's underwriter in the future.

109. In addition, Debtor and Morgan Keegan entered a confidentiality agreement as part of the 2008 Contract on September 2, 2008.

110. On April 25, 2008, Irena Snider, an Associate at Morgan Keegan emailed Wade Cordell and Hargrett seeking approval of a draft of an executive summary letter to be provided by Morgan Keegan to prospective mezzanine debt lenders/investors.

111. It appears that in late April 2008, Morgan Keegan created a solicitation packet on behalf of Debtor that included the executive summary letter and a modified version of a

---

would permit the conversion of the debt into an equity ownership of the borrowing company for the lender. *Id.* at *2–5.

presentation that Debtor had previously developed in October of 2007. The solicitation packet also included the 2008 through 2012 financial models developed by Hargrett.

### Debtor's Consideration to Change the Accounting Practice and Write Down the Accounts Receivable Balance

112.    Shortly before the entry of the 2008 Contract, Hargrett requested that Meyers gather and send public information on revenue accounting from other companies because Debtor was considering "mov[ing] to a more conservative accounting policy." [29]  Irena Snider of Morgan Keegan compiled the information and provided it to Hargrett and Wade Cordell.

113.    CFO Hargrett indicated to Meyers that Debtor was contemplating changing to a more conservative method of recognizing accounts receivable and doing a one-time write down of accounts receivable balance. Meyers testified that he advised Hargrett that Debtor should disclose this change initially when soliciting investors under the 2008 Contract to avoid any later issues. Meyers indicated that Debtor agreed to this disclosure and Hargrett "dictated to [Meyers] . . . what the policy would look like[,]" which Meyers incorporated in an overview.

114.    Thereafter, on April 30, 2008, CFO Hargrett provided a red-line version of edits that he had made to a document produced by Meyers explaining Debtor's accounts receivable and revenue recognition practice and Debtor's proposed change to the practice. The overview, as edited by Hargrett, explained that under the Accounting Practice, "[p]er the contract with Debtor's merchants, [Debtor] is entitled to the fees arising from the collection efforts of those checks and per accounting requirements of matching revenue and expenses, was required to accrue the estimated revenue that will be received upon collection of these checks. Again note that the

---

[29]     Hargrett, in his deposition testimony, stated his belief that Debtor's financials using the Accounting Practice were GAAP compliant.

accounts receivable balance only includes fees due to [Debtor] upon collection of the checks and does not include the face amount of the checks." The overview also states Debtor is experiencing a change in business model, in which Debtor would focus more heavily on electronic collections. It further explains that, under the proposed practice, the fees for an NSF Check will now be recognized at the time the check is collected. The overview indicates that as a result of this change in business model, Debtor is anticipating "a change in accounting principle" and a "one-time charge to expense and recorded as an extraordinary item." The overview approved by Hargrett was distributed by Morgan Keegan to all potential institutional investors considering a mezzanine debt investment under the 2008 Contract.

115.   On May 22, 2008, Irena Snider and Hargrett communicated by email regarding a potential institutional investor's question "regarding the amount of good receivable on the books." Snider indicated that she told the potential investors that [Debtor] was looking to potentially write off all of the receivables this year and clean-up the balance sheet . . . ." Hargrett responded that after the write down, the accounts receivable balance will not be zero but will be less than $1 million and that for practical purposes, Snider should tell the potential investors that all of the balance will be written down.

116.   On May 28, 2008, Edgar Sims, a principal of Nancy Creek Capital, one of the institutional investors considering a mezzanine debt offer to Debtor, indicated in an email to Wade Cordell, with copies to Hargrett and Meyers, that it would not extend an offer to Debtor, explaining: "In view of the unknown negative impact on the company's balance sheet and company's 2005, 2006 & 2007 income and expense statements of the probable write-off of approximately $15 million in accounts receivable, the company may not meet [Nancy Creek Capital's] standard."

117.    Confirming the likelihood of the write down of accounts receivable, on May 29, 2008, Hargrett emailed Meyers with a copy to Wade Cordell regarding suggested talking points for a potential institutional investor, which included "EBITDA carve out exception for write off of AR [(Accounts Receivable).]" It appears Hargrett was discussing the negotiation of certain covenants that would factor in the write down of Debtor's accounts receivable balance by reducing the minimum earnings Debtor must obtain to avoid a conversion of the mezzanine debt investor's interest from debt to an equity ownership interest in Debtor.

### Interest by Morgan Keegan Strategic Fund

118.    As a result of Morgan Keegan's efforts under the 2008 Contract, Morgan Keegan Strategic Fund, L.P. ("MKSF"), a private equity firm and independent venture capital wing of Morgan Keegan, expressed interest in a possible mezzanine financing deal with Debtor.

119.    On May 14, 2008, MKSF provided a preliminary term sheet offering a $6 million mezzanine debt investment in Debtor.

120.    On May 29, 2008, Irena Snider emailed Hargrett and Wade Cordell, with a copy to Meyers, an amended term sheet for up to $4.5 million in mezzanine debt investment. As part of this email, Irena Snider provided an analysis of ownership cost of going with the MKSF term sheet versus conducting a straight equity raise (through the sale of stock), with an ultimate conclusion that it is cheaper for Debtor to proceed with the MKSF deal than to directly raise capital. Debtor accepted MKSF's amended term sheet as the first step in finalizing an investment by MKSF, subject to MKSF conducting a due diligence review.

121.    On June 5, 2008, CFO Hargrett sent an email to Bill Nutter of MKSF with a copy to Wade Cordell, Meyers and Irena Snider, indicating that Debtor had revised its financial forecasts

with one of the major changes being a write down of $18 million in accounts receivable in July of 2008.

### Sale of 2008 Promissory Notes

122.    While Debtor was negotiating with MKSF, Debtor's managers continued to make additional individual direct efforts to raise capital. The direct efforts were authorized on April 23, 2008, the day before entering the 2008 Contract, when Debtor's Board of Directors approved a special resolution authorizing Debtor "to issue certain debt instruments to individual accredited investors on such basis and terms as may be determined by the President of the company from time to time in order to raise capital for the company."

123.    In appears Debtor's management viewed these "in house" capital raising efforts as necessary short-term gap funding to cover Debtor's current expenses until it obtained mezzanine financing from an institutional investor such as MKSF.

124.    On June 24, 2008, Debtor's Board of Directors held a special meeting, at which, among other matters, Debtor's financial status was discussed. According to the minutes of the special meeting, "the Directors considered an opportunity for selected investors to: 1) Loan to the company a minimum of $100,000.00 for 90 days, with a 20% rate of return, or 2) Purchase 100,000 shares of common stock and receive 100,000 additional stock warrants priced at $1.25 per share." For the purposes of this Order, the Court will refer to these loan opportunities as the "2008 Promissory Notes."

125.    On June 25, 2008, in-house counsel Blevins emailed a copy of a form promissory note he drafted to Handy and Debtor's management,[30] and stated that "[h]aving not heard from

---

[30]     The email was addressed to Handy's personal email address and "IBG-Executive Team <ExecutiveTeam@IBG.LAN>," which appears to have been an address serving as a listserv for Debtor's management.

anyone but Wade [Cordell], Haines [Hargrett], and Brad [Cordell], and assuming no one else had comments, Wade [Cordell] has asked me to finalize the [form] Note and **get it into your hands asap so that we are now fully prepared to approach our prospective contacts for this opportunity**." (emphasis added).

126.    On June 26, 2008, Brad Cordell solicited investments from a possible investor for the 2008 Promissory Notes by email. In explaining the purpose of the new offering, Brad Cordell describes the discussions of the June 24, 2008 Board meeting:

> Here is how it will work, as I stated above, [Debtor's] Board of Directors met on Tuesday [June 24, 2008] & has decided because of our rapid growth that there is an immediate need of additional funding to cover expenses over the next 60 to 90 day period until such time as [Debtor] will close on a signed agreement with the Morgan Keegan Strategic Fund in the amount of $4.5 million as well [Debtor] has secured approximately $5 million in funding through the Kentucky Highlands [I]nvestment Corporation which is a federally secured loan to our company. These funds will be used for the expansion of our Barbourville, KY Processing Center as well as for future working capital. By obtaining both the Morgan Keegan [Strategic Fund] as well as the Kentucky Highlands Investment capital, [Debtor] will be poised to take the company to the next level which is the ultimate sale of the company by year end 2009.

Brad Cordell further indicates that the payment of the loans will occur upon Debtor receiving funds from the MKSF deal, stating that "your collateral [for the loan] is the Morgan Keegan [Strategic Fund] funding that will be closed within a 30 to 45 day window ensuring that your loan gets paid in full." He assured the potential investor that:

> This is as solid of an opportunity as there is available out there & I would never try & get you into something that I did not firmly believe was going to become a reality as I am personally involved in all of these discussions with our company & know that it is all the real deal. . . . The risk you have is that [Debtor] folds within that 120 day period which would be impossible as the above funding from [MKSF] is set to be closed over the next 30 to 45 days thus solidifying your return on investment as these funds will be used to pay back all that loan [Debtor] capital in the interim time period. I personally would encourage you to pledge a minimum of $500,000 & earn a $100,000 return which would more than cover any penalties that you may incur in moving these funds but yet still make you a ton of return on investment in a 120 day period. Again[,] your collateral is the [MKSF] funding that

49

will be closed within a 30 to 45 day window ensuring that your loan gets paid in full.

### Commissions for Soliciting Investments from Individual Investors

127.    Throughout Debtor's existence, Debtor provided bonuses, stock shares, and commissions to various individuals for soliciting investments from individual investors. Caughman testified that "anyone employed or associated with the company—had the opportunity to solicit other investors" and be compensated for "successful recruiting." It appears that commissions up to 10% were a well-accepted policy, and several of the witnesses in this proceeding admitted to receiving these payments from Debtor for referring new investors to the company, including Caughman, Danielson, Scott Matula, Van Hoeven, Blevins, Wade Cordell and Brad Cordell. These commissions paid to unregistered individuals appear to have been in violation of securities laws. Debtor's in-house counsel was aware of the payments but did not take any action to address them. There is no evidence that Meyers or Morgan Keegan were aware of or participated in these improper commission payments.

### MKSF's Due Diligence Review of Debtor

128.    To conduct its due diligence prior to finalizing its investment in Debtor, MKSF hired Transaction Services, LLC ("Transaction Services"), and on June 6, 2008, Transaction Services advised Hargrett that it would be assisting MKSF with its financial due diligence review of Debtor.

129.    On July 1, 2008, Transaction Services issued a draft due diligence report ("TS Report") of its findings, which was emailed to CFO Hargrett and Meyers. On that same day, Hargrett forwarded a copy of the report to CEO Sturgill. In discussing the Accounting Practice, the TS Report states:

50

> <u>Why does the "check inventory" accounts receivable exist?</u> Based upon inquiry of Management, [Debtor] has historically attempted to estimate the amount of "revenue" still remaining in uncollected manual checks that <u>might</u> be collected in future periods (thus the term "check inventory"). It is our understanding that amounts were purely a monthly estimate made by Management.
>
> While [Debtor] <u>could</u> potentially collect some [of] the amounts in future periods, GAAP requires that contingent fee revenue recognition begin upon the <u>collection of funds</u> on behalf of customers. Because [Debtor's] fees are contingent under GAAP, [Debtor's] earnings process is not complete until [Debtor] receives the collection from check writers, or debtors.
>
> <u>Materially incorrect audited financial statements?</u> – MKSF and Transaction Services, LLC were provided audited financial statements for FY06 and FY07. Based on our findings, it is our position that **[Debtor's] audited financial statements are materially misstated,** and should not be relied upon.

(emphasis in original). The report also notes that **Debtor's management "[a]cknowledge that the accounts receivable balance was overstated, and that MKSF was made aware of an issue surrounding the accounts receivable balance.**" (emphasis added).

130.    The uncontradicted testimony of Meyers at trial indicated that he first learned that the Accounting Practice was not GAAP compliant on July 1, 2008 when the TS Report was issued to Debtor.

131.    A response to the TS Report was sent by Hargrett to MKSF on July 2, 2008 discussing Debtor's progression towards being cash  flow positive but did not address the findings regarding Debtor's accounts receivable balance.

132.    On July 8, 2008, John Murdock, counsel for MKSF, emailed Debtor's in-house counsel Blevins, Hargrett, Wade Cordell, and Outside Securities Counsel, among others, regarding issues involving Debtor and MKSF. In concluding this email, Murdock states, "John Blevins, at your convenience I would like to talk with you about the accounting revisions that I understand are being undertaken at the suggestion of MK's diligence team. Please let me know when we might talk briefly about that." Meyers and Morgan Keegan were not included on this correspondence.

51

**-266-**

133.    On July 10, 2008, Hargrett emailed Blevins and Wade Cordell to report that he

spoke with John Murdock about the change in accounting for Debtor's accounts receivable.

Hargrett stated in the email that:

> [Murdock] is concerned about identifying any liability that we might have from the
> sale of shares based on financial statements that included our old method of
> accounting. He would like to call [Outside Securities Counsel] George Nemphos
> and discuss the issue with him since [Nemphos] was involved in the [November
> 2006] PPM. When he does, I would like to be on the conversation.
> He asked questions about:
> - How many shareholders did we sell shares to based on the old
>   accounting. I told him I thought it was about 25-35.
> - He asked me if I thought anyone might come back after the accounting
>   change and feel they had been wronged. I told him most of the buyers
>   were old friends of Wade [Cordell] and [Sturgill] and probably already
>   existing shareholders. I said I did not think there was much of a risk
>   there.
> - I told him that the new accounting was definitely GAAP and that I had
>   been told the previous method was GAAP also, but I had never
>   investigated the issue thoroughly myself.

134.    Hargrett testified in his deposition that Meyers supported his efforts to change the

revenue recognition policies of Debtor, indicating that Meyers "agreed that . . . was a better way

of doing it." However, Hargrett indicated that he received pushback from other members of

Debtor's management about the change in the Accounting Practice. Hargrett explained that he

believed the primary reason for the pushback was that the other members of Debtor's management

"did not want to have to explain the change to the existing individual shareholders" and that

Debtor's management agreed that "if and when [Debtor] got a significant capital infusion from a

venture capitalist who did understand the change, [Debtor] would implement it at that point in

time."

135.    On July 21, 2008, CEO Sturgill directed employees and Debtor's management to

"stop talking about our auditors and GAAP" with anyone outside the management team. Sturgill

stated, "[Grafton] ha[s] signed off in the audit that we are in compliance with GAAP. We don't

need to be talking about possible legal issues or concerns that revolve around the [accounts receivable] (potential liabilities from investors)[,] the [accounts receivable] issue is being [sic] dealt with. . . . We have worked too hard and long to allow anything to happen that would jeopardize our futures." Again, this clearly demonstrated that Debtor's management was fully aware of the Accounting Practice and issues. However, there is no evidence that Morgan Keegan or Meyers knew about, participated in, or were otherwise consulted regarding Sturgill's communication to Debtor's employees and management.

### Debtor Declining to Accept MKSF's Term Sheet

136.    Despite issues raised in the TS Report about Debtor's Accounting Practice and its financial statements, MKSF continued to pursue an investment in Debtor through mezzanine debt financing, which included as a condition the expected write down of Debtor's accounts receivable balance and change in its revenue recognition practices.

137.    Debtor's management and Board of Directors were hesitant to accept the funding from MKSF when compared to their own direct fundraising abilities. In an August 2008 email, Wade Cordell wrote to Brad Cordell, Sturgill, Blevins, and Hargrett the following:

> I just wanted everyone to be aware of the problems as I see them with the Morgan Keegan [Strategic Funding] deal:
> 1. The fact that we all have our stock pledged and could lose it all.
> 2. That [MKSF] gets 2.8 million shares including warrants.
> 3. That [MKSF] has the "PUT" clause in their warrant.
> 4. That [MKSF] will NEVER go away even after we pay them back. That means we will pay them back somewhere between $5.5 - $6 million including interest, plus STILL own 2.8 million shares and we have to get their permission to do about anything. Plus we will pay [Morgan Keegan] (Keith Myers [sic]) $135,000 at closing, [MKSF] (Bill Nutter) $80,000 at closing, their attorney and other accounting fees will likely be @ $60-80K and our legal fees will be at least $30K. That totals @ $300,000 at closing. So [Debtor] will net @ $4.2 at closing and $1.5 will go to REGIONS, leaving [Debtor] $2.7 million.

53

**-268-**

5.  If [Debtor] sold 2.8 million shares at $1.25 we would retain @ $3.5 million. And we would not have [MKSF] with us forever, nor would we be paying back between $5.5 - $6 million in loans.

6.  On Monday [Blevins] and [Wade Cordell] are meeting with Steve Kane [of Debtor's Advisory Board] to talk about him finding [Debtor] the folks to buy 2.8 million shares at $1.25. Yes, we will need to pay him a hefty sum in stock[,] but it will still be better than the above.

Guys, next week we will begin receiving thousands of checks from US Bank. Let's be careful not to sell our SOULS at this stage of the game. Bryon [Sturgill], how much more can you raise with Tom before the end of the month? We are so close to break even that it would be a shame to make the wrong choice.

On that same day, Blevins responded:

Wade [Cordell,] You and I have already discussed these points[,] and you know I agree completely. On the other hand I think we need to string [MKSF] along a little longer to see what happens with the # of checks coming from US Bank, how much more money [the members of management] and anyone else can raise, and what we see for sure we think Steve can raise.

138.  On September 10, 2008, Bill Nutter of MKSF emailed to Hargrett and Wade Cordell, with a copy to Meyers, an amended term sheet for the potential mezzanine debt offering. In describing the warrant that would be given to MKSF under the deal, the term sheet provided that the amount of the warrant would be adjusted by Debtor's annual EBITDA;[31] however, the EBITDA figure "will exclude the impact of [a] one-time [accounts receivable] adjustments made prior to the closing of the proposed transaction." These terms reflect Debtor modifying the Accounting Practice and conducting a one-time write down of its accounts receivable balance, to which Debtor's management had agreed to make upon the closing of the transaction with MKSF.

139.  Ultimately, Debtor, through its management, declined to proceed with a mezzanine debt arrangement with MKSF, finding that the deal "would have been VERY expensive money for [Debtor]" and electing to raise capital on its own through various raises, including continuing

---

[31]    A warrant permits a party to purchase the issuing company's underlying stock at a fixed price for a period of time. *See* 3 Steven C. Alberty, *Advising Small Businesses* § 38:39 (2019) (discussing the differences between stock options and stock warrants).

to borrow under the 2008 Promissory Notes. Debtor's in-house counsel, Blevins, testified that he came up with the idea for Debtor to issue promissory notes, which would offer potential individual lenders the same terms as those provided in the MKSF deal.

### Debtor's September 23 and 24, 2008 National Sales Meeting

140.    On September 23 and 24, 2008, Debtor held a National Sales Meeting attended by several of Debtor's sales people and potential new sales people. The agenda for the meeting gave the impression that the meeting was to discuss becoming a sales person for Debtor and did not indicate that a stock offering would be made at the meeting. Wade Cordell asked Meyers to provide a brief presentation about Debtor's industry. Wade Cordell led the meeting, which included a slideshow presentation created by Debtor. The evidence presented did not establish that Meyers reviewed the slideshow presentation in advance of the meeting or that he knew a stock offering would be announced at the meeting. At the conclusion of the meeting, Wade Cordell announced a stock offering to those in attendance. The statements made by Meyers at the meeting have been characterized differently by witnesses. Some witnesses who attended the meeting indicated that Meyers stated that he had "reviewed [Debtor's] books," reviewed financial projections that utilized the Accounting Practice,  expressed that he had taken similar companies like Debtor to the market before and was able to sell these companies at stock valuations of $7 to $12, and was present for Cordell's stock offering during the meeting. Meyers testified that his comments were restricted to providing a general overview about the services Debtor offered and how those services were viewed in the industry as part of the presentation and not any specific details or assurances

55

regarding Debtor.[32] He also indicated that he was not present when Debtor's financial projections were discussed at the meeting or when Cordell made the stock offering to the attendees.[33]

141.    On September 29, 2008, Wade Cordell responded by email to a potential individual investor who attended the National Sales Meeting and requested to speak with Meyers over the phone about making an additional investment in the company. Wade Cordell stated, "I just spoke with Keith Meyers and he said he cannot speak to individual investors." This is consistent with Meyers' testimony of his position regarding communications with individual investors.

142.    On October 23, 2008, Debtor's Board resolved that certain notes issued between October 7, 2008 and November 3, 2008, varying in amounts from $25,000 to $500,000, would be treated as senior debt.

143.    By its terms, the 2008 Contract ended on October 24, 2008, ending Morgan Keegan's service to Debtor. The evidence does not indicate that there were any further agreements between Debtor and Morgan Keegan, or that Morgan Keegan was ever engaged to assist Debtor with a public offering as an underwriter.

144.    As compensation under the 2008 Contract was contingent on Debtor closing a mezzanine debt transaction, Morgan Keegan received no compensation for its work under that contract. Further, Meyers testified that whenever an engagement ends without the closing of a transaction, he does not seek reimbursement pursuant to the parties' contract for Morgan Keegan's

---

[32]    The only documentary evidence of Meyers' statements at the Sales Meeting are of questionable credibility because the drafter of the email, Brad Cordell, appeared to suggest at his deposition testimony that he may have made up his remarks about Meyer's statements at the meeting. Further, the record reflects that Brad Cordell and other members of Debtor's management had a propensity to exaggerate, if not lie, when soliciting investments from potential investors (which was the content of Brad Cordell's email). As such, the Court puts no weight into this documentary evidence.

[33]    Based on the contradictory evidence, the Court cannot conclude that Meyers made the alleged statements regarding Debtor's financial condition.

expenses. It appears in this case that Morgan Keegan did not seek reimbursement of its expenses from Debtor for either the 2006 Contract or the 2008 Contract.

### Meyers' Conversation with Danielson

145.    Danielson testified that in December 2008, he had a meeting with Wade Cordell about a possible individual investment in Debtor (either through the purchase of stock or serving as a lender on a promissory note) and that at the meeting Cordell suggested Danielson speak with Meyers. Danielson testified that he later had about a thirty minute telephone conversation with Meyers prior to investing. He testified that:

> [Wade Cordell] told [him] that [Meyers] would give [Danielson] . . . some background on the company, his experience with the company, what their exit strategy was, . . . maybe what the company might be worth down the road, or timing. He told [him] that he would not speak directly to particular accounts, or he wouldn't opine on the financial statements . . . . That we wouldn't get into specific information on . . . the accounts of the company, that that would be more up to their CFO to ask. But it would be more of a general conversation about the financial health of the company, not a specific conversation about revenues or expenses or net worth or something.

Danielson confirmed that Meyers spoke to these subjects on his call. Danielson also testified that Meyers stated he was very familiar with Debtor from his past experience with the company and that Debtor was a growing company "in general terms of taking on . . . national banks." Further, he testified that Meyers was aware of the 2008 Promissory Notes, explaining their purpose to him and indicating that the 2008 Promissory Notes contained similar terms to those offered to institutional investors. Danielson also testified that Meyers told him that Debtor's intention was "to sell the company in fairly short order . . . [Danielson] had been told that [the] notes probably wouldn't last a year. And . . . when [Danielson] asked [Meyers] . . . are they really looking to sell the company that quickly, he indicated to [Danielson] that [Meyers] thought that by the end of the year or certainly early the following year, they would have it sold." During cross-examination,

Danielson admitted that he "wasn't speaking to [Meyers] as an accountant, or someone that . . .
I'd be asking for a validation of the financial statements."[34]

146.    Meyers testified that he did not recall having a conversation with Danielson but
confirmed that it is his general practice to only speak to institutional investors such as private
equity firms and not to individual investors. He testified that on multiple occasions Wade Cordell
would try to get him on the phone with individuals. Meyers stated that he would advise Cordell
that he could not speak with people and that Cordell would respond "well can you just tell them
that you're an investor?" Meyers stated that on those phone calls he would "say 'investor', and . .
. tried to get off the phone politely but quickly."

147.    After the end of the 2008 Contract, there is no evidence that Morgan Keegan or
Meyers worked for Debtor.

**2009: Continued Capital Raises and Continued Financial Struggles**

148.    According to a Form D dated March 11, 2009 that was signed by Blevins and
submitted to the SEC, Debtor directly raised $10,222,500 from 121 individual investors pursuant
to an offering of securities that began on January 8, 2008.

149.    In 2009, Debtor prepared **in-house** another private placement memorandum for the
direct sale of up to 5,000,000 additional shares of stock at $1 per share ("2009 PPM"). The 2009
PPM was used by Debtor to solicit stock investments from individuals. According to the Form D
reported to the SEC dated June 22, 2009 and signed by Blevins, Debtor directly raised an additional
$1,187,500 pursuant to an offering of securities that began on March 3, 2009. There is no evidence
that Meyers or Morgan Keegan were involved in any way with the solicitation of these

---

[34]    While Danielson indicated that his conversation with Meyers influenced him to invest in Debtor, especially
the fact that the promissory notes were modeled after the terms offered to private equity firms, there is no evidence
that Danielson has brought a lawsuit against Meyers or Morgan Keegan over this alleged conversation.

investments.

150.    Despite raising significant capital in 2008 and 2009, Debtor again appeared to be experiencing financial distress as indicated by the minutes of a special meeting of the Board of Directors on May 5, 2009:

> "Wade [Cordell] constituted a 'Cost Cutting Committee' to address the need to reduce operating costs:
> - We should target a reduction in SC payroll by $50,000 per month.
> - We will reduce Barbourville payroll cost by $12,500 per month.
> - We need to raise $975,000 to pay off Regions. This will save approximately $53,000 per month.
> - We will reduce [travel and expense] cost and memberships (eliminate State [Chamber of Commerce], Keep Lexington [Chamber of Commerce])
> - We have cancelled the rented apartment costing $1,000+.
> - We have stopped paying car allowances.
> - We need to review IT expenditures. They seem high and have very little approval process.
> - We should renegotiate the ATI agreement to get reduced processing charges.
> - We can reduce health insurance by $3,000 per month.
>    Total saving = $150,000 per month.

**Patuxent Valuation of Debtor**

151.    In May of 2009, Debtor retained Patuxent Valuation Group LLC ("PVG") to conduct a valuation of its stock. During the development of the PVG valuation, members of Debtor's management suggested they would request Meyers communicate with PVG about Debtor's industry to more accurately reflect Debtor's true value. However, no evidence was presented that Meyers was ever contacted by Debtor on this subject or that Meyers communicated with PVG. In fact, Meyers testified that he did not contact PVG. Ultimately, PVG issued a report valuing Debtor's shares between $1.09 to $3.19 a share. These valuations became part of a document entitled "Talking Points" that was distributed by Debtor to various members of Debtor's management and its shareholders to further assist with their direct efforts to solicit investment in Debtor. It does not appear that Morgan Keegan or Meyers were involved in the preparation of the

"Talking Points."

### Assistance Provided by Meyers to Debtor

152.    In an effort to characterize Meyers', and therefore Morgan Keegan's, relationship with Debtor as a part of a broader scheme, the Trustee points to various acts of assistance provided by Meyers to Debtor from 2006 to 2010, including Meyers' referral of potential customers to Debtor. For example, in July 2006, Meyers referred to Debtor Transfirst, a credit card processor for 985 national banks. Transfirst eventually became a customer of Debtor. During this period of time, Meyers and Morgan Keegan discussed a producing agent arrangement with Debtor in which Morgan Keegan would be compensated for referring potential customers to Debtor; however, the parties never entered into such an agreement. It does not appear that Meyers or Morgan Keegan received any compensation from Debtor for referring potential customers to Debtor.

153.    Meyers served as an intermediary in exchanging information between Regions Bank (the parent company of Morgan Keegan) and Debtor when Debtor was seeking a line of credit.

154.    On December 2, 2008, Wade Cordell reached out to Meyers for assistance with an individual investor who wanted to make a $500,000 investment in Debtor by withdrawing funds from a 401K. It appears Meyers forwarded the email to a co-worker, Jeffery Schultz, who provided some general advice on the situation. Meyers then forwarded the response from Schultz to Wade Cordell.

155.    On February 24, 2009, Debtor held its Annual Meeting of Stockholders and Meyers provided two slides to Wade Cordell for his presentation, entitled, "State of the Company Address."  Specifically, these two slides addressed the growth rates and historical valuations of companies similar to Debtor based on publicly available information. A transcript of the meeting

indicates that Wade Cordell said to the audience that the slides came from Morgan Keegan. The transcript also indicates that Wade Cordell stated that "Debtor's exit strategies are basically the same. They include to sell the company to financial investors, to sell the company to financial service processing companies, to sell the company to a bank. . . . [W]e've got[ten] calls from companies wanting to talk to us. And of course[,] we move all of those to Keith Meyers so he can chat with them." It does not appear Meyers was present at or otherwise involved in the 2009 Annual Meeting of Stockholders.

156.    It appears that Debtor's management focused on an initial public offering or sale of the company since shortly after Debtor's inception, and its management talked freely to potential and current investors of Debtor about its goals of selling Debtor. However, it does not appear that Meyers or Morgan Keegan ever addressed outside offers to purchase Debtor, and Handy, in reviewing his notes created in 2010 stated ""[Wade Cordell] always said Morgan Keegan had people offering to buy the company but offers were too low so we needed to wait for better offers. Morgan Keegan was to be paid 6% of the sale price. . . . There was never a document from Morgan Keegan that I, as investor or member of [the Board of Directors], saw evidencing a possible sale."

### Initial Ouster of Debtor's Management

157.    Throughout its history from 2003 until late 2009, in its ordinary course of business, Debtor regularly used its customer's funds (the customer's share of the checks collected) to cover Debtor's costs and operating expenses with the intention of repaying its customers with other funds that Debtor later received. In essence, Debtor was continuing a practice of "borrowing from Peter to pay Paul" to sustain its rapid rate of growth. At any point of time, the deficit in the client's accounts ranged from $200,000 to $2.9 million. As of August of 2009, Debtor had accumulated a $2 million deficit of available funds in its customer accounts.

158.    There is no evidence that indicates that Meyers or Morgan Keegan were ever aware that Debtor was using client funds from its customer accounts to cover its operating expenses.

159.    At some point in 2009, certain shareholders of Debtor organized an effort to remove Wade Cordell, Brad Cordell, and Blevins, based on the allegations that these members of management caused Debtor's misappropriation of funds from the customer accounts ("Initial Ouster").[35] On August 17, 2009, Wade Cordell, Brad Cordell, and Blevins were purportedly removed the Board, terminated from their officer positions, and Debtor's Lexington, South Carolina office was closed. The removal of the Cordells and Blevins was based on a majority vote of Debtor's shareholders pursuant to Debtor's bylaws; however, the Cordells and Blevins disputed the validity of the removal and litigation ensued. In that litigation, John Freeman, who served as one of the Trustee's experts in this proceeding, actually served as an expert for the Cordells and Blevins. In the state court litigation, Freeman opined that controlling Nevada law requires a two-thirds majority vote to remove directors from their position under N.R.S. 78.335(1).

160.    The litigation between Debtor and the Cordells and Blevins caused Debtor to incur significant legal fees and costs. The litigation ultimately settled when the Cordells and Blevins agreed to be removed from the company in exchange for Debtor to pay $188,238 to Wade Cordell, $133,109 to Brad Cordell, and $150,081.50 to Blevins, as well as $100,000 to the attorneys who represented the Cordells and Blevins. In addition, Wade Cordell received a release of his guarantee on the $1million+ loan with Regions Bank. The settlement agreement between the parties further provided that the settlement "is not to be construed as an admission of liability on the part of that

---

[35]    There appears to still be a significant dispute about whether the ousting was appropriate and whether a legally sufficient percentage of shareholders voted in favor of the removal as the parties dedicated significant portions of their proposed orders discussing the legitimacy of the Initial Ouster. For the purposes of this Order, the Court does not need to address whether the removal of Wade Cordell, Brad Cordell and Blevins was appropriate or legal under controlling law.

party, by whom liability is expressly denied." Even after their removal, the Cordells and Blevins remained minority shareholders of Debtor, holding a combined 10,625,000 shares of Debtor's stock between the three of them. Thereafter, Debtor's Board of Directors expanded to nine members. Sturgill, Handy, and Van Hoeven remained from the former Board, and Potter, Lyle, James E. Beasley III, William G. Reed, Eason Leake, and Paul H. Newberry were added as new members.

161.    On August 31, 2009, CFO Hargrett prepared an affidavit for the state court litigation, which expressed the reasons shareholders sought the removal of the Cordells and Blevins from Debtor's management. The ultimate contention of the affidavit was that the discovery of the approximately $2 million deficit in customer accounts prompted the ouster action. Other statements in Hargrett's affidavit included that:

    a.  Hargrett asserted that, prior to the alleged ouster, the Cordells mismanaged Debtor's company accounts, misplaced certain funds, and procured loans at "extraordinary" rates without Board approval.

    b.  He explained that Debtor's business model depended upon processing a high enough volume of checks to cover variable costs and fixed expenses, but the Cordells did not follow Hargrett's advice to cut costs. To cover operating expenses, Debtor raised money through stock and loan offerings, and Wade Cordell directed Janice Barton, Vice President of Processing, to transfer monies out of customer accounts and into Debtor's operating accounts. The deficit in the customer accounts rose from $111,000.00 in March 2008 to $2,000.000.00 in August 2009.

    c.  "In June-July 2009 alone, Wade Cordell directed the transfer of approximately $261,000.00 of customers' money out of the customer accounts and into Debtor's South Carolina Bank & Trust operating account."

    d.  Hargrett asserted that "our expenses increased in anticipation and as a result of additional accounts, but the volume of business from the new accounts was not as high as anticipated."[36]

    e.  "Two new contracts with banks in 2008 and 2009 caused fixed costs . . . to increase. In addition, margins were lower on these new bank contracts."

---

[36]    Hargrett also testified to this effect in his deposition: "Probably mid to late 2008 was when [the financial crisis] began to show up." In his deposition testimony, Hargrett indicated that he believed that the 2008 recession was the central factor to the failure of Debtor's business because Debtor's bank clients were not sufficiently promoting Debtor's services to the bank's customers as a result of the recession.

    f.   Hargrett alleged that from January 2008 to August 2009 Debtor paid approximately $549,850.00 in bonuses and excess rent to the Cordells, Blevins, and their personally-owned companies.[37]

    g.   Finally, Hargrett asserted that because the Cordells did not cut Debtor's costs, the deficit from the customer accounts spiked rapidly.

**Change to the Accounting Practice and Write Down**

162.    After the Initial Ouster, Debtor's new Board of Directors considered changing the Accounting Practice. The minutes of the September 11, 2009 Board of Directors meeting provided the following:

> **Haines [Hargrett] recommended ratcheting down accounts receivable on financial statements to eventually eliminate accumulating uncollected checks to a level of $25 million. This process would be done on a "sliding" basis over a period of time and will be discussed with the external auditors [Grafton] during this year's audit.** The revised accounting policies would accomplish the intent of having our financial statements more accurately reflect true operations and would include the following:
>
> 1.   Eliminate the pass through revenue and cost of guaranteeing checks processed by our merchants that are not returned to us for collection. This is an accounting change that is recommended by our auditor[, Grafton]. This will have no impact on Net Income or Cash Flow.
>
> 2.   Discontinue the reporting of revenue associated with the estimated future collection of checks presented for collection. This will have a negative impact on current Net Income but should have a positive impact on future Net Income. It will have no impact on Cash Flow.

---

[37]    In the affidavit, Hargrett estimated that Debtor had paid excessive rent costs of $99,500.00 to Gibson Commons, LLC, owned by Brad Cordell, since January 2008. Hargrett also asserted that since January 2008, Debtor had paid bonuses to Wade Cordell totaling $190,750.00, to Brad Cordell totaling $187,500.00, and to John Blevins totaling $53,500.00. Finally, Hargrett asserted that Debtor had overpaid $18,600.00 in rent for a condominium used by Debtor's employees, which was owned by John Blevins' company.

    At trial, the Trustee presented the ledgers of Caughman that listed the alleged improper payments made by Debtor to Blevins and the Cordells and their personally owned companies. However, the examination of those ledgers in this proceeding indicate that much of these payments reflected the established salaries and other compensation for these former officers of Debtor. Furthermore, the Trustee did not present any testimony to show that the compensation of Debtor's management, including Blevins and the Cordells, was unreasonable in relation to the various duties, including capital raises which they performed. No evidence of comparable benefits paid to key officers in companies of similar size or value was presented to the Court.

3. Discontinue the Gross-Up of credit card revenue and cost for the portioning of credit card fees retained by the processor. This will have no impact on Net Income or Cash Flow.

4. Review the balance of Accounts Receivable currently carried on the Balance Sheet with the auditor and write down any amounts that are determined to be in excess of a very conservative collection rate. This will take place before or at year-end 2009.

(emphasis added). The minutes from the September 11, 2009 Board meeting also indicated that

the Board was considering ways to reduce expenses:

> Chairman Sturgill stated that [Debtor] has the best and most sophisticated technology system in industry, but that it has been extremely under-utilized. The Information Technology staff that is currently in place is very capable to handle all aspects of development, implementation, maintenance, etc. of a total IT package. Suggestion was made to move from existing 3rd party relationships to an in-house based IT system for service applications, thereby reducing (or possibly eliminating) outsourced expense and providing more control of all IT processes.

Further, the minutes indicated that the new Board pursued the same "exit strategy" and that at least

one company was interested in purchasing Debtor at that time:

> Chairman Sturgill stated that E-Payments of Colorado has expressed interest in purchasing [Debtor] and that an option for consideration by the Board may be presented as early as 4th quarter of 2009. E-Payments also does check processing, which may present an additional opportunity for [Debtor] to establish a separate relationship. Also, ReSubmitIt of Louisville, KY has expressed interest in a joint opportunity with [Debtor] for check processing. Director Bill Van Hoeven made a motion (seconded by Director Bill Reed) to invite E-Payments to make a formal presentation to the Board of Directors at the next regularly scheduled [B]oard meeting. Motion received unanimous approval.

In addition, it appears from the minutes of September 11, 2009 Board meeting that the Board

concluded that **the best way to raise funds to cover the customer account deficit was to**

**continue to [directly] sell additional shares of Debtor to current investors and to avoid**

**additional new debt**. The Board also approved Hargrett and Grafton, who remained Debtor's

auditor, to review the Accounts Receivable balance and to analyze what amounts should be written

down and on what schedule.

163.    Ultimately, Debtor wrote down $23 million of its accounts receivable balance as a one-time event, which was retroactively applied to January 1, 2009. The write down was publicly disclosed and made available to Debtor's shareholders by the Board. It was also included in a private-placement memorandum drafted in November of 2009, which was being used to raise capital directly by Debtor.

**Efforts to Continue Operations after the Write Down**

164.    On October 5, 2009, Debtor's Board of Directors held a meeting at which it approved an "increase [of] the number of shares of Class A Common Stock authorized for issue from seventy-two million (72,000,000) shares to eighty-five million (85,000,000) shares." The minutes of this meeting also indicate that in regard to concerns over the customer account deficit, "Sturgill stated that a considerable number of potential investors have been approached and that he hopes to begin having funds coming in by Friday, October 9." The Board also approved at this meeting a capital raise not to exceed $5 million, with the plan being that $3.8 million would be used to satisfy the customer account deficit, Debtor's loan with Regions Bank, and other outstanding debt obligations, with the remaining $1.2 million to be placed in escrow for future needs including the retirement of other outstanding debt instruments, such as the promissory notes issued by Debtor. The Board also approved a plan to offer an exchange of stock in satisfaction of $6.5 million of Debtor's debt to its noteholders, including the holders of the 2008 Promissory Notes.

165.    On November 19, 2009, Debtor's Board of Directors held a meeting, which reflected Debtor's efforts to continue its operations. The minutes of this meeting indicated that Hargrett identified anticipated funding from projected investments of between $4,395,000 and $5,745,000 and provided a detailed report of current obligations totaling $3,765,977. The minutes

66

do not reflect that Debtor had any offers for investment at that time. Debtor also continued to pursue new clients as the minutes stated:

> Negotiations are progressing for [Debtor] to provide processing services for Diversified Check. Citizen's Bank RFP [(Request for Proposal)] has been completed with an on-site presentation at their Providence, RI headquarters – [Debtor] is one of two finalists . . . with a decision expected by the end of December[] 2009. An RFP is expected to be received from Capital One by December 1, 2009. We expect approximately 20 new agreements within the Regional & Community Banks segment by the end of the first quarter of 2010. The School Division continues to add a significant number of new school district accounts. The Credit Card Division is adding 30-35 new accounts per month. We have experienced some push back from agents and ISO's to move forward due to delays in paying commissions and management change events of the recent past.

The minutes also reflect that Debtor had taken efforts to reduce its operating expenses and overhead costs by scaling back personnel at the Barbourville facility.

166.    On January 28, 2010, Debtor's Board of Directors held a further meeting, which provided additional updates of Debtor's operations. The minutes of that meeting report that by that time, US Bank cancelled its services agreement with Debtor, and that Debtor had past due obligations of $3.67 million and **projections were "extremely ugly for continuation of operations without additional funding to satisfy these past due obligations."** (emphasis added).

**Danielson's Review of Debtor's Ledgers**

167.    In March 2010, a group of Debtor's shareholders requested that Danielson, a former CEO of other companies, conduct an independent review of Debtor's ledgers and financial records.

168.    About four months later, Danielson was granted access to the entire stock ledger. Based on his review of Debtor's records, he determined that Debtor "had been booking a very material accounts receivable and recognizing earned revenue on a monthly basis that did not exist." He did not find any "material misstatements" of expenses or debt, but rather, a "stark accounts

receivable and revenue recognition policy and monthly entry that was completely wrong." He discovered a few instances of founder's stock that "didn't necessarily involve a cash deposit." He testified that those discrepancies were "fairly isolated" and maybe "ten to twenty questions as to people that were issued stock." He asserted that, based on his review of the records, those discrepancies did not have any downstream impact on Debtor's debts, losses, or revenues – only the capital accounts.

### Second Ouster of Management

169.    On July 19, 2010, Debtor's Board of Directors held a special meeting and voted to remove Sturgill as a Board member and as Debtor's Chief Executive Officer and to remove Hargrett as its Chief Financial Officer. Testimony was received that the Second Ouster was due to Sturgill and Hargrett's involvement with the Debtor's prior financial statements that included the Accounting Practice. However, Hargrett in his deposition testimony, testified that he believed the removal was the result of other Board members' concerns that Sturgill, after returning from an absence as CEO, was trying to take over the company.

170.    In late August 2010, Debtor won a request for proposal from the fifth largest school district in the country. This represented four hundred schools and fifty separate accounts for after school programs. It was the largest school district Debtor had ever signed.

171.    During the approximate 12 months of leadership of the new Board of Directors, Debtor continued to attract new customers, received interest from a buyer, directly raised capital through stock sales, but also continued to rapidly lose money. On September 1, 2010, Debtor's Board of Directors approved resolutions for Debtor to file a petition for relief under chapter 7 of the Bankruptcy Code.

172.    In total, during its existence, it appears Debtor raised at least $20 million from individual investors through sales of stock, territory licenses, and promissory notes.

### Post-Bankruptcy Developments

173.    In 2014, Hargrett and Grafton pled guilty to charges brought against them by the U.S. Attorney General on behalf of the United States, which included allegations, among other items, of inducing private investors to send money to Debtor without having provided the investors with material information as to the financial health of Debtor, all in violation of 18 U.S.C. § 1349.

174.    On May 26, 2011, the South Carolina Office of the Attorney General filed an Administrative Proceeding before the Securities Commissioner of South Carolina against Debtor, Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett for allegedly engaging in acts, practices and transactions that constitute violations of the South Carolina Uniform Securities Act. It appears the result of this proceeding was that the Management Defendants received a lifetime ban from selling securities in South Carolina.

175.    It does not appear that the United States, the State of South Carolina or other state or national regulatory authorities have asserted charges or complaints against Morgan Keegan or Keith Meyers for their involvement with Debtor.

### <u>CONCLUSIONS OF LAW</u>

At trial, there were four remaining causes of action that the Trustee asserted against Meyers and Morgan Keegan: (1) securities fraud under SEC Rule 10b-5(a) and (c), (2) common law fraud, (3) breach of fiduciary duty and (4) aiding and abetting a breach of fiduciary duty. The Trustee's causes of action are based on Meyers and Morgan Keegan's creation of or knowledge that the Accounting Practice used by Debtor was improper and caused damage to Debtor. The Trustee alleges that Meyers and Morgan Keegan either created the Accounting Practice or knew or should

have known it was improper and failed to advise Debtor. Morgan Keegan and Meyers respond that the Trustee's causes of action should be denied in their entirety because they deny creating the Accounting Practice or taking any improper action regarding it and because the Trustee has failed to prove the necessary elements of these causes of action and is barred from bringing such causes of action under the doctrine of *in pari delicto*.

### The Court's Directives on the Parties' Proposed Orders

This proceeding addressed facts and conclusions centering around the business operations of Debtor from 2004 to 2010. The proceeding included the consideration of thousands of corporate documents, many electronic, and thousands of emails and other correspondence. During multiple pre-trial hearings over a period of several years, the Court expressed significant concerns about the unnecessary breadth of the arguments being presented and the volume of documents being proposed as exhibits, many of which were duplicative, immaterial or irrelevant.  Due to the volume of proposed exhibits, during the first day of the trial, the Court set out clear directives to assist the parties in their decisions regarding the presentation of evidentiary exhibits:

> [The Court has] indicated that post-trial briefs would be in the form of proposed orders and the Court will look at those proposed orders for reference to exhibits that you introduce. And in essence, only review [those referenced] in your orders. You will have, by failing to list an exhibit, waived the Court's review of that [exhibit].[38]

---

[38]     Also, at the conclusion of the 18-day trial, the Court restated its prior directive to the parties, indicating that "for the Court to pay proper attention to any exhibits, they must be cited in the [respective] proposed order[s] to the Court. The Court will rely on the documents that you cite to it . . . ." At the conclusion of the trial, the Court again directed, "In the [parties'] proposed orders, the parties shall cite to specific exhibits for the Court's consideration. Failure to cite to a specific exhibit may result in a waiver of the Court's consideration of that exhibit and any argument related thereto."

In addition, at the conclusion of the trial, the Court directed that the parties' proposed orders address each element of the remaining causes of action and defenses raised so that the respective proposed orders "deal with the evidence and your recommended conclusions in light of the elements of each cause of action." In the Order on the Trustee's Motion for Directed Verdict, the Court reiterated that "the parties shall provide analysis as to each element of the causes of action and defenses raised by the parties [in the proposed orders]."

70

While the Court has reviewed all evidence submitted to it, the Court has relied heavily on the proposed orders submitted by the parties in considering this matter. To say that this proceeding was voluminous would be an understatement, and through their proposed orders, the parties were provided the opportunity to present the most clear and concise expression of their arguments, evidence, and case law that the parties deemed important and relevant to the proceeding. In consideration thereof, and after consultation and agreement of the parties, the Court allowed proposed orders of up to 100 pages[39] to fully express their positions.[40] Therefore, the case law, evidence, and arguments presented in the proposed orders have framed the Court's consideration of the matters presented. Similarly, the arguments, evidence and case law that were only briefly mentioned or not mentioned at all in the proposed orders were weighed accordingly.[41]

---

[39]     The Court notes that setting a reasonable page limitation for briefs and memoranda is a common practice to encourage a concise presentation of the relevant arguments and evidence. Both the District Court of South Carolina and the Court of Appeals for the Fourth Circuit have such limitations. *See, e.g.,* Local Civ. R. 7.05 (D.S.C.) ("Unless an exception is granted by the court, no memorandum shall exceed: [t]hirty-five (35) double-spaced pages in the case of an initial brief of any party [and] [f]ifteen (15) double-spaced pages in the case of any reply . . . ."); Fed. R. App. P. 32(a)(7)(A) ("A principal brief may not exceed 30 pages, or a reply brief 15 pages . . . ."); Local App. R. 32(b) (4th Cir.) ("The Fourth Circuit encourages short, concise briefs. An opening or response brief that cites to the paper appendix and the electronic record . . . may, without motion, exceed the length limitations in FRAP 32(a)(7) and FRAP 28.1(e)(2) by up to 200 words. Briefs may not otherwise exceed the length limitations without the Court's advance permission. . . . These motions [for permission to submit a longer brief] are not favored and will be granted only for exceptional reasons.").

[40]     The Court's Order on the Trustee's Motion for Directed Verdict also indicated that "[t]o the extent that the parties find as they draft these proposed orders that the limitation in length inhibits counsel from adequately addressing all matters before the Court, counsels for the parties may seek a reconsideration of the 100-page limit by submitting a correspondence to the Court, with a copy to opposing counsel." The Court did not receive requests to reconsider the 100-page limit for the proposed orders. Therefore, the Court must conclude that the proposed orders submitted to the Court fully and adequately raise and address all of the parties' legal and factual arguments and any support thereof for the Court to consider in this proceeding.

[41]     Implementing this approach, the Court notes that the Trustee's proposed order did not address or reference in any way the cause of action alleging a breach of the 2008 Contract. Similarly, Meyers and Morgan Keegan's counterclaims against the Trustee were not addressed in their proposed order. Therefore, the Court has concluded that each of the parties have abandoned or otherwise waived those causes of action, and the Court will not address those causes of action in this Order other than to deny them.

71

### Choice of Law

The Court has previously determined the choice of law for each of the Trustee's remaining causes of action in its June 19, 2013 Order on Meyers and Morgan Keegan's Motion to Dismiss. In that Order, the Court determined that South Carolina law applied to the breach of fiduciary duty and fraud causes of action,[42] and that Nevada law applied to aiding and abetting breach of fiduciary duty cause of action. As to the federal securities fraud cause of action, the Court determined that federal law applies, but that South Carolina law governs the issue regarding the imputation of the knowledge and conduct of Debtor's agents to Debtor.[43]

### Burden of Proof

For the common law fraud cause of action, the Trustee must prove his claim by clear and convincing evidence. *See Turner v. Milliman*, 708 S.E.2d 766, 769 (S.C. 2011) (holding that under South Carolina law, a party must establish fraud by clear and convincing evidence). For the other remaining causes of action, the Trustee must establish his claims by the preponderance of evidence. *See e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387–88 (1983) (stating that the preponderance of the evidence standard is generally applicable in civil actions and applying it to securities fraud claim); *Rutledge v. St. Paul Fire & Marine Ins. Co.*, 334 S.E.2d 131, 138 (S.C.

---

[42]    The Court notes that its Order on Meyers and Morgan Keegan's motion for summary judgment entered on December 22, 2016 stated incorrectly that Nevada law is applicable to the breach of fiduciary duty cause of action asserted against Meyers and Morgan Keegan. *See Bowen v. Houser*, C/A No. 3:10-02398-MBS, slip op. 2011 WL 380455, at *9 (D.S.C. Feb. 3, 2011) (applying South Carolina law to the state law claims of breach of fiduciary duty because the plaintiff's claims are based on events that occurred in South Carolina); *Moore v. Moore*, 599 S.E.2d 467, 475 (S.C. Ct. App. 2004) (holding "a cause of action for breach of fiduciary duty sounds in tort rather than in contract"); *Bannister v. Hertz Corp.*, 450 S.E.2d 629, 630 (S.C. Ct. App. 1994) ("Under South Carolina conflict of law principles, the substantive law governing a tort action is determined by the state in which the injury occurred."). The Court finds that this error was not material to the Court's ruling on the motion for summary judgment as the outcome would be the same.

[43]    The Court notes that its Order on Meyers and Morgan Keegan's motion for summary judgment entered on December 22, 2016 stated that South Carolina law governs the federal securities fraud cause of action. It was the intention of the Court that South Carolina law governs the issue regarding imputation of the conduct and knowledge of Debtor's agents to Debtor as to the federal securities fraud cause of action. The Court finds that this error was not material to the Court's ruling on the motion for summary judgment as the outcome would be the same.

72

Ct. App. 1985) ("In South Carolina, a party having the burden of an issue ordinarily must carry it by a preponderance of the evidence.").

## Summary of Allegations

According to his Complaint, the Trustee asserts these causes of action in his capacity as the successor-in-interest of Debtor pursuant to 11 U.S.C. § 541. In other words, the Trustee is standing in the shoes of Debtor in its corporate capacity in alleging liability and damages as opposed to asserting the causes of action based on the standing of Debtor's investors or its creditors. While any recovery in this adversary proceeding by the Trustee would benefit the bankruptcy estate, which in turn may benefit the creditors and equity holders of Debtor that have allowed claims in the bankruptcy case, the causes of action are to be considered from the position of Debtor's rights and standing, not the separate, independent rights of shareholders or investors.

The Trustee has proposed multiple narratives for establishing Meyers and Morgan Keegan's liability under his causes of action. First, the Trustee asserts that Meyers and Morgan Keegan were actively involved in, colluded or schemed with the Management Defendants in creating and introducing the Accounting Practice used by Debtor to recognize its accounts receivable with the intent of inflating Debtor's revenues in order to overvalue Debtor and make it appear more profitable, the benefits of which would be realized by a higher commission for Meyers and Morgan Keegan upon any ultimate sale, merger, or initial public offering ("IPO") of Debtor. However, as an alternative theory, the Trustee asserts that Meyers and Morgan Keegan were aware or should have been aware of the alleged impropriety of the Accounting Practice used by Debtor and certified by its auditor, Grafton, from 2005 until late 2009, and failed to adequately report it to the company, which resulted in a detriment to Debtor because it prevented certain non-managing or "innocent" Board members from forcing a change in the Accounting Practice, seeking earlier

73

the ouster of key managers and Board members, or closing the business earlier, which would limit the damages suffered by it.

To establish liability, the Trustee also asserts that Meyers and Morgan Keegan's relationship with Debtor went beyond their written contractual relationship established in the 2006 Contract and 2008 Contract and that they agreed, either in word or by action, to serve in additional roles, including as Debtor's underwriter,[44] its investment advisor, its broker for Debtor's offerings to individual investors and its "producing agent." The Trustee asserts that, based on the existence of these alleged other roles, Meyers and Morgan Keegan owed additional fiduciary duties to Debtor that were breached.

The Trustee also asserts that the Management Defendants, with the assistance of Meyers and Morgan Keegan, looted Debtor and used capital raised by Debtor though the use of the Accounting Practice for their own personal benefit.[45]

---

[44]    *Black's Law Dictionary* defines "underwriter" as "[o]ne who buys stocks from the issuer with an intent to resell it to the public; a person or entity, [especially] an investment banker, who guarantees the sale of newly issued securities by purchasing all or part of the shares for resale to the public." Underwriter, *Black's Law Dictionary* (9th ed. 2009). While not asserting a cause of action under the Securities Act of 1933, the Trustee seeks the Court's acceptance of the definition of "underwriter" under that Act:

> The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

15 U.S.C. § 77b (11) (2019).

[45]    The Court notes that there is an inherent conflict between the Trustee's characterizations of the motivations for the Accounting Practice. As to the Management Defendants, it would appear the Trustee is alleging that they were personally benefitting on an ongoing basis from the Accounting Practice through the looting of Debtor. On the other hand, it would appear the Trustee is also alleging that, contrary to siphoning assets, Meyers and Morgan Keegan were seeking a delayed long-term benefit from the Accounting Practice to be achieved through an inflation of value and the eventual sale of Debtor through a corporate merger or initial public offering. It would appear that any immediate looting of Debtor would be inconsistent with the alleged motivation of Morgan Keegan and Meyers to inflate the long-term value of Debtor for an IPO, sale, or merger.

74

Conversely, Meyers and Morgan Keegan assert that they did not create the Accounting Practice but that Sturgill, Debtor's longstanding CEO, or another party did; that the Accounting Practice had been reviewed and certified as GAAP compliant by Debtor's auditor, Grafton, from 2005 to 2009; that the practice was well known and understood by Debtor's management and Board of Directors; and that Meyers and Morgan Keegan had a right to, and did in fact, rely upon the accuracy of Debtor's representation of its financials without their own independent verification. Meyers testified that whenever he raised questions regarding the Accounting Practice to Sturgill, Debtor's CEO (who purported to be a CPA and was also overseeing Debtor's financials at the time), Sturgill was adamant about using the Accounting Practice and indicated that Debtor's auditor had approved of the policy as GAAP compliant. Meyers and Morgan Keegan indicate that they did not have sufficient information or indication that the Accounting Practice was questionable or improper until the July 2008 TS Report. Even after that date, Meyers and Morgan Keegan believed and understood that Debtor's management was making efforts to change the Accounting Practice and reconcile the financial records in a generally acceptable fashion by writing down a significant portion of the company's accounts receivable balance at that time. Further, Meyers and Morgan Keegan assert that their relationship with Debtor was governed by and confined to the terms of their written contractual relationships. Finally, Meyers and Morgan Keegan assert that they were not aware of any looting by or unreasonable payment to the Management Defendants, as alleged by the Trustee. In total, Meyers and Morgan Keegan maintain their actions were consistent with the written contracts, and that they did not conspire, collude, or participate with the Management Defendants in any improper actions.

Prior to the trial, the Trustee's previous counsel indicated to the Court that the Trustee's case was heavily circumstantial and required significant evidence to infer liability.[46] As demonstrated by the record in this proceeding, the Court received 18 days of testimony from 21 witnesses and ultimately admitted nearly 700 exhibits (down from a pretrial total of over 2,000 exhibits) from the parties to establish their respective positions. The Court has been provided a very robust "blow by blow" record of the operations and ultimate collapse of Debtor's business operations as well as the involvement of Meyers and Morgan Keegan with Debtor. Because of the circumstantial nature of this adversary proceeding, much of the evidence presented by the Trustee in support of his causes of action could also be viewed as supporting the defenses presented by Meyers and Morgan Keegan.[47] For the most part, the Court often received testimony presenting two opposing explanations of the events—a veritable "he said, she said"—and was asked to apply the appropriate burdens of proof to determine liability.

Prior to addressing the individual merits of each of the Trustee's remaining causes of action, the Court will first consider Meyers and Morgan Keegan's affirmative defense of *in pari delicto* as Meyers and Morgan Keegan assert that it is determinative of all the Trustee's remaining causes of action.

### *In Pari Delicto*

While the Trustee's causes of action center on the extent of Meyers and Morgan Keegan's knowledge, Meyers and Morgan Keegan's defense conversely focuses on the extent of the knowledge and use of the Accounting Practice by Debtor's management. Specifically, Meyers and

---

[46]     As stated by the Trustee's previous counsel, Clarence Davis, in a pre-trial hearing: "This is . . . what I would call a circumstantial case. . . . [T]here are hundreds of documents that are needed in order to prove that. Maybe even 1,000. . . . The problem you have in this case is . . . what I have found is one thing had to build on another, has to build on another, has to build on another, has to build on another . . . ."

[47]     For example, the Court received identical exhibits from both parties to support each of their respective cases.

76

**-291-**

Morgan Keegan allege that knowledge of the Accounting Practice, and any impropriety related thereto, were imputed to Debtor through its managing agents, and since the Trustee stands in the shoes of Debtor, his remaining causes of action would be barred by the doctrine of *in pari delicto*.

"*In pari delicto* is an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing." *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital, LLC)*, 716 F.3d 355, 367 (4th Cir. 2013). If the plaintiff bears equal or greater fault in the alleged tortious conduct as the defendant, the defense of *in pari delicto* will bar the plaintiff's claims. *Id.* If the *in pari delicto* defense could have been raised against Debtor before the commencement of the case, the doctrine also applies as a defense to actions brought against Meyers and Morgan Keegan by the Trustee under 11 U.S.C. § 541, since the Trustee stands in the shoes of Debtor. *See id.* (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 358 (3d Cir. 2001) (affirming bankruptcy court's application of *in pari delicto* doctrine to bar a trustee's tort claims against a third party broker used by the debtor to facilitate an alleged Ponzi scheme)). As *in pari delicto* is an affirmative defense, the burden is on Morgan Keegan and Meyers to establish the defense. *See Youmans v. S.C. Dep't of Transp.*, 670 S.E.2d 1, 10 (S.C. Ct. App. 2008) ("The defendant asserting an affirmative defense bears the burden of its proof."); *Nev. Ass'n Servs., Inc. v. Eighth Judicial Dist. Ct.*, 338 P.3d 1250, 1254 (Nev. 2014) (holding that the defendant bears the burden of proving the application of an affirmative defense).

Meyers and Morgan Keegan assert that Debtor had both constructive knowledge and actual knowledge of the Accounting Practice as a result of the knowledge of its agents, Debtor's management and Board members.

77

### Constructive Knowledge

A corporation, like Debtor, is a distinct legal entity, which may only act through its agents. 1 W. Fletcher, *Cyclopedia of the Law of Corporations* § 30, p. 30 (Supp. 2012–13); *see also Inter'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)( "[T]he corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact . . . ."). Therefore, a corporation's knowledge stems from its agent's knowledge, which is imputed to the corporation as the law presumes that an agent will disclose all information to its principal. *See Strohecker v. Mut. Bldg. & Loan Ass'n of Las Vegas*, 34 P.2d 1076, 1077 (Nev. 1934); *In re 1031 Tax Group, LLC*, 420 B.R. 178, 199 (Bankr. S.D.N.Y. 2009).

Generally, a principal has constructive knowledge of an agent's knowledge and actions if the agent learned of that knowledge or took the action within the agent's scope of authority. *See In re Amerco Derivative Litigation*, 252 P.3d 681, 694–95 (Nev. 2011) ("'[T]he general rule [is] that the corporation is affected with constructive knowledge, regardless of its actual knowledge, of all the material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority . . . even though the officer or agent does not in fact communicate his knowledge to the corporation.'" (quoting *Strohecker*, 34 P.2d at 1076)); *Crystal Ice Company of Columbia, Inc. v. First Colonial Corp.*, 257 S.E.2d 496, 497 (S.C. 1979) ("It is well established that a principal is affected with constructive knowledge of all material facts of which his agent receives notice while acting within the scope of his authority."). Morgan Keegan alleges that imputation is appropriate in this matter because the creation, implementation, and use of the Accounting Practice and issuance of financial statements

were done by and within the scope of the authority of Debtor's management in their roles as officers and Board members.

A corporate officer or director's scope of authority generally stems from the corporation's bylaws. *See* Nev. Rev. Stat. § 78.130(3) (2015) ("[O]fficers . . . have such powers and duties as may be prescribed by the bylaws or determined by the board of directors.")); S.C. Code. Ann. § 33-31-841 (2016) ("Each officer has the authority and shall perform the duties set forth in the bylaws or, to the extent consistent with the bylaws, the duties and authority prescribed in a resolution of the board or by direction of an officer authorized by the board to prescribe the duties and authority of other officers.").

In the instance of Debtor, its bylaws are silent as to the explicit authority of Debtor's management to create and implement accounting policies or to issue financial statements. However, Debtor's bylaws provide that the business and affairs of Debtor were to be managed by the Board and gave the Board the right to delegate any specific "powers . . . to any other officer or officers of the corporation." The employee contracts for the company's officers provide that:

> [The officer] shall have the full authority and responsibility prescribed by the Company's Bylaws relating to or otherwise normally attendant to an officer of a corporation holding such position and shall have, subject to the review and approval of the Board of Directors of the Company . . . or any committee thereof and the CEO, general supervision, direction and control of the financial business and affairs of the Company and such other duties commensurate with the Executive's position that may be assigned to him from time to time by or under the authority of the Board.

Without clear direction from the bylaws or employee contracts, the Court will look to the general corporate practice and course of conduct of Debtor and its management to determine if the Management Defendants' actions fell within their scope of authority. Multiple courts have logically held that issuing and approving financial statements and practices are within the corporate management's scope of authority. *See Kirschner v. KPMG LLP*, 938 N.E.2d 941, 951 (N.Y. Ct.

79

**-294-**

App. 2010) ("When corporate officers carry out the everyday activities central to any company's operations and well-being—such as issuing financial statements—their conduct falls within the scope of their corporate authority."); *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504, 520 (S.D.N.Y. 2009) (finding that in preparing and certifying financial statements, the officers were engaged in conducting work of the corporation; thus, the acts of those corporate agents who effected the transactions were the responsibility of the corporation); *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) (applying Mass. Law) ("The approval and oversight of [financial] statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's action to the company itself.").[48] This Court agrees that even without express designation in the bylaws or other direction from Debtor's board, the day-to-day activities of a corporation, including implementing accounting procedures and issuing financial statements, would fall to the corporation's management and be within their scope of authority as agents of the corporation.

Without any express designation, the authority to implement accounting policies and issue financial statements would not only appear to be inherent in Debtor's employment of a chief executive officer and chief financial officer but would be the usual impression of anyone dealing with the company.[49] Based on the record, the Court finds that the Management Defendants,

---

[48]    The District Court for the District of Nevada in applying Nevada law, cited favorably the following proposition from *Kirschner v. KPMG LLP*, 938 N.E.2d at 951: "Everyday activities central to any company's operation and well-being such as issuing financial statements, accessing capital markets, handling customer accounts, moving assets between corporate entities, and entering into contracts constituted conduct within the scope of a corporate officer's authority." *See USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1218 (D. Nev. 2011).

[49]    The Trustee argues that because the bylaws and employment contracts were silent as to the authority of Management Defendants, Meyers and Morgan Keegan must establish an apparent agency in regards to the Management Defendants, citing to the requirements under South Carolina law for a party to establish an apparent agency, namely that they relied upon an indicia of authority originated by the principal and such reliance must have effected a change of position by the third party.

    However, it is clear from the record that the Management Defendants were agents of Debtor as officers and board members. Debtor's selection and employment of the Management Defendants alone is sufficient indicia of

80

including Sturgill and Hargrett, had authority, whether actual or apparent, to implement accounting policies and practices and issue financial statements on behalf of Debtor and in fact implemented and maintained the use of the Accounting Practice. Therefore, it appears that Debtor had constructive knowledge of the Accounting Practice and any alleged misstated financial statements.

## Actual Knowledge

In addition to constructive knowledge, Meyers and Morgan Keegan also allege that Debtor, through its officers and directors, had actual knowledge of the Accounting Practice. Specifically, they call the Court's attention to the minutes of the January 2007 meeting of Debtor's Board of Directors and the explanatory notes of Debtor's historic audited financial statements. The minutes of the January 2007 meeting show that the Accounting Practice was known to, specifically discussed by, and expressly approved by Debtor's Board of Directors. Further, Wade Cordell, Van Hoeven, and Hargrett all testified that they knew how Debtor was recording its accounts receivable. All members of Debtor's Board received and reviewed the company's audited financials and were aware of the growth in Debtor's accounts receivable balance. Also, the record shows that Debtor's management actively discussed changing the Accounting Policy throughout 2007 and 2008, including such a change as part of the term sheet for an investment by MKSF. Further, Debtor's historic audited financial statements included an explanatory note outlining that

---

authority from the principal, and it is clear from the record that Meyers and Morgan Keegan relied upon these representations and changed their position as result of this authority.  "[T]he principal is bound by the acts of its agent when it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they in turn deal with the agent based on that assumption." *R&G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.*, 540 S.E.2d 113, 117 (S.C. Ct. App. 2000). As already discussed, Debtor's management had the authority to implement accounting practices and issue financial statements.

Further, the Trustee asserts that Meyers and Morgan Keegan could not have a reasonable belief that the Management Defendants had the authority to bind Debtor to a perpetration of fraud against Debtor because the Management Defendants' employment contracts provided that they must perform their duties in good faith and for the benefit of Debtor. However, this argument assumes Meyers and Morgan Keegan knew of the alleged impropriety of the Accounting Practice when it was created and used, which, based on the evidence, the Court does not conclude. Therefore, the Court rejects this argument.

81

the accounts receivable balance includes state mandated fees and that Debtor is "actively collecting

that amount." This note in the audited financial statements described the Accounting Practice.

Further, while the Trustee asserts that issues regarding the Accounting Practice may have

not been known at any one point in time by the entirety of Debtor's Board since it periodically

changed, the general principles of agency law provide that a single agent's knowledge can be

imputed to the company as a whole. *See USACM Liquidating Trust*, 764 F.Supp.2d at 1217

("Under Nevada law, the knowledge of an officer or agent is imputed to the corporation when the

agent obtains the knowledge 'while acting in the course of his employment and within the scope

of his authority, and the corporation is  charged with such knowledge even though the officer or

agent does not in fact communicate his knowledge to the corporation.'" (quoting *Strohecker*, 34

P.2d at 1077)); *Bankers Trust of S.C. v. Bruce*, 323 S.E.2d 523, 532 (S.C. Ct. App. 1984) ("It is

well established that a principal is affected with constructive knowledge of all material facts of

which his agent received notice while acting within the scope of his authority.").

The Court agrees with Meyers and Morgan Keegan that these facts show that members of,

if not the entirety of, Debtor's governing body had actual knowledge of the Accounting Practice

that they received within the scope of their authority, and that this actual knowledge is therefore

imputed to Debtor.

### Adverse Interest Exception

The Trustee also argues that the knowledge of the alleged impropriety of the Accounting

Practice cannot be imputed to Debtor because the Management Defendants' actions were clearly

adverse to Debtor's interest. Both South Carolina and Nevada courts have recognized an exception

to imputation when the agent is acting clearly adverse to the principal, commonly known as the

"adverse interest exception." *See Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545, 547 (S.C. Ct. App.

82

**-297-**

2006); *In re Amerco Derivative Litigation*, 252 P.3d at 695. The extent of adversity required to invoke this exception and prevent imputation varies by jurisdiction.

Nevada law requires that the agent's actions must be completely and totally adverse to the corporation and provide no benefit to the corporation. *In re Amerco Derivative Litigation*, 252 P.3d at 695. In other words, the standard under Nevada law requires what is often referred to as "total abandonment." Total abandonment is the approach taken by the majority of jurisdictions that have considered the extent of adversity required under the adverse interest rule.[50]

South Carolina's courts have not defined the level of adversity required to prevent imputation under the exception and have only stated that the "exception applies where the actions of one wrong-doer, usually an agent, are clearly adverse to the other party's interests." *Myatt*, 635 S.E.2d at 547. In the absence of more direction, this Court must predict how the state's highest court would rule on the matter.

In the Court's Order on Meyers and Morgan Keegan's Motion to Dismiss, the Court indicated that "it would be reasonable to predict that the South Carolina Supreme Court would [follow the majority of jurisdictions and] apply a standard that requires total abandonment of the principal's interest and no benefit to the principal in order to apply the adverse interest exception."

---

[50]    *See e.g., Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 325 (1st. Cir. 2008) (applying Massachusetts law); *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 575 (7th Cir. 2004) (applying Illinois law); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) (applying New York law); *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (applying Florida law); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768 (4th Cir. 1995) (applying Maryland law); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1311 (M.D. Fla. 2009); *In re Nat'l Century Fin. Enter., Inc. Inv. Litig.*, 604 F. Supp. 2d 1128, 1143 (S.D. Ohio 2009); *Fine v. Sovereign Bank*, 634 F. Supp. 2d 126, 139 (D. Mass. 2008); *Ladd Furniture, Inc. v. Ernst & Young*, No. 2:95-CV-00403, 1998 WL 1093901, at *7 (M.D.N.C. Aug. 27, 1998); *In re Verilink Corp.*, 06-8-566-JAC-11, 2009 WL 4609308 (Bankr. N.D. Ala. Dec. 3, 2009), *aff'd in part, rev'd in part (on other grounds) and remanded*, 457 B.R. 832 (N.D. Ala. 2011); *Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 216 (Iowa 1998); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007); *Kirschner v. KPMG, LLP*, 938 N.E.2d 941, 952 (N.Y. Ct. App. 2010); *James Cape & Sons Co. v. Streu Construction Co.*, 775 N.W.2d 277 (Wis. App. 2009); *MCA Financial Corp. v. Grant Thornton, LLP*, 263 Mich. App. 152, 164, 687 N.W. 2d 850, 857 (App. Ct. 2004); *American Fidelity & Cas. Co. v. Backstrom*, 47 Wash. 2d 77, 82, 287 P.2d 124, 127 (1955); *Goldstein v. Union Nat'l Bank*, 109 Tex. 555, 568, 213 S.W. 584, 591 (1919); *Smith v. Boyd*, 162 Mo. 146, 62 S.W. 439, 443 (1901).

The Court previously considered the Supreme Court of South Carolina's opinion in *Citizens' Bank v. Heyward*, 133 S.E. 709 (S.C. 1925) to find support that South Carolina law would likely apply the total abandonment standard.[51] The Court has no reason to believe that the Supreme Court of South Carolina would not follow Nevada and the majority of jurisdictions and apply the total abandonment standard in regards to the adverse interest exception.

**What is "Totally Adverse" Conduct?**

While the Court is convinced that both Nevada and South Carolina courts would rely upon the total abandonment standard when applying the adverse interest exception, the Court must also consider what constitutes "totally adverse" conduct so as to bar imputation of an agent's actions and knowledge to a principal.

In discussing the total abandonment standard, the Supreme Court of Nevada has indicated that such a standard "'avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party.'" *In re Amerco Derivative Litigation*, 252 P.3d at 695 (quoting *Kirschner v. KPMG LLP*, 938 N.E.2d at 952). The Supreme Court of Nevada has emphasized the narrowness of the application of the exception by explaining that "[s]imply because an agent has a conflict of interest or is acting mostly for his own self-interest will not invoke the [adverse interest] exception." *Id.* (citing *In re American Int'l Grp., Inc.*, 965 A.2d. 763, 824 (Del. Ct. Chan. 2009) (applying N.Y. law)). Therefore, while an agent's action may provide a clear personal benefit to the agent, the key inquiry under the total abandonment standard is whether the principal received any benefit, however minor, from the

---

[51]        It does not appear that any South Carolina courts have addressed the extent of adversity required to establish the adverse interest exception since the Court's entry of the Order on Meyers and Morgan Keegan's Motion to Dismiss.

84

agent's conduct. *Id.* at 696 (in addressing the total abandonment standard, noting that the agent's actions clearly benefited themselves, but finding the actions were not adverse because the corporation was not completely harmed by the agent's actions and the agents did not act solely for their own benefit). It appears Nevada law follows a similar approach taken by New York courts.

While South Carolina courts have not defined the degree of adversity required under the total abandonment standard, this Court has no reason to believe that South Carolina state courts would follow a different approach.

In reviewing the case law from various jurisdictions that apply the total abandonment standard, it appears courts look to both the benefit and the harm that the principal incurred as a result of the agent's actions to determine if the principal benefited at all from the actions or was completely harmed by the agent's actions. Determining the harms and benefits to a corporate principal resulting from an agent's action requires a fact-intensive inquiry that must be conducted on a case-by-case basis.

### Actions that Benefit the Corporation

In the present matter, the Trustee's causes of action raise claims against Morgan Keegan and Meyers, who, unlike a corporation's auditor, did not have a duty to audit Debtor's financials, and seek damages resulting from an alleged fraud by the Management Defendants.

Even in actions involving auditor liability, courts have emphasized that the critical distinction for imputation of the officer's and director's alleged accounting fraud to the company is whether the fraud is "on behalf of" or "against" the company. As stated by one court:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. Maybe not net beneficiaries, after the fraud is unmasked and the corporation is sued—that is a

85

> question of damages, and is not before us. But the primary costs of a fraud on the
> corporation's behalf are borne not by the stockholders but by outsiders to the
> corporation, and the stockholders should not be allowed to escape all responsibility
> for such a fraud, as they are trying to do in this case.

*Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 456 (7th Cir. 1982). In other words, if an

officer's or director's alleged fraud was "on behalf" of the company, it would be imputed to the

company and *in pari delicto* would apply; whereas, if the fraud was "against" the company, the

alleged fraud would not be imputed to the company. In many jurisdictions that apply the total

abandonment standard, it appears those courts utilize the total abandonment standard to determine

if the alleged fraud is "against" the company so as to bar imputation. *See, e.g., Kirschner v. KPMG*

*LLP*, 938 N.E.2d at 952–53 (noting "[t]he crucial distinction . . . between conduct that defrauds

the corporation and conduct that defrauds others for the corporation's benefit" and noting that the

total abandonment standard would apply to determine if the adverse interest exception is applicable

in the matter). Therefore, the Court will take a similar approach and apply the total abandonment

standard to determine if the Management Defendant's alleged fraud was "on behalf of" or

"against" Debtor.

### Timing of Corporate Benefit

Generally, courts look to the time of the agent's action to determine if those actions had a

benefit to the corporate principal rather than relying on hindsight. *See, e.g., Rogers v. McDorman*,

521 F.3d 381, 395 (5th Cir. 2008) ("It cannot be . . . that [the corporate directors and employees]

were acting adversely simply because the scheme eventually hurt [the corporation]."); *Robinson*

*v. GEO Licensing Co., LLC*, 173 F.Supp.2d 419, 424 (D. Md. 2001) (explaining that adversity

must be determined at the time the knowledge is acquired).

As such, courts generally do not consider the consequences from the unmasking of the

alleged fraud, such as the fact that the alleged fraud contributed to the insolvency or bankruptcy

of the corporation, in determining if the agent's actions benefitted the corporate principal. *See, e.g., Beck*, 144 F.3d at 736 (applying Fla. Law) ("[T]he knowledge of a corporate officer whose fraud or misbehavior ultimately brings short-term gain to the corporation, or merely injures a third party, is imputed to the corporation, even if the officer's misbehavior ultimately causes the corporation's insolvency."); *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 242 (S.D.N.Y. 1987) ("[C]ourts have identified '[t]he relevant issue [as being the] short term benefit or detriment to the corporation, not any detriment…resulting from the unmasking of the fraud.'" (quoting *Security America Corp. v. Schacht*, No. 82-c-2132 (N.D. Ill. 1983))); *CEPA Consulting Ltd. v. King Main Hurdman (In re Wedtech)*, 138 B.R. 5, 9 (S.D.N.Y. 1992) (same); *Kirschner v. KPMG LLP*, 938 N.E.2d at 953 ("[A]ny harm from the discovery of the fraud—rather than from the fraud itself—does not bear on whether the adverse interest exception applies"); *In re Maui Indus. Loan & Fin. Co., Inc.*, 88 F. Supp. 3d 1175, 1186 (D. Haw. 2015) (applying Haw. law) (same); *In re Pitt Penn Holding Co.*, 484 B.R. 25, 39–40 (Bankr. D. Del. 2012) (applying N.Y. law) (same); *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d at 523 (applying N.C. law) ("[P]laintiffs' proposed focus on the end result for purposes of determining whether the adverse interest exception to the rule of imputation underlying *in pari delicto* defense is misdirected.");[52] *Restatement (Third) of Agency* § 5.04 cmt. c ("[T]he fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely.").

Therefore, even if an agent's actions may be detrimental to the corporation in the long-term, most courts find there is no total abandonment and imputation applies as long as the agent's actions provided even a short-term benefit to the corporation. *See, e.g., Baena*, 453 F.3d at 7

---

[52]    While the Court of Appeals for the Second Circuit vacated a significant portion of the District Court's order in *In re Parmalat Securities Litigation*, the Court of Appeals affirmed the District Court's findings on the adverse interest rule and the application of *in pari delicto* under North Carolina law. *See Parmalat Cap. Fin. Ltd. v. Bank of America Grp.*, 412 F. App'x 325 (2d Cir. 2011).

(applying Mass. law) ("A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company, but, like price fixing, it profits the company in the first instance."); *Beck*, 144 F.3d at 736 (holding under Florida law that a corporate officer's fraud that provides a short-term gain to the corporation is imputed to the corporation); *Maui Indus. Loan & Fin. Co.*, 88 F. Supp.3d at 1186 (finding imputation to the corporation was appropriate when agent's actions provided short-term benefit to the corporation); *In re Parmalat Sec. Litig.*, 659 F.Supp.2d at 522–23 (rejecting the plaintiff's arguments that the total abandonment standard should look only to the long term effects of the agent's actions on the corporation); *Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 303 (Del. Ct. Chan. 2015) (applying Del. law) ("The adverse interest exception, if applied correctly, should cover only the 'unusual' case in which the allegations support a reasonable inference of 'the type of total abandonment of the corporation's interests' that is characteristic of, for example, outright stealing from the corporation. Because most instances of fraud or illegal misconduct by corporate actors confer at least some benefit on the corporation, the adverse interest exception may not apply even when the 'benefit' enjoyed by the corporation is outweighed by the long-term damage that is done when the agent's mischief comes to light." (quoting *In re American Int'l Grp. Inc. Consol. Derivative Litigation*, 976 A.2d 872, 891 (Del Ct. Chan. 2009))).

Courts have identified examples of benefits to a corporation that fall short of the total abandonment standard and therefore allow imputation to the corporate principal:

- **Growing and Expanding the Company's Business:** Courts have found that a corporate agent did not totally abandon the interests of the corporation when the agent's action led to the company being able to grow and expand its business.

  o As a result of the corporate officers' misrepresenting the corporation's true financial condition, the corporation was able to raise $14 billion in capital that was

used to expand the corporation's production facilities, workforce, product line, and international presence. *In re Parmalat Sec. Litig.*, 659 F.Supp.2d at 520–25.

- o The involvement of Bank's CEO and employees in a check-kiting scheme, which generated, developed, and grew the Bank's business, was a benefit to the Bank to permit imputation of the CEO's and employees' actions to the Bank for *in pari delicto* purposes. *Rogers*, 521 F.3d at 394–85.

- **Paying Down Other Corporate Liabilities:** Courts have also found that when an agent's action results in funds which are then used to pay corporate liabilities, there was a short-term benefit to the corporation such that the agent did not totally abandon the interest of the corporation.

  - o A corporation benefited from an agent's Ponzi Scheme when the proceeds from that scheme were used to pay down other corporate liabilities. *In re Liberty State Benefits of Del., Inc.*, 541 B.R. 219, 236 (Bankr. D. Del. 2015).

- **Benefits Resulting from an Inflated Corporate Value:** Courts have also found that a corporation benefitted when the corporation took advantage of certain opportunities that would have otherwise not been available but for the corporation's inflated value resulting from the agent's actions.

  - o A court has found that a corporation, whose value was overinflated based on an agent's action, benefited when it was able to acquire another company for a lower premium due to its own inflated value of its stock. *In re American Int'l Grp., Inc.*, 965 A.2d at 827.

- **Raising Capital for the Company's Use:** Courts have also found that an agent's actions which caused the company to raise capital for the company's use is a benefit to bar the application of the adverse interest exception.

  - o A fraud by a company's top management to overstate earnings in order to facilitate stock sales or acquisition, which did not benefit the company in the long-term, was found to still "profit the company" such that the adverse interest exception did not apply. *Baena*, 453 F.3d at 7.

  - o The proceeds raised as a result of a partner's Ponzi scheme was a short-term benefit to a partnership so as to impute the scheme to the partnership and bar the application of the adverse interest exception. *Maui Indus. Loan & Fin. Co.*, 88 F. Supp.3d at 1186.

89

o  A complaint which alleges that a CEO's misstatement of financial statements that allowed the corporation "to thrive, attract investors, or raise funds" would be subject to an *in pari delicto* defense. *ShengdaTech Liquidating Trust v. Hansen, Barnett & Maxwell, P.C. (In re ShengdaTech, Inc.)*, 519 B.R. 292, 300 (D. Nev. 2014).

o  The corporation's management who utilized misrepresentations to obtain investments from the public created a benefit to the corporation (not implicating the adverse interest exception) because a portion of the $22 million raised from the investors was utilized by the corporation, including paying promised returns to certain investors. *Cobalt Multifamily Invs I, LLC v. Shapiro*, C/A No. 06-Civ.-6468, slip op. 2008 WL 833237 at *4 (S.D.N.Y. Mar. 28, 2008) (applying N.Y. law).

o  Accounting frauds by a corporation's management, which hid the corporation's true financial situation and led to the corporation attracting investors provided short-term benefits to the corporation so as to prevent the application of the adverse interest exception. *In re American Int'l Grp., Inc.*, 965 A.2d at 827.

- **Extending the Company's Life:** Courts have also found that an agent's actions which help the corporation extend its life is a benefit to bar the application of the adverse interest exception.

    o  "So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—[the total abandonment standard] test is not met." *Kirschner v. KPMG LLP*, 938 N.E.2d at 953.

    o  A corporation's managers were not acting adversely to the corporation when they concealed the corporation's financial issues in order to obtain funding because the funding benefited the corporation and the managers "were acting to enable [the corporation] to survive through new sources of shareholder capital or debt financing." *Brickley for Crypto Metrics, Inc. Creditors' Trust v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 842 (W.D. Tex. 2017) (applying N.Y. law).

Courts applying New York law have rejected the proposition that an agent's incurring of debt for an insolvent corporation is automatically adverse to the corporation. As stated by the District Court for the Southern District of New York in *Kirschner v. Grant Thornton, LLP*:

It is a basic principle of corporate finance that extending credit to a distressed entity in itself does the entity no harm. Cash infusions expand the debt of a corporation in precise proportion to the expansion of assets in the form of new cash contributed by the underwriters and investors. Accordingly, with respect to injury to the corporate body, as distinguished from any injury thereby to creditors or prospective shareholders, the extension of credit is—at worst—neutral.

90

**-305-**

> That is the case even where, as here, credit is extended to an entity that is, as the Trustee alleges, "insolvent or in the zone of insolvency." Creating an illusion of solvency is not necessarily, in itself, a corporate benefit sufficient to rebut the adverse-interest exception, but neither does it harm the corporation. While a "corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it," any *harm* done to the corporation is not done by the extension of credit itself but by any subsequent looting or embezzlement. That is, where insiders prop up moribund entities in order to misappropriate corporate assets for personal gain, such plunder is adverse and cannot thereby be imputed to the corporation.

*Kirschner v. Grant Thornton LLP*, C/A No. 07-Civ.-11604-GEL, slip op. 2009 WL 1286326, at

*8 (S.D.N.Y. Apr. 14, 2009), *aff'd sub nom. Kirschner v. KPMG LLP*, 626 F.3d 673 (2d Cir.

2010) (quoting *Bankruptcy Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d

432, 453 (2d Cir. 2008)). The Court finds the reasoning of *Grant Thornton* to be convincing.[53]

---

[53]     The Trustee cites to the Court of Appeals for the Seventh Circuit's opinion in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983) for the proposition that no benefit is conferred to a corporation when a corporate agent's actions continue a business past the point of insolvency. In *Schacht*, the defendants alleged that the plaintiff should be estopped from bringing claims because the corporate agent's fraudulent acts benefited the company by continuing the corporate existence of the company past the point of insolvency to the detriment of outside creditors and policyholders. *Id.* at 1348.  As put by the Seventh Circuit, "the fact that [the company's] existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances, the prolonged artificial insolvency of [the company] benefitted only [the company's] managers and other alleged conspirators, not the corporation." *Id.*

In *Rogers v. McDorman*, 521 F.3d 381, 395 (5th Cir. 2008), the Court of Appeals for the Fifth Circuit upheld a lower court's decision to apply the adverse interest exception, distinguishing *Schacht* in that matter because the agents did not loot the corporate principal, but through the agent's actions, attempted to grow and develop the corporate principal's business. *See also Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. Dist. Ct. App. 1992) (distinguishing *Schacht* in an auditor liability case because "the fraud committed by the managing director was not intended to loot the corporation" but was a fraud on behalf of the corporation when the managing director misrepresented the value of the corporation that allegedly artificially prolonged the corporation's life").

Further, the Court notes that the circumstances of *Schacht* appear to be like those described as adverse by the court in *Grant Thornton*— that is the propping up of an insolvent company to serve management's central purpose of looting the company. In *Schacht*, the Seventh Circuit emphasized the fact that by prolonging the artificial insolvency of the company,  the company's management was also systematically looting the company "of its most profitable and least risky business and more than $3,000,000 in income—all actions which aggravated [the company's] insolvency" and noted "the real damage . . . inflicted by the diminution of [the company's] assets and income." *Schacht*, 711 F.2d at 1347–48.

**Subjective Motivation of Agents**

Courts also disagree as to whether an agent's subjective motivation should factor into the determination of whether the agent totally abandoned its interest to the corporate principal. Most courts hold that the subjective motivation of the agent is not relevant to the determination of whether the agent totally abandoned its interest to the corporate principal, applying the objective test of determining the beneficial nature of the agent's actions. *See In re Parmalat Sec. Litig.*, 659 F. Supp. 2d at 524 ("Plaintiffs are incorrect also in contending that the Court must look primarily to the intent of the agents while ignoring or discounting evidence that the agents acted for the benefit of the company."); *Kirschner v. KPMG LLP*, 938 N.E. 2d at 954–55 (suggesting the adverse interest exception would become a "dead letter" if the exception depended upon the subjective intent of the agent as almost all corporate fraud cases would result in a bar to imputation under the exception). Nonetheless, other courts have considered the subjective motivation of the agents in determining whether an agent acted adverse to its principal. *See MCA Fin. Corp. v. Grant Thornton, LLP*, 687 N.W.2d 850, 858 (Mich. Ct. App. 2004) ("The 'adverse interest' exception will not apply if the wrongdoers' motivation was not entirely for personal gain at the expense of the corporations, but was, even in part, a misguided belief that their wrongdoing would benefit the corporations."); *In re CBI Holding Co.,* 529 F.3d at 451 ("[I]t is important to remember that the 'total abandonment' standard looks principally to the intent of the managers engaged in misconduct.").[54] In addition, the *Restatement (Third) of Agency* suggests that the subjective intent of the agent may be relevant in determining if the agent's knowledge and actions should be imputed

---

[54]    This holding of *In re CBI Holding Co*. have been called into doubt as a result of the Court of Appeals of New York's holdings in *Kirschner v. KPMG, LLP*, 938 N.E.2d 941 (N.Y. 2010). *See Kirschner v. KPMG LLP*, 626 F.3d 673, 678 (2d Cir. 2010) ("To whatever extent language in *CBI* might be thought to misstate New York law concerning the adverse interest exception, such language must henceforth be understood in light of the authoritative views expressed by the Court of Appeals.").

to the principal. *See Restatement (Third) of Agency* § 5.04 (stating that an agents knowledge "is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, *intending* to act solely for the agent's own purposes or those of another person" (emphasis added)).

With this general framework, the Court will apply the facts of the present proceeding to determine if the Management Defendants totally abandoned the interests of the Debtor.

### *Management Defendants' Actions*

The record in this proceeding is replete with evidence that during the time that the Accounting Practice was in place, Management Defendants' constant efforts and goal were to raise capital for Debtor to grow the company and increase its value for all constituents and stockholders through an IPO or sale of the company.[55] Their actions resulted in the influx of millions of dollars to Debtor. For example, Debtor filed several filings with the SEC regarding its capital raises based on the Management Defendants' personal efforts, including reporting $2,614,180 raised in 2007, $10,222,500 in 2008, and another $1,187,500 in 2009. The vast majority of the funds raised by Management Defendants' efforts were expended to benefit Debtor, allowing it to grow and operate.

### **Payment of Debtor's Expenses and Other Liabilities**

It clear from the record that capital raised when the Accounting Practice was in place went to the payment of Debtor's legitimate expenses. For example, in January 2008, Wade Cordell reported in emails to other members of Debtor's management that funds received from a sale of Debtor's stock would be used to decrease the company's bills by nearly $200,000, and pay their monthly bill to Debtor's Outside Securities Counsel and all of the company's past due payroll and

---

[55]    Many of Debtor's shareholders were friends and family members of the Management Defendants, and local investors recruited due to close, personal acquaintance with the Management Defendants.

taxes. The evidence also shows that the capital raised was spent on professional fees and infrastructure. The Court also notes that the stated purpose of the November 2006 PPM was to raise capital to allow Debtor to buy back potentially improperly issued shares and territory licenses. Not only were the proceeds from the November 2006 PPM used for that purpose, but the capital raised also went towards the purchase of new technology, the hiring of new personnel, and the payment of expenses to expand Debtor's business to new areas. Further, Hargrett, during his deposition testimony indicated that the capital raised during his service as Debtor's CFO went to fund the growth and operations of Debtor. The payment of these operating expenses and liabilities benefited Debtor.

### Supporting Debtor's Growth

The capital raised when the Accounting Practice was in place also went to fund the significant growth that Debtor experienced from 2006 through 2009. The Trustee does not dispute that "[a] successful infusion of capital was critical for [Debtor] to realize its full growth potential." Beginning in 2006, Debtor made significant expenditures to reach this growth potential, including $2 million in expenses relating to the startup of the Barbourville check processing facility and $500,000 in legal fees for advice relating to Debtor's direct fundraising efforts.

As a result of the Management Defendants' actions, Debtor grew its customer base significantly. As the Trustee indicated, "business was booming" for Debtor in 2008. For example, between 2006 to 2008, the number of Debtor's school customers increased five-fold, from around 1,000 schools to 5,000 schools. By 2008, Debtor was processing 30,000 checks per month. As part of this growth, it was necessary for Debtor to increase the number of employees it employed, and at one point, the Barbourville facility employed at least 60 employees (more than doubling its size from 27 employees). The Management Defendants' efforts culminated in the landing by

Debtor of two "dream" accounts, Wachovia Bank and U.S. Bank. The costs to Debtor to on-board

both Wachovia Bank and U.S. Bank were $350,000, requiring a capital influx to accomplish.

The evidence clearly indicates that the capital raised by Management Defendants during

the time the Accounting Practice was in place permitted the expansion of Debtor's operations and

its customer base, and therefore, benefited Debtor.[56]

### Lack of Sufficient Evidence of Embezzlement or Looting & Nexus with Accounting Practice and Morgan Keegan

Throughout this proceeding, the Trustee has alleged that Management Defendants utilized

the Accounting Practice in a scheme to loot Debtor to personally benefit themselves at the

detriment of Debtor.[57] However, at trial, the evidence the Trustee presented of the existence of this

alleged looting and any relationship with the Accounting Practice was weak and unconvincing.

The Trustee first points to Debtor's payment of excessive and unreasonable salaries, bonuses and

personal expenses to the Management Defendants as well as Debtor's payment of excessive and

unreasonable rent to Management Defendants for property leased by Debtor. However, the Trustee

presented no comparative evidence of the salaries and bonuses of management for similarly sized

or situated companies or the monthly rent amounts for similar properties in order to show that

Debtor's payments were excessive.[58] Based on the evidence presented, the Court cannot conclude

---

[56]    The Trustee, relying on *Schacht v. Brown*, asserts that the actions of the Management Defendants, including implementing the Accounting Practice, provided no benefit to Debtor because it artificially prolonged Debtor's insolvency. However, when the Accounting Practice was implemented, it was not a situation where Debtor's operations were on the brink of collapse and that, but for the capital raised, Debtor would not have been able to continue its operations. Rather, when the Accounting Practice was implemented, capital was being raised and used to assist Debtor with expanding its business, which in turn resulted in Debtor experiencing unprecedented growth. Therefore, the Court is not convinced by the Trustee's arguments or evidence that the Management Defendants' actions provide no benefit to Debtor.

[57]    The Court notes that the Trustee dedicated only a very minor portion of his proposed order in this proceeding (3 of 100 pages) to address the adverse interest exception, which predominately focused on the Trustee's assertions that South Carolina would not apply the total abandonment standard.

[58]    While the Trustee notes that many of the bonuses received by Management Defendants were not authorized by Debtor's Board, the Court notes that the Management Defendants constituted the majority of the Board and that such bonuses would have likely been formally approved regardless.

that these payments were unreasonable or that they were veiled attempts by Management Defendants to siphon funds from Debtor. It is not unexpected that the management of a growing company with considerable revenues would be: (1) paid a salary for their work or (2) receive bonuses, especially when their efforts included successful and significant fund raising and rapid expansion of the company's customer base and its business operations.[59]  While there may be circumstances where the salaries and bonuses of agents are so clearly exorbitant and excessive that they provide strong evidence that the agent was systematically utilizing a fraudulent scheme for the sole purpose of stealing from the principal (and therefore acting adverse to and totally abandoning the interests of the corporate principal), the present case is not that situation.

Second, the Trustee points to evidence that on two occasions Wade and Brad Cordell were paid directly by investors for shares issued by Debtor. In the first instance, in November 2006, Wade Cordell accepted $40,000 from Scott Matula in exchange for 32,000 shares of Debtor's stock issued directly by Debtor. The second instance was alleged by Al Berry, who stated that he paid Brad Cordell $50,000 and Cordell LLC another $50,000 in exchange for shares issued directly by Debtor.[60] Accepting the testimony as true, these instances appear to be unrelated to the utilization

---

[59]    In addition, considering the company had a long-standing policy of paying commissions to any officer, director or third party who precipitated the sale of Debtor's stock to investors, it can be inferred that these bonuses resulted from the company-wide policy.

[60]    It appears the stock that Mr. Berry purchased was Debtor's stock originally held by Cordell LLC. It appears Cordell LLC sold 1,461,000 shares of Debtor's stock it held from August 28, 2007 to November 12, 2008; however, the record does not indicate the amount that Cordell LLC received for the sales of these stock. The Trustee alleged that Cordell LLC misappropriated these shares during the merger of FARS, FARS Marketing and Debtor in 2004, and relies on the general Confessions of Judgment executed by Wade Cordell, Brad Cordell and Cordell LLC as evidence that they intentionally misappropriated the Cordell LLC shares. However, as Confessions of Judgments are entered for various reasons and are not an admission to all the facts alleged against the defendant unless specifically asserted, the Court does not find the Confessions of Judgment to be probative that Wade Cordell and Brad Cordell knowingly used the shares of Cordell LLC to loot Debtor. However, even considering these sold shares in the determination of the benefit received by Debtor through the Accounting Practice, the Court would still hold that the evidence does not convince the Court that the Management Defendants systematically looted the company or totally abandoned the interests of Debtor.

of the Accounting Practice.[61] In fact, Danielson, who conducted a "look-see" of Debtor after the ousters, testified that such incidents were isolated and that Caughman, who conducted a thorough review of Debtor, only identified 10-20 stock transactions that created questions for further investigation out of the hundreds of stock transactions completed by Debtor.

Further, even accepting the Trustee's arguments, the sums and circumstances at issue do not indicate or amount to an overarching scheme of looting and would not be significant in light of the total amount of capital raised by the Management Defendants—the same capital that clearly benefited and sustained Debtor through the payment of expenses and the expansion of its business and customer base.[62] The issue before the Court under the total abandonment standard for imputation is not whether Management Defendants received a personal benefit from their actions, but whether Debtor also received a benefit, which it is apparent from the record that it did. *See Giddens v. D.H. Blair & Co., Inc.  (In re A.R. Baron & Co., Inc.)*, 280 B.R. 794, 801 (Bankr. S.D.N.Y. 2002) ("[T]he [adverse] exception is inapplicable when the agent acts both for himself and for the principal though the primary motivation for the acts is inimical to the principal.").

Finally, the Trustee asserts, based on *Sonoco Products Co. v. Guven*, C/A No. 4:12-cv-00790-BHH, slip op. 2015 WL 127990 (D.S.C. Jan 8, 2015), that the payment of salaries to the Management Defendants during a period in which they were disloyal constitutes total adversity to Debtor. While the Court is not fully convinced that *Guven* stands for the proposition as alleged by the Trustee,[63] the evidence presented does not sufficiently establish that the Management

---

[61]    Overall, the Court is not convinced that all of the Management Defendants implemented the Accounting Practice for the purpose of allowing the Cordells to obtain personal benefits.

[62]    The Trustee in his proposed order indicates that Debtor raised several *millions* of dollars in capital but alleges that the Management Defendants "loot[ed] *thousands* of dollars from [Debtor] to fund their lavish lifestyles." (emphasis added).

[63]    *Guven* addressed a breach of loyalty claim, noting that a corporation is entitled under that cause of action to recover compensation paid to a disloyal employee during the period that the employee engaged in disloyal acts. *Guven*, 2015 WL 127990, at * 10. The facts of *Guven* were distinguishable from the present matter as the employee formed

97

Defendants were disloyal to Debtor when the Accounting Practice was in place. Based on the evidence, the Court believes that the Management Defendants' actions, including utilizing the Accounting Practice, were ultimately intended to be used in furtherance of the interest of Debtor. In fact, the evidence indicates that the Management Defendants were driven and worked tirelessly to grow Debtor and sustain its business. The vast majority of capital raised by Management Defendants during that period went to Debtor for its expenses and liabilities and resulted in significant growth of Debtor's business. The Court also notes that an eventual sale of Debtor as hoped for by the Management Defendants would have benefited all shareholders alike.

The evidence also indicates examples that contradict the Trustee's theory that the Management Defendants primarily intended to use Debtor as a vehicle for theft. For example, the record shows that Management Defendants loaned personal funds to Debtor in times of need and enacted cost cutting measures to assist Debtor in financially difficult times. On at least one occasion, Management Defendants considered suspending payments to officers and managing employees in a cost-cutting effort. Debtor was a real business with real customers and provided desired services to those customers. This is not a circumstance where the business is merely a front or sham to centrally serve the purposes of the company's insiders. The significant and continual efforts of Management Defendants to attract and retain customers, including major banks, and to raise capital evidence Management Defendants' genuine belief in the likelihood of Debtor's success. These are not actions indicative of an agent placing his own interests above his principal's. While Management Defendants, like all of Debtor's shareholders, would have benefited from the

---

a competing company using his employer's protected information while employed by the corporation. *Id.* at *11. Issues of imputation and the adverse interest exception were not present or addressed in *Guven*.

success of Debtor's business, that secondary benefit does not indicate that Management Defendants were acting against Debtor.

The evidence is clear that Management Defendants trusted Debtor's business model and that they steadily believed they were just a few steps away from reaching a level of stable growth or attracting a buyer.[64] The Management Defendants' actions, including the maintenance of the Accounting Practice, were not fueled by self-interest to the detriment of Debtor, but were aimed towards helping Debtor's business grow and succeed. Unfortunately, as is the case for many companies that appear before this Court which have a great or timely business idea, the challenge of managing rapid growth and sustaining profitable operations is often difficult and success frequently depends on changing markets, the costs and availability of capital, proper management decisions, and professional advice, amongst other factors. In this case, the hope of permanent success did not materialize in time, and the reality was that rapid growth caused constant capital needs, resulting in an increase of fixed costs and lower profit margins for Debtor. However, the fact that Management Defendants' actions did not result in the hoped-for success for Debtor is not indicative that Management Defendants totally abandoned Debtor's interests. *See Restatement (Third) of Agency* § 5.04 cmt. c ("[T]he fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely.").

For the foregoing reasons, it is apparent to the Court that Management Defendants' actions provided benefit to Debtor. As a result, the Court finds the Management Defendants did not totally abandon the interests of Debtor through their actions, including the use of the Accounting Practice. Therefore, the Court finds, based on the evidence presented, that the adverse interest exception

---

[64]   While the subjective motivation of an agent is not generally relevant in determining if the agent totally abandoned the interests of the corporate principal, it appears to the Court that the actions of the Management Defendants were taken because of their belief that it would help Debtor succeed and grow and not solely for their own personal gain.

does not apply in this matter to prevent imputation of the Management Defendants' knowledge and actions to Debtor. [65]

### Alleged Collusion Exception to Imputation

The Trustee also alleges that the knowledge and use of the Accounting Practice should not be imputed to Debtor because Meyers and Morgan Keegan colluded with the Management Defendants to defraud Debtor. To succeed on this theory, the Trustee argues that South Carolina and Nevada courts would adopt a "collusion exception" to imputation, which, in effect, would prohibit a third party from asserting an agent's knowledge is imputed to the principal when the agent and third party secretly collude to commit a wrong against the agent. Therefore, the Trustee alleges that without imputation to Debtor due to an alleged collusion, *in pari delicto* is unavailable as a defense to Meyers and Morgan Keegan.

In support of this argument, the Trustee cites to the Supreme Court of South Carolina's holdings in *Crystal Ice Company of Columbia, Inc. v. First Colonial Corp.*, 257 S.E.2d 496 (1979). In *Crystal Ice*, the court indicated that a "well-recognized exception to this general rule [of imputation] exists in situations where the agent is acting fraudulently against his principal or for any other reason has an interest in concealing his acquired knowledge from his principal." *Id.* at 498. The Supreme Court of South Carolina further held that "an agent's fraud [against the principal] cannot alter the effect of his knowledge to his principal with respect to third persons who had no connection with the fraud." *Id.* The Trustee argues that the inverse of the holdings of

---

[65]     Agency law provides a further exception, known as the sole actor exception, to permit imputation of knowledge to a principal even when the adverse interest exception applies. *See In re Derivium Capital, LLC*, 716 F.3d at 368. Under the sole actor exception, imputation will occur regardless of whether the agent acts adversely to the interest of the principal if the agent exercises so much control over the principal that the agent could be considered one in the same as the principal. *Id.* Significant argument and evidence were presented from the parties as to whether the Management Defendants were the sole actors of Debtor; however, as the Court finds that the adverse interest exception is not applicable in this matter and that the knowledge of the Accounting Practice is imputed to Debtor, it is not necessary for the Court to consider at this time whether the Management Defendants were the sole actors of Debtor.

100

*Crystal Ice* is also applicable to bar imputation, namely that there will be no imputation if the third party seeking to impute the agent's knowledge and actions to the principal has colluded with the agent to defraud the agent's principal.

The Trustee also suggests that both Nevada and South Carolina courts would follow the public policy considerations adopted by the Supreme Court of Pennsylvania's holdings in *Official Committee of Unsecured Creditor of Allegheny Health Education & Research Foundation v. PriceWaterhouseCoopers, LLP (Allegheny)*, 989 A.2d 313 (Pa. 2010). In *Allegheny*, the Supreme Court of Pennsylvania addressed certified questions regarding the application of imputation based on the *in pari delicto* defense in an *auditor-liability* case brought by a bankruptcy committee. *Id.* at 314–15. The *Allegheny* court, after recognizing a collusion exception to imputation, categorically "declined to consider that a knowing, secretive, fraudulent misstatement of corporate financial information to be of benefit to a company" and therefore, declined to review the adverse interest exception to imputation in the matter to determine if the management's actions provided a benefit to the company under the total abandonment standard. *Id.* at 337–38. Instead, the Supreme Court of Pennsylvania allows imputation only in circumstances where the auditor has acted materially in good faith. *Id.* at 338–39.

In the nine years since it was issued, it appears that no other jurisdiction has adopted the broader approach of *Allegheny*. Both the Court of Appeals of New York and Delaware's Court of Chancery have questioned the policy considerations of *Allegheny*. *See Stewart*, 112 A.3d. at 317-18; *Kirschner v. KPMG LLP*, 938 N.E.2d at 958. The Court of Appeals of New York noted that the equities of such a rule are not as apparent as indicated in *Allegheny*, questioning, "why . . . the interests of innocent stakeholders of corporate fraudsters trump those of innocent stakeholders of the outside professionals who are the defendants in these cases" and that such holdings:

101

> may be viewed as creating a double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged with knowledge of their wrongdoing agents. And, of course, the corporation's agents would almost invariably play the dominant role in the fraud and therefore would be more culpable than the outside professional's agents who allegedly aided and abetted the insiders or did not detect the fraud at all or soon enough.

*Kirschner v. KPMG LLP*, 938 N.E.2d at 958. The Delaware Court of Chancery also noted that the policy considerations relied upon in *Allegheny* are misguided, as the approach would provide limited deterrence considering "the numerous government and non-governmental bodies regulating and otherwise overseeing the audit industry." *Stewart*, 112 A.3d at 317.

Similarly, while a Nevada state court has not yet addressed the arguments raised in *Allegheny*, the United States District Court for the District of Nevada, applying Nevada law, noted that "the Pennsylvania Supreme Court's requirement [in *Allegheny*] that the auditor act in good faith creates a double standard. [The liquidating corporation's] innocent stakeholders would be able to avoid the bad faith conduct of [its] agents imputed to [it], but [the Auditing Firm's] innocent stakeholders would have no such opportunity." *USACM Liquidating Trust*, 764 F.Supp.2d at 1228 n. 3 *aff'd*, 754 F.3d 645 (9th Cir. 2014).

The Court first notes that the present matter is distinguishable from *Allegheny* as Debtor did not retain Meyers and Morgan Keegan to serve as its accountants or auditors. Further, the Court finds the reasoning of the Court of Appeals of New York and Delaware Court of Chancery to be compelling and relevant to the present matter.[66]  For these reasons, the Court is not convinced that Nevada or South Carolina state courts would follow the approach taken in *Allegheny*.

---

[66]    For example, applying an approach similar to *Allegheny* in this matter would provide minimal additional deterrence as there are several regulatory authorities that monitor and oversee financial professionals like Meyers and Morgan Keegan, including the Financial Industry Regulatory Authority, the Securities and Exchange Commission, the South Carolina Attorney General, as well as enforcement of matters through investor lawsuits under the federal and state securities laws. Also, similar concerns of a "double standard" are present in this matter.

Ultimately, in the present matter, to the extent South Carolina or Nevada recognizes a collusion exception, the Court finds, based on the evidence presented, that Meyers and Morgan Keegan did not participate in secretive, collusive conduct with Management Defendants in connection with the Accounting Practice to defraud or otherwise act against Debtor.[67]

### Meyers and Morgan Keegan's Knowledge of the Accounting Practice

The Trustee in his proposed order states "[t]he heart of this case is [Debtor's] recognition of AR and revenues, in violation of GAAP and the [M]anagement [D]efendants' scheme and actions with [Meyers and Morgan Keegan] designed to bring [Debtor] to its exit without the hampering of full disclosure of the material facts [Meyers and Morgan Keegan] knew or were recklessly indifferent in trying to avoid." Central to determining if Meyers and Morgan Keegan secretly and fraudulently colluded with the Management Defendants using the Accounting Practice is the extent of Meyers and Morgan Keegan's knowledge of its impropriety. While Meyers, personally and as the representative of Morgan Keegan, does not dispute that he was aware of the Accounting Practice, the Defendants strongly deny that they created it or knew of any possible issues with the practice until the release of the TS Report, but instead relied upon the repeated statements and assurances of CEO Sturgill (a purported CPA), CFO Hargrett (a CPA), and Debtor's auditor, Grafton (also a CPA) that the policy was GAAP compliant. Contrary to the Trustee's arguments, the evidence showed that Meyers raised questions about the accounts

---

[67]    To the extent it is recognized, it appears the burden to demonstrate the alleged collusion between Meyers and Morgan Keegan and Management Defendants to defraud the Debtor is on the Trustee. *See Pilot Life Ins. Co. v. Pulliam Motor Co.*, 229 F.2d 912, 917–18 (4th Cir. 1956) (applying S.C. law) (in the context of rescinding an insurance policy, finding the knowledge of the insurer's medical examiner was imputed to the insurer because there was no evidence of a fraud or collusion presented involving the insurer's medical examiner and the insured); *see also* 23 S.C. Jur. § 57 Agency, Presumptions and Burden of Proof (1994) ("Once a party proves that an agent has acted within the apparent scope of his authority, the burden becomes that of the principal to demonstrate by a preponderance of the evidence that the agent's acts were outside his authority.").

-318-

receivable approach and required full disclosure to institutional investors with whom Morgan Keegan dealt pursuant to its contracts. Furthermore, Meyers understood from Debtor's management, including Debtor's CEO, CFO, and an institutional investor considering an investment in Debtor that a write down of the accounts receivable balance was an acceptable fix of the issue—a write down that Debtor's management indicated it was considering.

The Trustee asks the Court to conclude that the Accounting Practice was created by Meyers due to his original training as a certified public account and financial professional; whereas, Sturgill, Debtor's CEO (and effectively Debtor's CFO until Hargrett's arrival), who had apparently failed all four sections of the CPA exam on six separate occasions (although not disclosed to Meyers or other members of Debtor's management at the time the Accounting Practice was first put in place), was incapable of creating the policy. The Trustee's theory is speculative and not proven according to his burden. It is the Court's view that the fact that the Accounting Practice may not have correctly applied generally accepted accounting principles could equally suggest that it was created by someone with inexperience or limited knowledge. Ultimately, the evidence indicates that its use was dependent upon and perpetuated by both CEO Sturgill and Debtor's auditor, Grafton.

Next, the Trustee points to the fact that the Accounting Practice was first implemented shortly after Morgan Keegan formed a relationship with Debtor and first appeared in the April 2006 Confidential Investor Memorandum (April 2006 CIM) that was compiled by Morgan Keegan. However, the evidence before the Court clearly indicates that the 2005 financials first reflecting the Accounting Practice were provided by CEO Sturgill to Morgan Keegan's agents on March 27, 2006 for incorporation into the April 2006 CIM.

Finally, the Trustee relies on an array of events over a period of many years to indicate some broader involvement by Morgan Keegan in Debtor's Accounting Practice and financial statements. Included in this argument were the following: (1) Meyers and Morgan Keegan became familiar with Debtor's financials as it was the intermediary for communication between potential institutional investors and Debtor; (2) Morgan Keegan's employee, Clark, helped to assist Debtor with its responses to the due diligence requests of the institutional investor, Bison, and created financial models of Debtor for use by potential institutional investors;[68] and  (3) occasions where Meyers and Clark provided assistance to Sturgill regarding financial matters, such as providing minor stylistic and formatting suggestions to the notes of Debtor's financials,[69] and assisting with a draft of a monthly statement of income for the first six months of 2006. However, the evidence cited by the Trustee does not provide a connection from Meyers or Clark to the creation of the Accounting Practice and furthermore, it appears that Meyers and Clark's suggestions were always given to Sturgill and Hargrett for final approval.[70] Ultimately, the evidence does not establish how and by whom the Accounting Practice was created beyond its initial presentment by CEO

---

[68]    The evidence indicated that Meyers insisted on full disclosure of the Accounting Practice to Bison and all institutional investors with whom he dealt. As Meyers testified, his "goal is to have as much disclosure as possible" to the institutional investors when considering an investment. There is no convincing evidence that he acted deceptively to hide the Accounting Practice.

[69]    The Trustee's expert asserted that the financial notes regarding Debtor's revenue recognition practice included with the 2005 audited financial statements were misleading because they used the term "entitled" in describing Debtor's rights to the fees of the uncollected NSF checks. The Trustee alleges that this term was misleading in that it gave the impression that Debtor had already earned the Service Fee. While the Court is not fully convinced that the use of the term "entitled' was misleading, the Court notes that the evidence does not suggest that Meyers or Morgan Keegan drafted this note or suggested the use of the term "entitled."

[70]    The Trustee suggests that Clark's calculation of Debtor's collection rate as part of his work on the due diligence requests of Bison was an effort to conceal the Accounting Practice. However, the Court is not convinced that this was an effort to conceal as Clark was open to both to Debtor's management and to Bison as to his methodology in calculating the collection rate. Further, there was no documentary evidence presented showing that any member of management or the Board expressed issues or concerns with Clark's methodology.

105

Sturgill.[71] Therefore, weighing the evidence presented, the Court cannot conclude that Meyers or

Morgan Keegan created the Accounting Practice or introduced it to Debtor.

**Knowledge of Impropriety**

The Trustee also argues that Meyers and Morgan Keegan knew about the alleged

impropriety of the Accounting Practice when it was implemented in 2006.

The Trustee's expert opined that the Accounting Practice violated basic principles of

accounting, namely that revenue, like a receivable, is not earned until "you've done everything

you have to do, you've provided a service," and that, because Debtor had not yet collected every

check associated with the fee, Debtor could not count that fee as a receivable. Therefore, the

Trustee's expert opined that it is not possible for someone with Meyers' prior training to be

unaware of the impropriety of the approach.

To the contrary, Meyers testified that he relied on the repeated assurances of Sturgill and

Grafton that the Accounting Practice was proper. Furthermore, Meyers testified that he was aware

of an accounting method in certain sectors of the debt collection industry that treated collection

fees as a receivable, known as the effective yield method of accounting. Meyers explained that, as

he understood the effective yield method, when a company buys a pool of accounts for collection,

---

[71]    The record reflects that Blevins testified that he believed Meyers created or introduced the Accounting
Practice and that Sturgill was not educated enough to create such a policy. However, the Court had serious doubts
about the veracity of Blevins's testimony due to his pre-trial communications with the attorneys on both sides in this
matter in which he appears to be "shopping" his testimony to each side in this matter by suggesting to offer testimony
to benefit whichever side would benefit him. Further, there were discrepancies between Blevins's testimony and the
evidence presented. For example, Blevins testified that he never received communication of the findings of the TS
Report or that Debtor's financial statements were misstated; however, documentary evidence indicated that he was
included in the discussions regarding the use of and change from the Accounting Practice after the release of the TS
Report. *See* Def. Ex. 127. As such, the Court does not find Blevins' testimony to be credible.

During the trial, the Court also received testimony from others that Wade Cordell had told investors of Debtor
that Meyers was "working the financials." However, the evidence indicated that Wade Cordell had a tendency to
hyperbolize and misrepresent facts to investors, and he, in fact, testified at trial that he believed Sturgill with Grafton
provided the financial information that first used the Accounting Practice for the April 2006 CIM and that Sturgill
"put this whole system together of . . . how you book accounts receivables . . ." The evidence presented lacked the
necessary specificity to convince the Court that Meyers created or introduced the Accounting Practice to Debtor.

106

**-321-**

the company may treat both the principal debt owed and the fees associated with the collection of the debt as a receivable. According to Meyers, companies using the effective yield method record revenues based on the expected collections rate for those accounts, which may be later written down based on the actual amount of the accounts collected. Further, Meyers' experience while he was an accountant was limited to the accounting of manufacturing businesses and not the accounting of debt collections businesses. Without more, these factors reasonably explain how Meyers could have been unaware of the alleged impropriety with the Accounting Practice, despite being aware of its use.

In addition, the record shows that throughout its use of the Accounting Practice, Debtor had several professionals working for it that did not question the practice, and therefore, provided additional legitimacy for its use. Debtor's independent auditor, Grafton, indicated that the policy was GAAP compliant, and it appears the auditor issued certified audited financials, that incorporated the policy. Hargrett, Debtor's subsequent chief financial officer and a CPA, believed or accepted that the policy was GAAP compliant, and while Jones Day, Morgan Keegan's counsel, reviewed the 2005 audited financial statements and noted that the Accounting Practice was "aggressive GAP [sic] revenue recognition," it did not identify it as improper. Further, while unbeknownst to Meyers, it appears Debtor also discussed certain revenue accounting issues with the accounting firm of Ernst and Young in conversations with its Outside Securities Counsel. Based on the number of professionals employed by Debtor who were familiar with the Accounting Practice or expected to be but did not report it as improper, the Court is not convinced any impropriety of the Accounting Practice was apparent to Meyers and Morgan Keegan.

Also, pursuant to Morgan Keegan's contracts, Meyers and Morgan Kegan dealt exclusively with sophisticated institutional investors or lenders who, in considering lending or investing,

107

**-322-**

would be expected to conduct their own due diligence in reviewing Debtor's financials, often with the assistance of their own accounting professionals. In fact, that was exactly what occurred when MKSF employed Transaction Services, which issued the first written report, the TS Report, that raised several concerns about the Accounting Practice. Under neither the 2006 Contract nor the 2008 Contract were Meyers and Morgan Keegan retained to conduct an audit or provide accounting services to Debtor. Finally, pursuant to the express terms of the 2006 Contract, Morgan Keegan had no duty to verify the financial information provided to it by Debtor. In fact, Debtor had a duty to provide accurate information to Morgan Keegan.

Further, by the time the parties entered the 2008 Contract and after the TS Report, it appears that Debtor's management were actively discussing a change in the Accounting Practice and a one-time write down of the company's accounts receivable balance, which was generally viewed as an acceptable method of correcting or clarifying the issues with it.

There is also affirmative evidence which raises a significant doubt that Meyers and Morgan Keegan schemed to introduce or even knew the Accounting Practice was improper for use by Debtor. On many occasions, far from hiding its use, the Accounting Practice was openly discussed by Meyers and Morgan Keegan with Debtor's management and the institutional investors it consulted. The evidence is uncontradicted that Meyers insisted on transparency regarding the Accounting Practice with the institutional investors he brought to Debtor. The record includes several instances where Meyers provided explanations regarding the Accounting Practice with interested institutional investors, including providing those potential investors an explanatory note as to how Debtor calculated its accounts receivable balance during the 2006 Contract and providing institutional investors an explanation regarding Debtor's proposal to change its accounts receivable recognition policy and conduct a one-time write down of its accounts receivable

balance. In fact, the evidence shows that under the 2008 Contract, one such institutional investor withdrew its interest in Debtor due to the possible negative effects of a one-time write down. Furthermore, at the end of the 2006 Contract, in November 2006, during his closing conference with Debtor's management, Meyers actively recommended that Debtor hire a more recognized auditor, such as Ernst and Young, and for Debtor's management to consider changing the Accounting Practice to a "less aggressive revenue recognition policy." His testimony appears supported by the fact that soon after the conclusion of the 2006 Contract, Debtor's Board of Directors actively discussed and considered changes to the Accounting Practice at the Board's January 2007 meeting, but the Board affirmatively decided not to make a change. Later in 2008, in anticipation of a new engagement of Morgan Keegan by Debtor, Meyers was surprised that Debtor had not already written down the accounts receivable balance and encouraged CFO Hargrett's efforts to change the Accounting Practice and conduct a one-time write down of the company's accounts receivable to correct any concerns.

Furthermore, it seems counterintuitive that Meyers and Morgan Keegan would risk their reputations and jobs to knowingly promote the use of an improper Accounting Practice in dealing with sophisticated institutional investors who were certain to undertake their own due diligence reviews, including financial reviews, and likely discover the improper practice.

The record reflects that Meyers, and therefore Morgan Keegan, had a genuine belief in the prospects for Debtor, its business model, its products, and its industry. This is further bolstered by the fact that Meyers made a significant personal investment of $50,000 in Debtor, introduced the investment opportunity in Debtor to certain co-workers at Morgan Keegan (which resulted in at least one additional investment in Debtor), introduced Debtor to Regions Bank (the parent company of Morgan Keegan) which extended a $1 million+ line of credit to Debtor, referred

Debtor to MKSF (a related company of Morgan Keegan), who offered a multi-million dollar investment in Debtor, and introduced Debtor to many of his industry connections as potential customers for Debtor.

Considering all of these circumstances, even after the release of the TS Report on July 1, 2008, the Court cannot find sufficient evidence that Meyers and Morgan Keegan secretly colluded with the Management Defendants through the Accounting Practice to defraud or otherwise act against Debtor. The record reflects that even before the release of the TS Report, Debtor's management expected a sophisticated investor, lender or buyer would understand the change of its Accounting Practice and accept a write down as a suitable correction. On several occasions, the Management Defendants advised Meyers of that intention. Importantly, and perhaps telling, regarding the concerns expressed in the TS Report is the fact that MKSF, the actual recipient of the TS Report, still wanted to and, in fact, did offer to make a significant investment in Debtor's business with the contemplation that Debtor would write down its accounts receivable balance.[72] In anticipation of the MKSF transaction, Hargrett created monthly financial projections reflecting a write down in the middle of 2008. The understanding was that Debtor would write down the accounts receivable balance upon the closing of the MKSF deal, which remained pending until September 2008.

The evidence also reflects that when Meyers received the TS Report, a copy was also received by Hargrett, who passed it along to Sturgill. Hargrett testified that he believed copies of the TS Report were also given to Blevins and Wade Cordell. While it appears certain members of Debtor's Board may not have been presented with the findings on the Accounting Practice in the

---

[72]      Not only did the Board sitting at the time of the TS Report not change the Accounting Practice, but the succeeding new Board, seated after the Initial Ouster, first determined to transition from the Accounting Practice over time by a series of accounts receivable write downs over time to mitigate concern for Debtor, but later wrote down the accounts receivable balance in a single event, retroactively applying it to the entirety of 2009.

TS Report, the Court finds, weighing the evidence presented, that Meyers was not aware of this fact and was not aware that any of the Management Defendants would conceal the findings of the TS Report from other members of the Board. It appears such a belief is reasonable considering Debtor's management was actively and openly discussing changing the Accounting Practice and/or writing down the accounts receivable balance.[73]

Based on his testimony and considering Meyers' previous openness and disclosure of the Accounting Practice to institutional investors, it appears Meyers believed that the findings of the TS Report were communicated to all of the relevant parties within Debtor by its management, and it does not appear he consciously intended to conceal the findings to any individuals within Debtor. Further, the evidence does not demonstrate that Meyers and Morgan Keegan were aware of any alleged misappropriation of Debtor's assets by Management Defendants.

It appears, even after the release of the TS Report, Meyers as well as Debtor's management and most of its stockholders continued to have a strong belief in the potential success of Debtor when considering the demand for its services in the industry. This outlook was bolstered by the fact that Debtor was still attracting more and more customers and that, despite a possible write down of the accounts receivable balance and change in the Accounting Practice, a sophisticated private equity firm, MKSF, was still interested in making a significant investment in Debtor. For these reasons, the Court is not convinced that Meyers and Morgan Keegan secretly colluded with

---

[73] The Trustee calls the Court's attention to several events involving Meyers after the release of the TS Report, including the September 2008 Sales Force Meeting where Meyers gave a presentation, the December 2008 phone call between Meyers and Danielson, and Meyers' alleged assistance with Debtor's 2009 stock valuation. However, all of these events appear to be genuine "he said, she said" disputes regarding the statements and conduct of Meyers, for which both sides could be viewed as credible. Even assuming the Trustee's allegations to be true, which the Court is not concluding, the Court does not find based on this evidence that the Trustee has demonstrated that Meyers and Morgan Keegan were acting in concert or otherwise secretly colluding with Management Defendants to defraud Debtor through the use of the Accounting Practice.

111

**-326-**

the Management Defendants. Therefore, to the extent South Carolina or Nevada law would accept
*Crystal Ice* as a possible bar to imputation, the Court finds that the Trustee has not satisfied his
burden to invoke such an exception.

### The "Greater Fault" Exception to *In Pari Delicto*

As an additional theory to escape the consequences of imputation of the knowledge of the
Accounting Practice to Debtor, the Trustee also argues that *in pari delicto* should not apply because
Meyers and Morgan Keegan bear greater fault than Debtor for the alleged injuries to Debtor
resulting from the Accounting Practice.

Both South Carolina and Nevada courts have recognized that *in pari delicto* applies when
the plaintiff is at equal or greater fault as the defendant. *See Proctor v. Whitlark & Whitlark, Inc.*,
778 S.E.2d 888, 893 (S.C. 2015) ("'[W]here parties are in pari delicto, that is equally in the wrong,
no affirmative relief will be given to one against the other and that no one shall be permitted to
profit by his own wrong.'" (quoting 4 S.C. Jur. *Action* § 21 (1991 & Supp. 2015))); *Magill v.
Lewis*, 333 P.2d 717, 719 (Nev. 1958) (in addressing *in pari delicto*, noting that the defense should
not be applied "where the defendant is the one guilty of the greatest moral fault"). Further, in the
context of private causes of action for damages under federal securities laws, the Supreme Court
of the United States has indicated that *in pari delicto* should only be applicable when "the plaintiff
bears at least substantially equal responsibility for the violations he seeks to redress." *Bateman
Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).

However, based on the evidence presented, the Court does not find Meyers and Morgan
Keegan were at greater fault in this matter. The decision to implement and utilize the Accounting
Practice was made by Debtor, and not Morgan Keegan or Meyers. Further, the Trustee has failed

112

**-327-**

to establish that Meyers and Morgan Keegan participated with the Management Defendants in any type of scheme involving the Accounting Practice.

While the Trustee has attempted to frame Debtor as a neophyte to the world of securities and raising capital that relied heavily on Meyers and Morgan Keegan for advice, translating into greater blame on Morgan Keegan, the Court does not agree. Over the company's history, most, if not all, of Debtor's significant capital raises were conducted without the participation of Meyers and Morgan Keegan, and in fact, the record reflects that on the one occasion that Meyers and Morgan Keegan finalized a possible agreement between Debtor and an institutional investor, MKSF, Debtor's management instead elected to pursue a capital raise on its own through the personal efforts of the Management Defendants, and other officers, Board members and shareholders.

To the degree this factor should be considered, the evidence simply does not demonstrate that Meyers and Morgan Keegan were masterminds of a scheme or otherwise controlled Debtor's operations, such that they should be considered more to blame in this matter than Debtor. Debtor, through its management, bears the greater fault in this matter for the implementation and consequences of the use of the Accounting Practice, including any capital raises during the time period that the policy was in use.

### Public Policy Exception to *In Pari Delicto*

Finally, the Trustee argues that public policy should bar the application of *in pari delicto*, noting that the doctrine is rooted in equity and that both South Carolina and Nevada law recognize that in certain circumstances, an overriding public policy consideration may permit relief to be granted despite the application of *in pari delicto. See Proctor*, 778 S.E.2d at 893 ("'On the other hand, there may be an overriding policy consideration that permits relief to be granted [even if *in*

*pari delicto* were applicable to the matter]." (quoting 4 S.C. Jur. *Action* § 21 (1991 & Supp. 2015))); *In re Amerco Derivative Litigation*, 252 P.3d at 696 (noting that "there are public policy grounds for not applying in pari delicto as a bar to an action among wrongdoers").[74]

Here, the Trustee again relies heavily on the Court of Appeals for the Seventh Circuit's opinion in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983) for the proposition that public policy should bar the application of *in pari delicto*. In *Schacht*, the Seventh Circuit found that the directors of an insurance company participated in a fraud *against* the company (and not a fraud *on behalf* of the company) based on an alleged "far-reaching scheme in which, as a consequence of the illegal activities of [the Insurance Company's] directors and the outside defendants, [the Insurance Company] was, *inter alia*, fraudulently continued in business past its point of insolvency and systematically looted of its most profitable and least risky business and more than $3,000,000 in income—all actions which aggravated [the Insurance Company's] insolvency." *Schacht*, 711 F.2d at 1347–48. As an initial matter, the Court notes that it is not convinced the use of the Accounting Practice amounted to a fraud against Debtor or that the Management Defendants' actions were otherwise adverse to Debtor. As discussed above, the significant majority of the capital was utilized for Debtor's growth and expenses and served to benefit Debtor. *See McDorman*, 521 F.3d at 395 ("The situation here clearly differs from that in *Schacht*; in short, trying to generate and develop business for the corporation is a far cry from looting the corporation's assets. Accordingly, we conclude that there was sufficient evidence to support a jury finding that Directors—and

---

[74]     Nevada Courts have listed public policy factors to consider when applying *in pari delicto*: "Where, by applying the rule, [1] the public cannot be protected because the transaction has been completed, [2] where no serious moral turpitude is involved, [3] where the defendant is the one guilty of the greatest moral fault, and [4] where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied." *In re Amerco Derivative Litigation*, 252 P.3d at 696 (internal quotation omitted).

[therefore the Insurance Company]—were *in pari delicto*."). On those grounds, this case is distinguishable from *Schacht*.

Nonetheless, the Trustee insists upon the Court's application of the two-pronged analysis utilized in *Schacht* to determine whether a director's actions and knowledge should be imputed to the company: "whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing." *Schacht*, 711 F.2d at 1348.

First, the Court notes that it appears neither South Carolina nor Nevada law have considered this two-pronged analysis in *Schacht* in determining if *in pari delicto* should be applied. In addition, in the present case, the weight of the evidence convinces the Court that Debtor, through the actions of members of its management and officers, were the originators of the Accounting Practice and could not recover from others if the Accounting Practice was improper. In other words, Debtor should not be able to recover damages against a third party for a wrong that it itself created and implemented. Further, as Morgan Keegan and Meyers received no compensation from Debtor, it appears that Morgan Keegan or Meyers would not be unjustly enriched by allowing the application *in pari delicto*.

This Court further believes that South Carolina or Nevada law would also not apply a public policy exception to *in pari delicto* under these circumstances. While the Trustee asserts that any recovery in this proceeding would inure to Debtor's estate and not to the Management Defendants, South Carolina and Nevada courts have applied *in pari delicto* equally to receivers and bankruptcy trustees who stand as the successor to an insolvent company without such a consideration. Specifically, the Court notes the holding of the Court of Appeals for South Carolina in *Myatt v. RHBT Financial Corp.*, 635 S.E.2d 545, 548 (S.C. Ct. App. 2006), which addressed

the application of *in pari delicto* in the context of a claim brought by a receiver of a corporation, holding that when the receiver is seeking only tort damages, "in the absence of a fraudulent conveyance case, the receiver of a corporation used to perpetuate fraud may not seek recovery against an alleged third party co-conspirator in the fraud." *See also Hays v. Pearlman*, C/A No. 2:10-CV-1135-DCN, slip op. 2010 WL 4510956, at *5–6 (D.S.C. 2010) (following *Myatt* and applying *in pari delicto* as to claims brought by a company's receiver against the company's attorney who allegedly assisted or should have known he was assisting the Ponzi scheme organized by the company's management); *In re Agribiotech, Inc.*, C/A No. CV-S-02-0537-PMP, slip op. 2005 WL 4122738, at *8 (D. Nev. Apr. 1, 2005) (applying Nev. law) ("[A]n equitable defense is as good against a bankruptcy trustee as it would have been against the debtor as of the commencement of the bankruptcy case."). In addition, the Court notes the Fourth Circuit's holdings in *Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital, LLC)*, 716 F.3d 355, 367 (4th Cir. 2013), that even though the appointment of a bankruptcy trustee removed the alleged wrongdoer from the matter, based on the language of § 541, "to the extent *in pari delicto* would have barred a debtor from bringing suit directly, it similarly bars a bankruptcy trustee—standing in the debtor's shoes—from bringing suit."

Further, the Court is not convinced that a recovery by the Trustee in this matter would create a significant impact the deterrence similar alleged wrongdoing in the future. First, the Court finds that applying *in pari delicto* in this matter would not undermine the securities laws of this country.[75] Any wrong-acting securities professional would still be subject to possible enforcement actions from the Securities and Exchange Commission, Financial Regulatory Authority and the

---

[75]    In the context of Federal Securities law, *in pari delicto* should only be applied if "the preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman*, 472 U.S. at 310.

South Carolina Attorney General as well as possible direct causes of action from investors.[76]  The Court finds that this possibility serves as a powerful deterrent to such wrongdoing and that it is not necessary to permit Debtor, the party originating the alleged fraud, to recover in the present matter as a means of further deterrence. Further, to allow a recovery in this matter could also effectively excuse fraudulent accounting practices by a corporation because, in spite of being the originator of the fraudulent practice and the party in the best position to stop such a practice in such situations. The corporation, who not only enjoyed the benefits of its actions,[77] could pass any costs and damages resulting from such a practice to a third party who may have allegedly assisted.

For these reasons, the Court finds that public policy considerations should not bar the application of *in pari delicto* in this matter.

### Application of *In Pari Delicto*

As the Court finds that the Management Defendants were acting within their scope of authority when implementing the Accounting Practice and issuing the alleged misrepresented financial statements, these actions and knowledge are imputed to Debtor. Therefore, the Court finds *in pari delicto* applies to this proceeding, and the Trustee, standing in the shoes of Debtor, is barred from recovering for his causes of actions against Morgan Keegan and Meyers as they relate to their alleged involvement with the Accounting Practice, as Debtor (and therefore, also the Trustee) would equally (or to a greater degree) be a wrongful actor in regards to the alleged impropriety and the consequences resulting from the Accounting Practice.

---

[76]   For example, in the present matter, the record reflects that certain investors have brought separate, individual causes of action in a state court lawsuit against Morgan Keegan, which the Court addressed in a motion for relief in Debtor's main bankruptcy case.

[77]   While the Trustee has emphasized the alleged harm that the Accounting Practice caused Debtor's shareholders, the Court cannot discount the fact that if Debtor had been purchased by another company or conducted an initial public offering at an increased value resulting from the use of the Accounting Practice, Debtor's shareholders would have primarily benefited from the increased value.

### *Merits of the Trustee's Causes of Action*

While the Court finds that the Trustee's remaining causes of action are all fully barred by *in pari delicto*, the Court has nonetheless considered the Trustee's remaining causes of action on their merits and finds for the reasons stated herein and in prior sections, that Meyers and Morgan Keegan are entitled to judgment in their favor.

### *Causation*

Common to all of the Trustee's remaining causes of action is that Meyers and Morgan Keegan's actions/inaction relating to the Accounting Practice caused Debtor's net operating losses from the time that the April 2006 CIM was finalized until Debtor's bankruptcy filing. Causation is an essential element of each of the Trustee's remaining causes of action. *See Troutman v. Facetglas, Inc.*, 316 S.E.2d 424, 426 (S.C. Ct. App. 1984) ("The elements of a tort are (1) duty; (2) breach of that duty; (3) proximate causation; and (4) injury."); *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (holding that causation is an element of a Rule 10b-5 securities fraud claim); *In re Amerco Derivative Litigation*, 252 P.3d at 702 (holding that the breach of fiduciary relationship that was aided and abetted, resulted in damages).

Each of the Trustee's claims is premised on the theory that Meyers and Morgan Keegan failed to disclose to every member of the Board that Debtor was engaged in a fraudulent Accounting Practice, details regarding Sturgill's background,[78] and the findings of the TS Report.[79]

---

[78]     The Court finds credible Meyers' testimony that he did not believe he was free to communicate the findings of Sturgill's background report because of the confidentiality and liability provisions of the report. The evidence does indicate that Meyers encouraged Debtor's management to exchange their background reports, which it appears that it in fact occurred with Sturgill refusing to release his background report.

[79]     As previously discussed, the Court finds that the Trustee has not met his burden of showing that Meyers and Morgan Keegan knew that findings of the TS Report would not be communicated to all of Debtor's management and members of the Board.

118

As a result of Meyers and Morgan Keegan's failure to affirmatively disclose, the Trustee argues that Debtor continued to operate and incur losses for a number of years which ultimately caused the prolonged collapse of the company and enabled the Management Defendants to embezzle funds from Debtor. Damages equal to Debtor's total operating losses are the only theory of damages the Trustee offered at trial. Specifically, the Trustee offered the expert testimony of George DuRant to establish Debtor's operating losses over a period of approximately four years, ending with the date that Debtor filed its chapter 7 bankruptcy petition, which was nearly two years after the end of the 2008 Contract between Debtor and Morgan Keegan.

DuRant's testimony is only relevant to the extent the Trustee first establishes that Meyers and Morgan Keegan were the cause of these alleged losses; a damages assertion without a causal link is of no use to the analysis. *See Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) (holding "[a]n expert's opinion as to damages must be causally related to the alleged harm" and "should be excluded when it is based on assumptions which are speculative and are not supported by the record"); *PBM Prod., LLC v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2010 WL 56072, at *6 (E.D. Va. Jan. 4, 2010) (excluding damages expert who failed to establish a "causal link between the alleged misconduct and the claimed damages"). As outlined below, the Trustee has failed to satisfy this burden on the causation of damages.

### Proximate Cause of Debtor's Net Operating Losses

The Trustee has failed to prove that Debtor would not have remained in operation (and, therefore, continue to incur losses as alleged by the Trustee) absent Meyers and Morgan Keegan' actions. The evidence at trial fails to demonstrate that Meyers and Morgan Keegan independently and proximately caused Debtor's alleged net operating losses. *Cf. In re Acterna Corp. Sec. Lit.*, 378 F. Supp. 2d 561, 588 (D. Md. 2005) ("Here, Plaintiffs have alleged no facts which, if proven,

119

**-334-**

would show that their economic loss, i.e., the decline in the value of their purchased stocks, was caused by the alleged misstatements of Defendants, as opposed to an alternative intervening event.").

Meyers and Morgan Keegan did not cause Debtor to implement or continue to utilize the Accounting Practice. Meyers and Morgan Keegan had no significant role in the preparation of Debtor's financial statements—that was the role of Sturgill and later Hargrett. Similarly, Meyers and Morgan Keegan had no role in auditing the Company's financial statements—that was Grafton's role. Furthermore, all Board members had a legal obligation to review and understand the financial statements of the company, which they acknowledged and yet failed to perform.

Equally determinative is the fact that Debtor had notice that the Accounting Practice may not accurately reflect the financial condition of Debtor —information it chose to ignore. In early 2006, Debtor discussed its Accounting Practice with Outside Securities Counsel and Ernst and Young. Specifically, the evidence showed that Sturgill sent Debtor's "Accounts Receivable Recognition" section to Outside Securities Counsel. Likewise, Debtor involved Ernst and Young, which provided a letter to Sturgill, with a copy to Outside Securities Counsel that "addresses the accounting issues and how to resolve them." When Hargrett joined Debtor in October 2006, he questioned Debtor's Accounting Practice and recommended to Sturgill and Wade Cordell that Debtor change it.  Debtor refused. In addition, both Meyers and Jones Day described the Accounting Practice as "aggressive," and communicated as much to Sturgill.  These facts sufficiently show that Debtor had knowledge (or should have had knowledge)—imputed to it through notice to one or more of its Board members and officers—that there were potential issues with its audited financials. Debtor, however, ignored these warnings, and in January 2007, the Board, with this knowledge, affirmatively voted to continue with the Accounting Practice and re-

engaged Grafton.

The evidence also convinces the Court that Debtor's operations were effectively controlled by the Management Defendants until the Initial Ouster in 2009, which was completely attributed to Debtor's failure to timely pay customers' funds and its related loss of business, and not the Accounting Practice. It is noteworthy that thereafter, Management Defendants Sturgill and Hargrett, parties fully aware of the Accounting Practice for many years, remained as CEO and CFO of Debtor respectively. Throughout the history of Debtor, it was the Management Defendants who controlled nearly all aspects of Debtor's operations, individually raised the significant capital used to operate the business, held the significant officer positions, owned a significant portion of Debtor's stock,[80] and held a voting majority of Debtor's board positions.[81]

While the Trustee presented testimony of employees and managers of Debtor who indicated they would have taken action if they knew of the alleged impropriety of the Accounting Practice, this testimony lacked specificity, even with the benefit of hindsight. Further, while the Trustee points to the fact that the Management Defendants were eventually ousted from Debtor, it is important to note that this ouster took place in two phases and that the first phase of the ouster had the support of certain members of the Management Defendants. The Initial Ouster in 2009 removed Wade Cordell, Brad Cordell and Blevins, resulted from the discovery of the deficit in

---

[80]    Significant evidence and argument were presented by the parties regarding the extent of the Management Defendant's ownership of Debtor, with the Trustee alleging that the Cordells misappropriated stock from Debtor without consideration and that Management Defendants improperly retired Michael Potter's 4.5 million shares. However, even considering the changes to Debtor's stock ledger as asserted by the Trustee, there is a significant question of whether the Management Defendants could have been removed from their positions over the period when the Accounting Practice was used, especially if the Court considers the shares of Michael Potter (who routinely voted in line with Sturgill). With Potter's shares, the Management Defendants' ownership of Debtor was near, if not over, a majority of the company's shares when the Accounting Practice was first used, and they continued to own approximately one-third of the company's shares until Debtor filed its petition for bankruptcy.

[81]    Until the 2009 Initial Ouster, Management Defendants held four of the six director positions on Debtor's Board.

121

**-336-**

customers' trust accounts. According to the ouster litigation, the impropriety of the Accounting

Practice was not an issue during the 2009 Ouster. Further, the Initial Ouster in 2009 was heavily

contested, including disputes regarding whether the ouster was legally proper and whether there

was a sufficient shareholder vote in favor of the removal. The litigation was an expensive cost to

Debtor that was ultimately resolved with an agreement in which Debtor would continue weekly

payments to the Cordells and Blevins. Importantly, two of the Management Defendants, Sturgill

and Hargrett, voted in favor of the ouster of the Cordells and Blevins in 2009 and remained as key

officers and directors of Debtor. The second phase of the ouster did not occur until a year later,

with the removal of Sturgill and Hargrett by Debtor's Board. Considering the years of "borrowing

from Peter to pay Paul" and related loss of confidence by some large customers, the removal of

key founders and leaders and managers, which were the face of Debtor for its entire history, and

the other contributing factors, including the constant need for more and more new capital, it is not

surprising that Debtor incurred large net operating losses and failed.

### Foreseeability

Regardless of which state's law governs the Trustee's remaining claims, the Trustee may

only recover those damages that were the foreseeable result of Meyers and Morgan Keegan'

alleged misconduct. *Young v. Tide Craft, Inc.*, 270 S.C. 453, 462, 242 S.E.2d 671, 675 (1978)

("Foreseeability of some injury from an act or omission is a prerequisite to its being a proximate

cause of the injury for which recovery is sought."); *Goodrich & Pennington Mortg. Fund, Inc. v.

J.R. Woolard, Inc.*, 101 P.3d 792, 797 (Nev. 2004) ("More particularly, we define proximate cause

as any cause which in natural [foreseeable] and continuous sequence, unbroken by any efficient

intervening cause, produces injury complained of and without which the result would not have

occurred." (alteration in original) (internal quotations omitted)). Therefore, a question before the

122

Court is whether it was foreseeable that Meyers and Morgan Keegan' conduct would cause Debtor's net operating loss?[82] In this case, the evidence requires an answer of "no," which precludes a finding in favor of the Trustee.

The Trustee's claimed damages were not foreseeable because, in the Court's judgment, the alleged damages "would have happened with or without" Meyers and Morgan Keegan involvement.[83] Meyers and Morgan Keegan played no controlling role with respect to Debtor's direct capital raises, and therefore did not cause Debtor to continue its operations. Meyers and Morgan Keegan had no role with respect to Debtor's friends and family offering, sale of territory licenses, its issuance of promissory notes, or its 2009 capital raise. Although the Trustee contends Meyers and Morgan Keegan were involved with the November 2006 PPM, Meyers and Morgan Keegan were purposely excluded from any involvement in the issuance of securities to non-institutional investors after October 31, 2006, and Debtor's management confirmed that "Morgan Keegan has absolutely nothing to do with this offering." Indeed, Meyers and Morgan Keegan' name does not appear anywhere on the November 2006 PPM that Debtor provided to investors and Meyers and Morgan Keegan had no communications with Debtor or with Outside Securities

---

[82]      In fact, the 2006 Contract specifically provided that Meyers and Morgan Keegan could rely on the financial information provided by IBG without independent verification.

[83]      Meyers and Morgan Keegan called the Court's attention to the District Court of South Carolina's opinion in *Inheritance Funding Co. v. Chatman*, C/A No. 3:12-CV-1308-JFA, slip op. 2013 WL 3946237 (D.S.C. July 31, 2013). In that case, Inheritance Funding Company ("IFC") advanced money on a probate estate to the decedent's children. *Id.* at *1. But unknown to IFC, the decedent's child had created fraudulent financial records, vastly inflating the value of the estate. *Id.* After IFC advanced funds on the estate, an accountant – retained by one of the decedent's children – provided records to the probate court; "[r]elying on documentation entirely provided by [the decedent's son], [the accountant] composed a letter accounting for the estate funds. While [the accountant] did no independent verification of the estate information, he did include in the letter that the financial transactions at issue were 'as indicated by the [decedent's son]'." *Id.* at *2. IFC then sued the accountant, claiming the letter "played a central role in the cover-up of the fraud," and the "existence of the letter delayed discovery of [the decedent's son's] fraud after the fact." *Id.* The court, in rejecting IFC's constructive fraud claim and granting summary judgment in favor of the accountant, found the lack of proximate cause determinative, noting the foreseeability requirement of causation and holding that "the injury would have happened with or without the existence of the [accountant's] letter." *Id.* at *3.

Counsel with respect to the November 2006 PPM after October 31, 2006, a date prior to the use

or issuance of that PPM. Moreover, Debtor's management decided not to complete a mezzanine

debt financing transaction with MKSF in 2008, electing instead to again directly raise capital—

this time through the issuance of promissory notes to individual investors. Meyers and Morgan

Keegan did not authorize or allow any use of Meyers and Morgan Keegan' name on any materials

used by Debtor to solicit non-institutional investors, as required by the 2006 Contract; in fact, the

evidence shows Debtor's agents were explicitly told to remove Meyers and Morgan Keegan' name

from all investor materials. Accordingly, the alleged operating losses are too tenuously connected

to Meyers and Morgan Keegan' actions to meet the foreseeability requirement.[84]

### Intervening Factors

At trial, the Trustee presented, in essence, an "all or nothing" damage theory based entirely

upon Debtor's operating losses from March 29, 2006 through the date it filed its bankruptcy

petition. The fatal flaw in this analysis is that there appears to be many other causes for Debtor's

operating losses, causes which are wholly unconnected with the actions of Meyers and Morgan

Keegan. These intervening factors include: (1) Debtor's direct issuance of stock, territory licenses,

and promissory notes in violation of securities law and the resulting cost associated with a

rescission offer; (2) Debtor's longstanding misuse of monies ostensibly held in trust for the benefit

of its customers to pay its operating expenses, which led to the Initial Ouster; (3) the removal of

---

[84]       As noted by the U.S. District Court for the District of South Carolina, "[t]ypically, to prove proximate cause in South Carolina, a Plaintiff must establish: (1) causation in fact; and (2) legal cause. Causation in fact requires proof that the injury never would have occurred 'but for' the defendant's actions. Legal cause, meanwhile, pertains to foreseeability." *Chatman*, 2013 WL 3946237, at *3 (citing *Whitlaw v. Kroger Co.*, 410 S.E.2d 251, 253 (S.C. 1991)). For the reasons specified in this Order, the Court also finds the evidence presented by the Trustee is insufficient to determined that Debtor would not have incurred its total net operating losses "but for" Meyers and Morgan Keegan's actions/inactions or the Accounting Practice. In addition, based on the evidence presented and for the reasons stated, the Court does not find that the Accounting Practice or Meyers and Morgan Keegan's actions/inactions were a substantial factor in Debtor's total net operating losses. Finally, the Court finds the Trustee has not sufficiently demonstrated a nexus between the Accounting Practice and Meyers and Morgan Keegan's actions/inactions and Debtor's net operating losses to establish loss causation.

founders and key managers of Debtor under allegations of wrongdoing; (4) illegal payment of sales

commissions to unlicensed personnel; (5) interest Debtor paid on the illegal promissory notes; (6)

costly litigation expenses incurred during the ouster of Debtor's key management and resulting

settlement payment to resolve the litigation; (7) Debtor's continued use and approval of its

Accounting Practice and re-hiring of Grafton with actual and constructive knowledge that the

Accounting Practice had been called into question; (8) Debtor's continued direct capital raises

from individuals even after the TS Report put Debtor on notice that its financial statements may

be materially misstated; and (9) Sturgill's misrepresentations of his background, which deterred

institutional investors from proceeding with an investment in Debtor.

The Trustee's damage calculation did not adequately consider these intervening factors,

each of which undoubtedly caused Debtor's total net operating losses. Because intervening causes

increased the amount of Debtor's operating loss, the Court rejects the Trustee's attempt to attribute

the entirety of Debtor's downfall to Meyers and Morgan Keegan or the Accounting Practice.

This ruling is consistent with cases from other circuits finding that a party may not recover

net operating losses if an intervening cause breaks the link between the alleged wrongful conduct

and the damages suffered. *Carco Grp., Inc. v. Maconachy*, 383 F. App'x 73, 75 (2d Cir. 2010). In

*Carco*, the Second Circuit noted that the mere existence of a wrongful act "[does] not necessarily

mean the [wrongful act] caused the company [seeking to recover net operating losses] to be

unprofitable." *Id*. Accordingly, the Court reversed the trial court's award of damages, remanding

the case with instructions to consider whether "potential intervening causes . . . might have broken

the link between [the] breach and any damages suffered." *Id*.

In sum, because the Trustee failed to prove the requisite nexus between the losses he seeks

to recover and Meyers and Morgan Keegan' alleged misconduct, each of the Trustee's claims fail.

125

### *Damages*

It is well established that a plaintiff has the burden to prove its damages with reasonable certainty. *Jackson v. United States*, No. 4:16-CV-03219-RBH, 2018 WL 1755503, at *19 (D.S.C. Apr. 12, 2018) ("[F]or damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy."). "[W]hile proof with mathematical certainty is not required, the amount of damages cannot be left to conjecture, guess, or speculation." *Whitfield v. John Bourne Co.*, 16 F. App'x 116, 124–25 (4th Cir. 2001) (applying South Carolina law); *accord Uhlig LLC v. Shirley*, No. 6:08-CV-01208-JMC, 2012 WL 2923242, at *14 (D.S.C. July 17, 2012). In the present matter, the Trustee relies on the testimony of his damages expert, DuRant, who derives his opinions exclusively from Debtor's financial statements, the same financial statements that have been repeatedly described as fraudulent and misleading.

The Court finds that the Trustee has failed to meet his burden to prove damages to a reasonable certainty by relying exclusively on financial statements that, according to his expert. are "deficient, false and misleading" due to the fraudulent actions and malpractice perpetrated by Debtor's management and by Grafton. The Trustee's expert concedes that Debtor's financial statements are an example of fraudulent accounting, and there is no trial balance or aging schedule to support the calculations in those statements. Grafton and Hargrett, two parties chiefly responsible for Debtor's financial statements, both pled guilty to felonies for their roles in preparing the fraudulent financial statements. The evidence indicates that Grafton may have never actually conducted an audit of Debtor's financials. Nevertheless, the Trustee bases his analysis on the very same fraudulent financial statements and argues that the Court should rely on those statements to calculate damages. The Court declines to do so.

126

In sum, the Court finds that the Trustee has failed to establish damages to a "reasonable certainty." For this additional reason, Meyers and Morgan Keegan are entitled to judgment in their favor on each of the Trustee's claims.

### Other Elements of the Trustee's Remaining Causes of Action

In addition to not meeting his burden on causation and damages, the Court finds that the Trustee has not met his burden of proof on other elements in each of the remaining causes of action. As to his Rule 10b-5 securities fraud and common law fraud causes of action, the Trustee is not able to establish the required reliance by Debtor due to the imputation of knowledge of the Accounting Practice, including its impropriety, to Debtor. *See Matrix Capital*, 576 F.3d at 181 (stating that a plaintiff's reliance is an element of a § 10(b) private action); *Hollman v. Woolfson*, 683 S.E.2d 495, 499 (S.C. 2009) (stating under South Carolina law that fraud requires the Plaintiff to establish by clear and convincing evidence that the plaintiff was ignorant of the falsity of the representation and that the plaintiff relied on the truth of the representation).

Further, weighing the evidence presented and for the similar reasons that have already been discussed in this Order, the Court finds that the Trustee has not met his burden of proof to establish that Meyers and Morgan Keegan "knowingly and substantially participated in or encouraged" the Management Defendants' breach of their fiduciary duties. *See Gulfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 198 (Nev. 2014) (stating that an element of aiding and abetting breach of fiduciary duty under Nevada law is "the defendant third party knowingly and substantially participated in or encouraged that breach [of fiduciary duty]).

Finally, as to the Trustee's breach of fiduciary duty cause of action, the Trustee alleges that Meyers and Morgan Keegan had an expansive overarching role that went beyond the parties' written contracts, including agreements to serve as Debtor's underwriter, investment adviser, and

producing agent. However, in weighing the evidence, the Court finds that the Trustee has not met his burden of proof that Meyers and Morgan Keegan agreed to serve Debtor in these expanded capacities. In making this determination, the Court considers, among other evidence, (1) the provision of the 2006 Contract Morgan Keegan's right to first refusal to serve as Debtor's underwriter for a period of six months after the terms of that contact,[85] (2) the relative lack of communication between Meyers and Morgan Keegan and Debtor between the 2006 Contract and the 2008 Contract, and (3) the nature of the additional actions taken by Meyers, which appeared to be more in line with business courtesies and not evidence of an agreement for Meyers and Morgan Keegan to serve Debtor in an expanded role.[86] The Court finds that the parties' relationship is defined only by the two written contracts that they entered.

Under this framework and weighing the evidence presented, the Court finds that the Trustee has not satisfied his burden of establishing the necessary fiduciary relationship between Meyers and Morgan Keegan and Debtor, specifically, in regard to Debtor's financial statements and accounting procedures, including the Accounting Practice. This conclusion is supported by a number of factors, including: (1) the express provision in the 2006 Contract that Morgan Keegan may rely on the accuracy of the financial information Debtor provides it without independent verification, (2) the provision of the April 2006 CIM that others may not rely on Morgan Keegan for the accuracy of the financial information provided in the document, (3) the fact that neither Meyers nor Morgan Keegan had any control over Debtor's operations, its accounting policies, or

---

[85]     If Debtor and Morgan Keegan had an overarching agreement for Morgan Keegan to serve as its underwriter or investment adviser, there would have been no need for this right to first refusal in the 2006 Contract.

[86]     For example, Meyers referred potential customers to Debtor (without receiving compensation) throughout their relationship. In addition, he introduced Debtor to several of his co-workers for considering an investment in Debtor. While the Trustee presented testimony of several individuals related to Debtor stating that Meyers and Morgan Keegan had agreed to take Debtor "over the finish line" to an initial public offering or merger, it appears that most of these individuals received this impression based on comments by Wade Cordell and other members of Debtor's management, who often took liberties in such statements to impress both current and potential investors.

its assets, (4) the fact that Debtor did not retain Meyers and Morgan Keegan to conduct an audit

of or opine on Debtor's accounting practices,[87] (5) the fact that Debtor made all of the decisions

with respect to its financial statements and capital raises, and (6) the fact that on the one occasion

that Meyers and Morgan Keegan created a lending investment opportunity with MKSF, Debtor's

management declined to proceed with the investment, electing to raise capital directly on their

own.

Further, even if Meyers and Morgan Keegan were fiduciaries of Debtor in regard to its

financial statements and accounting policies, the Trustee has not satisfied his burden of

establishing a breach when considering Meyers and Morgan Keegan's efforts to advise Debtor's

management of potential issues regarding the Accounting Practice, its openness to institutional

investors about the Accounting Practice, and its support of Hargrett's efforts to change the practice.

For the foregoing reasons, the Trustee has failed to satisfy his burden of establishing the

elements of his remaining causes of action, and the Court finds Meyers and Morgan Keegan are

entitled to judgment in their favor.

### *Motion to Amend Complaint Post-Trial*

At the conclusion of the trial, the Trustee orally moved to amend the Complaint pursuant

Fed. R. Civ. P. 15(b) to add two new causes of action: a claim under the South Carolina Unfair

Trade Practices Act and a claim for securities fraud under the South Carolina Code. The Trustee's

motion was based solely on the assertion that the Trustee had "demonstrated violations of both of

---

[87]    The Trustee also asserts that the novel argument that because the initial marketing materials that Morgan Keegan provided indicated that Meyers was a CPA and did not otherwise indicate that he was inactive, Meyers, through his services to Debtor, became subject to the Code of Professional Conduct of the American Institute of Certified Public Accountants, including a duty to disclose any significant findings and fraud or illegal act involving senior management to a higher level group within the company, such as a board of directors. The Trustee alleges this theory as a basis that Meyers had an affirmative duty to disclose. However, as Debtor did not retain Meyers and Morgan Keegan to serve as accountants or auditors and had no expectation of them acting as such, the Court is not convinced that that Meyers and Morgan Keegan had such a duty or that Debtor relied on Meyers and Morgan Keegan in such a capacity. Therefore, the Court is not convinced by the Trustee's arguments.

129

those [proposed claims]" and thus the Complaint should "be amended to conform to the evidence." In relevant part, Fed. R. Civ. P. 15(b) allows for amendments to pleadings made during and after trial in only two circumstances. First, where "a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended." Fed. R. Civ. P. 15(b)(1). This provision is not applicable as there was no relevant objection at trial to trigger this provision. Second, Fed. R. Civ. P. 15(b)(2) allows a party to move to amend the pleadings, at any time, to conform to the evidence presented at trial if issues not raised by the pleadings were tried by the opposing party's express or implied consent. The Fourth Circuit has described the requirements for amendment under Rule 15(b)(2) as follows:

> That Rule provides that "an issue not raised by the pleadings" will be treated as if it were raised, provided it is "tried by the parties' express or implied consent." Fed.R.Civ.P. 15(b)(2). Of course, Rule 15(b)(2) does not offer a failsafe for any and every faulty pleading. Rather, the Rule sets forth "an exception to the general rules of pleading . . . when the facts proven at trial differ from those alleged in the complaint, and thus support a cause of action that the claimant did not plead." *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 901 (4th Cir.1996). But "[b]ecause notice to the defendant of the allegations to be proven is essential to sustaining a cause of action, Rule 15(b) applies *only* when the defendant has consented to trial of the non-pled factual issues and will not be prejudiced by amendment of the pleadings to include them." *Id.* (emphasis added). Thus, Rule 15(b)(2) requires that a party expressly or impliedly consent to trial on an unpled claim and not be prejudiced by doing so.

*Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 783 F.3d 976, 983 (4th Cir. 2015).

Meyers and Morgan Keegan objected to the post trial amendment of the Complaint on the grounds that (1) allowing the Trustee to amend his Complaint without allowing Meyers and Morgan Keegan an opportunity for further discovery "to fully investigate, discover, and defend against these newly-raised claims" would be prejudicial and (2) the Court previously denied the Trustee's pre-trial motion to amend the Complaint and the circumstances have not changed since the entry of that Order.

130

The Fourth Circuit has routinely found that a motion to amend is properly "denied when it has been unduly delayed and when allowing the motion would prejudice the non-movant." *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 940 (4th Cir. 1995) (affirming district court's denial of motion to amend pleading); *Nat'l Bank of Washington v. Pearson*, 863 F.2d 322 (4th Cir. 1988) (same); *Laber v. Harvey*, 438 F.3d 407, 427 (4th Cir. 2006) (noting that a prejudicial amendment is one that "raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial"). Under the circumstances, the Court finds that the timing and nature of the Trustee's proposed amendment would cause prejudice to Meyers and Morgan Keegan, particularly since the Court has previously denied the Trustee's pretrial request to amend the complaint to assert the same causes of action and they would not be prepared to defend against the claims at trial.

The Court denied the Trustee's Pre-Trial Motion to Amend on two grounds. First, the Court noted that under Fed. R. Civ. P. 16(b)(4), "a deadline in a scheduling order 'may be modified only for good cause and with the judge's consent.'" The Court found that the failure to assert the additional causes of action were "the result of inadvertence or neglect by Trustee's counsel," and therefore no good cause existed to warrant modification of the Court's scheduling order to allow an amendment of the Trustee's Complaint. The Court also denied the Pre-Trial Motion to Amend pursuant to Fed. R. Civ. P. 15(a) finding that "granting the Motion to Amend at this stage of the litigation will unfairly prejudice Meyers and Morgan Keegan" because "Meyers and Morgan Keegan would not have had a fair opportunity to fully investigate, discover, and defend against these newly-raised claims." The Trustee has presented no change in circumstances that supports an amendment to the Complaint at this late stage of the proceedings. The Trustee has also failed to demonstrate that the issues raised by the proposed amendment were tried with Meyers and

131

Morgan Keegan's express or implied consent. Meyers and Morgan Keegan expressly opposed the Trustee's pretrial amendment to include these claims, and the Trustee has not presented any convincing argument to show that Meyers and Morgan Keegan implicitly or expressly agreed to try these claims during the trial. Moreover, the Court finds any amendment to the Complaint would be futile as the Court finds that each of these claims would also be subject to the defense of *in pari delicto* and the same causation issues discussed in this Order. Accordingly, the Trustee's Motion to Amend the Complaint pursuant to Fed. R. Civ. P. 15(b) is denied.

### *Motion to Dismiss, Renewed Motion to Strike and Motion for Sanctions*

After the conclusion of the trial, Meyers and Morgan Keegan brought a motion to strike the Trustee's proposed order because it violated the Court's directive on the submission of proposed orders in this proceeding and was filed after the Court's deadline. The Trustee's original proposed order went well beyond the 100 page limit set by the Court as it contained approximately 110 pages of body text (without including a caption), 65 pages of additional single spaced footnotes (listing over 1,100 footnotes) and utilized different formatting conventions than the Court's usual fashion for orders, including using 11 size font and 1.5 line spacing. After adjusting the Trustee's original proposed order into the typical formatting of the Court's orders, the proposed order was nearly 250 pages long.

While the Court provided the parties with an opportunity in advance of the deadline to seek a reconsideration of the page limit, the Trustee did not file such a request. In addressing the motion for sanctions, the Court initially ordered that the Trustee resubmit the proposed order in compliance with the Court's directives and page limit, and the Court indicated that as a sanction and in the interest of fairness, it would not consider the Trustee's originally submitted proposed order that violated the Court's directives. At the hearing and in the Court's Order on the motion to

strike, the Court provided express instructions to the Trustee to not add any additional facts, authority, or arguments in response to the then already submitted proposed order of Meyers and Morgan Keegan. The Court also took the request for sanctions included in the motion to strike under advisement.

After submission of the Trustee's second proposed order, Morgan Keegan and Meyers filed a Motion to Dismiss Adversary Proceeding, Renewed Motion to Strike or in the alternative, Motion for Sanctions, alleging that the Trustee included new arguments and citations not originally included in the Trustee's original proposed order. After a hearing, the Court took the matter under advisement.

Based on the outcome reached in this Order, it is unnecessary for the Court to consider at this time Meyers and Morgan Keegan's Motion to Dismiss Adversary Proceeding, Renewed Motion to Strike or in the alternative, Motion for Sanctions and their request for sanctions in the originally filed Motion to Strike.

## **CONCLUSION**

Based on the foregoing reasons, the Court finds that the Trustee's remaining causes of action are barred because Debtor was *in pari delicto* with Meyers and Morgan Keegan. Further, the Court finds that, regardless of the application of *in pari delicto*, the Trustee has not met his burden of proof to satisfy the elements of his remaining causes of action. For these reasons, the Court hereby grants judgment in favor of Meyers and Morgan Keegan as to all remaining causes of action. The Court also denies the Trustee's post-trial oral motion to amend his complaint.

**IT IS SO ORDERED.**

133

**-348-**

Case 12-80208-jw   Doc 1066-1   Filed 12/03/19   Entered 12/03/19 19:56:15   Desc
Exhibit A - Email Correspondence    Page 1 of 6

# RE: In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

Andrew_Powell@scb.uscourts.gov

Thu 8/9/2018 3:07 PM

To: Mitchell Willoughby <MWilloughby@Willoughbyhoefer.com>;

Cc: Robert F. Anderson <bob@andersonlawfirm.net>; Byrd, Robert C. <bobbybyrd@parkerpoe.com>; Elizabeth Zeck <EZeck@Willoughbyhoefer.com>; Laura Lee Andrews <LAndrews@Willoughbyhoefer.com>; Polk, Larry <larrypolk@eversheds-sutherland.com>; Dalton, Lucy <lucydalton@eversheds-sutherland.com>; Marilyn Gartley <marilyn@andersonlawfirm.net>; Greenberg, Olga <olgagreenberg@eversheds-sutherland.com>; Podris, A. Smith <smithpodris@parkerpoe.com>; Walker Humphrey <WHumphrey@Willoughbyhoefer.com>; Williams-Wass, Yvonne <yvonnewass@eversheds-sutherland.com>;

Counsel,

I spoke with Judge Waites briefly this afternoon about this matter. In regards to a request for the audio recording, Judge Waites stated that if the parties agree to relieve the seal in order to permit each side to have an audio recording of the sealed portion of the trial, then the parties may submit a proposed consent order for his consideration. If the parties cannot agree, then this should be raised at the hearing next week.

Also, Judge Waites indicated the he will not consider the requests to extend the deadline to submit the proposed order or to increase the permitted length. The Court has been clear of the length requirements and the deadline to submit the proposed orders since the close of trial as addressed in the May 29, 2018 order and the text order entered on July 3, 2018. Therefore, the parties are expected to submit their proposed orders (of no longer than 100 pages in length) by no later than August 13, 2018 at 5:00 PM EST.

Sincerely,
Andrew Powell

Andrew A. Powell
Law Clerk to the Hon. John E. Waites
U.S. Bankruptcy Court for the District of South Carolina
(803) 765-5030
(803) 253-3464 (fax)

From:      Mitchell Willoughby <MWilloughby@Willoughbyhoefer.com>
To:        "'Andrew_Powell@scb.uscourts.gov'" <Andrew_Powell@scb.uscourts.gov>
Cc:        "Robert F. Anderson" <bob@andersonlawfirm.net>, "Byrd, Robert C." <bobbybyrd@parkerpoe.com>, Elizabeth Zeck <EZeck@Willoughbyhoefer.com>, "Polk, Larry" <larrypolk@eversheds-sutherland.com>, "Dalton, Lucy" <lucydalton@eversheds-sutherland.com>, Marilyn Gartley <marilyn@andersonlawfirm.net>, "Greenberg, Olga" <olgagreenberg@eversheds-sutherland.com>, Walker Humphrey <WHumphrey@Willoughbyhoefer.com>, "Williams-Wass, Yvonne" <yvonnewass@eversheds-sutherland.com>, "Podris, A. Smith" <smithpodris@parkerpoe.com>, Laura Lee Andrews <LAndrews@Willoughbyhoefer.com>
Date:      08/09/2018 02:04 PM
Subject:   RE: In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

Andrew:

We appreciate the clarification provided by Ms. Podris, and it is most helpful to have the MK Defendants state that transcribing "the sealed proceeding into a sealed transcript is not an action by the Trustee that would support any of the arguments MK Defendants have made related to the attorney-client privilege "issues." Nevertheless, in regard to the MK Defendants' pending Motion to Open Sealed Portion of Trial Proceedings for Transcription Purposes, the Trustee respectfully requests that he be permitted to secure an audio copy of the sealed portion of the record to review. If the Trustee is permitted to secure the audio of the sealed portion of the record, the Trustee should be able to determine

**-349-**

that attorney-client privilege issues are not implicated or to the extent that an attorney-client issue may be implicated in the sealed portion of the record, work with the MK Defendants' to determine if a resolution of their motion may be agreed to. Since the attorney-client privilege is the Trustee's to assert, we believe this proposed procedure may be most efficient and may lead to resolution of the MK Defendants' motion without having to use the Court's time. Please advise if the Trustee may submit a request to the Clerk of Court to secure an audio copy of the sealed portion of the record of trial.

Second, in order to provide sufficient time for the Trustee to review the sealed transcript, and, if necessary, for the Court to address the motion should agreement not be achieved, the Trustee respectfully requests a delay of the filing of the post trial proposed orders by one week, setting the new filing date for Monday, August 20 at 5:00pm. Please advise if this request for an extension of time in which to file post trial proposed orders is acceptable to the Court.

Finally, the Court indicated that the parties should make reasonable efforts to limit their post-trial proposed orders to 100 pages. The Trustee respectfully requests that the page limit be extended to 135 pages. Obviously this request would extend to both parties. Please advise.

If there are any questions or if further information is needed, please let me know. Thank you and with warmest regards,

Mitch



Mitchell Willoughby, Esquire
**Willoughby & Hoefer, P.A.**
930 Richland Street (29201)
P.O. Box 8416
Columbia, SC 29202
(o) 803.252.3300 | (d) 803.771.2121
mwilloughby@willoughbyhoefer.com

**From:** Podris, A. Smith <smithpodris@parkerpoe.com>
**Sent:** Thursday, August 9, 2018 1:09 PM
**To:** 'Andrew_Powell@scb.uscourts.gov' <Andrew_Powell@scb.uscourts.gov>; Mitchell Willoughby <MWilloughby@Willoughbyhoefer.com>
**Cc:** Robert F. Anderson <bob@andersonlawfirm.net>; Byrd, Robert C. <bobbybyrd@parkerpoe.com>; Elizabeth Zeck <EZeck@Willoughbyhoefer.com>; Polk, Larry <larrypolk@eversheds-sutherland.com>; Dalton, Lucy <lucydalton@eversheds-sutherland.com>; Marilyn Gartley <marilyn@andersonlawfirm.net>; Greenberg, Olga <olgagreenberg@eversheds-sutherland.com>; Walker Humphrey <WHumphrey@Willoughbyhoefer.com>; Williams-Wass, Yvonne <yvonnewass@eversheds-sutherland.com>
**Subject:** RE: In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

Andrew,

We were surprised by the Trustee's objection to our motion.  After reviewing Mr. Willoughby's email, we hope that a few clarifications may obviate the need for Tuesday's hearing.

First, MK Defendants do not seek any extension of time for the submission of our proposed order.  Our proposed order will be circulated to the Court and counsel for the Trustee no later than 5 p.m. on Monday.  When we filed our motion, we anticipated receiving the transcript with sufficient time to add the citation needed.  At this point, that will not happen, but the substance of our proposed order will not change based upon receipt of the transcription.  We will simply ask the Court's permission to "fill in the blank" of a citation once the transcript is received without changing the body of the order (in the same way that cites to the record are added to briefing after the record on appeal is prepared).  The purpose of the citation, of course, is simply to aid the Court's review of our proposed order.

Second, it appears the Trustee has misunderstood our intention with respect to the "sealed" status of the proceeding.  Our request for a transcript is not intended to "unseal" the proceeding, and our intention is to treat the transcript as a sealed transcript.  We agree and stipulate that the transcription of the sealed proceeding into a sealed transcript is not an action by the Trustee that would support any of the arguments MK Defendants have made related to the attorney-client privilege issues.

Importantly, we do not believe we are citing to any testimony over which the Trustee maintains a claim of privilege.  It is simply the case

that the testimony is contained within the sealed portion of the proceedings. Further, we note the Court's instructions regarding submission of the proposed orders only to the Court with copy to counsel for MK Defendants and counsel for the Trustee should eliminate any concerns the Trustee has regarding publication of that material, inasmuch as all of the Trustee's objections and arguments are still pending before the Court.

We hope that this simplifies the matter and avoids any unnecessary use of the Court's time.  If the Court still wishes for us to appear on Tuesday, we will be happy to do so.

Thank you,
Smith

**From:** Andrew_Powell@scb.uscourts.gov [mailto:Andrew_Powell@scb.uscourts.gov]
**Sent:** Tuesday, August 07, 2018 12:11 PM
**To:** Mitchell Willoughby
**Cc:** Robert F. Anderson; Byrd, Robert C.; Elizabeth Zeck; Polk, Larry; Dalton, Lucy; Marilyn Gartley; Greenberg, Olga; Podris, A. Smith; Walker Humphrey; Williams-Wass, Yvonne
**Subject:** RE: In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

Counsel,

As the motion is disputed, Judge Waites finds a hearing will be necessary on the motion to be scheduled next week on Tuesday, August 14, 2018 at 9:30 AM in Columbia.  Judge Waites is aware that the resolution of the Motion may affect the parties' proposed orders. The proposed orders are still due on August 13, 2018; however, Judge Waites will consider additional opportunities to amend the proposed order at a later time depending on the outcome of the Motion.

Thanks,
AP

Andrew A. Powell
Law Clerk to the Hon. John E. Waites
U.S. Bankruptcy Court for the District of South Carolina
(803) 765-5030
(803) 253-3464 (fax)

From:      Mitchell Willoughby <MWilloughby@Willoughbyhoefer.com>
To:        "Andrew_Powell@scb.uscourts.gov" <Andrew_Powell@scb.uscourts.gov>
Cc:        "Robert F. Anderson" <bob@andersonlawfirm.net>, "bobbybyrd@parkerpoe.com" <bobbybyrd@parkerpoe.com>, Elizabeth Zeck
           <EZeck@Willoughbyhoefer.com>, "Polk, Larry" <larrypolk@eversheds-sutherland.com>, "Dalton, Lucy" <lucydalton@eversheds-sutherland.com>, Marilyn Gartley
           <marilyn@andersonlawfirm.net>, "Greenberg, Olga" <olgagreenberg@eversheds-sutherland.com>, "Podris, A. Smith" <smithpodris@parkerpoe.com>, Walker
           Humphrey <WHumphrey@Willoughbyhoefer.com>, "Williams-Wass, Yvonne" <yvonnewass@eversheds-sutherland.com>
Date:      08/06/2018 04:48 PM
Subject:   RE: In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

Andrew:

        Please thank Judge Waites for his patience and for giving us an opportunity to respond to the MK Defendants' Motion to Open Sealed Portion of Trial Proceedings for Transcription Purposes. The Trustee respectfully objects to the Motion for the following reasons:

1.      The request is untimely. The portion of the record to which the MK Defendants refer was received by the Court on the last day of the trial, May 22, 2018. The MK Defendants and their counsel were present in the courtroom (I recall Mr. Meyers was voluntarily absent on that day) and heard all of the questions and answers for Mr. Cordell during the sealed portion of the record. The MK Defendants have had this

portion of the transcript since June 29, 2018, and approximately five weeks later, they now seek an Order to open the record to transcribe that portion of the transcript. Further, they indicate that they need that portion of the trial transcript "to complete work on their proposed order to be submitted to the Court by the Court's August 13, 2018 deadline." They went to great lengths to secure an Order of the Court permitting them to recall Mr. Cordell. The Court granted their request over the objections of the Trustee. For the MK Defendants now to suggest that they just realized this portion of the transcript had not been transcribed belies belief, and suggests to us that the real motivation is further delay.

2.      As I recall, this portion of the record was sealed to protect against inadvertent disclosures of attorney-client privileged information. The Trustee is therefore concerned that the MK Defendants are simply using this request as yet another effort to invade the attorney-client privilege. Consequently, we are concerned that unsealing the record will result in yet another attorney-client waiver argument from the MK Defendants; thus, we respectfully object to unsealing the record on this ground as well.

Thank you for this opportunity to respond. If further information is required or if a formal response is requested for the official record, please advise. With warmest regards,



Mitchell Willoughby, Esquire

**Willoughby & Hoefer, P.A.**

930 Richland Street (29201)

P.O. Box 8416

Columbia, SC 29202

(o) 803.252.3300 | (d) 803.771.2121

mwilloughby@willoughbyhoefer.com

**From:** Andrew_Powell@scb.uscourts.gov <Andrew_Powell@scb.uscourts.gov>
**Sent:** Friday, August 3, 2018 2:10 PM
**To:** Mitchell Willoughby <MWilloughby@Willoughbyhoefer.com>
**Cc:** Robert F. Anderson <bob@andersonlawfirm.net>; bobbybyrd@parkerpoe.com; Elizabeth Zeck <EZeck@Willoughbyhoefer.com>; Polk, Larry <larrypolk@eversheds-sutherland.com>; Dalton, Lucy <lucydalton@eversheds-sutherland.com>; Marilyn Gartley <marilyn@andersonlawfirm.net>; Greenberg, Olga <olgagreenberg@eversheds-sutherland.com>; Podris, A. Smith <smithpodris@parkerpoe.com>; Walker Humphrey <WHumphrey@Willoughbyhoefer.com>; Williams-Wass, Yvonne <yvonnewass@eversheds-sutherland.com>
**Subject:** RE: In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

Mitchell,

I will alert Judge Waites of your email.

Thanks
AP

Andrew A. Powell
Law Clerk to the Hon. John E. Waites
U.S. Bankruptcy Court for the District of South Carolina
(803) 765-5030
(803) 253-3464 (fax)

**From:**    Mitchell Willoughby <MWilloughby@Willoughbyhoefer.com>

Case 12-80208-jw    Doc 1066-1    Filed 12/03/19    Entered 12/03/19 19:56:15    Desc
Exhibit A - Email Correspondence    Page 5 of 6

To:      "Andrew_Powell@scb.uscourts.gov" <Andrew_Powell@scb.uscourts.gov>
Cc:      "Robert F. Anderson" <bob@andersonlawfirm.net>, "bobbybyrd@parkerpoe.com" <bobbybyrd@parkerpoe.com>, Elizabeth Zeck
<EZeck@Willoughbyhoefer.com>, "Polk, Larry" <larrypolk@eversheds-sutherland.com>, Marilyn Gartley <marilyn@andersonlawfirm.net>, "Greenberg, Olga"
<olgagreenberg@eversheds-sutherland.com>, "Podris, A. Smith" <smithpodris@parkerpoe.com>, Walker Humphrey <WHumphrey@Willoughbyhoefer.com>,
"Williams-Wass, Yvonne" <yvonnewass@eversheds-sutherland.com>, "Dalton, Lucy" <lucydalton@eversheds-sutherland.com>
Date:    08/03/2018 01:38 PM
Subject: RE: In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

---

Andrew:

     I need until Monday morning to review the motion in full and discuss with the Trustee and our legal team any potential issues that may
be raised by the motion. Please beg the Court's indulgence for me to provide the answer to your question below no later than Monday at
12:00 noon. Thank you in advance for the Court's and your consideration of this request. With warmest regards,



Mitchell Willoughby, Esquire
**Willoughby & Hoefer, P.A.**
930 Richland Street (29201)
P.O. Box 8416
Columbia, SC 29202
(o) 803.252.3300 | (d) 803.771.2121

mwilloughby@willoughbyhoefer.com

From: Andrew_Powell@scb.uscourts.gov <Andrew_Powell@scb.uscourts.gov>
Sent: Friday, August 3, 2018 9:31 AM
Cc: Robert F. Anderson <bob@andersonlawfirm.net>; bobbybyrd@parkerpoe.com; Elizabeth Zeck
<EZeck@Willoughbyhoefer.com>; Laura Lee Andrews <LAndrews@Willoughbyhoefer.com>; Polk, Larry <larrypolk@eversheds-
sutherland.com>; Marilyn Gartley <marilyn@andersonlawfirm.net>; Mitchell Willoughby <MWilloughby@Willoughbyhoefer.com>;
Greenberg, Olga <olgagreenberg@eversheds-sutherland.com>; Podris, A. Smith <smithpodris@parkerpoe.com>; Walker Humphrey
<WHumphrey@Willoughbyhoefer.com>; Williams-Wass, Yvonne <yvonnewass@eversheds-sutherland.com>; Dalton, Lucy
<lucydalton@eversheds-sutherland.com>
**Subject:** In Re: Infinity Business Group, Inc., Adv. Proc. No. 12-80208-jw

Counsel,

Chambers has reviewed the Motion to Open Sealed Portion of Trial Proceedings for Transcription Purposes filed by the MK
Defendants. The motion does not indicate whether the Trustee consents to the opening of the sealed portion of the trial
proceedings for transcription purposes. If the Trustee consents, Judge Waites would prefer that this matter be addressed by a
consent order of the parties. If the Trustee does not consent, Judge Waites will likely schedule a hearing next week on the
motion.

Please advise if the Trustee consents, and if so, whether the parties can submit a proposed consent order on the matter.

Thanks,

Andrew Powell

Andrew A. Powell
Law Clerk to the Hon. John E. Waites
U.S. Bankruptcy Court for the District of South Carolina
(803) 765-5030
(803) 253-3464 (fax)

Click here to report this email as spam.

---

**A Smith Podris**
Special Counsel



200 Meeting Street | Suite 301 | Charleston, SC 29401-3156
Office: 843.727.6312 | Fax: 843.727.2680 | vcard | map

Visit our website at
www.parkerpoe.com

PRIVILEGED AND CONFIDENTIAL: This electronic message and any attachments are confidential property of the sender. The information is intended only for the
use of the person to whom it was addressed. Any other interception, copying, accessing, or disclosure of this message is prohibited. The sender takes no responsibility
for any unauthorized reliance on this message. If you have received this message in error, please immediately notify the sender and purge the message you received.
Do not forward this message without permission. [ppab_p&c]

3:19-cv-03096-JFA

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

---

In re: Infinity Business Group

---

Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc.,

Appellant,

vs.

Wade Cordell, O. Bradshaw Cordell, Cordell, L.L.C., The Cordell Group, L.L.C., Gibson Commons, L.L.C., Bryon K. Sturgill, Sturgill & Associates Inc., John F. Blevins, Law Offices of John F. Blevins, L.L.C., Golden Ghost, Inc., Haines H. Hargrett, Donald Brent Grafton, D. Larry Grafton, Grafton and Company, P.L.L.C., Morgan Keegan & Company, Inc., Keith E. Meyers,

Defendants,

Of whom Morgan Keegan & Company, Inc. and Keith E. Meyers are,

Respondents.

---

Appeal from the Bankruptcy Court for the District of South Carolina
Bankruptcy Case No. 10-06335-jw, Adversary Proceeding No. 12-80208-jw

---

**APPELLANT'S OPENING BRIEF**

---

Mitchell Willoughby
Elizabeth Zeck
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street
Columbia, South Carolina 29201
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com

R. Walker Humphrey, II
**WILLOUGHBY & HOEFER, P.A.**
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
(843) 619-4426
whumphrey@willoughbyhoefer.com

*Attorneys for Appellant*

\*    \*    \*    \*

could be realized—at a significant fee for the MK Defendants. (*See* App. 193-194 (Apr. 27 Tr.) (noting Morgan Keegan's fee for an IPO would be 7%); *see also* App. 2655 (Tee Ex. 55 at 5) (same).) As described above, Meyers specifically pitched IBG to individual investors using the prospect of a quick turnaround via a sale or IPO at many multiples of the existing share price. This "exit" would enable Meyers to reap the large fee he originally hoped for and promised his superiors. That large prize was Meyers' goal. The MK Defendants just had to ensure IBG made it to the exit when the fraudulent receivables could be written off. As questions and obstacles arose in the meantime due to his fraudulent accounting policy, he was never fazed; he just disguised the lie a little bit more with the goal of getting to his payday.

2. <u>The MK Defendants had a duty to, but never did, disclose the existence of this fraud and their knowledge of numerous red flags.</u>

The Bankruptcy Court found Meyers had been forthright with IBG's management and investors regarding its finances and accounting policy. The record proves otherwise.

a. *The MK Defendants had a close, intimate, and familiar relationship with IBG and owed it a duty of good faith, fair dealings, and trustworthiness.*

The Bankruptcy Court repeatedly minimized the extensive and familiar relationship between IBG and the MK Defendants. This was clear error.

Meyers graduated from Washington University in St. Louis with degrees in accounting and finance and a minor in economics. (App. 539 (May 7 Tr.).) His first professional job was as an accountant in the audit department of Deloitte & Touche. (App. 539-540 (May 7 Tr.).) He passed the CPA exam and, in 1997, received his New York CPA license. (App. 540-541 (May 7 Tr.).) He was a practicing CPA at the time. (App. 541 (May 7 Tr.) Meyers kept this license active until 2001 and inactive thereafter. (*Id.*) He received his M.B.A. from Duke in 2000. (App. 541-542 (May 7 Tr.).) At Duke, Meyers interned with Raymond James and became a full-time investment banker

31

upon graduation. (App. 543 (May 7 Tr.).) He joined Morgan Keegan's investment banking group

in early 2005 as the first investment banker in the firm's then-new Atlanta office. (App. 543-544

(May 7 Tr.).) He focused on non-bank lending, debt collection, and payment processing services,

and termed himself an "industry specialist" within this niche and cited his expertise as an asset to

his clients. (App. 544-542 (May 7 Tr.).)

Four months before trial, Meyers gave an interview wherein he confidently stated that

"[a]ccounting is the – the benchmark of business. Being able to understand the financials is very

critical to what we do in our business."[21] (App. 621 (May 8 Tr.), 4269-4270 (Tee Ex. 1638).) He

further explained that "accounting, and particularly audit, is a – is a very good stepping stone to

other things." (*Id*.) In explaining why accounting experience and industry knowledge are valuable

assets to an investment banker, he stated that "[o]ne of the biggest reasons that we see deals fail is

because there's a surprise, and usually it's a financial surprise, so the financials that we – that our

clients put forth under scrutiny don't hold up" because they are not prepared in accordance with

GAAP. (App. 627, 629-630 (May 8 Tr.).) Surprises exist even with audited financial statements,

as "top-notch" audit firms may not catch things they should have when reviewing a company's

---

[21] Before he learned the Trustee had a copy of this interview, he denied these very propositions. (App. 620 (May 8 Tr.).) This is one of many examples where Meyers was directly impeached with his own words as he attempted to minimize his experience and role with IBG. For instance, Meyers testified he saw a CPA credential in Sturgill's office. (App. 637 (May 9 Tr.) When pressed, Meyers "retract[ed] the statement" and admitted he did not "specifically remember." (App. 637-638 (May 9 Tr.).) Meyers denied giving IBG permission to list Morgan Keegan on its website as its financial advisor and claimed he instructed IBG to remove Morgan Keegan's name from the site. (App. 643 (May 10 Tr.).) He was forced to admit that he "stand[s] corrected" when shown emails where he personally drafted the language for IBG's website describing Morgan Keegan as IBG's "financial advisor." (App. 644-645 (May 10 Tr.); *see also* App. 1658-1659 (Tee Ex. 377).) Meyers asserted he reviewed contracts with customers that showed IBG was entitled to fees on checks that had not yet been collected, thereby lending credence to the disclosures he helped draft. (App. 641-642 (May 10 Tr.).) When the Trustee tried to show Meyers the contracts, Meyers backtracked and conceded "I don't think I reviewed the contracts." (App. 676-677 (May 14 Tr.).)

financials "if they're not industry experts . . . because there's uniqueness" in the business. (App. 628 (May 8 Tr.).) By Meyers' own admissions, his accounting experience, knowledge of the specific industry involved, and ability to read and understand financial statements was a critical part of the professional services he offered clients like IBG.[22]

Shortly after joining Morgan Keegan, Meyers began marketing his and Morgan Keegan's services to IBG. (App. 679-681 (Tee Exs. 23-24).) IBG first met with Meyers and other Morgan Keegan personnel at Morgan Keegan's Atlanta offices in January 2006. (App. 477-479 (May 3 Tr.).) At Meyers' direction, Morgan Keegan prepared a "hello pitch book" of materials touting its strengths and depth of services which listed Meyers as a CPA.[23] (App. 548-549 (May 7 Tr.), 629-724 (Tee Ex. 37).) These materials were shared with others at IBG who did not attend the meeting. (App. 177-178 (Apr. 26 Tr.).) IBG's management was impressed by Meyers' background in finance, M.B.A. from Duke, and certification as a CPA.[24] (App. 178-179 (Apr. 26 Tr.).)

IBG's management universally testified to their excitement at having Morgan Keegan "dig into our business, take a look at it, help us form the business[,] and get it ready to go public"; the trust they reposed in Morgan Keegan to be truthful and honest; and their expectation that Morgan Keegan would inform the board of any concerning issues it discovered.[25] (App. 7-8, 10, 11-12, 17,

---

[22] The MK Defendants' accounting expert, Howard Zandman, also testified that Meyers' "CPA background and training in his early years most probably gave him some expertise in which [sic] to do his role at Morgan Keegan." (App. 466 (May 2 Tr.).)

[23] Meyers did not directly answer his own attorney's question about the inclusion of the CPA reference, testifying only that he wishes he "reviewed it in more detail." (App. 550 (May 7 Tr.).) But Meyers continued to identify himself as a CPA (albeit an "inactive" one) even after Raymond James acquired Morgan Keegan in 2012. (*See* App. 4239 (Tee Ex. 1626).)

[24] The MK Defendants did not disclose to IBG that Meyers' CPA license was then inactive.

[25] Shareholders as well were lured in by Morgan Keegan's imprimatur on the various offerings. (*E.g.*, App. 101, 104 (Apr. 25 Tr.) (Scott Matula), 105-106, 111-112 (Apr. 25 Tr.) (Bill Danielson), 147-149 (Apr. 26 Tr.) (Al Berry), 172-173 (Apr. 26 Tr.) (Al Fowler).)

39 (Apr. 23 Tr.), 72-73 (Apr. 24 Tr.) (testimony of IBG vice president, director, and shareholder Bill Van Hoeven); *see also* App. 76-77, 86 (Apr. 24 Tr.) (testimony of IBG vice president of sales and shareholder Jeff Lyle), 133-134 (Apr. 25 Tr.) (testimony of IBG director of school sales, IBG shareholder, former school superintendent in Lexington County, and recipient of PhD in educational administration Dr. Evelyn Berry), 181 (Apr. 26 Tr.) (testimony of IBG vice president of administrative support, board member and secretary, and shareholder Bob Caughman), 197-198, 200-203 (Apr. 27 Tr.) (testimony of IBG general counsel, board member, and shareholder John Blevins), 479-487, 490 (May 3 Tr.) (testimony of IBG co-founder, president, board member, and shareholder Wade Cordell).) As board member and shareholder Michael Potter described, "we was all going to the Promised Land" with Morgan Keegan. (App. 4263 (Tee Ex. 1635).)

Meyers wanted a long-term advisory relationship with IBG based on "our knowledge of the sectors in which you operate and our relationships with both private equity firms and institutional investors, coupled with our geographic footprint." (App. 725-726 (Tee Ex. 41).) This quickly came true. In September 2006, Meyers authorized IBG to describe Morgan Keegan as its "financial advisor" on IBG's website. (App. 1656-1659 (Tee Exs. 375, 377).) Blevins testified that "no financial decisions of any consequence were made without Mr. Cordell or Mr. Sturgill picking up the phone and talking to Keith or him being there from time to time," (App. 202 (Apr. 27 Tr.)), and Wade Cordell similarly confirmed that IBG "did not make any financial decision without consulting with Morgan Keegan and Keith Meyers and getting their advice, counsel, and input," (App. 494 (May 3 Tr.)). IBG board member Thomas Handy—an attorney, one-time Kentucky lieutenant governor candidate, and former Commonwealth Attorney—confirmed that the MK Defendants "were providing the service of counseling, advising, IBG on their business operation." (App. 218 (Apr. 27 Tr.).) While their specific "agenda" may have been to find a purchaser for IBG,

the MK Defendants "were heavily involved and constantly involved in the operation and seeing that it would develop along the lines where it could be sold." (*Id.*) Hargrett confirmed that Meyers "was pretty much on the scene, you know, throughout, off and on. I mean, he was always there." (App. 4946 (MK Ex. 309.)

On February 22, 2006, Meyers and Clark traveled to Lexington and gave a presentation to a larger group of IBG management and employees. During that presentation, and consistent with Meyers' hope for a long-term advisory relationship, Meyers promised that Morgan Keegan would review IBG's significant accounting policies, including its revenue recognition policies. (App. 180-181 (Apr. 26 Tr.).) IBG and the MK Defendants thereafter entered into a formal, written engagement agreement on March 16, 2006 ("2006 Engagement") wherein they agreed to become IBG's "exclusive placement agent" for the sale of IBG securities. (App. 4273 (MK Ex. 4 at 1).) Morgan Keegan would remain "solely responsible for its own actions with regard to the transactions described" in the agreement. (App. 4274 (MK Ex. 4).) It further promised that its actions would "be in compliance with all applicable laws and regulations, including but not limited to investment advisor, broker-dealer and similar rules and regulations." (*Id.*)

This engagement lasted until March 6, 2007, "or such other date as may be mutually agreed by [IBG] and Morgan Keegan." (App. 4277 (MK Ex. 4).) The MK Defendants claimed, and the Bankruptcy Court found, this specific engagement terminated by October 31, 2006. [Dkt. No. 1058 ¶ 75.] This conflicts with the court's summary judgment order where the court found that "IBG ended the 2006 Engagement sometime in 2007." [Dkt. No. 549 ¶ 24.] The evidence at trial also proved it did not end in October 2006:

- On November 10, 2006, Meyers emailed Hargrett about hiring new auditors and suggested that he "begin the process now to avoid delay." (App. 2648 (Tee Ex. 552).)

35

-360-

- Meyers wrote (in his own hand) on November 15, 2006, that "MK is"—not *was*—"engaged to raise Private Equity capital" for IBG. (App. 2653 (Tee Ex. 555).)

- On November 18, Wade Cordell recognized that "Morgan Keegan and DLA Piper have been there along the way advising IBG on which steps need to be followed in order to reach out final goals." In the same email, he indicated that the prior Friday he met with a potential investor who has "been waiting for IBG to hit the target numbers before they move forward with us, through Morgan Keegan." (App. 2658-2659 (Tee Ex. 557).)

- On November 20, 2006, Meyers spoke on a call with investor Scott Matula about investing in IBG. Also participating in the call were Wade Cordell, Blevins, Hargrett, Sturgill, and two others. (App. 93-100 (Apr. 25 Tr.), 2661-2664 (Tee Ex. 558).)

- Meyers confirmed to his boss on December 6, 2006, that the IBG deal was expected to close or terminate the following summer. (App. 2665 (Tee Ex. 569).)

- On December 18, Meyers passed along news of a similar deal to IBG with the sentiment that there are "[l]ot's [sic] of opportunity [sic] for you guys in the near terms [sic] . . . ." (App. 2668 (Tee Ex. 571).)

- Meyers met with IBG's leadership on January 15, 2007. (App. 2790 (Tee Ex. 591).)

- On January 15, 2007, Meyers spoke at meeting of IBG investors, touting the company's prospects based on accounting policies he knew were false and misleading. (App. 146-149 (Apr. 26 Tr.).)

- On January 25, 2007, Meyers wrote Wade Cordell and Sturgill to report on a meeting he had with Blackrock, a private equity group, which he told that "*we* were concentrating on growing the business and implementing the many banks that had been and continue to sign with *us*" and "*we* will likely re-evaluate the Company's investment needs in the latter half of the year." He continued, "As the company continues to have successes, we should feed them to the select firms that we might want to partner with in the future." (App. 2793 (Tee Ex. 592 (emphasis added)).)

On April 24, 2008, IBG and Morgan Keegan entered into a second formal engagement, this time for mezzanine debt financing ("2008 Engagement"). (App. 3085-3089 (Tee Ex. 766).) Morgan Keegan's obligations were broader than merely finding a buyer for IBG debt instruments. Morgan Keegan expressly agreed to "(i) provide financial advisory services, *including general business and financial analysis of the company*, and (ii) provide advisory services concerning the raising of necessary mezzanine debt." (App. 3086 (Tee Ex. 766) (emphasis added)).) It further

36

agreed to "[c]onduct financial due diligence of [IBG], including but not limited to an examination of financial results and management projections." (*Id.*) Morgan Keegan's fee for providing these services was a contingent 3% of the gross proceeds raised. (App. 3087 (Tee Ex. 766.) Similar to the 2006 Engagement, the MK Defendants' relationship with IBG continued well beyond the stated expiration date, as Regions Financial (Morgan Keegan's parent) recognized in April 2009 that IBG has "a relationship with Morgan Keegan" (App. 3560 (Tee Ex. 1182)) and Meyers continued to search for IBG investors into November 2009 (*E.g.,* App. 3714-3718 (Tee Ex. 1317).)

Neither the 2006 nor 2008 Engagements limited the scope of services the MK Defendants could provide. As their course of dealings prove, the MK Defendants went beyond attracting institutional investors. They rendered a host of general advisory services to IBG during and outside of these specific engagement agreements, including providing comments on a press release to be included on IBG's website (App. 922-926 (Tee Exs. 100, 101)); editing and commenting on IBG's revenue pipeline (App. 1098-1105 (Tee Exs. 115, 117)); creating a check collection rate for IBG (which was false, fraudulent, and misleading) (*see* discussion, *supra*, SOC Part A(1)); building a financial model for IBG that could be used to market IBG to potential investors (App. 1333-1334, 1319-1341, 1760-1888, 2392-2416 (Tee Exs. 282, 290, 404, 480, 486, 491); securing a large line of credit with Regions Bank (App. 1186-1191, 1194-1213 (Tee Exs. 155, 156, 163, 165)); recommending Hargrett become IBG's CFO (App. 1286-1287 (Tee Ex. 193)); editing IBG's financial statements and accompanying disclosures (App. 915-921, 927-933, 1303-1312, 1660-1665 (Tee Exs. 98, 99, 105, 227, 228, 229, 382)); drafting and editing presentations for existing shareholders and potential investors (App. 1682-1711, 1715-1744, 1889-1915, 2337-2379 (Tee Exs. 395, 400, 409, 457, 465, 472)); authoring an article in an IBG newsletter (App. 3080 (Tee Ex. 752)); coordinating tax advice for individual IBG investors (App. 3517-3520 (Tee Ex. 1097));

referring customers to IBG as a self-described "producing agent" (App. 1319-1322, 2805-2807, 3453-3457, 3538-3542 (Tee Exs. 243, 677, 1044, 1125)); and assisting in formulating IBG's "exit strategy" (*see* discussion, *supra*, SOC Part B(1)(d)).

> b. *The MK Defendants had an affirmative legal obligation to discover fraud, rather than instigate it, as well as red flags and other concerns, and to disclose their discoveries to IBG management.*

Professor John Freeman testified for the Trustee as an expert in the following fields: (1) the standard of care and conduct required of, and responsibilities owed by, securities professionals in connection with advising and assisting clients in effort to market securities to investors; (2) the standard of care and conduct owed by securities industry professionals, in whom trust and confidence is reposed, in connection with the offer and sale of securities; and (3) the breach of these standards by the MK Defendants and the right of IBG to recover damages proximately caused by these breaches.[26] (App. 246-247, 251 (Apr. 30 Tr.).)

As IBG's financial advisor and placement agent, Morgan Keegan's role was to provide a road to market for the company's securities. (App. 257-268 (Apr. 30 Tr.).) Their duties included assisting in the preparation of disclosures and offering documents that presented a full and fair disclosure of all material facts. (App. 260-261 (Apr. 30 Tr.).) This requires appropriate due diligence, meaning the MK Defendants must employ "a searching eye" to review facts, not turn away from "challenging facts," verify that what is being done is proper and within professional

---

[26] The Bankruptcy Court incorrectly recalled that it took Professor Freeman's qualification as an expert under advisement. [Dkt. No. 1058 at 3 n.1.] The Bankruptcy Court readily qualified Professor Freeman—the foremost expert on these matters in South Carolina. (App. 251 (Apr. 30 Tr.).) This is in stark contrast to the MK Defendants' counter expert, Scott Ilario, with respect to whom the Bankruptcy Court found "significant issues raised regarding the qualifications and reliability," "there is some significant question of his qualifications, reliability, value in assistance to the Court," and "this is the most difficult expert issue that I've had in my 24 -- in June, 25 years on the bench, and I think I do have some significant concerns" and took the acceptance of *his* testimony under advisement. (App. 648-650 (May 11 Tr.).)

standards, address any identified problems, and "not be satisfied with glib answers." (App. 261-263 (Apr. 30 Tr.).) They were responsible for disclosing, addressing, and resolving any "red flags" or problems that arose during the capital raising process. (App. 269-272 (Apr. 30 Tr.).)

In other words, "[i]f you see something that raises questions about accounting principles, you're expected to react." (App. 262 (Apr. 30 Tr.).) Professor Freeman summarized it well:

> You're not just winking and nodding at management or saying, you know, this company's got an auditor, we don't have to worry about financials because, after all, it's the auditor's financials. First of all, it's not the auditor's financials. Okay? The auditor signs off on them, but the – the financials of the business are the – the management – the company's responsibility. And if you see something there, you're expected to address it. If you see something with the company management, you're expected to address it and get it resolved.
>
> And if they – if it can't be resolved, if, for example, you catch the company doing something improper and they – they want to cover it up and they won't let you disclose, then you're expected to hit the road and not – and not assist them, not aid and abet them, not conspire with them, but to get out of there rather than endorsing a fraudulent product. [27]

(App. 262-263 (Apr. 30 Tr.); *see also* App. 269-272 (Apr. 30 Tr.).) This is a fiduciary standard that requires the individual to act as a prudent person in the management of his own property. (App. 265 (Apr. 30 Tr.).) A more searching inquiry is required if the company is unsophisticated

---

[27] In holding otherwise, the Bankruptcy Court relied, in part, on language in the 2006 Contract that the MK Defendants were entitled to rely on the accuracy of information IBG provides without independent verification. [Dkt. No. 1058 at 128.] In addition to being legal error, it ignored the facts. Meyers and Clark conceded they performed due diligence and did not blindly parrot IBG's data. (App. 512 (May 4 Tr.), 564-566 (May 8 Tr.).) They consequently recognized and undertook this obligation irrespective of any contract limitation. Meyers also confirmed that the MK Defendants could not knowingly distribute false and misleading information to institutional investors. (App. 633 (May 9 Tr.).) Moreover, the 2008 Engagement Agreement contains no such limitation and actually obligated the MK Defendants to "[c]onduct financial due diligence of the Company, including but not limited to an examination of financial results and management projections." This due diligence also is inherent in the work they undertook as a private placement agent. *See* FINRA Regulatory Notice 10-22, *Regulation D Offerings: Obligations of Broker-Dealers to Conduct Reasonable Investigations in Regulation D Offerings* (April 2010), *available at* http://www.finra.org/sites/default/files/ NoticeDocument/p121304.pdf.

and inexperienced. (App. 265-266 (Apr. 30 Tr.).) This was IBG, which the MK Defendants knew had already "gummed up" prior offerings and "it had been amateur hour when they were at it on their own." (App. 266-268 (Apr. 30 Tr.).) Thus, the MK Defendants promised to bring their expertise to raise capital. (App. 267-269 (Apr. 30 Tr.).)

Meyers' status as a CPA, and his holding himself out as such to IBG, imposed additional due diligence and disclosure obligations on the MK Defendants. George DuRant, a licensed South Carolina CPA who served on national boards regarding the ethical obligations of CPAs and has published materials on the ethical duties of CPAs in South Carolina, reviewed Meyers' actions and representations. (App. 347-350 (May 1 Tr.).) DuRant testified without contradiction that Meyers' holding himself out as a CPA to IBG constituted the practice of accounting in South Carolina. (App. 367 (May 1 Tr.).) This subjected him to the American Institute of Certified Public Accountants' ("AICPA") Code of Professional Conduct. (App. 366-368 (May 1 Tr.).)

The AICPA's rules prohibit misrepresenting facts and require that a CPA bring evidence of fraud or illegal activity to management's attention. (App. 370-373 (May 1 Tr.).) Importantly,

> [w]hen matters regarding fraud or an illegal act involves [*sic*] senior management, the accountant should report the matter to an individual or group at a higher level within the entity, such as the manager, owner, or Board of Directors. When matters regarding fraud or an illegal act involve an owner of the business, the accountant should consider resigning the engagement.

(App. 372 (May 1 Tr.).) The AICPA's rules do not permit a CPA to write misleading notes to financial statements, distribute financial statements containing footnotes known to be misleading, make adjustments to financial statements that take them out of compliance with GAAP, endorse a non-GAAP compliant accounting policy designed to deceive, or distribute financial statements known to be materially misstated. (App. 374-375 (May 1 Tr.).) These rules embrace a "common

decency" standard, where if "you discover something illegal going on, or fraudulent going on, you don't just endorse it, and accept it, and sit back and be quiet." (App. 375 (May 1 Tr.).)

> c. *The MK Defendants failed to disclose what they knew about IBG's fraudulent accounting policy; rather they actively concealed the truth.*

As discussed in detail above, no disclosure after the implementation of this policy (whether in the CIM, PPM, or financial statements) up through the subsequent management ouster accurately described IBG's practice of accounts receivable recognition. Meyers knew how accounts receivable was calculated and therefore knew this disclosure was false but never said a word. (*See* App. 1144-1148 (Tee Ex. 125).) When the MK Defendants were hit with questions and concerns about the accounts receivable policy, they deflected. Meyers explicitly and falsely represented to management and investors that the accounting policy was GAAP-compliant. (*E.g.*, App. 100 (Apr. 25 Tr.), 204-205 (Apr. 27 Tr.).) Criticism of the policy reached its apex with the Transaction Services Report, a scathing takedown of the house of cards upon which IBG's financial prospects were built. (*See generally* App. 3221-3319 (Tee Ex. 898).) Meyers did not inform IBG's board, management, current shareholders, or potential shareholders about its findings. He instead ghost-wrote responses that buried the truth and then carried on with business as usual. Meyers' conduct was inexcusable, abhorrent, and fraudulent, and breached the legal duties owed by the MK Defendants to IBG even if one assumes he did not actively create the fraudulent policy.

The Bankruptcy Court found issues regarding the accounting policy were broached with management twice: once during Meyers' November 2006 "exit interview" and at the January 8, 2007 Board of Directors meeting. The "exit interview," even assuming it occurred, was a telephone call with only Sturgill, Wade Cordell, and Hargrett. (App. 614-615 (May 8 Tr.).) During it, Meyers *still* failed to disclose that IBG's accounting policy violates GAAP. (*See id*.) Hargrett further

recalled that Meyers "didn't actively take a position one way or the other" on whether IBG should stop using this accounting policy. (App. 4947 (MK Ex. 309).) While Meyers also suggested IBG retain a new auditor, this was based on private equity investors' desire for a more prominent firm and not on any explicit concerns about Grafton. (App. 616-617 (May 8 Tr.).)

On January 8, 2007, Hargrett addressed the board concerning the 2006 financial statements and discussed whether to change the way the revenues of the company were booked. (App. 2786 (Tee Ex. 588).) Hargrett believed the existing practice was GAAP-compliant but suggested a change to more closely align accounts receivable with revenue simply because it "would serve the company better." (App. 4944 (MK Ex. 309).) Hargrett did not inform the board that the accounting policy violated GAAP and was misleading. (App. 31-32, (Apr. 23 Tr.), 210-212 (Apr. 27 Tr.), 491-493 (May 3 Tr.).) Without this critical information, the board decided it was in IBG's best interest to maintain the status quo and not change the policy. (App. 2786 (Tee Ex. 588).) With no understanding that the policy violated GAAP or otherwise was improper, the board also decided to continue with Grafton as IBG's auditors. (*Id.*) This meeting in no way put the board on notice that there was any fraud being perpetuated.

Meyers' characterization of the policy as "aggressive" to Sturgill also does not immunize the MK Defendants from responsibility for IBG's accounting practices. Rather, it is further evidence of their knowing participation in this massive, long-lived, and damaging fraud. (App. 305-307 (Apr. 30 Tr).)

> d. *The MK Defendants ignored repeated other red flags and wholly failed to fulfill their own due diligence obligations.*

The red flags did not end (or start) with the accounting policy. The earliest red flag was IBG's status as a new company which had already botched a capital raise, creating rescission rights in early investors. (App. 273 (Apr. 30 Tr.).) The MK Defendants were on notice from the outset

*also* App. 2-3 (Apr. 23 Tr.).) IBG's had a deep bench of non-defendant management. (App. 30 (Apr. 23 Tr.) (discussing App. 2345-2348 (Tee Ex. 472)).)

- "The Management Defendants also held a sizeable portion of Debtor's stock." [Dkt. No. 1058 ¶ 9.]

As discussed in SOC Part C(2)(b), *supra*, the Management Defendants never legitimately owned a controlling portion of IBG's stock.

### *IBG's Knowledge of Fraud*

- "The minutes of the January 2007 meeting show that the Accounting Practice was known to, and specifically discussed by, and expressly approved by Debtor's Board of Directors. Further, Wade Cordell, Van Hoeven, and Hargrett all testified that they knew how Debtor was recording its accounts receivable." [Dkt. No. 1058 at 81.]

Hargrett believed the existing practice was GAAP-compliant but suggested a change to more closely align accounts receivable with revenue simply because it "would serve the company better." (App. 4944 (MK Ex. 309).) Hargrett did not inform the board at this meeting that the accounting policy was not in compliance with GAAP and was misleading. (App. 31-32 (Apr. 23 Tr.), 210-212 (Apr. 27 Tr.), 491-493 (May 3 Tr.).)

- Regarding Trustee Exhibit 967 (App. 3448-3452), the email from Sturgill stating to "stop talking about our auditors and GAAP," "this clearly demonstrated that Debtor's management was fully aware of the Accounting Practice and issues." [Dkt. No. 1058 ¶ 135.]

Wade Cordell, who received the email, explained Sturgill sent it because "people were getting confused at what GAAP is" and "most [people] don't understand accounting, so we need to let the auditors do what the auditors do." (App. 471-472 (May 2 Tr.).) Institutional investors were confused about the recognition policies, and "we need to let the . . . people that understand them do the talking." (App. 472-473 (May 2 Tr.).) In sum, "[h]e's saying the auditor said they're GAAP-compliant, so they're GAAP-compliant." (App. 473 (May 2 Tr.) Hargrett had a similar recollection of this email. (App. 4950-4951 (MK Ex. 309).) This email did not put its recipients on notice that the accounting policy violated GAAP and was false, fraudulent, and misleading.

- "Further, Debtor's historic audited financial statements included an explanatory note outlining that the accounts receivable balance included state mandated fees and that Debtor is 'actively collecting that amount.' This note in the audited financial statements described the Accounting Practice." [Dkt. No. 1058 at 81-82.]

These notes did not accurately describe the accounting practice. They claimed there were three components of the accounts receivable balance: (1) the face amount of guaranteed checks IBG was "entitled" to receive, (2) the fees from "actively collecting" guaranteed checks which IBG also was "entitled" to receive, and (3) and fees from collecting non-guaranteed checks to which IBG "by contract is entitled." (App. 4101, 4113, 4127, 4143, 4160 (Tee Ex. 1572).) The actual policy was just a baseless estimate of fees with no evidence IBG was "entitled" to them. (App. 1144-1148 (Tee Ex. 125).)

### *Other Findings*

- "Prior to his involvement with Debtor, Blevins was suspended from the practice of law in the State of Maryland for a period of six months." [Dkt. No. 1058 ¶ 8.]

Blevins' law license was suspended for six months in 2002, without an admission of wrongdoing, as a result of alleged conduct occurring under his real estate (not law) license. (App. 191-192 (Apr. 27 Tr.).) He thereafter renewed his law license, and it was still active as of the time of trial. (App. 192 (Apr. 27 Tr.).)

*           *           *

The Bankruptcy Court's findings also were the result of a double standard. The Trustee presented testimony from thirteen IBG employees, managers, directors, and shareholders. Only two of the MK Defendants' witnesses, Meyers and Clark, testified as to the MK Defendants' story. The Bankruptcy Court's order turned entirely on their testimony. The court recognized they are not impartial. [Dkt. No. 1058 at 4 n. 3.] They were impeached repeatedly at trial. (*See, e.g.*, notes 21 & 42, *supra* (Meyers); note 8 *supra* (Clark).) They were evasive. (*E.g.*, App. 513-530 (May 4 Tr.) (Clark), 657-661, 664-667 (May 14 Tr.) (Meyers).) Meyers demonstrated a lack of decorum.

64
**-369-**

(*E.g.*, App. 668 (May 14 Tr.) (testifying that Brad Cordell was "making s\*\*t up" with respect to what Meyers said at the 2008 Sales Meeting).) Yet the court adopted their testimony without scrutiny. It dismissed the Trustee's witness testimony if it was not corroborated by documents while wholesale adopting the MK Defendants' testimony on the same issue despite a similar absence of documents.[45] The court adopted Meyers' testimony that lacked any documentary support or corroboration without question.[46] Where the Trustee had supporting documentation, the Bankruptcy Court dismissed it or, worse, simply ignored it despite an abundance of other corroborating evidence.[47] Most troubling, however, was the Court's abdication of its role as fact finder by expressing an inability to find facts so long as there was a dispute. (*E.g.*, Dkt. No. 1058 at 56 n. 33 ("Based on the contradictory evidence, the Court cannot conclude that Meyers made the alleged statements regarding Debtor's financial condition [at the September 2008 Meeting].").

---

[45] *Compare* Dkt. No. 1058 at 23 n. 19 (asserting there is no documentary evidence that Van Hoeven discussed concerns about Clark's check collection rate methodology) and *id*. at 105 n. 70 ("[T]here was no documentary evidence presented showing that any member of management or the Board expressed issues or concerns with Clark's methodology."), *with id*. at 23 (accepting the MK Defendants' contention that "it does not appear any party expressed concerns with [Clark's] methodology"); *compare id*. at 37 (noting, incorrectly, that there was no corroborating evidence of the Berrys' recollection of Meyers' presentation at the January 15, 2007 board meeting), *with* (accepting Meyers' oral testimony that "contradicts that of the Berrys" on this issue).

[46] *E.g.*, Dkt. No. 1058 ¶ 34 (adopting Meyers' claim of a conversation with Sturgill about IBG's accounting policy, which no other witnesses supported); *id*. ¶ 76 (adopting Meyers' testimony that the 2006 Engagement ended in 2006, which no other witness supported and the documentary evidence contradicted); *id*. ¶ 77 (discussing Meyers' claimed "exit interview," which no other witness supported).

[47] For example, investor Scott Matula took contemporaneous notes of a call with Meyers in November 2006 during which Meyers made repeated assertions about IBG's finances and investment prospects. (App. 2661-2664 (Tee Ex. 558); *see also* App. 94-101 (Apr. 25 Tr.).) The Bankruptcy Court never cited or discussed this evidence. Instead, it simply repeated the refrain that Meyers testified he had a "general practice" of not speaking with individual investors in order to discount all claims to the contrary. The court similarly disregarded the "only documentary evidence of Meyers' statements at the [September 2008] sales meeting" and adopted Meyers' version of the facts, despite the testimony of five witnesses who were personally present at the meeting and contradicted Meyers' self-serving testimony. [Dkt. No. 1058 at 56 n. 32.]

Furthermore, there is a difference between knowing of the accounting practice and knowing that it was fraudulent. The Bankruptcy Court went through great pains to explain how the MK Defendants knew all of the details of the policy but nevertheless remained ignorant that it was fraudulent despite their expertise. [Dkt. No. 1058 at 106-12.] IBG did not get the same treatment. Presented with the same evidence, much of which allegedly came from Meyers, the court charged IBG's board with knowledge of a fraud. [*Id.* at 81-82, 120.] To be sure, the court overstated IBG's knowledge and ignored evidence as to the MK Defendants. But at baseline, this reflects the court's strained effort to adopt the MK Defendants' narrative regardless of the evidence in the record and the inconsistencies this approach created. The court's approach resulted in the multitudinous clearly erroneous factual findings that permeated the Bankruptcy Court's order.

**B. The Trustee is entitled to judgment in his favor on his causes of action.**

The Bankruptcy Court found against the Trustee on each cause of action. This was error.

1. <u>Aiding and abetting breach of fiduciary duty.</u>

Nevada law governs the Trustee's aiding and abetting claim. *Anderson v. Cordell (In re Infinity Bus. Grp., Inc.)*, 497 B.R. 794, 804 (Bankr. D.S.C. 2013). Nevada adopted the Delaware standard for this claim: (1) a fiduciary relationship exists, (2) the fiduciary breached the fiduciary relationship, (3) the third party knowingly participated in the breach, and (4) the breach resulted in damages. *In re Amerco Derivative Litig.,* 127 Nev. 196, 225, 252 P.3d 681, 702 (2011) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)). Aside from its general discussion of causation and damages, which the Trustee addresses below, the Bankruptcy Court summarily determined only that the Trustee failed to satisfy the third element.[48]

**\*   \*   \*   \***

---

[48] The first and second elements never have been in dispute with respect to the Management Defendants.

3:19-cv-03096-JMC

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

---

In re: Infinity Business Group

---

Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc.,

Appellant,

vs.

Wade Cordell, O. Bradshaw Cordell, Cordell, L.L.C., The Cordell Group, L.L.C., Gibson Commons, L.L.C., Bryon K. Sturgill, Sturgill & Associates Inc., John F. Blevins, Law Offices of John F. Blevins, L.L.C., Golden Ghost, Inc., Haines H. Hargrett, Donald Brent Grafton, D. Larry Grafton, Grafton and Company, P.L.L.C., Morgan Keegan & Company, Inc., Keith E. Meyers,

Defendants,

Of whom Morgan Keegan & Company, Inc. and Keith E. Meyers are,

Respondents.

---

Appeal from the Bankruptcy Court for the District of South Carolina
Bankruptcy Case No. 10-06335-jw, Adversary Proceeding No. 12-80208-jw

---

**APPELLANT'S REPLY BRIEF**

---

Mitchell Willoughby
Elizabeth Zeck
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street
Columbia, South Carolina 29201
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com

R. Walker Humphrey, II
**WILLOUGHBY & HOEFER, P.A.**
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
(843) 619-4426
whumphrey@willoughbyhoefer.com

*Attorneys for Appellant*

\* \* \* \*

regarding the 2004 restated financials to the later set to diminish the latter's reliability. This transference is on full display in their attack on DuRant's opinions. They assert DuRant "purported to calculate damages using financial statements that he admitted were not trustworthy." (MK Defs.' Br. at 4.) They later claim DuRant "relied exclusively on IBG's 'restated' financial statements," which they contend both DuRant and Freeman opined are "false and misleading and cannot be relied upon due to the 'fraudulent and despicable' actions of Hargrett." (MK Defs,' Br. at 63.) In their view, "Du[R]ant acknowledged serious 'concerns with respect to the legitimacy' of the restated financials prepared at the direction of Hargrett." (MK Defs.' Br. at 64.)

As damning as this may sound, it simply is not true. The cited Freeman testimony pertains only to financials including the fraudulent receivables and revenue—*not the later restatements which omit them.* (MK App. 52-56 (Apr. 30 Tr.).) The MK Defendants tried to elicit a more sweeping pronouncement from him, but he refused their bait and instead confirmed that the fraud can be isolated. (MK App. 54 (Apr. 30 Tr.).) The cited testimony from DuRant contains his explanation as to why these later restated financials *are* reliable and are not "false and misleading." (MK App. 71-73 (May 1 Tr.).) His "concerns with respect to the legitimacy" comment related to the Grafton financials, not the later restatement prepared at Hargrett's direction. (MK App. 72 (May 1 Tr.).) The MK Defendants asked DuRant if he had the same concerns with respect to Hargrett, and DuRant testified, "Well, to the extent that the only problem identified by anybody in this case, is revenue recognition, and that's been addressed and taken care of, no." (MK App. 72-73 (May 1 Tr.).) The MK Defendants' assertions here are troublingly false.

*Whether DuRant Confirmed the Later Restated Financials Are Reliable*: The MK Defendants assert that "DuRant testified that he did nothing to confirm the accuracy of the restated financials or otherwise determine whether those statements are GAAP-compliant." (MK Defs.'

\* \* \* \*

17

\*    \*    \*    \*

Lyle), 135-141 (Apr. 25 Tr.) (Dr. Evelyn Berry), 152, 168-176 (Apr. 26 Tr.) (George "Al" Fowler).) The court's findings were clearly erroneous as a result.

    *IBG's Knowledge of the Fraud*: The MK Defendants' brief and the Bankruptcy Court's order are notably short on actual evidence IBG knew the policy was fraudulent. As a proxy to mask this void, the MK Defendants vaguely refer to IBG being informed of "issues" regarding the policy but without identifying those "issues." (*E.g.*, MK Defs' Br. at 16, 21, 39, 71.) Discussions about changing the policy for anodyne reasons do not convert "issues" into "fraud." The MK Defendants never said it was fraudulent, and there is no evidence anyone else did so before the Transaction Services Report, which Meyers helped bury and was not shared beyond Sturgill and Hargrett. Finally, Sturgill and Hargrett's knowledge is not imputed to IBG under *in pari delicto*.

    *The MK Defendants' Engagement with IBG in 2006*: The Bankruptcy Court improperly ignored contemporaneous documentation in its crabbed view of the relationship between IBG and Morgan Keegan. Its finding that the MK Defendants "did not undertake to . . . opine on [IBG's] financial information" [Br. Dkt. No. 1058 at 13] is contradicted by Morgan Keegan's own contemporaneous description of the parties' relationship, which was written by Meyers himself and posted on IBG's website: MK had been retained by IBG "as its financial advisor." (App. 1656-1659 (Tee Exs. 375, 377).) The Bankruptcy Court may have been confused by Meyers' own conflicting testimony on this issue, as he first denied giving IBG permission to list Morgan Keegan's involvement on its website, but then admitted that he "stand[s] corrected" after being shown his own emails (App. 643 (May 10 Tr.)), thus providing a very telling demonstration of the dangers of relying on *post hoc* testimony instead of contrary contemporaneous documentation.

**C. The MK Defendants fail to advance any meritorious argument supporting the Bankruptcy Court's findings in their favor on each of the Trustee's causes of action.**

By and large, the law governing the Trustee's claims is not in dispute. Viewed through the proper factual lens, these legal standards compel judgment in favor of the Trustee.

    1. Aiding and abetting breach of fiduciary duty.

A claim for aiding and abetting breach of fiduciary duty requires proof of the following: (1) a fiduciary relationship, (2) the fiduciary breached the fiduciary relationship, (3) the third party knowingly participated in the breach, and (4) the breach resulted in damages. *In re Amerco Derivative Litig.,* 127 Nev. 196, 225, 252 P.3d 681, 702 (2011) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)). There is no dispute that the Management Defendants were fiduciaries of IBG, or that that they breached their duties to the company. While the MK Defendants generally argue there is not sufficient proof that *they* caused IBG to incur damages, there is no dispute that the Management Defendants' breaches caused IBG harm. The MK Defendants therefore exclusively focus on whether they "knowingly participated in the breach."

Their opposition narrows further. The MK Defendants claim that because evidence supports two discrete points, the order is not clearly erroneous: "the Accounting Practice was openly discussed by Meyers and Morgan Keegan with [IBG]'s management and the institutional investors it consulted," and "[t]here is also affirmative evidence which raises a significant doubt that Meyers and Morgan Keegan . . . even knew the Accounting Practice was improper for use by [IBG]." (MK Defs.' Br. at 66-67.) As discussed above, these findings are clearly erroneous. More importantly, even if true they still do not provide an escape hatch to the MK Defendants.

Discussing the policy is one thing; identifying it as a fraud is another. Masking the fraudulent nature of the policy, as Meyers did, is a textbook example of knowing participation. *In re Rural Metro Corp.*, 88 A.3d 54, 97, 99 (Del. Ch. 2014.), *aff'd sub nom. RBC Capital Markets,*

*LLC v. Jervis*, 129 A.3d 816 (2015) (aiding and abetting can be shown by the creation of "an informational vacuum" and "informational gaps"). Similarly, the alleged openness to institutional investors is of no solace. Not one institutional investor approached by the MK Defendants invested in IBG. Instead, millions of dollars each year poured in from individual investors. (MK App. 453-468 (MK Exs. 286, 287).) These investors were provided the false and fraudulent PPM the MK Defendants helped draft, the financial statements built on the fraudulent accounting policy, and other false information rooted in the fraudulent policy. (Tee Br. at 27-30 (citing various portions of the Appendix); *see also* Supp. App. 27-32 (Tee Ex. 627).) Many either personally met with Meyers or heard him speak at meetings where he peddled the false and fraudulent financial information, projections, and prospects the MK Defendants created. (Tee Br. at 27-30.) The MK Defendants and the Bankruptcy Court studiously avoid mentioning those who actually invested in IBG for whom there is no evidence Meyers was "open" about IBG's finances and accounting.

Finally, the Bankruptcy Court's clearly erroneous finding that Meyers did not know the policy was fraudulent does not end the analysis. Knowing participation can be shown by reckless indifference. *RBC Capital Markets*, 129 A.3d at 862. The evidence demonstrating reckless indifference is legion. Meyers had information proving Sturgill's alleged basis for the policy was false (*e.g.*, App. 892 (Tee Ex. 75)), the change in accounting resulted in a 67-fold increase in accounts receivable (*compare* App. 4088 (Tee Ex. 1572) (2004 accounts receivable), *with* App. 4108 (Tee Ex. 1572) (2005 accounts receivable)), Meyers thought this change was "aggressive" (MK App. 162-163 (May 7 Tr.)), this jump was masked through back-dated restated financials created with the MK Defendants' assistance that failed to disclose a change had occurred (Tee Br. at 10-11 (citing various portions of the Appendix)), no institutional investors were willing to invest on acceptable terms when they learned the truth, the Transaction Services Report blew the lid off

28

-376-

the fraud but Meyers drafted responses on IBG's behalf that ignored it (App. 3230-3231, 3243 (Tee Ex. 898), Tee Br. at 21 (citing various portions of the Appendix)), and Meyers thereafter continued to pitch IBG to individual investors without disclosing the Transaction Service's fraud findings (Tee Br. at 29-30 (citing various portions of the Appendix)). And per the MK Defendants here, Meyers told Hargrett and the Sturgill that the policy needed to change and then sat back and continued to search for investors even when no change was made. (*See*, *e.g.*, MK Defs.' Br. at 71.)

These undisputed facts are more than sufficient, as a matter of law, to establish reckless indifference. *See Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000), *cited with approval in RBC Capital Markets*, 129 A.3d at 862 n. 169 ("Likewise there is general agreement that [scienter] is present when the representation is make without belief as to its truth, or with reckless disregard whether it be true or false. Further than this, it appears that all courts have extended it to include representations made by one who is conscious that he has no sufficient basis or information to justify them.") (internal citation and quotations omitted).

The Bankruptcy Court therefore erred when it found the Trustee has not shown knowing participation, and this Court should reverse and enter judgment in the Trustee's favor.

2. Breach of fiduciary duty.

The MK Defendants ignore the critical point that the existence of a fiduciary relationship is a question of law. *Turpin v. Lowther*, 404 S.C. 581, 589, 745 S.E.2d 397, 401 (Ct. App. 2013). That determination is reviewed *de novo*. *Litton v. Wachovia Bank (In re Litton)*, 330 F.3d 636, 642 (4th Cir. 2003) (holding the court of appeals reviews questions of law and mixed questions of law and fact from a bankruptcy court *de novo*).

As noted previously, the Bankruptcy Court failed to cite the standard for creating a fiduciary duty under South Carolina law. (Tee Br. at 69.) The MK Defendants do not do much

29

-377-

better, citing just one case stating the general rule and then engaging in the same truncated analysis as the court and cite the same "six factors" for why no duty arises. (MK Br. at 67-68.) The "six factors" are wrong or inapposite for the reasons discussed above and in the Trustee's opening brief.

Moreover, they do not end the analysis even if correct. There is copious undisputed evidence never cited or discussed by the Bankruptcy Court or the MK Defendants that the MK Defendants sought and accepted IBG's trust and confidence with respect to the company's finances and capital raises. While the MK Defendants claim that the Trustee did not "specifically identify this evidence" (MK Defs.' Br. at 69), he had an entire section of his Statement of Case titled "*The MK Defendants had a close, intimate, and familiar relationship with IBG and owed it a duty of good faith, fair dealings, and trustworthiness*" wherein he detailed the supporting evidence (Tee Br. at 31-38). This undisputed evidence creates a fiduciary relationship as a matter of law irrespective of the court's "six factors." *See Moore v. Moore*, 360 S.C. 241, 250-51, 599 S.E.2d 467, 472 (Ct. App. 2004) ("A fiduciary relationship is founded on the trust and confidence reposed by one person in the integrity and fidelity of another.") (citations omitted). So does the MK Defendants' service as IBG's financial advisor, placement agent, and broker-dealer—and the MK Defendants notably do not contend otherwise. (*See* Tee Br. at 70-71.)

With respect to the breach of these duties, the MK Defendants beat a familiar drum: they claim there is evidence supporting the Bankruptcy Court's finding that Meyers advised IBG's management of "potential issues" regarding the accounting policy and Meyers was "open[]" to institutional investors" about the policy. (MK Defs.' Br. at 71.) Yet Meyers *never* told management the policy was fraudulent, and he was notably dishonest with the individuals who actually invested in IBG. Additionally, the Bankruptcy Court's finding that Meyers did not know the policy was fraudulent until receiving the Transaction Services Report in July 2008 is clearly erroneous and

\* \* \* \*

30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| In re: Infinity Business Group, Inc., | ) | Civil Action No. 3:19-cv-03096-JMC |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Robert F. Anderson, as Chapter 7 | ) | |
| Trustee for Infinity Business Group, Inc., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Wade Cordell; O. Bradshaw Cordell; | ) | |
| Cordell, L.L.C.; The Cordell Group, L.L.C.; | ) | |
| Gibson Commons, L.L.C.; Bryon K. | ) | |
| Sturgill; Sturgill & Associates Inc.; | ) | |
| John F. Blevins; Law Offices of John F. | ) | |
| Blevins, L.L.C.; Golden Ghost, Inc.; | ) | |
| Haines H. Hargrett; Donald Brent Grafton; | ) | |
| D. Larry Grafton; Grafton and Company, | ) | |
| P.L.L.C.; Morgan Keegan & Company, Inc.; | ) | |
| and Keith E. Meyers; | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| Of whom Morgan Keegan & Company, Inc. | ) | |
| and Keith E. Meyers are, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

This matter is before the court by way of an appeal by Appellant Robert F. Anderson ("Trustee"), as the Chapter 7 Trustee for Infinity Business Group, Inc. ("IBG"), from an order and judgment filed on October 15, 2019, by the United States Bankruptcy Court for the District of

1

South Carolina ("Bankruptcy Court"). (CV ECF No. 1 at 1.)[1] For the reasons set forth below, the court **AFFIRMS** the Bankruptcy Court's order and judgment.

## I.   RELEVANT BACKGROUND

To support its findings, the Bankruptcy Court set forth detailed findings of fact. (AD ECF No. 1058 at 5-70.) This court will not set aside the Bankruptcy Court's factual findings unless clearly erroneous and will only reference herein factual findings by the Bankruptcy Court that are pertinent to the analysis of the issues on appeal.

The Trustee's claims arise from the collapse of IBG, a payment processing company that specialized in collecting bad checks. (*Id.* at 5, 6, 13.) IBG would collect checks with insufficient funds when first presented for collection ("NSF Checks") then obtain state-mandated recovery fees ("Service Charges") upon the successful collection of the check. (*Id.* at 6.)

IBG offered two (2) programs for collecting NSF Checks: the Guaranteed Program and the Non-Guaranteed Program. (*Id.*) Under the Guaranteed Program, IBG would become the owner of the NSF Check by paying its customer the face value of the check. (*Id.*) Upon any collection, IBG would receive both the face value of the check and the applicable Service Charge. (*Id.*) In contrast, ownership of the NSF Check remained with the customer under the Non-Guaranteed Program. (*Id.*) Accordingly, upon collection of an NSF Check under the Non-Guaranteed Program, IBG would retain the applicable Service Charge and deliver the face value of the check to its customer. (*Id.*)

---

[1] Citations to the record herein contain the relevant document number preceded either by the letters "CV" denoting that the document is listed on the docket in Civil Case No. 3:19-cv-03096-JMC, the letters "AD" denoting that the document is listed on the docket in Bankruptcy Case No. 12-80208-JW, or the letters "BK" denoting that the document is listed on the docket in Bankruptcy Case No. 10-06335-JW.

2

Throughout its operations, IBG was managed by a Board of Directors ("Board") and several key officers, including the following individuals who are relevant to this matter:

- Bryon Sturgill ("Sturgill"): Sturgill was IBG's Chief Executive Officer ("CEO") and a member of its Board from its founding until July 19, 2010. As part of Sturgill's duties from 2003 to September 2006, he reviewed and prepared the company's financial statements and effectively served as IBG's Chief Financial Officer ("CFO"). During that period, he was also responsible for providing the Board with all financial information and hiring IBG's outside accounting firm, Grafton & Company, PLLC ("Grafton"). On the company's website, Sturgill represented that he was a certified public accountant ("CPA") when he in fact never passed the CPA exam.

- Wade B. Cordell ("Wade Cordell"): Wade Cordell was IBG's President and Chairman of the Board from 2004 until August 15, 2009. Wade Cordell oversaw IBG's operations and sales, met with prospective customers, and raised capital from individual investors.

- O. Brad Cordell ("Brad Cordell"): Brad Cordell was IBG's Chief Operating Officer ("COO") and a Board member from 2004 until August 15, 2009. Brad Cordell was responsible for managing IBG's daily operations and achieving IBG's financial targets. In addition, he assisted with IBG's capital raises from individual investors.

- Haines Hargrett ("Hargrett"): Hargrett, a CPA, served as IBG's CFO from September 2006 to July 2010. Hargrett was not a member of the Board, but he reported to the Board and frequently attended Board meetings.

- John Blevins ("Blevins"): Blevins served as IBG's general counsel and as a member of the Board from 2004 until August 15, 2009. He was in charge of compliance for IBG and was responsible for all legal issues affecting IBG, including contract review and negotiation as well as providing advice and counsel to IBG's Board, President, and CEO. Blevins also retained and interacted with outside counsel.

- Thomas Handy ("Handy"): Handy served as a member of IBG's Board from June 24, 2008 until March 31, 2010.

- Michael Potter ("Potter"): Potter served as a member of IBG's Board from May 2003 until the Annual Meeting in November 2007 and rejoined the Board in August 2009 until his resignation in August 2010.

- Bill Van Hoeven ("Van Hoeven"): Van Hoeven served on the Board from 2004 until August 31, 2010, when IBG filed its bankruptcy petition. Van Hoeven

3

**-381-**

> managed IBG's Processing Center in Jacksonville, Florida until September
> 2006. He subsequently served as IBG's Director of Information and
> Technology and assisted with IBG's capital raises from individual investors.

(*Id.* at 7-8.) The Bankruptcy Court's order refers to Sturgill, Wade Cordell, Brad Cordell, Hargrett,

and Blevins as the "Management Defendants" because they were defendants in the adversary

proceeding. (*Id.* at 9.) In contrast, the Bankruptcy Court's order refers to Handy, Potter, and Van

Hoeven as the "Non-Defendant Directors" because they were not named as defendants in the

adversary proceeding. (*Id.*)

Despite Sturgill's and Hargrett's accounting experience, IBG retained Grafton as its

auditor. Grafton served as IBG's auditor from 2003 to 2009 and issued audited financials for each

of those years. (*Id.* at 10.)

Following its incorporation in 2003, IBG's business and customer base grew rapidly. (*Id.*

at 3, 5.) IBG's success attracted numerous individual investors, most of whom were family and

friends of IBG's founders and key members. (*Id.* at 3.) As a result of its rapid growth, IBG and

its shareholders aspired to increase the value of the company by attracting a purchaser, merging

with another company, or pursuing an initial public offering ("IPO"). (*Id.*) To improve IBG's

investment prospects, IBG began using an accounting practice that created the appearance that

IBG was in a better financial position than it was by incorrectly stating the composition and

collectability of its accounts receivable ("Accounting Practice"). (*Id.*) Although Generally

Accepted Accounting Principles ("GAAP") only allow receivables to be reported after they are

earned, the Accounting Practice counted Service Charges as receivables before IBG collected the

checks associated with the fees. (*Id.* at 107.)

IBG's success eventually became a double-edged sword. IBG's rapid business growth and

expansion improved IBG's investment prospects, but it also created a constant need for cash. (*Id.*

at 3.)  Unable to attract sufficient investment to fuel its development, IBG regularly used its customer's funds (the customer's share of the checks collected) to cover IBG's costs and operating expenses with the intention of repaying its customers with other funds that IBG later received.  (*Id.* at 62.)  At any point in time, the deficit in client accounts ranged from $200,000 to $2.9 million. (*Id.*)

On March 16, 2006, IBG entered into an engagement agreement ("2006 Contract") with Morgan Keegan & Company, Inc. ("Morgan Keegan"), a brokerage and investment banking firm. (*Id.* at 15.)  The 2006 Contract provided that Morgan Keegan would serve for a period of one (1) year as IBG's exclusive placement agent  in exchange for a six (6) percent commission on all gross proceeds raised on behalf of IBG from a private equity placement.  (*Id.*)

 After a potential investor withdrew its proposal, IBG and Morgan Keegan terminated the 2006 Contract on October 31, 2006.  (*Id.* at 33.)  Morgan Keegan discontinued its efforts to find institutional investors interested in investing in IBG after the 2006 Contract ended but IBG's managers, officers, employees, and Board members continued to sell securities to investors directly.  (*Id.* at 33, 43.)  After the 2006 Contract concluded, Keith E. Meyers ("Meyers"), a Vice President at Morgan Keegan who led the firm's efforts to find an institutional investor for IBG, continued to occasionally correspond with IBG's management and personally invested $25,000 in IBG on November 20, 2006.  (*Id.* at 35.)

On April 24, 2008, IBG and Morgan Keegan entered into a second contract ("2008 Contract"), in which Morgan Keegan agreed to be IBG's exclusive financial advisor with respect to a possible mezzanine debt financing in exchange for a contingent placement fee equal to three (3) percent of the gross proceeds Morgan Keegan raised on IBG's behalf.  (*Id.* at 44-45.)  The 2008

5

Contract concluded on October 24, 2008 by its terms, ending Morgan Keegan's service to IBG. (*Id.* at 57.)

At some point in 2009, certain IBG shareholders alleged that Wade Cordell, Brad Cordell, and Blevins caused IBG's misappropriation of funds from the customer accounts and organized an effort to remove them ("Initial Ouster"). (*Id.* at 63.) Wade Cordell, Brad Cordell, and Blevins were purportedly removed from the Board and terminated from their officer positions on August 17, 2009.[2] (*Id.*) Thereafter, IBG's Board expanded to nine (9) members. (*Id.* at 64.) Sturgill, Handy, and Van Hoeven remained from the former Board and Potter, Jeffrey Lyle, James E. Beasley III, William G. Reed, Eason Leake, and Paul H. Newberry were added as new members. (*Id.*) On July 19, 2010, IBG's Board held a special meeting and voted to remove Hargrett as CFO and Sturgill as a Board member and as CEO. (*Id.* at 69.)

During the twelve (12) months the new Board was in place, IBG continued to attract new customers, received interest from a buyer, and directly raised capital through stock sales. (*Id.* at 69.) However, it also continued to rapidly lose money. (*Id.*) Due to its financial struggles, IBG filed for relief under Chapter 7 of the Bankruptcy Code on September 1, 2010. (BK ECF No. 1.) Two (2) years later, the Trustee commenced an adversary proceeding on behalf of IBG against IBG's former managers and third-party service providers for their alleged involvement with the Accounting Practice. (AD ECF No. 1.) Prior to trial, many of the individual Defendants defaulted, confessed judgment, or entered into settlements with the Trustee, leaving Morgan Keegan and

---

[2] As the Bankruptcy Court noted, there appears to be a significant dispute about whether the ousting was appropriate and whether a legally sufficient percentage of shareholders voted in favor of the removal. (AD ECF No. 1058 at 63 n.35.) For the purposes of this Order, the court does not need to address whether the removal of Wade Cordell, Brad Cordell, and Blevins was appropriate or legal under controlling law.

6

Meyers (collectively, "MK Defendants") as the remaining defendants at trial.[3]  (AD ECF No. 1058 at 4.)

On April 23, 2018, the Bankruptcy Court commenced an eighteen (18) day bench trial on the Trustee's claims against the MK Defendants.  (AD ECF Nos. 844; 1058 at 4.)  The Trustee asserted four (4) causes of action against the MK Defendants: (1) securities fraud under Rule 10b-5(a) and (c); (2) common law fraud; (3) breach of fiduciary duty; and (4) aiding and abetting a breach of fiduciary duty.  (AD ECF No. 1058 at 70.)  The Trustee proposed the following narratives to establish the MK Defendants' liability:

> First, the Trustee assert[ed] that Meyers and Morgan Keegan were actively involved in, colluded or schemed with the Management Defendants in creating and introducing the Accounting Practice used by [IBG] to recognize its accounts receivable with the intent of inflating [IBG]'s revenues in order to overvalue [IBG] and make it appear more profitable, the benefits of which would be realized by a higher commission for Meyers and Morgan Keegan upon any ultimate sale, merger, or [IPO] of [IBG].  However, as an alternative theory, the Trustee assert[ed] that Meyers and Morgan Keegan were aware or should have been aware of the alleged impropriety of the Accounting Practice used by [IBG] and certified by its auditor, Grafton, from 2005 until late 2009, and failed to adequately report it to the company, which resulted in a detriment to [IBG] because it prevented certain non-managing or "innocent" Board members from forcing a change in the Accounting Practice, seeking earlier the ouster of key managers and Board members, or closing the business earlier, which would limit the damages suffered by it.
>
> To establish liability, the Trustee also assert[ed] that Meyers and Morgan Keegan's relationship with [IBG] went beyond their written contractual relationship established in the 2006 Contract and 2008 Contract and that they agreed, either in word or by action, to serve in additional roles, including as [IBG]'s underwriter, its investment advisor, its broker for [IBG]'s offerings to individual investors and its "producing agent."  The Trustee assert[ed] that, based on the existence of these alleged other roles, Meyers and Morgan Keegan owed additional fiduciary duties to [IBG] that were breached.

---

[3] The Bankruptcy Court granted a default judgment against Sturgill & Associates Inc.; Sturgill; Donald Brent Grafton; D. Larry Grafton; and Grafton and Company, P.L.L.C. on January 9, 2014. (AD ECF No. 98.)  Before trial, the Trustee settled their claims against Blevins; Law Offices of John F. Blevins, L.L.C.; Golden Ghost, Inc., and Hargrett.  (AD ECF Nos. 355; 963.)  The Cordells; Gibson Commons, L.L.C.; Cordell, L.L.C.; and The Cordell Group, L.L.C. also confessed judgment before trial.  (AD ECF Nos. 598; 600; 602; 604; 821.)

7

> The Trustee also assert[ed] that the Management Defendants, with the assistance of
> Meyers and Morgan Keegan, looted [IBG] and used capital raised by [IBG] through
> the use of the Accounting Practice for their own personal benefit.

(*Id.* at 74-75.)  In their defense, the MK Defendants denied creating the Accounting Practice, claimed the Trustee failed to prove the necessary elements of the causes of action, and maintained that the Trustee was barred from bringing the causes of action under the doctrine of *in pari delicto*. (*Id.* at 71.)

On October 15, 2019, the Bankruptcy Court issued a 134-page order finding for the MK Defendants on all of the Trustee's causes of action and entered judgment in their favor.  (AD ECF Nos. 1057; 1058.)  The Trustee appealed the Bankruptcy Court's order and judgment to this court on October 31, 2019.  (CV ECF No. 1.)

The Trustee filed their Opening Brief (ECF No. 17) on May 20, 2020.  The MK Defendants subsequently filed their Response Brief (ECF No. 42) on August 4, 2020 and the Trustee filed their Reply Brief (ECF No. 52) on September 3, 2020.

## II.    LEGAL STANDARD

A district court has jurisdiction to hear appeals from final orders of the bankruptcy court. 28 U.S.C. § 158; *see, e.g.*, *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010) (noting district court's "capacity as a bankruptcy appellate court").  The court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Williams v. Colonial Penniman, LLC*, 582 B.R. 391, 396 (E.D. Va. 2018).  The standard of review of a bankruptcy appeal by a district court is the same as when a court of appeals reviews a district court proceeding.  *See* 28 U.S.C. § 158(c)(2).  Accordingly, the bankruptcy court's findings of fact are reviewed under a "clearly erroneous" standard.  *Dunes Hotel Assocs. v. Hyatt Corp.*, 245 B.R. 492, 495 (D.S.C. 2000).  A finding of fact is clearly erroneous when the

entire record demonstrates convincingly to the reviewing court that "a mistake has been committed." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A bankruptcy court's conclusions of law are subject to *de novo* review. *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999); *In re K & L Lakeland, Inc.*, 128 F.3d 203, 206 (4th Cir. 1997). Mixed questions of law and fact are reviewed under a hybrid standard, "applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining *de novo* the legal conclusions derived from those facts." *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996).

## III.   ANALYSIS

The Trustee presents one (1) question of law:

1. Whether the Bankruptcy Court erred as a matter of law by failing to consider the entire record of the adversary proceeding. (CV ECF Nos. 7 at 2; 17 at 15.)

Furthermore, the Trustee identifies one (1) question of fact:

2. Whether the Bankruptcy Court's "core factual findings" are clearly erroneous. (CV ECF Nos. 7 at 2; 17 at 15-16.)

The Trustee also raises three (3) mixed questions of law and fact:

3. Whether the Bankruptcy Court erred by holding that the MK Defendants did not owe IBG a fiduciary duty, a duty of due diligence, or a duty to disclose all known material facts. (CV ECF Nos. 7 at 3; 17 at 16.)
4. Whether the Bankruptcy Court erred by concluding that the Trustee's claims were barred by the doctrine of *in pari delicto*. (CV ECF Nos. 7 at 3-4; 17 at 16-17.)
5. Whether the Bankruptcy Court's finding that the Trustee did not adequately prove damages caused by the MK Defendants misrepresented the evidence and misapplied the law. (CV ECF Nos. 7 at 4-5; 17 at 17-18.)

The court will address each issue in turn.

**1.  Whether the Bankruptcy Court erred as a matter of law by failing to consider the entire record of the adversary proceeding**

a.  The Bankruptcy Court's Proposed Order Procedure

The bench trial addressed IBG's business operations from 2004 to 2010.  (AD ECF No. 1058 at 71.)  Given the breadth of the proceeding, the parties proposed nearly 2,000 exhibits, submitted almost 700 exhibits, and presented eighteen (18) days of witness testimony to establish their respective positions.  (*Id.* at 77.)  To facilitate the Bankruptcy Court's review of such an extensive record, it instructed the parties on the first day of trial that "post-trial briefs would be in the form of proposed orders[.]"  (*Id.* at 71.)  The Bankruptcy Court explained that it would "look at those proposed orders for reference to exhibits" and "in essence, only review [those referenced] in [the] orders."  (*Id.*)  It also told the parties, "You will have, by failing to list an exhibit, waived the Court's review of that [exhibit]."  (*Id.*)

The Bankruptcy Court provided a similar directive to the parties at the conclusion of trial, instructing that "for the Court to pay proper attention to any exhibits, they must be cited in the [respective] proposed order[s] to the Court.  The Court will rely on the documents that you cite to it[.]"  (*Id.* at 71 n.38.)  It later reiterated that "[i]n the [parties'] proposed orders, the parties shall cite to specific exhibits for the Court's consideration.  Failure to cite to a specific exhibit may result in a waiver of the Court's consideration of that exhibit and any argument related thereto."  (*Id.*)  It then set a 100-page limit for the parties' proposed orders.  (*Id.* at 72.)

Both parties agreed to the proposed order procedure.  On the seventh day of trial, May 1, 2018, the Bankruptcy Court informed the parties that "reference to important evidence . . . will have to be mentioned in your respective proposed orders . . . for the Court to observe it[.]"  (CV ECF No. 43 at 81.)  The Bankruptcy Court then warned the parties that "[t]he consequence of the failure to cite [evidence], will be that the Court [is] relieved of the responsibility of knowing they

10

[sic] importance of that document or evidence[.]"  (*Id.* at 82.)  The Trustee's counsel then responded, "[t]hat is more than fair, Your Honor."  (*Id.*)  The Bankruptcy Court subsequently asked defense counsel whether the procedure "suit[ed]" the MK Defendants.  (*Id.*)  Defense counsel replied, "[y]es, Your Honor."  (*Id.*)

    b.   The Parties' Arguments

The Trustee claims that the Bankruptcy Court "erred as a matter of law by consciously and deliberately ignoring evidence not cited in the parties' proposed orders[.]"  (CV ECF No. 17 at 66.)  He contends that the Bankruptcy Court "consciously elected to abrogate its duty to review the entire record by instead determining it would only review evidence cited by the parties in their page-limited proposed orders."  (*Id.* at 67.)  Specifically, the Trustee alleges that the Bankruptcy Court's erroneous factual findings were "the product" of the Bankruptcy Court's "self-imposed restriction on the evidence it would consider" and "a more general failure to review all of the evidence in the record[.]"  (*Id.* at 66-67.)

The MK Defendants counter that the Bankruptcy Court fulfilled its duty to consider the entire record.  (CV ECF No. 42 at 15.)  First, the MK Defendants argue that the trial court did not limit its decision to evidence cited in the parties' post-trial proposed orders as the Trustee claims.  (*Id.* at 16.)  Second, they claim that the Trustee waived any objections to the procedure adopted by the Bankruptcy Court for post-trial submissions by stipulating to the process.  (*Id.* at 16-17.)  Third, the MK Defendants maintain that the Trustee has not cited any evidence that the trial court refused to consider solely because it was not included in the Trustee's proposed order.  (*Id.* at 17.)

    c.   Analysis

Given the extensive record in this case, it was appropriate for the Bankruptcy Court to request proposed orders limited to 100 pages.  Inviting the parties to submit proposed findings of

fact and conclusions of law "is well established as a valuable aid to decision making." 9C ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2578 (3d ed. 2020). In fact, "the presentation of proposed findings by the parties may help the court to avoid error." *Id.* Additionally, setting a reasonable page limitation for briefs and memoranda is a common practice to encourage a concise presentation of the relevant arguments and evidence. As the Bankruptcy Court's order notes, the local rules for both the District of South Carolina and the Court of Appeals for the Fourth Circuit contain page limitations. *See, e.g.*, Local Civ. R. 7.05 (D.S.C.) ("Unless an exception is granted by the court, no memorandum shall exceed: [t]hirty-five (35) double-spaced pages, in the case of an initial brief of any party"); Local App. R. 32(b) (4th Cir.) ("The Fourth Circuit encourages short, concise briefs. Under no circumstances may a brief exceed the length limitations in FRAP 32(a)(7) and FRAP 28.1(e)(2) without the Court's advance permission.").

Nonetheless, the Trustee waived any objections to the Bankruptcy Court's proposed order procedure by agreeing to the procedure at trial. Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Here, the Trustee waived its right to challenge the Bankruptcy Court's proposed order procedure by affirmatively agreeing to the procedure at trial.

But while the Trustee waived any objections to the proposed order procedure, they did not waive their right to challenge an alleged abuse of the proposed order procedure. The Bankruptcy Court's proposed order instructions did not suggest that the Bankruptcy Court would never consider exhibits omitted from the parties' proposed orders. Instead, they informed the parties that the exhibits cited in the proposed orders would frame the Bankruptcy Court's consideration of the matters presented. (*See, e.g.*, AD ECF No. 1058 at 71 n.38 ("[F]or the Court to pay proper attention to any exhibits, they must be cited in the [respective] proposed order[s] to the Court. The Court

12

will rely on the documents that you cite to it[.]").)  Accordingly, there is no evidence before the court suggesting that the Trustee agreed to a procedure that did not entail a review of all of the evidence in the record.  Therefore, the court will consider the Trustee's argument that the "Bankruptcy Court erred as a matter of law by consciously and deliberately ignoring evidence not cited in the parties' proposed orders" on the merits.  (CV ECF No. 17 at 66.)

After trial, the Bankruptcy Court issued its order pursuant to Federal Rule of Civil Procedure 52, made applicable to the proceedings below by Federal Rule of Bankruptcy Procedure 7052.  (AD ECF Nos. 966; 1058 at 4.)  Rule 52 provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  "It is clear from the language of Rule 52(b) that the duty to make findings of fact after a bench trial exists independently of any request by a party to the litigation." *United States ex rel. Belcon, Inc. v. Sherman Const. Co.*, 800 F.2d 1321, 1324 n.2 (4th Cir. 1986). Accordingly, a court has both the right and the duty to weigh the evidence and draw reasonable inferences and deductions after a bench trial.  *United States v. Bales*, 813 F.2d 1289 (4th Cir. 1987) (where jury trial is waived, judge weighs the evidence, determines the credibility of the witnesses, and finds the facts).

Here, it is clear that the Bankruptcy Court fulfilled its duty to make factual findings by reviewing the record, weighing the evidence, and drawing reasonable inferences and deductions from the evidence.  Although the Bankruptcy Court "relied heavily on the proposed orders submitted by the parties in considering this matter[,]" it "reviewed all evidence submitted to it[.]" (*Id.* at 72.)  The "case law evidence, and arguments presented in the proposed orders . . . framed the [Bankruptcy] Court's consideration of the matters presented" while "the arguments, evidence

and case law that were only briefly mentioned or not mentioned at all in the proposed orders were weighed accordingly." (*Id.*)

Moreover, the Trustee has not cited any evidence that the Bankruptcy Court refused to consider solely because it was not included in the Trustee's proposed order. The Trustee generally alleges that the Bankruptcy Court's factual errors were "the result of the court's review only of evidence cited in the parties' proposed orders, a more general lack of support in the record, or a refusal to consider contrary evidence[.]" (CV ECF No. 17 at 68.) But despite devoting eleven (11) pages of its Opening Brief to alleged factual errors, the Trustee fails to cite a single specific instance where the Bankruptcy Court failed to evaluate evidence omitted from the Trustee's proposed order. (*See id.* at 68-77.) Upon its own review of the record, the court cannot discern an instance where the Bankruptcy Court failed to consider evidence or testimony not cited by the Trustee's proposed order. Thus, the court finds that the Bankruptcy Court fulfilled its duty to make factual findings by considering the entire record and did not err as a matter of law.

**2. Whether the Bankruptcy Court's "core factual findings" are clearly erroneous**

a. The Parties' Arguments

The Trustee claims that the following "core factual findings" in the Bankruptcy Court's order are clearly erroneous:

   i. "[T]he [MK Defendants] did not cause [IBG] to implement or continue utilizing the fraudulent accounting practices that led to IBG's demise;"
   ii. "[T]he MK Defendants were unaware or had insufficient knowledge of red flags and other indicia that the fraudulent accounting practices they helped create and perpetuate violated Generally Accepted Accounting Principles at the outset;"
   iii. "[T]he MK Defendants did not conceal the fraudulent nature of the accounting practice from IBG's innocent directors and management, investors, and potential investors;"
   iv. "[T]he MK Defendants did not knowingly and substantially participate in or encourage the Management Defendants' breaches of fiduciary duty to IBG;"
   v. "[T]he MK Defendants did not breach their fiduciary duties and duty to disclose to IBG;"

14

**-392-**

vi.   "IBG's innocent directors and management did not participate in the day to day operation and management of IBG, and they lacked the ability to control the Company; and"

vii.   "IBG's innocent directors, management, and advisors failed to discharge their duties to the Company and were aware of the fraudulent nature of the accounting practice and the misconduct of the MK Defendants and the Management Defendants."

(CV ECF Nos. 7 at 2; 17 at 66.)  However, the Trustee contends in their Opening Brief that the Bankruptcy Court's factual errors are not confined to the seven (7) alleged factual errors in the Statement of Issues.  Instead, the Trustee maintains that "[i]t is impossible to capture every clearly erroneous finding the Bankruptcy Court made" and contends that the seven (7) factual errors previously alleged merely " highlight[] a number of the Bankruptcy Court's factual errors[.]"  (CV ECF No. 17 at 68.)  In support of their argument, the Trustee commits eleven (11) pages of their Opening Brief to rebutting the Bankruptcy Court's factual findings.  (*Id.* at 68-79.)

The MK Defendants counter that the Bankruptcy Court's "core factual findings" are not clearly erroneous and devote thirty-four (34) pages to defending the Bankruptcy Court's factual findings.  (CV ECF No. 42 at 17-51.)  Both the Trustee and the MK Defendants organize their factual arguments using the same headings: (1) The MK Defendants' Role; (2) The MK Defendants' Knowledge of the Fraud; (3) Control of IBG; (4) IBG's Knowledge of the Fraud; and (5) Other Findings.  (*See* CV ECF Nos. 17 at 68-79; 42 at 18-51.)

The Trustee counters that the MK Defendants' "deliberate choice" to "not contest or refute significant portions of the Trustee's facts and arguments" constitutes "waiver[.]"  (CV ECF No. 52 at 9.)  The Trustee's Reply Brief lists twenty-eight (28) "facts and arguments" allegedly "undisputed" by the MK Defendants.  (*Id.* at 10-14.)

b. <u>Waiver</u>

    i. *Waiver by the Trustee*

An issue not listed in an appellant's statement of issues pursuant to Federal Rule of Bankruptcy Procedure 8009 (formerly Rule 8006) and not inferable from the other issues listed in the statement of issues is deemed waived and will not be considered on appeal. *Cumbo v. McDow*, No. 2:06CV97, 2006 WL 3692665, at *2 (E.D. Va. Dec. 12, 2006) (citing *In re Startec Glob. Commc'ns Corp.*, 300 B.R. 244, 249-50 (D. Md. 2003)).

Rule 8009 requires an appellant to properly present issues for appeal. *In re Dunlap*, No. 3:16-CV-00037-RJC, 2017 WL 374915, at *2 (W.D.N.C. Jan. 25, 2017). Specifically, an appellant must "file with the clerk and serve on the appellee a designation of items to be included in the record on appeal and a statement of the issues to be presented." FED. R. BANKR. P. 8009(a)(1)(A). Here, the Trustee failed to fulfill the requirements of Rule 8009. The Trustee's Statement of Issues identifies seven (7) allegedly erroneous factual findings. (CV ECF No. 7 at 2.) However, the Trustee challenges the seven (7) allegedly erroneous factual findings identified in the Trustee's Statement of Issues as well as the "systemic failure of the Bankruptcy Court to make findings of fact that are supported by the record" in their Opening Brief. (*Id.* at 68.)

Although the Fourth Circuit has not adopted a test for determining whether an issue is inferable, other circuits and district courts in the Fourth Circuit consider an issue to be inferable if it (1) is raised in the bankruptcy court; (2) does not require the court to make independent factual findings; and (3) presents no surprise to the appellee. *See In re Dunlap*, 2017 WL 374915, at *2 (citing *Cumbo*, 2006 WL 3692665, at *2). The Trustee's briefed issue – whether all of the Bankruptcy Court's factual findings are clearly erroneous – is not inferable from the issues designated in the Trustee's Statement of Issues. The Trustee challenged factual findings in favor

16

of the MK Defendants by presenting its own case-in-chief at trial. (AD ECF No. 1058 at 4.) Additionally, reviewing all of the Bankruptcy Court's factual findings would not require this court to make independent factual findings because factual findings are reviewed for clear error rather than *de novo*. *See Dunes Hotel Assocs.*, 245 B.R. at 495.

Nevertheless, challenging all 175 factual findings made by the Bankruptcy Court would present a surprise to the MK Defendants. Before the Trustee filed their Opening Brief disputing all of the Bankruptcy Court's factual findings, the court granted the Trustee's Motion to Enlarge Page Limitations (CV ECF No. 12) in part and permitted the parties to file initial briefs up to 100 pages. (CV ECF No. 15.) However, if the Trustee's Statement of Issues specified that the Trustee intended to challenge all 175 of the Bankruptcy Court's factual findings, the MK Defendants may not have opposed the Trustee's Motion to Enlarge Page Limitations and the court may have been inclined to allow the parties to file initial briefs of up to 135 pages as the Trustee initially requested. (CV ECF No. 13.) The MK Defendants may have also moved for an extension of time if they knew that the Trustee planned to challenge 168 more factual findings than are identified in the Trustee's Statement of Issues. Given the volume of factual findings disputed by the Trustee's Opening Brief, the page and time limitations imposed before the Trustee filed their Opening Brief may have limited the MK Defendants' ability to sufficiently address the 175 factual findings challenged by the Trustee's Opening Brief. As a result, the new issue raised in the Trustee's Opening Brief would present a surprise to the MK Defendants and is not inferable.

As the Trustee's challenge of all of the Bankruptcy Court's factual findings was not included in their Statement of Issues and cannot be inferred from the five (5) issues presented in the Trustee's Statement of Issues, the Trustee waived its challenge of all of the Bankruptcy Court's

17

**-395-**

factual findings.  Therefore, the court will only consider whether the seven (7) allegedly erroneous factual findings identified in the Trustee's Statement of Issues are clearly erroneous.

     *ii.    Waiver by the MK Defendants*

The MK Defendants' "deliberate choice" to "not contest or refute significant portions of the Trustee's facts and arguments" does not constitute waiver as the Trustee alleges.  (CV ECF No. 52 at 9.)  Forfeiture is "the failure to make the timely assertion of a right" while waiver is the "intentional relinquishment or abandonment of a known right."  *Olano*, 507 U.S. at 733.  In this case, the MK Defendants have neither forfeited nor waived their challenge to the findings of fact alleged to be erroneous by the Trustee.

In the Fourth Circuit, "an appellee's wholesale failure to respond to a conspicuous, nonfrivolous argument in the appellant's brief ordinarily constitutes a forfeiture." *W. Virginia Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x. 214, 226 (4th Cir. 2019).  Here, the MK Defendants responded to all of the Trustee's conspicuous arguments.  The MK Defendants' Response Brief advances five (5) arguments directly responsive to the issues raised in the Trustee's Statement of Issues and Opening Brief.  (*Compare* CV ECF No. 42 at 3-4, *with* CV ECF Nos. 7 at 1-5; 17 at 3-4, 14-18.)  The Response Brief also devotes thirty-four (34) pages to a section entitled "The Trial Court's 'Core Factual Findings' Are Not Clearly Erroneous" that "address[es] the Trustee's argument that certain 'core factual findings' are clearly erroneous" and is organized by the same headings the Trustee used in the factual findings section of their Opening Brief.  (CV ECF Nos. 17 at 68-77; 42 at 17-51.)  Given that the MK Defendants devoted almost forty (40) percent of their brief to the factual findings challenged by the Trustee, one of just five (5) issues on appeal, they cannot be faulted for failing to directly respond to twenty-eight (28) inconspicuous "facts and arguments" that the Trustee failed to designate as issues on appeal.

Additionally, there is no evidence in the record demonstrating that the MK Defendants intended to relinquish their ability to respond to the Trustee's arguments. In fact, the thirty-four (34) pages the MK Defendants committed in their Response Brief to refuting the Trustee's factual error arguments show that the MK Defendants did not intend to abandon their challenge. (CV ECF No. 42 at 17-51.) As the MK Defendants did not waive or forfeit their challenge to the Trustee's factual error arguments, the court will consider the propriety of the Bankruptcy Court's "core factual findings" on the merits.

c.  Analysis

The court reviews the Bankruptcy Court's factual determinations for clear error. *Dunes Hotel Assocs.*, 245 B.R. at 495. Clearly erroneous review "is properly focused upon fact-finding processes rather than directly upon fact-finding results." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 379 (4th Cir. 1995) (citing *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983)). "The appellate function is to insure that the process shall have been principled; the function is not authoritatively to find the 'facts' first instance, or to affirm or deny that the facts 'found' by the trial court are the 'actual' facts of the case." *Miller*, 720 F.2d at 361. If the trial court's "account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

The trial on the merits should be the "main event" rather than a "tryout on the road." *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2128 (2020) (citing *Anderson*, 470 U.S. at 575). "The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate

the role of the lower court." *Anderson*, 470 U.S. at 573. "In cases in which a [trial court's] factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." *Helton v. AT&T, Inc.*, 709 F.3d 343, 351 (4th Cir. 2013).

In this case, the record does not suggest that any of the seven (7) challenged "core factual findings" by the Bankruptcy Court are clearly erroneous.

i.    *"[T]he [MK Defendants] did not cause [IBG] to implement or continue utilizing the fraudulent accounting practices that led to IBG's demise"*

The Trustee contends that the Bankruptcy Court erred in finding that the MK Defendants did not cause IBG to implement or continue utilizing the Accounting Practice. (CV ECF No. 17 at 15.) They assert that the factual finding fails to account for evidence demonstrating that the MK Defendants reviewed IBG's accounting policies, directed the restatement of financial policies, drafted financial documents, communicated with investors, and failed to change the Accounting Practice. (*Id.* at 68-72.) The court disagrees.

The Bankruptcy Court's finding that the Accounting Practice's "use was dependent upon and perpetuated by both CEO Sturgill and [IBG]'s auditor, Grafton" is well-supported by the record. (AD ECF No. 1058 at 105.) Before Hargrett became CFO in September 2006, Sturgill prepared IBG's financial statements. (CV ECF No. 45 at 58-59.) Accordingly, the 2005 balance sheet, the first set of financial statements in the record including an increased accounts receivable figure, originated from Sturgill. (CV ECF No. 19 at 97, 99.) Grafton facilitated IBG's use of the Accounting Practice by issuing an unqualified audit opinion that IBG's financials were prepared in conformity with GAAP each year from 2003 to 2008. (CV ECF No. 44 at 1, 2, 10, 20, 33, 48, 62.)

In contrast, the record reveals that the MK Defendants did not have the authority to cause IBG to implement and utilize the Accounting Practice. IBG hired the MK Defendants to raise capital. The 2006 Contract appointed Morgan Keegan as IBG's "exclusive placement agent[.]" (CV ECF No. 39 at 177-83.) When asked to explain the purpose of the 2006 Contract, Calvin Clark ("Clark"), a Morgan Keegan associate who worked on the engagement, testified that the engagement between IBG and Morgan Keegan was specifically limited to serving as "a broker between [IBG] and ultimately an institutional investor to raise capital." (CV ECF No. 43 at 114.) IBG similarly retained Morgan Keegan to facilitate investment transactions under the 2008 Contract. The 2008 Contract engaged Morgan Keegan as "exclusive financial advisor to [IBG] with respect to a possible mezzanine debt financing[.]" (CV ECF No. 32 at 11.)

Although IBG hired the MK Defendants for their financial expertise, IBG did not hire them to audit the company's financials or implement accounting practices. The 2006 Contract and the 2008 Contract do not mention auditing services. (*See* CV ECF Nos. 32 at 11-14; 39 at 177-83.) Clark also testified that IBG did not engage Morgan Keegan to "review the accounting principles of the company." (CV ECF No. 43 at 112.) Instead, "[a]s an investment bank, [Morgan Keegan was] engaged to execute a transaction" and therefore it "rel[ied] upon the company prepared financials, as well as the audited financials to provide information to investors." (*Id.*) Meyers similarly testified that there was no discussion or commitment by Morgan Keegan to undertake a "deep dive" into IBG's financials. (*Id.* at 154-55.)

In fact, both the 2006 Contract and the 2008 Contract obligated IBG to provide the MK Defendants with accurate and complete financial information. The 2006 Contract provided that IBG "w[ould] furnish Morgan Keegan with such information . . . including financial statements, with respect to the business, operations, assets and liabilities of [IBG] as Morgan Keegan may

21

**-399-**

reasonably request" and that "Morgan Keegan may rely upon the accuracy and completeness of the Information without independent verification." (CV ECF No. 39 at 178.) Moreover, the 2008 Contract states that IBG "agrees to provide Morgan Keegan all financial and other information requested by Morgan Keegan for the purpose of its engagement hereunder." (CV ECF No. 32 at 12.)

Given IBG's duty to provide the MK Defendants with accurate financial information, the MK Defendants reviewed IBG's finances in order to discuss them with potential institutional investors but were not involved in the formulation or application of the company's accounting practices. In 2006, the MK Defendants prepared a Confidential Information Memorandum ("2006 CIM") summarizing IBG's financial state in a standard format used by private equity firms contemplating investments. (*Id.* at 177.) Although the 2006 CIM included financial information tainted by the Accounting Practice, the MK Defendants did not generate the financial information contained in the document. (CV ECF No. 18 at 374-75.) Meyers testified that the information in the 2006 CIM "is all the company's information" and that the MK Defendants did not "audit the information." (CV ECF No. 43 at 161.) Likewise, Clark testified that he received the data used to develop the profit models in the 2006 CIM from "the management team." (*Id.* at 118-19.)

When assessing the origin of corrupt financials in the 2006 CIM, the Bankruptcy Court noted:

> The record reflects that Blevins testified that he believed Meyers created or introduced the Accounting Practice and that Sturgill was not educated enough to create such a policy. However, the Court had serious doubts about the veracity of Blevins's testimony due to his pre-trial communications with the attorneys on both sides in this matter in which he appears to be "shopping" his testimony to each side in this matter by suggesting to offer testimony to benefit whichever side would benefit him. Further, there were discrepancies between Blevins's testimony and the evidence presented. For example, Blevins testified that he never received communication of the findings of the TS Report or that [IBG]'s financial statements were misstated; however, documentary evidence indicated that he was included in

22

**-400-**

the discussions regarding the use of and change from the Accounting Practice after the release of the TS Report . . . As such, the Court does not find Blevins' testimony to be credible.

During the trial, the Court also received testimony from others that Wade Cordell had told investors of [IBG] that Meyers was "working the financials." However, the evidence indicated that Wade Cordell had a tendency to hyperbolize and misrepresent facts to investors, and he, in fact, testified at trial that he believed Sturgill with Grafton provided the financial information that first used the Accounting Practice for the April 2006 CIM and that Sturgill "put this whole system together of . . . how you book accounts receivables . . ." The evidence presented lacked the necessary specificity to convince the Court that Meyers created or introduced the Accounting Practice to [IBG].

(AD ECF No. 1058 at 107 n.71.)  Because the Bankruptcy Court's findings as to the source of the fraudulent financial information in the 2006 CIM rely on the Bankruptcy Court's assessment of witness credibility, "such findings are entitled to even greater deference." *Helton*, 709 F.3d at 351.

After the MK Defendants drafted the 2006 CIM, IBG's outside securities counsel advised the company that it should conduct a rescission offering to address certain securities laws violations from prior offerings.  (CV ECF No. 43 at 132-33.)  To "speed up the process," the MK Defendants agreed to help IBG's outside securities counsel draft a recission offer.  (*Id.*)  However, they did nothing more than provide outside securities counsel with information that was largely "dropped in" or "cut and paste" from the 2006 CIM and financial information previously provided by IBG's management.  (*Id.* at 139, 142, 191; CV ECF No. 21 at 140.)  Ultimately, IBG's outside securities counsel controlled the rescission offer and its contents.  (CV ECF Nos. 43 at 137, 192; 44 at 230.)

Furthermore, the record shows that the MK Defendants were not involved in the selection of IBG's accounting service providers or in the auditing of IBG's financials.  IBG hired Grafton to audit its financial statements three (3) years before IBG engaged Morgan Keegan's services.  (CV ECF No. 44 at 2.)  IBG later consulted with Ernst & Young ("E&Y") in 2006 about its

accounting practices without the MK Defendants' knowledge. Emails between Blevins and Sturgill establish that IBG sought E&Y's services to address "the accounting issues" while Meyers testified that he did not know that IBG "had been in conversation with E&Y[.]" (CV ECF Nos. 43 at 219-20; 44 at 78, 83, 88.)

The Bankruptcy Court's finding that the MK Defendants did not cause IBG to implement or continue utilizing the Accounting Practice is also supported by Meyers' desire to change the Accounting Practice. Evidence in the record shows that on or around November 2006, Meyers conducted an exit interview with IBG's management in which he recommended that IBG "get a new audit firm" and "go to the most conservative accounting possible." (CV ECF Nos. 43 at 197-98; 44 at 91.) Additionally, Hargrett stated at his deposition that Meyers supported his attempts to change the Accounting Practice and that Meyers thought there was "a better way" of recognizing accounts receivable. (CV ECF No. 45 at 71-72.)

Given the significant evidence in the record supporting the Bankruptcy Court's finding that the MK Defendants did not cause IBG to implement or use the Accounting Practice, the court cannot conclude that the Bankruptcy Court committed clear error. Although a different factfinder may have come to a contrary conclusion from that reached by the Bankruptcy Court in this case, the "rigorous" clear error standard requires more than a party's simple disagreement with the court's findings. *PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161, 174-75 (4th Cir. 2013).

      ii.     *"[T]he MK Defendants were unaware or had insufficient knowledge of red flags and other indicia that the fraudulent accounting practices they helped create and perpetuate violated [GAAP] at the outset"*

In May 2008, Morgan Keegan Strategic Fund, L.P. ("MKSF"), a private equity firm, expressed interest in a possible mezzanine financing deal with IBG and provided a preliminary

term sheet for $6 million in growth and working capital.  (CV ECF Nos. 43 at 215; 44 at 183.)

MKSF retained Transaction Services, LLC ("TS") to conduct independent financial due diligence

on IBG.  (CV ECF No. 43 at 47.)  On July 1, 2008, TS issued a Financial Due Diligence Report

on IBG ("TS Report") to MKSF.  (CV ECF No. 33 at 53.)  The TS Report concluded that IBG's

"audited financial statements are materially misstated, and should not be relied upon due to the

material overstatement of revenue, net income, and accounts receivable."  (*Id.* at 81.)  In making

this assessment, the TS Report noted that "GAAP requires that contingent fee revenue recognition

begin upon the collection of funds on behalf of customers."  (*Id.* at 62.)

The Bankruptcy Court concluded that the "uncontradicted testimony of Meyers at trial

indicated that he first learned that the Accounting Practice was not GAAP compliant on July 1,

2008 when the TS Report was issued to [IBG]."  (AD ECF No. 1058 at 52.)  The Trustee challenges

this finding, claiming that it is unsupported by the record.  (CV ECF No. 17 at 73-75.)  Specifically,

the Trustee claims that Meyers should have known that the Accounting Practice was improper

based on Sturgill's explanations for the practice and Meyers' own knowledge of accounting.  (*Id.*)

Additionally, the Trustee asserts that the Bankruptcy Court failed to consider evidence in the

record that "[l]anding a deal the size of IBG . . . would provide a needed and desired boost to

[Meyers' and Clark's] career prospects and bank accounts."  (*Id.* at 74.)

Upon review of the record, the court cannot conclude that the Bankruptcy Court's finding

as to the MK Defendants' knowledge of the impropriety of the Accounting Practice is clearly

erroneous.  Instead, the record contains significant evidence supporting the Bankruptcy Court's

assessment.

When asked when was the "first time that [he] learned that IBG's financial statements may

not be GAAP-compliant" at trial, Meyers responded "in 2008 when we were given a copy of the

Transaction Services report."  (CV ECF No. 43 at 202.)  He then added that "prior to that time," he did not "have any information to indicate that IBG's financial statements may not be [in accordance with] GAAP[.]"  (*Id.*)  The Bankruptcy Court found Meyers' testimony to be credible because multiple "factors reasonably explain how Meyers could have been unaware of the alleged impropriety with the Accounting Practice, despite being aware of its use."  (AD ECF No. 1058 at 108.)

The Bankruptcy Court first noted that Meyers "relied on the repeated assurances of Sturgill and Grafton that the Accounting Practice was proper" and that IBG "had several professionals working for it that did not question the practice, and therefore, provided additional legitimacy for its use."  (*Id.* at 107-08.)  IBG's management did in fact provide multiple assurances that the Accounting Practice was GAAP-compliant.  Meyers testified that "the CEO and acting CFO indicated to me emphatically that Grafton and Company, their auditors, had signed off on it, and he acknowledged that he believed it was GAAP."  (CV ECF No. 43 at 222-23.)  He also testified that IBG's management repeatedly confirmed that the Accounting Practice complied with GAAP.  (*Id.* at 209.)  Prior to the 2008 Contract, Hargrett continued to assert that IBG's accounting policies were GAAP-compliant.  (*Id.*)

Second, the Bankruptcy Court highlighted that Meyer's knowledge of a similar accounting practice utilized by other debt collection companies led him to believe that the Accounting Practice complied with GAAP.  (AD ECF No. 1058 at 19, 107-08.)  At trial, Meyers testified that his "rudimentary" knowledge about the effective yield method of accounting led him to believe that there was "some basis behind [the Accounting Practice.]"  (CV ECF No. 43 at 170-71.)

Third, the Bankruptcy Court observed that Meyers' misunderstanding of the Account Practice was understandable because "Meyers' experience while he was an accountant was limited

to the accounting of manufacturing businesses and not the accounting of debt collections businesses." (ADE ECF No. 1058 at 108.)

Finally, the Bankruptcy Court emphasized that "[u]nder neither the 2006 Contract nor the 2008 Contract were Meyers and Morgan Keegan retained to conduct an audit or provide accounting services to [IBG]." (AD ECF No. 1058 at 109.) In fact, "[p]ursuant to the express terms of the 2006 Contract, Morgan Keegan had no duty to verify the financial information provided to it by [IBG]." (*Id.*) Instead, IBG "had a duty to provide accurate information to Morgan Keegan." (*Id.*) Both the documentary and testimony evidence in the record support the Bankruptcy Court's conclusion. *See supra* pp. 18-19.

Here, the Bankruptcy Court's finding that the MK Defendants did not know the Accounting Practice was improper is well supported by the record. As a result, the finding is not in error.

iii.    *"[T]he MK Defendants did not conceal the fraudulent nature of the accounting practice from IBG's innocent directors and management, investors, and potential investors"*

The Bankruptcy Court rejected the Trustee's assertion that the MK Defendants colluded to create the Accounting Practice to conceal IBG's true financial state and instead found that the MK Defendants did not "act[] deceptively to hide the Accounting Practice." (AD ECF No. 1058 at 4, 106 n.68.) Specifically, the Bankruptcy Court found that "far from hiding its use, the Accounting Practice was openly discussed by Meyers and Morgan Keegan with [IBG]'s management and the institutional investors it consulted. The evidence is uncontradicted that Meyers insisted on transparency regarding the Accounting Practice with the institutional investors he brought to [IBG]." (*Id.* at 109.) This finding is supported by substantial evidence in the record.

The record reveals that accounting transparency was in the MK Defendants' best interests. Meyers testified that his "goal is to have as much disclosure as possible" because if private equity

firms discover an accounting irregularity, "they ask . . . questions and then I've got to answer the question ten times." (CV ECF No. 43 at 173.)

The evidence also shows that Meyers promoted disclosure of the Accounting Practice. During the 2006 Contract, Meyers advised Sturgill to explain and justify the Accounting Practice to potential investors. (*Id.* at 172.) Meyers and Clark also discussed the revenue recognition policy extensively, including the collections rate and other figures supporting the accounts receivables figures, with a potential investor, Bison Capital, in the summer of 2006. (*Id.* at 184-85; CV ECF No. 45 at 40-42.) Meyers continued his practice of full disclosure during the 2008 Contract. Meyers testified that at the beginning of the 2008 Contract, he encouraged IBG to proactively address the Accounting Practice with potential investors. (CV ECF No. 43 at 211-12.) To facilitate disclosure of the Accounting Practice, Meyers helped Hargrett draft an explanatory document describing the accounting practice and IBG's intent to write off the receivables balance. (*Id.*; CV ECF No. 44 at 178-82.)

The Bankruptcy Court also correctly rejected the Trustee's suggestion that "Clark's calculation of [IBG]'s collection rate as part of his work on the due diligence requests of Bison was an effort to conceal the Accounting Practice." (AD ECF No. 1058 at 106 n.70.) Although Clark's methodology for calculating the collection rate ultimately proved flawed, Clark was transparent with IBG's management and Bison about his methodology. (CV ECF Nos. 21 at 103; 43 at 130.) On July 26, 2006, Calvin sent an email to Bison and IBG management explaining his methodology for calculating the collection rate and providing the raw data he used to calculate the collection rate. (CV ECF No. 21 at 103.) And as the Bankruptcy Court noted, there is no evidence in the record showing that any member of management or the Board expressed concerns with Clark's methodology. (AD ECF No. 1058 at 106 n.70.)

As the record supports the Bankruptcy Court's finding that the MK Defendants did not conceal the Accounting Practice, the court concludes that the finding is not clearly erroneous.

> iv.    *"[T]he MK Defendants did not knowingly and substantially participate in or encourage the Management Defendants' breaches of fiduciary duty to IBG"*

Under Nevada law,[4] aiding and abetting a breach of a fiduciary duty has four required elements: (1) a fiduciary relationship between two parties; (2) breach of the fiduciary relationship; (3) the defendant knowingly and substantially participated in or encouraged the breach of fiduciary duty; and (4) the plaintiff suffered damage as a result of the breach. *Guilfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 198 (Nev. 2014). Whether "the defendant third party knowingly and substantially participated in or encouraged that breach" is a question for the trier of fact and thus subject to review for clear error. *Id.* (granting summary judgment on aiding and abetting a breach of a fiduciary duty claim because plaintiff failed to present evidence that defendant "knowingly and substantially participated in or encouraged that breach").

At trial, the Trustee alleged that the MK Defendants aided and abetted the breach of the Management Defendants' fiduciary duties, claiming that "the Management Defendants, with the assistance of Meyers and Morgan Keegan, looted [IBG] and used capital raised by [IBG] through the use of the Accounting Practice for their own personal benefit." (AD ECF No. 1058 at 75.) After "weighing the evidence presented[,]" the Bankruptcy Court concluded that "the Trustee has not met [their] burden of proof to establish that Meyers and Morgan Keegan 'knowingly and

---

[4] The Bankruptcy Court determined that South Carolina law applies to the breach of fiduciary duty and fraud causes of action and that Nevada law applies to the aiding and abetting a breach of fiduciary duty cause of action. (AD ECF No. 1058 at 73.) As to the federal securities fraud cause of action, the Bankruptcy Court found that federal law applies but that South Carolina law "governs the issue regarding the imputation of the knowledge and conduct of [IBG]'s agents to [IBG]." (*Id.*)

29

substantially participated in or encouraged' the Management Defendants' breach of their fiduciary duties." (*Id.* at 128.)

The Trustee contends that the Bankruptcy Court's finding is not supported by the record because the MK Defendants created an "informational vacuum" that allowed the Management Defendants to implement and use the Accounting Practice. (CV ECF No. 17 at 80-81.) In addition, the Trustee claims that the Bankruptcy Court failed to consider that "Meyers' bonus-heavy compensation structure incentivized him to . . . work in tandem with [IBG's] faithless fiduciaries." (*Id.* at 81.)

The evidence presented at trial suggests the MK Defendants did not (1) knowingly participate in the Management Defendants' breach or (2) substantially participate in the breach. First, the record shows the MK Defendants did not know that the Accounting Practice was fraudulent or that the Management Defendants were misappropriating company assets. The Bankruptcy Court properly concluded the MK Defendants were unaware of the impropriety of the Accounting Practice until the release of the TS Report. *See supra* pp. 22-25; (AD ECF No. 1058 at 52.) The Trustee also does not challenge the Bankruptcy Court's finding that "the evidence does not demonstrate that Meyers and Morgan Keegan were aware of any alleged misappropriation of [IBG]'s assets by Management Defendants." (*See* CV ECF No. 17; AD ECF No. 1058 at 112.) Accordingly, the MK Defendants could not have "knowingly" participated in or encouraged the Management Defendants' alleged breaches of their fiduciary duties: implementing the Accounting Practice and misappropriating company funds.

Second, the record does not demonstrate the MK Defendants "substantially" participated in the Management Defendants' breach. The evidence does not suggest the MK Defendants caused IBG to implement or use the Accounting Practice. *See supra* pp. 18-22. Instead, it shows the

Accounting Practice's use was dependent upon and perpetuated by both Sturgill and Grafton.  *Id.*  Additionally, the record demonstrates the MK Defendants did not create an "informational vacuum" around the Accounting Practice.  *See supra* pp. 25-26.  Far from hiding IBG's use of the Accounting Practice, Meyers raised questions about the practice and required full disclosure of the practice to institutional investors.  (*See, e.g.*, CV ECF Nos. 43 at 172, 184-85, 211-12; 44 at 178-82; 45 at 40-42.)  Moreover, the record shows IBG had knowledge of the Accounting Practice independent of the MK Defendants' involvement.  For example, Sturgill directed Wade Cordell, Hargrett, Blevins, and Brad Cordell on July 21, 2008 to "stop talking about [IBG's] auditors and GAAP" because "[w]e don't need to be talking about possible legal issues or concerns that revolve around the [accounts receivable.]"  (CV ECF No. 44 at 187.)  Wade Cordell, Van Hoeven, and Hargrett also testified they knew IBG used the Accounting Practice.  (AD ECF No. 1058 at 82.)

Furthermore, the Bankruptcy Court did not commit clear error by interpreting Meyers' compensation structure differently than the Trustee.  One interpretation of Meyers' "bonus-heavy compensation structure" is that it "incentivized him to . . . work in tandem with [IBG's] faithless fiduciaries."  (CV ECF No. 17 at 81.)  However, as the Bankruptcy Court concluded, another interpretation of Meyers' compensation structure is that "it seems counterintuitive that Meyers and Morgan Keegan would risk their reputations and jobs to knowingly promote the use of an improper Accounting Practice in dealing with sophisticated institutional investors who were certain to undertake their own due diligence reviews, including financial reviews, and likely discover the improper practice."  (AD ECF No. 1058 at 110.)  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Anderson*, 470 U.S. at 574.

In sum, the testimony and documentary evidence submitted at trial support the Bankruptcy Court's finding that "the Trustee has not met [their] burden of proof to establish that Meyers and Morgan Keegan 'knowingly and substantially participated in or encouraged' the Management Defendants' breach of their fiduciary duties." (AD ECF No. 1058 at 128.) Consequently, the finding is not clearly erroneous.

   v.    *"[T]he MK Defendants did not breach their fiduciary duties and duty to disclose to IBG"*

To establish a claim for breach of fiduciary duty under South Carolina law, a plaintiff must prove (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately resulting from the wrongful conduct of the defendant. *RFT Mgmt. Co., L.L.C. v. Tinsley & Adams L.L.P.*, 732 S.E.2d 166, 173 (S.C. 2012). While the existence of a fiduciary duty is a question of law, breach of a fiduciary duty is a question of fact reviewed for clear error. *See Spence v. Wingate*, 716 S.E.2d 920, 928 (S.C. 2011); *Moore v. Moore*, 599 S.E.2d 467, 473 (S.C. Ct. App. 2004).

Although the Bankruptcy Court found the MK Defendants did not owe IBG a fiduciary duty, it determined:

> [E]ven if Meyers and Morgan Keegan were fiduciaries of [IBG] in regard to its financial statements and accounting policies, the Trustee has not satisfied his burden of establishing a breach when considering Meyers and Morgan Keegan's efforts to advise [IBG]'s management of potential issues regarding the Accounting Practice, its openness to institutional investors about the Accounting Practice, and its support of Hargrett's efforts to change the practice.

(AD ECF No. 1058 at 130.) The Trustee counters that the "MK Defendants breached their fiduciary duties" because their "knowing development and concealment of IBG's fraudulent accounting policy is the antithesis of good faith, loyalty, due care, and fair dealing." (CV ECF No. 17 at 84, 86.)

Here, the Trustee has failed to demonstrate the Bankruptcy Court's finding on the element of breach is clearly erroneous. The Bankruptcy Court identified several determinative facts supporting its conclusion that no breach occurred. (AD ECF No. 1058 at 130.) First, it noted the MK Defendants' "efforts to advise [IBG]'s management of potential issues regarding the Accounting Practice[.]" (*Id.*) Evidence in the record shows on or around November 2006, Meyers conducted an exit interview with IBG's management in which he recommended that IBG "get a new audit firm" and "go to the most conservative accounting possible." (CV ECF No. 43 at 197-98; 44 at 91.) Second, the Bankruptcy Court emphasized the MK Defendants' "openness to institutional investors about the Accounting Practice[.]" (AD ECF No. 1058 at 130.) The record not only demonstrates Meyers and Clark discussed IBG's revenue recognition policy with Bison extensively, but it also shows Meyers helped Hargrett draft an explanatory document describing the accounting practice and IBG's intent to write off the receivables balance for potential institutional investors. (CV ECF Nos. 43 at 184-85, 211-12; 44 at 178-82; 45 at 40-42.) Finally, the Bankruptcy Court noted the MK Defendants' "support of Hargrett's efforts to change the practice." (AD ECF No. 1058 at 130.) Hargrett's deposition testimony reinforces this finding. During his deposition, Hargrett stated that Meyers supported his attempts to change the Accounting Practice and that Meyers thought there was "a better way" of recognizing accounts receivable. (CV ECF No. 45 at 71-72.)

In contrast, the Trustee's arguments are unsupported by the record. The evidence presented at trial demonstrates the MK Defendants did not know the Accounting Practice was fraudulent, implement the Accounting Practice, or conceal the impropriety of the Account Practice. *See supra* pp. 18-26. Accordingly, the court concludes the Bankruptcy Court did not clearly err in finding the MK Defendants did not breach their fiduciary duties.

33

**-411-**

vi.    *"IBG's innocent directors and management did not participate in the day to day operation and management of IBG, and they lacked the ability to control the Company"*

In regards to IBG's operations, the Bankruptcy Court concluded "the Management Defendants controlled both the day-to-day and long-term aspects of [IBG]'s business" and the "[N]on-[D]efendant [D]irectors did not have involvement in the day-to-day operations of [IBG]." (AD ECF No. 1058 at 9.)  However, it acknowledged Van Hoeven had a larger role in IBG's activities than the other Non-Defendant Directors, stating "[u]ntil September of 2006, Van Hoeven managed [IBG]'s Processing Center located in Jacksonville, Florida.  In addition, [IBG] employed Van Hoeven in various capacities, including the Director of Information and Technology.  In addition, he assisted with [IBG]'s capital raises from individual investors."  (*Id.* at 8.)

The Trustee asserts the Bankruptcy Court's findings as to the management of IBG's daily operations are unsupported by the record.  (CV ECF No. 17 at 58.)  They maintain the "board members' roles were not those of 'passive overseers' but instead active governing directors from whose [sic] 'ideas, vision, insight and wisdom' were received during meetings."  (CV ECF No. 17 at 59.)

The court finds the Trustee's challenge is without merit.  In addition to serving on IBG's Board, Sturgill served as CEO, Wade Cordell served as President, Bard Cordell served as COO, and Blevins served as General Counsel.  (AD ECF No. 788 at 6-7.)  Hargrett was not a member of the Board but served as CFO.  (*Id.* at 7; CV ECF No. 45 at 68.)  Given the Management Defendants' roles as corporate executives, they were responsible for the company's principal business activities, including sales, compliance, capital raises, presentations to the Board, and preparing the company's financial statements.  (*See, e.g.*, CV ECF Nos. 34 at 143-44; 43 at 110; 44 at 92, 168; 45 at 51, 59.)

In contrast to the Management Defendants, Handy and Potter did not hold corporate executive positions at IBG. Both Handy and Potter were only affiliated with IBG in their capacities as members of the Board. (AD ECF No. 788 at 7.) The record demonstrates that Handy and Potter had little influence over IBG's operations as members of the Board. Handy testified that it was difficult for him to effect change in IBG's operations because he did not "know how many allies of action [he] would have had on the board[.]" (CV ECF No. 18 at 231.) Wade Cordell also testified at trial that Potter "didn't participate very much at all" and "pretty much voted however [Sturgill] wanted to vote, on pretty much everything." (CV ECF No. 43 at 102.)

Unlike Handy and Potter, Van Hoeven served in various capacities at IBG from 2004 until 2010. (*Id.*) In addition to serving as a member of the Board, he served as Processing Center Director, Vice President of Electronic Processing, and Vice President of Product and Technology Development. (*Id.* at 7-8.) However, the record shows Van Hoeven was primarily involved in IBG's processing operations. In his various roles, Van Hoeven's "job [was] to run [IBG's processing] facility and to process the checks from the merchants that the marketing company would bring on." (CV ECF No. 18 at 17.) He did not oversee the company's finances, compliance obligations, or sales efforts like the Management Defendants. (*Id.* at 17, 65.) In fact, Van Hoeven testified at trial that he "lost control" of customer payments and that customer payments were "completely controlled by Mr. Cordell[.]" (CV ECF No. 43 at 30-31.) The record also suggests Van Hoeven was only occasionally involved in soliciting new investors because of his intimate knowledge of IBG's processing operations. (*Id.* at 16-18.) Thus, while it could be said that Van Hoeven was involved in the IBG's day-to-day processing operations, it could not be said that Van Hoeven was involved in IBG's day-to-day corporate operations.

After a thorough review of the record, the court finds that the Bankruptcy Court's finding that the "[N]on-[D]efendant [D]irectors did not have involvement in the day-to-day operations of [IBG]" but that "Van Hoeven managed [IBG]'s Processing Center . . . [and] assisted with [IBG]'s capital raises from individual investors" is not clearly erroneous.  (AD ECF No. 1058 at 8-9.) Although the Trustee challenges the Bankruptcy Court's interpretation of the record, the Bankruptcy Court's "account of the evidence is plausible in light of the record viewed in its entirety[.]" *Anderson*, 470 U.S. at 574 (1985).

> vii.   *"IBG's innocent directors, management, and advisors failed to discharge their duties to the Company and were aware of the fraudulent nature of the accounting practice and the misconduct of the MK Defendants and the Management Defendants"*

In the course of its imputation analysis, the Bankruptcy Court found "that members of, if not the entirety of, [IBG]'s governing body had actual knowledge of the Accounting Practice that they received within the scope of their authority[.]"  (AD ECF No. 1058 at 83.)  This finding is not clearly erroneous.

As the Bankruptcy Court notes, the minutes of the January 2007 IBG Board meeting, discussions between IBG's management about changing the Accounting Practice, and the explanatory note to IBG's audited financial statements show that IBG had knowledge of the Accounting Practice.  (*Id.* at 82-83.)  IBG's Board expressly discussed changing the Accounting Practice at its January 8, 2007 meeting.  Minutes from the meeting state:

> Haines Hargrett then addressed the Board concerning the 2006 financial statements and discussed [sic] ensued regarding changing the way the revenues of the company are booked, i.e. checks in the system waiting for collection.  It was decided unanimously that it is in the Company's best interests to maintain the status quo and not to change the reporting method.

(CV ECF No. 30 at 38.)  At trial, Wade Cordell and Van Hoeven confirmed that the Board discussed the Accounting Practice and unanimously decided "to continue to go on with the way

36

we were doing it[.]" (CV ECF No. 43 at 29, 103-04.) As a result of such evidence, the Bankruptcy Court concluded that "[a]ll members of [IBG]'s Board received and reviewed the company's audited financials and were aware of the growth in [IBG]'s accounts receivable balance." (AD ECF No. 1058 at 82.)

Discussions between IBG's management about changing the Accounting Practice likewise demonstrate that IBG was aware of the Accounting Practice. In July 2008, Sturgill directed Wade Cordell, Hargrett, Blevins, and Brad Cordell to "stop talking about [IBG's] auditors and GAAP" because "[w]e don't need to be talking about possible legal issues or concerns that revolve around the [accounts receivable.]" (CV ECF No. 44 at 187.)

Finally, the explanatory note to IBG's audited financial statements illustrates that IBG had actual knowledge of the Accounting Practice. From 2004 to 2008, IBG's historic audited financial statements included an explanatory note stating that the company's account receivable balance includes state-mandated fees and that IBG is "actively collecting that amount." (CV ECF Nos. 25 at 86; 44 at 7, 15, 26, 39, 53, 67.)

As the Bankruptcy Court's finding that members of IBG's governing body had knowledge of the Accounting Practice is well-supported by the record, it is not clearly erroneous.

3.  **Whether the Bankruptcy Court erred as a matter of law by holding that the MK Defendants did not owe IBG a fiduciary duty, a duty of due diligence, or a duty to disclose all known material facts**

    a.   The Bankruptcy Court's Findings

At trial, the Trustee alleged that the MK Defendants "had an expansive overarching role that went beyond the parties' written contracts, including agreements to serve as [IBG]'s underwriter, investment adviser, and producing agent." (AD ECF No. 1058 at 128-29.) However, after weighing the evidence, the Bankruptcy Court found that "the Trustee ha[d] not met his burden

of proof that Meyers and Morgan Keegan agreed to serve [IBG] in these expanded capacities."

(*Id.* at 129.)  In making this determination the Bankruptcy Court specially considered

> (1) the provision of the 2006 Contract Morgan Keegan's right to first refusal to serve as [IBG]'s underwriter for a period of six months after the terms of that contact, (2) the relative lack of communication between Meyers and Morgan Keegan and [IBG] between the 2006 Contract and the 2008 Contract, and (3) the nature of the additional actions taken by Meyers, which appeared to be more in line with business courtesies and not evidence of an agreement for Meyers and Morgan Keegan to serve [IBG] in an expanded role.

(AD ECF No. 1058 at 129.)  Given that the MK Defendants did not agree to serve in an expanded

capacity, the Bankruptcy Court concluded that IBG's relationship with the MK Defendants was

defined by the two (2) written contracts they entered.  (*Id.*)

"Under this framework and weighing the evidence presented," the Bankruptcy Court found

that the Trustee failed to establish "the necessary fiduciary relationship between Meyers and

Morgan Keegan and [IBG], specifically, in regard to [IBG]'s financial statements and accounting

procedures, including the Accounting Practice."  (*Id.*)  The Bankruptcy Court cited "a number of

factors" in support of this conclusion, including:

> (1) the express provision in the 2006 Contract that Morgan Keegan may rely on the accuracy of the financial information [IBG] provides it without independent verification, (2) the provision of the April 2006 CIM that others may not rely on Morgan Keegan for the accuracy of the financial information provided in the document, (3) the fact that neither Meyers nor Morgan Keegan had any control over [IBG]'s operations, its accounting policies, or its assets, (4) the fact that [IBG] did not retain Meyers and Morgan Keegan to conduct an audit of or opine on [IBG]'s accounting practices, (5) the fact that [IBG] made all of the decisions with respect to its financial statements and capital raises, and (6) the fact that on the one occasion that Meyers and Morgan Keegan created a lending investment opportunity with MKSF, [IBG]'s management declined to proceed with the investment, electing to raise capital directly on their own.

(*Id.* at 129-30.)

The Bankruptcy Court did not address whether the MK Defendants owed IBG a duty of

due diligence.  (*See id.*)  However, the Bankruptcy Court concluded that the MK Defendants did

not owe IBG a duty to disclose.  (*Id.* at 129 n.87.)  The Bankruptcy Court rejected the Trustee's argument that Meyers owed IBG a duty to disclose because he was a CPA, finding that IBG "did not retain Meyers and Morgan Keegan to serve as accountants or auditors and had no expectation of them acting as such[.]"  (*Id.*)

    b.  <u>Analysis</u>

Although the Trustee asserts that this issue is a mixed question of law and fact, it is in actuality a question of law.  *See Walbeck v. I'On Co., LLC*, 827 S.E.2d 348, 358 (S.C. Ct. App. 2019) (citing *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 714 (S.C. 2003) ("Whether the law recognizes a particular duty is an issue of law to be decided by the [c]ourt.")).  Accordingly, the court reviews the issue *de novo*.  *See In re Biondo*, 180 F.3d at 130.  "[B]y definition, *de novo* review entails consideration of an issue as if it had not been decided previously."  *Stone v. Instrumentation Lab. Co.*, 591 F.3d 239, 246 (4th Cir. 2009); (citing *United States v. George*, 971 F.2d 1113, 1118 (4th Cir.1992)).

"A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence."  *Pitts v. Jackson Nat. Life Ins. Co.*, 574 S.E.2d 502, 507 (S.C. Ct. App. 2002) (citing *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150, 152 (S.C. Ct. App. 1987)).  As a general rule, a fiduciary relationship cannot be created by the unilateral action of one party.  *Moore v. Moore*, 599 S.E.2d 467, 472 (S.C. Ct. App. 2004).  "To establish the existence of a fiduciary relationship, the facts and circumstances must indicate the party reposing trust in another has some foundation for believing the one so entrusted will act not in his own behalf but in the interest of the party so reposing."  *Id.* (*citing Burwell v. S.C. Nat'l Bank*, 340 S.E.2d 786, 790 (S.C. 1986)).  The evidence must show the entrusted party actually

accepted or induced the confidence placed in him.  *Id.*  "Parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud."  *Id.* (citing *Ellie, Inc. v. Miccichi*, 594 S.E.2d 485, 497 (S.C. Ct. App. 2004)).

South Carolina courts "have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring."  *Island Car Wash*, 358 S.E.2d at 152.  Thus, the existence of a fiduciary relationship is based on the "particulars" of the relationship.  *Pitts*, 574 S.E.2d at 507.

The Trustee argues that the MK Defendants owed IBG a fiduciary duty because "the record is replete with evidence that the MK Defendants sought, induced, and accepted IBG's trust and confidence."  (CV ECF No. 17 at 83.)  However, the Trustee fails to identify any evidence in the record or provide a single citation to the record to support this claim.  (*See id.* at 82-83.)

When a party has "effectively left to the [court] the unenviable task of poring over [voluminous] pages of . . . exhibits in search of bits of evidence[,]" the court remains "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate."  *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 395 (4th Cir. 1994).  Here, the record on appeal consists of nearly 6,000 pages.  (*See* CV ECF Nos. 18; 19; 20; 21; 22; 23; 24; 25; 26; 27; 28; 29; 30; 31; 32; 33; 34; 35; 36; 37; 38; 39; 40; 41; 43; 44; 45; 46; 47; 48.)  Given the depth of the record and the Trustee's failure to direct the court to specific evidence in the record, the court declines to consider the Trustee's argument that "the record is replete with evidence that the MK Defendants sought, induced, and accepted IBG's trust and confidence."  (CV ECF No. 17 at 83.)

The Trustee also recycles an argument it presented at trial and contends that the MK Defendants owed IBG a fiduciary duty because they served as IBG's financial advisor, agent, and broker-dealer. (*Id.* at 83-84.) Like the Bankruptcy Court, this court disagrees.

First, the Trustee asserts that the MK Defendants' role as IBG's financial advisor created a fiduciary duty under *Burwell* and *Maybank v. BB&T Corp.*, No. 6:12-cv-00214-JMC, 2012 WL 3157006 (D.S.C. Aug. 3, 2012). (*Id.* at 83.) In *Burwell*, a guarantor of a loan alleged that the bank providing the loan breached its fiduciary duty to him by allowing the loan to be renewed without his knowledge. 340 S.E.2d at 790. The Supreme Court of South Carolina acknowledged that "[i]n limited circumstances . . . a fiduciary relationship may be created between a bank and a customer if the bank undertakes to advise the customer as a part of the services the bank offers." 340 S.E.2d at 790. However, it found that no fiduciary relationship existed between the guarantor and the bank because the guarantor did not repose a "special trust" in the bank and "could not reasonably have believed that [the bank's employee] was acting on [the guarantor's] behalf instead of on behalf of [the bank]." *Id.*

In *Maybank*, the court interpreted *Burwell* as standing for the proposition that "a financial institution owes a fiduciary duty to its customer where the institution goes beyond the mere provision of transactional services and actually engages in an advisory role with respect to the customer." 2012 WL 3157006, at *3. It then speculated that it is not "unreasonable to presume that South Carolina state courts may extend this proposition to individual investment or financial advisors who provide advice to a client and not merely the execution of discreet transactions at the direction of the client." *Id.* This court respectfully disagrees with such reasoning.

*Burwell* recognized that a fiduciary relationship may be created between a bank and a customer if the bank undertakes to advise the customer "[i]n limited circumstances[.]" 340 S.E.2d

41

**-419-**

at 790.  But the court only concluded that such limited circumstances did not exist after analyzing whether "the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party."  *Id.* Thus, *Burwell* does not stand for the blanket proposition that a financial institution owes a fiduciary duty to its customer if it provides the customer with advisory services.  Instead, *Burwell* is consistent with South Carolina's canon of fiduciary duty cases and suggests that the existence of a fiduciary duty should be determined based on the substance of the relationship rather than the name of the relationship.  Accordingly, the court will evaluate whether the MK Defendants' role as IBG's financial advisor led IBG to impose a "special confidence" in the MK Defendants that bound the MK Defendants to "act in good faith and with due regard" to IBG and its interests.  *Pitts*, 574 S.E.2d at 507.

The record does not demonstrate that the MK Defendants owed IBG a fiduciary duty on the basis that they served as IBG's financial advisor.  The court notes that the MK Defendants served as IBG's financial advisor in a narrow capacity.  Only the 2008 Contract explicitly appointed the MK Defendants as IBG's financial advisor and it specifically engaged the MK Defendants to serve as IBG's financial advisor on specific mezzanine debt financing transactions. The 2006 Contract appointed Morgan Keegan to act as IBG's "exclusive placement agent in connection with the sales of . . . [s]ecurities" such as "common stock . . . convertible debt or other equity securities"  while the 2008 Contract engaged Morgan Keegan to "act as exclusive financial advisor to [IBG] with respect to a possible mezzanine debt financing which includes securities which are modest or non-amortizing debt instruments[.]"  (CV ECF Nos. 32 at 11; 39 at 177.) Neither contract appointed the MK Defendants to serve as IBG's financial advisor on a range of financial and business matters.  In fact, the 2006 Contract expressly provided Morgan Keegan with

"a right of first refusal to act as [IBG's] financial advisor in connection with [other financing transactions that occur during the 2006 Contract or within six (6) months thereafter] or as lead managing underwriter or exclusive placement agent in connection with such Financing[.]" (CV ECF No. 39 at 181.) As the Bankruptcy Court noted, if IBG and Morgan Keegan "had an overarching agreement for Morgan Keegan to serve as its underwriter or investment adviser, there would have been no need for this right to first refusal in the 2006 Contract." (AD ECF No. 1058 at 128 n.85.) IBG's actions also show the MK Defendants only advised IBG on specific financing transactions. IBG pursued securities offerings, oversaw its operations, managed its own finances, controlled its accounting practices, and developed its own business model without the MK Defendants' assistance. (CV ECF Nos. 39 at 185; 43 at 15, 20-21, 23-27, 241-42, 255-56; 44 at 2.)

Nevertheless, the MK Defendants' narrow advisory role did not cause IBG to impose a "special confidence" in the MK Defendants that would create a fiduciary relationship. IBG could not have reasonably believed the MK Defendants would act in IBG's best interests rather than their own. Both the 2006 and 2008 Contracts provided that Morgan Keegan would only be compensated if it secured an institutional investor for IBG, IBG agreed to the investment, and the deal closed. (CV ECF Nos. 32 at 12; 39 at 177.) As a result, Morgan Keegan had an incentive to secure institutional investments even if the investments were not in IBG's best interests. In addition, the 2008 Contract explicitly noted that Morgan Keegan may hold positions in "other companies which may be the subject of the engagement contemplated by this Agreement." (CV ECF No. 32 at 13.) Thus, IBG was on notice the MK Defendants' interests could conflict with IBG's interests.

**-421-**

IBG's lack of "special confidence" in the MK Defendants advisory services is best shown by IBG's decision to reject MKSF's investment. Although Meyers believed "in good faith" IBG should have accepted MKSF's investment offer, IBG rejected the investment because the terms were "too onerous[.]" (CV ECF No. 43 at 215-16.)

IBG's decision to exclude the MK Defendants from certain financial matters also underscores that IBG did not impose a "special confidence" in the MK Defendants. During the 2006 Contract, IBG consulted with E&Y about its accounting practice without the MK Defendants' knowledge. (CV ECF Nos. 43 at 219-20; 44 at 78, 83, 88.) IBG also pursued investments from individuals during the 2006 Contract without the MK Defendants' knowledge. (CV ECF No. 43 at 143-44, 193, 200, 219.)

Thus, IBG did not have a foundation for believing the MK Defendants would act in IBG's best interests or impose a "special confidence" in the MK Defendants as IBG's financial advisor. Accordingly, the MK Defendants did not owe IBG a fiduciary duty as a result of their role as IBG's financial advisor.

Second, the Trustee claims Morgan Keegan's role as IBG's agent establishes a fiduciary duty. (CV ECF No. 17 at 84.) Contrary to the Trustee's assertions, the title "agent" does not automatically create a fiduciary duty. In *Pitts*, the Court of Appeals of South Carolina found that a fiduciary relationship did not exist between a customer and their insurance agent. 574 S.E.2d at 507-09. Rather than assume a fiduciary relationship existed on the basis of the title "agent," the court analyzed the "particulars" of the relationship to determine whether a fiduciary duty was created. *Id.* Thus, the court will assess the particulars of IBG's agency relationship with the MK Defendants to determine if a fiduciary relationship existed.

The court observes the MK Defendants only served as IBG's agent in a limited capacity. Only the 2006 Contract appointed Morgan Keegan as IBG's agent. While the 2008 Contract does not even contain the word "agent," the 2006 Contract engages Morgan Keegan as IBG's "exclusive placement agent" in connection with the sale of certain securities. (CV ECF Nos. 32 at 11-14; 39 at 177.) The Trustee does not cite to any other evidence in the record to establish an agency relationship between the MK Defendants and IBG. (*See* CV ECF No. 17 at 84.) Standing alone, the 2006 Contract's use of the word "agent" did not create a fiduciary relationship between the MK Defendants and IBG. Once again, the record shows IBG did not impose a "special confidence" in the MK Defendants or reasonably believe the MK Defendants' were acting solely in IBG's interests. *See supra* pp. 43-44.

Third, the Trustee maintains that the MK Defendants had a fiduciary relationship with IBG based on its role as IBG's broker-dealer. (CV ECF No. 17 at 84.) Not only does the Trustee fail to define "broker-dealer," but the Trustee also fails to cite case law from any jurisdiction establishing that broker-dealers owe fiduciary duties. (*See id.*) South Carolina Code § 35-1-102 (2020) defines a "broker-dealer" as "a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account." However, the term does not include "an agent[.]" *Id.* An agent is an individual who "represents an issuer in effecting or attempting to effect purchases or sales of the issuer's securities." *Id.* Here, the MK Defendants appear to have served as IBG's "agent" rather than IBG's "broker-dealer." The 2006 Contract engaged the MK Defendants as IBG's "exclusive placement agent" for certain securities rather than as IBG's "broker-dealer." (CV ECF No. 39 at 177.) The MK Defendants' responsibilities under both the 2006 and 2008 Contracts also required the MK Defendants to represent IBG in effecting the sale of IBG securities. (*See* CV ECF Nos. 32 at 11-14; 39 at 177-83.) As a result,

the court finds the MK Defendants did not serve as IBG's "broker-dealer" under South Carolina law. Thus, the court will not consider whether the alleged broker-dealer relationship created a fiduciary relationship.

After a *de novo* review of the record, the court finds the MK Defendants did not owe IBG a fiduciary duty. Accordingly, the court affirms the Bankruptcy Court's finding that the MK Defendants did not owe IBG a fiduciary duty. (*See* AD ECF No. 1058 at 129-30.)

Given that a fiduciary relationship did not exist between the MK Defendants and IBG, a duty to disclose did not arise in this case. *See Moore*, 599 S.E.2d at 472 (finding that parties in a fiduciary relationship owe each other duties to disclose). The MK Defendants also did not owe IBG a duty to disclose due to Meyers' CPA certification. IBG did not retain the MK Defendants to serve as its accountants and had no expectation of them serving as such. *See supra* pp. 20-23. Therefore, the court affirms the Bankruptcy Court's finding that the MK Defendants did not owe IBG a duty to disclose. (*See* AD ECF No. 1058 at 130 n.87.)

The court will not address whether the MK Defendants owed IBG a duty of due diligence because neither the Bankruptcy Court's order nor the Trustee's briefing address the issue. (*See* AD ECF No. 1058; CV ECF Nos. 17; 52.)

### 4. Whether the Bankruptcy Court erred by concluding that the Trustee's claims were barred by the doctrine of *in pari delicto*

*In pari delicto* is "an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing. *In re Derivium Capital LLC*, 716 F.3d 355, 367 (4th Cir. 2013). The Bankruptcy Court concluded that *in pari delicto* precluded each of the Trustee's claims because IBG "(and therefore, also the Trustee) would equally (or to a greater degree) be a wrongful actor in regards to the alleged

impropriety and the consequences resulting from the Accounting Practice."  (AD ECF No. 1058 at 118.)

The Trustee asserts that the Bankruptcy Court erred in concluding the Trustee's claims were barred by the doctrine of *in pari delicto* in the following respects:

    i.    *In pari delicto* should not apply as a matter of law in adversary proceedings brought by a Chapter 7 Trustee;

    ii.    *In pari delicto* does not apply as a matter of law to breach of fiduciary duty and aiding and abetting breach of fiduciary claims;

    iii.    The Bankruptcy Court erred as a matter of law in determining that South Carolina would apply the total abandonment and "no benefits" standard to the adverse interest exception to *in pari delicto*;

    iv.    The Bankruptcy Court applied the incorrect standard in determining that the Management Defendants from IBG totally abandoned IBG's interest, IBG benefitted from their defalcations, and the MK Defendants colluded with the Management Defendants; and

    v.    The Bankruptcy Court made clearly erroneous findings that: (1) the Management Defendants were acting within their express, implied, inherent, or apparent authority; (2) IBG had actual or constructive knowledge of the fraud perpetuated by the MK Defendants; (3) the Management Defendants had not totally abandoned IBG's interests; (4) IBG received a benefit from the Management Defendants' actions; (5) the MK Defendants did not collude with the Management Defendants; (6) the MK Defendants were not at greater fault than the Management Defendants; and (7) and that the public policy exception to *in pari delicto* does not apply.

(CV ECF Nos. 7 at 3-4; 17 at 16-17.)  The court will address each alleged error in turn.

    a.    "*In pari delicto* should not apply as a matter of law in adversary proceedings brought by a Chapter 7 Trustee"

The Bankruptcy Court properly found that "[i]f the *in pari delicto* defense could have been raised against [IBG] before the commencement of the case, the doctrine also applies as a defense to actions brought against Meyers and Morgan Keegan by the Trustee under 11 U.S.C. § 541, since the Trustee stands in the shoes of [IBG]."  (AD ECF No. 1058 at 78.)  In *Derivium Capital*, the Fourth Circuit determined that *in pari delicto* applies to a bankruptcy trustee asserting claims under 11 U.S.C. § 541.  716 F.3d at 367 ("[T]o the extent that *in pari delicto* would have barred a debtor

from bringing suit directly, it similarly bars a bankruptcy trustee – standing in the debtor's shoes – from bringing suit[.]").  The Trustee contends that *Derivium Capital* was "wrongly decided" because it reaches "a patently absurd result in a system designed to protect creditors[.]"  (CV ECF No. 17 at 88-89.)  However, the Fourth Circuit's holding in *Derivium Capital* is binding on this court.  *See United States v. Williams*, No. 4:12-CR-00969-RBH, 2014 WL 971749, at *5 (D.S.C. Mar. 12, 2014) ("The Court . . . must follow the established precedent of this Circuit.").  Thus, the court affirms the Bankruptcy Court's ruling that *in pari delicto* applies as a defense to claims asserted by a bankruptcy trustee under 11 U.S.C. § 541.  (AD ECF No. 1058 at 78.)

  b.  "*In pari delicto* does not apply as a matter of law to breach of fiduciary duty and aiding and abetting breach of fiduciary claims"

The Trustee asserts the Bankruptcy Court erred by applying *in pari delicto* to the Trustee's breach of fiduciary duty and aiding and abetting a breach of fiduciary duty claims.  (CV ECF No. 17 at 90.)  Specifically, the Trustee contends that a "fiduciary duty" exception bars the application of *in pari delicto* to these claims as a matter of law.  (*Id.* at 90-92.)  The Trustee is mistaken.  Neither Nevada law (which governs the aiding and abetting a breach of fiduciary duty claim) nor South Carolina law (which governs the breach of fiduciary duty claim) recognize this exception.  In fact, South Carolina courts have applied *in pari delicto* to breach of fiduciary duty claims and Nevada courts have applied *in pari delicto* to aiding and abetting a breach of fiduciary duty claims.  *See Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545, 548 (S.C. Ct. App. 2006) (affirming summary judgment on claim for breach of fiduciary duty based on *in pari delicto* grounds under South Carolina law); *In re Amerco Derivative Litig.*, 252 P.3d 681, 695 (Nev. 2011) (discussing application of *in pari delicto* to both breach of fiduciary and aiding and abetting a breach of fiduciary claims under Nevada law*)*; *USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1229-30 (D. Nev. 2011) (applying *in pari delicto* to aiding and abetting a breach

of fiduciary duty claim under Nevada law).  Accordingly, the Bankruptcy Court did not err in

applying the doctrine of *in pari delicto* to the Trustee's breach of fiduciary duty and aiding and

abetting a breach of fiduciary duty claims.

   c.  <u>"The Bankruptcy Court erred as a matter of law in determining that South Carolina would apply the total abandonment and 'no benefits' standard to the adverse interest exception to *in pari delicto*"</u>

   Both South Carolina and Nevada courts have recognized the "adverse interest exception"

to the imputation of an agent's acts and knowledge to a corporation.  Under the adverse interest

exception, an agent's knowledge and wrongs are not imputed to the corporation when the agent's

actions are adverse to the corporation's interests.  *Myatt*, 635 S.E.2d at 547 (citing *Little v. S.

Cotton Oil Co.*, 153 S.E. 462, 463 (S.C. 1930)); *see also USACM Liquidating Trust*, 764 F. Supp.

2d at 1218 (under the adverse interest exception, "an agent's knowledge will not be imputed to the

corporation when the agent is acting on his own behalf and not on behalf of the corporation")

(citing *Keyworth v. Nev. Packard Mines Co.*, 186 P. 1110, 1113 (Nev. 1920)).  Thus, the adverse

interest exception can preclude the application of *in pari delicto* against a corporation in a suit for

its agent's wrongs.

   As the Bankruptcy Court noted, the extent of adversity required to invoke the adverse

interest exception and prevent imputation varies by jurisdiction.  (AD ECF No. 1058 at 84.)  Like

the majority of jurisdictions, Nevada law employs the "total abandonment" standard.  *In re Amerco

Derivative Litigation*, 252 P.3d at 695.  Under the total abandonment standard, the adverse interest

exception does not apply unless the agent's actions are completely adverse to the corporation and

provide no benefit to the corporation.  *Id.*  However, while South Carolina courts have recognized

and applied the adverse interest exception, they have not specified the extent of adversity required

to invoke the exception. *See Myatt*, 635 S.E.2d at 547 ("[T]he adverse interest exception applies

where the actions of one wrong-doer, usually an agent, are clearly adverse to the other party's interests.").

At trial, the Trustee claimed the adverse interest exception applied, arguing that "knowledge of the alleged impropriety of the Accounting Practice cannot be imputed to [IBG] because the Management Defendants' actions were clearly adverse to [IBG]'s interest." (AD ECF No. 1058 at 83.) As a result, the Bankruptcy Court had to determine how South Carolina's "highest court would rule" on the extent of adversity required under the adverse interest exception. (*Id.*) The Bankruptcy Court ultimately concluded it would be reasonable to predict the Supreme Court of South Carolina would apply a standard that "requires total abandonment of the principal's interest and no benefit to the principal in order to apply the adverse interest exception." (*Id.*)

On appeal, the Trustee argues that the South Carolina standard for the adverse interest exception is "clearly adverse" rather than "total abandonment." (CV ECF No. 17 at 100.) Specifically, they claim that the agent's actions must only be "clearly adverse" to the principal's interest for the exception to apply under *Myatt*. (*Id.* at 100-01.)

As this issue presents a question of law, the court reviews the Bankruptcy Court's findings *de novo*. Since "the South Carolina Supreme Court has spoken neither directly nor indirectly on the particular issue before us, [the court is] called upon to predict how that court would rule if presented with the issue." *Private Mortgage Inv. Servs., Inc. v. Hotel & Club Associates, Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).

The court agrees with the Bankruptcy Court and finds that South Carolina would apply the total abandonment standard for the adverse interest exception. Contrary to the Trustee's assertions, *Myatt* does not suggest South Carolina has adopted a clearly adverse standard. In *Myatt*, the Court of Appeals for South Carolina broadly described the adverse interest exception, finding that it

50

**-428-**

applies "where the actions of one wrong-doer, usually an agent, are clearly adverse to the other party's interests."  635 S.E.2d at 547.  However, *Little*, the Supreme Court of South Carolina decision cited for that proposition, does not use the language "clearly adverse."  Instead, *Little* defined the adverse interest exception as the "general rule . . . that when an agent is engaged in a transaction in which he is interested adversely to his principal, the principal will not be charged with knowledge of the agent acquired therein."  *Id.*  Thus, *Myatt* is not determinative of whether the Supreme Court of South Carolina would adopt a clearly adverse standard.  Additionally, this court does not interpret *Myatt* to expound a clearly adverse standard for the adverse interest exception.  Other courts have used various degrees of adversity to describe the exception but have continued to require total abandonment to apply the exception.  For example, Maryland courts define the adverse interest exception as an exception that "permits a principal to avoid imputation when the agent's interests are *sufficiently* adverse to the principal's interests" but require total abandonment to apply the exception.  *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-73 (4th Cir. 1995) (emphasis added).

In contrast, the Supreme Court of South Carolina's consideration of the relative benefit to a corporation from its agent's acts to determine the corporation's liability for its agent's acts in *Citizens' Bank v. Heyward*, 133 S.E. 709 (S.C. 1925) suggests the total abandonment standard would apply in South Carolina.  In *Citizens' Bank*, the Supreme Court of South Carolina concluded the agent, a bank president, was acting within the scope of his agency when he negotiated a loan with a customer, which provided for the payment of eight (8) percent interest to the bank and two (2) percent interest to the bank president personally.  *Id.*  Even though the agent's act of accepting the additional two (2) percent commission was for his personal benefit and was adverse to the bank due to its unlawful nature, the Supreme Court of South Carolina stated that "it is a mistake to

51

**-429-**

suppose that the bank was not benefited by the fraudulent act of [the bank president], as it could not be carried into effect, except by securing a borrower for the bank, out of whom it made several thousand dollars." *Id.* at 713. Consequently, the Supreme Court of South Carolina concluded the agent's act was done in the course of his agency and by virtue of his authority as agent, thus the bank could be held liable for usury based on the acts of its agent. *Id.* at 715.

Thus, it would be reasonable to predict the Supreme Court of South Carolina would follow the majority of jurisdictions and apply a standard that requires total abandonment of the principal's interest and no benefit to the principal in order to apply the adverse interest exception.[5]  Such a standard "avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party[.]"  *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010).

Accordingly, the Bankruptcy Court did not err in finding the Supreme Court of South Carolina would apply a total abandonment standard to the adverse interest exception.

---

[5] *See, e.g.*, *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 325 (1st. Cir. 2008) (applying Massachusetts law); *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 575 (7th Cir. 2004) (applying Illinois law); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) (applying New York law); *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (applying Florida law); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-73 (4th Cir. 1995) (applying Maryland law); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1311 (M.D. Fla. 2009); *In re Nat'l Century Fin. Enter., Inc. Inv. Litig.*, 604 F. Supp. 2d 1128, 1143 (S.D. Ohio 2009); *Fine v. Sovereign Bank*, 634 F. Supp. 2d 126, 139 (D. Mass. 2008); *Ladd Furniture, Inc. v. Ernst & Young*, No. 2:95-CV-00403, 1998 WL 1093901, at *7 (M.D.N.C. Aug. 27, 1998); *In re Verilink Corp.*, No. 06-8-566-JAC-11, 2009 WL 4609308 (Bankr. N.D. Ala. Dec. 3, 2009); *Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 216 (Iowa 1998); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007); *Kirschner v. KPMG, LLP*, 938 N.E.2d 941, 952 (N.Y. 2010); *MCA Financial Corp. v. Grant Thornton, LLP*, 687 N.W. 2d 850, 857 (Mich. App. Ct. 2004); *Goldstein v. Union Nat'l Bank*, 213 S.W. 584, 591 (Tex. 1919).

d.  "The Bankruptcy Court applied the incorrect standard in determining that the Management Defendants from IBG totally abandoned IBG's interest, IBG benefitted from their defalcations, and the MK Defendants colluded with the Management Defendants"

After combing the Trustee's briefs to discern any argument on this issue, the court believes this issue is addressed to the Bankruptcy Court's decision that Nevada and South Carolina state courts would reject the holding in *Official Committee of Unsecured Creditor of Allegheny Health Education & Research Foundation v. PriceWaterhouseCoopers, LLP* (*Allegheny*), 989 A.2d 313 (Pa. 2010).[6]

At trial, the Trustee asserted "that both Nevada and South Carolina courts would follow the public policy considerations adopted by the Supreme Court of Pennsylvania's holdings in . . . *Allegheny*[.]"  (AD ECF No. 1058 at 102.)  In *Allegheny*, the defendant auditor allegedly issued a clean opinion of the principal corporation's finances despite knowing the corporation's agents had misstated those finances and thereby hid substantial operating losses.  989 A.2d at 315.  The clean opinions purportedly "conceal[ed] the corporation's deepening insolvency and facilitat[ed] management's continuation of a ruinous business strategy while thwarting essential, remedial intervention by the board of trustees."  *Id.*  While considering the case on appeal, the Third Circuit certified two (2) questions to the Supreme Court of Pennsylvania to determine whether the agents' wrongdoing could be imputed to the corporation when the non-innocent, colluding auditor sought to invoke *in pari delicto*.  *Id.* at 314-15.

The Supreme Court of Pennsylvania noted that because imputation rules "justly operate to protect third parties on account of their reliance on an agent's actual or apparent authority," imputation should not apply "where both the agent and the third party know very well that the

---

[6] The court observes that the Trustee did not organize either of their briefs by the issues presented in their Statement of Issues.  (*See* ECF Nos. 7; 17; 52.)  Accordingly, the court had to unravel the assertions in the Trustee's briefs to identify arguments relevant to each issue.

agent's conduct goes unsanctioned by one or more of the tiers of corporate governance." *Id.* at 336. As a result, the Supreme Court of Pennsylvania considered it "ill-advised, if not perverse" to charge a principal corporation "with knowledge as against a third party whose agents actively and intentionally prevented those in [the corporation's] governing structure who were non-participants in the fraud from acquiring such knowledge." *Id.* It also categorically "decline[d] to consider a knowing, secretive, fraudulent misstatement of corporate financial information to be of benefit to a company." *Id.* at 318. Thus, the Supreme Court of Pennsylvania held that when an outside auditor engages in "secretive, collusive conduct" with corporate agents, the colluding auditor may not rely on an imputation defense. *Id.* at 339.

Ultimately, the Bankruptcy Court was "not convinced that Nevada or South Carolina state courts would follow the approach taken in *Allegheny*." (AD ECF No. 1058 at 103.) The Trustee challenges this finding on appeal, claiming Nevada and South Carolina courts would follow *Allegheny* and decline "to impute malevolent insiders' knowledge where the insiders had colluded with outside professionals to generate false reports." (CV ECF No. 17 at 92-95.)

This court agrees with the Bankruptcy Court that Nevada and South Carolina state courts would not follow the imputation approach taken in *Allegheny* in this case. Since *Allegheny* was decided in 2010, it appears that no other jurisdiction has adopted *Allegheny*'s approach to imputation. In fact, numerous courts have questioned the policy considerations enunciated in *Allegheny*. In *Kirschner*, the Court of Appeals of New York found that *Allegheny* "may be viewed as creating a double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged with knowledge of their wrongdoing agents." 938 N.E.2d at 958. The United States District Court for the District of Nevada, applying Nevada law, similarly

noted that "the Pennsylvania Supreme Court's requirement [in *Allegheny*] that the auditor act in good faith creates a double standard. [The liquidating corporation's] innocent stakeholders would be able to avoid the bad faith conduct of [its] agents imputed to [it], but [the auditing firm's] innocent stakeholders would have no such opportunity." *USACM Liquidating Trust*, 764 F. Supp. 2d at 1228 n.3. The Delaware Court of Chancery also observed that *Allegheny* would "open a floodgate of *ex post* auditor liability" in *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 318 (Del. Ch. 2015).

Additionally, the holding in *Allegheny* would not apply to the facts of this case. *Allegheny* explicitly held that "imputation is unavailable relative to an auditor which has not dealt materially in good faith with the client-principal. This effectively forecloses an *in pari delicto* defense for scenarios involving secretive collusion between officers and auditors to misstate corporate finances to the corporation's ultimate detriment." 989 A.2d at 339. Thus, even if Nevada and South Carolina courts accepted *Allegheny*, it would not apply here because IBG did not engage the MK Defendants to serve as its accountants or auditors. *See supra* pp. 20-23.

As a result, the court finds the Bankruptcy Court did not err in concluding that South Carolina and Nevada courts would reject the Supreme Court of Pennsylvania's holding in *Allegheny*.

e.  Allegedly Erroneous Findings

i.    *"[T]he Management Defendants were acting within their express, implied, inherent, or apparent authority"*

The Bankruptcy Court's finding that "the Management Defendants, including Sturgill and Hargrett, had authority, whether actual or apparent, to implement accounting policies and practices and issue financial statements on behalf of [IBG] and in fact implemented and maintained the use of the Accounting Practice" is not clearly erroneous. (AD ECF No. 1058 at 81-82.)

Although IBG's bylaws and officer employment contracts do not specifically confer authority over the corporation's accounting practices and financial statements, they gave the Management Defendants broad authority over the company's business affairs and operations that would include control over the company's financial affairs. IBG's bylaws provide "[t]he business and affairs of th[e] corporation shall be managed by its Board of Directors" and the CEO "shall have general and active management of the business of the corporation." (CV ECF No. 30 at 7, 9.) Sturgill's, Brad Cordell's, and Wade Cordell's employment contracts also granted them "general supervision, direction, and control of the business and the affairs of the operations of the Company." (CV ECF No. 41 at 117, 131, 140.)

Corporate management typically has authority to issue and approve financial statements and practices. *See, e.g.*, *USACM Liquidating Trust*, 764 F. Supp. 2d at 1218 (citing *Kirschner*, 938 N.E.2d at 950-51 ("everyday activities central to any company's operation and well-being – such as issuing financial statements, accessing capital markets, handling customer accounts, moving assets between corporate entities, and entering into contracts" constitutes conduct within the scope of a corporate officer's authority) and *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504, 518 (S.D.N.Y. 2009) (stating that the "preparation, approval and oversight of financial statements are ordinary functions of management" which typically would be attributed to the company)); *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) ("The approval and oversight of [financial] statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's actions to the company itself."). Accordingly, management of IBG's financial affairs would be within the Management Defendants' scope of authority even without express designation in the bylaws or their employment contracts.

The court also agrees with the Bankruptcy Court that "the authority to implement accounting policies and issue financial statements would not only appear to be inherent in [IBG]'s employment of a [CEO] and [CFO] but would be the usual impression of anyone dealing with the company." (AD ECF No. 1058 at 81.) As both Sturgill and Hargrett represented they were CPAs and held positions that would typically entail oversight of corporate financial statements, anyone interacting with the company would assume they were responsible for issuing and approving IBG's financial statements and practices.

Finally, the court rejects the Trustee's argument that the Bankruptcy Court's finding is erroneous because the Management Defendants "did not have authority to falsify IBG's financial statements and defraud the company." (CV ECF No. 17 at 97.) A corporation is "responsible for the acts of its authorized agents even if particular acts were unauthorized," because the "risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent." *USACM Liquidating Trust*, 764 F. Supp. 2d at 1218 (citing *Kirschner*, 938 N.E.2d at 951). This general rule holds "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud[.]" *Kirschner*, 938 N.E.2d at 951. Thus, the Management Defendants were acting within their authority despite performing unauthorized acts.

ii.    *"IBG had actual or constructive knowledge of the fraud perpetuated by the MK Defendants"*

After an extensive review of the Trustee's briefing, the court cannot discern any argument on this issue. (*See* CV ECF Nos. 17; 52.) Accordingly, the Trustee waived its challenge. *See Olano*, 507 U.S. at 733.

**-435-**

    *iii.*    *"[T]he Management Defendants had not totally abandoned IBG's interests" and*
*"IBG received a benefit from the Management Defendants' actions"*

As both the Bankruptcy Court and the Trustee acknowledge, application of the adverse interest exception "requires a fact-intensive inquiry that must be conducted on a case-by-case basis." (AD ECF No. 1058 at 86; CV ECF No. 17 at 102.) The Bankruptcy Court rigorously engaged in this fact-intensive analysis and determined "the Management Defendants did not totally abandon the interests of [IBG] through their actions, including the use of the Accounting Practice" because "Management Defendants' actions provided benefit to [IBG]." (AD ECF No. 1058 at 100.)

The Bankruptcy Court found that the Accounting Practice "resulted in the influx of millions of dollars" to IBG that paid IBG's "legitimate expenses" and funded IBG's "growth and operations[.]" (*Id.* at 94-95.) Specifically, money raised as a result of the Accounting Practice funded IBG's outside securities counsel, past due payroll and taxes, the buyback of potentially improperly issues shares and territory licenses, the purchase of new technology, the hiring of new personnel, and expenses related to the startup of IBG's Barbourville check processing facility. (CV ECF Nos. 31 at 152-53; 44 at 83; 45 at 63-64, 73; 48 at 26.)

The Trustee asserts that the Bankruptcy Court's finding that the Management Defendants' actions did not totally abandon IBG's interests because they provided a benefit to IBG is erroneous, claiming their experts "demonstrated that any 'benefit' to IBG from capital raised in reliance upon the false and misleading financial statements was illusory, as these funds created only liabilities for the company." (CV ECF No. 17 at 102.) The Bankruptcy Court expressly rejected this argument, concluding

> [W]hen the Accounting Practice was implemented, it was not a situation where [IBG]'s operations were on the brink of collapse and that, but for the capital raised, [IBG] would not have been able to continue its operations. Rather, when the

> Accounting Practice was implemented, capital was being raised and used to assist [IBG] with expanding its business, which in turn resulted in [IBG] experiencing unprecedented growth. Therefore, the Court is not convinced by the Trustee's arguments or evidence that the Management Defendants' actions provide no benefit to [IBG].

(AD ECF No. 1058 at 96 n.56.)

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. Here, the Bankruptcy Court's finding that the Management Defendants' actions provided a benefit to IBG and therefore did not abandon IBG's interests is contrary to the Trustee's preferred finding but supported by significant evidence in the record. Therefore, it is not clearly erroneous.

    *iv.*    *"[T]he MK Defendants did not collude with the Management Defendants"*

After rejecting the Trustee's assertion that South Carolina and Nevada courts would embrace the holding in *Allegheny*, the Bankruptcy Court found that "to the extent South Carolina or Nevada recognizes a collusion exception . . . Meyers and Morgan Keegan did not participate in secretive, collusive conduct with Management Defendants in connection with the Accounting Practice to defraud or otherwise act against [IBG]." (AD ECF No. 1058 at 104.) The Trustee asserts "there is no way the Bankruptcy Court could have reached its conclusion had it taken an independent and complete review of the record." (CV ECF No. 17 at 96.) The court disagrees.

The record demonstrates the MK Defendants did not know the Accounting Practice was improper until the TS Report was released. *See supra* pp. 24-27. It also shows the MK Defendants did not conceal the fraudulent nature of the Accounting Practice, cause IBG to adopt or use fraudulent accounting practices, or encourage the Management Defendants' breaches of fiduciary duty. *See supra* pp. 20-24, 27-31. Thus, substantial evidence supports the Bankruptcy Court's

conclusion that the MK Defendants did not collude with the Management Defendants to defraud IBG through the Accounting Practice. As a result, the finding is not clearly erroneous.

    v.      *"[T]he MK Defendants were not at greater fault than the Management Defendants"*

Both South Carolina and Nevada courts apply *in pari delicto* when the plaintiff is at equal or greater fault than the defendant. *See Proctor v. Whitlark & Whitlark, Inc.*, 778 S.E.2d 888, 893 (S.C. 2015); *Magill v. Lewis*, 333 P.2d 717, 719 (Nev. 1958). Similarly, *in pari delicto* is only applicable in private causes of action for damages under federal securities laws when "the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).

In its assessment of the "greater fault" exception to *in pari delicto*, the Bankruptcy Court found the MK Defendants do not bear greater fault than IBG for the alleged injuries to IBG resulting from the Accounting Practice. (AD ECF No. 1058 at 113.) Specifically, it concluded that "the evidence simply does not demonstrate that Meyers and Morgan Keegan were masterminds of a scheme or otherwise controlled [IBG]'s operations, such that they should be considered more to blame in this matter than [IBG]." (*Id.* at 114.) Instead, "[IBG], through its management, bears the greater fault in this matter for the implementation and consequences of the use of the Accounting Practice, including any capital raises during the time period that the policy was in use." (*Id.*)

The Trustee contends IBG's fault is not equal to or greater than that of the MK Defendants. (CV ECF No. 17 at 99-100.) Citing no evidence in the record, they claim the Bankruptcy Court's finding on fault is clearly erroneous because the "Management Defendants could not have implemented this scheme, caused this years-long harm, and attempted to enrich themselves

60

through the exit strategy without the MK Defendants." (*Id.* at 99.)  Once again, the Trustee is incorrect.

The evidence in the record clearly establishes that the Accounting Practice did not originate with the MK Defendants.  The MK Defendants did not know the Accounting Practice was fraudulent until the TS Report was released in July 2008 and were not engaged to audit the company's financials or implement accounting practices.  *See supra* pp. 21-24.  In fact, the MK Defendants were so far removed from implementing accounting policies and issuing financial statements that IBG was contractually obligated to provide them with accurate and complete financial information.  *See supra* pp. 21-23.

While the exact origin of the Accounting Practice is unclear, it appears that Sturgill and Grafton were responsible for the creation and implementation of the policy.  Sturgill prepared IBG's financial statements until September 2006 and disseminated the 2005 balance sheet, the first set of financial statements in the record including an increased accounts receivable figure.  (CV ECF No. 19 at 97, 99.)  Grafton then concealed the impropriety of the practice by issuing an unqualified audit opinion that IBG's financials were prepared in conformity with GAAP each year from 2003 to 2008.  (CV ECF No. 44 at 1, 2, 10, 20, 33, 48, 62.)

The record also shows the MK Defendants did not conceal the impropriety of the Accounting Practice.  Unlike Sturgill who attempted to obscure the impropriety of the practice, Meyers promoted disclosure of the Accounting Practice to institutional investors.  *See supra* pp. 27-28.

As the record demonstrates the MK Defendants did not create, implement, or conceal the Accounting Practice, the MK Defendants could not be at greater fault than IBG for the harms resulting from the Accounting Practice.  Given the significant evidence in the record supporting

the Bankruptcy Court's finding that the MK Defendants were not at greater fault, the court cannot conclude the Bankruptcy Court committed clear error.

vi.    *"[T]he public policy exception to in pari delicto does not apply"*

In a final attempt to escape the application of *in pari delicto*, the Trustee asserts the Bankruptcy Court erred in finding that "public policy considerations should not bar the application of *in pari delicto* in this matter." (AD ECF No. 1058 at 118.) Specifically, the Trustee claims "[p]ublic policy does not permit the MK Defendants to cloak themselves in this defense and escape liability for their destruction of IBG." (CV ECF No. 17 at 104.)

The Bankruptcy Court devoted almost four (4) pages to rejecting this argument. The Bankruptcy Court first concluded IBG "should not be able to recover damages against a third party for a wrong that it itself created and implemented." (AD ECF No. 1058 at 116.) It then found that "as Morgan Keegan and Meyers received no compensation from [IBG], it appears that Morgan Keegan or Meyers would not be unjustly enriched by allowing the application *in pari delicto*." (*Id.*) Finally, the Bankruptcy Court noted that a recovery by the Trustee in this matter would not significantly deter similar alleged wrongdoing in the future, observing that "[a]ny wrong-acting securities professional would still be subject to possible enforcement actions" and allowing "a recovery in this matter could also effectively excuse fraudulent accounting practices by a corporation[.]" (*Id.* at 117-18.)

Such conclusions are well-supported by the record. The Accounting Policy was created and implemented by IBG's employees and auditor, not the MK Defendants. *See supra* p. 20. Morgan Keegan and Meyers also did not receive "any compensation, period, related to any investments at IBG." (CV ECF No. 43 at 240.) Furthermore, the record shows securities professionals in this case were subject to other enforcement actions. In 2011, the South Carolina

Office of the Attorney General filed an Administrative Proceeding before the Securities Commissioner of South Carolina against IBG, Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett for allegedly engaging in acts that constitute violations of the South Carolina Uniform Securities Act. (AD ECF No. 1058 at 70.) As a result of the proceeding, the Management Defendants received a lifetime ban from selling securities in South Carolina. (*Id.*) Hargrett and Donald Grafton, the owner of Grafton, subsequently pled guilty to federal securities charges relating to their roles in preparing IBG's financial statements in 2014. (*Id.* at 8, 10, 70.)

A review of the entire record does not leave this court "with the definite and firm conviction that a mistake has been committed" by the Bankruptcy Court. *Hall*, 664 F.3d at 462 (citing *U.S. Gypsum Co.*, 333 U.S. at 395). Accordingly, the Bankruptcy Court's finding that "public policy considerations should not bar the application of *in pari delicto* in this matter" is not clearly erroneous. (AD ECF No. 1058 at 118.)

### 5. Whether the Bankruptcy Court's finding that the Trustee did not adequately prove damages caused by the MK Defendants misrepresented the evidence and misapplied the law

The Trustee maintains the Bankruptcy Court's findings and conclusions regarding the Trustee's damages claims erred as follows:

> i.   In holding that IBG's net operating losses were not the foreseeable and proximate result of the MK Defendants' conduct;
> ii.  In finding that there were legally significant intervening causes of IBG's net operating losses;
> iii. In not applying the doctrine of joint and several liability to IBG's net operating losses; and
> iv.  In holding that the evidence proving the amount of IBG's damages caused by the MK Defendants was not reliable, because any material misstatements in IBG's financial records had been adjusted, thereby rendering the restated financial statements prepared after the management ouster and reviewed by the Trustee's expert reliable, and alternatively because the law does not allow the MK Defendants to avoid liability by rendering IBG's financial statements unreliable through their own misconduct.

(CV ECF Nos. 7 at 4-5; 17 at 17-18.)  The court will address each issue in turn.

    a.  Proximate causation, foreseeability, and intervening causes of IBG's net operating losses

Although the Bankruptcy Court concluded the Trustee's causes of action were "all fully barred by *in pari delicto*," it considered the Trustee's causes of action on their merits.  (AD ECF No. 1058 at 119.)  As causation is an essential element of each of the Trustee's claims, the Bankruptcy Court first considered whether "Meyers and Morgan Keegan's actions/inaction relating to the Accounting Practice caused [IBG]'s net operating losses from the time that the April 2006 CIM was finalized until [IBG]'s bankruptcy filing."  (*Id.*)

At trial, the Trustee only presented one (1) theory of damages: damages equal to IBG's total operating losses.  (*Id.* at 120.)  The Trustee argued that as a result of the MK Defendants' failure to affirmatively disclose, IBG continued to operate and incur losses for a number of years which eventually caused the prolonged collapse of the company and enabled the Management Defendants to embezzle funds from the company.  (*Id.*)

The Bankruptcy Court ultimately determined that the "evidence [presented] at trial fails to demonstrate that Meyers and Morgan Keegan independently and proximately caused [IBG]'s alleged net operating losses."  (*Id.*)  In arriving at this conclusion, the Bankruptcy Court observed that "the alleged operating losses are too tenuously connected to Meyers and Morgan Keegan's actions to meet the foreseeability requirement" of proximate causation and noted nine (9) intervening causes of IBG's operating losses.  (*Id.* at 125-26.)  On appeal, the Trustee maintains the Bankruptcy Court erred in holding that the Trustee did not prove causation and foreseeability and concluding that intervening causes of IBG's harm existed.  (CV ECF No. 17 at 105.)

Here, the record demonstrates that IBG's alleged damages would have happened with or without the involvement of the MK Defendants.  The MK Defendants did not cause IBG to

implement or utilize the Accounting Practice. *See supra* pp. 20-24. To the contrary, Meyers promoted disclosure about the practice and encouraged IBG to change it. *See supra* pp. 24, 27-28.

The MK Defendants also did not secure investments that caused IBG to continue its operations in the face of growing losses. The MK Defendants failed to secure a single institutional investment in IBG and were uninvolved with IBG's friends and family offering, sale of territory licenses, issuance of promissory notes, and 2009 capital raise. (CV ECF No. 43 at 27, 195-96, 201, 215-16.) Furthermore, the MK Defendants did not authorize or allow any use of Meyers' or Morgan Keegan's names on any materials used by IBG to solicit non-institutional investors. (CV ECF No. 39 at 182.)

In contrast, IBG perpetuated and fostered the Accounting Practice. Sturgill and later Hargrett were responsible for IBG's financial statements while Grafton was responsible for the company's audits. *See supra* p. 20. IBG also failed to change the practice despite being on notice of its impropriety. E&Y instructed IBG how to fix its "accounting issues[,]" Hargrett recommended changing the Accounting Practice to management and the Board, and Meyers advised the company's management to "go to the most conservative accounting possible." (CV ECF Nos. 30 at 38; 43 at 29, 103-04, 197-98, 219-20; 44 at 78, 83, 88, 91; 45 at 71-72.) But despite these warnings, IBG continued to use the policy. In fact, the Board unanimously voted to continue with the Accounting Practice in January 2007. (CV ECF No. 43 at 29, 103-04.)

Additionally, the Bankruptcy Court correctly noted there were other causes for IBG's operating losses wholly unconnected to the Accounting Practice and the MK Defendants. (AD ECF No. 1058 at 125.) Such intervening factors include:

(1) IBG's direct issuance of stock, territory licenses, and promissory notes in violation of securities law and the resulting cost associated with a rescission offer (CV ECF No. 43 at 17, 247);

(2) IBG's longstanding misuse of monies ostensibly held in trust for the benefit of its customers to pay its operating expenses, which led to the Initial Ouster (*Id.* at 26, 30-31, 64);

(3) The removal of founders and key managers of IBG under allegations of wrongdoing (CV ECF Nos. 36 at 12-29; 43 at 65);

(4) Illegal payment of sales commissions to unlicensed personnel (CV ECF No. 43 at 45-46, 52-53);

(5) Interest IBG paid on the illegal promissory notes (*Id.* at 42-44);

(6) Costly litigation expenses incurred during the ouster of IBG's key management and resulting settlement payment to resolve the litigation (CV ECF Nos. 36 at 12-29; 43 at 64);

(7) IBG's continued use and approval of its Accounting Practice and re-hiring of Grafton with actual and constructive knowledge that the Accounting Practice had been called into question (CV ECF Nos. 30 at 38; 43 at 29, 103-04);

(8) IBG's continued direct capital raises from individuals even after the TS Report put IBG on notice that its financial statements may be materially misstated (CV ECF Nos. 34 at 5-6; 45 at 67); and

(9) Sturgill's misrepresentations of his background, which deterred institutional investors from proceeding with an investment in IBG (CV ECF No. 43 at 196-97).

(*Id.* at 125-26.)  Because intervening causes increased the amount of IBG's operating losses, the Bankruptcy Court properly rejected the Trustee's attempt to attribute the entirety of IBG's downfall to the MK Defendants.  (*Id.* at 126.)

The record does not show IBG's net operating losses were the foreseeable result of the MK Defendants' alleged misconduct.  Instead, it suggests certain factors unconnected to the MK Defendants caused IBG's net operating losses.  Thus, the Bankruptcy Court's finding that the MK Defendants did not cause IBG's net operating losses is not clearly erroneous.  *See Korman v. EagleBank*, No. PWG-12-3449, 2013 WL 3816987, at *2 (D. Md. July 22, 2013) ("So long as the bankruptcy court's account of evidence is plausible, the district court may not reverse the decision simply because it would have weighed the evidence differently.")

**-444-**

b. <u>Applicability of joint and several liability</u>

Contrary to the Trustee's assertions, the Bankruptcy Court did not err by failing to consider whether the MK Defendants were jointly and severally liable for IBG's operating losses. (CV ECF No. 17 at 106, 108.) Joint and several liability relates to the satisfaction of a judgment. *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220-21 (1994) ("Joint and several liability applies when there has been a judgment against multiple defendants."). Thus, a defendant must be liable for joint and several liability to apply. Here, the Bankruptcy Court properly found the MK Defendants were not liable for IBG's operating losses. (AD ECF No. 1058 at 119, 120, 126.) It first concluded that *in pari delicto* bars the Trustee's claims against the MK Defendants and then found that the Trustee's claims fail on the merits because the MK Defendants did not cause IBG's operating losses. (*Id.*) Accordingly, the doctrine of joint and several liability is irrelevant in this case.

c. <u>Reliability of damages evidence</u>

The Bankruptcy Court found that the Trustee "failed to meet his burden to prove damages to a reasonable certainty by relying exclusively on financial statements that, according to his expert are 'deficient, false and misleading' due to the fraudulent actions and malpractice perpetrated by [IBG]'s management and by Grafton." (AD ECF No. 1058 at 127.) The Trustee asserts this finding is erroneous because their damages expert, George DuRant ("DuRant"), "did not rely on IBG's fraudulent accounting statements that Grafton falsely claimed to have audited" but on "the later restated financials." (CV ECF No. 17 at 109.)

To calculate IBG's net operating losses, DuRant relied exclusively on IBG's "restated" financial statements. (CV ECF No. 43 at 69-71.) However, the record demonstrates the restated financial statements are unreliable. One of the Trustee's experts, John Freeman ("Freeman"),

opined that IBG's audited and restated financial statements are misleading and cannot be relied upon due to Hargrett's and Grafton's "fraudulent and despicable actions." (*Id.* at 59.) Freeman testified "there's a taint, a cloud over the financials as a whole that ain't going to go away." (*Id.* at 60.) He claimed IBG's fraudulent inflation of its accounts receivable figure affected other figures in its balance sheet such as IBG's bottom line, assets, and net worth as well as IBG's future financial statements. Freeman asserted "once you start to put fraud on your financials, because your financials go forward in time, next you're using last year's fraudulent numbers as a base for this year, and they just get embedded and get bigger and get wilder and get nastier." (*Id.* at 59-60.)

The MK Defendants' damages expert, Howard Zandman ("Zandman"), similarly opined that the restated financial statements are "garbage in and garbage out[.]" (*Id.* at 98.) He testified

> You can carve out the fraudulent parts, but you have to have sufficient, reliable data in order to carve out those fraudulent parts to get to what's left. Just by carving out what you think is fraudulent, or what you think is materially fraudulent, does not in itself create a good financial statement to rely upon.

(*Id.* at 99.) Thus, he claimed the restated financial statements are "not reliable" because the "underlying documents" such as "general ledgers, underlying subledgers, cash receipts journals, [and] cash disbursement journals" are not present to verify the information contained in the restated financial statements. (*Id.* at 89-90.) Moreover, Zandman noted various irregularities in the restated financial statements, including a roughly $14 million error. (*Id.* at 95-96.)

DuRant himself even expressed "concerns with respect to the legitimacy" of the restated financial statements because they were prepared at the direction of Hargrett, a man convicted of financial fraud. (*Id.* at 78.) Nonetheless, DuRant testified that he did nothing to confirm the accuracy of the restated financial statements or otherwise determine whether the statements are

GAAP-compliant. (*Id.* at 77-79.) Accordingly, the Bankruptcy Court correctly found that DuRant based his opinion on deficient financial statements.

The Trustee also asserts the Bankruptcy Court's damages finding is erroneous because "the fraud in IBG's original financials is a fraud of the MK Defendants' own doing" and "the law does not allow the MK Defendants to avoid liability by rendering IBG's financial statements unreliable through their own misconduct." (CV ECF No. 17 at 18, 109.) As this court has repeatedly emphasized, the record demonstrates the MK Defendants had no knowledge of the impropriety of the Accounting Practice, did not implement the Accounting Practice, and did not conceal IBG's use of the Accounting Practice. *See supra* pp. 20-28. In fact, the MK Defendants had no control over IBG's accounting practices and financial statements whatsoever. *See supra* pp. 20-23. Consequently, the MK Defendants are not responsible for the misleading nature of the financial statements used by the Trustee's damages expert.

The record suggests the restated financial statements relied upon by the Trustee's damages expert are deficient and demonstrates the MK Defendants were uninvolved in the fraud that ultimately rendered the restated financial statements misleading. Therefore, the Bankruptcy Court did not err in finding the Trustee "failed to meet his burden to prove damages to a reasonable certainty by relying exclusively on financial statements that, according to his expert are 'deficient, false and misleading' due to the fraudulent actions and malpractice perpetrated by [IBG]'s management and by Grafton." (AD ECF No. 1058 at 127.)

## IV.    CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the order and judgment issued by the

Bankruptcy Court on October 15, 2019 and **DISMISSES** the Trustee's appeal.


**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

March 31, 2021
Columbia, South Carolina

70

**-448-**

AO 450 (SCD 04/2010)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of South Carolina

In re: Infinity Business Group, Inc.,
*Debtor*

Robert F. Anderson, as Chapter 7
Trustee for Infinity Business Group, Inc.,
*Appellant*

v.                                    Civil Action No.    3:19-03096-JMC

Morgan Keegan & Company, Inc., and Keith E.
Myers,
*Appellees*

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❏ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($__), which includes prejudgment interest at the rate of ____ %, plus postjudgment interest at the rate of ____ %, along with costs.

❏ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____.

■ other: the appeal of the Trustee's is dismissed.

This action was *(check one)*:

❏ tried by a jury, the Honorable _____ presiding, and the jury has rendered a verdict.

❏ tried by the Honorable _____ presiding, without a jury and the above decision was reached.

■ decided by the Honorable J. Michelle Childs, United States District Judge presiding.  The court having affirmed the decision of the US Bankruptcy Court's order issued October 15, 2019.

Date:   March 31, 2021                        *CLERK OF COURT*

                                              s/Angie Snipes
                                              _____
                                              *Signature of Clerk or Deputy Clerk*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| IN RE:<br>Infinity Business Group, Inc.,<br><br>Debtor. | Case No. 3:19-cv-03096-JMC |
| Robert F. Anderson, as Chapter 7<br>Trustee for Infinity Business Group, Inc.,<br><br>Appellant,<br>vs.<br><br>Wade Cordell, O. Bradshaw Cordell,<br>Cordell, L.L.C., The Cordell Group, L. L. C.,<br>Gibson Commons, L.L.C., Bryon K. Sturgill,<br>Sturgill & Associates Inc., John F. Blevins,<br>Law Offices of John F. Blevins, L.L.C.,<br>Golden Ghost, Inc., Haines H. Hargrett,<br>Donald Brent Grafton, D. Larry Grafton,<br>Grafton and Company, P.L.L.C., Morgan<br>Keegan & Company, Inc., Keith E. Meyers,<br><br>Defendants,<br><br>Of whom Morgan Keegan & Company, Inc.,<br>Keith E. Meyers are,<br>Respondents. | |

### NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

Notice is given that Appellant Robert F. Anderson, as Chapter 7 Trustee for Infinity

Business Group, Inc., ("Trustee"), appeals to the United States Court of Appeals for the Fourth

Circuit from the March 31, 2021 Order and Opinion [Dkt. No. 61] and Judgment [Dkt. No. 62] of

the United States District Court for the District of South Carolina affirming the October 15, 2019

order and judgment of the United States Bankruptcy Court for the District of South Carolina [Dkt.

Nos. 1057 and 1058 under Bankruptcy Case No. 10-06335-jw, Adv. Pro. No. 12-80208] and

dismissing the Trustee's appeal of and from the same. To be clear and so there is no doubt, this Notice of Appeal provides notice that the Trustee continues, in this appeal as of right to the United States Court of Appeals for the Fourth Circuit, to challenge and appeal the order and judgment of the United States Bankruptcy Court for the District of South Carolina as referenced above and seeks de novo review of said order and judgment by the Court of Appeals for the Fourth Circuit.

Respectfully submitted,

**WILLOUGHBY & HOEFER, P.A.**

s/ Mitchell Willoughby
Mitchell Willoughby, Fed. ID No. 4702
Elizabeth Zeck, Fed. ID No. 6627
Post Office Box 8416
Columbia, South Carolina 29202
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com

R. Walker Humphrey, II, Fed. ID No. 12524
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
(843) 619-4426
whumphrey@willoughbyhoefer.com

*Counsel for Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc.*

April 30, 2021
Columbia, South Carolina