# RECORD NO. 21-1536

In The

# United States Court Of Appeals

## For The Fourth Circuit

**In re: INFINITY BUSINESS GROUP, INC.,**

*Debtor,*

----------------------

**ROBERT F. ANDERSON,**
**as Chapter 7 Trustee for Infinity Business Group, Inc.,**

*Trustee - Appellant,*

v.

**MORGAN KEEGAN & COMPANY, INC.,**
**KEITH E. MEYERS,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AT COLUMBIA**

_____

## BRIEF OF TRUSTEE-APPELLANT

_____

Mitchell Willoughby
Elizabeth Zeck
WILLOUGHBY &
  HOEFER, P.A.
930 Richland Street
Columbia, SC  29201
(803) 252-3300

R. Walker Humphrey, II
WILLOUGHBY &
  HOEFER, P.A.
133 River Landing Drive,
Suite 200
Charleston, SC  29492
(843) 619-4426

Gerald Malloy
MALLOY LAW FIRM
108 Cargill Way
Hartsville, SC  29550
(843) 339-3000

*Counsel for Trustee-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-1536__        Caption: __Robert F. Anderson v Morgan Keegan & Company, Inc; Keith E. Meyers__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc.__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☑YES ☐NO
If yes, identify entity and nature of interest:

Raymond James Financial, Inc. - Parent/owner of Respondent Morgan Keegan & Associates, Inc.
Regions Financial Corporation - Agreement to indemnify for any losses incurred by Respondents

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☑YES ☐NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

(1) None
(2) None other than debtor in caption
(3) None

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/Mitchell Willoughby          Date:    May 19, 2021

Counsel for: Robert F. Anderson, as Chapter 7 Tr

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES .................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ..................................................................1

STATEMENT OF THE CASE...............................................................4

I.      MK Defendants Implemented and Concealed the Fraudulent Policy........5

        A.      Implementation of the fraudulent accounting policy during
                MK Defendants' engagement ........................................6

                1.      IBG hired MK Defendants as its financial advisor...............6

                2.      IBG's accounting changed from legal to fraudulent to
                        attract MK Defendants' investors.........................................8

                3.      MK Defendants supported and concealed the
                        fraudulent policy ................................................................13

        B.      MK Defendants' assistance with raising capital from
                individual investors ........................................................17

        C.      MK Defendants' continued cover-up of the fraud.........................22

                1.      MK Defendants' attempt to secure mezzanine debt
                        financing .............................................................................22

                2.      Meyers actively worked to shield Transaction
                        Services' confirmation of the fraud .....................................23

                3.      MK Defendants' continued work after the Transaction
                        Services Report ..................................................................25

i

II.     IBG Could Not be Saved ......................................................27

        A.     Removal of Management Defendants...........................27

        B.     Damages caused by the fraud......................................28

III.    The Bankruptcy Court's Order ..........................................30

SUMMARY OF ARGUMENT ..............................................................31

STANDARD OF REVIEW ...................................................................33

ARGUMENT .........................................................................................34

I.      Trustee Preserved His Arguments that MK Defendants Sought,
        Induced, and Accepted IBG's Trust and Confidence and that IBG
        Had No Notice of the Fraud .................................................34

II.     The Bankruptcy Court's Factual Findings Were Clearly Erroneous
        Because They Ignored Substantial Contrary Evidence and Resulted
        from an Inconsistent Evidentiary Standard ..............................35

        A.     MK Defendants had an extended advisory relationship ..............37

        B.     MK Defendants knew of the fraud ................................41

        C.     MK Defendants participated in the fraud .......................45

        D.     MK Defendants concealed the fraud..............................54

        E.     The evidence proving IBG's losses is reliable ..............57

III.    MK Defendants Had a Fiduciary Relationship with IBG and Owed
        IBG the Duties of Honesty, Due Diligence, and Disclosure...................58

IV.     The Bankruptcy Court Erred by Finding *In Pari Delicto* Bars
        Trustee's Claims Against MK Defendants................................61

        A.     Breach of fiduciary duty and aiding and abetting breach of
               fiduciary duty claims are exempt from *in pari delicto* .................62

B.    *In pari delicto* is inapplicable because MK Defendants colluded with Management Defendants...........................................64

C.    *In pari delicto* is inapplicable because Management Defendants' actions were clearly adverse to IBG..........................68

D.    *In pari delicto* is inapplicable because Trustee stands in the shoes of IBG's creditors..................................................72

V.    The Bankruptcy Court Misapplied the Law on Causation.......................73

CONCLUSION.................................................................................77

STATEMENT ON ORAL ARGUMENT ............................................78

CERTIFICATE OF COMPLIANCE.....................................................80

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    351 F. Supp. 2d 79 (S.D.N.Y. 2004) ........................................59

*Anderson v. City of Bessemer City, N.C.*,
    470 U.S. 564 (1985).................................................................34

*Anderson v. Cordell (In re Infinity Bus. Grp., Inc.)*,
    497 B.R. 794 (Bankr. D.S.C. 2013)...........................30, 61, 68, 70

*Avery v. Homewood City Bd. of Educ.*,
    674 F.2d 337 (5th Cir. Unit B 1982) ........................................78

*Baker O'Neal Holdings, Inc. v. Ernest & Young LLP*,
    No. 1:03-CV-0132-DFH, 2004 WL 771230
    (S.D. Ind. March 24, 2004)......................................................67

*Butts v. United States*,
    930 F.3d 234 (4th Cir. 2019) ...................................................33

*C&B Sales & Serv., Inc. v. McDonald*,
    177 F.3d 384 (5th Cir. 1999) ...................................................77

*Coleman v. Cmty. Tr. Bank (In re Coleman)*,
    426 F.3d 719 (4th Cir. 2005) ...................................................34

*Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*,
    515 F.3d 319 (4th Cir. 2008) ...................................................34

*Escott v. BarChris Const. Corp.*,
    283 F. Supp. 643 (S.D.N.Y. 1968) ..........................................60

*FDIC v. O'Melveny & Myers*,
    61 F.3d 17 (9th Cir.1995) ........................................................72

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015).........................................31

iv

*In re Gillett Holdings, Inc.*,
    137 B.R. 452 (Bankr. D. Colo. 1991)............................................................59

*Grayson Consulting, Inc. v. Wachovia Securities, LLC*
*(In re Derivium Capital, LLC)*,
    716 F.3d 355 (4th Cir. 2013) .......................................................3, 70, 71, 72

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)......................................................................................67

*Jiminez v. Mary Washington Coll.*,
    57 F.3d 369 (4th Cir. 1995) ...................................................................33, 34

*Jones v. UNUM Life Ins. Co. of Am.*,
    223 F.3d 130 (2d Cir. 2000) ........................................................................78

*Jones v. Wells Fargo Bank, N.A.*,
    666 F.3d 955 (5th Cir. 2012) .......................................................................72

*Liquidating Tr. of the Amcast Unsecured Creditors Liquidating Tr. v.*
*Baker (In re Amcast Indus. Corp.)*,
    365 B.R. 91 (Bankr. S.D. Ohio 2007) .........................................................63

*Matter of Marchiando*,
    13 F.3d 1111 (7th Cir. 1994) .......................................................................78

*Maybank v. BB&T Corp.*,
    No. 6:12-cv-00214-JMC, 2012 WL 3157006
    (D.S.C. Aug. 3, 2012).................................................................................59

*McGraw v. Wachovia Sec., LLC*,
    756 F. Supp. 2d 1053 (N.D. Iowa 2010) .....................................................59

*McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*,
    334 F.3d 239 (3d Cir. 2003) ........................................................................71

*Miller v. Asensnio & Co.*,
    364 F.3d 223 (4th Cir. 2004) .......................................................................73

*Miller v. Mercy Hosp., Inc.*,
    720 F.2d 356 (4th Cir. 1983) ................................................................33, 34

*Mut. Life Ins. Co. of N.Y. v. Hilton-Green*,
 241 U.S. 613 (1916)................................................................64, 69

*Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*,
 267 F.3d 340 (3d Cir. 2001) ...............................................72

*Off. Comm. of Unsecured Creditors ex rel. Felt Mfg. Co. v. Foss
(In re Felt Mfg. Co.)*,
 371 B.R. 589 (Bankr. D.N.H. 2007)........................................63

*Podell & Podell v. Feldman (In re Leasing Consultants Inc.)*,
 592 F.2d 103 (2d Cir. 1979) ...............................................71

*Prodigious Ventures, Inc. v. YBE Hosp. Grp., LLC*,
 No. 5:14-CV-433-F, 2017 WL 9478487
 (E.D.N.C. Feb. 23, 2017)...................................................59

*S.E.C. v. Rauscher Pierce Refsnes, Inc.*,
 17 F. Supp. 2d 985 (D. Ariz. 1998) .......................................59

*Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*,
 264 F.3d 1344 (Fed. Cir. 2001) ...........................................36

*Scholes v. Lehmann*,
 56 F.3d 750 (7th Cir.1995) ................................................72

*Segal v. Rochelle*,
 382 U.S. 375 (1966)........................................................71

*Seitz v. Fretz (In re Covenant Partners, L.P.)*,
 Adv. No. 16-226, 2017 WL 838637
 (Bankr. E.D. Pa. Mar. 2, 2017)...........................................62

*Sender v. Buchanan (In re Hedged-Invest. Assocs., Inc.)*,
 84 F.3d 1281 (10th Cir. 1996) ............................................72

*Sender v. Porter (In re Porter McLeod, Inc.)*,
 231 B.R. 786 (D. Colo. 1999)..............................................71

*Stahle v. CTS Corp.*,
 817 F.3d 96 (4th Cir. 2016) ...............................................62

*Story Parchment Co. v. Paterson Parchment Co.*,
    282 U.S. 555 (1931) ........................................................................58

*Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*,
    961 F.2d 496 (4th Cir. 1992) ........................................................33

*U.S. Tr. v. Bane (In re Bane)*,
    565 Fed. Appx. 246 (4th Cir. 2014) ............................................34

*United States v. Norman*,
    935 F.3d 232 (4th Cir. 2019) ..................................................62, 63

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364 (1948) ........................................................................33

*USACM Liquidating Tr. v. Deloitte & Touche LLP*,
    764 F. Supp. 2d 1210 (D. Nev. 2011) ..........................................63

**State Cases**

*In re Amerco Derivative Litig.*,
    252 P.3d 681 (Nev. 2011) ...................................................*passim*

*Anthony v. Padmar, Inc.*,
    465 S.E.2d 745 (S.C. Ct. App. 1995) ..........................................60

*Banks ex rel. Banks v. Sunrise Hosp.*,
    102 P.3d 52 (Nev. 2004) ................................................................73

*Bower v. Harrah's Laughlin, Inc.*,
    215 P.3d 709 (Nev. 2009) .........................................................73, 76

*Burwell v. S.C. Nat'l Bank*,
    340 S.E.2d 786 (S.C. 1986) ..........................................................59

*Citizens' Bank v. Heyward*,
    133 S.E. 709 (S.C. 1925) ...............................................................69

*Crystal Ice Co. of Columbia, Inc. v. First Colonial Corp.*,
    257 S.E.2d 496 (S.C. 1979) .....................................................64, 65

*Encite LLC v. Soni*,
No. 2476-VCG, 2011 WL 5920896 (Del. Ch. Nov. 28, 2011) ....................45

*Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*,
101 P.3d 792 (Nev. 2004)...............................................................................73

*Holly Hill Lumber Co. v. McCoy*,
23 S.E.2d 372 (S.C. 1942) .............................................................................30

*Island Car Wash, Inc. v. Norris*,
358 S.E.2d 150 (S.C. Ct. App. 1987) ............................................................58

*J.T. Baggerly v. CSX Transp., Inc.*,
635 S.E.2d 97 (S.C. 2006) .............................................................................73

*Kirschner v. KPMG LLP*,
938 N.E.2d 941 (N.Y. 2010) ...................................................................65, 66

*Koester v. Carolina Rental Ctr., Inc.*,
443 S.E.2d 392 (S.C. 1994) ...........................................................................73

*Little v. S. Cotton Oil Co.*,
153 S.E. 462 (S.C. 1930) ...............................................................................64

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001) ............................................................................45

*Moore v. Moore*,
599 S.E.2d 467 (S.C. Ct. App. 2004) ......................................................58, 59

*Moseley v. All Things Possible, Inc.*,
694 S.E.2d 43 (S.C. Ct. App. 2010) ..............................................................30

*Myatt v. RHBT Financial Corp.*,
635 S.E.2d 545 (S.C. Ct. App. 2006) ......................................................62, 68

*Ex parte Nimmer*,
47 S.E.2d 716 (S.C. 1948) .............................................................................69

*Off. Comm. of Unsecured Creditors of Allegheny Health Educ. & Rsch. Found. v. PriceWaterhouseCoopers, LLP,*
 989 A.2d 313 (Pa. 2010)...........................................................................64, 65

*Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club,*
 425 S.E.2d 764 (S.C. Ct. App. 1992) ............................................................60

*Player v. Thompson,*
 193 S.E.2d 531 (S.C. 1972) ...........................................................................74

*RPT Mgmt. Co. v. Tinsley & Adams, LLP,*
 732 S.E.2d 166 (S.C. 2012) ...........................................................................30

*In re Rural Metro Corp.,*
 88 A.3d 54 (Del. Ch. 2014.) ......................................................................45, 54

*In re Rural/Metro Corp. S'holders Litig.,*
 102 A.3d 205 (Del. Ch. 2014) ........................................................................74

*S.C. Ins. Co. v. James C. Greene & Co.,*
 348 S.E.2d 617 (S.C. Ct. App. 1986) ............................................................69

*Small v. Pioneer Mach., Inc.,*
 494 S.E.2d 835 (S.C. Ct. App. 1997) .......................................................73, 76

*Spence v. Spence,*
 628 S.E.2d 869 (S.C. 2006) ...........................................................................69

*Stewart v. Wilmington Tr. SP Servs., Inc.,*
 112 A.3d 271 (Del. Ch. 2015) ............................................................63, 65, 66

*Wyeth v. Rowatt,*
 244 P.3d 765 (Nev. 2010)...............................................................................74

## Federal Statutes

11 U.S.C. § 541 ..............................................................................1, 70, 71, 72

11 U.S.C. § 541(a) ............................................................................................72

11 U.S.C. § 541(a)(1)........................................................................................71

11 U.S.C. § 544 ...................................................................1, 72

11 U.S.C. § 544(a) ....................................................................71

11 U.S.C. § 544(b) ....................................................................71

11 U.S.C. § 547 ...........................................................................1

11 U.S.C. § 548 ............................................................1, 71, 72

11 U.S.C. § 550 ...........................................................................1

11 U.S.C. §§ 701, *et seq.*..........................................................4

15 U.S.C. § 77k(c) .....................................................................60

15 U.S.C. § 78u-4(f)(2)(A) .......................................................74

28 U.S.C. § 157 ...........................................................................1

28 U.S.C. § 158(a)(1) .................................................................1

28 U.S.C. § 158(d)(1) .................................................................1

28 U.S.C. § 1331 .........................................................................1

28 U.S.C. § 1334 .........................................................................1

28 U.S.C. § 1367 .........................................................................1

**State Statutes**

Nev. Rev. Stat. § 17.130(2) .....................................................78

S.C. Code Ann. §§ 15-38-15(F), -20(G) .................................74

S.C. Code Ann. §§ 33-8-300, -420 ..........................................62

S.C. Code Ann. § 34-31-20(A) ................................................78

S.C. Code Ann. § 40-2-20(15)(b) ............................................61

**Rules**

Fed. R. App. P. 4(a)(1)(A) ........................................................................1

Fed. R. Bankr. P. 8002(a)(1) ...................................................................1

Fed. R. Bankr. P. 8019 ...........................................................................31

Fed. R. Evid. P. 702 .................................................................................4

**Regulations**

17 C.F.R. §§ 230.500, *et seq.* ...............................................................18

**Other Authorities**

Restatement (Second) of Torts § 432(2) ................................................74

Restatement (Third) Torts-Physical & Emotional Harm § 27 cmt. c. ....................74

# JURISDICTIONAL STATEMENT

Robert F. Anderson, Chapter 7 Trustee for Debtor Infinity Business Group, Inc., (IBG) brought this adversary proceeding pursuant to 11 U.S.C. §§ 541, 544, 547, 548, and 550. The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157, 1331, 1334, and 1367, and issued its final order and entered final judgment against Trustee on all claims against Defendants-Appellees Morgan Keegan & Company, Inc. and Keith E. Meyers (collectively, MK Defendants) on October 15, 2019.

Trustee timely appealed to the District Court on October 29, 2019. *See* Fed. R. Bankr. P. 8002(a)(1). The District Court had jurisdiction under 28 U.S.C. § 158(a)(1). It issued its final order affirming the Bankruptcy Court in full and entered judgment dismissing Trustee's appeal on March 31, 2021.

Trustee timely appealed to this Court on April 30, 2021. *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 158(d)(1).

# STATEMENT OF ISSUES

1. An appellant preserves an issue on appeal by presenting evidence or argument in its brief. Trustee devoted numerous pages to presenting facts, supported by record citations, and argument regarding whether MK Defendants sought, induced, and accepted IBG's trust and confidence and whether IBG had actual or constructive knowledge of MK Defendants' fraud. Assuming *arguendo* the District Court's determinations are relevant under this Court's direct review

1

standard, did the District Court correctly determine that Trustee waived these issues?

2.    A trial judge sitting without a jury must review the entire record when making factual findings, make findings supported by substantial evidence, and not disregard substantial evidence directly contradicting those findings. The Bankruptcy Court disregarded significant and substantial portions of the record directly contradicting its findings concerning Trustee's claims, MK Defendants' defenses, and IBG's damages, and it applied differing evidentiary standards to the parties. Were the Bankruptcy Court's findings clearly erroneous?

3.    Fiduciary duties arise in a close, confidential relationship, and holding oneself out as a CPA independently creates a duty to disclose. The evidence shows MK Defendants had such a relationship with IBG, including documents showing MK Defendants served as IBG's financial advisor and agent, and Meyers held himself out as a CPA. Did the Bankruptcy Court err in determining that MK Defendants did not owe these duties to IBG?

4.    *In pari delicto* is a judicially created equitable defense precluding recovery by one who participated in wrongdoing with the defendant, but it does not bar recovery by an injured third-party. Trustee did not bring this adversary proceeding on behalf of alleged wrongdoers at IBG but as a representative and fiduciary of IBG's creditors, in whose shoes he stands. Does *in pari delicto* even

apply to Trustee's claims, notwithstanding this Court's decision in *Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital LLC)*?

5.     Case law recognizes that *in pari delicto* does not shield a company's fiduciaries and those who assist or collude with management from liability for harm caused to the company and its creditors. Did the Bankruptcy Court err in nevertheless determining that Trustee's claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are subject to *in pari delicto*, and that South Carolina's "collusion exception" does not apply even if the defense does?

6.     South Carolina courts hold that an agent's actions adverse to the principal are not imputed under *in pari delicto* when there is "clear" adversity. The Bankruptcy Court imposed a stricter standard and determined South Carolina law requires "total abandonment" and "complete[] and total[]" adversity to make *in pari delicto* inapplicable. Did the Bankruptcy Court apply the wrong legal and evidentiary standard, and were Management Defendants' actions clearly adverse to IBG under the correct standard?

7.     Defendants are liable for actual damages proximately flowing from their actions, even if they are not the sole cause of the harm. Only unforeseeable intervening causes cut the chain of proximate causation. The intervening causes identified by the Bankruptcy Court were the foreseeable result of MK Defendants'

conduct. Did the Bankruptcy Court err in determining that MK Defendants were not a proximate cause of IBG's losses?

8. Once admitted as part of the Rule 702 gatekeeping function, expert testimony regarding damages is substantial, competent, and reliable when the evidence demonstrates the basis for the expert's analysis. Trustee's damages expert calculated IBG's losses using revised financial statements which were prepared specifically to correct MK Defendants' fraud, which he expressly explained and affirmed were reliable. Did the Bankruptcy Court clearly err in finding that Trustee's damages evidence was unreliable, where that finding largely rested on a misapprehension about which statements Trustee's expert used?

## STATEMENT OF THE CASE

IBG was destroyed by an accounting fraud and petitioned for relief under 11 U.S.C. §§ 701, *et seq.* Robert F. Anderson was appointed and remains its Chapter 7 Trustee. Trustee commenced this adversary proceeding to recover substantial losses MK Defendants wrought through their role in developing, implementing, and concealing a change in IBG's accounts receivable and revenue recognition policies to make IBG appear lucrative when it was hemorrhaging cash.[1] [*See generally* JA 15-187.] Absent relief here, hundreds of individuals who invested over

---

[1] The other defendants confessed judgment or had default judgments entered against them. They are not parties to this appeal.

$20,000,000 in IBG based on lies propagated and enabled by MK Defendants are left defrauded. [JA 3626-27, 3693.]

Following an 18-day bench trial, four of Trustee's causes of action remained: (1) aiding and abetting breach of fiduciary duty; (2) breach of fiduciary duty; (3) Rule 10b-5 securities fraud; and (4) common law fraud. MK Defendants are liable whether they implemented the fraudulent policy, knew but did not disclose it was fraudulent, or failed to discover it was fraudulent.

## I.     MK Defendants Implemented and Concealed the Fraudulent Policy.

IBG collected bad checks returned for insufficient funds. Its primary revenue was the $25-35 per check fee earned upon successful collection. IBG originally sent checks to the maker's bank electronically and added "hard collections" attempting to collect checks through traditional means in September 2005. [JA 457, 1230-32.] IBG also offered a "guarantee" program wherein it purchased and owned the bad check, and thus was entitled to collect the face amount plus the fee. [JA 468.]

Its management included CEO Bryon Sturgill, COO Brad Cordell, General Counsel John Blevins, President and Chairman Wade Cordell, CFO Haines Hargrett beginning September 2006, (collectively, Management Defendants) and 18 others.[2] [JA 476-77, 2421-24.] While Management Defendants held leadership positions and

---

[2] IBG hired Hargrett upon Meyers' recommendation. [JA 1495, 4901.]

a voting majority of IBG's board [JA 4124, 4139, 4165, 4180, 4419], they did not own a majority of IBG stock [*see* JA 648-49, 3532, 3552, 3672-86, 3869-71, 4154-55, 4175].   A shareholder majority therefore could have removed them as directors or "packed" the board by increasing its membership at any time, and reversed their decisions if the shareholders had sufficient cause. [*See* JA 2814, 2821.]

IBG initially was successful and needed an infusion of capital to support its growth. The company lacked the knowledge and expertise to properly conduct its own capital raises. [JA 228.] It therefore needed an investment bank to provide general financial and business advice and search for investors.

## A.    Implementation of the fraudulent accounting policy during MK Defendants' engagement.

### 1.    IBG hired MK Defendants as its financial advisor.

Meyers, a CPA, alumnus of Deloitte & Touche, and Duke MBA graduate, joined Morgan Keegan in 2005 as the first investment banker in the firm's then-new Atlanta office. [JA 884-90.] His New York CPA license was active from 1997-2001 and inactive thereafter. [JA 885-86.] He is an "industry specialist" on non-bank lending, debt collection, and payment processing services. [JA 890-92.] Meyers explained his accounting knowledge and industry expertise provide special insight as an investment banker: accounting is "the benchmark of business," "[b]eing able to understand the financials is very critical to what we do," deals frequently fail due to a "financial surprise" when financial records "our

6

clients put forth under scrutiny don't hold up" because they do not comply with Generally Accepted Accounting Principles ("GAAP"),[3] and even "top-notch" audit firms will miss errors in a company's financials "if they're not industry experts…because there's uniqueness in the business." [JA 976-81, 3885.] He therefore knew fundamental accounting concepts like revenue recognition. [JA 738-39, 804.]

After pursuing IBG for months, Meyers met with members of its management in January 2006. [JA 816-18, 1025-1031, 1036-37.] Morgan Keegan's "hello pitch book" for IBG listed Meyers as a CPA. [JA 893-95, 1048.] These materials were shared with others at IBG who did not attend the meeting. [JA 643-44.] Meyers did not disclose his CPA license was inactive and later promised Morgan Keegan would review IBG's significant accounting policies, including revenue recognition. [JA 494-95, 646-47.]

IBG's management was impressed by Meyers' background, education, and CPA certification. [JA 643-44.] They were excited Morgan Keegan would "dig into our business," trusted MK Defendants to be truthful and honest, and expected they would inform the board of any concerning issues they found. [JA 455-56, 458-460, 465, 487, 531-32, 535-36, 544, 600-01, 647, 662-67, 818-32, 835.] Meyers

---

[3] GAAP are promulgated by the Financial Accounting Standards Board to create a "level playing field on financial reporting of a company or a business' financial condition." [JA 736.]

himself recognized the importance of trust, honesty, forthrightness, "do[ing] the right thing," and compliance with the law in his client relationships. [JA 910-11, 974-75, 983.]

Meyers wanted a long-term advisory relationship. [JA 1076-77.] He authorized IBG to describe Morgan Keegan as its "financial advisor" in September 2006, and Morgan Keegan continued serving as IBG's general financial advisor in 2008. [JA 1834-37, 3131.] Multiple witnesses confirmed Meyers frequently advised on a range of issues. [JA 666, 685, 839, 4913.] Meyers' associate Calvin Clark became so familiar with IBG that he jokingly referred to himself as IBG's "interim CFO," and Hargrett, IBG's actual CFO, deemed him "the expert on the financial affairs of IBG." [JA 1509-10, 2479-83.]

### 2. IBG's accounting changed from legal to fraudulent to attract MK Defendants' investors.

Meyers initially eyed a $100,000,000 initial public offering. [JA 1038-42, 1078-79.] This would net a $7,000,000 fee, a substantial prize for Meyers' bonus-heavy compensation, and make a name for Meyers and Morgan Keegan's fledgling Atlanta office. [*See* JA 1084, 3720-21.] At all times, IBG's "exit strategy" therefore was an eventual IPO or sale to a third party effectuated by Morgan Keegan. [*E.g.*, JA 533-534, 575-79, 602-07, 627, 3104, 3498, 3584, 3835-41.]

The first step was interim financing through the private sale of $15,000,000-20,000,000 in IBG securities to institutional investors, which, if

successful, could earn MK Defendants up to $1,000,000 as placement agent (2006 Engagement). [JA 1102-03, 1356, 3962.] However, IBG was a "small or break-even" company that was "not as exciting" to private equity firms. [JA 912.] For example, its receivables for 2003 and 2004 were just $151,789 and $148,460. [JA 3725.] Moving to an accounting policy causing its receivables to "be piling up and shooting…through the roof" would generate the needed excitement. [*See* JA 2461.]

Accounts receivable and revenue go hand in hand; the recording of a receivable simultaneously yields a recording of revenue. [JA 753-54, 766-67.] Revenue recognition is one of the most fundamental concepts of accounting— revenue is not earned until "you have done everything you have to do; you've provided the service." [JA 738.] Before the 2006 Engagement, IBG's receivables consisted of only the face value of uncollected "guaranteed" checks IBG purchased. [JA 3729.] This complied with GAAP. [JA 748-49.] That changed within two weeks of MK Defendants' engagement. The new policy first appeared in draft 2005 financials Sturgill sent to Clark on March 27, 2006, for use in the Confidential Information Memorandum (CIM) which MK Defendants were preparing for institutional investors. [JA 1272-79.] MK Defendants incorporated it into the final CIM two days later. [JA 1332.]

IBG's receivables switched from the *face value* of checks IBG was *entitled* to receive under the *guarantee program*, to *fees* which IBG *hoped to earn* from the successful collection of *all* checks. [JA 1408.] The balance became the product of IBG's anticipated total fees for the year and an estimated "conservat[ive]" check collection rate of 75%. [*Id.*] This generated a 67-fold increase in receivables from $148,460 in 2004 to $9,936,403 in 2005. [*Id.*] IBG thereafter never reduced its receivables when it later received the associated fees, and it simply added estimated new ones thereafter. [JA 588-591, 3275, 3288.]

These fees had not been earned and therefore were not recognizable as revenue or receivables under GAAP. [JA 737, 753-54.] The policy double-counted revenues: once when the estimated revenue was booked as a receivable, and again when the money came in. And it resulted in a four-layer fraud for receivables: first, the fraudulent $9,936,403 starting point; second, the retention of fraudulent receivables on IBG's books after collection; third, the initial fraudulent receivables grew by adding new estimated receivables; and fourth, the creation of an ever-increasing spiral because new estimated receivables were never adjusted. [*See* JA 588-591, 3275, 3288.]

The fraud was limited to receivables and revenue. [JA 858-87, 778-79.] But its effect was stunning[4]:

**Total Assets**

|  | 2006 | 2007 | 2008 |
|---|---|---|---|
| Fraudulent | $23,187,292 | $26,950,876 | $32,452,224 |
| Real | $8,527,893 | $7,527,554 | $7,847,331 |

**Total Revenue**

|  | 2006 | 2007 | 2008 |
|---|---|---|---|
| Fraudulent | $42,653,766 | $43,971,583 | $41,198,936 |
| Real | $3,224,597 | $3,952,780 | $5,081,179 |

**Net Income (Loss)**

|  | 2006 | 2007 | 2008 |
|---|---|---|---|
| Fraudulent | $608,365 | ($697,832) | ($2,157,364) |
| Real | ($4,101,231) | ($5,821,246) | ($7,160,015) |

Meyers deflected responsibility by claiming Sturgill promptly assuaged his concerns regarding the policy. [JA 913-18.] There is no evidence corroborating Meyers' testimony. But assuming the conversation occurred as Meyers testified, Meyers knew Sturgill's explanation was false.

Sturgill allegedly said the increase occurred because the "hard collections business had substantially ramped up" during 2005 and was "now a much larger piece of the business than it was in previous years." [JA 914-15.] Meyers knew "hard collections" only started in September 2005. [JA 1230-32.] There were no "previous

---

[4] "Fraudulent" data come from Trustee Exhibit 1572 [JA 3722-3801], and "Real" data come from Trustee Exhibit 1446 [JA 3628-33]. The only years for which both sets overlap are 2006, 2007, and 2008.

years." Furthermore, Meyers knew the total fee revenue from hard collections in 2005 was $146,775.15—just 1.5% of the receivables increase allegedly attributable to them. [*Id.*]

Meyers also claimed Sturgill described a policy called the "effective yield method." [JA 917-18.] It allows debt collection companies which purchase pools of accounts to record *both* the face value and fees as receivables. [*Id.*] Only *deferred* revenue is recognized at the time, with actual revenue recognized later. [*Id.*; JA 1417-20, 1789-90.] This method is "never accurate." [JA 918.] Meyers knew IBG did not use this method. IBG recognized receivables and non-deferred revenue simply as an estimate of total expected fees before they were earned. [JA 1408.]

Meyers never told IBG the policy was fraudulent or told Sturgill he was wrong. Attempting to deflect this failure, Meyers claimed he told Sturgill the policy was "aggressive" and told Wade Cordell, Sturgill, and Hargrett during an "exit interview" that IBG should find a new auditor[5] and move to a more conservative policy. [JA 916, 946-47, 971-72.]

---

[5] Defendants Brent Grafton, Larry Grafton, and Grafton and Company, PLLC were IBG's auditors. Brent Grafton pled guilty to never actually auditing IBG's financial statements. [JA 5281-82.] Any reference herein or in the record to audited IBG financial statements are to those Grafton falsely attested to have audited.

Describing the policy as "aggressive" does not identify it as fraudulent. [JA 322.] Meyers' testimony nevertheless confirms he knew it was. He characterized the policy as "aggressive" because IBG was "recording the revenue prior to actually doing the work" and "they haven't actually started the collections process yet." [JA 916.] That is, Meyers knew the policy violated the fundamental GAAP rule requiring that "you have done everything you have to do; you've provided the service" before revenue is recognized. [JA 738.]

Meyers similarly failed to disclose anything noteworthy in his "exit interview." He did not recommend IBG change auditors because Grafton facilitated a fraud. Meyers in fact "made no opinion of Grafton at all." [JA 973.] He suggested only that IBG retain an auditor with more notoriety to gain credibility with investors. [971-72.] His milquetoast suggestion of a more "conversative" policy is a far cry from warning the existing policy was fraudulent. Meyers ultimately "didn't actively take a position one way or the other" on whether IBG should stop using the fraudulent policy. [JA 4917.]

3.   MK Defendants supported and concealed the fraudulent policy.

In addition to the CIM employing the fraudulent accounting policy, its notes describing receivables used old language from 2004 explaining the original GAAP-compliant methodology instead of the new policy. [*Compare* JA 1334-35, *with* JA 3729.] This gave the manifestly false impression that no change had occurred. [JA

13

876, 878.] MK Defendants were the principal authors of and "owned" this fraudulent document which they quickly sent to potential institutional investors.[6] [JA 750-51, 919-20.]

Bison Capital, a potential investor under the CIM, requested support for the claimed "historical collection rate [of] 80-85%" reduced to 75% "[f]or conservatism" at the heart of the receivables policy. [JA 1508.] Clark set out to generate this support. IBG's collection rate was highly variable across its business lines, the status of the bank account, the age of the check, and the amount of the check. [JA 463-64, 466-67, 470-71.] Any desired rate can be generated by modifying these inputs. [JA 474-75.] Clark did just that, limiting his sample to checks under 60 days old to get an 82.6% collection rate matching Meyers' explanation. [JA 1508.]

This rate was a sham. Bison questioned and disputed it, and Meyers admitted the discrepancy was "likely my error and I would like to correct it." [JA 1497-1501, 1511-12, 1953-57.] Both Meyers and Clark then generated their own supplemental data showing a substantially lower rate than Clark originally reported. [JA 1517-25, 1943, 1947.] Clark also recognized his sample size was too small. [JA 869, 883.] It ultimately was undisputed Clark's rate was a misrepresentation. [JA 466-67, 470-71.] But Meyers never corrected it or the policy.

_____

[6] MK Defendants knew itself IBG used the CIM. [JA 1430-92.] They only instructed IBG to take Morgan Keegan's name off the document and did not demand IBG stop distributing. [JA 1430-92.]

With the policy in place, the receivables jump from around $150,000 in 2003 and 2004, to $9,936,403 in 2005, needed smoothing. In June 2006, Regions Bank, which Meyers contacted regarding an IBG line of credit, asked for 2004 financials including "the figures from the collections company, so there is no jump in the receivables number when comparing to '05." [JA 1493.] Meyers testified "collections company" referred to IBG's hard collections business, which he knew did not exist in 2004. [JA 932-34, 1230-32.]

With no 2004 hard collections to add, the financials were restated to extend the fraudulent policy to 2004 ("First Restatement"). [JA 762-64; *compare* JA 3729, *with* JA 3738.] Meyers forwarded Morgan Keegan's attorneys' comments on the 2005 audited financials to Sturgill, directing him to "please review and forward to Grafton to utilize in revising the 2005 and 2004 audit." [JA 1760.] Sturgill then forwarded Grafton and Clark the fraudulent "[r]estate[d]" 2004 and 2005 financial statements and accompanying notes. [JA 1794-1833.] Meyers and Clark edited the restated 2005 notes. [JA 1838-43.] Clark later admitted that "[r]estating the financials has held us up a little bit" and "we have these numbers done." [JA 1890.]

The First Restatement achieved its goal. By fraudulently inflating 2004's receivables from $148,650 to $3,132,446, the jump in 2005 dropped from 67 times the 2004 balance to just three. [JA 3734.] The First Restatement did not disclose the policy had changed, as it was required to do. [JA 764-65.] Worse, a back-dated audit

15

opinion was added giving the intentionally false impression that the First Restatement constituted IBG's original 2004 audited financials. [JA 763-64, 3733.]

The notes to the First Restatement and IBG's "audited" fiscal-year 2005-2008 financials also failed to disclose the true policy. They incorporated three components of receivables: (1) the face amount of guaranteed checks IBG was "entitled" to receive, (2) fees from "actively collecting" guaranteed checks to which IBG also was "entitled," and (3) and fees from collecting non-guaranteed checks to which IBG "by contract is entitled." [JA 3734, 3750, 3764, 3780, 3797.] Use of the word "entitled" suggested IBG only recorded fees for checks it actually collected, which would be proper. [JA 757-59.]

In reality, the balance was only estimated fees with no evidence IBG was entitled to them. [JA 759-60, 1408.] MK Defendants helped draft these fraudulent notes. Meyers forwarded Sturgill inapplicable sample language from other companies using the effective yield method [JA 1417-19, 1792-93], and Meyers and Clark provided other edits, comments, and feedback on IBG's statements and notes without so much as suggesting this flagrant error be corrected [JA 1253-59, 1265-71, 1506-07, 1838-43, 2484].

Bison continued to raise concerns. It asked "to look at the monthly financials two ways: 1) GAAP as per Grafton; and 2) revised to recognize hard collections revenue as collected." [JA 1512.] This email "is clear evidence" Bison had "smelled

16

a rat." [JA 713-15.] Bison also pushed back against MK Defendants' efforts to mask the First Restatement as a "purchase" of "collections company" receivables.[7] [JA 1535-38.] Bison finally walked after learning Sturgill lied about being a CPA, had failed all parts of the CPA exam six times, was not a Certified Valuation Analyst ("CVA"), and had "duped" the CVA-accrediting authority into believing he was a CPA. [JA 944-45, 2594.] Meyers received this report and knew Sturgill, whose accounting explanations Meyers allegedly accepted at face value, was a liar and a fraud. [JA 2618-19.] But Meyers stayed with IBG and "Sturgill's" policy even after Sturgill refused to share the report internally. [JA 969-70.]

**B.    MK Defendants' assistance with raising capital from individual investors.**

In August 2006, IBG began pursuing a rescission offering to repurchase previously sold securities and a private placement offering to sell new stock to individual investors. [JA 480.] The private placement memorandum (PPM) issued for the new offering incorporated the fraudulent financials. [JA 2701-11.] IBG raised $12,134,228 through it. [JA 3693.] Although MK Defendants had no fee interest in

---

[7] Bison questioned "$3M of purchased A/R" appearing in MK Defendants' draft 2005 cash flow statement. [JA 1535-38.] This draft included an entry for "[p]urchase of [a]ccounts [r]eceivable," claiming that "[d]uring 2005 the Company consolidate [*sic*] its collection subsidiary into Infinity Business Group, Inc. in anticipation of this Transaction." [JA 1412.] As noted, there were no "collections company" receivables from 2004 to "purchase[]." [JA 1230-32.] This "purchase" is never referenced outside of this draft.

this offering, capital raised under it could carry IBG toward its "exit strategy" from

which MK Defendants would profit handsomely.

MK Defendants therefore were intimately involved with drafting a PPM they

knew would be used to solicit new investment from individuals:

- August 7: Clark "set up a call with DLA [IBG's outside counsel] to go over the offering so I can begin putting together some materials this week." [JA 1526.]

- August 11: Clark informed Meyers that he "had begun a draft of the Reg D offering,"[8] noted "[t]he piece we need to add is our discussion of the financials," and sought Meyers' input. [JA 1532-34.]

- August 16 & 17: Meyers obtained information from IBG for use in drafting the "offering memorandum." [JA 1539-42.]

- August 18: Meyers anticipates the "Reg D" offering will be ready for distribution by mid-September, believes IBG "agreed to a very reasonable valuation for this offering to entice investors to come on-board," seeks to schedule meetings with potential investors, and jokingly asks his supervisor if Meyers can "put [him] down for the full $6,000,000?" [JA 1543-45.]

- August 18: Clark forwards MK Defendants' "initial draft of the Reg D offering" to DLA. Clark's draft included IBG's fraudulent 2005 financials, defined "The Offering" as "Up to 4,000,000 of Common Stock at a per share price of $2.00," described the use of its proceeds, and identified potential purchasers as "[a]ccredited investors only." [JA 1546, 1575-85.]

- August 28: DLA sends Meyers and IBG a revised PPM for $6,000,000 in IBG common stock, identifying Morgan Keegan as placement agent, directing inquiries to Clark and Meyers, and explaining "the offering is being made in reliance upon an exemption from registration under the

---

[8] "Reg D" is short for Regulation D, 17 C.F.R. §§ 230.500, *et seq.*, under which unregistered securities are sold to individuals. Clark was tested on Regulation D for his Series 7 general securities representative license. [JA 879.]

Securities Act for an offer and sale of securities not involving a public offering." [JA 1588, 1590, 1592-93, 1602, 1653-68.]

- August 30: Meyers sends DLA a draft wherein he extensively edited the "Company Overview," "The Financing," and "Risk Factors" sections, added new "Government Regulation" and "Competition" sections, and included biographies of IBG management. He did not change the name of the document from a Confidential Private Placement Memorandum, remove Morgan Keegan as placement agent or his and Clark's contact information, or change the disclosures or relevant portions of the Outline of Proposed Terms. [JA 1671-1758.]

- September 20: Clark sends Sturgill, Wade Cordell, and Blevins "the financial section for the Reg D offering" for review. [JA 1844.]

- September 29: DLA forwards a draft to Jones Day, Morgan Keegan's counsel, copying Meyers and Clark. It was for the "SALE OF UP TO $6,000,000[] Common Stock," continued to name Morgan Keegan as placement agent, and explained that some proceeds would be used "to conduct a private tender offer for stock held by existing stockholders." Regarding this separate offering, DLA also forwarded "a chart summarizing the rescission offer requirements of the blue sky laws relevant to prior issuances of stock by the company." [JA 1985, 1987, 2000.]

- October 4: Hargrett sends Clark the restated financial statements "in word/Excel format so whatever you want can be included in the PPM." [JA 2087.]

- October 4 & 5: Clark sends Hargrett "the updated financial section for the offering" and states he "used [Hargrett's] language in the notes." [JA 2113; see also JA 2128-30 (Hargrett questioning whether Clark integrated all changes), JA 2131-63 (Clark sending DLA his updated "language in the financial section for the offering.").]

- October 6: Morgan Keegan's attorneys circulate another draft PPM, indicating it "would be the base for other tender documents," e.g., a rescission offering, and adding more language confirming that it was for a new issuance. The PPM continued to offer new shares of stock, identify

19

Morgan Keegan as placement agent, name Meyers and Clark as points of contact, and utilize the false and fraudulent accounting policy. [JA 2203, 2206, 2209, 2218, 2326.]

- October 25: DLA circulates a draft declaring, "Through Morgan Keegan, as exclusive placement agent, we are offering up to $6,000,000 of our Common Stock solely to 'accredited investors.'" It reiterates a *separate* rescission offering will take place and emphasizes that "HAINES WILL TALK TO CALVIN" about including the 2005 audited financial statements. [JA 2506, 2515, 2517, 2578, 2585.]

The final PPM, like every prior draft, sought to raise new capital through issuing new stock. [JA 2620-2711.] The only material difference was it removed Morgan Keegan's name, and IBG primarily distributed the PPM on its own. But removing their name and independently distributing the PPM does not relieve MK Defendants of responsibility for its fraudulent content. The PPM ultimately was distributed to hundreds of individuals. [*E.g.*, JA 2858-63.] The separate rescission offering was issued in December 2006. [JA 2729-2811.]

Furthermore, MK Defendants were not completely excluded from this offering. Meyers and Clark prepared a "Reg D" presentation bearing Morgan Keegan's logo. [JA 1913-42, 1958-84, 2414-16.] A version was used at IBG's October 9, 2006 shareholders meeting. [JA 2417-56.] Days before the meeting, Clark sent Hargrett a "new" financial overview slide representing a net income increase from $130,000 in 2004 to nearly $5 Million in 2005. [JA 2414-16.]

By November 14, 2006, Meyers received six copies of the PPM for distribution to individuals. [JA 2712.] In December 2007, Meyers raised $125,000-

150,000 after Wade Cordell asked whether Meyers was "in a position to help sell [IBG stock] to any 'individuals.'" [JA 2869-3103, 3887-88.] Meyers encouraged them to send the PPM to other interested investors and insisted Morgan Keegan get credit. [JA 3021-73, 3081-90.]

Meyers also participated in a November 2006 call with investor Scott Matula. [JA 546-574 668-72, 833-34.] Matula took contemporaneous notes confirming Meyers validated IBG's representations about its financial status and use of GAAP, discussed IBG's reporting of revenue and receivables, vouched for the accuracy of IBG's financials, and made other false and misleading statements. [JA 550-57, 2720-23.] Matula and his investment group purchased IBG stock relying upon Meyers' representations. [JA 558-60.]

Meyers next spoke at a January 15, 2007 investor presentation led by Wade Cordell featuring a presentation nearly identical to Clark's, including the Morgan Keegan logo and slide showing a steep growth curve. [*Compare* JA 2822-43, *with* JA 2417-56.] Evelyn Berry, Ph.D., IBG's Executive Director of Education/School Districts, and her husband Al, a retired Lexington County school administrator, testified that Meyers spoke at the meeting, touted IBG's financial prospects, and validated information they had already received. [JA 597- 599, 610-15.] Mr. Berry purchased stock for his family because of Meyers' representations and encouraged approximately thirty friends and relatives to invest approximately $2,500,000. [JA 614-17.]

### C.     MK Defendants' continued cover-up of the fraud.

#### 1.     MK Defendants' attempt to secure mezzanine debt financing.

On April 24, 2008, IBG and Morgan Keegan entered into a second formal engagement. MK Defendants agreed to "provide financial advisory services, including general business and financial analysis of the company" and "[c]onduct financial due diligence of [IBG], including but not limited to an examination of financial results and management projections" (2008 Engagement). [JA 3131.] They also would assist with a proposed mezzanine debt offering for which they anticipated earning $135,000. [*Id.*; JA 3463-64.]

For this offering, MK Defendants drafted a marketing letter making patently false representations about IBG's finances, including that IBG was "cash flow break-even." [JA 3136, 3276.] MK Defendants included IBG's fraudulent financials with this letter to prospective investors. [*E.g.*, JA 3139-3220.]

Anticipating objections, Meyers and Hargrett discussed the "main points" about IBG's receivables. One reinforced the lie that IBG recognized revenue "at time of collection which essentially equals cash received." [JA 3226.] They also drafted an "Overview of Accounts Receivable and Revenue Recognition" peddling the fiction that IBG was *required* to recognize anticipated fees as receivables. [JA 3226.] While this "Overview," unlike IBG's financials, correctly stated receivables were an estimate of future fees and did "not include the face amount of the checks," there is

no evidence Meyers sent it. [*Id.*] And it still did not disclose that the estimated receivables were never reduced and IBG's receivables continued to fraudulently increase.

In May 2008, MK Defendants obtained term sheets from Morgan Keegan Strategic Fund[9] and Nancy Creek Capital. [JA 3234-37, 3242-43.] MK Defendants disclosed that IBG planned to write down its receivables. [JA 3238-41, 3246-65.] Hargrett predicted that "for all practical purposes [] it will be all written off." [JA 3238.] Nancy Creek promptly withdrew as a result. [JA 3246-65.] Morgan Keegan Strategic Fund opted to investigate further, retaining Transaction Services to conduct an in-depth review of IBG.

### 2. Meyers actively worked to shield Transaction Services' confirmation of the fraud.

Transaction Services issued a scathing report laying bare the full fraud (all emphasis in the original):

- "Based upon inquiry of Management,[10] the Company has historically attempted to estimate the amount of 'revenue' still remaining in uncollected manual checks that <u>might</u> be collected in future periods….It is our understanding that amounts [sic] were purely a monthly estimate made by Management." [JA 3275.]

- "While the Company <u>could</u> potentially collect some [sic] the amounts in future periods, GAAP requires that contingent fee revenue recognition begin

---

[9] Morgan Keegan Strategic Fund was a Morgan Keegan-affiliated private equity firm separate from the investment banking arm. [JA 958-59.]

[10] "Management" in this context means only Wade Cordell, Brad Cordell, and Hargrett. [JA 3271.]

upon the <u>collection of funds</u> on behalf of customers. Because the Company's fees are contingent, under GAAP, the Company's earnings process is not complete until the Company receives the collections from check writers, or debtors." [*Id.*]

- "Based on our findings, it is our position that **the Company's audited financial statements are materially misstated**, and should not be relied upon." [*Id.*]

- "[T]hese financial statements could have potentially been used to solicit equity investments from common shareholders." [JA 3276.]

- "We addressed this issue with Management, and they acknowledged that the accounts receivable balance was overstated….<u>[Morgan Keegan Strategic Fund] should require that all audited financial statements in the future be performed by an alternative qualified accounting firm</u>." [*Id.*]

- "We were provided an introductory letter from Morgan Keegan & Company, Inc. to [Morgan Keegan Strategic Fund] indicating that 'the Company has managed its business to almost cash flow break-even'. Our analysis obviously refutes this statement. More importantly, our adjustment creates at [sic] significantly larger [gap] to breakeven cash flow, and hence future profitability." [*Id.*]

- "[T]he Company recorded certain 'non-cash' check inventory revenue during the historical period by increasing accounts receivable and increasing revenue through a series of journal entries.[] In short, cash recovery fee collections were not properly netted against accounts receivable, but were recorded as recovery fee income when received." [JA 3288.]

- "Further, based on our proof of cash analysis, it appears that Management's estimate of 'check inventory revenue' was approximately 2x the amount of historical recovery fee income being collected on a monthly basis." [*Id.*]

Meyers, who received the report, agreed that the failure to net cash collections against accounts receivable was "absolutely wrong." [JA 1006-07.]

Rather than disclose those revelations or terminate the relationship, Meyers ghost-wrote two responses to deflect and conceal the report's findings. The first was a memorandum to Morgan Keegan Strategic Fund in Wade Cordell's name regarding IBG's efforts to become cash-flow positive. [JA 3417-41.] It did not specifically reference the report or the fraud. The second was in Hargrett's name purporting to provide a point-by-point rebuttal to the report. [JA 3442-62.] In it, Meyers wrote "we are very impressed with the report" and Transaction Services "absorbed a great quantity of data" in a "very brief time," "presented a very cogent and effective analysis," and assembled "an excellent report." [JA 3459.] He yet again never mentioned or addressed the fraud.

There is no evidence anyone at IBG other than select Management Defendants received the Transaction Services Report, knew of its existence, or received these memoranda. Meyers certainly did not tell anyone else. Even if others saw the memoranda, they could not have learned anything about the fraud.

3.    MK Defendants' continued work after the Transaction Services Report.

Morgan Keegan Strategic Fund was willing to invest after receiving the Transaction Services Report, but only with the receivables write-down and strict criteria to correct the fraud which IBG feared it could not meet. [JA 678-81, 960, 5192-93.] The deal fell through, the receivables write-down was tabled, and MK Defendants resumed assisting with raising capital from individuals using the

25

fraudulent financials. They never again mentioned the Transaction Services Report, its findings, or the write-down.

Five individuals present at IBG's September 2008 National Sales Meeting testified Meyers made and endorsed projections that IBG was growing tremendously, it was well-positioned in the market, its growth rate was 7-11 times EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization), its stock could go up ten-fold, and investors would be able to cash out within twelve to eighteen months when Morgan Keegan brokered either an IPO or a sale to a larger financial institution. [JA 481-83, 518-30, 576-78, 602-07, 634-41.] Many attendees and their families invested as a direct result of Meyers' statements. [JA 528, 607-08, 618, 642.]

IBG also issued promissory notes to individuals to supplement its capital without the onerous covenants Morgan Keegan Strategic Fund required. [JA 678-81.] Meyers thought the promissory notes were a good idea and knew they would be marketed using IBG's fraudulent financials. [JA 681-82.] From 2008 onward, IBG raised $8,195,000 from these promissory notes. [JA 3626-27.]

Promissory note holder Bill Danielson spoke with Meyers in December 2008 at Wade Cordell's suggestion. Meyers gave a history of Morgan Keegan's involvement, disclosed he and another Morgan Keegan employee obtained special permission to personally invest in IBG, expressed confidence in IBG's growth, and

described its exit strategy to sell the company in a year. [JA 576-78.] While Meyers did not speak specifically to the validity of IBG's financials, he generally discussed IBG's well-being and anticipated growth. [JA 593-95.] Danielson personally invested $650,000 as a result. [JA 580-84.]

## II.    IBG Could Not be Saved.

### A.    Removal of Management Defendants.

In August 2009, innocent management discovered the Cordells and Blevins had mismanaged IBG's assets by allowing a deficit to accrue in merchant-accounts owed to customers and using company funds for personal benefit. [JA 485-86, 628, 633, 650-51.] The board immediately solicited a shareholder vote to terminate them. [JA 453, 628-29.] Over two-thirds of IBG's issued and outstanding shares voted in favor.[11] [JA 3503-04.] Hargrett and Sturgill were later terminated once the fraudulent accounting policy came to light. [JA 632.] IBG's innocent management would have acted sooner had they known of the fraud.[12] [JA 461-62, 484, 488-91, 537, 543, 633, 687-88.]

---

[11] The Cordells and Blevins filed a retaliatory lawsuit claiming insufficient shares voted to fire them and seeking to freeze IBG's accounts. [JA 630, 652-53.] The board settled to salvage the company and avoid further waste of corporate assets. [JA 630-31, 687-88.]

[12] The court criticized this testimony as "lack[ing] specificity, even with the benefit of hindsight." [JA 336.] There is no requirement for such specificity. The precise action taken depends on when, how, and to what extent they obtained the information. They all testified they would—and they ultimately did—protect IBG.

On September 11, 2009, the board amended IBG's accounting policies to accurately reflect IBG's true operations by, *inter alia*, no longer recording revenue associated with the future check collection and writing down the receivables balance. [JA 4444-47.] The board directed Hargrett (before his termination) to prepare restated financials for the years 2006-2009 removing fraudulent receivables and revenue (the "Second Restatement"). [*Id.*]

While IBG's innocent management thereafter attempted to right the ship, the damage had been done. IBG filed its petition for bankruptcy on September 1, 2010.

## B.    Damages caused by the fraud.

George DuRant, a South Carolina CPA with over 45 years' experience, was qualified without objection as Trustee's expert on accounting, GAAP, the preparation of financial statements, the conduct of CPAs, and the calculation of damages resulting from the fraud. [JA 734-35.] He opined that IBG's losses should be measured as the cumulative total of its net operating losses from the date MK Defendants knew of or became involved with the fraud through the petition date.[13] [JA 770, 774-76.] These damages would make IBG whole. [JA 773.] MK Defendants did not offer a competing methodology.

---

[13] DuRant originally considered IBG's increased debt as well. Trustee's securities expert Professor John Freeman testified IBG's equity capital represents a legal liability to the company. DuRant therefore concluded his increased debt calculation would not make IBG whole. [JA 772-73, 786.]

Net operating losses are the difference between total revenues and expenses. [JA 774-75.] DuRant relied on the Second Restatement to calculate losses in fiscal years 2006-2009, and a separate statement dated July 31, 2010, to determine the remaining net operating loss. [JA 776.] He did not rely on the First Restatement or Grafton's "audited" financials. The Second Restatement was reliable evidence because the fraud was limited to receivables and revenue, IBG otherwise had "good books," and DuRant "wish[ed] every bankrupt debtor had this type of record." [JA 776-81, 791-92; *see also* JA 585-587 (Danielson's testimony identifying no other material errors in IBG's records).] The 2010 statement was prepared under the direction of IBG's board following the management ouster and likewise is reliable. [JA 781.]

DuRant used three alternative start dates: (1) March 29, 2006, when MK Defendants first deployed the fraudulent policy in the CIM; (2) July 27, 2006, when Meyers outlined the fraudulent policy to Sturgill; and (3) July 2, 2008, the date of the Transaction Services Report. [JA 769-772.] The total net operating losses are $24,370,225 beginning March 29, 2006, and $23,010,640 beginning July 27, 2006. [JA 782-84.] These track the fraudulent receivables written off in 2010 [JA 785] and the fraudulent capital raised from many of IBG's creditors under the PPM and via promissory notes [JA 3626-27, 3693]. Losses for the period beginning July 2, 2008, are $11,855,103 using DuRant's methodology. [*See* JA 782-84, 3872.]

### III. The Bankruptcy Court's Order.

The Bankruptcy Court found for MK Defendants on all causes of action, their *in pari delicto* defense, causation of damages, and reliability of Trustee's damages evidence. [*See generally* JA 213-348.] The damages findings applied across the board, and the court also found against Trustee on certain elements specific to his claims. The court ruled against Trustee only on knowing participation for aiding and abetting.[14] [JA 342.] The court found MK Defendants did not owe or breach fiduciary duties to IBG.[15] [JA 342-44.] For common law fraud and securities fraud, the court found no reliance "due to the imputation of knowledge of the Accounting Practice, including its impropriety, to Debtor."[16] [JA 342.]

---

[14] Nevada law governs the aiding and abetting breach of fiduciary duty claim. *Anderson v. Cordell (In re Infinity Bus. Grp., Inc.)*, 497 B.R. 794, 804 (Bankr. D.S.C. 2013). It requires proof of: (1) a fiduciary relationship, (2) which the fiduciary breached, (3) the third party's knowing participated in the breach, and (4) damages resulted from the breach. *In re Amerco Derivative Litig.,* 252 P.3d 681, 702 (Nev. 2011).

[15] South Carolina law governs this claim. *Infinity Bus. Grp.*, 497 B.R. at 804. Breach of fiduciary duty requires proof that a duty exists, the duty was breached, and damages resulted. *RPT Mgmt. Co. v. Tinsley & Adams, LLP*, 732 S.E.2d 166, 173 (S.C. 2012).

[16] South Carolina law governs the common law fraud claim as well. *Infinity Bus. Grp.*, 497 B.R. at 804. It requires proof by clear and convincing evidence of: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely; and (9) the hearer's consequent and proximate injury. *Moseley v. All Things Possible, Inc.,* 694 S.E.2d 43, 45 (S.C. Ct. App. 2010). Fraud includes concealing material facts one has a duty to disclose. *Holly Hill Lumber Co. v. McCoy,* 23 S.E.2d 372, 376 (S.C. 1942). Trustee's Rule 10b-5 claim

Trustee appealed to the District Court. The District Court affirmed the Bankruptcy Court in full and dismissed Trustee's appeal without holding oral argument or making the required findings under Bankruptcy Rule 8019 to decide the appeal without argument. [*See generally* JA 379-449.]

## SUMMARY OF ARGUMENT

This appeal involves the fundamental factfinding processes of a trial court sitting without a jury, novel questions of state law, and actual damages exceeding $24,000,000, before interest, resulting from an undisputedly fraudulent accounting policy implemented with MK Defendants' knowledge and support. The Bankruptcy Court's order leaves IBG's innocent creditors with losses from a fraud they knew nothing about, while excusing MK Defendants because they worked collaboratively with a few corporate insiders.

The court took a blinkered view of the record by unquestioningly adopting MK Defendants' litigation-spun trial testimony and ignoring or dismissing the substantial evidence directly refuting it. This evidence notably includes contemporaneous documents, many of which were received or authored by MK Defendants. The court did not engage in a "he said, she said" resolution of factual

---

asserts "scheme liability." The elements of scheme liability are: (1) a deceptive or manipulative act in furtherance of a scheme; (2) scienter; (3) a connection between the acts and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015).

disputes; rather, it ignored or dismissed voluminous and irrefutable evidence contradicting MK Defendants' after-the-fact narrative. This flawed fact-finding process touched nearly every aspect of the Bankruptcy Court's order, from liability under each cause of action, to damages, and to the *in pari delicto* defense. The resulting critical factual findings therefore are clearly erroneous.

The court's order also suffered from multiple legal errors. It applied the wrong standards when finding a fiduciary duty and duty to disclose did not exist. The court failed to correctly anticipate South Carolina and Nevada would exempt breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims from *in pari delicto*. The court also misapplied the collusion and adverse interest exceptions to that defense. It then failed to recognize *in pari delicto* simply is inapplicable to a bankruptcy trustee protecting the rights of creditors. And finally, the court misapplied the law on causation by segregating the integrated questions of proximate cause, foreseeability, and intervening cause, and by improperly focusing on Management Defendants' culpability rather than whether MK Defendants were a contributing cause.

IBG petitioned for bankruptcy 11 years ago, Trustee filed this action nine years ago, and the 18-day trial was over three years ago. The evidence yields only one conclusion which can be sustained under this Court's standard of review: MK Defendants are jointly and severally liable for IBG's net operating losses. In the

interest of judicial economy given the passage of time and the abundance of evidence, this Court should reverse and remand for entry of judgment in favor of Trustee.

## STANDARD OF REVIEW

This appeal presents questions of law and fact. Questions of law are reviewed *de novo*; questions of fact are reviewed under the clearly erroneous standard. *Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496, 499 (4th Cir. 1992).

"Clearly erroneous" does not mean factual findings are "so sacrosanct as to evade review." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 379 (4th Cir. 1995); *see also Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019) ("But while clear error is deferential, it is not toothless."). A factual finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co*., 333 U.S. 364, 395 (1948). A reviewing court should channel its review "upon factfinding processes rather than directly upon fact-finding results." *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983). Accordingly, Trustee may "assault the citadel" of adverse factual findings "by demonstrating pitfalls in the avenue by which the [trial] court arrived at" them. *Jiminez*, 57 F.3d at 379.

A trial court may go awry in arriving at factual findings by: (1) making factual determinations not supported by substantial evidence; (2) disregarding substantial evidence militating a contrary conclusion; (3) reaching conclusions contrary to the clear weight of the evidence considering the entire record; and (4) misunderstanding testimony. *See Jiminez*, 57 F.3d at 382; *Miller*, 720 F.2d at 361. A trial judge cannot "'insulate his findings from review' by casting them as being grounded on credibility determinations." *Jiminez*, 57 F.3d at 379 (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985)).

This standard applies to the Bankruptcy Court's order which this Court reviews directly, and not to the District Court's order which is reviewed *de novo*. *U.S. Tr. v. Bane (In re Bane)*, 565 Fed. Appx. 246, 250 (4th Cir. 2014); *Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 324 (4th Cir. 2008) *Coleman v. Cmty. Tr. Bank (In re Coleman)*, 426 F.3d 719, 724 (4th Cir. 2005).

## ARGUMENT

## I. Trustee Preserved His Arguments that MK Defendants Sought, Induced, and Accepted IBG's Trust and Confidence and that IBG Had No Notice of the Fraud.

The District Court determined Trustee failed to present evidence demonstrating MK Defendants sought, induced, and accepted IBG's trust and confidence, and that IBG had no notice of the fraud, and concluded Trustee therefore abandoned or waived those arguments on appeal. [JA 418, 435.] This was an error

34

of law, even assuming this issue is relevant under this Court's *de novo* review of the District Court's order.

Trustee's opening brief to the District Court contained a section titled "*The MK Defendants had a close, intimate, and familiar relationship with IBG and it owed a duty of good faith, fair dealings, and trustworthiness*" detailing supporting evidence with record citations. [JA 356-63.] When MK Defendants argued Trustee cited no supporting evidence, Trustee directed the District Court to this section of his brief. [JA 378.] Trustee also provided an in-depth discussion of facts demonstrating MK Defendants never disclosed the fraud, specifically argued the Bankruptcy Court's findings regarding IBG's knowledge of the fraud were clearly erroneous, and included specific introductory headings and captions. [JA 356-69, 371, 374.]

The District Court therefore erred in finding Trustee waived or abandoned these arguments.

## II. The Bankruptcy Court's Factual Findings Were Clearly Erroneous Because They Ignored Substantial Contrary Evidence and Resulted from an Inconsistent Evidentiary Standard.

The Bankruptcy Court's fact-finding process went awry in two respects. First, the court disregarded substantial contrary evidence submitted by Trustee.[17] As

---

[17] Trustee argued below that the court erred in part by limiting its review to only evidence cited in the page-limited proposed orders even after inviting the parties to request additional pages [JA 211-12], denying Trustee's request for additional pages [JA 349-54], denying Trustee ever requested additional pages [JA 286], and from that false foundation, concluding the proposed orders necessarily

detailed below, this was driven largely by its persistent reliance on Meyers and Clark's trial testimony—ignoring contrary contemporaneous documentary evidence, including Meyers and Clark's own writings. *See Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001) ("Because documentary or physical evidence is created at the time of conception or reduction to practice, the risk of litigation-inspired fabrication or exaggeration is eliminated.").

Second, the court imposed a double standard. It dismissed testimony offered by Trustee if it was uncorroborated by documents but adopted MK Defendants' testimony on the same issue without corroboration.[18] The court otherwise adopted without question Meyers' unsupported testimony.[19] Where Trustee had supporting documents,

---

presented all supporting evidence [*id.*]. Here, Trustee asserts the more general argument raised to the District Court that the Bankruptcy Court did not consider substantial evidence regardless of the reason why.

[18] *Compare* JA 238 (asserting there is no documentary evidence that Vice President of Electronic Processing Bill Van Hoeven discussed concerns about Clark's check collection rate) and *id.* at JA 320 ("[T]here was no documentary evidence presented showing that any member of management or the Board expressed issues or concerns with Clark's methodology."), *with* JA 237 (accepting MK Defendants' contention that "it does not appear any party expressed concerns with [Clark's] methodology"); *compare* JA 252 (claiming there was no corroborating evidence of the Berrys' recollection of Meyers' presentation at the January 2007 meeting), *with id.* (accepting Meyers' oral testimony that "contradicts that of the Berrys" on this issue).

[19] *E.g.*, JA 233 (adopting Meyers' uncorroborated claim of a conversation with Sturgill about IBG's accounting policy); JA 247 (adopting Meyers' testimony that the 2006 Engagement ended in 2006, which no other witness supported and documentary evidence contradicted); JA 247 (discussing Meyers' uncorroborated "exit interview").

the court dismissed or ignored them.[20] And at times, the court avoided contradicting MK Defendants by refusing to find facts if a dispute existed. [*E.g.*, JA 271.]

These process errors contaminated each critical issue. The court did not weigh conflicting evidence. It instead disregarded the substantial evidence compelling a contrary conclusion, resulting in findings that are contrary to the clear weight of the evidence and not supported by substantial evidence. These findings therefore were clearly erroneous. Considering the whole record, the only findings supported by substantial evidence are the exact opposite of the Bankruptcy Court's.

### A.    MK Defendants had an extended advisory relationship.

The Bankruptcy Court found "the parties' relationship is defined only" by the 2006 and 2008 Engagements. [JA 343.] It therefore decided MK Defendants served only as IBG's placement agent in 2006 [JA 229], Meyers terminated the 2006 Engagement on October 31, 2006 [JA 274], MK Defendants had "little involvement" with IBG from that point until the 2008 Engagement [JA 252], MK Defendants served as a financial advisor only "with respect to a possible

---

[20] For example, the court ignored Matula and his contemporaneous notes of the November 2006 call with Meyers during which Meyers made repeated assertions about IBG's finances and investment prospects. [JA 2720-23; *see also* JA 550-57.] The court similarly disregarded the "only documentary evidence of Meyers' statements at the [September 2008] sales meeting" and ignored the corroborating testimony of five witnesses present at the meeting, while summarily adopting Meyers' contrary version. [JA 271.]

mezzanine debt financing" under the 2008 Engagement [JA 258], and there is no evidence MK Defendants worked for IBG after the 2008 Engagement expired [JA 273].

MK Defendants remain liable for their actions during those engagements even if their relationship was as narrow as the court found; nevertheless, those findings are clearly erroneous and directly contradicted by the record.

### MK Defendants served as
### IBG's financial advisor in 2006

The court disregarded the evidence proving MK Defendants served as more than just IBG's placement agent in 2006. Meyers told IBG to list Morgan Keegan "as its financial advisor *and* to evaluate capital raising alternatives" on its website [JA 1834-37] (emphasis added)], pitched that he and Morgan Keegan would be IBG's "ideal long-term advisor" [JA 1076-77], and promised to review IBG's revenue recognition policy, planning and budgeting processes, and projected performance [JA 646-47].

### MK Defendants continued working
### for IBG after October 31, 2006

Meyers' testimony that he terminated the 2006 Engagement on October 31, 2006 [*e.g.*, JA 908] was contradicted by contemporaneous documentary evidence

the court disregarded which shows his relationship with IBG continued well after that date[21]:

- <u>November 15, 2006</u>: Meyers handwrote that "MK is"—not *was*—"engaged to raise Private Equity capital" for IBG. [JA 2715.]

- <u>November 20</u>: Meyers spoke on the Matula call about investing in IBG. [JA 549-56, 2720-23.]

- <u>December 6</u>: Meyers confirmed to his boss that the IBG deal would close or terminate the following summer. [JA 2724-26.]

- <u>December 18</u>: Meyers passed along news of a similar deal to IBG, predicting there are "[l]ot's [sic] of opportunity [sic] for you guys in the near terms [sic]." [JA 2727-28.]

- <u>January 15, 2007</u>: Meyers met with IBG's leadership. [JA 2853-55.]

- <u>January 25</u>: Meyers told a private equity group "*we* were concentrating on growing the business and implementing the many banks that had been and continue to sign with *us*" and "*we* will likely re-evaluate the Company's investment needs in the latter half of the year." He told IBG, "As the company continues to have successes, we should feed them to the select firms that we might want to partner with in the future." [JA 2856-57 (emphasis added).]

---

[21] The court referenced only three examples of post-2006 Engagement contact. [JA 248 (November 2006 email between Meyers and Hargrett about hiring new auditors); JA 252 (Meyers' January 15, 2007 presentation to shareholders); JA 256 (contact with potential individual investors at Wade Cordell's request in December 2007).] The court overlooked the conflict between this evidence and Meyers' testimony.

### MK Defendants were
### IBG's general financial advisor in 2008

The Bankruptcy Court disregarded the plain language of the 2008 Engagement in finding MK Defendants' role was limited to serving as IBG's financial advisor only "with respect to a possible mezzanine debt financing." [JA 258.] This contract expressly provided that IBG retained Morgan Keegan to "(i) provide financial advisory services, *including general business and financial analysis of the company*, and (ii) provide advisory services concerning the raising of necessary mezzanine debt" and to "[c]onduct financial due diligence of [IBG], including but not limited to an examination of financial results and management projections." [JA 3131 (emphasis added).]

### MK Defendants continued working
### for IBG after the 2008 Engagement

The 2008 Engagement expired on October 24, 2008. [JA 3133]. Nevertheless, the Bankruptcy Court disregarded the evidence that Regions Financial—Morgan Keegan's parent—recognized in April 2009 that IBG "ha[s] a relationship with Morgan Keegan" [JA 3499-3504], and Meyers continued to search for IBG investors as late as November 2009 [*e.g.*, JA 3584-88].

### B.     MK Defendants knew of the fraud.

The Bankruptcy Court found IBG always knew the policy was fraudulent, whereas MK Defendants did not learn of the fraud until the Transaction Services Report. [JA 296-97, 321-27, 335-36.] Both were clearly erroneous.

First, MK Defendants necessarily knew of the fraud under the standard the court applied to IBG. The court determined IBG knew the policy was fraudulent because Meyers and Morgan Keegan's law firm said it was "aggressive," and Meyers and Hargrett recommended changing it.[22] [JA 335.] MK Defendants—who said the policy was "aggressive" and recommended changing it—also knew it was fraudulent.

Second, the court ignored substantial evidence demonstrating MK Defendants actually knew the policy was fraudulent before the Transaction Services Report: revenue recognition is one of the most fundamental, basic accounting concepts [JA 738], Meyers admitted the importance of his accounting knowledge and ability to spot errors in financial statements better than "top-notch" audit firms [JA 976-81], both parties' experts agreed Meyers was aware of GAAP's revenue recognition rules

---

[22] The Court also found that Management Defendants' authority to set IBG's accounting policies meant they knew it was fraudulent. [JA 295-96.] Knowledge of the policy and knowledge it is fraudulent are very different things for a company like IBG which, unlike MK Defendants, lacked the expertise to evaluate GAAP-compliance. Furthermore, the court did not identify any advice IBG "chose to ignore" from its outside counsel and Ernst & Young. [JA 335; *see also* JA 1420-22, 3974-75.]

[JA 738-39, 804], and Meyers believed the policy was "aggressive" because it violated these rules [JA 916].

The Bankruptcy Court's excuses for MK Defendants similarly do not withstand scrutiny:

- The court emphasized the 2006 Engagement allowed MK Defendants to accept IBG's financial information without verification. [JA 229, 290, 338.] Meyers and Clark conceded they nevertheless performed their own due diligence. [JA 875, 922-24.] Moreover, the 2008 Engagement obligated MK Defendants to conduct due diligence and examine results and projections. [JA 3131.] Both parties' experts agreed MK Defendants could not contract away their legal obligation to verify data. [JA 691-97, 725-27. *But see* JA 996-1000 (MK Defendants' expert attempting to deny he said this).] The court disregarded this evidence.

- The court accepted Meyers' testimony that he relied upon Sturgill, Hargrett, and Grafton's assurances that the policy complied with GAAP. [JA 318.] The court disregarded evidence showing blind reliance is insufficient. [JA 692.] Neither did the court consider whether these individuals, particularly Sturgill and Grafton, were entitled to deference. Meyers knew Sturgill failed the CPA exam six times and lied about it.[23] [JA 2591-2617.] Meyers also knew Sturgill's alleged explanation for the increase in receivables was false. *See* discussion *supra* pp. 12, 15. Grafton's work product was riddled with misspellings, obvious grammatical mistakes, and gross mathematical errors. [JA 703-09, 3724-30.] He also delayed the alleged 2005 "audit" and improperly issued a back-dated audit opinion for the First Restatement. [JA 710-11, 1502-05, 3733.]

- The court accepted Meyers' claim that he believed IBG used the effective yield method. [JA 321-22.] But the court never compared it to IBG's policy. Under the "never accurate" effective yield method, both face value and fees are recorded as receivables along with *deferred* revenue, and actual revenue is recognized later. [JA 917-18, 1417-19,

---

[23] The court referenced this report in other contexts, but it never addressed whether Meyers could blindly trust Sturgill after it came out.

1789-90.] IBG, in contrast, recognized receivables and non-deferred revenue simply as an estimate of total expected fees before they were earned. [JA 1408.] Meyers knew effective yield had nothing to do with IBG's accounting.

- The court found IBG considered writing down receivables to "fix" the issue, which placated Meyers. [JA 319, 323.] IBG never did so during Morgan Keegan's involvement, yet Meyers continued working for it.

Considering the whole record, as the court was required to do, leads to the inescapable conclusion that MK Defendants knew the accounting policy was fraudulent from its inception. The Transaction Services Report merely confirmed what Meyers already knew. Unsurprised, Meyers carried on with business as usual, helping conceal the report's findings rather than withdrawing from the engagement or demanding that IBG change its "absolutely wrong" practices.

Notably, the court never found that anyone at IBG knew the policy was fraudulent before the Transaction Services Report. The court merely found certain members of IBG's management "had knowledge…that there were potential issues with its audited financials." [JA 335.] Undefined "potential issues" are not the same as fraud.

Neither does the evidence otherwise support a finding that IBG knew. Hargrett recommended IBG consider a new policy only because it would "serve the company better" and not because the existing policy was fraudulent. [JA 4912.] IBG's January 8, 2007 board meeting was not "a clear instance of issues related to

43

the Accounting Practice being raised to the Board, thus placing all Board members on notice of the Accounting Practice, and that the Board approved the continued use of the Accounting Practice," as the court found. [JA 250.] The board discussed changing the policy, voted to keep using it, and voted to continue using Grafton. [JA 4168.] But the board was not told the policy violated GAAP and was misleading. [JA 478-79, 673-75, 811-13, 836-38, 4912.] This meeting therefore provides no evidence that anyone on the board consented to the policy despite knowing it was fraudulent.

Sturgill and Hargrett, and perhaps other Management Defendants, received the Transaction Services Report along with Meyers. [JA 1008.] The court failed to recognize that no one else at IBG received the report, and it inexplicably disregarded Meyers' ghost-written responses that prevented others from learning of the report and its damning findings. [JA 3417-62.] The suggestion that anyone at IBG other than Management Defendants knew the policy was fraudulent after the report is clearly erroneous.

## C.    MK Defendants participated in the fraud.

MK Defendants are liable so long as they knowingly participated in the fraud with Management Defendants[24] or recklessly disregarded it.[25] Even assuming *arguendo* Sturgill conceived the policy and Management Defendants breached their duties to IBG concerning it, MK Defendants cannot facilitate or blindly ignore wrongdoing. The Bankruptcy Court found MK Defendants did not knowingly participate in these breaches "for similar reasons that have already been discussed." [JA 342.] The foundation for this conclusion is rooted in the court's systemic failure to consider contrary, largely contemporaneous, evidence.

### Meyers knew Sturgill's explanation
### for the accounting change was incorrect

The Bankruptcy Court emphasized Meyers' uncorroborated testimony that he questioned Sturgill about the jump in receivables. [JA 233.] As repeatedly noted, the court disregarded evidence proving Meyers knew Sturgill's alleged explanation was

---

[24] Nevada adopted the Delaware standard for aiding and abetting. *In re Amerco,* 252 P.3d at 702 (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)). Knowing participation can be shown by proving the third party "attempted to create or exploit conflicts of interest in the board or conspired in or agreed to the fiduciary breach." *Encite LLC v. Soni*, No. 2476-VCG, 2011 WL 5920896, at *26 (Del. Ch. Nov. 28, 2011) (cleaned up). A third party can aid and abet a breach committed by unsuspecting and innocent directors by "creating an informational vacuum" and "informational gaps" that lead to the breach. *In re Rural Metro Corp.*, 88 A.3d 54, 97, 99 (Del. Ch. 2014.).

[25] MK Defendants owed IBG a duty of due diligence to undercover and disclose any accounting issues. [JA 691-702; *see also* discussion *infra* at pp. 59-62.]

false. [JA 914-15, 1230-32.] Meyers' trial testimony therefore shows he continued to implement a policy he knew was a lie.

### MK Defendants manufactured
### the misleading supporting check collection rate

The Bankruptcy Court acknowledged Clark's work generating a collection rate to support the fraudulent policy. [JA 237-39.]. The court also noted in passing that Bison told Meyers the collection rate was wrong. [JA 239-240 (referencing Trustee Exs. 240 [JA 1511-12] and 402 [JA 1953-57]).] But the court failed to find that the rate itself constituted fraud.

The court disregarded Meyers' statement that the rate discrepancy "is likely my error and I would like to correct it." [JA 1511.] It failed to consider the variability of IBG's collection rate and how Clark created his rate by self-selecting an admittedly unrepresentative sample of checks less than 60 days old. [JA 463-64, 466-67, 469-70, 474-75, 869, 883, 1508.] The court similarly disregarded the other evidence confirming the falsity of Clark's 82.6% rate. [JA 466-67, 470-71, 1517-25, 1943-52.] Nor did the court recognize that MK Defendants never changed the collection rate central to the policy despite knowing it was misleading.

## MK Defendants did not disclose
## the policy change in the CIM

The Bankruptcy Court acknowledged the CIM—the very first document which publicly deployed the fraudulent policy—but ignored MK Defendants' role in creating it and its attendant failure to disclose the policy. [JA 235-36.]

The CIM was MK Defendants' document; "they owned it." [JA 750-51.] Meyers sent the first draft to IBG on March 5, 2006, and MK Defendants made substantial edits thereafter before circulating the final March 29 draft employing the fraudulent accounting policy. [JA 1104-1229, 1233-43, 1280-1353.] The CIM did not disclose the policy had changed, which Clark agreed was misleading, and did not accurately describe its method of calculating receivables. [JA 751-55, 876-78.] When asked about the quality of the CIM's disclosures, DuRant testified that "[t]hey're totally misleading, inadequate, false; how many descriptions should I -- ?" [JA 756.] MK Defendants never challenged this opinion.

## MK Defendants knew of and assisted
## the fraudulent First Restatement

It was undisputed the First Restatement was fraudulent and its purpose was to mislead. [JA 765.] The Bankruptcy Court generically discussed it but did not examine MK Defendants' involvement. [JA 239, 241-42.] Citing no evidence,

the court concluded Meyers did not "direct[]" IBG to restate its financials.[26] [JA 239.]

The court disregarded evidence proving that, even if MK Defendants did not direct the First Restatement, they knew of and were involved with it and knew the fraudulently restated financials were sent to prospective investors. [JA 1759-81, 1794-1833, 1890, 1893-1912.] The court categorically adopted Meyers' claim that Sturgill explained the increase without considering the contemporaneous evidence proving Meyers knew the explanation was impossible. [*Compare* JA 242, *with* JA 1230-32.] The court also ignored the backdated audit opinion and non-disclosure of a policy change.

Contrary to the court's findings, MK Defendants knew of the change, knew it was not disclosed, and knew Sturgill's explanation was false. Yet they never raised a concern to IBG.

### MK Defendants assisted with drafting the fraudulent PPM

The 2006 PPM was indisputably fraudulent. The court skirted the question of whether MK Defendants drafted this fraudulent document soliciting individual

---

[26] The court also found it "unlikely that Meyers or Clark would knowingly participate in a deception involving the Accounting Practice conveyed to the parent company of their employer." [JA 239.] An entire body of law exists because investment bankers, financial advisors, and other similar professionals often abandon the interests of their employer for their personal gain.

investment by adopting Meyers and Clark's testimony that they instead worked on a rescission offering. [JA 245.] This was clear error.

The court cited one document which it claimed supported Meyers' belief that the rescission offer would be "part of" the offer for new shares. [JA 245.] However, Meyers did not testify the rescission offer would be "part of" the PPM. He pointedly testified the document he drafted would be used for "no other purpose" than a rescission. [JA 948.] Furthermore, in that document IBG's outside counsel stated IBG asked her—not MK Defendants—to draft proposed rescission terms. [JA 4751.]

More fundamentally, the court ignored an insurmountable mound of documentary evidence and admissions confirming MK Defendants knew they were drafting a PPM to raise new money from individuals. [JA 1526, 1532-34, 1539-1758, 1844-59, 1985-2078, 2087-2129, 2202-2413, 2488-2590.] The drafts received and edited by MK Defendants and their counsel, and into which MK Defendants inserted the fraudulent financials, sought to raise up to $6,000,000 selling new stock to individuals, and all but the first and final drafts listed Morgan Keegan, Meyers, and Clark as the placement agents. [JA 1546-1758, 2202-2413, 2488-2590.] Meyers expressly understood the document would "entice investors to come on-board" and jokingly asked his boss to invest "the full $6,000,000." [JA 1543-45.] His preposterous claim at trial that he had no indication IBG was even contemplating a common stock offering was pure fabrication. [JA 885.]

The court's finding here epitomizes its erroneous approach to the facts. Meyers' testimony can be accepted only by disregarding a mountain of contemporaneous evidence conclusively disproving it.

### The disclosures supported by MK Defendants were false and misleading

Incredibly, the Bankruptcy Court found IBG's financial statements disclosed the true accounting policy. [JA 296-97.] This is patently incorrect; their falsity was not even disputed.

The notes described three components of accounts receivable: (1) the face amount of guaranteed checks IBG was "entitled" to receive, (2) fees from "actively collecting" guaranteed checks to which IBG also was "entitled," and (3) and fees from collecting non-guaranteed checks to which IBG "by contract is entitled." [JA 3783, 3750, 3764, 3780, 3797.] Meyers confirmed this was *not* how accounts receivable were calculated—the balance was just an estimate of all fees with no evidence IBG was "entitled" to them. [JA 759-60,  1408.] Even if Sturgill were correct that a new policy was needed to capture fees from hard collections, which he was not, Meyers knew the notes still failed to disclose it.

The court also found that Meyers and Clark made only stylistic and grammatical changes to the notes. [JA 241.] The court disregarded the evidence confirming Meyers and Clark reviewed and edited the financial statements and accompanying notes, Meyers proposed disclosure language for the fraudulent

accounting policy, and Meyers worked with Sturgill on the accounts receivable policy. [JA 1253-1259, 1265-71, 1417-19, 1506-07, 1792-93, 1838-43.]

In sum, the evidence the court disregarded proves MK Defendants knew the correct policy, knew the notes did not disclose it, offered sample language which did not disclose it, had an opportunity to edit the disclosures, and did not suggest changes to accurately state the receivables policy.

### Meyers met with individual investors

The court found Meyers had a "practice" of speaking only with institutional investors and not individuals. [*E.g.*, JA 252, 273.] However, the court largely ignored Meyers' repeated contact with individual investors contradicting his claimed practice.

 Meyers and Clark drafted and updated the "Reg D" presentation given at IBG's October 2006 shareholder's meeting falsely showing net income increasing from $130,000 in 2004 to nearly $5 Million in 2005.[27] [JA 1913-42, 958-84, 2164-2201, 2414-56.] The court ignored Meyers' November 2006 call with Scott Matula whose contemporaneous notes show Meyers confirmed IBG's use of GAAP to report revenue and receivables and vouched for the accuracy of IBG's "audited"

---

[27] The court referenced this presentation only to note Meyers instructed IBG to remove Morgan Keegan's name. [JA 249.] Removing the name does not absolve MK Defendants of liability for its content. Via an ellipsis, the court also omitted Wade Cordell's statement on March 20, 2007, that "we do have a 'relationship' with Keith Meyers and will continue this relationship down the road." [JA 4047.]

financials. [JA 619-26, 2720-23.] Meyers does not deny he was on the call; he simply "could not remember" it. [JA 669-70.]

The court dismissed the evidence that Meyers touted IBG's prospects and validated its financial information at the January 15, 2007 investor meeting. [JA 597-99, 610-15.] Meyers had already traveled to South Carolina to meet with IBG's leadership that same day. [JA 2853-55.] When pressed, Meyers could not deny under oath speaking at the meeting and said only he does not remember being there. [JA 1003-05.] The Bankruptcy Court nonetheless dismissed Dr. and Mr. Berry's testimony that Meyers spoke, solely because it was "uncorroborated" and conflicted with Meyers' disproven "general practice" testimony. [JA 252.]

The court correctly found Meyers distributed the PPM to potential individual investors. [JA 255-56.] But it left out that Meyers encouraged these individuals to send the PPM to others and insisted Morgan Keegan get credit [JA 3021-73, 3081-90], and it never addressed the conflict with Meyers' "general practice" testimony.

Meyers admitted he spoke at the September 2008 National Sales Meeting. [JA 1010-11.] The issue was whether he made statements recalled by five witnesses that IBG was growing tremendously, it was well-positioned in the market, its growth rate was 7-11 times EBITDA, its stock could increase ten-fold, and investors would be able to cash out within twelve to eighteen months when IBG either went public or

was sold to a larger firm. [JA 481-83, 518-530, 538-42, 602-07, 634-41.] Meyers provided similar information, including the EBITDA over-valuation, on other occasions. [JA 1012-13.] But he denied making those statements at *this* meeting. [JA 1010-11.]

The Bankruptcy Court ducked this dispute because the evidence was contradictory. [JA 270-71.] This in and of itself was error. Furthermore, the clear weight of the evidence confirms Meyers made these statements—he was present at the meeting, made other similar statements in the past, and had a record of making such projections to individual investors.[28]

Finally, Meyers did not dispute that he spoke with promissory note holder Bill Danielson in December 2008. [JA 596.] As with the National Sales Meeting, the Bankruptcy Court made no finding regarding this call. The court simply noted Meyers' "general practice" testimony and moved on. [JA 273.] Again, this was error, and the clear weight of the evidence proves Meyers made those statements to this individual investor.

---

[28] The court disregarded a contemporaneous email from Brad Cordell to his father-in-law similarly recounting Meyers' statements [JA 3470-74] as being "of questionable credibility" because Brad Cordell "appeared to suggest" that he made it up. [JA 271.] Brad Cordell testified by deposition that "[t]his could be something that I made – I don't know. I don't – I don't recall," and then clarified that he does not generally make things up when communicating with his father-in-law, generally tells him the truth, and has no reason to lie to him. [JA 3883-84.] Notwithstanding this testimony, and citing no supporting evidence, the court found Brad Cordell "had a propensity to exaggerate, if not lie, when soliciting investment from potential investors." [JA 271.]

## That MK Defendants received
## no fee is irrelevant

The court emphasized that MK Defendants ultimately were not paid for their work.[29] [*See* JA 330.] This is of no moment:

> Humans do not always achieve the ends we seek. Failure does not imply that we did not pursue the means. Elite athletes spend years training and sacrificing for a chance at an Olympic medal. To not qualify at the trials, or to fall short of the podium, does not negate the pursuit.

*In re Rural Metro*, 88 A.3d at 100. MK Defendants are not excused because the fraud was discovered and IBG imploded before their anticipated payday.

### D.    MK Defendants concealed the fraud.

The Bankruptcy Court found MK Defendants did not conceal the fraud and instead were open with IBG's management and potential investors. [JA 319-20, 323, 326, 344.] This was clearly erroneous.

The court ignored Professor Freeman's uncontradicted testimony that MK Defendants, as IBG's financial advisor and placement agent, were required to employ "a searching eye" to review facts, not turn away from "challenging facts," verify that what is being done is proper and within professional standards, address any identified problems, and "not be satisfied with glib answers."[30] [JA 691-93.]

---

[29] Meyers nevertheless became part of IBG's inner circle. IBG wined and dined him, including multiple alcohol-fueled "male bonding" trips to Platinum Plus, a Columbia-based strip club. [JA 676-77, 815.]

[30] The court incorrectly recalled that it took Professor Freeman's qualifications under advisement. [JA 218.] The court readily qualified Professor

They were responsible for disclosing, addressing, and resolving any "red flags" or problems during the capital raising process. [JA 699-702.] "You're not just winking and nodding at management or saying, you know, this company's got an auditor, we don't have to worry about financials because, after all, it's the auditor's financials." [JA 692.] Nor did the court cite testimony from defense expert Howard Zandman that MK Defendants could not just report fraud to the fraudsters—"you can't bring the chickens to the fox." [JA 802-03.]

When viewed properly, the court's repeated finding that Meyers was "open" with IBG is clearly erroneous. The only alleged instances of "openness" were conversations with Sturgill, Hargrett, and Wade Cordell.[31] [JA 247, 323, 335, 946-47.] Disclosure to them is facially inadequate given their roles in the fraud. Moreover, Meyers never disclosed the policy was fraudulent. He merely said the policy was "aggressive" and the company should consider a change, but he did not actively take a position. [JA 916-17, 971, 4917.] As the court recognized, characterizing the policy as aggressive "did not identify it as improper" even if

---

Freeman—the foremost expert on these matters in South Carolina. [JA 690.] This is in stark contrast to MK Defendants' counter-expert, Scott Ilario, regarding whom the Bankruptcy Court expressed deep reservations and whose testimony it took under advisement. [JA 991-93.]

[31] The court sometimes used the term "management" to refer to some or all Management Defendants, as it did here. [*E.g.*, JA 225, 235, 247.] Other times, the court used the term to refer generally to IBG's entire management. [*E.g.*, JA 227, 274.] Any reference to "management" should be viewed in context.

Meyers otherwise knew of its impropriety. [JA 322.] And when Meyers was confronted with the Transaction Services Report, he ghost-wrote responses ignoring the fraud and continued with business as usual. [JA 3417-62.]

Disclosure to a third party did not satisfy MK Defendants' obligations to IBG. The court's finding of openness with institutional investors nevertheless is clearly erroneous. Meyers did not tell them IBG's policy was fraudulent. He instead expected them to find any problems on their own. [JA 984-95.] And while he provided them more information than he provided IBG's innocent management [*e.g.*, JA 1368, 1377], he still hid the ball. For example, the court referenced a 2008 explanatory letter describing IBG's planned receivables write-down. [JA 324.] There is no evidence Meyers sent it to potential investors. The letter also made gross misstatements. Meyers falsely represented that "accounting requirements of matching revenue and expenses" *required* IBG to book estimated revenue as a receivable. [JA 3226.] This violates GAAP. [JA 737, 753-54.] It further stated only that IBG was "evaluating" its receivables policy and "may write-off some portion" of them "[d]ue to a change in its business model." [JA 3226.] It therefore re-affirmed IBG's existing policy instead of identifying it as fraudulent.

The court sought to bolster its findings of investor openness by noting that Morgan Keegan Strategic Fund still wished to invest after receiving the Transaction

Services Report. [JA 326-27.] However, the court ignored the onerous terms Morgan Keegan Strategic Fund imposed and IBG's concerns about meeting them. [JA 960, 5192-93.] Meyers thereafter never mentioned the planned write-down or the Transaction Services Report to another potential investor.

### E. The evidence proving IBG's losses is reliable.

The Bankruptcy Court found Trustee failed to prove damages because DuRant "rel[ied] exclusively" on financial statements he allegedly deemed "'deficient, false and misleading' due to the fraudulent actions and malpractice perpetuated by Debtor's management and Grafton," and he "base[d] his analysis on the very same fraudulent statements" Grafton failed to audit and for which Hargrett was responsible. [JA 341.] This was clearly erroneous.

There are three sets of relevant financials—the fraudulent original "audited" financials, the fraudulent First Restatement in 2006, and the Second Restatement in 2010 removing improper receivables and revenues. For the years 2006-2009, DuRant relied *only* on the Second Restatement.[32] [JA 776-77.] He never characterized these statements as "deficient, false, and misleading." Quite the contrary, DuRant explained why the Second Restatement—in contrast to the others—is reliable and *not* false or misleading. [JA 776-77, 787, 788-92; *see also* JA

---

[32] DuRant relied on financial statements for 2010 that were prepared after the management ouster and after the write-off of IBG's fraudulent receivables without challenge to their reliability. [JA 781.]

724 (Freeman testifying that fraud in financial statements can be isolated).] And if the fraud caused irreparable harm to IBG's financials, it is a "perversion of fundamental principles of justice" to deny relief and permit MK Defendants to profit from wrongdoing when their acts make it difficult to ascertain damages precisely. *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563 (1931).

The court therefore erred in not concluding the Second Restatement provided reliable evidence of IBG's damages.

### III.    MK Defendants Had a Fiduciary Relationship with IBG and Owed IBG the Duties of Honesty, Due Diligence, and Disclosure.

The Bankruptcy Court found no fiduciary relationship existed between MK Defendants and IBG. [JA 342-44.] The court cited no law regarding the creation of a fiduciary duty, and it took a myopic view of the evidence which ignored the governing legal standard.

Whether a fiduciary duty exists is a question of law. *Moore v. Moore*, 599 S.E.2d 467, 473 (S.C. Ct. App. 2004). It is based on the nature of the parties' relationship, and courts have "refused to set any bounds to the circumstances out of which a fiduciary relationship may spring." *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150, 152 (S.C. Ct. App. 1987), *overruled on other grounds, Paradis v. Charleston Cty. Sch. Dist.*, 861 S.E.2d 774, 780 (S.C. 2021). It exists when "one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the

one imposing the confidence." *Moore*, 599 S.E.2d at 472. The party reposing trust need only have "some foundation for believing that the one so entrusted will act not in his own behalf but in the interest of the party so reposing." *Id*. Financial advisors and similar professionals can engender this trust and are charged with fiduciary responsibilities for it. *See Maybank v. BB&T Corp.*, No. 6:12-cv-00214-JMC, 2012 WL 3157006, at \*3 (D.S.C. Aug. 3, 2012); *Burwell v. S.C. Nat'l Bank*, 340 S.E.2d 786, 790 (S.C. 1986); *see also Prodigious Ventures, Inc. v. YBE Hosp. Grp., LLC*, No. 5:14-CV-433-F, 2017 WL 9478487, at \*5 (E.D.N.C. Feb. 23, 2017); *McGraw v. Wachovia Sec., LLC*, 756 F. Supp. 2d 1053, 1078 (N.D. Iowa 2010); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 102 (S.D.N.Y. 2004); *S.E.C. v. Rauscher Pierce Refsnes, Inc.*, 17 F. Supp. 2d 985, 992 (D. Ariz. 1998); *In re Gillett Holdings, Inc.*, 137 B.R. 452, 458 (Bankr. D. Colo. 1991).

The record is replete with evidence that MK Defendants sought, induced, expected, and accepted IBG's trust and confidence.[33] [JA 455-56, 458-60, 465, 487, 531-32, 535-36, 544, 600-01, 647, 662-67, 818-32, 835, 910-11, 974-75, 983.] This is consistent with Morgan Keegan's role as IBG's general financial advisor. [JA 1834-

---

[33] Wade Cordell and Blevins expressed frustration with Meyers' lack of results in November 2006. [JA 5190-5191.] There is no evidence anyone else at IBG shared this sentiment. It also does not negate the trust and confidence MK Defendants engendered from the start which carried through the CIM, First Restatement, and drafting the PPM. Meyers had regained Wade Cordell and Blevin's support before IBG again retained MK Defendants as its general financial advisor in April 2008.

37, 3131.] It also is consistent with MK Defendants' service as IBG's placement agent under the 2006 Engagement. It is axiomatic that an agent is a fiduciary of his principal. *Peoples Fed. Sav. & Loan Ass'n v. Myrtle Beach Golf & Yacht Club*, 425 S.E.2d 764, 773 (S.C. Ct. App. 1992). The various "factors" cited in support of the court's finding that a fiduciary relationship did not exist are inapposite given the applicable legal standard. [*See* JA 343-44.] As a matter of law, MK Defendants had a fiduciary relationship with IBG.

South Carolina requires "utter good faith or honesty, loyalty or obedience, as well as candor, due care, and fair dealing" from a fiduciary. *Anthony v. Padmar, Inc.*, 465 S.E.2d 745, 752 (S.C. Ct. App. 1995). A fiduciary must disclose "all known information that is significant and material." *Id.* Disclosing fraud to those involved in it does not discharge this duty. [JA 803-04.] Both sides' experts also cited Section 11 of the 1933 Securities Act, which facially pertains to underwriters, as the basis for MK Defendants' due diligence obligations as a financial advisor and placement agent. [JA 639-97. *But see* JA 996-1000 (MK Defendants' expert denying this despite stating it in his report).] An underwriter cannot "tak[e] at face value representations made to them by the company's management" and instead "must make some reasonable attempt to verify the data submitted to them." *Escott v. BarChris Const. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968); *see also* 15 U.S.C. § 77k(c).

60

Independent of their fiduciary status, MK Defendants had a duty to disclose because Meyers held himself out as a CPA. The Bankruptcy Court dismissed this "novel argument" and was "not convinced that Meyers and Morgan Keegan had such a duty or that Debtor relied on Meyers and Morgan Keegan in such a capacity." [JA 344.] This was error. The American Institute of Certified Public Accountants' Code of Professional Conduct applies to those who hold themselves out as CPAs in South Carolina.[34] [JA 741-43.] Meyers did just that. [JA 644-45, 740-41, 1048.] He therefore was required to bring evidence of a fraud or illegal act to the attention of innocent management or, if none, resign the engagement. [JA 741-46.] More generally, he was required to inform IBG of "significant engagement findings or events." [JA 746-47.]

As explained at pages 42-58, *supra*, the court's finding that MK Defendants did not breach these duties was clearly erroneous.

## IV. The Bankruptcy Court Erred by Finding *In Pari Delicto* Bars Trustee's Claims Against MK Defendants.

*In pari delicto* precludes recovery by a plaintiff who participated in the alleged wrongdoing with the defendant. *Infinity Bus. Grp.*, 497 B.R. at 804-05. The Bankruptcy Court determined that Management Defendants' knowledge is imputed

---

[34] The practice of accounting includes "using or assuming the title 'Certified Public Accountant' or the abbreviation 'CPA' or any other title, designation, words, letters, abbreviation, sign, card, or device tending to indicate that the person is a certified public accountant." S.C. Code Ann. § 40-2-20(15)(b).

to IBG such that the company itself participated in the wrongdoing, and therefore excused wrongdoing by MK Defendants. This conclusion was error.

### A. Breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims are exempt from *in pari delicto*.

South Carolina courts have not determined whether breach of fiduciary duty claims are exempt from *in pari delicto*.[35] The South Carolina Supreme Court likely would recognize this exception. *See Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016) (holding a Federal court "must anticipate" how a state's highest court would rule on an unsettled issue).

A corporation has a statutory right to sue its corporate officers and directors, each of whom owe fiduciary duties to the company. S.C. Code Ann. §§ 33-8-300, -420. *In pari delicto* does not bar those claims, as the defense would eliminate the officers' and directors' liability for their malfeasance. There is no sound reason to shield any other corporate fiduciary, particularly one who is closely intertwined with the officers and directors whose conduct he seeks to impute. *See, e.g., Seitz v. Fretz (In re Covenant Partners, L.P.)*, Adv. No. 16-226, 2017 WL 838637, at *7

---

[35] In *Myatt v. RHBT Financial Corp.*, 635 S.E.2d 545 (S.C. Ct. App. 2006), the South Carolina Court of Appeals applied *in pari delicto* to a breach of fiduciary duty claim. However, the issue on appeal was whether *in pari delicto* applied against a receiver of a corporation. *Id.* at 547-48. The court did not analyze, and was not asked to analyze, whether the defense applied to breach of fiduciary claims. *See United States v. Norman*, 935 F.3d 232, 241 (4th Cir. 2019) ("[U]nder our adversarial system of justice, an unchallenged and untested assumption is simply not a holding that binds future courts.").

(Bankr. E.D. Pa. Mar. 2, 2017); *Off. Comm. of Unsecured Creditors ex rel. Felt Mfg. Co. v. Foss (In re Felt Mfg. Co.)*, 371 B.R. 589, 610 (Bankr. D.N.H. 2007); *Stewart v. Wilmington Tr. SP Servs., Inc.,* 112 A.3d 271, 319 (Del. Ch. 2015); *see also Liquidating Tr. of the Amcast Unsecured Creditors Liquidating Tr. v. Baker (In re Amcast Indus. Corp.*), 365 B.R. 91, 124 (Bankr. S.D. Ohio 2007). Trustee's breach of fiduciary duty claim therefore is not subject to *in pari delicto* as a matter of law.

Nevada similarly has not determined whether *in pari delicto* applies to aiding and abetting claims.[36] It too likely would recognize an exception. Nevada relies heavily on Delaware law for aiding and abetting claims and *in pari delicto*. *See Amerco*, 252 P.3d at 694-97; *id.* at 702. In *Stewart*, the Delaware Court of Chancery held *in pari delicto* does not bar aiding and abetting breach of fiduciary duty claims against "non-fiduciaries like auditors, who occupy a position of trust and materially participate in the traditional insiders' discharge of their fiduciary duties." 112 A.3d

---

[36] At least one Nevada court assumed *in pari delicto* may bar an aiding and abetting claim. *Amerco*, 252 P.3d at 694-97; *see also USACM Liquidating Tr. v. Deloitte & Touche LLP,* 764 F. Supp. 2d 1210, 1229-30 (D. Nev. 2011) (applying *in pari delicto* to aiding and abetting claim under Nevada law*).* Like *Myatt*, however, the court was not asked to determine if aiding and abetting claims are subject to this defense. It therefore is not controlling. *See Norman*, 935 F.3d at 241. Moreover, these decisions pre-date *Stewart*, the persuasive Delaware decision rejecting *in pari delicto* for aiding and abetting claims.

at 319-20. The Bankruptcy Court therefore also erred as a matter law by applying *in pari delicto* to Trustee's aiding and abetting claim.

> **B.** **_In pari delicto_ is inapplicable because MK Defendants colluded with Management Defendants.**

The Bankruptcy Court found MK Defendants did not collude with Management Defendants to implement and conceal the fraudulent accounting policy. [JA 325-27.] The court did not apply the correct legal standard for collusion and thereby made clearly erroneous factual findings.

There is no dispute that those who collude with corporate insiders cannot benefit from *in pari delicto*. *Mut. Life Ins. Co. of N.Y. v. Hilton-Green*, 241 U.S. 613, 622-23 (1916); *Crystal Ice Co. of Columbia, Inc. v. First Colonial Corp.*, 257 S.E.2d 496, 498 (S.C. 1979); *Little v. S. Cotton Oil Co.*, 153 S.E. 462, 463 (S.C. 1930). The question is what constitutes collusion.

The bulk of the Bankruptcy Court's analysis concerned the Supreme Court of Pennsylvania's decision *in Official Committee of Unsecured Creditors of Allegheny Health Education & Research Foundation. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313 (Pa. 2010), and other courts' responses to it. [JA 316-18.] But the Bankruptcy Court did not dispute *Allegheny*'s discussion of the collusion exception in the context of insiders colluding with outside professionals to generate false reports:

> To the extent this occurred with the auditor's knowledge and acquiescence,…applying imputation as against [the debtor] would result in the corporation being charged with knowledge as against a third party whose agents actively and intentionally prevented those in [the debtor's] governing structure who were non-participants in the fraud from acquiring such knowledge. *Such an application of the imputation doctrine seems ill-advised, if not perverse.*

*Allegheny*, 989 A.2d at 336 (emphasis added). Common principles of agency law "demonstrate[] that, fundamentally, imputation is not justified in scenarios involving secretive, collusive activity on the part of an auditor to misstate (and/or sanction management's misstatement of) corporate financial information." *Id.* at 337. *Allegheny*'s approach is consistent with *Crystal Ice* and relies on the same common law underpinnings.

The Bankruptcy Court's observation that MK Defendants were not IBG's accountants or auditors is a distinction without a difference as the same logic applies to investment bankers, placement agents, financial advisors, and others. [JA 317.] The court also claimed the Delaware Court of Chancery in *Stewart* and the Court of Appeals of New York in *Kirschner v. KPMG LLP*, 938 N.E.2d 941 (N.Y. 2010), "have questioned the policy considerations of *Allegheny*." [JA 316.] First, South Carolina courts have not "questioned" *Allegheny*. As explained above, it is consistent with South Carolina law. Second, *Stewart* and *Kirschner* do not support the court's finding in the context of this case.

In *Stewart*, the plaintiffs sought a blanket "auditor exception" to *in pari delicto*, which the court felt could result in an imbalance where claims against auditors would proceed while claims against others would not. 112 A.3d at 317. That is not relevant here as Trustee does not seek an exception based on a specific role. *Stewart* also held this new "auditor" exception was unnecessary in part because the fiduciary duty exception (which the Bankruptcy Court did not apply) gives the corporation "at least some remedy for wrongs done and a source for recoupment of its losses." *Id. Stewart* similarly recognized the aiding and abetting breach of fiduciary duty exception, which the Bankruptcy Court also did not apply here. *Id.* at 319.

The question in *Kirschner* was whether New York should recognize *any* exception beyond the separate adverse interest exception. 938 N.E.2d at 958. That question is academic, for as noted, South Carolina already recognizes the collusion exception. *Kirschner*'s primary concern was that a double standard would result: the "innocent" shareholders of the of the outside professional would bear the risk of the loss, while the creditors of the corporation with malfeasant management would not. *Id.* But it is this holding which creates the double standard because it "effectively immunize[s] auditors and other outside professionals from liability wherever any corporate insider engages in fraud."[37] *Id.* at 962 (Ciparick, J., dissenting).

---

[37] The Bankruptcy Court observed that MK Defendants are subject to regulatory oversight and investors theoretically can bring lawsuits under the federal and state securities laws. [JA 317.] Regulators did not bring actions against MK

Per the Bankruptcy Court, IBG's innocent creditors bear the risk of misconduct concealed from them, while MK Defendants' stakeholders have no risk no matter how bad their agents act. The better rule, and the one adopted by South Carolina, is that Management Defendants and MK Defendants are both liable for their misconduct. Giving MK Defendants a pass because they found willing partners in a few corporate managers undermines the equitable foundations of *in pari delicto*. *See Baker O'Neal Holdings, Inc. v. Ernest & Young LLP*, No. 1:03-CV-0132-DFH, 2004 WL 771230, at *10 (S.D. Ind. March 24, 2004) ("The risk of a liberal application of *in pari delicto* is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation.").

The court's generic factual finding that MK Defendants nevertheless "did not participate in secretive, collusive conduct with Management Defendants in connection with the Accounting Practice to defraud or otherwise act against" IBG is clearly erroneous. [JA 318.] As described in detail at pages 6-29, *supra*, Meyers knew the real policy and that it was not GAAP-complaint, but he actively worked with Management Defendants to draft financial statements, notes, and offering

---

Defendants. Furthermore, investors relying on the fraudulent financials without knowledge of MK Defendants' role and without hearing from Meyers may not have a securities law claim against them. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-46 (2011). Suits by a trustee on behalf creditors may be the only relief available for such secretive misconduct.

memoranda which failed to disclose this to IBG's innocent directors and management; to the extent he discussed changing the policy or other concerns, he did so only with Management Defendants; he literally stood next to them and falsely proclaimed IBG's prospects, even after receiving the Transaction Services Report; and he and Hargrett drafted responses that consciously concealed the accounting errors and fraud it highlighted.

The only finding supported by the record is that Meyers colluded with Management Defendants. The Bankruptcy Court therefore erred in finding the collusion exception inapplicable.

### C.  *In pari delicto* **is inapplicable because Management Defendants' actions were clearly adverse to IBG.**

The adverse interest exception precludes imputation of an agent's actions which are adverse to the principal. *Infinity Bus. Grp.*, 497 B.R. at 809. The extent of adversity required to prevent imputation varies by jurisdiction. *Id*. at 809 & n.8. The Bankruptcy Court used the "total abandonment" standard, which means the agent's actions must be "completely and totally adverse" to the principal with absolutely no benefit whatsoever. [JA 298-99.] This was an error of law.

The court erroneously found that South Carolina courts "have not defined the level of adversity required." [JA 299.] South Carolina requires the agent's actions merely be "clearly adverse" to the principal's interest to invoke this exception—not totally and completely adverse. *Myatt*, 635 S.E.2d at 547. General South Carolina

imputation law supports this standard. The imputation defense protects innocent third parties dealing with the agent in good faith, not those who use the agent to further their own frauds upon the principal or to shield unfair dealing. *See Spence v. Spence*, 628 S.E.2d 869, 879-80 (S.C. 2006); *S.C. Ins. Co. v. James C. Greene & Co.*, 348 S.E.2d 617, 625-26 (S.C. Ct. App. 1986); *see also Mut. Life Ins. Co. of N.Y.*, 241 U.S. at 622-23. Malevolent third parties almost always can find *some* benefit to the principal, no matter how small or fleeting, and thereby avoid liability for their own wrongful conduct under the "total abandonment" standard. This upends South Carolina's established policy undergirding *in pari delicto*. *See Ex parte Nimmer*, 47 S.E.2d 716, 719 (S.C. 1948) (holding *in pari delicto* is "without controlling force" where public policy is advanced by allowing suit against the transaction).

The Bankruptcy Court incorrectly found *Citizens' Bank v. Heyward*, 133 S.E. 709 (S.C. 1925), supports the total abandonment standard. [JA 299.] In *Citizens' Bank*, a bank president wrote a note where the bank received 8% interest and the president personally received a 2% "commission." *Id.* at 711. When the bank foreclosed, the debtor counterclaimed for usury based upon the cumulative 10% rate. The bank argued that the president's actions were not imputable to the bank. The court found that "there was a well-planned scheme by the bank itself to charge usury." *Id.* at 712. The evidence showed any other bank would have done the same thing. *Id.* at 710. Usury therefore was the *goal* of the bank, and the president's actions

carrying it out were not clearly adverse to his employer. The facts here are monumentally different, as IBG did not have a goal of defrauding investors and would be (and in fact was) ruined if that were the case.

There can be no dispute that Management Defendants' actions were clearly adverse to IBG. They, like MK Defendants, were looking to reap a windfall via a sale of their shares at an exorbitant price via the "exit strategy" irrespective of any lasting harm to IBG. [*See, e.g.*, JA 1033-35, 3498, 3835-41.] For these reasons, *in pari delicto* does not apply to Trustee's Rule 10b-5, common law fraud, and breach of fiduciary duty claims, where imputation is governed by South Carolina law.[38] *Infinity Bus. Grp.*, 497 B.R. at 804.

## D.  *In pari delicto* is inapplicable because Trustee stands in the shoes of IBG's creditors.

The Bankruptcy Court further erred in applying *in pari delicto* because the defense is inapplicable to a Bankruptcy Trustee standing in the shoes of the debtor's creditors. Citing *Grayson Consulting, Inc. v. Wachovia Securities, LLC (In re Derivium Capital, LLC)*, 716 F.3d 355, 367 (4th Cir. 2013), the Bankruptcy Court believed 11 U.S.C. § 541 compelled application of *in pari delicto*. [JA 331.] This issue is only relevant if *in pari delicto* otherwise bars Trustee's claims. If this Court reaches it, the Bankruptcy Court incorrectly applied § 541.

---

[38] Nevada law, which governs the aiding and abetting claim, uses the higher "total abandonment" standard. *In re Amerco*, 252 P.3d at 695.

Section 541 defines the bankruptcy estate's property and includes Trustee's claims under § 541(a)(1). This Court in *Derivium Capital* held that a bankruptcy trustee stands in the debtor's shoes under § 541(a)(1) and therefore is subject to the same defenses as the debtor, including *in pari delicto*. *Derivium Capital*, 716 F.3d at 367. But this Court did not address a trustee's relationship with creditors, whose interests he also is charged with protecting.

"The main thrust of [§ 541(a)(1)'s predecessor] is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term 'property' has been constructed most generously…." *Segal v. Rochelle*, 382 U.S. 375, 379 (1966). By operation of law, claims that are "property" of the estate are not limited to those belonging to the debtor and automatically include claims on behalf of creditors to collect money owed to the estate. *See* 11 U.S.C. § 544(a); 11 U.S.C. § 544(b); 11 U.S.C. § 548. These claims are not subject to *in pari delicto*. *McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*, 334 F.3d 239, 246-47 (3d Cir. 2003) (discussing § 548); *Podell & Podell v. Feldman (In re Leasing Consultants Inc.)*, 592 F.2d 103, 110-11 (2d Cir. 1979) (discussing predecessor to §544(b)); *Sender v. Porter (In re Porter McLeod, Inc.)*, 231 B.R. 786, 794 (D. Colo. 1999) (discussing § 544(a)).

The plain language of § 541 therefore does not determine whether *in pari delicto* applies here. Broadly applying it as the Bankruptcy Court did produces

absurd results. First, it infringes on the rights granted by §§ 544 and 548. Second, it conflicts with the very nature of *in pari delicto*. The defense "precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing," but applying the defense to a trustee's claim on behalf of a creditor precludes not participants but victims of fraud and collusion from recovery.[39] *Derivium Capital*, 716 F.3d at 367. Many courts, including this Court, have recognized not applying *in pari delicto* to a trustee makes sense. *Id.*; *Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 357 (3d Cir. 2001); *Sender v. Buchanan (In re Hedged-Invest. Assocs., Inc.*, 84 F.3d 1281, 1285 (10th Cir. 1996); *see also Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966, (5th Cir. 2012), *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995); *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir.1995).

Trustee brought his claims under § 541 and § 544, and these claims are estate property under § 541(a). [JA 19.] But § 541(a) is broader than just claims on the debtor's behalf, where *in pari delicto* applies pursuant to *Derivium Capital*, and includes claims on behalf of the creditors, where *in pari delicto* does not apply. The Bankruptcy Court therefore erred in applying *in pari delicto*.

---

[39] Trustee argued to the District Court that *Derivium Capital* was wrongly decided because it produced this absurd result. As explained here, the same substantive result can be reached without overruling *Derivium Capital.*

## V.    The Bankruptcy Court Misapplied the Law on Causation.

The Bankruptcy Court divided its causation discussion into three parts: proximate cause, foreseeability, and intervening factors.[40] [JA 333-40.] These are not separate concepts. Foreseeability is the "touchstone" of proximate cause. *Koester v. Carolina Rental Ctr., Inc.*, 443 S.E.2d 392, 394 (S.C. 1994); *see also Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d 793, 797 (Nev. 2004). "Foreseeability is determined by looking to the natural and probable consequences of the act complained of." *Koester*, 443 S.E.2d at 394. Only *some* injury must be foreseeable; the defendant need not foresee the specific injury which resulted. *J.T. Baggerly v. CSX Transp., Inc.*, 635 S.E.2d 97, 101 (S.C. 2006). Intervening acts cut off liability only if they are not foreseeable. *Bower v. Harrah's Laughlin, Inc.*, 215 P.3d 709, 725 (Nev. 2009); *Small v. Pioneer Mach., Inc.*, 494 S.E.2d 835, 844 (S.C. Ct. App. 1997).

These concepts factor into contributing cause. Defendants need not be the sole proximate cause of an injury; it is sufficient if they are contributing or substantial proximate causes. *Miller v. Asensio & Co.*, 364 F.3d 223, 232 & n.6 (4th Cir. 2004); *Banks ex rel. Banks v. Sunrise Hosp.*, 102 P.3d 52, 65-66 (Nev. 2004); *J.T. Baggerly*, 625 S.E.2d at 101. The court's discussion almost exclusively focused on

---

[40] The court's factual findings regarding causation resulted from its clearly erroneous findings that MK Defendants did nothing wrong. It made no "alternative" findings assessing causation assuming Trustee had otherwise proven his case. The conclusion that MK Defendants did not cause IBG's losses was a given because the court found they did nothing wrong, which was clearly erroneous.

Management Defendants' own culpability for IBG's losses. [JA 334-40.] That does not decide whether MK Defendants are *also* responsible. This is a classic case of contributing cause, yet the court relegated its entire discussion to one sentence not even defining the standard. [JA 339.]

Defendants are liable if their actions would be sufficient, standing alone, to cause the harm. *Wyeth v. Rowatt*, 244 P.3d 765, 788 (Nev. 2010); *Player v. Thompson*, 193 S.E.2d 531, 606-07 (S.C. 1972); *see also* Restatement (Third) Torts-Physical & Emotional Harm § 27; Restatement (Second) of Torts § 432(2). "A defendant whose tortious act was fully capable of causing the plaintiff's harm should not escape liability because of the fortuity of another sufficient cause." Restatement (Third) Torts-Physical & Emotional Harm § 27 cmt. c. Defendants may be liable even if their actions were not independently sufficient to cause the harm but became sufficient when combined with another's. *Id.* cmt. f. Joint and several liability, which applies to each of Trustee's claims, is a variation on this theme. *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 221 (Del. Ch. 2014); 15 U.S.C. § 78u-4(f)(2)(A); S.C. Code Ann. §§ 15-38-15(F), -20(G)

The Bankruptcy Court therefore erred as matter of law in focusing on whether MK Defendants "independently and proximately" caused IBG's harm in light of Management Defendants' actions, and on whether the harm would have occurred "with or without" MK Defendants. [JA 334, 338.] The correct question

was whether MK Defendants' actions would have been sufficient without Management Defendants, or whether they became sufficient when combined with Management Defendants' actions. Under the facts detailed above at pages 6 - 29, MK Defendants were at least a contributing cause of IBG's losses and therefore are jointly and severally liable for all losses regardless of the portion of fault attributable to them.

The effect of this error became particularly acute in the aiding and abetting claim. Damages recoverable are those resulting from the fiduciary's breach—not damages specifically caused by the defendant's knowing participation. *Amerco*, 252 P.3d at 702. The Bankruptcy Court found Management Defendants breached their fiduciary duties to IBG. If MK Defendants knowingly participated in these breaches, which as shown above they did, then MK Defendants are liable just the same as Management Defendants.

This pinched focus on Management Defendants' actions as opposed to MK Defendants' concurrent conduct carried through to the court's related discussion of intervening causes. The court determined there was an insufficient nexus between the accounting fraud and MK Defendants' conduct on one hand, and IBG's net operating losses on the other, because there are other causes for these losses "which are wholly unconnected with the actions of Meyers and Morgan Keegan." [JA 339-40.] However, the court failed to properly consider whether the identified

75

"intervening causes" were the foreseeable result of MK Defendants' wrongful conduct. *Bower*, 215 P.3d at 725; *Small*, 494 S.E.2d at 844. The record confirms they were:

> (1) IBG's direct capital raises and cost of the rescission offer – the cost of the rescission is unclear,[41] but the direct raises and funds used to pay for the recission came under the false and fraudulent PPM MK Defendants developed [JA 2630];

> (2) spending customer money held in "trust" – only Wachovia insisted these funds go into a "trust" account immediately, while other customers allowed as long as thirty days to be paid back (which they always were) [JA 509-10, 512-13];

> (3) removal of Management Defendants and ensuing litigation expenses – the initial ouster, which resulted in a lawsuit and subsequent settlement, was the result of the Cordells and Blevins' abuse of IBG enabled by the accounting fraud;

> (4) payments of commissions for sales of IBG securities and notes – these commissions (if paid) were the result of selling securities using fraudulent financials propagated by MK Defendants;

> (5) interest on "illegal promissory notes" – these notes were only "illegal" because they were sold using the fraudulent financials, and Meyers knew IBG was selling the notes, thought they were a good idea, and even spoke with an investor about them [JA 576-78, 593-95, 678-82];

> (6) continued use of the accounting practice "with actual and constructive knowledge that the Accounting Practice had been called into question" – Meyers did not inform the board or shareholders that the practice was fraudulent and violated GAAP;

---

[41] Hargrett estimated at one point it was only about $20,000. [JA 4919-20.] Earlier, he recalled it was $353,100—still just 1.5% of IBG's net operating losses. [JA 4174.]

(7) IBG's direct capital raises after the Transaction Services Report – there is no evidence anyone outside of Management Defendants learned of the Transaction Services Report, and Meyers actively worked to hide its most damning revelations while presenting rosy pictures of IBG's finances to potential individual investors; and

(8) Sturgill's misrepresentations of his background – it is unclear how this caused an operating loss, but if it did Meyers knew Sturgill lied about his background and never blew the whistle internally, informed the shareholders he spoke with, withdrew from the engagement, or took any action consistent with his fiduciary and other obligations.

Viewed in light of the whole record, each intervening factor identified by the court was a foreseeable result of MK Defendants' conduct. As a matter of law, none cuts off the chain of causation.

MK Defendants' actions and inactions therefore were, the very least, a contributing cause of IBG's net operating losses, for which MK Defendants are jointly and severally liable.

## CONCLUSION

For the foregoing reasons, Trustee respectfully requests that this Court reverse the Bankruptcy Court's order and, by extension, reverse and vacate the District Court's order affirming it. The only findings supported by substantial evidence and not contrary to the clear weight of evidence in the record prove every element of Trustee's claims. *See supra* notes 15-17. This Court therefore may render judgement in the interests of judicial economy. *See C&B Sales & Serv., Inc. v. McDonald*, 177 F.3d 384,

389 (5th Cir. 1999); *Matter of Marchiando*, 13 F.3d 1111, 1114 (7th Cir. 1994); *Avery v. Homewood City Bd. of Educ.*, 674 F.2d 337, 341 n.5 (5th Cir. Unit B 1982).

Trustee respectfully requests that this Court remand only for the entry of judgment in Trustee's favor for $24,370,225 plus prejudgment interest. *See also* Nev. Rev. Stat. § 17.130(2) (providing for the rate of prejudgment interest under Nevada law); S.C. Code Ann. § 34-31-20(A) (prejudgment interest is awarded at 8.75% under South Carolina law); *Jones v. UNUM Life Ins. Co. of Am.*, 223 F.3d 130, 139 (2d Cir. 2000) (holding that the appropriate prejudgment interest rate under Federal law is within the Court's discretion).

## STATEMENT ON ORAL ARGUMENT

Pursuant to Local Rule 34(a), Trustee respectfully requests this appeal be scheduled for oral argument. This appeal presents a number of interrelated issues, a lengthy record, novel questions of law, substantial actual damages exceeding $24,000,000 before interest, and the rights of IBG's innocent creditors who currently bear the loss caused by MK Defendants' actions. With the benefit of oral argument, the parties and their counsel will greatly assist the Court in further distilling the relevant facts and law. Oral argument therefore will substantially aid the decisional process.

Respectfully submitted,

[Signature page follows]

78

**WILLOUGHBY & HOEFER, P.A.**

<u>s/Mitchell Willoughby</u>
Mitchell Willoughby
Elizabeth Zeck
930 Richland Street
Columbia, South Carolina 29201
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com

R. Walker Humphrey, II
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
(843) 619-4426
whumphrey@willoughbyhoefer.com

**MALLOY LAW FIRM**
Gerald Malloy
108 Cargill Way
Hartsville, South Carolina 29550
(843) 339-3000

*Counsel for Robert F. Anderson, as Chapter 7 Trustee for Infinity Business Group, Inc.*

November 22, 2021
Columbia, South Carolina

## CERTIFICATE OF COMPLIANCE

1.  This Brief complies with the Order of this Court entered June 15, 2021, extending the type-volume limits of this Brief to 20,000 words excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains <u>18,624</u> words.

2.  This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

    **WILLOUGHBY & HOEFER, P.A.**

    <u>s/Mitchell Willoughby</u>
    Mitchell Willoughby

80